Volume 1

Pages 1 - 227

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ALSUP

LISA GARVEY, individually and on behalf of all others similarly situated,

Plaintiff,

VS.

KMART CORPORATION, and DOES 1 through 50 inclusive,

Defendants.

No. C 11-2575 WHA

San Francisco, California
Tuesday
November 13, 2012

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

**For Plaintiff**:

Righetti Glugoski, P.C.
456 Montgomery Street, Suite 1400
San Francisco, California 94101
**By: Matthew Righetti, Esquire**
**Michael Righetti, Esquire**

McInerney & Jones
18124 Wedge Parkway, #503
Reno, Nevada 89511
**By: Kevin J. McInerney, Esquire**

**Reported By: Katherine Powell Sullivan, RPR, CRR, CSR #5812**
**Debra L. Pas, RMR, CRR, CSR #11916**
**Official Reporters - U.S. District Court**

**APPEARANCES (CONTINUED)**:

**For Plaintiff:**          Dostart Clapp & Coveney LLP
                            4370 La Jolla Village Drive, Suite 970
                            San Diego, California 92122
                  **By:  Zachariah Paul Dostart, Esquire**

**For Defendants:**         Paul Hastings LLP
                            55 Second Street, 24th Floor
                            San Francisco, California  94105
                  **By:  Jeffrey D. Wohl, Esquire**

                            Winston & Strawn
                            333 South Grand Ave, 38th Floor
                            Los Angeles, California  90071
                  **By:  Amanda C. Sommerfeld, Esquire**
                       **Emily C. Schuman, Esquire**

                            Winston and Strawn LLP
                            101 California Street, Suite 3900
                            San Francisco, California 94111
                  **By:  Robb Christopher Adkins, Esquire**
                       **Joan B. Tucker Fife, Esquire**

**P R O C E E D I N G S**

**NOVEMBER 13, 2012** **7:33 a.m.**

**THE CLERK:** Calling No. 11-2575, Garvey versus Kmart Corporation. It's on for bench trial.

Counsel, can you please state your appearances for the record?

**MR. McINERNEY:** Kevin McInerney for the plaintiff, your Honor.

**MR. MATTHEW RIGHETTI:** And Matthew Righetti for plaintiff.

**MR. DOSTART:** Zach Dostart for plaintiff.

**THE COURT:** Spell that last name for me?

**MR. DOSTART:** D-O-S-T-A-R-T.

**THE COURT:** Okay.

**MR. MICHAEL RIGHETTI:** And Michael Righetti for plaintiff.

**MR. ADKINS:** Rob Adkins on behalf of defendant Kmart, your Honor.

**THE COURT:** Adkins?

**MR. ADKINS:** Yes, your Honor.

**THE COURT:** Okay.

**MS. SOMMERFELD:** Amanda Sommerfeld on behalf of Kmart Corporation.

**THE COURT:** All right.

**MS. SCHUMAN:** Emily Schuman on behalf of Kmart

Corporation.

**MS. FIFE:** Joan Fife on behalf of Kmart Corporation.

**THE COURT:** F-i-f-e?

**MS. FIFE:** Yes, sir.

**MR. WOHL:** And Jeffrey Wohl for defendant Kmart Corporation. Good morning, your Honor.

**THE COURT:** Good morning.

So welcome to everyone. We're here for a trial.

Again, many motions have been filed. We will get started on a few of them, but we need to get the opening statements underway. So whose motions were these?

**MR. MICHAEL RIGHETTI:** The plaintiff made a motion, your Honor.

**THE COURT:** All right. Pick out your most important one and let's hear that one first.

**MR. MICHAEL RIGHETTI:** Good morning, your Honor.

The most important aspect of plaintiff's motion relates to the late disclosure of certain incredibly relevant evidence that we received.

**THE COURT:** Just pick one of those groups. Don't pick them all. We will get to them all in due course, but I want to start with the one -- look, we've got a trial to run. You lawyers think that every morning we're going to come in here and deal with discovery objections ad infinitum. We'll deal with most of that, but this is -- we're now at trial.

So let's be brief and get to the point. What is the -- what is your main issue on one group of documents, and in due course we will get to the others.

These are not even in your case. This is for the defense case, right?

**MR. MICHAEL RIGHETTI:** Your Honor, they may be in our case as well. The most important one is the Checkout Exception Reports. Let's start with that.

**THE COURT:** All right. Go ahead.

**MR. MICHAEL RIGHETTI:** And we received a disk on Friday evening at the close of business that contains Checkout Exception Reports, which the Court may recall were the subject of many discovery issues throughout this case.

The defendant has said that those Checkout Exception Reports were destroyed, written over every seven days.

On the Friday before trial we get all of the Checkout Exception Reports that date back to October 2010 for the entire class, entire class period. We were not expecting these. We do not know where they came from. They show log on and log off times.

**THE COURT:** All right. I understand that. Are these documents you want to use in your case?

**MR. MICHAEL RIGHETTI:** They would have been very relevant for us to be able to show how much time cashiers --

**THE COURT:** Answer my question. Do you want to use

them or not?

**MR. MICHAEL RIGHETTI:** Yes.

**THE COURT:** Then why are you complaining?

**MR. MICHAEL RIGHETTI:** Your Honor, we got them three days ago. We have been asking for these since before certification and the defendant has continually told us that they have been destroyed and were unavailable.

How on the eve of trial are they able to reproduce all of them for the entire class period? They have been making representations to plaintiff and the Court that these have been documents they don't have, data that is unavailable, that is not maintained.

**THE COURT:** Okay. Let me hear from the defense.

**MS. SOMMERFELD:** Thank you, your Honor.

This is not a new issue. This was briefed, discussed, argued and addressed --

**THE COURT:** Yes, it was. But how can you produce something like this so late after telling me they did not exist and could not be reconstructed?

**MS. SOMMERFELD:** We specifically in opposition to the spoliation motion submitted a declaration of Mr. Ebert, which is Document No. 136-2, in which Mr. Ebert explained that he was going to undertake the extraordinary effort and resources to create a code, process the data and recreate the Checkout Exception Reports. He said he has begun this process. That

was set forth under oath in the declaration by Mr. Ebert in opposition to the motion for discovery sanctions.

So the plaintiff knew that this was being undertaken. He completed the 130 hours of reconstruction. We produced it. Had we not produced it, there would have been an argument that we didn't do what we said we did, your Honor. We did exactly what we said.

**THE COURT:** Are these identical to the ones that were destroyed?

**MS. SOMMERFELD:** Mr. Ebert believes so, yes.

**THE COURT:** That's an opinion.

**MS. SOMMERFELD:** They look the same to me, your Honor, and he believes that they are identical.

**THE COURT:** Here is the ruling. Let me hear, does the plaintiff have anything more to say on this subject?

**MR. MICHAEL RIGHETTI:** Your Honor, we will wait for the Court's ruling.

**THE COURT:** Here is the ruling. If plaintiff wants to use these documents, plaintiff can use them. Defendant cannot use them.

They should have been produced a long time ago. If the defendant wanted to use them, they should have done this months ago.

So defendants cannot use these. Plaintiff has the option. You don't have to use them. You can use them. If you feel

they help your case, great. If you don't want to use them, you don't have to use them. If you do use them, I will give you some latitude for discovery -- I'm sorry, for disclosure violations to allow you to adjust within reason, but not extravagantly. The reason the defendants cannot use these in the absence of the plaintiff trying to use them first is, it's too late.

All right. However, I will take this into account when it comes time to deal with the sanctions issues on spoliation.

All right. End of first motion. What is your next motion?

**MR. MICHAEL RIGHETTI:** Your Honor, the second relates to the disclosure of the uniform policy that Kmart had also said had been destroyed years ago.

**THE COURT:** Show me the documents so I can be sure. I understand what you're talking about.

Is this the PowerPoint slide?

**MR. MICHAEL RIGHETTI:** Yes, your Honor.

**THE COURT:** I think I have that up here. Does it look like this (indicating)?

**MR. MICHAEL RIGHETTI:** Yes, your Honor.

**THE COURT:** Do you want to use this document or not?

**MR. MICHAEL RIGHETTI:** Yes, your Honor.

**THE COURT:** Why are you complaining?

**MR. MICHAEL RIGHETTI:** Your Honor, we're complaining

because it's certainly suspicious, I suppose, that the defendants' attorneys have had possession of this document since May of 2012. Throughout --

**THE COURT:** The defendants' attorneys or the defendants?

**MR. MICHAEL RIGHETTI:** The defendants' attorneys have had this document since May of 2012, and we received it on Thursday of last week.

**THE COURT:** How do you know that they have had it that long?

**MR. MATTHEW RIGHETTI:** Ms. Sommerfeld told us that she had it since May of 2012.

**THE COURT:** Is that true?

**MS. SOMMERFELD:** I did, your Honor. May I explain the course of events?

**THE COURT:** Sure.

**MS. SOMMERFELD:** Ms. Grabau testified back in December of '11 about the directive, as the Court is well aware. She testified that there was one line in the PowerPoint presentation that referenced it. She didn't remember exactly what it was. She explained that her computer crashed. She did not have the PowerPoint any more.

Approximately five months later she forwarded to me -- she found it and forwarded it to me. I inadvertently did not act upon the email, which I have informed Mr. Righetti immediately

when I learned last week during witness preparation that the email and PowerPoint slide existed. I sent a letter to Mr. Righetti with the slide. I explained when it was produced to me. I explained that it was my inadvertent error for not producing it.

I offered Ms. Grabau up for deposition immediately. They accepted that offer. They are taking her deposition this Thursday at 2:00 p.m.

And ultimately, your Honor, as the Court has addressed this and referred to this policy directive numerous times in numerous orders, Ms. Grabau will testify to the course of events and the consistency between her deposition testimony and the one line item in the slide.

**THE COURT:** Mr. Righetti, anything more?

**MR. MICHAEL RIGHETTI:** Your Honor, I think what's sort of interesting here is what the defendant has been arguing throughout the case, which is obviously a lot different than what this document shows; that this is merely a directive. It doesn't apply at the Tulare store. It is -- it's not a common policy for all cashiers in California.

And while they are making these arguments to the Court that we have to refute, they have a document in their possession -- not only in the defendant's position, but in the defendants' attorneys' possession -- that say something completely different.

So I don't know what to believe any more. We're getting these sort of half truths, if they are even half truths, about what documents they have and what documents they don't have, and now we're finally getting the documents 72 hours before trial begins. I don't really have anything else to say other than it's just -- it is incredibly suspicious.

**THE COURT:** Ms. Sommerfeld, anything more?

**MS. SOMMERFELD:** Your Honor, this was completely inadvertent. The testimony --

**THE COURT:** How can it be inadvertent?

**MS. SOMMERFELD:** Your Honor, I accept full responsibility. I --

**THE COURT:** You certainly should.

**MS. SOMMERFELD:** I do, your Honor.

**THE COURT:** And this is unacceptable behavior by any lawyer. A document of this importance in the case was sent to you in an email and you somehow forget to produce it? My, my, my. I wonder what was going on?

**MS. SOMMERFELD:** Your Honor, I don't remember the PowerPoint. I don't remember the email. All I know is that as soon as it surfaced last week, I attempted to correct the issue.

**THE COURT:** No, it surfaced back in May.

**MS. SOMMERFELD:** It did, your Honor.

**THE COURT:** It stayed on your computer, maybe other

places in your office, for many months. And then on the eve of trial to avoid even more severe sanctions, you finally come clean on it.

Now, I can't say that you did this on purpose. I'm going to let Mr. Righetti take your deposition to find out.

So you can take her deposition, not -- sometime over the coming weekend, you take the deposition of Ms. Sommerfeld, if you wish, in addition to this other person. And I will consider that testimony on the motion for spoliation sanctions.

But in the meantime the order is the same. You can use it if you wish on the plaintiff's side. The defendants may not use it. It's a late-produced document. However, if plaintiff puts it in evidence, both sides can use it. That's the immediate ruling.

But this is disturbing, Ms. Sommerfeld.

**MS. SOMMERFELD:** It is, your Honor. I assure the Court that it was an inadvertent error and it is one I take responsibility for.

**THE COURT:** Right.

Okay. What's your next motion?

**MR. MICHAEL RIGHETTI:** The next motion, your Honor, relates to the demonstrative exhibits produced by Dr. Fernandez and those, I think, the Court -- we have already briefed.

**THE COURT:** This one is an easy one. I see Mr. Wohl is getting up.

Mr. Wohl, you can't use these late-produced things. How can you justify that?

**MR. WOHL:** It's in response to their late prototype.

**THE COURT:** Their what?

**MR. WOHL:** Their late prototype. This thing of beauty that's in the corner of the courtroom.

**THE COURT:** I thought they weren't going to use that thing. I thought you withdrew it.

**MR. MICHAEL RIGHETTI:** We did withdraw it, your Honor, but Kmart wanted to use it.

**MR. WOHL:** For good reason, your Honor.

**THE COURT:** No, you can't do that.

Mr. Wohl, you go ahead and say what you'd like. You might persuade me. You're brand new to the case. Welcome.

**MR. WOHL:** Thank you, your Honor.

**THE COURT:** But I have been around the case. Let's see here what you have to say. Go ahead.

**MR. WOHL:** I appreciate that, your Honor.

First off, all of Mr. Fernandez's reports were submitted timely. There's no issue about that.

Number two, there's no issue --

**THE COURT:** The illustratives were not submitted timely. Please don't say that.

**MR. WOHL:** I didn't say that, your Honor.

Number two, the prototype, was submitted untimely and

after they represented they weren't going to use the prototype.

Number three, the prototype is supposed to be the embodiment of what their ergonomics expert, Dr. Johnson, said could be done in a Kmart check stand to allow seating. Dr. Fernandez did testify and in his report did point out the fallacies in Dr. Johnson's proposed modifications.

The only thing that's changed now, your Honor, is that once we got the prototype, we sent Dr. Fernandez over to assess it. He did that. He created graphic slides, which do two things: Demonstrate to the Court in a graphic easy-to-follow way his critiques of Dr. Johnson's modifications, the same issues they talked about in his report, in his deposition; and, number two, comments specifically about this prototype as the embodiment of those modifications. Those were given to plaintiff's counsel within, I think, about four days, five days after they prepared those slides.

If you look at the standard under 37(c)(1), they have to show without substantial justification for the delay or actual harm for the production.

And we cited to your Honor the *San Francisco Bay Keeper versus West Bay Sanitary District* case decided by this District in which the Court enumerated five factors to assess whether evidence should be excluded because it was untimely under 37(c). And on Pages 2 and 3 of our response we ticked off each and every one of those five points to demonstrate that there

has been no -- there was a substantial excuse for the delay. Namely, it was all key to when this prototype was presented; that there is no prejudice to the other side, because this is simply tracking Dr. Johnson's testimony.

Dr. Johnson was here in the courtroom. He's going to be their first witness. He's fully prepared to say whatever he wants to say in response to Dr. Fernandez's critiques of his modifications and this prototype.

So, your Honor, what this really comes down to is they don't want you to see these graphic slides which explain in a very clear way why Dr. Johnson's modification simply will not work.

We're trying to get at the truth of this matter, your Honor. We are trying to figure out: Can seats be used in the check stand. Why would your Honor want to deliberately exclude evidence that would show it?

**THE COURT:** The old get at the truth thing is a very good line, but the rules -- to get at the truth, we have rules and the rules are designed to fairly get at the truth.

Have you finished? I interrupted you. I want to make sure you finished your argument.

**MR. WOHL:** No, your Honor. I was going to agree with that completely.

**THE COURT:** Go ahead.

**MR. WOHL:** That is correct, but, again, this was not

that we delayed. This was that they delayed. Having delayed, they are in no position to say: Well, you can't do something because you delayed, when we simply reacted to what they did.

So, your Honor, the reason for our delay was their delay. No prejudice to their position whatsoever. Important evidence we think to help illustrate Dr. Fernandez's critiques of Dr. Johnson's modifications.

We think you would be in a far better position to decide this case if you can see those slides than to exclude them the way plaintiff wants them to be excluded.

**THE COURT:** All right. Ready for a ruling?

**MR. MICHAEL RIGHETTI:** Sure, your Honor.

**MR. WOHL:** Thank you, your Honor.

**THE COURT:** All right. Here we go. Rule 26, this is the Federal Rules of Civil Procedure, say that:

"Under the expert disclosures the report of the expert must include any exhibits that will be used to summarize or support them, referring to the opinions of the expert."

So without any question, the illustrative material that was going to be used by this expert should have been attached to his expert report.

Lest there be any doubt about that, the case management order in this case said in paragraph seven:

"Illustrative animations, diagrams, charts and models

may be used on direct examination only if they were part of the expert's report, with the exception of simple drawings and tabulations that plainly illustrate what is already in the report."

So that was in the CMO, case management order, long ago.

In addition, the guidelines that the Court has for trials says the same thing:

"Illustrative animations, diagrams, charts and models may be used on direct examination only if they were part of the expert report."

Now, the reason I put all that in there is because of the recurring problem of just what we have here, of last minute attempts to lard the record and beef up expert reports that are insufficient. Maybe not insufficient, but the lawyers think they are insufficient and they want to lard -- lard it up with more charts and diagrams.

Now, that's not the end of the story. If, in fact, it were true that the plaintiff's expert was going to go beyond the four corners of his report -- in other words, if the plaintiff's expert goes beyond the four corners of his report on direct examination -- not on cross, but on direct examination -- and that is somehow permitted, then the Court would consider allowing the defendant expert to do the same because what's good for one is good for the other.

That does occur in trials. In fact, I would say it occurs

about 50 percent of the time, but it doesn't always occur.

Now, what happens in this case? Mr. Wohl cited the record almost correctly, but he left out one important fact. It is true that the original report of the plaintiff expert referred to this model, which is now reconstructed and looks like put into the courtroom. I see it over there.

For the record, it looks like something that might be sold at the Home Depot. It's a large mock-up made out of ply board.

**MR. WOHL:** By a standing cashier, I might say, your Honor.

**THE COURT:** However, an objection was made by the defendant. That's the part that Mr. Wohl keeps leaving out. An objection was made by the defendant, a vigorous objection.

Now, Mr. Wohl was not here when that objection was made, and I don't blame him for not knowing about that. But I was here and I do remember. It was vigorously made, it was made up and down. So finally the plaintiff said: We will withdraw our reliance upon and the expert won't even mention that mock-up. So that solved the problem. The mock-up was out.

Well, just as I suspected, the defendants actually secretly wanted to have that mock-up because I guess they thought it proved their case.

I don't know why they ever objected to it in the first place. They wanted to have it both ways. Well, too bad for the defendants. They managed to get it withdrawn over their

vigorous objection that it should never have been -- ever see the light of day in the courtroom. Well, then they won that point.

Now, they want to use it and they are the ones, I assume, who went out and subpoenaed that to have it brought in, right?

**MR. MICHAEL RIGHETTI:** Yes, your Honor.

**THE COURT:** Okay. So I said you could subpoena it to bring it back in, but that doesn't -- now that becomes part of your affirmative case, Mr. Wohl. And that is not an excuse for at the last minute enlarging upon your report.

So I'm going to make a tentative ruling and I'll tell you why it's tentative in a minute. A tentative ruling is none of these -- none of these contested materials are timely and they should not be used.

However, here is the part that has to make that tentative. I've seen enough trials to know that by the time we get to the defense case, it could easily be the case that the plaintiffs themselves, through their own examination of their own witnesses, have enlarged upon what their own expert has said. And you have to distinguish between cross where it's -- the defense tries to shoe horn it in versus where the plaintiff themselves bring it up.

But if at the end of the plaintiff's case the Court believes that it would -- that the discovery -- sorry, the disclosure violation should be excused for substantial

justification, then I'm going to allow these to be used at that point. It's too premature for me to say. I don't want to make that call right now.

I'm just tentatively -- I'm tentatively ruling they should not come in, but there are many avenues that the plaintiffs could shoot themselves in the foot and open the door to this.

So, Mr. Righetti, you should be careful in how you approach your case. And don't ask me for advisory opinions. I'm not going to fall for that. If you -- if you step over the line, these are going to sail in. If you -- at least for illustrative purposes. If you don't step over the line, then you can keep them out. You have to use your own good judgment as to where that line is. End of that story.

What's your next motion?

**MR. MICHAEL RIGHETTI:** I don't have any other motions, your Honor. Thank you.

**THE COURT:** Does the defense have any more motions?

**MR. WOHL:** No, your Honor.

Did you mention about the trial briefs, just so we have that clear?

**THE COURT:** I have an issue I would like to make sure you brief, but I -- because I have been thinking about your case.

But go ahead. What did you want to say?

**MR. ADKINS:** I just have a couple of house cleaning

items, your Honor, to hopefully streamline things.

We have reached and conferred with opposing counsel and I think we reached stipulation on a very large portion of the relevant exhibits. I just wanted to inquire of your Honor how you would like us to handle that? Would you like us just to read that into the record as to the admissibility of those exhibits?

**THE COURT:** It would be a good idea if you could just give me a document that says Exhibit No., whatever it is, 3175, received in evidence.

**MR. ADKINS:** We'll do that, your Honor.

**THE COURT:** All right. Now, let's be clear on this for both sides, because sometimes the lawyers -- if you stipulated into evidence, then you don't need to -- it comes into evidence. It's there for whatever value it is. A witness need not even refer to it for the Court to rely upon it later.

So don't come back and later say, "Oh, that document was never explained." You can say that for purposes of whether or not it's persuasive, but you can't say that for whether or not it can be considered at all.

I assume that's what you mean when you stipulate something into evidence; true?

**MR. ADKINS:** Yes, your Honor. And these are videos and photographs and business records that I think both sides plan on using in this case.

**THE COURT:** That's fine. We all understand it the same way, Mr. Righetti?

**MR. MICHAEL RIGHETTI:** Yes, your Honor.

**THE COURT:** Okay. What's your next point?

**MR. ADKINS:** Your Honor, I just wanted to inquire about whether your Honor wants closing argument in this case. I think you made mention of that.

**THE COURT:** Yes, probably we will, but let's wait and see. When that will be and how long that will be is going to be a different issue. I don't want to decide that right now.

**MR. ADKINS:** And would you like post closing briefing, your Honor?

**THE COURT:** Yes. Yes. I'm going to give you probably today or tomorrow a procedure that we will follow on findings of fact and conclusions of law.

**MR. ADKINS:** Very well, your Honor.

The final issue is I wanted to confirm whether witnesses are excluded.

**THE COURT:** Yes, they are all excluded. If you all want to let the experts stay, that's fine. If you disagree over the experts, we'll hear argument on that.

**MR. WOHL:** Well, we had asked the other side about allowing an expert to sit in on an opposing expert's testimony and we were told, no, they would not go along with that, so we didn't have our expert come out.

So we think the rule should be all experts should be excluded the same as fact witnesses. They, obviously, shouldn't be able to now change course given their position they would not allow experts to sit in.

**THE COURT:** What do you have to say about that, Mr. McInerney?

**MR. McINERNEY:** Sounds fair to me.

**THE COURT:** Once they have testified and never will come back under any circumstance, they can sit in as ordinary civilians; but until that happens, they are excluded.

**MR. WOHL:** And, your Honor, does the --

**THE COURT:** Except for corporate representatives and the plaintiff.

**MR. WOHL:** Your Honor, does your admonition no discussion with a witness during the cross-examination phase also apply to expert witnesses?

**THE COURT:** Of course. Yes.

**MR. WOHL:** Just want a clarification.

**THE COURT:** Only on cross.

**MR. WOHL:** Only on cross.

**THE COURT:** Yes, Mr. McInerney.

**MR. McINERNEY:** Two housekeeping.

Does the exclusion also exclude them during opening statements?

**THE COURT:** I don't care. What do you two say?

**MR. WOHL:** I think we probably should, your Honor, be consistent. If the whole point is to avoid them somehow being tainted, that I think they should be excluded from opening statements that refer to evidence. So I would suggest doing the same there, too, your Honor.

**THE COURT:** All right. We'll exclude them from the opening statement, too.

What else, Mr. McInerney?

**MR. McINERNEY:** Your Honor ordered at the pretrial that on the morning of trial Kmart would disclose to us which of our absent class members they are really going to call.

**THE COURT:** I think I did say something like that. I don't remember that way I worded it, but what's the problem?

**MR. McINERNEY:** I just want their names.

**THE COURT:** Have you provided the answer?

**MR. WOHL:** I think we did, your Honor. Did we not provide a rolling witness list?

**MS. SOMMERFELD:** We provided it with all the class members name on them.

**MR. WOHL:** Yes, your Honor. We provided that a couple days ago.

**MR. McINERNEY:** Three of them?

**MS. SOMMERFELD:** Correct.

**MR. McINERNEY:** Okay. Thank you.

**THE COURT:** Here is the issue that I hope that you can

all brief for me. But before I do it, remind me what the exact wording of the statute is? I don't want approximations. Read into the record for me the exact wording of the statute.

**MR. WOHL:** Section 14 of the Wage Order 7-2001 says:

"When the nature of the work reasonably permits it, the employer shall provide a suitable seat."

**THE COURT:** All right. Here is the issue that has occurred to me, and this is based upon other aspects of California Labor Law, and that is: What deference is given to the management's view in the matter as to whether or not it's reasonable?

To put it differently, does the judge just decide on his own what's reasonable and not reasonable, or does the judge instead say: Was it -- was the view -- assuming that -- not assuming, but assuming that it's proven, that the management actually thought and made a considered judgment that seats were not required, if the judge decides reasonable people could differ over that and that was at least a reasonable decision, does the judge have to defer to that business judgment even though the judge, if he was making the decision, would come out the other way? Do you understand the difference?

**MR. WOHL:** Yes, your Honor.

**THE COURT:** Yes, Mr. Wohl.

**MR. WOHL:** I didn't mean to interrupt, your Honor. I was just going to say very much so. In fact, this issue has

been thoroughly briefed in other seats cases.

**THE COURT:** Well, has it been briefed in this case?

**MR. WOHL:** I don't know, your Honor, since I'm new, but I assure you that if you look at --

**THE COURT:** I'd like each side to put in a five-page brief by -- today is Tuesday. Say, Thursday when we start. Can you -- if you need more time, I'll give you more time.

**MR. WOHL:** That's eminently doable, your Honor.

**THE COURT:** Is that doable on your side?

**MR. McINERNEY:** Yes, your Honor.

**MR. MATTHEW RIGHETTI:** Yes, your Honor.

**THE COURT:** All right. I don't know the answer to this. I do know that in other aspects of California law -- I think, for example, in the area of wrongful discharge -- not where you have an issue of race or gender or some other suspect category, but where you have just was it fair to -- and reasonable to discharge this person, I think the law says you have to defer to management's view on the matter as long as it's a reasonable judgment.

I don't know that that's true, and I don't know what the rule ought to be here. But thinking about this case over the last few days, that thought occurred to me and I would like to have your input.

Now, I would also like to know whether or not there ever actually was a considered judgment by the defendant. In other

words, was there a meeting where they sat down and decided we do or do not need to have chairs. There is a decision memo.

I don't know how the decision would be implemented, but as part of that, does there actually have to be proof that there was, in fact, a decision and maybe even what it was based upon, or is it just enough that that's the way it kind of played out in the history of the particular company?

Anyway, these are things please address in a five-page memo. You can bring to it court on Thursday.

**MR. WOHL:** Yes, your Honor.

**THE COURT:** Great. All right. Any other things to bring up right now?

**MR. ADKINS:** No, your Honor.

**THE COURT:** So, here is what we're going to do. We're going to proceed to opening statements. If we have anyone in the courtroom who thinks they may be a witness in the case, please step outside. I'm sorry to do this to you, but that's the rule. But if you're not going to be a witness in the case, you're welcome to stay. So there we are.

(Brief pause.)

**THE COURT:** All right. At this time --

**MR. MICHAEL RIGHETTI:** Your Honor, if I may introduce the Court to our plaintiff, Lisa Garvey, who is here.

**THE COURT:** All right. She should sit at counsel table, if she wishes. She doesn't have to.

Are you Ms. Garvey?

**MS. GARVEY:** Yes, sir.

**THE COURT:** Welcome to the court. How are you today?

**MS. GARVEY:** Fine, sir.

**THE COURT:** Great. Please have a seat.

All right. At this time on behalf of Ms. Garvey the plaintiffs may make their opening statement.

**OPENING STATEMENT**

**MR. McINERNEY:** The 1960's Irish folk group The Clancey Brothers once introduced a song by saying, "We're going to sing you a little Irish ditty. It's so short and it's so simple we have to explain it at some length."

The Wage Order in this case is one sentence long. It contains 21 words.

Could we put up 358?

(Document displayed.)

It's the top part, 14-A, that we are addressing in this case. And I -- I want to also welcome Paul Hastings to this case. They will be of great help, I'm sure, in explaining this one sentence.

The Court will recall that attempts have been made to add onto the one sentence. And, for example, we had a suggestion that we should insert the words "if requested, the employer shall provide." "If requested."

The second part of the Wage Order that I got there on

Exhibit 358, that's Section 17 down there at the bottom. And basically I think that will help explain to the Court what the focus of the preceding wage conditions are. It talks about how an employer, if it feels that it can't meet the requirements of any of the wage orders, including the seating requirement, can apply for an administrative exemption; but what's important is that the employer has to show that it wouldn't adversely impact the welfare or comfort.

Now, Dr. Johnson is our expert on ergonomics, and he's going to be talking about where comfort comes in. Because according to Dr. Johnson, there's sort of a rising scale that we experience in anything we do. It starts with effort, and the next step -- and we all have effort, whether we're sitting or standing at a podium. The next step up is fatigue, and then you get to discomfort.

Now, the Wage Orders are geared to protecting employees from discomfort. They talk about the comfort or welfare. Beyond that, you know, we get into things that other experts may want to talk about, but really aren't too relevant for our consideration of Section 14 because you go through effort, then there is fatigue, and then there is discomfort, and then you escalate up to pain, injury, and ultimately disability.

And what Dr. Johnson will be talking about in large measure is not -- of course, I hope this goes almost without saying. We're not suggesting that every Kmart employee be

issued a seat. Like, "Here, Mary, here is your seat." Like a uniform. We're obviously suggesting that seats be provided at the work station. And the work station for the cashier is the register.

And what Dr. Johnson is talking about is not having seated cashiers like he'll tell you they have in Europe, but rather having a sit/stand option. And we utilize that, of course, in our everyday lives.

Of course, you know when you have to stand up to move something heavy. If you have to move a little file on your desk, you reach over and you move it. If it's a big file, like this case has gotten to be, you may have to -- you'll naturally stand up and move it.

But what Dr. Johnson -- the word he's going to be using a lot is recovery. And the idea behind that, he'll explain, is that even though you may have to stand to do some of the work, the fact that you can sit down at least some of the time gives you recovery, and that cuts into the fatigue which eventually creates discomfort.

Dr. Johnson will be focusing on the nature of the work and that's really the central theme because that's what the Wage Order says: When the nature of the work reasonably permits the use of a seat.

I wonder if we can put up Exhibit 156?

(Document displayed.)

And we have sort of a happy convergence in this case because we have the Kmart job description. There's actually two. This is the first one in time and it covered most of the class period.

But the reason I say we have a happy convergence is it talks about the nature of the job when we go down the page, but let's just, if we will, we'll start out, this is the checkout service associate. The pay grade level is one. It's a minimum wage job. And the -- you see the general summary at the top:

> "Provide 'World Class' customer service by surprising and delighting our customers every day. Able to run fast and efficient cash register operations. Observes customer traffic and calls for additional service as needed."

And then it lists all the essential functions. We will get into that in detail with our cashier witnesses and with Dr. Johnson.

But if the Court later looks at this Exhibit 156, the Court will see that I think all but one of these essential functions can actually be performed while seated.

They have this other thing that Kmart likes to do called Operation Invitation, and that is if a cashier -- they have got a light on, which indicates they are open for business. It's up on a pole, like in a lot of stores. But they are also supposed to go out and invite customers, "Hey, I'm open for

business. Come into my lane." That obviously, the way things are set up, would have to require standing.

Can we slide that up a little?

This is what I was trying to focus on, the nature of the job. There is a disclaimer. It says:

> "This job description describes the general nature of the duties and requirements of the job."

Of course, it goes on to say, you know, you may be assigned to do other things by the managers.

But there it is. It's a confluence -- I think that's the right word -- with what the Wage Order says. You focus on the nature of the cashier's work. And here we have it described: "The nature of the duties and requirements of the job."

Now, could you put up 157?

(Document displayed.)

Thanks.

In March of this year Kmart updated its job description. So this one is called "Internal Job Description" at the top. And, again, this is your checkout person or checkout service associate.

And about six lines down it explains what the scope of responsibility is:

> "The cash register operation area within store/unit location."

So the scope is really focused on the register. There,

again, the nature of the work. And a couple lines underneath it says:

"What's the job summary? Provides 'World Class' customer service by surprising and delighting our customers every day. Able to run fast and efficient cash register operations. Observes customer traffic and calls for additional service as needed."

And, again, they list the primary job duties and responsibilities. And as we go through these, your Honor, with the -- I think we've got six cashier witnesses. Hopefully, obviously, if it becomes repetitive, we'll cut it even shorter, but they should be pretty short witnesses. They will be talking about what they do at the register and it's going to coincide, I expect pretty much, with what the job description says.

And Dr. Johnson will also be addressing these, as he's observed these functions performed. Dr. Johnson will testify that in addition to, you know, actually going out to Kmart stores himself, he's reviewed a lot of video footage that was provided by the defendants, surveillance. Dr. Fernandez did videos, some other expert did videos. So Dr. Johnson has been able to observe these cashiers.

The testimony of the cashiers and of Dr. Johnson, in essence, will be that cashiers scan, electronically scan the items and put it into a bag. That's the heart of it.

So what's happening is that we have another add-on here. Just like earlier there was an attempt to graft on some words to that one sentence in 14-A. You know, "if requested." The new add-on is not "nature of the work," but "nature of the work station." So now we have a lot of emphasis on the work station.

But, of course, the Wage Order doesn't mention work station. It mentions the nature of the work.

And the defendant's position, as they will articulate in their witnesses, as they have in the past through declarations and argument, is basically: Look, this is our work station. You can't require us to change it.

And, of course, we conceded, your Honor, at the pretrial -- and I don't think we've really made a secret of it -- that you can't use a seat at a Kmart checkout counter without modifying the work station. There is no room for your knees. There is no place to put your knees. And because there is no place to put your knees, there's also -- if the cashier elects to stand, either because they are tired of sitting or they have to do a certain transaction that requires them to stand, there is no place to push the stool.

And our position has always been that, yeah, you've got to modify your work station because the law is the law. And if the nature of the work requires that you provide a seat, you can't defeat the law by designing or maintaining, you know, a

work station that can't accommodate a seat. It would be like if GSA put a barrier in front of a judge's bench so the judge could not put his knees under the bench. We think this is supported not only by the Wage Order, but by the history.

In case this Court missed it, I wrote a pretty boring trial brief. The first seven pages were sort of a history of the Wage Orders which, you know, started in 1920.

And we have this idea that we're, of course, smarter than our fore-bearers and -- but, and so the Wage Orders must have been quite primitive. But I want to read you from the Wage Order of 1920 because this, I think, is a relevant exhibit. It's Exhibit 179 for the record, and it's also document 171-1.

Now, back in 1920 Section 14 was actually Section 23. And just like 14 today has an A and B that pertain to when you're working, that's A or B, when you're -- there is a lull in business and, you know, you can sit down, but when normally your work requires standing, like a salesperson. If there is nobody around, you know, that's a lull.

So 14-B, this is 92 years ago says:

"Seats shall be provided at work tables or machines for each and every woman or minor employed."

That's sort of interesting because I think until '73 the California Wage Orders didn't protect men. They only covered women and children. So:

"Seats shall be provided at work tables or machines

for each and every woman or minor employed, and such seat shall be capable of such adjustment and shall be kept so adjusted to the work tables or machines that the position of the worker relative to the work shall be substantially the same whether seated or standing. Work tables, including sorting belts, shall be of such dimensions and design that there are no physical impediments to efficient work in either a sitting or a standing position, and individually adjustable footrests shall be provided. New installations are to be approved by the commissioner."

That was 92 years ago. And that Wage Order was followed up by one in 1933 that used similar language. And then by 1947 it got to the simplicity we have today. It's actually even simpler.

In the 1947 Wage Order it says:

"Suitable seats shall be provided for all female employees."

Now, in some ways we don't get to the issue here of whether Kmart provided suitable seats because they provided no seats. And I think definitionally if you don't provide any seat, you can't have provided a suitable seat.

And I don't think we get to it because in a PAGA, the statute here, a penalty statute. PAGA has no injunctive provisions. You know, we can't get an injunction saying that

 Kmart shall provide suitable seats in the future. The train has left the station. PAGA looks back and said: Did you provide suitable seats? If not, you get penalized.

The plaintiff, if you look at Section 14, has no burden to provide a suitable seat. Because Section 14 says:

"All employees shall be provided with a suitable seat."

Well, I mean, it's not the employee comes in and brings in a suitable seat and modifies his or her work station. Obviously, it's the employer's burden.

So Lisa Garvey had no burden here to design or build or bring into Kmart a suitable seat or work station.

And Dr. Johnson, Dr. Johnson doesn't have any, you know, burden to inform Kmart of what would be a suitable seat.

Dr. Johnson is going to testify that in his line of work -- and he does consulting, you know, with big companies about work stations and seats. If he gets hired, he goes out. He looks at the job. He looks at how it's performed. He talks to management and it's sort of an interactive process, and he comes up with a design for a seated work station. It's not rocket science by the way, I don't think.

You know, so if Kmart wants to know what a suitable seat is, they should ask their witness, their expert, Dr. Fernandez because Dr. Fernandez will testify, as he has testified in deposition, that given a budget -- and he couldn't estimate

what it might be, but just an unlimited budget, could he design a sit/stand work station for Kmart? Yes.

And, you know, if the question is: Well, has it ever been done? Dr. Johnson will testify: Yeah, it's been done for about 30 years over in Europe.

Could we take a look at Exhibit 1?

I don't know how I'm doing on time.

**THE COURT:** You have about seven more minutes.

**MR. McINERNEY:** Okay. Good. Because I'll move it right along.

(Document displayed.)

**MR. McINERNEY:** I briefly want to familiarize the Court. This is Exhibit 1, and this is just a floor plan of the Tulare store. This is the front door, your Honor, (indicating).

**THE COURT:** It's not coming through on my machine -- oh, it is coming through but you've got the wrong color. It's white. You have to put in red or green or something so it will stand out.

**MR. McINERNEY:** This is why your order said I should speak with your clerk in advance and find out how to operate it. Well --

**THE COURT:** I see what you're pointing at. So while it's being adjusted, continue on.

**MR. McINERNEY:** Yes, thank you.

(Brief pause.)

**MR. McINERNEY:** I think I'll just describe it. Thank you.

So anyway, the front door is up there on the right sort of protruding out.

Would you slide that down a little?

As you enter this door, up in the upper right-hand corner, that's the service area and they do refunds and stuff like that. They've got a register there.

And then to the left of that is Nathan's restaurant. It's a little snack bar basically. They have got a register in there.

Then all this other stuff, dark colored stuff is apparel and clothing.

And then before you get down -- well, let me drop down to the middle right. Those are the registers.

**THE COURT:** Point your pencil at them to make sure I see.

**MR. McINERNEY:** (Indicating).

**THE COURT:** That's what I thought. That's, what? It looks like six or so registers.

**MR. McINERNEY:** Yes. I think there is actually seven. There is one on top that looks a little shorter. It doesn't have all the candy racks out front as you approach it.

And then you have apparel right across from that. And

you'll hear our witnesses say that if things got slow, they might be sent out to go straighten apparel. Apparently, people, customers come in and they are looking at different things out there on tables and stuff and they make a mess. So the cashiers are from time to time tasked with walking over there and trying to straighten that out.

And then -- well, below that is a jewelry section. They have their own register. There's electronics. In the back there is lay-away.

Can we look at Exhibit 7?

(Photograph displayed.)

This picture is sort of a broad view of a checkout stand. The photographer was actually pretty lousy, and I haven't gotten any better.

But that shows you register number one. The Court will observe, they are really tight. Really tiny. And that's why a stool won't fit.

But as the Court may also learn from Dr. Johnson, once you make knee room, the very tightness works to the benefit of the cashier because stuff gets into reach readily.

Okay. Let's take a look at Exhibit 9.

(Photograph displayed.)

This is a -- just a -- it's a photograph of the register and it shows the screen where the purchase shows up for the customer to look at and the cashier.

And if you look at the upper left, that's a coupon dispenser. Dr. Johnson will testify that's one of the things that you would want to lower or move.

Dr. Johnson, incidentally, will testify that this configuration of a Kmart checkout counter, even for a standing cashier, is a train wreck. It's not ergonomically sound at all, even if you're using a standing cashier. You really should modify it.

Let's move on rapidly to --

**THE COURT:** You've got one more minute.

**MR. McINERNEY:** Thank you. Perfect.

This is a good shot. This is Exhibit 8, your Honor. This is looking at the checkout stand.

(Photograph displayed.)

You see how tight it is? And, like I said, right now you put a stool in there, you wouldn't be able to do your job. It would be right in your way.

But if we take a look at the next one, Exhibit 10...

(Photograph displayed.)

...this is the underneath portion of the existing counter. And you see you've got two plastic bins in there, but with some modification, you know, with a saw and about five minutes, you create knee room in there.

Is that the perfect work station? No. But you know we haven't been hired by Kmart to provide or design the perfect

work station. We're just making a point, they could have done it and they should have done it.

And then, finally, my last remark is, you know, there is no question here what Kmart's policy was. I mean, that's been well documented. And the testimony by Kmart is that despite a policy to give seats to any associate who asks for one, their testimony is that at Tulare no seat was ever provided and no seating was ever requested.

The inference that, of course, we'll eventually ask the Court to draw is if they had a policy to provide a seat to anyone who asks for it, that meant the essential functions, in their view, could have been done while seated.

Thank you very much, your Honor.

**THE COURT:** Thank you, Mr. McInerney.

All right. Let's go to the defense opening statement. You also have 15 minutes.

**MR. ADKINS:** Thank you, your Honor.

**OPENING STATEMENT**

**MR. ADKINS:** Thank you, your Honor.

Wage Order 14, which Mr. McInerney was just mentioning, in one form or another has been in place since the 1920's. And in all the time since then retailers have been servicing their customers with cashiers who have been standing. No Court, no agency, no regulator during that time has ever taken or adopted the position that the plaintiffs take in this case.

As your Honor knows, Section 14 requires that an employer provide a seat to an employee only when the nature of the work reasonably permits the use of a seat. And as you'll see in this trial, your Honor, the evidence will show that the nature of the work as a cashier at the Kmart store in Tulare does not reasonably permit the use of a seat.

The cashier is required in the business judgment and policy and model of Kmart to have them work efficiently and provide customer service. Part of those functions require bagging of the merchandise for the customers. It requires handing the merchandise to the customer or placing it into the shopping cart; helping the customer work the point of sale, where you slide your credit card, and they can even take a survey on whether the customer service is to their satisfaction. It includes helping the customer out of the store, if needed. And at all times the cashiers are to show an ever ready alert image eye-to-eye with their customers. And, your Honor, these tasks include lot of physical movements. It includes lifting items.

Part of the job description that Mr. McInerney put up on the Elmo here talks about the fact that the cashiers are required to be able to lift more than 20 pounds. You'll hear in this trial, your Honor, everyone will agree, I submit to you, that you can't do that while seated. There is walking, bending, lifting, stretching, twisting repeatedly and

continuously, and you can't to that while sitting.

And you will hear from the expert, Dr. Fernandez, that if you were to do that as a cashier, it would not be ergonomically sound to do so.

And, your Honor, the check stands at the Tulare store are part of the business model, part of the nature of the work. They are designed to be fast and efficient and to convey that customer service. The check stands do not allow enough room to allow a seat safely and efficiently. The plaintiffs concede this central fact. You can't put a seat in there.

And Kmart is not alone, your Honor, in terms of having their cashiers stand. Virtually all retailers, major U.S. retailers, have standing cashiers and sales associates for the same reason: The physical demands of the job, the space limitations of the check stand, and the need for customer service, your Honor. That's been true for decades.

I would like to speak about the store at issue, the Kmart store at Tulare and its business model. There is an image of it, your Honor.

(Photograph displayed.)

That's the Kmart store in Tulare, in part of the Central Valley of California.

You'll hear that Kmart sells a wide array of merchandise, not surprisingly. Some small and light. Some heavy and bulky. You'll have some kitchenware items, such as this. You will

have flat screen TVs, clothing items, furniture, much more. And the business model is to offer this wide array of merchandise at discount prices.

And so with that business model --

**THE COURT:** Are you saying that big sofa you just put up there, that would be shoved across the -- those items there, those big chairs would be shoved across the checkout counter as opposed to being picked up at the back dock?

**MR. ADKINS:** No, your Honor. In fact, as you'll hear in trial, the cashier is to come out and take a tag off of larger items to bring back and to scan in the checkout aisle.

And for some of the mid-sized items, like the flat screen TV, your Honor, that can actually can go down the aisle. There is a gun scanner that they take out from under the cashier stand and they walk out into the aisle to scan that in the shopping cart.

**THE COURT:** But they don't manhandle it across the top of the -- that's what you were seeming to suggest: These big heavy items have to be picked up by the person.

**MR. ADKINS:** No. Certainly, no sofa is going across the scanning counter, your Honor. And the suggestion is they have to move in order to be able to scan those items. They can't stay seated.

**THE COURT:** What do you say to this? The plaintiff's point seems to be if you built these stalls big enough to begin

with, there could be a stool there. For the smaller items they could handle it with sitting on the stool, but the larger numbers they would have to stand up and they could just stand up. If there was enough room, they could stand up.

So what do you say to that point?

**MR. ADKINS:** Your Honor, there's several answers to that point, and I think our ergonomics expert will address many of them. In addition to those items, it would be a constant stand/sit situation.

It's the fact that it's the business judgment of Kmart to have a cashier stand that allows the efficient and quick movement through that area.

Also, that it requires bagging. So you have to go out to the bagging. When you have those larger items, they'd have to get up and to scan those items.

They also have a lot of job responsibilities away from the cashier stand. As I was going to mention, your Honor, there's several types of activities that the cashiers are supposed to do.

For example, when it comes to customer service, they are the face of the store, your Honor. They greet the customers when the customers come in the store. They make sure the checkout process is efficient and friendly. Oftentimes they are the only point of contact between the customer and the store. In reality, they are the face of Kmart. They usually

have -- and they are able to sit. They usually work shifts of at or under four or four-and-a-half hours. When they are on break, they are able to go to the break room and have a seat or sit at the restaurant towards the front of the store.

But when they are not on break, your Honor, the evidence in this trial will show that they have a lot of important responsibilities that require constant movement.

If we can put up the job description that Mr. McInerney was describing.

(Document displayed.)

These are exhibits in the trial, your Honor, and these are the official job descriptions that are approved and placed on the internet. They describe job requirements that include duties at the register, away from the register.

Away from the register, for example, includes straightening and restocking the merchandise, emptying the garbage bins, replenishing materials, going into the aisle to invite customers in or if there is a longer line over at the next aisle, to make sure they come through swiftly. They go to the service desk. Obviously, none of those of could be done while seated.

But focusing on the cashier stand. And that's really the focus of the plaintiff's argument you were referencing. Mr. McInerney referred to cashiers who'll say that they could do their job while seated, which he has conceded none of them

ever have done it. They have -- they couldn't use seats in the current configuration.

But to answer your Honor's question. Beyond the documents and the witnesses in this case, I think it's -- what's essential to understand this case with common sense and practicality is to actually just see the process in motion.

What is this process we're talking about in terms of the checkout stand at the Kmart store? And to look at the continuous movement that I was just describing, all the different physical movements that our ergonomics expert will describe.

If you can put up one of the videos that you'll see in this trial, your Honor. There are many of these videos. If we can go ahead and play it.

(Videotaped played.)

This is, in fact, a cashier at the Tulare Kmart. And there is the checkout counter and the scanning of items. She's facing a scanner right there. She's pulling out bags. There is a cash register to her right. And as you can see, the customer is coming down the aisle.

Now, for those seven aisles, your Honor, there's shopping carts coming down each side typically. You can see a flatbed scanner in front of her and the bagging table to her left.

Now, as you see these videos, your Honor, and the movements required in the checkout process at Kmart -- and this

is why we were talking about some of those items that are sold there -- you'll see that what is required of the cashier is to, first of all, again customer service, to meet the customer eye-to-eye and to welcome them. At times to walk out into the aisle and invite them in. To reach and then pull sometimes the merchandise along that counter to the scanner. You can scan the merchandise on that flatbed scanner or, as I said, there is a little gun they can take out to do the scanning for other larger items that requires movement through that little pass-through right there.

They are also instructed to do things for loss prevention, your Honor. If there is a backpack, to unzip the backpack and to look into it to make sure there's no items that have been placed in there either inadvertently or otherwise. They are supposed to, for the same reasons, look into the shopping cart to make sure there is no items in there that have not been processed through the transaction. They are trained on this.

They are also trained on sales. There are add-on sales that they are supposed to engage in. Certain warranties and use of certain cards for which -- for some of which they receive a financial incentive or commission. There is a pin pad that's located just in front of the checkout scanner, which they are to assist the customer with in terms of the sliding of the card. As you may have experienced, some people have difficulty with that or it's not going through clearly. It's a

common occurrence to reach and assist with that. There is a survey that pops up for customers on that pin pad to give a response as to how they felt their customer service experience went.

As they scan these items, they then need to go back to the cash register, of course, to do entries. They have to reach up and grab the receipts and coupons that print out. Go back and hand that across to the customer. And then repeatedly going back and forth to the bagging area.

And here on the video you will see one of many instances where supplies ran low even in the middle of a transaction, where you have to go somewhere else to grab it and come back, or get change, or call a price check, any number of things required every day, while conducting the essential function at the front-end cash register in Tulare.

And, your Honor, when there is down time, you'll hear from numerous witnesses that you're not to stand around. There's plenty of other things to be done around the store, to help keep it running.

Your Honor, the plaintiff's position is wrong for a number of reasons, including the fact that the job functions just don't permit a seat, the real job functions that you can see.

And you're going to hear from people that have been at Kmart for decades, as well as people in the front lines in the Tulare store, that the practical reality, the common sense

reality of how this works in the store doesn't permit a seat.

I believe, you know, your Honor has heard about the directive by Ms. Grabau that has been discussed, and that she had sent it out to store managers, that they should provide seats to cashiers upon request.

Here's what the evidence, we believe, will show on that directive your Honor, that she was reacting to what she understood was a series of seat cases being brought against California retailers, and she thought her actions would help Kmart, perhaps, forestall being sued; that she did not vet with the Kmart operations executives at the same; didn't go through the same process that, for example, the job descriptions or other policies that are posted on the intranet and are the official policies of the store. Didn't go through that process.

And when she told the store managers about her directive, they openly contested it, believing it was inconsistent with the business model. And some of them even voiced that it might lead to cashiers' injuries.

Again, your Honor, plaintiffs concede this point. You cannot use a seat under the current configuration in the stores.

Now, plaintiff contends that Kmart should be required to rebuild its checkstands to fit a seat. Your Honor, first, that's not what's required by Section 14.

Mr. McInerney cited some language about reconfiguration. You know, the original version of that section did include a requirement of reconfiguration, but that was dropped 70 years ago, you know.

When laws wish to put in place reconfiguration requirements like in the Americans with Disabilities Act, they do. Section 14 does not.

Now, plaintiffs claim that Kmart should rebuild three checkstands based on the opinion of an ergonomics expert, Dr. Johnson. Not an engineering or customer service expert. And you will hear that no retailer has ever adopted his theories, and he didn't give any assurance that his theory will actually work.

In fact, your Honor we expect the evidence will show that in order to rebuild the Tulare checkstands alone would cost more than $140,000, projecting statewide into the millions and millions of dollars.

And Kmart will call its expert, Dr. Jeffrey Fernandez. He's a recognized expert in ergonomics and in mechanical engineering.

He viewed these actual videos of cashiers doing their job in the Tulare store. He'll explain that the job duties of the cashier require physical movements that can't be performed in an ergonomically-safe way while seated. He will say that trying to do so could increase the risk to health and safety.

Now, needless to say that Tulare cashiers don't all come in the same size and shape. And many of them are -- have different age, gender, height, weight, physical characteristics. They range from 4-foot-11 to 5-foot-11, and up to 250 pounds.

And because of these differences, Dr. Johnson's hypothetical configuration would not allow all the cashiers to perform their jobs at the checkstand while seated, or to do it in ergonomically sound fashion.

This sit-and-stand concept that Mr. McInerney raised won't work. The stool is in the way. There's loss of productive time.

Kmart's business model talks about customer service that can't be performed while seated.

And the doctor will say that things that can be done seated must be done standing. He will claim you can sit ergonomically to perform some of these functions, but the evidence will show that's not correct.

And we've talked about customer service, your Honor, but it's important -- it's a very subtle but important part of this case. Customer service is the lifeblood of Kmart in a very competitive marketplace.

Kmart does not operate in a vacuum. They have competitors: Target, Wal-Mart. In fact, in Tulare, right across the street from the Kmart store, is a Wal-Mart. And

just a few blocks down there is a Target. All of their cashiers stand.

And if the expectations of the customers at Kmart are not being met, they can shop elsewhere. They can go across the street, to Wal-Mart.

And you will hear in this trial interest Dr. Valerie Zeithaml. She's an expert in customer service and in branding and marketing, and she will discuss those things.

She'll explain that because of -- Kmart's customers expect fast and efficient shopping; they expect their items to be bagged; they expect to be treated in a friendly and attentive way; that the customer is always right, or so is the adage of sales; that standing allows those functions to take place, allows that fast transaction, allows that important eye contact, and it allows the customer expectations to be met.

Standing, your Honor, sends a message. It's a uniformly-understood message of respect. That's why when we're in court addressing a jury, we stand. You have our complete attention and we're very ready.

And as Dr. Zeithaml will explain, that difference between active versus passive engagement is the difference between repeat sales or not.

And Mr. McInerney also mentioned Europe for a moment, and that there are some European stores, European based, with a European model, in which the cashiers sit while checking out

customers.

But, European retailers follow an incredibly different business model than American retailers like Kmart. In Europe, the cashiers provide very little or no customer service. They are expected just to ring up the sale.

The customer does the work. So the customer brings the items and places it in front of the seated cashier, who scans it. And then the customer takes those items and goes and bags it themselves.

And I suppose we could have a debate about whether the American model or the European model is better in terms of sales or customer service, although it's been shown that the customer service model in Europe has some of the lowest ratings among American consumers. But, that's not the relevant question in this trial, your Honor.

Section 14 does not require an employer adopt a business model. Kmart's allowed to have the business model that works. As is Target. As it Wal-Mart. And that is what they have done. The question is whether it reasonably permits the use of a seat.

So, your Honor, after hearing the evidence in this trial, the videos, and the real common sense, practical issues, you'll have certain stubborn facts at the end of the day.

First, that cashiers' job duties, like bagging and lifting items more than 20 pounds, they just require you to stand. You

can't sit to do it.

You can't use a seat with the current checkstand. Kmart would have to reconfigure it in order to even allow it. And contrary to their business model.

And, finally, the customers at Kmart and stores like it expect customer service. They have an expectation that needs to be met. It's incredibly important to the business model. And that needs to be accomplished while standing, not sitting.

Your Honor, for all those reasons, we ask the Court to reject the plaintiff's claim after hearing the evidence, and to enter its judgment in favor of Kmart.

Thank you.

**THE COURT:** All right. Thank you, Mr. Adkins.

Let me ask a couple of questions to both sides. This work is put out, I presume, by a labor commissioner. Is that correct?

**MR. McINERNEY:** The industrial wage commission, your Honor, yes.

**MR. WOHL:** Actually, it's Industrial Welfare Commission, your Honor. They have promulgated a Division of Labor Standards Enforcement under the DLSE, which is headed by the labor commissioner. Their job is to interpret it and enforce it.

**THE COURT:** Have there been any interpretive letters or opinions by any of those people?

**MR. WOHL:** Yes, Your Honor.

**THE COURT:** What?

**MR. WOHL:** That's in evidence. They were asked.

**THE COURT:** What do you mean in evidence?

**MR. McINERNEY:** They're marked. Some of them are marked.

**THE COURT:** Each side summarize, briefly, what those say.

**MR. WOHL:** Yes, Your Honor.

So both the DLSE is the IWC were separately asked, with regard to a Macy's sales associate, someone who both waits on customers and goes back to the register to ring up the sale, to bag the merchandise, to give it back to the customer -- very similar with Kmart. And the question was, should they be getting a seat?

And both the DLSE and the IWC responded, no, the nature of their work is not such that you would sit down because they have to move to do their customer service job. So they rejected that proposition.

Also, I don't think Mr. Adkins mentioned it, but there have been three court decisions on interpretation of Section 14 on the merits. Not the procedural stuff that precedes it, but on the merits. In the San Francisco Hilton case, dealing with front desk attendants at a hotel. Bank of America, dealing with bank tellers. And, most recently, *CVS Pharmacy*, dealing

with drugstore cashier clerks. Probably the closest equivalency to the Kmart position.

Each and every time those judges have said Section 14 does not require providing a seat because the nature of those employees' work.

**THE COURT:** Are those federal cases, state cases?

**MR. WOHL:** Those were one state case. San Francisco Superior Court decided the *Hilton* case. And Central District decided the *Bank of America* case. And the Southern District decided the *CVS Pharmacy* case.

**THE COURT:** Mr. McInerney, what do you say?

**MR. McINERNEY:** Well, there's actually six letters that went to the DLSE in the late '80s and early '90s. And Mr. Wohl has cited the one involving salespersons. And that's a standing position, so we would say that has no applicability.

The others, generally, iterated that the rule is the rule, and there's a reason for the rule. And, you know, you have to apply it within the business, and that, historically, it's been interpreted in such and such a way.

With respect to the cases, your Honor, the San Francisco Hilton case involved receptionists at the Hilton Hotel. I think that has been pretty well shot through by two DCA opinions in cases in which we were involved: *Home Depot* and *99 Cents*. Happy to provides those cites.

With respect to the *CVS* opinion, which was a federal court

opinion, we found that an interesting decision. Judge Anello said that, this is a wage order which applies to cashiers, and it's recognized that cashiers can do their job while seated; so I can't believe that the wage order says what it says.

That case was cited to your Honor during class certification, and you declined to follow it.

And we have a -- the one nice thing about us, for better or for worse, is, we are an equal opportunity plaintiff firm.

They talked about the business models of Wal-Mart and Target. Well, truth is, we've sued them, too.

Judge D'Avila certified Wal-Mart for us recently. And another judge, in San Diego, ruled in our favor on --

**THE COURT:** Well, certification is not the same thing as winning.

**MR. McINERNEY:** No, no.

**THE COURT:** So right now I'm trying to figure out what the wage order means, and whether the agencies have given us any help on --

**MR. McINERNEY:** The answer is no. I mean, the only significance that I can say about the -- you know, these letters that -- and we'll produce them.

I think they've actually been attached as, you know, one of a hundred exhibits and SJ motions earlier, and even on cert.

But the thing that's important about them is that in the '80s and '90s, both the companies and the DLSE were focusing on

this wage order. It's not like something that's been, you know, a military secret. 14 has been around, and it's been in the attention of --

**THE COURT:** All right. Here's what I would like to get you to do.

**MR. McINERNEY:** Sure.

**THE COURT:** Would you give me a stack of all letters. If they are an exhibit, make sure it has the exhibit numbers, but all rulings by the agencies and in any form, and also the decisions that you think are on point.

And then the plaintiff should go through and, in pink, highlight the words you want me to read. And the defendant should go through in blue, and you highlight in blue the words you want me to read.

I may read it all, but at least I'll know for sure to read the parts that you have highlighted. And you can give me this tomorrow morning when we start, unless you need more time. If you need more time, fine, I'll give you more time.

**MR. McINERNEY:** I'd like until Thursday morning.

**THE COURT:** Thursday morning. Does that work for you?

**MR. WOHL:** That certainly does, your Honor.

**THE COURT:** Just one stack now. I don't want two stacks. I want the highlighting on one document so I can compare.

**MR. WOHL:** May I say a couple of things quickly, your

Honor, to dispel what my friend, Mr. McInerney's impression, I think, is being left with the Court?

There is no Court of Appeal decision on the substantive interpretation of Section 14. The only thing that's happened has been dealing with these procedural issues, such as, can you even sue for penalties under Padre [sic] for this alleged violation, and so forth. So, please, don't be misled by that.

The only positions we have are District Court or trial court decisions.

**THE COURT:** Here's my last question. Have either of you submitted these questions to the state agencies, to find out what they think should be the answer in the Kmart case?

**MR. WOHL:** I'm not aware any employer has done so, your Honor, but with good reason. The usual policy of the labor commissioner is, they will not opine on any matter that's under active litigation.

**THE COURT:** What if I were to ask them for an amicus brief? What would they say?

**MR. WOHL:** I don't know, your Honor.

**THE COURT:** What would they say?

**MR. McINERNEY:** Probably they will say they are too busy and don't have enough money.

But, I will point out that there is one way to get a ruling.

**THE COURT:** What's what?

**MR. McINERNEY:** Well, it's that Section 17 that I put up there. It's -- and it's in the wage order. And, at any time, Kmart could have gone to the labor commissioner and sought an exemption. So we know they didn't do that.

**MR. WOHL:** There's a quick answer to that, your Honor. Section 17 only applies if, first, Section 14 does apply.

So, first, you have to find the nature of the work does reasonably permit a seat. If you've met that finding, then the employer can say, In my particular case, it would create too much of a hardship and wouldn't really promote the safety or health of the employees, and the agency can assert an exemption. But we're not there yet, your Honor, because you have to deal with the Section 14 interpretation issue first.

**THE COURT:** You lawyers know the personnel. Look back there in the courtroom and see if you see anyone from any state agency here.

Is there anyone in the public seating area who is from the state agencies?

I guess not.

Mr. Wohl, you did not look back. Do you already know every person in the courtroom?

**MR. WOHL:** I'm sorry, your Honor. I didn't realize that was directed to me. I do not see anybody from the state agency. I was going to put them on the spot if they were here. If I could make one more comment, your Honor.

**THE COURT:** I want you to think about an amicus brief. If it was going to take a long time, forget it. But if I could get it in a reasonable period of time, I might be interested in getting the considered views of the state officials that came up with this wage order in the first place.

**MR. WOHL:** Your Honor, I would observe that these cases have been well publicized for over three years, at this point. I am certain if the agency thought this was something that their views would be of value, we would have heard from them. I do not suppose that they want to get involved with pending litigation. That's the key distinction.

**THE COURT:** Can it hurt to ask? I don't know.

**MR. WOHL:** And then, your Honor, one other point, if you'll indulge me --

**THE COURT:** Who would I even ask? What would be the official agency that I would ask?

**MR. WOHL:** Well, the head of the DLSE, is the labor commissioner.

**THE COURT:** Labor commissioner.

**MR. MATTHEW RIGHETTI:** Your Honor, if I may. Matthew Righetti.

In the *Save-On* litigation, which we litigated before Judge Chaney in L.A. Superior complex several years ago, who is now Justice Chaney, she had very similar questions about how the DLSE interpreted the exemptions from overtime for executives

under the wage order.

And what she did is, she ordered the DLSE to provide a person most knowledgeable to come in and testify at a deposition about what the agency's historic position has been in enforcing and interpreting that provision of the wage order. Which, the DLSE sought to quash it.

She denied that motion, and they came in and testified and had no problem testifying about how they handled that wage order. So that's one way it can go.

**THE COURT:** Well, that's an imaginative approach, but I'm thinking more mundanely about just a plain ole amicus brief.

**MR. WOHL:** If I could be heard on this. Just as a misunderstanding, as I said in my outside remarks, they have spoken to the interpretation of Section 14, the retail environment, twice.

And what's very interesting is, you just heard from Mr. McInerney -- and, frankly, their thinking has evolved as they have pursued these cases.

Initially, they argued simply for seats, and that was it. Now we hear, well, really what Johnson means is sit/stand. They should sit for part of the time and stand for part of the time.

That, your Honor, was precisely the fact pattern presented in the Macy's case, where they asked for the opinion because,

after all, the salesmen may need to stand on the sales floor, but, arguably, when he goes back to ring up the sale, consistent with their view, he could sit down and ring up that sale.

And the agency said that would be ridiculous. The nature of the work is a customer service on your feet, serving that customer. So, your Honor, our view is that DLSE has actually already spoken to this issue. They have already --

**THE COURT:** Let me read your -- you all get this packet put together for me and let me read it before I decide whether to ask for an amicus brief.

So give me your packet by Thursday morning, 7:30 a.m., color coded as I have indicated. And it should also include those other District Court decisions and the like. Court of Appeals.

Whatever you want to put in there, that you think bears on the issues of law, I'd like to see what the appropriate agencies and other judges have said on that subject.

Now, did you give me -- did you also give me trial briefs, both sides?

**MR. WOHL:** I believe trial briefs were submitted, your Honor.

**MR. McINERNEY:** I referred to my boring trial brief earlier.

**THE COURT:** Well, if it's boring, I'm not going to

 read yours, Mr. McInerney.

(Laughter)

**MR. McINERNEY:** Yeah.

**THE COURT:** If the other one is not boring, I will read it. Boring or not, I will read them both.

Okay. We'll take a 15-minute break. Please have the first witness ready to go when we come back.

**MR. WOHL:** Yes, Your Honor.

**MR. McINERNEY:** Yes, Your Honor.

(Recess taken from 9:11 to 9:34 a.m.)

**THE COURT:** Please, be seated. Let's go back to work.

Before we get to our first witness, I want to hand out something. Here is a -- the order that I used in the *Oracle vs. Google* case, on proposed findings of fact. I will eventually adjust it for your case.

Dawn, if you would hand this out. I only have one copy. You will have to share or make a copy.

If you would give me your proposed changes sometime tomorrow on how you would like to proceed on these things, then I'm happy to consider any adjustments to it that you have.

I do want to say one thing about proposed findings. One gimmick that a lot of lawyers like to do is evade answering -- admitting or denying. In other words, what -- the way I have this laid out is, one side says the light was green. The other side then has to either admit it or deny it. And you'll see

how that works.

What you cannot do is evade. If you evade, you will be in trouble, because I can see right through it. You will see that I have it set up so that you cannot evade.

Now, if you're dumb enough to put out a thing like the light was green and the driver was as reckless as anybody on the face of the earth, then, yes, you can deny that even though the light was green, because it's a dumb point to begin with. In other words, nobody in their right mind would frame the point that way.

But if it's as simple as the light was green, you've got to say yes or no. You can't say, oh, I don't know. We don't know.

This is based upon -- you'll see how -- I want to stress this. This system works very well, and has worked very well for me in almost 14 years. If works well because I come down hard on anyone who evades. If you want to be Mr. or Mrs. Evasion, be my guest. But you will regret it when the findings of fact come out.

All right. So you two share on that and see. If you want me to change the wording, then I'm happy to consider a way to change the wording.

All right. So that's that item. And then I have this question for you before we get to the first witness.

This is a class action for the Tulare store only. So I

have this question for you. Let's -- I'm going to ask it both ways.

Let's say that the defendant wins. Is this going to be -- even though not technically res judicata against all the other stores, is this going to be the end of the line, or do we then go to store number two, store number three? And can the plaintiff keep improving upon -- plaintiffs keep improving upon the story as we go forward?

Or, let's say plaintiff wins. Is this going to be the end of the story Kmart-wide?

Now, I know what you're both thinking. Neither of you want to admit or deny that because I know how you think.

But I'm going to ask -- here's the thing. I want you to answer that question right now. Because if you do wind up winning, and you try to take a different position later, you're not going to be allowed to.

So I want to hear right now what your position is. Is this going to be -- is this going to decide this story once and for all, for all stores, or is this going to be a one-off thing?

I'm okay either way. It's just if you wind up losing, you're not going to be allowed to adjust.

Let's hear what you have to say on that subject.

**MR. MATTHEW RIGHETTI:** Thank you, Your Honor.

**THE COURT:** Okay. Please, go ahead.

**MR. MATTHEW RIGHETTI:** I'll let Mr. Wohl go first.

**THE COURT:** No, Mr. Righetti, you get to go first.

(Laughter)

**THE COURT:** You're the plaintiff.

**MR. MATTHEW RIGHETTI:** Based upon the -- I think how the issues are framed for the Court, I think it's going to be all or nothing.

**THE COURT:** So this is all stores or nothing?

**MR. MATTHEW RIGHETTI:** For --

**THE COURT:** All stores. It's not nothing. It's going to be all stores.

**MR. MATTHEW RIGHETTI:** Right. I think, for instance, if the Court finds that there's business judgment that comes to bear on this, and that the Court should defer to Kmart's business judgment, then that's going to apply to all of the stores.

**THE COURT:** I don't know what the -- maybe I find -- I don't know. Maybe I find something -- something different. But your view is it's all or nothing?

**MR. MATTHEW RIGHETTI:** Yes, Your Honor.

**THE COURT:** All right. Let's hear from the defendant.

**MR. WOHL:** Our view, your Honor, is that since you've only certified the class of Tulare employees, it would only be binding as to that class or to Kmart as to that class.

Any effect on future proceedings would just depend on what

the Court does.

**THE COURT:** So that means that if you win, we are going to store number two, and you can't argue we've already decided the issues, unless there's something about the way in which the Court decides the issues that is compelling in all cases.

**MR. WOHL:** Yes, Your Honor. I think that could be a possibility. Thank you.

**THE COURT:** Okay. You two have now stated your views on that. We will now go forward to start hearing the evidence.

At this time, plaintiff may call its first witness. Please, go ahead, Mr. Righetti.

**MR. MATTHEW RIGHETTI:** Plaintiff calls Dr. Steven Johnson, your Honor.

**THE COURT:** All right. Are you that man?

**THE WITNESS:** I am, sir.

**THE COURT:** Please, stand up and raise your right hand, and the clerk will swear you in.

**STEVEN JOHNSON**,

called as a witness for the Plaintiff herein, having been first duly sworn, was examined and testified as follows:

**THE WITNESS:** I do.

**THE COURT:** Okay. Thank you.

**THE CLERK:** Okay.

**THE COURT:** Okay. Excellent. Have a seat.

What you need to do, so everyone can hear, be this close to the microphone. Say your name so we make sure it's coming through okay.

**THE WITNESS:** Steven Johnson.

**THE COURT:** Can everyone hear okay over there?

Okay. Great. You have materials in front of you. I don't care if you do or not. But, the lawyers ought to know that the witness has got some kind of notes in front of him. If you object, we'll have proceedings on that. But I don't know.

**MR. WOHL:** I appreciate you drawing our attention to it. I would like to know what notes Dr. Johnson has in front of him.

**THE COURT:** What do you have in front of you?

**THE WITNESS:** Exhibit 28, Exhibit 29, and my CV.

**THE COURT:** Close everything up until you get permission to look at it.

**MR. WOHL:** As long as those are exhibits in evidence, no objections.

**THE COURT:** Let's wait and see.

**MR. MATTHEW RIGHETTI:** So stipulated.

**THE COURT:** What?

**MR. MATTHEW RIGHETTI:** We'll stipulate.

**THE COURT:** I don't think people should be testifying with crib notes.

**MR. MATTHEW RIGHETTI:** It's his report.

**THE COURT:** Unless I give him permission to. I don't care whether it's in evidence or not. He's going from his memory under oath. If he needs to refresh his memory as to his CV, okay, he can ask to do that.

But, we're going to do this the technically -- not technically. I don't like that word. We're going to do this the proper way. If we get to the point where he can't remember where he went to college, then you may ask him to look at his resume.

Thank you.

**MR. MATTHEW RIGHETTI:** Closed-book exam.

**THE COURT:** Right.

**MR. MATTHEW RIGHETTI:** For starters.

**THE COURT:** This is the real thing, Mr. Righetti.

**MR. MATTHEW RIGHETTI:** Okay.

**THE COURT:** This is not something else. This is it.

Okay. I'm all ears. Go right ahead.

**MR. MATTHEW RIGHETTI:** Have you been sworn?

**THE COURT:** He's been sworn.

**MR. MATTHEW RIGHETTI:** Thank you.

**DIRECT EXAMINATION**

**BY MR. MATTHEW RIGHETTI:**

**Q.** Dr. Johnson, where do you reside?

**A.** In Fayetteville, Arkansas. 2432 North Toy Drive.

**Q.** And are you employed?
**A.** Yes, I am.
**Q.** Where are you employed?
**A.** University of Arkansas.
**Q.** What do you do for the University of Arkansas?
**A.** I'm a professor of industrial engineering.
**Q.** And how long have you been employed as a professor of industrial engineering at the University of Arkansas?
**A.** Thirty years.
**Q.** And what do you do as a professor of industrial engineering at the University of Arkansas over those years?
**A.** I teach graduate and undergraduate courses. I do research, and then I do service within the university.
**Q.** Okay. And do you have any other employment over that period of time other than your University of Arkansas work?
**A.** I have a consulting company, Ergonomic Analysis Incorporated, that I'm president of, and that was since 1980. I spent a semester on sabbatical in England at the University of Nottingham, and then I taught one semester at Pohang University of Science and Technology in Pohang, Korea, but other than that, no.
**Q.** All right. Does the -- being a professor of industrial engineering have anything to do with being an ergonomist?
**A.** The field I teach is ergonomics. One of the areas that I teach is ergonomics.

**Q.** Can you explain what the field of ergonomics is?

**A.** Ergonomics is designing the -- matching the physical, physiological and psychological requirements of the job with the physical, physiological and psychological characteristics of the person is probably the easiest description.

**Q.** And how long have you one doing that kind of work?

**A.** Forty years.

**Q.** And what educational background do you have that qualifies you, in your view, to do that kind of work?

**A.** I received a bachelor's degree in psychology at the University of South Dakota. After my bachelor' degree, I went to the University of Illinois and joined the aviation research laboratory -- which was an interdisciplinary laboratory of electrical engineers and mechanical engineers and aero-engineers and psychologists -- and did the interdisciplinary work.

I got a master's degree in engineering psychology at the University of Illinois, and then went to Buffalo, New York, to work. Finished my Ph.D. in Buffalo at the State University of New York in Buffalo, in human factors, which is sometimes in psychology and sometimes in industrial engineering.

At the State University of New York at Buffalo, it was in engineering, so I finished my Ph.D. in ergonomics in industrial engineering at State University of New York at Buffalo.

**Q.** When you do work for ergonomic analysis, which is apart

from your University of Arkansas work, can you explain for us what type of work you do?

**A.** It's in both the ergonomic -- sometimes ergonomics is referred to as human factors. "Human factors" is the terminology that's used in the United States a lot of times.

And so I'll do consulting on workplace design. I do consulting on quality control as well. Methods in work measurement, designing processes, lean manufacturing, lean processes type of work, as well.

But the primary work would be -- in terms of ergonomics would be looking at workplace design and tasks, the tools and equipment that they use.

**Q.** Who hires Economic Analysis, Inc., for you to do those types of analyses?

**A.** I work for the companies themselves, the individual plants or the corporations.

**Q.** Can you give some examples of the companies that you've worked for in that area?

**A.** Yes. I have a list in my resume. May I access that?

**THE COURT:** No, unless you've forgotten. Have you forgotten who they are?

**THE WITNESS:** No, I --

**THE COURT:** All right. Then you have to stick with memory.

**THE WITNESS:** It is a list of, I think, approximately

60 different companies over this period of time. It has ranged from steel companies, Chaparral Steel; poultry companies, Tyson's and George's and ConAgra.

It has included Maybelline. It has -- Mary Kay cosmetic industry. It's been the food processing industry, French's Mustard. A wide variety of industries.

**BY MR. MATTHEW RIGHETTI:**

**Q.** Okay. Did you also work for General Motors Institute?

**A.** Yes. I worked for General Motors Institute after I got my Ph.D., received my Ph.D.

**Q.** For how long and what did you do for them?

**A.** I was there for five years. General Motors Institute, at that time, which is now Kettering University today, is a -- was a wholly-owned subsidiary University of General Motors. It only had engineering and management.

And there I did the same thing only I didn't have graduate students. I was teaching human factors, or ergonomics, quality control, methods in work measurement, design experiments and statistics.

**Q.** Did any of that work involve evaluating the workstations of workers?

**A.** Yes, yes, I did consulting within the corporation on production operations as well as some limited amount of work on product design. But most of it was on the industrial operations.

**Q.** Have you ever been hired as -- has Ergonomic Analysis, Inc., ever been hired by retailers to evaluate whether the cashier positions at the retail stores can be performed while seated?

**A.** Yes. I work for -- not to determine whether it could be done seated at Aldi, but -- Aldi is a grocery store company that has seated operators, and I did some consulting work for them.

**THE COURT:** What was that name again?

**THE WITNESS:** Aldi, A-l-d-i.

**THE COURT:** Where are they located?

**THE WITNESS:** It's a German grocery store company that has set up in the United States. I think it has about 400 stores around the United States, mostly in upper midwest.

And, again, because it was a German store, they have the -- Europeans do it that way. They have -- the checkout operation was in a seated posture, and I did some work with them.

And then I also did some consulting with Wal-Mart on looking at seated operations on their checkout.

**THE COURT:** Now, Counsel, let's just be clear what we're doing here. You're putting some pictures up. If there's no objection, that's fine.

But the witness wasn't testifying to any of this, so I don't know what the point of doing this is. Is this sort of

like background pictures for me to -- I don't get it. If he's not going to be testifying about these pictures --

**MR. MATTHEW RIGHETTI:** He --

**THE COURT:** -- I can't do two tracks. I can't have your slide show going and the witness going. I need one track. If he wants to refers to these pictures, okay, he can do that.

**MR. MATTHEW RIGHETTI:** Well, these are all figures from his report.

**THE COURT:** Then he needs to refer to them.

**MR. MATTHEW RIGHETTI:** I was going to lay a foundation for this.

**THE COURT:** Then please do that. You can do that part. But these were sliding by with no testimony.

**MR. MATTHEW RIGHETTI:** Right. I understand.

**MR. WOHL:** And I appreciate it, your Honor. I didn't even see it was on the screen. I was focused on Dr. Johnson, so thank you for that.

**THE COURT:** Go ahead.

(Document displayed.)

**BY MR. MATTHEW RIGHETTI:**

**Q.** All right. What we have is a photo on the screen, which is Figure 1 from -- I'll represent it's Figure 1 from page 7 of the report you provided in this case.

Do you recognize that photo?

**A.** Yes, I do.

**Q.** And what is that?

**A.** This was the Aldi store back when I was doing work with them, which is in '94 to '96, in that range. This particular -- they were just transitioning to scanners. And this particular workstation was a 10-key operation.

In other words, they put the data into the keyboard as they were checking as opposed to a scanning operation. But it was an example of what they were doing in a seated posture. After they scanned the item, they put it in the basket.

**Q.** Is this, you know, the work area that you were evaluating for the work that you did for Aldi?

**A.** No, this is Aldi -- well, I looked at this, but this was not their primary concern. Their primary concern was the scanning workstations as opposed to the 10-key.

**Q.** Okay. Let me show you what's Figure 2 on page 9 of your report and ask you if you can please identify --

**THE COURT:** Let me stop for a second.

Usually reports don't come into evidence. They're hearsay unless you two have stipulated otherwise, in which case that's fine. Is there such a stipulation?

**MR. MATTHEW RIGHETTI:** We haven't discussed it. I'm fine with allowing them into evidence.

**THE COURT:** Well, you're showing these, but they're not in evidence.

**MR. MATTHEW RIGHETTI:** Not yet, right.

**THE COURT:** I'd like for them to be moved one at a time, because if we do it at the end of the witness, I will have forgotten everything about the foundation. So you need to move them one at a time, as soon as you're done with it, and let's see if there's an objection.

**MR. MATTHEW RIGHETTI:** Okay.

**THE COURT:** So if you -- that's just the way it helps me keep -- rule while it's fresh. Now, maybe there's no objection.

What's the exhibit number we have up on the screen now?

**MR. MATTHEW RIGHETTI:** It is a portion of Exhibit 28. It is Figure 1 on page 9 of Exhibit 28.

**THE COURT:** Any objection?

**MR. WOHL:** I'll object, your Honor. It's not relevant.

**THE COURT:** All right. That objection is overruled.

What is that exhibit number?

**MR. MATTHEW RIGHETTI:** I would -- it's Exhibit 28, and I would mark it as 28A.

**THE COURT:** All right. 28A is in. It's your burden to get that today, Mr. Righetti. Listen to me now.

**MR. MATTHEW RIGHETTI:** I am, yes.

**THE COURT:** Today. The tag has got to be correct today. All right. Please attend to that when the session is over, or before that. But we can't let -- if it's not properly

marked now, you're in violation of the Court rules already.

**MR. MATTHEW RIGHETTI:** I understand.

**THE COURT:** So you've got to get that fixed.

All right. 28A received.

Go ahead.

(Trial Exhibit 28A received in evidence.)

(Document displayed.)

**BY MR. MATTHEW RIGHETTI:**

**Q.** The next photo, do you recognize that photo?

**A.** Yes, that's the workstation that I looked at for Aldi, and it's a seated workstation where they are scanning now as opposed to using a 10-key, using an input into a keyboard.

**THE COURT:** You looked at it in Germany or here?

**THE WITNESS:** No, this was in the United States.

**THE COURT:** What state was that in?

**THE WITNESS:** In Kansas and Arkansas. They had some stores in Kansas and some in Arkansas. They have stores all over, but those are the only two locations that I observed.

**THE COURT:** All right. Go ahead. Thank you.

**MR. MATTHEW RIGHETTI:** This is Figure 2 of page 9 of Dr. Johnson's report, and we would move that into evidence as well.

**THE COURT:** That's what exhibit number?

**MR. MATTHEW RIGHETTI:** 28B.

**THE COURT:** 28B. Any objection?

**MR. WOHL:** Yes, Your Honor. Object on basis of lack of relevancy. And just to make clear, the witness has not said that he did any seat evaluation for Aldi, simply looked at the scanner. There's no issue about scanner configuration in this case, so it's not relevant to the testimony.

**THE COURT:** That objection is overruled. 28B received.

Please continue.

(Trial Exhibit 28B received in evidence.)

**BY MR. MATTHEW RIGHETTI:**

**Q.** So can you explain for us what you did for Aldi when you consulted with them on their workstations in the United States?

**A.** Well, the -- this was in the '90s. And there was a big surge at that point in the United States of problems with cumulative trauma disorder called musculoskeletal disorders. Carpal Tunnel Syndrome was one of the main ones.

This was one of the things that caused a lot of organizations to be concerned with ergonomics. They did not have any experience -- negative experience with that, but they wanted to make sure that they handled that from their standpoint.

So they asked me to come in and look at their workstation and make any recommendations that I might that would help them, basically, make it a more efficient operation. And so it was looking at the -- the -- the seated operation.

It was not to look at whether it would be standing or seated. It was already a seated operation, and that's what they wanted to stay with. But then look at the footrests and the scanner and how they were proceeding.

And then I also developed for them a training program on how to use good biomechanics in the process of doing scanning. And they took what I developed and then made it into part of their training program for their cashiers.

**Q.** What type of products are sold at Aldi?

**A.** It's a grocery store.

**Q.** All small items like toothpaste and Dixie cups?

**A.** No, it has --

**MR. WOHL:** Objection, Your Honor, leading.

**THE COURT:** Pretty close to leading. I'll allow it this time, but do not lead your own witness.

Go ahead, answer the question.

**THE WITNESS:** It has a range. It's much like a Safeway store or a Kroger's.

**THE COURT:** Those are grocery stores too?

**THE WITNESS:** Yes.

**THE COURT:** Okay.

**BY MR. MATTHEW RIGHETTI:**

**Q.** I'm going to go back to your background now.

Are you a member of -- strike that.

Have you been a member of any professional societies?

**A.** Yes. The Human Factors Society. The Institute of -- it's now it's called Human Factors and Ergonomics. Traditionally, it's called Human Factors Society. Human Factors and Ergonomics Society. The Institute of Industrial Engineers. The Society for Quality Control. And then I'm also a member of the Transportation Research Board. And, yeah, those are the societies.

**Q.** And have you held any positions of note with any of those societies?

**A.** I was chair -- chairman of the -- chair of the industrial ergonomics group, technical group in the Human Factors Society. I was the director of the ergonomics group of the Institute of Industrial Engineers. Those would be the only ones.

**Q.** Have you received any awards?

**A.** I -- I'm a member of the -- in terms of organizations, I'm on the board -- I was on the board of directors of BCBE. That's the accrediting agency for ergonomics nationally.

I got the Jerome H. Eli award from the Human Factors Society for an article. And then last year -- or two years ago, I had an article that was selected as being one of the best articles in the last 30 years in the human factors area.

**Q.** Have you participated in authoring any textbooks or chapters of textbooks?

**A.** Yes. I'm a second author on a textbook, "Occupational Ergonomics," and -- with Stephen Konz. There's also an

instructor's manual that goes with that, that's a second document. That's the only textbook I've been a coauthor on.

And then I've been an author on a number of chapters in reference books and textbooks.

**Q.** Who is Stephen Konz, K-o-n-z?

**A.** He was -- he's retired now. He was a faculty member at K State, at Kansas State University --

**Q.** What area?

**A.** -- in the industrial engineering department.

**Q.** Does he work in the area of ergonomics?

**A.** Yes, he does.

**Q.** And tell us about how you become involved in writing chapters for other textbooks.

**A.** The authors -- or the editors, I should say. The editors of those textbooks search out people to write on specific topics that are applicable to their textbook.

**Q.** This -- the one textbook, "Work Design Occupational Ergonomics," that you coauthored with Stephan Konz, how is that used? Who uses that?

**A.** It's used -- I don't know, I haven't looked lately. It was used by about 20 different universities in and around the United States, and then used also internationally a bit. But -- in university. They use it for introductory ergonomics courses.

**Q.** For undergrad?

**A.** For undergrad.

**Q.** Okay. And that publication began approximately when? When was the first edition, do you know?

**A.** I got involved in the sixth edition, I believe. It's in the seventh edition now. I got involved in the fifth edition. This is now in the seventh edition. And I don't know exactly when the first edition was published.

**Q.** In addition to being the author -- strike that.

In addition to being the coauthor or chapter author of various textbooks, does your ergonomics work involve being the author of any articles, published articles?

**A.** Yes, I published articles. Most of my research is in the form of reports to the sponsors as opposed to refereed journal articles. But I have had some refereed journal articles as well.

**Q.** And over the years, how many articles would you estimate you've published in the area of ergonomics?

**A.** Over 50.

**Q.** And as part of your work as an ergonomist, do you work on funded research projects?

**A.** Yes, I do.

**Q.** Explain that type of work for us, if you would.

**A.** That's work where either I've become interested in something and then found someone to fund the research at the University of Arkansas, on my own time, part of my own time, as

well as the graduate students' time.

Or, sometimes, organizations develop requests for proposal and send them, and we respond to those in a competitive situation.

Or sometimes I've had National Science Foundation grants where you send an unsolicited proposal to the National Science Foundation and they fund it.

**Q.** What are some of the organizations that have funded your research from the area of ergonomics?

**A.** The Air Force, United States Air Force. Department of Transportation. The U.S. Poultry and Egg Association. Truckload Carriers Association. The majority of my research has been funded by industry groups.

**MR. MATTHEW RIGHETTI:** Your Honor, we would move to have Dr. Johnson qualified as an expert in the area of ergonomics. I'm not sure if there is an objection or we can stipulate to that.

**THE COURT:** In federal court you don't need to do that. As long as he stays within the scope of his established expertise, the opinions will come in. Obviously, he has expertise in -- I'm not quite sure myself what the field would be, but ergonomics sounds close enough.

You have to stay within his scope of expertise and not veer outside that. As long as he stays there, you may -- and stays within the four corners of his report, you will be fine.

So it's unnecessary to make that motion. A lot of lawyers do it and I never have understood exactly why. You laid the foundation and showed that he has considerable expertise. That doesn't mean that all of your questions are going to be within that expertise. That's my -- I've learned the hard way I have to say that. Okay?

**MR. MATTHEW RIGHETTI:** Thank you.

**THE COURT:** So stay within his expertise.

**BY MR. MATTHEW RIGHETTI:**

**Q.** As part of your ergonomics work, are you licensed?

**A.** Yes, I am a registered engineer in Arkansas, professional engineer in Arkansas.

**Q.** How is your time split between your work at the University of Arkansas versus your work for private clients at the Ergonomic Analysis, Inc.?

**A.** In terms of percentage --

**Q.** Sure.

**A.** -- time? Twenty percent. Traditionally, I did research during the summer. Over the last couple of years I've done more consulting during the summer. I'm on a nine-month appointment. So it's increased a little bit in the last few years.

But in general, about 20 percent of my time is with consulting, and 80 percent of my time is university.

**Q.** Do you do a lot of testifying in court?

 **A.** No, this is the first time I've ever been in court.

**Q.** When were you -- if you recall, approximately, when were you retained in this case?

**A.** Uhm, I believe it was in February or March. March of this year.

**Q.** And do you recall what the -- explain what it was that you were asked to do as part of your work in this case.

**A.** Well, I was asked to look at -- at Kmart's work checkout stand, the tasks that are performed by the cashier in the -- at the checkout stand at Kmart organization, and to look at whether those tasks -- define those tasks and determine whether those tasks could be performed in a seated posture.

**Q.** And had you ever done that type of evaluation in the past, to determine whether something could be done in a seated versus standing or sit/stand option?

**A.** Yes. Part -- when I did the consulting for Wal-Mart, I was looking at the advantages and disadvantages of different configurations. And then also with CVS, Rite Aid and Target, I've have been involved in those options.

**Q.** That's because CVS, Rite Aid and Target, you were hired to do litigation consulting, correct?

**MR. WOHL:** Objection. Leading, your Honor.

**THE COURT:** That's leading.

**MR. MATTHEW RIGHETTI:** You're right.

**BY MR. MATTHEW RIGHETTI:**

**Q.** Tell us, if you would, what the -- I'm trying to separate between you being hired by a company to do an evaluation versus you being hired in a litigation context.

So you had mentioned Aldi as a company that hired you to do an evaluation of a cashier position. You recall that?

**A.** Yes.

**Q.** Were you hired by any other corporate clients to do an evaluation of their cashier workstation in the United States?

**A.** I was hired by Wal-Mart to look at the advantages and disadvantages of different postures, including seated posture.

**Q.** For what position?

**A.** For a check -- for checkout operations for cashiers.

**Q.** In what geographic region?

**A.** This would be -- it was in northwest Arkansas.

**Q.** Okay. And can you discuss with us the scope of your work and your findings from the Wal-Mart -- Wal-Mart consultation that you did?

**A.** My understanding is, no, I have a confidentiality agreement about the results of that research.

**Q.** Confidentiality agreement with whom?

**A.** With Wal-Mart.

**MR. WOHL:** Your Honor, may I be heard on this?

**THE COURT:** Yes.

**MR. WOHL:** Mr. -- Dr. Johnson testified freely in a

case called *Brown vs. Wal-Mart*, which is yet another seats case prosecuted by the same plaintiff's counsel as here, and there was no declination to answer any questions, there was no protective order entered, there was no confidentiality order.

It was a -- as public a deposition as any deposition there could be, so there is no basis for the witness to avoid answering questions about his Wal-Mart work on the basis of confidentiality.

**THE COURT:** Is this something that's going to come up on cross?

**MR. WOHL:** Yes, it is, your Honor, very much so.

**THE COURT:** Well, then we'll get to it on cross.

Are you going to get into this yourself?

**MR. MATTHEW RIGHETTI:** I would love nothing more than to talk about his Wal-Mart work, but I think that we couldn't do that without notifying Wal-Mart.

**THE COURT:** Well, did he, in fact, testify in -- did he testify in some other case freely about this subject matter?

**MR. MATTHEW RIGHETTI:** In the Wal-Mart litigation, he testified about the work he did for Wal-Mart. And as I understand it, in all their litigation he has felt confined by the -- by the confidentiality agreement that Wal-Mart had him sign.

So the point was that Wal-Mart couldn't prevent him from testifying about his work in Wal-Mart pursuant to a

confidentiality agreement, but, you know --

**THE COURT:** Has he, in fact, testified?

**MR. MATTHEW RIGHETTI:** He has provided -- he testified as a fact witness at deposition under subpoena in the Wal-Mart case. That's what I understand.

**MR. WOHL:** And no time during the deposition, your Honor, was there any sealing of the deposition, protective order, confidentiality. Wal-Mart showed up, plaintiff's counsel showed up, they proceeded to examine the witness. It's all public record and we have it.

**THE COURT:** Did he testify just on facts or did he testify about opinions?

**MR. WOHL:** Well, he testified in terms of -- as a fact witness in terms of what he did for Wal-Mart.

**MR. MATTHEW RIGHETTI:** Do you have a -- I assume what you're saying is you have a copy of that deposition transcript.

**MR. WOHL:** Yes, I do.

**THE COURT:** Well, when we get to -- you have a copy and that was not sealed or anything like that?

**MR. WOHL:** That's correct, Your Honor.

**THE COURT:** Well, when we get to your cross-examination, we'll decide then how far you can go on that. Plaintiff's counsel says he doesn't want to get into it anyway. But if he did testify -- I'll just tell you tentatively, if he has testified as an open book in some other

case, then he's going to be allowed to be examined within -- to that same extent in this case.

**MR. MATTHEW RIGHETTI:** Sure. Mr. Wohl makes representation about whether it was sealed, whether it was subjected to the confidentiality.

**THE COURT:** Yes, he does.

**MR. MATTHEW RIGHETTI:** I wasn't the attorney who took that deposition.

**THE COURT:** Well, I'm not going to take Mr. Wohl's word for it. He'll have to bring in a witness to prove, to voir dire something that it was, in fact, open. So maybe he'll put on one of his colleagues. I don't know how he'll do it.

But if you two can't agree on that point, then we'll have to have -- it'll come out of your time -- not your time; it'll come out of Mr. Wohl's time -- a sideshow on whether or not it was under seal or not.

We've taken up too much time on this. You don't want to get into it, correct?

**MR. MATTHEW RIGHETTI:** I said I don't have any problem getting into it. We would --

**THE COURT:** Well, then if you want to get into it, go ahead.

**MR. MATTHEW RIGHETTI:** But I worry about the -- Dr. Johnson has concerns about the confidentiality agreement.

**THE COURT:** He refuses to answer, I'll take that into

account in evaluating his credibility.

I'm telling you if you testified to this as an open book in some other case and there was no privilege there, there's no privilege here.

**MR. MATTHEW RIGHETTI:** We don't know whether privilege was asserted.

**THE COURT:** Well, he can tell us. He's the witness. He's under oath.

**MR. MATTHEW RIGHETTI:** Okay. I don't know if he would know, but --

**THE COURT:** Maybe not. Find out.

**BY MR. MATTHEW RIGHETTI:**

**Q.** At the Wal-Mart deposition, do you know if Wal-Mart asserted your confidentiality agreement as part of those proceedings?

**A.** I do not know whether they did or not. They were present at the deposition.

**Q.** Do you know whether or not they sealed or sought to seal your deposition transcript?

**A.** I do not know if they sought to seal it.

**Q.** Under the protective order or confidentiality agreement?

**A.** I do not know.

**MR. MATTHEW RIGHETTI:** I'm ready to move on from Wal-Mart.

**THE COURT:** All right. Please, go ahead.

**MR. MATTHEW RIGHETTI:** Thank you.

**BY MR. MATTHEW RIGHETTI:**

**Q.** So the -- when you were hired to evaluate the Kmart -- let's get back to your Kmart work.

So you were hired around March of 2012, to do an evaluation of Kmart checker stations in California; is that your understanding?

**A.** Yes.

**Q.** All right. And had you -- you had done some work evaluating seated cashier positions in the past, right?

**A.** Yes.

**Q.** Okay. As part of your work in this case, did you evaluate the extent to which the retail industry provides seats to cashiers?

**A.** In terms of evaluating it, no. Just my own experience, which was, to my knowledge, that Aldi was, but most of the retail organizations in the United States used standing cashiers.

**Q.** How about in other countries? Did you do an evaluation of the extent to which seated versus standing cashiers are used in other countries?

**A.** Well, when I lived in England, from that experience I knew that they seat -- they were seated at the cashier station throughout Europe, traveling through Europe. And then I traveled to London about a year ago to look at a number of

different companies that use seated cashiers.

**Q.** Why did you travel to London? What was the purpose of that trip?

**A.** This was part of the consulting on the seat -- from the counsel -- from counsel.

**Q.** Okay. I'd like to -- this is Figure 3 from page 10 of your report, and I'd ask you whether you recognize that photo?

**A.** Yes. I believe that's Boots. It's an organization in London, in England, that has cashiers in a seated posture.

**Q.** What is Boots?

**A.** It's a pharmacy much like a Walgreen.

**Q.** Okay. Can you tell us the range of items that they sell at Boots?

**A.** Uhm, primarily smaller things. Like I say, it would be personal items. Other than saying that, it would be comparable to a Walgreen or a pharmacy in the United States. It would be comparable to a pharmacy in the United States.

**Q.** And I can't really tell from this photo, but -- because we're looking at the front of the counter -- are the cashiers at Boots seated or standing?

**A.** They're seated.

**Q.** All right.

**MR. MATTHEW RIGHETTI:** I move --

(Document displayed.)

**BY MR. MATTHEW RIGHETTI:**

**Q.** Who took this photo?

**A.** I took the photo.

**Q.** Okay. And is it a correct representation of a seated cashier at the Boots store in London?

**A.** Yes.

**Q.** All right.

**MR. MATTHEW RIGHETTI:** And I would move this photo, 28C, into evidence.

**MR. WOHL:** Can we have a time on that, your Honor? When did he take the photo?

**MR. MATTHEW RIGHETTI:** Sure.

**THE COURT:** When did you take the photo, approximately? Was it this year?

**THE WITNESS:** It was last year. It was last year. I think it was 2011.

**THE COURT:** Received. Go ahead.

(Trial Exhibit 28C received in evidence.)

**BY MR. MATTHEW RIGHETTI:**

**Q.** The next photo is Figure 4 from page 10 of your report, and I'd ask you if you recognize that photo?

**A.** Yes, I believe that's Wilkinson.

**Q.** Who took that photo?

**A.** I took the photo.

**Q.** Approximately -- was that -- we're going to go through

several photos of London cashiers -- or England, UK cashiers. Were all these taken around the same time or the same trip?

**A.** Yes, they were all taken in the same trip.

**Q.** So this is Wilkinson's. What is Wilkinson's?

**A.** It's more of a household furniture -- not furniture, household items.

**Q.** What is the range of size of items they sell at Wilkinson's?

**A.** It's broader than it is at Boots. It does have larger items.

**Q.** Okay. And are the cashiers at Wilkinson's seated or standing in the UK?

**A.** They are seated.

**Q.** Did you do any evaluation about approximately how long cashiers in the United Kingdom have done their cashier work while seated, in general?

When did seats get rolled out in the UK?

**A.** I do not know that.

**Q.** I can see from this exhibit, which we'll mark 28D, as in David, that the cashier is doing what?

**A.** Uhm, placing an item in the bag for the person.

**Q.** So the cashiers at Wilkinson's, do they do bagging?

**A.** Yes, they do.

**Q.** Do you know if the cashiers at Boots do bagging?

**A.** Yes, they do bagging.

**Q.** We'll go to Figure 5 from --

**MR. MATTHEW RIGHETTI:** Oh, and we'll move 28D into evidence, your Honor.

**THE COURT:** Hearing no objection, received.

(Trial Exhibit 28D received in evidence.)

**BY MR. MATTHEW RIGHETTI:**

**Q.** Figure 5 from page 10, the next photo, was this taken on that same trip to London?

We'll mark this as 28E, as in echo.

**A.** Yes.

**Q.** And what does this photo show?

**A.** I believe that's Tesco. I can confirm that with my report.

**THE COURT:** You can look at your report.

**BY MR. MATTHEW RIGHETTI:**

**Q.** Page 10 of your report.

**THE COURT:** Please, if you're going to have to resort to belief, I'd rather you confirm it.

**THE WITNESS:** I didn't want to confuse it because it's small area there. There is a Tesco in United Kingdom.

**BY MR. MATTHEW RIGHETTI:**

**Q.** And who took this photo?

**A.** I took the photo.

**Q.** On the same trip?

**A.** Yes.

**Q.** And what does it show?

**A.** It shows a cashier in a seated posture.

**Q.** Do the Tesco cashiers do bagging?

**A.** They ask the person whether they would like it bagged. If they do say yes, they will do the bagging. That's their policy, is to ask them. If not, the majority of the people do not ask it to be bagged.

**MR. WOHL:** Objection, Your Honor, lack of foundation. He hasn't established he knows what their procedure is.

**THE COURT:** How do you know what was just said?

**THE WITNESS:** That's what I was told at the store by the cashiers and the manager.

**MR. WOHL:** Objection, Your Honor, hearsay.

**THE COURT:** Well, it is hearsay, but the rule permits an expert to rely upon hearsay. This falls within that rule, so I will allow it.

What is that guy doing with his right hand? Your picture washes out. I can't see what he's doing there.

**THE WITNESS:** He's getting it from the right. This is coming down on the conveyor. And then he will pass it across the scanner.

**THE COURT:** Looks like somebody's buying something that's unhealthy. What is that item? Are those cigarettes?

**MR. MATTHEW RIGHETTI:** It is the UK, after all, your Honor.

**THE COURT:** So let's just see if I've got it right. The items come in on the right. And then what does the cashier do with it? Sweeps it across to the left?

**THE WITNESS:** Yes.

**THE COURT:** Maybe that is healthy. All right.

So go back to the outside. So it would then go across, what, a scanner or what?

**THE WITNESS:** Yes, that's a scanner in front of him, below his left hand.

**THE COURT:** And then once it's registered, it would wind up over there with the paper towels?

**THE WITNESS:** Yes.

**THE COURT:** I understand that. Thank you.

All right. That's 28E?

**MR. MATTHEW RIGHETTI:** Yes.

**THE COURT:** Any objection?

**MR. WOHL:** No, Your Honor.

**THE COURT:** Thank you. Received.

Go ahead.

(Trial Exhibit 28E received in evidence.)

**BY MR. MATTHEW RIGHETTI:**

**Q.** And the next is 28F. And I'll ask you if you took this photo?

**A.** Could I ask to look at the previous one for a second and make sure what I said was correct?

I'm trying to decide for sure whether it's going left to right or right to left in that situation.

**Q.** What makes you question what direction it's going?

**A.** The conveyor -- if you focus in on where the left hand is, where the conveyor is there, they do have some that are left to right and some that are right to left.

**THE COURT:** All right. So you're just not certain on that point.

**THE WITNESS:** Yes, I'm not certain which direction that's going.

**THE COURT:** Thank you for the caveat.

Let's go to the next picture.

**BY MR. MATTHEW RIGHETTI:**

**Q.** And what does this picture show, which we'll mark as 28F?

**A.** Okay. This again is in -- on page 9. I'm sorry.

**Q.** Would your report refresh your recollection about this photo?

**A.** May I use my report?

**THE COURT:** Yes, you can, if it will refresh your memory.

**THE WITNESS:** This is ASDA. A-S-D-A.

**BY MR. MATTHEW RIGHETTI:**

**Q.** And what does this photo show?

**A.** It shows a seated posture with a person doing checkout.

**THE COURT:** What country is that?

**THE WITNESS:** That's at the UK. This was on the same trip.

**BY MR. MATTHEW RIGHETTI:**

**Q.** What do the ASDA stores sell, in general?

**A.** That is a full department store.

**Q.** Which means what?

**A.** Like Wal-Mart. It's part of Wal-Mart.

**Q.** Okay. And what is the range of items that they sell?

**A.** Like I say, it's the full range as they would in a Wal-Mart in the United States.

**Q.** Okay. And who does the bagging at the ASDA in the UK?

**A.** They have the same policy where they ask whether they should -- whether they'd like it bagged or not. Again, the majority of the customers do not have it bagged by the cashier.

**MR. MATTHEW RIGHETTI:** And we'll move 28F into evidence as well.

**THE COURT:** Received.

(Trial Exhibit 28F received in evidence.)

**BY MR. MATTHEW RIGHETTI:**

**Q.** The -- when you do -- when you approached this case and -- did you -- to become familiar with your assignment and to provide an opinion, is there a methodology that you go through that is routine for you, that you've been doing it this long?

**A.** Well, yes. You -- you observe the operations. You take measurements of the workstation. And you look at what the flow

of materials and flow of the -- the pattern of work that the person does.

**Q.** Okay. And did you attempt to do that in this case?

**A.** Uhm, I did not -- in terms of the measurements, I did not take the measurements myself. I used measurements that were provided by counsel. I used measurements that were provided by Kmart through counsel. They are dimensional drawings. And then I used, toward the end, also the dimensions that were taken by Dr. Fernandez.

**Q.** In the field of ergonomics, what is the -- what is the thinking in terms of the health benefits or lack of benefits of seated versus standing work?

**A.** I would contend that it's a universal statement that it is beneficial to have the opportunity to sit or stand as opposed to requiring. There's a lot of literature on prolonged standing. There's a lot of literature on the disadvantages of prolonged sitting. And the opportunity to sit or stand has benefits. Almost every -- I would guess that every introductory text would make a statement of that type.

**Q.** So when you say there's literature about prolonged sitting, what does the literature generally say about prolonged sitting, the health effects? Good or bad or --

**A.** Prolonged sitting -- the reality is static posture. The problem is static posture. It depends on how static the posture is in the seated situation. But over a period of time,

long-term seated operations, if you have to stay in one posture without moving can be detrimental.

**Q.** How about prolonged standing?

**A.** That can be detrimental as well.

**Q.** You say -- did you say it was universal? Explain to me the sit/stand option in the field of ergonomics.

**A.** It is university within ergonomics. I do not know of an exception that would not acknowledge that the opportunity to sit or stand is beneficial compared to being required to sit or being required to stand.

**Q.** I'll show you Figure 7 from page -- well, for the record, Figure 7, page 28 of the report.

Do you recognize this photo?

**A.** Yes. That's one that was provided to me by counsel of the Tulare store.

**Q.** Okay. And what does it show?

Can you generally describe what we -- how the Tulare store checkout cashier stations are configured?

**A.** Well, they have the --

**THE COURT:** You can -- Dawn, is it activated so that the witness can draw John Madden-style on the --

**THE CLERK:** It's always working; so, yes, he can.

**THE COURT:** So you can put your finger on the screen and draw a circle or a stick person, whatever you want to do.

Now, the lawyers need to know it won't be preserved unless

you make a special request, which is problematic. But if it's important enough to you, Dawn can save it. Otherwise, it goes into the ether.

But for purposes of illustrating the witness's testimony, you may draw on the picture on the screen, and it may help.

So go ahead.

**THE WITNESS:** Okay.

**THE COURT:** The question was: What does it illustrate?

**THE WITNESS:** It illustrates the checkout stand at that particular store.

**BY MR. MATTHEW RIGHETTI:**

**Q.** And we also have on the easel over here, Exhibit -- I'm not sure which exhibit it is. It's a defense exhibit. I'm not sure what number it is. Oh, here it is. I have it.

It's marked as Exhibit -- as slide 2B. And it is, I believe, marked as 215, Exhibit 215.

**A.** Could it be put on my thing so I can draw on it here?

**Q.** Well, I don't have it to put on there. But is this roughly -- when you look at what's on the Elmo, which is -- we'll mark as 28G, as compared to slide 2B, Exhibit 215, is there any difference in the layout?

**A.** Not that I can see. I don't believe there is.

**Q.** All right. So what -- explain for us what the -- what the work tools are and the workflow that goes on for cashiers at

 the currently configured checkout station at Tulare?

**A.** Okay. The customer comes from the aisle down this direction and places items on the cabinet or on the counter in that area. The cashier takes the items from there, takes them across the scanner that is about in this area, sets them on the demagnetizer, which is this area right here, here. (Witness indicating.)

After that is done, they will tend to bag them. But in the meantime, they also will use the -- touch the monitor. That's a touch screen monitor here. They also will use the keyboard that's right there (indicating).

They also will need at times to scan cards, individual small credit card things, on a slot up here by swiping it across on the top part of the -- this is referred to as the POS. The cash register part of it is referred to as the POS. Those are the primary things they do at that point in the process of the transaction.

Then they will either bag the items on the demagnetizer here, or they will bag them by dropping them down into this bag well here. And then they will move them over to the bagging table here. That's the general layout.

At that point then they will take the money from the customer. They will get the receipt from this area right up here (indicating) and then also get coupons from an area that's right up here during this process, as well.

At times they do have to reach around here to this item, which is the credit card device, to reactivate that.

I think those are the general tasks performed with that station.

**THE COURT:** If you move that picture, all the drawings get moved. Don't move, so -- it will become misaligned. So keep that in mind whenever you -- all right.

**MR. MATTHEW RIGHETTI:** We would move 28G, just the picture of a Tulare checkout station --

**THE COURT:** Any objection?

**MR. WOHL:** No, Your Honor.

**THE COURT:** Received.

(Trial Exhibit 28G received in evidence.)

**BY MR. MATTHEW RIGHETTI:**

**Q.** I'm going to now put on slide 1A from Dr. Fernandez, which is 215, I believe.

**THE COURT:** You keep saying that, but -- is that correct? Do we have the right -- are you referring to the correct numbers?

**MR. MATTHEW RIGHETTI:** It's Bates 905, and it was a group of -- that's a group of photographs. And the first -- the -- go ahead, Jeff.

**MR. WOHL:** I'm told it's 216.

**MR. MATTHEW RIGHETTI:** 216. So these group of photographs are Exhibit 216; the first one being slide 2B,

which is up on the easel, and the second one being what we now have on the Elmo as slide 1A.

**THE COURT:** All right. The one up on the easel has not been moved into evidence. Did you move it into evidence?

**MR. MATTHEW RIGHETTI:** No.

**THE COURT:** I just misunderstood?

**MR. MATTHEW RIGHETTI:** We would move the -- what we would mark as 216A into evidence, because that's a whole group of photographs, some of which are the subject of your order this morning.

**MR. WOHL:** So just for clarity, your Honor, this is part of the Fernandez slides that they then want to put into evidence.

**THE COURT:** I'm confused.

**MR. WOHL:** This part we're okay with.

**THE COURT:** Mr. Righetti, you made all that fuss.

**MR. MATTHEW RIGHETTI:** I talked to Mr. Wohl and Ms. Sommerfeld at the break, and made clear to them that our motion had to do with what began as Slide 3 on, and did not have to do with Slides 1 and 2, which are just the as-built configurations. And I thought we had an agreement that those were okay.

**MR. WOHL:** Well, all I'm reporting, your Honor, is that they -- that these are exactly as late produced as the rest of them, but they're -- they're okay with these. They're

not objecting to these. They're objecting to the rest of them.

**MR. MATTHEW RIGHETTI:** I don't have a problem. I don't care. Just --

**THE COURT:** It's okay. Since they are late produced, I don't have any problem with them cherry-picking and using the ones that help them, if they think that, since it's late produced. So unless there's a rule of completeness problem, then it gets more complicated.

**MR. WOHL:** That's fine, Your Honor. Thank you.

**THE COURT:** So 216 -- what is that over there, that easel? What is that going to be called, 216 what?

**MR. MATTHEW RIGHETTI:** 216A, as in apple.

**THE COURT:** That is -- this is so confusing, Mr. Righetti.

All right. 216A is received in evidence.

(Trial Exhibit 216A received in evidence.)

**THE COURT:** And then you had another one.

**MR. MATTHEW RIGHETTI:** 216B is what we have up on the Elmo.

**THE COURT:** All right. Received in evidence.

(Trial Exhibit 216B received in evidence.)

**BY MR. MATTHEW RIGHETTI:**

**Q.** So looking at what's on the Elmo, 216B, is this the same or different than the -- than the -- strike that.

What does this show?

**A.** This is a graphic that illustrates and labels the items that are in the workstation at Tulare, as I understand.

**Q.** Okay. Can you see on this and can you identify the different work items or processes that are used by the cashier during checkout?

**A.** Yes. Again, to go through what we just did, they're coming down -- they're set on the counter in that area right there, the product. When the customer brings it, they take it out of their cart and will set it on the counter here.

The cashier will take the item, take it across the scanner, which is right here, then set it on the demagnetizer here. (Witness indicating.)

**THE COURT:** Can I ask you to do it a different way?

Go back and erase all of those circles, Dawn.

All right. I want you to use 1, 2, 3, and do it in sequence. And then I'm going to ask Dawn to capture that image. Don't move the picture on the Elmo. Otherwise, it will get misaligned.

All right. Start over with the 1, 2, 3. I know you're just doing it in a crude way, but that will help me to understand it. Go ahead.

**THE WITNESS:** So the items are put on the counter at 1, on -- at that position. Then they're taken across the scanner at the 2 --

**THE COURT:** You don't have to circle. Start over and

do it my way.

**THE WITNESS:** Yes.

**THE COURT:** My way is put in a 1, put in a 2. You don't have to circle. You can't draw, it's not your fault. The machinery is not accurate enough.

There's the 1.

**THE WITNESS:** That's the counter that the items are placed on. This is the scanner that they're passed across.

**MR. MATTHEW RIGHETTI:** What number is that?

**THE WITNESS:** Number 2.

**THE COURT:** What is the purpose of that?

**THE WITNESS:** It is a security device that demagnetizes the items so that they don't ring as they go through the front door.

**THE COURT:** All right.

**THE WITNESS:** Then they will tend to be piled there and then they are placed in the bag, either on the rack here in this bag well or they will be actually -- that would be 4-A, or they will be bagged with 4 -- that's a 4 -- A on the demagnetizer.

As they are doing this, one of the things that they are doing is they are accessing the keyboard, which is 5. They are also accessing the monitor, which is 6.

And then after they have taken and filled the bags, they will move it to the table that's toward us that is not shown on

this photograph. They will then take the money from the customer. They will use the cash --

**THE COURT:** Put a number 7 down there in the bottom left and an arrow that points -- you can barely see that table.

**THE WITNESS:** 7 going that way.

**THE COURT:** Put an arrow that way. I got it. Thank you.

**THE WITNESS:** Okay, 7.

All right. Then they will get the money from the customer. That would be over here at 8. I can put it here.

**THE COURT:** What happens to the coupon part?

**THE WITNESS:** We haven't gotten to that point yet. They could have the coupons at any time in this process. I'm not sure what the order of getting the coupons is.

**THE COURT:** Those two circles are 8?

**THE WITNESS:** That's an 8. That's an 8.

Then they have the receipts, which are 9 -- oh, there is another thing that I forgot up here, and that's swiping, potentially swiping the card across the swipe up here, if they are using a card for reasons, for certain reasons. And I'm not sure what that is.

Again, the order -- well, let me put 9 because I'm not sure when that occurs, but it's one of the things that occurs during the process. But that will generally occur during the transaction, but before the time that they are paying for it.

So then after that they will use 10 up here, which is the receipt.

And then we also had the 11, is the -- at some point in this process they will access the coupon dispenser there.

Then 12, the other thing that they will interact with is, this is the credit card device where sometimes they have to reset that, or my perception is they have to reset that.

**THE COURT:** So are you done to with that?

**THE WITNESS:** Yes.

**THE COURT:** Dawn, can you capture that image so I can look at it later?

And, counsel, I think there is a way for Dawn to send that image to both of you. If so, she will do that.

**MR. WOHL:** Do you need an email or something, your Honor?

**THE COURT:** She will tell you. She knows how it works. But it's easier than I am suggesting. I think she can do it pronto.

**MR. WOHL:** Thank you, your Honor.

**MR. MATTHEW RIGHETTI:** This will be 216-C.

**THE COURT:** What is that? The one with the numbers on it?

**MR. MATTHEW RIGHETTI:** Yes.

**THE COURT:** The number is 216-C. That's what that's going to be. We'll call that annotated photo.

(Trial Exhibit 216-C marked for identification)

**THE COURT:** All right. Go ahead.

**THE WITNESS:** Could I --

**MR. MATTHEW RIGHETTI:** Can we move that into evidence as well?

**THE COURT:** Did you want to adjust something?

**THE WITNESS:** No. I would like to add a couple items that occur sometimes.

**THE COURT:** Sure.

**THE WITNESS:** Sometimes they will take the hangers off of the clothing and drop them down into this area.

What number are we up to? Is that 13? Just to keep it separated. And there is also trash areas where they may put trash. That's 14.

**THE COURT:** With that curve ball the witness has thrown us, you will have to copy a second document. That will be 216-D. We have C and D as annotated photos.

(Trial Exhibit 216-D marked for identification)

**THE COURT:** Okay. Please continue on, Mr. Righetti.

**BY MR. MATTHEW RIGHETTI:**

**Q.** So when you evaluated the work of the Kmart cashiers when they are stationed at the checkout counters, did you make a determination as to whether the work functions could be performed in a seated -- from a seated position, regardless of the checkout counter configuration as it currently is in

Tulare?

**A.** When you say "regardless of the" --

**Q.** Strip away the currently configured checkout counter in Tulare and just look at what is done by the cashier at the checkout station in Tulare.

Did you evaluate whether that work that is done at the checkout station at Tulare could be performed from a seated position?

**A.** Oh, yes. If you were going to -- if you're saying, if you were starting from scratch, could you configure a checkout stand that could be performed in a seated posture? The answer is yes.

**Q.** That's my question. The answer would be yes?

**A.** Yes.

**Q.** When you evaluated this currently configured checkout station at Tulare, did you feel it was well designed ergonomically for a standing posture cashier? What was your opinion on that?

**A.** Well, I think there definitely could be some improvements, even with respect to a standing operation.

**Q.** Do you have any understanding of when this cash register station was constructed?

**A.** The dimensional drawings that I received from counsel were 1991 and I don't know -- that's the only information I would of have.

**Q.** So what improvements for a standing cashier would you -- would come to mind from an ergonomic standpoint?

**MR. WOHL:** Objection, your Honor, lack of relevance. I'm not making a standing claim. I'm making a seating claim.

**MR. MATTHEW RIGHETTI:** I will withdraw the question, your Honor.

**THE COURT:** Thank you.

**BY MR. MATTHEW RIGHETTI:**

**Q.** Did you do an evaluation to determine whether there could be improvements to this checkout station at Tulare that would accommodate a seated cashier?

**A.** Yes, I did. And my -- my objective in this was to not look at a seated only cashier. That was not the objective.

My object was to look at it as could you have a sit and/or stand, where the person can sit or stand at their choice. So it was not to develop as Aldi is, a seated-only operation. It was to develop a sit or stand operation.

So I was also looking at how some of the changes would affect the standing part of that work station, as well as rather the seat.

**Q.** Was there anything about the currently configured checkout stations at Tulare that were an impediment to dropping a seat in? Could you just drop a seat in there now and let cashiers do their work?

**A.** No. There are items -- one of the things for a seat is

you need to have room for the knees so that you can get close to the item that you're working with. And the items underneath were -- would need to be adjusted.

**Q.** May I show you another photo from your report and ask you if you -- from Exhibit 28 and ask you if you recognize that photo?

**A.** Yes.

(Photograph displayed.)

**Q.** What is that?

**A.** That's just the area underneath, right now underneath the counter. And this, number one here, is the lower part of the scanner. And that's the constraint in terms of what width the counter would be.

**Q.** What is the -- so the counter has a certain -- strike that.

So the scanner that's on top of the table has a certain depth to it, correct?

**A.** Yes.

**Q.** What is the depth at Tulare?

**A.** Five-and-a-half inches.

**Q.** Okay. And what is available on the market for scanners? Is that about standard for what's on the market now in terms of depth?

**A.** No. The new scanners are referred to as low profile. They are much thinner.

**THE COURT:** I didn't understand. What is five-and-a-half inches?

**THE WITNESS:** The scanner that is right above this, at position one, the mechanism for the scanner is what is the constraint on how thick this --

**THE COURT:** I don't see -- can I see what you're talking about or is that washed out? Is the --

**MR. MATTHEW RIGHETTI:** It's protruding under the counter.

**THE WITNESS:** Well, it's actually not protruding because we're looking from the bottom, so it's actually at the same level as the bottom of the counter at this point.

**THE COURT:** All I want you to do is indicate by drawing a line what is the five-and-a-half inch distance?

**THE WITNESS:** Okay. The five-and-a-half inch -- okay. Am I doing it?

**MR. MATTHEW RIGHETTI:** No, Zach was. What did you do?

**THE CLERK:** You hit the clear. It's just if you go too far up, it will start getting --

**THE COURT:** When you hit the corner, sometimes it activates those settings.

**THE CLERK:** Right.

**THE COURT:** All right. Do it again. Let's do this. See where you've got the blue squiggle --

**THE WITNESS:** There will be a better one later, I

think, that will illustrate that.

**THE COURT:** All right. I will pass it for now. Thank you.

**THE WITNESS:** Here, underneath there is what would have to be moved or readjusted for you to have knee room to be able to slide in a comfortable posture with your legs underneath the counter.

**THE COURT:** Where is the cash register on that picture?

**THE WITNESS:** It is on our right.

**THE COURT:** And then so the flow of goods would be from the right side going across the scanner to the left?

**THE WITNESS:** Yes.

**THE COURT:** And then the cash register is hidden from view, but off to the right, okay. I kind of got it.

I still don't understand the five-and-a-half point, but you say we'll get to that later.

**THE WITNESS:** Yes. There will be a better one, I think.

**BY MR. MATTHEW RIGHETTI:**

**Q.** So can you see the -- does this photo, which is 28-G -- no, 28-H. Pardon me, 28-H. Does this provide a description of the impediments for leg room underneath the counter in the current configuration?

**A.** Yes. It would be these -- these, one and two, would have

to be moved, resized and moved to have -- at least one would. Two would have to be resized. One would to have been removed to have room for the legs in a seated posture.

**THE COURT:** What are those things?

**THE WITNESS:** This is the underneath of the counter.

**THE COURT:** What are those plastic things?

**THE WITNESS:** Oh, one of them is trash, is my understanding. The other one is return items and where they drop the hangers.

**THE COURT:** Dawn, we're back to having the color wrong. It's white now. It's hard to see. If we can put it red, green or blue.

**THE CLERK:** Yeah. The color settings --

**MR. DOSTART:** I seem to have touched it. All right.

**THE COURT:** I've got the 1 and the 2. You don't have to change that.

All right. So those are impediments. Go ahead.

**BY MR. MATTHEW RIGHETTI:**

**Q.** And over here you see this -- I can't mark it.

We can see on this Elmo or on this screen -- there we go -- marked in red, what is that marked in red?

**A.** This is on the left-hand side. Again, we'll have one that I think shows this better later, but this is a vertical that would need to be moved. But we have one later that would show that better, I believe.

**MR. MATTHEW RIGHETTI:** We'll move 28-H into evidence your Honor.

**MR. WOHL:** I'm sorry, your Honor.

Can the witness just verify, when he says "the vertical that would have to be moved," what is he referring to?

**THE COURT:** You see that magenta color on the left side?

**MR. MATTHEW RIGHETTI:** It's the vertical support on the left side.

**THE COURT:** That's what he's referring to.

**MR. MATTHEW RIGHETTI:** Just underneath the demagnetizing.

**THE COURT:** All right. 28-H is received.

(Trial Exhibit 28-H received in evidence)

**BY MR. MATTHEW RIGHETTI:**

**Q.** Is this a -- is this one of the photos that shows things better?

**A.** Yes. Well, that illustrates one of the areas that I would change in terms of making this what I consider to be a better design to be more efficient.

**THE COURT:** I've just got to tell you, whoever took these photographs, these are some of the worst photographs I have ever seen.

**MR. McINERNEY:** That would be me, your Honor.

**THE COURT:** Mr. McInerney, that -- look how blurry

that is. There is nothing in focus in that whole picture.

**MR. McINERNEY:** You should see the ones I took of my burros.

**THE COURT:** Really. It hurts my eyes to try to strain to see -- I can't even tell what that picture is.

**MR. McINERNEY:** Your Honor, everybody says that.

**THE COURT:** Well, but it's not a funny thing. I've got to decide based on your evidence.

All right, go ahead.

**BY MR. MATTHEW RIGHETTI:**

**Q.** So when you did your evaluation, did -- and you went to the Tulare store, correct?

**A.** Yes.

**Q.** Did you see any difference in the configurations of the checkout counters at Tulare? Do you know how many checkout stations there were at Tulare?

**A.** I'm not sure what the number was. I'm not sure. I don't remember how many.

**Q.** Were there differences in the physical configurations of the checkout counters at Tulare?

**A.** I was focusing -- I think they are the same, but I'm not positive about that.

**Q.** And I think you've already testified that if you started from scratch, you could design a work station that could accommodate a seat for the work that's done at the checkout

station by Kmart cashiers at Tulare?

**A.** Yes.

**Q.** If you were not working from scratch and you wanted to modify the current configuration, did you evaluate that?

**A.** Yes.

**Q.** And what would you do to -- from an ergonomic standpoint to modify the currently configured Tulare checkout stations so that they could accommodate a seat?

**A.** Okay. Let me mention a couple things from -- if I can try to use the -- this. This right there is the POS (indicating). That's the cash register, that point right there.

**THE COURT:** For the record, the witness is referring to the -- what is marked slide 2-B, which I think has a different designation now. It's in evidence.

That's fine. You're using a laser pointer to do that. That's fine. There won't be any record later. That's fine.

Go ahead.

**A.** One of the issues for both the standing and a seated operation is the reach to this position on the counter (indicating).

When the customers -- most of the time the customers will put items on the counter. As it gets emptied, they will move them down this direction so that it's more easily reached by the cashier. But this distance out here is a long reach in the current configuration (indicating). I think it's about

 37 inches.

This is the POS. That's the cash register. This is an area than we can show you on other slides later. This area right there (indicating) and the area behind it caused this to be on a shelf that's much larger than it needs to be. If this were moved back and that was cut off, that reach would be much less by being able to get into this area. That would be one of the things that would make it...

**BY MR. MATTHEW RIGHETTI:**

**Q.** So one of the things you would do is shorten up the stand that the cash register is currently sitting on?

**A.** Yes.

**Q.** And how would that be an improvement?

**A.** That would make the reach to this corner much less. Right now it's what we would refer to as ineffective worker moment. Ineffective worker movements are in lean manufacturing or lean processes they are talked about as non-value added. In other words, the extra reach takes time, takes effort. It makes a slower operation.

**THE COURT:** Is that a -- I can't tell from what you've said so far. Is there a conveyor belt there?

**THE WITNESS:** No. It is a counter.

**MR. MATTHEW RIGHETTI:** Tulare does not have conveyor belts.

**MR. WOHL:** So stipulated, your Honor.

**A.** So that is one of the things that I would change.

Another, from an ergonomic standpoint -- from an efficiency standpoint, I should really say, is the idea of taking items from this level on the counter and dropping them down into the bags here and then lifting them back up to the other table.

If I were -- if it were my option, I would move the table closer, put the bags on the other side so that they could just slide things on across instead of dropping them down.

One of the things in terms of efficiency in motion is you never take items, particularly heavy items, drop them down and lift them back up again.

So those are two things that would make it easier from my standpoint. It would make it feasible for a seated and better for a standing operator.

**BY MR. MATTHEW RIGHETTI:**

**Q.** What other items, what other modifications would you make?

**A.** Can we go back to the previous thing that you had on the Elmo?

(Photograph displayed.)

**Q.** Would this one be good?

**A.** No. It was the one.

**Q.** This one?

(Photograph displayed.)

**A.** Yes.

**Q.** We now have 216-C, is what you're referring to now.

**A.** Okay. One of the things is the coupon is higher than it needs to be. As you look at it, it's just on a piece of PVC coming up or a piece of pipe. And literally people have to -- that's above shoulder level for operators and they have to reach up that high. So bringing that down is something that would be easier both for a standing operator and a sitting operator.

It's also the distance, the reach distance is higher than it needs to be. Putting it in a different position would be better in that case.

**Q.** Well, is the coupon printer attached to the cash register?

**A.** No.

**Q.** Tell us -- we can't see on this exhibit what it's attached to, but what does the apparatus look like?

**A.** It's on a pipe coming up here (indicating). It sets on that counter, comes up, and it's on a pipe coming up this direction and then it has a shelf there.

**Q.** How are the wires fed to it?

**A.** I'm sorry?

**Q.** Do the wires -- do you understand the wires come through the pipe?

**A.** Yes.

**Q.** Okay. And what is it about the current configuration of

the coupon printer that's --

**A.** Both the height and the reach distance are higher than they should be.

**Q.** Seated, standing or both?

**A.** Both.

**Q.** Why is it higher than they should be?

**A.** It's unnecessary to have the shoulder go -- or have the elbow go above shoulder level.

**Q.** So where would you recommend that be moved?

**A.** It would be put in this area right here (indicating).

Again, this can be moved over slightly as well.

**THE COURT:** What does "this" mean?

**THE WITNESS:** Oh, the POS as well.

**A.** But in general what it amounts to is putting it in a better location. There are many -- many different positions you can put it in. All I'm getting at here is it's a higher position than is desirable right now.

The other thing that's awkward a bit is the position of the credit device. And, again, from my standpoint, having that rotate so that they can more easily access it would be an advantage for both the sitting and the standing person.

**BY MR. MATTHEW RIGHETTI:**

**Q.** You are referring to the credit card reader?

**A.** The credit card reader here.

**Q.** And who uses that primarily?

**A.**   The customer uses it at this point.  And from time to time
the cashier does interact with it.

**Q.**   So in its current configuration the credit card reader,
when the cashier has to interact with it, what's the impact of
that?

**A.**   It's awkward.  They either need to walk around to do it.
Some of them do that or reach across to do it.

**Q.**   And your recommendation --

**A.**   Would be to either pull it off and be able to use it that
way or turn it around.

**Q.**   Have you gained knowledge about whether Kmart is --
whether any of those credit card readers can be pulled off?

**A.**   Yes, they can.  I think that Kmart is looking at doing
that relative to an ADA situation now.

**Q.**   So we have several modifications:  Moving the coupon
reader closer and lower; putting the credit card reader on a
swivel or so it can be popped off.

    What other modifications would you recommend?

**A.**   Putting this check writing on the other side so that after
people -- after they are scanned and set here, people can take
the items straight off of this area.  This is an obstruction
from the standpoint of people being able to take items directly
off of that area, of the demagnetizer into their basket.

    Especially if you're dealing with things like a 12-pack of
Coke or something like that.  What you really would like to do

is bring it down -- not lift it up, just pull it along. Scan it, set it here and have the person be able to take it without lifting it to that table on the other side.

**Q.** Any other modifications that you would recommend? Are there modifications to get leg room underneath?

**A.** The other photographs will illustrate that.

**THE WITNESS:** We'll move -- I don't think we moved into evidence 28-I, which I have now back up. So I would move that into evidence.

**THE COURT:** Should we clear this one? Dawn will need to clear the writing.

28-I, any objection?

(No response.)

**THE COURT:** Received.

(Trial Exhibit 28-I received in evidence)

**BY MR. MATTHEW RIGHETTI:**

**Q.** 28-J we have up now.

(Photograph displayed.)

**Q.** Does this show the modifications to the -- more modifications to the checkout station?

**A.** Yes.

**Q.** Recommended by you?

**A.** This would be for both -- well, for a seated operation, to have room for the knees, which is critical, this divider there,

the dividers that are pointed out by the yellow would need to be removed.

**Q.** Okay. And we have a toe kick down at the bottom. Would the toe kick stay or would the toe kick go?

**A.** No. The toe kick would go. In other words, you would have a foot rest further underneath for people to use as a foot rest when they are sitting.

**MR. WOHL:** I'm sorry, your Honor. Could the witness just specify what he means by "toe kick"? I don't think he's marked that, so I'm not sure.

**THE COURT:** I don't know what that means. So what does that mean?

**THE WITNESS:** Is that what you're referring to?

**THE COURT:** Toe kick.

**THE WITNESS:** The shelf at the bottom (indicating)?

**MR. WOHL:** I'm sorry. The witness identified the toe kick.

**THE COURT:** The witness used the phrase. It must mean something to you.

**A.** I think you initiated the phrase and I was trying to explain what it was.

**BY MR. MATTHEW RIGHETTI:**

**Q.** I was trying to reference the bottom of the photograph.

I think you testified that you need room for your knees, right?

**A.** Yes. That lowest shelf would need to be removed as well.

**Q.** Okay. That's what I was referring to as the toe kick.

**MR. WOHL:** So the toe kick is the lowest, bottom shelf.

**THE WITNESS:** I don't use the word "toe kick."

**BY MR. MATTHEW RIGHETTI:**

**Q.** Okay. Lowest bottom shelf. "Toe kick" got everybody confused.

So you remove that lowest bottom shelf and what benefit do you get by removing the bottom shelf?

**A.** One of the aspects of this is when you -- this is a stand or sit operation. So when you're standing, you will not have the stool in your way. So at that point you could shift the stool into the area shown here (indicating).

**Q.** On this photo you see an orange -- something orange and you also see there the bin underneath it. Do you see those two things?

**A.** Yes.

**Q.** Would those be able to stay where they are under your modification?

**A.** No. They would be moved.

**Q.** Where would they be moved?

**A.** Yes. And they would be moved into -- either into this area over in here that we showed on that photograph before. There was a large area back in the corner, below where they put

the items on the shelf, or they could be moved in -- the other alternative is if you a bring that other drive to this, that other counter or --

**Q.** The Bagging counter?

**A.** Bagging counter here they, could be put into the bagging counter as well.

The other thing here is that this lip up here (indicating), I recommended would be cut off because it doesn't serve a purpose. In fact, at the Fayetteville office, the Fayetteville store that I visited they have already cut this part off to make it so that it doesn't -- it just is an obstruction at this point.

The other thing is this, the demagnetizer is not as deep as the -- this is that five-and-a-half inches we were talking about right here. That's the width of the -- from the counter top here to the bottom of the scanner. That's five-and-a-half inches.

And then coming across here, I would cut this off to five-and-a-half because there's nothing behind here that is a problem. It's only a barrier.

At that point, then, that would allow the person to sit with their legs underneath the --

**THE COURT:** Could they sit with the -- let's assume the five-and-a-half is legitimately there. So would somebody be able to sit underneath there with the five-and-a-half inches

as now configured?

**THE WITNESS:** Are you saying leaving this part on (indicating)?

**THE COURT:** No. I'm just talking about the five-and-a-half.

**THE WITNESS:** No.

**THE COURT:** Assume that the five-and-a-half is a given. Is there enough room under there for somebody to sit?

**THE WITNESS:** Yes.

**THE COURT:** Put their legs?

**THE WITNESS:** Yes. And my assumption is the five-and-a-half is a constraint, that the -- when I was looking at this and evaluating whether it was possible to do it seated or not, that having a narrower scanner was not an option, that we would use this.

It would be advantageous to have a narrower scanner, but this would work out all right to have the five-and-a-half. But at this point over here, to have it be so that the -- what you're trying to do is get the person up, so their upper arms and shoulders are in a comfortable posture. So you want to get the person as high as possible. To get the person as high as possible, then you would want to cut this off so that there is room for the legs at that point (indicating), and there is nothing behind that.

**THE COURT:** All right. Go ahead.

**BY MR. MATTHEW RIGHETTI:**

**Q.** Let me show you the next -- this, I think, segues to what we were talking about.

You recognize this, which is going to be 28-K?

(Document displayed.)

**Q.** What is this?

**A.** This is just an illustration in my report to indicate that you can design a work station so that it's both a sitting and a standing operation. This happens to be a fifth percentile female, and with the idea that you can -- you can design it so that a person can either sit at the work station or stand at the work station without a problem.

**Q.** So when you're doing the ergonomics design, you must certainly appreciate that not every person is the same height, weight, arm length, leg length, et cetera, right?

**MR. WOHL:** Objection, your Honor. Leading.

**THE COURT:** It's preliminary enough. You can lead on a preliminary matter. This is an obvious point.

Okay. Go ahead. Overruled.

**BY MR. MATTHEW RIGHETTI:**

**Q.** How do you accommodate -- or do you try and accommodate the different known physical differences from one person to the next?

**A.** Yes. You try to accommodate as many people as you can. And when you're doing that, then what you have is two things.

One is, you have clearances and on a clearance you're accommodating the 95th or the 99th percent- -- the very large person on the argument that if the large person can fit, then the small person can fit. At that point you're accommodating the very large person.

If you're talking about reach, distances, then you're accommodating the shorter person on the argument that if a short person can reach it, then a tall person can as well.

The way you establish the seat height, though, and the maximum seat height is you want to have the shoulders and the arms in a comfortable posture. So you want to have the person get as high as possible so that that's in a comfortable posture. To do that, you end up with this being a constraint, is the area underneath the counter. And now the maximum seat height is this height, which is 30. That's the 26 -- or 36 inches --

**Q.** When you say "this height"?

**A.** This is on the Kmart Tulare case.

**Q.** Nothing is coming up on the Elmo though. Are you writing on the Elmo?

**A.** Oh. I drew a cross here. That is -- at Tulare that's 36 inches.

**Q.** Okay.

**A.** So what you're trying to do is you're trying to get the person as high as possible. So what you're doing is you're

 taking the smallest thigh thickness, you're taking the bottom of the counter and subtracting the smallest thigh thickness to get what the maximum seat height is. It's not related to the tallest person.

**MR. WOHL:** I'm sorry, your Honor. Can counsel just clarify? When he says "36 inches," does that take into account the five-and-a-half inches for the scanner or is that without taking that into account?

**THE WITNESS:** Yes.

**THE COURT:** What was -- is it the vertical line that you're saying is 36 or the horizontal line?

**THE WITNESS:** I would like to use this not relative to the Tulare -- when you mentioned that, I would like to use this as an illustration of talking about how you set the seat height that was in the report as opposed to talking about the Tulare. This is does not represent Tulare right here at this point. This is just a demonstration.

**THE COURT:** I understand you're demonstrating, but are you trying in some way to teach us something about what the heights could be at Tulare?

**THE WITNESS:** No. Let me not do that at this point.

**THE COURT:** Okay.

**BY MR. MATTHEW RIGHETTI:**

**Q.** When you say fifth percent and 95th percent, that's according to who? Where do these fifth percentile and 95th

percentile --

**A.** A fifth percentile person, only five are smaller than. A 95th percentile person, only five percent are taller.

**Q.** According to what?

**A.** According to the anthropometric data that are taken. There are many different sources of anthropometric data. I prefer Kodak. Kodak uses workers in the United States as a group to evaluate.

**Q.** And the width of the current Tulare checkout counter is what? From the point where the counter starts on the customer's side to the point where the cashier is, what is the width of that?

**A.** Twenty-three inches.

**Q.** Twenty-three inches, all right.

**THE COURT:** What is the height then? Now if we're talking about Tulare, what is the height then: That vertical line that you have there, arrow, what is that height at Tulare, taking into account the five-and-a-half inches?

**THE WITNESS:** The height of the counter is 36 inches from the floor?

**THE COURT:** So we take off five and a half?

**THE WITNESS:** Yes.

**THE COURT:** That would be thirty and a half.

**THE WITNESS:** Thirty and a half is the bottom of this. And then it turns out that the smallest thigh thickness of the

 fifth percentile person -- and, again, there is nothing magic about the fifth percentile person. If you decide to design for the second percentile person or 99 percent of the people, that is not a problem.

**THE COURT:** Do we have a yardstick here, Dawn?

**MR. MATTHEW RIGHETTI:** We have a tape measure.

**THE CLERK:** No.

**THE COURT:** Can I see your tape measure for a minute?

**THE COURT:** Would you hand it please to Dawn? I want to have in mind what thirty-and-a-half inches is.

(Tape measure was tendered to the Court.)

**THE COURT:** For the record, I have on the bench -- it's 27 inches from the floor to the bottom of my bench. So thirty-and-a-half inches is even more than what I have up here.

Okay. Thank you.

(Tape measure was returned to counsel.)

**THE COURT:** Not that the bench is perfect. It's just something that judges on appeal might use as a benchmark.

Okay. Yes, Mr. Wohl?

**MR. WOHL:** No, no. I'm just observing the tape measure.

**THE COURT:** Please continue on.

**BY MR. MATTHEW RIGHETTI:**

**Q.** And if you -- if you cleared out the vertical constraints and made the other changes, how would that affect -- I know you

weren't here during opening statement, but how would that affect the -- let me give you a straight question here.

When you reference seated, the sit versus stand option, does that necessarily indicate a difference in height, eye height of the worker?

**A.** No. As you can see by this photograph, for this particular situation the eye height of the workers is about the same both sitting and standing.

**Q.** Does the seated option necessarily imply that the worker is going to be much lower seated than standing?

**A.** Actually, it turns out that the small worker, the eye height would be relatively comparable. For the tall worker, their eye height will be lower.

**Q.** About how much, can you say?

**A.** It depends on what the height of the person would be.

**MR. MATTHEW RIGHETTI:** Okay. So that's 28-K we would move into evidence, your Honor.

**THE COURT:** Received.

(Trial Exhibit 28-K received in evidence)

**MR. MATTHEW RIGHETTI:** And 28-J I have back up here.

(Document displayed.)

**MR. MATTHEW RIGHETTI:** We had not moved that into evidence. We would move that into evidence as well.

**THE COURT:** Received.

(Trial Exhibit 28-J received in evidence)

**BY MR. MATTHEW RIGHETTI:**

**Q.** Now, we're still on the subject of modifications. You had recommended the checkout station at Tulare, if you had to work with the current --

**THE COURT:** That is such a bad picture. I just cannot -- what is that?

Let me ask the witness. What is that? That's so blurry. Does that make sense to you?

**THE WITNESS:** Well, that's a top view of the work station. It is a very poor --

**BY MR. MATTHEW RIGHETTI:**

**Q.** Where did this come from, do you know?

**A.** This was a capture of one of the videos.

**Q.** Whose video?

**A.** I believe this one was Crandall.

**THE COURT:** Who?

**MR. MATTHEW RIGHETTI:** Robert Crandall was a defense expert who took videotape from cameras in the ceiling.

**THE COURT:** All right. Go ahead.

**MR. WOHL:** Just for clarification, that was not at the Tulare store.

**THE COURT:** Is that correct? It was some other store?

**MR. MATTHEW RIGHETTI:** Right. That's the Prescott, Arizona store, correct.

**THE COURT:** All right. Go ahead.

**BY MR. MATTHEW RIGHETTI:**

**Q.** Was the physical set-up the same at Prescott as it was at Tulare at the checkout stations?

**A.** According to the Crandall deposition or declaration, it was. I have not visited the Prescott store.

**Q.** So this shows something in blue to the left.

**MR. MATTHEW RIGHETTI:** And we're going to mark this as 28-L.

(Trial Exhibit 28-L marked for identification.)

**BY MR. MATTHEW RIGHETTI:**

**Q.** What does the blue part on 28-L show you?

**A.** That's the bag, bagging counter.

**Q.** Is that where the bagging counter is currently located?

**A.** No.

**Q.** What does this picture -- did you create this picture?

**A.** Yes.

**Q.** And what is it designed to show?

**A.** It's illustrating that -- with a seated, but I also think with a standing operation, that moving the bagging counter at this position and putting the bags potentially here, I have different alternatives. But these are only possibilities because another thing is that there are Kmart stores that have the circular carousel type of bag arrangement, like Walmart has as well. So this is just one alternative.

But one thing would be to put the bags here. Move that table closer. And the point of this is that you take things off of the counter here, take it across the scanner and then move it straight across here. You don't have to drop it down to the bagging well, pick it back up again and put it onto the...

**Q.** What is the bagging carousel that you say is in use at some Kmart's and in use at some Walmarts?

**A.** I have just seen that in to some of the material provided to me by counsel.

**Q.** What is it though? We're not all familiar with what a bagging carousel is. Can you explain what it is and how it works?

**A.** It's a circular rotating device with the bags coming off here, and it rotates (indicating).

**Q.** From a functional standpoint, how does a cashier use a rotating bagging carousel and why is that beneficial for a seated cashier?

**A.** Well, what they would do is they would put items into this, into the bags. Rotate that. The customer then takes the bag off on the other side, puts it back in their basket.

The object is to make it so that the cashier does not have to lift the bag up again, another 12 inches or whatever it would be, up to the table. That reduces -- that would increase the efficiency of it as well as reduce the effort.

**Q.** So 28-L you've used to demonstrate moving the bagging station closer to the cashier and giving a couple of alternatives for bagging?

**A.** Yes.

**MR. MATTHEW RIGHETTI:** Okay. We move 28-L into evidence, your Honor.

**THE COURT:** Received.

(Trial Exhibit 28-L received in evidence.)

**BY MR. MATTHEW RIGHETTI:**

**Q.** Now 28-M, what is this? Did you create this?

**A.** Yes. This was just another concept. And, again, these are just looking at some alternatives that might be considered. These are not final designs of any sense. Would be to put the bagging wells here, the bagging rack right here, so the person would reach across and put it into here (indicating).

Right now where they are sticking out is over here (indicating). They have got to kind of walk around and go at a right angle to put things into the bags. And I find it beneficial to have it oriented that way. That is just a different alternative.

The object here is that when they fill the bags, they would be able to take the bags off and leave them there for the customer to pick up. What I'm trying to do is reduce the requirement to lift the bag back up again after it's filled.

**Q.** This is 28-M. And when you look at 28-L and 28-M when you drew this bagging station and moved it over to the -- closer to the cashier, did you draw those to scale? Was that your intention?

**A.** No, no. This was just to illustrate it. The size of this bagging table is not correct. I was just -- that's not...

**Q.** So when you work with a corporate customer who is allowing you access to their checkout counters and their workers, how would you go about -- let's assume that Kmart hired you. How would you go about making the modifications from an ergonomic standpoint?

**A.** Well, I would go in and talk to them about what are the constraints, the primary constraints. Sometimes I will end up with constraints that when I discuss what the disadvantage of it is, that the constraint goes way. The constraint was not understanding what the problem was.

But I'll find out what the constraints are and then I'll work with them to come up -- or I will come up with an alternative design from my standpoint and then work with them on modifying that.

Virtually all the time either the customer that I'm -- the company that I'm working for or their suppliers can make improvements to what I've suggested. The goal that I'm trying to do is have them be able to accomplish what my objective is by the design.

 And so it's a sequential type of process. So you go through a prototype. You tryout the prototype, see what works and what doesn't work very well and move up to a final, final design.

**Q.** Then once you have a final design, then it's ready to be rolled out?

**A.** Yes. Then you go to the fabricators.

**MR. WOHL:** Objection, your Honor. There is a leading tendency here --

**THE COURT:** Yes, that was leading. Sustained.

**MR. WOHL:** Thank you, your Honor.

**THE COURT:** Please do not lead the witness on something that is in controversy.

Next question.

**MR. MATTHEW RIGHETTI:** We move 28-L and M into evidence, your Honor.

**THE COURT:** L is already in.

M, any objection?

(No response.)

**THE COURT:** Hearing none, received.

(Trial Exhibit 28-M received in evidence)

**BY MR. MATTHEW RIGHETTI:**

**Q.** Putting on the projector 28-N, as in Nancy. What does this photo demonstrate?

(Photograph displayed.)

**A.** This was just showing that there are POS's available on the market today that are smaller and more comfortable that could be used.

What I was assuming when I was looking at this originally is would it be able to be done with the current equipment possibly by changing some aspects of it, but with the current equipment? And this in my report was just a discussion of the fact that there is product on the market that could be configured.

In fact, this is designed for a seated operator, as opposed to "Do you sit or stand" after the design. They design it for seated operation.

**Q.** This is a picture of Wilkinson -- oh, strike that.

What is this a picture of?

**A.** This is one of the pictures from Europe. I believe this is from -- may I look at my report?

**THE COURT:** Sure.

**A.** I believe in is Wilkinson. I'm not sure.

**BY MR. MATTHEW RIGHETTI:**

**Q.** It's from Page 16 of your report.

**THE COURT:** In any event, it's from Europe somewhere or maybe England, right?

**THE WITNESS:** Yes.

**MR. MATTHEW RIGHETTI:** Move 28-N into evidence.

**THE COURT:** Received.

(Trial Exhibit 28-N received in evidence)

**BY MR. MATTHEW RIGHETTI:**

**Q.** And 28-O, what does that picture show?

(Photograph displayed.)

**A.** I was just showing some alternative designs. One of the things that occurs today is in the cash register, that the cash drawer comes out quite a ways. And that is a constraint for both standing and for sitting.

And so I was showing an alternative design for that. The keyboard is on top. This part here is a keyboard in this particular situation.

**Q.** And the drawer, the cash is kept where?

**A.** The cash is underneath. So when you -- when you pop it up, then the cash -- this comes up and the cash is accessible here.

**MR. MATTHEW RIGHETTI:** Move 28-O into evidence.

**THE COURT:** Received.

(Trial Exhibit 28-O received in evidence)

**BY MR. MATTHEW RIGHETTI:**

**Q.** And 28-P, as in Peter, what does this depict?

(Photograph displayed.)

**A.** This one was either at -- I think this was at Asta, but it's in England. And this is another alternative. This is the type they have at Aldi at this point where it's between the person and the scanner. And the object, again, here is to have

the cashier always looking at the customer as part of the friendly concept. But the cash drawer is here and it pops up right in front of the person, as opposed to being over on the right-hand side.

So I'm just showing that there are alternative approaches to cash drawer positions that can be very consistent with a seated operation.

**Q.** Well, at the current Kmart in Tulare, does the cashier take their eye off of the customer?

**A.** Yes. They turn to the side.

**Q.** And with this configuration, 28-P, how is that different?

**A.** You would always be facing the customer. You would never have to twist. You would just stay in one direction.

**Q.** Okay.

**THE COURT:** Are you moving 28-P?

**MR. MATTHEW RIGHETTI:** I am moving 28-P.

**THE COURT:** Any objection?

**A.** Aldi also uses this same configuration in their U.S. stores.

**THE COURT:** Received in evidence.

(Trial Exhibit 28-P received in evidence)

**THE COURT:** Next. Please continue.

How much do you have of direct?

**MR. MATTHEW RIGHETTI:** Maybe five minutes or less.

**THE COURT:** Let's finish up your direct and we'll take

a break at that point.

**BY MR. MATTHEW RIGHETTI:**

**Q.** Now, when you did your evaluation of the Kmart cashiers in Tulare, did you consider activities that occur away from the checkout station?

**A.** No, I did not.

**Q.** Do you know what activities occur outside of the checkout station for cashiers at Tulare?

**A.** Just from the job description that I read that talked about restocking and the various things.

**Q.** Is it your opinion that the cashier should be seated while they are stocking shelves?

**A.** No.

**Q.** If they are stocking shelves?

**A.** No.

**Q.** Or when they are getting shopping carts out in the parking lot?

**A.** No.

**Q.** Is it -- is the fact that a cashier may have to at times come out of the cash register station -- strike that.

The modifications that you have suggested for the Tulare station, are they -- is it your opinion that a cashier can do 100 percent of the cashier work that comes through their aisle from a seated position?

**A.** No, no.

**Q.** Okay. So tell me the types of things that you would envision a cashier at Tulare doing at the cash register station with the modifications that would still need to be handled from a non-seated position?

**A.** Primarily moving heavy or awkward objects by -- things that are coming that are -- you don't want to have someone lifting in a seated posture heavy objects. They can lift quite a bit, but not heavy objects. So --

**Q.** And so what were -- I'm sorry.

**A.** So if something came in, a tent or something, that, in fact, my expectation is they would stand to do that.

Now, to a great extent with the bagging counter changed to where I've put it, even heavier and more awkward items can more easily be taken across the scanner and just put right on the thing much more easily.

The way it is now where you have to take steps to go from the scanning area over to the bagging counter, that makes it much more difficult. So that would be one of the things that would help, both for a standing operating and a sitting operator.

**Q.** Is the fact that there are heavier or bulkier items sold at Kmart a justification in your view not to provide seats to cashiers?

**A.** No. They would simply stand to handle those.

**Q.** And when you have the -- you were referencing a far reach

area for the cashier which would be minimized some by cutting off the lip of the cash register station, could you envision cashiers from a seated position reaching out to that far corner?

**A.** Yes. What the cashier would do would rotate a bit and literally stand on their right -- stand up on their right leg and get it in and come back down again.

**Q.** Is that some -- from an ergonomics perspective is that a hazard?

**A.** Not if it's not a repetitive operation.

**Q.** When we talk about heavy and bulky items, is there a universal understanding of that that would apply to all cashiers?

I mean, for instance, for the 4-foot-11 cashier, would the same thing be bulky and heavy as compared to the 6-foot-4 cashier?

**A.** No. Different people have different capabilities.

**Q.** How in the world do they figure out -- do cashiers figure out what's heavy and bulky and what would require standing and what could be done seated?

**MR. WOHL:** Objection, your Honor. Calls for speculation. Lacks foundation.

**THE COURT:** Overruled. Please answer.

**A.** Their muscular system works out pretty well. Your body tells you what your -- what happens is, and the body is set up

pretty well to actually restrict how much you can lift to the point where you don't damage yourself. I think that's what you're asking.

**BY MR. MATTHEW RIGHETTI:**

**Q.** Do you understand that employers train employees to reduce injuries on how to lift and how to handle merchandise?

**A.** Yes.

**MR. WOHL:** Objection, your Honor. Leading.

**THE COURT:** That is leading. Sustained. That answer is stricken.

On something that could be in controversy, do not lead your witness. If it's preliminary to something, it's okay to lead. But if it is in controversy, you may not ask a leading question.

**MR. MATTHEW RIGHETTI:** Yes. I'm getting the hang of it.

**BY MR. MATTHEW RIGHETTI:**

**Q.** What type of recommendations, if any, would you make in terms of training cashiers at Kmart to do their work at the cash register station from a seated position -- or a sit/stand position, I would say?

**A.** Well, what you do, you do train them, if you will, to push items as opposed to lift items, although they naturally do that, but just to encourage that as well.

Another area that we have problems with checkout is people

rotating the things when they don't need to. That causes some wrist injuries from an ergonomic standpoint. Doesn't have anything to do with sitting or standing, but there are other parts of training that you would do in that situation.

**Q.** In the event a sit/stand option was introduced to Kmart, do you have an opinion about what the -- whether that would be beneficial to Kmart cashiers?

**A.** I think it would be beneficial to both Kmart cashiers and to Kmart. I think in the long run their efficiency would go up. There absenteeism would go down. Their turnover rate would go down. I think it would be beneficial across the board.

**MR. MATTHEW RIGHETTI:** We have nothing further, your Honor.

**THE COURT:** All right. The witness is now on cross-examination. So the rule against consulting with the witness while he's on cross-examination will apply.

So is it Dr. Johnson?

**THE WITNESS:** Yes.

**THE COURT:** All right. So, please, no talking with any counsel while on cross. We'll take a 15-minute break at this time.

While we're on break I'm going to hand down to Dawn my list of what's in evidence. I'm going to ask the lawyers to look at it.

I want to say, Mr. Righetti, you referred after the fact to some of these exhibits by what I think is the wrong exhibit number. This is a product of you not having marked these properly to begin with. You need to get with Dawn and the other lawyers and make sure that every exhibit is properly marked before we resume. I want them marked. I do not want this to slide. It will turn into a mess.

**MR. MATTHEW RIGHETTI:** I understand and apologize for the confusion.

**THE COURT:** Do it within the next 15 minute, please. Thank you.

(Whereupon there was a recess in the proceedings from 11:22 a.m. until 11:39 a.m.)

**THE COURT:** All right. My clerk is not here. Is my court reporter ready?

**THE REPORTER:** Yes, I'm ready, Judge.

**THE COURT:** Have you straightened out the exhibits?

**MR. DOSTART:** We're doing that right now, your Honor.

**THE COURT:** Can I have my notepad back? I need it to do my work.

(Notepad was tendered to the Court.)

**THE COURT:** Are we ready, Mr. Wohl?

**MR. WOHL:** We certainly are, your Honor.

**THE COURT:** All right. You may proceed.

**MR. WOHL:** Thank you very much.

**CROSS EXAMINATION**

**BY MR. WOHL:**

**Q.** Good morning, Dr. Johnson.

**A.** Good morning.

**Q.** Nice to see you again.

Dr. Johnson, would you say it's fair to say that ergonomics is concerned with prompting both the productivity of the employee as well as the employee's well-being?

**A.** Yes.

**Q.** So it's a balance between the two, correct?

**A.** To try and improve both.

**Q.** And perhaps in a perfect world the employee could be the most productive possible and the most well off as possible, but in a real world it doesn't quite work that way; isn't that correct?

**A.** The vast majority of my cases by the time we end up with having it ergonomically designed for the operator, it's also faster and better quality.

**Q.** Are you denying that there are cases in which productivity is, in fact, somewhat impaired because of considerations given to the employee's well-being?

**A.** In my 40 years productivity has never declined at the end of my effort.

**Q.** Or conversely the other way; that the employer, to obtain a certain left level of productivity, has had to settle for

something less than optimal well-being for the employee?

**A.** I'm not understanding what you're saying there.

**Q.** That because of the demands of the job the way the work station is configured, it serves productivity perhaps somewhat at the expense of employee well-being; that that's the solution that's reached by the ergonomist in consultation with the employer?

**THE COURT:** I'm not sure -- I don't really understand the question myself. I understood your first version, but I don't understand this version. So try it again in different words.

**MR. WOHL:** I certainly will, your Honor.

**BY MR. WOHL:**

**Q.** Isn't it true, Dr. Johnson, that sometimes because of the employer's demand for a certain level of productivity, the ergonomist has to come up with a solution that is not necessarily optimal for the employee's well-being?

**A.** There are constraints that I've dealt with that constrain what you can do from an ergonomic point, but productivity has not been one in my experience.

**Q.** Don't you agree that there are some jobs that require standing?

**A.** Some jobs? What do you mean by "job"?

**Q.** I'm sorry. You don't know what a job is?

**A.** There are many different -- are you talking about an

entire job -- are you talking about a task or are you talking about a task element or are you talking about a job?

**Q.** Well, let's start with a job. Aren't there some jobs that require standing?

**A.** Some jobs have tasks that would require standing, yes.

**Q.** Even though in performing those jobs and in standing, it may not be optimal for the employee's well-being?

**A.** Say that again.

**Q.** In performing the task that requires standing, it may not be optimal for the employee's well-being?

**A.** That's the second part of it --

**THE COURT:** Here is what I think counsel is asking. Let me try it. That is: Assume that you have a job. And by "job" I mean the overall job, not just one task. And let's assume that that job has got a bunch of tasks or one task and everyone agrees that you've got to stand to do that job.

All right? So counsel is asking you whether or not it would be true that in order to perform that job the guy or woman has got to stand the whole time even though standing the whole time is not necessarily in the best interests of that employee's health. Agreed?

**THE WITNESS:** Yes. There are some jobs that require and have constraints that require a long-term standing position, yes.

**THE COURT:** No. And that it would be not necessarily

in the employee's best health interests. That's the part he's after. Do you agree with that or not?

**THE WITNESS:** If it is long-term standing, that would not be in their interest. I agree.

**THE COURT:** All right. Is that the point you were trying to get at?

**MR. WOHL:** Yes. The job, however, in that situation requires it.

**BY MR. WOHL:**

**Q.** Okay. As an ergonomist, you're being hired to design work spaces to be safer and more efficient, correct?

**A.** Yes. Those are two of the goals.

**Q.** But even if the employer follows your recommendations, you can't guarantee that there will be never any jury to the employee resulting from performing the job, correct?

**THE COURT:** You have so many words here going by so fast. Say that again more slowly so I can understand it.

**MR. WOHL:** I'm sorry. I will break it down, your Honor. I apologize.

**BY MR. WOHL:**

**Q.** If an employer followed your recommendations for what you believe to be a safer, more efficient workplace, you can't guarantee that nevertheless the employee might still suffer from sort of injury, correct?

**A.** Injury due to the job you're talking about?

**Q.** In performance of the job, that's right.

**A.** There would be no guarantees. If you're saying -- as a result of my design, that my design caused the jury?

**Q.** Or notwithstanding your design. Notwithstanding your design, as an ergonomist, you can't promise the employer if the employee uses this design, he will never be injured on the job, correct?

**A.** I would never say never.

**THE COURT:** Promise. Guarantee. I mean, who in the world would make such promises or guarantees? That doesn't prove very much, Mr. Wohl. That's too argumentative for my taste.

**MR. WOHL:** All right.

**THE COURT:** There are ways to get at the point you're making without being so argumentative.

**MR. WOHL:** Okay. I don't mean to be argumentative, your Honor. I just want to draw out these facts.

**BY MR. WOHL:**

**Q.** Isn't it also true that when you approach a work space as an ergonomist being asked to possibly redesign it, you're trying to design it to match the demands of the job in an ergonomically efficient way, correct?

**A.** What do you define as an "ergonomically efficient way"?

**Q.** That's not a meaningful phrase to you, "ergonomically efficient way"?

**A.** No.

**Q.** A way that satisfies the goals of ergonomics, which is to the extent possible improving both productivity and employee well-being.

**A.** Okay. So let's say that productivity and well-being. Ask your question again.

**Q.** When you're asked to design or modify a workplace, that is the goal that you're trying to achieve, correct?

**A.** Increase productivity, increase quality of work life, increase quality of the product and decrease the potential for occupational safety and health.

**Q.** What you're not charged with doing is changing the demands of the job, isn't that correct?

**A.** What I'm not charged with doing is changing the demands of the job.

**Q.** Right.

**A.** When you're saying "the demands of the job," can you give me an example of what you mean by that?

**Q.** What the employer wants the employee to accomplish in the job. I want the employee to perform the following job functions.

Your job is not to say: Well, let's change those job functions. Let's not have the employee do certain things.

It's, how do we best enable the employee to perform those job functions, isn't that correct?

 **A.** That is correct. And to inform the employer of what the disadvantage of having that particular definition is for them.

**Q.** But is the --

**A.** From an ergonomic standpoint.

**Q.** But it is the employer's prerogative if he wants the job performed that way, he's entitled to have the job performed that way, correct?

**A.** They hired me, yes.

**Q.** Isn't it also true then coming up with an ergonomic solution, there are trade-offs that you must make in coming up with a recommendation?

**A.** There are always -- with respect to what? I mean, there are -- as a general statement, there are trade-offs.

**Q.** Yes. In other words, there are no absolute answers here. It's always a matter of balancing different considerations, isn't that correct?

**A.** What -- can you give me an example of what considerations are? I'm not sure I'm...

**Q.** Well, for example, what might be best for one worker might not be best for another worker, correct?

**A.** Usually you don't run into that that much.

**Q.** Well, you've already said that you strive to satisfy the fifth percentile and the 95th percentile. So within that group the ergonomic solution may work, but it may leave out those at either extreme, correct?

**A.** If you recall, I said that I don't stick to the fifth and 95th. That's up to the company to decide what percentile they would accommodate.

**Q.** But you're facilitating that choice by the employer, correct, in coming up with your solution?

**A.** I'm telling the employer what the advantages and disadvantages are of accommodating a greater or lesser number of people.

**Q.** But in coming up with your solution, you have to take into account what range of employees the employer wants to be able to help?

**A.** Yes, yes. But that's the employer's decision, yes.

**Q.** It's also possible that a solution for one company may not be the right solution for another company, isn't that correct?

**MR. MATTHEW RIGHETTI:** Object to vague and ambiguous.

**THE COURT:** Overruled.

**A.** The identical situation?

**BY MR. WOHL:**

**Q.** Yes.

**A.** I don't know what would be different between -- I mean, without knowing what the differences are.

**Q.** Company values, would that play a role?

**A.** In terms of --

**Q.** What the company values as being important in the performance of the job, would that come into play?

**A.** Are you talking about from an ergonomics standpoint?

**Q.** From the business perspective.

**A.** I'm not representing a business perspective. I'm representing an ergonomist.

**Q.** So you're not getting into that part of it. That's up to the employer to decide?

**A.** Yes. That would not be -- that's not my domain.

**Q.** And isn't it correct that in your experience consulting, you have encountered numerous different situations and, as a result, helped design different work stations?

**A.** Say it one more time.

**Q.** In your consulting practice have you not encountered different work situations; that is, different -- both configuration and what the business is and so forth. You've counted different types of situation is in that regard, isn't that correct?

**A.** Yes.

**Q.** And you have come up with different work solutions, different ergonomic solutions to match those differences, isn't that correct?

**A.** Yes. I don't -- when you're saying "differences," to match what they are requirements are. I'm not sure what -- when you say "differences," you're saying A versus B and I don't know what the A and B are in the case that we're talking about.

**Q.** Ergonomics is not a one size fits all type of practice, isn't that correct?

**A.** I don't know what this statement means.

**Q.** That you cannot impose the same solution in every workplace irregardless -- regardless of these other considerations; what the business is, what the company values are and so forth?

**A.** The principles that we use in ergonomics, I would contend, in terms of motion, economy and these types of things can be equally applied in each situation.

**Q.** Jobs have different physical requirements, don't they?

**A.** Yes.

**Q.** And you have to tailor your solution with respect to that, is that correct?

**A.** That's what we're looking at, is the requirements.

**Q.** And at times you have found that the physical demands of a particular job did not allow use of a seat, isn't that correct?

**A.** Yes, yes. There are --

**Q.** For example, you did work with a chicken processing facility, correct?

**A.** I've done a lot of work with chicken processing facilities, yes.

**Q.** And at the facility one of the functions that the employee had to perform was a so-called live hang function?

**A.** Yes.

**Q.** That's where the bird is suspended from some sort of hook?

**A.** That's where they are putting it on the hook, shackles.

**Q.** Without getting, I think, too graphic about that whole process, in that regard you did not --

**THE COURT:** That would be Livingston, not Tulare. If you know the Central Valley.

**MR. WOHL:** That's true, your Honor. That's very true. Thank you.

**BY MR. WOHL:**

**Q.** It's correct in that instance you did not recommend that a lean stool or seat be used for the employees, correct?

**A.** Correct.

**Q.** Is that correct, that when you're hired to conduct an ergonomic analysis, you consider the actual job the employee is required to do as opposed to a hypothetical job that could be performed differently?

**A.** No. I look at what -- I don't restrict it to how they do the job now or I would not make very many recommendations.

**Q.** You are looking at the actual job they are performing, isn't that correct?

**A.** No. I'm looking at how to change the job they are performing to make it more productive and better for the people.

**Q.** I'm sorry. Change the job they are performing or job the way in which they are performing the job?

 **A.** I'm having trouble with the definition between those two.

**Q.** Do you not see the difference between those two?

**A.** I am not. Are you talking about the output? What are you defining by the job?

**Q.** The actual work that the employee is doing. The actual value that he is delivering to the employer, you're not looking to change that?

**A.** I'm trying to improve that.

**Q.** Through what you believe to be a more efficient process, correct?

**A.** And lowering absenteeism and turnover, yes.

**Q.** And you generally consider the expectations the employer has about the job, isn't it true?

**A.** I'm not sure how that, how much I would -- I don't know how that plays that much of a part. When you're saying -- expectations with respect to what?

**Q.** The employer's expectations as to the --

**A.** Employer's expectations?

**Q.** Yes, sir.

Is it not true that you generally consider the employer's expectations about the job when you come up with your ergonomic analysis and recommendation?

**A.** Yes. There are constraints that the employer imposes.

**Q.** And you also have to know for whom the employer has designed the work station, isn't that right?

**A.** Who the operators are, yes.

**Q.** I think you said before you would need to know from the employer what range of employees by whatever might be a relevant consideration the employer wants to accommodate or fit in order so that you can make your recommendation meaningful for the employer, correct?

**A.** Well, I would tell them what the advantage and disadvantage of choosing to exclude or include -- to accommodate people, yes.

**Q.** Dr. Johnson, isn't it true that there's different types of ergonomics?

**A.** Could you elaborate on that?

**Q.** Specifically aren't there two categories of ergonomics, cognitive ergonomics and physical ergonomics?

**A.** They're -- to an extent they are in the same area. When I teach a course, I teach content both ways.

**Q.** Well --

**A.** But they are --

**Q.** My question is: Isn't it true there is recognized in the field two separate categories of ergonomics; one is considered cognitive and one is considered physical?

**A.** You're making them two totally different categories and they are not. They overlap significantly. Most everyone that works in physical also works a little bit in cognitive and vice-versa.

**Q.** Do you recall giving a deposition in a case called *Hall versus Rite Aid Corporation*?

**A.** Yes.

**Q.** Do you recall in that deposition I asked you if there were different types of ergonomics?

**A.** Yes.

**Q.** And you told me that generally --

**THE COURT:** No, no. You've got to read it exactly.

**MR. WOHL:** All right. Your Honor, I will do that.

**THE COURT:** Give us page and line number.

**MR. WOHL:** Would you like a copy of the deposition, your Honor?

**THE COURT:** I would but, no, I don't want to hold you up on this. You go ahead and I will trust you to read it correctly.

**MR. WOHL:** Your Honor, I'm reading from Dr. Johnson's deposition, again, in the *Hall versus Rite Aid Corporation* case pending in San Diego Superior Court. This deposition was taken on January 27, 2012. I am reading starting on Page 28, Line 24 and continuing until Page 29, Line 2.

**THE COURT:** All right. Just read the entirety of the question and the entirety of the answer.

**MR. WOHL:** I will, your Honor.

**BY MR. WOHL:**

**Q.** (As read)

 "**QUESTION:** Okay. Are there different types of ergonomics?

"**ANSWER:** There are two general categories that people consider sometimes, and one is cognitive ergonomics and the other is physical ergonomics."

That was your testimony; correct, sir?

**A.** Yes.

**Q.** Would you care to tell the Court what the difference is between cognitive and physical ergonomics?

**A.** Cognitive ergonomics have to do with the psychological component of it. And physical ergonomics have to do with the physio, physiological aspect of it more so.

**Q.** So more specifically would it be fair to say that in terms of cognitive ergonomics, you're dealing with the mental processes and capacities of humans when at work?

**A.** The -- yes. And then the perception and sensation and not just the cognitive, yes.

**Q.** And issues that would be considered in that field would include mental strain from workload?

**A.** Yes, but physical ergonomists include that as well.

**Q.** I'm just asking about cognitive, sir. So just answer my question, please.

**A.** Okay.

**Q.** It would also include decision making?

**A.** People in ergonomics, some areas of ergonomics consider

decision making, yes.

**Q.** Human error?

**A.** Yes.

**Q.** And training?

**A.** Again, you're not separating that into only cognitive ergonomics at this point, is that correct?

**Q.** I'm simply asking you if those are areas that cognitive ergonomics encompasses.

**A.** Those are some of the areas that some cognitive ergonomists work in.

**Q.** Physical ergonomics deals with the human body's responses to physical and physiological workloads, isn't that correct?

**A.** That's a reasonable definition.

**Q.** Physical ergonomics deals with such issues as repetitive strain injuries from repetition?

**A.** That's one of the areas that it deals with, yes.

**Q.** Vibration?

**A.** Any -- any stressor, yes.

**Q.** Force?

**A.** When you're saying "force "-- I mean, yes.

**Q.** The impact of force on the human body?

**A.** Yes.

**Q.** Isn't that not part of it?

**A.** Yes.

**Q.** And posture?

**A.** Yes.

**Q.** Now, do you contend that you're an expert in both categories of ergonomics?

**A.** I have done work in both and have written in both areas, yes.

**Q.** You would agree, would you not, that to the extent ergonomics plays a role in this case, we're concerned with physical ergonomics?

**A.** No. There is the cognitive aspect everybody it as well.

**Q.** So you --

**A.** From the standpoint -- I'm sorry.

**Q.** Excuse me. I think I cut you off.

**A.** When you're looking at location of displays or this type of thing, then you've got to make sure they are readable, readable from the distance and that type of thing. So there are cognitive aspects that play a part, like I say, with physical. They are not totally separate issues in many respects.

**Q.** Do you think the physical ergonomics are the predominant issue though?

**A.** I wouldn't say that's true.

**Q.** Now -- and, again, you do consider yourself to be an expert in physical ergonomics as well, is that correct?

**A.** I have worked in physical ergonomics my life, yes.

**Q.** Isn't that correct, Dr. Johnson, that you have not

published anything on physical ergonomics in a peer-reviewed journal since 1998?

**A.** That's very -- that's possible.

**Q.** Isn't it true that you have not published anything related to physical ergonomics in a peer-reviewed proceeding since 2005?

**A.** That's possible.

**Q.** Isn't it true that the focus of your work, or at least your academic work has been in the area of cognitive ergonomics?

**A.** My academic work, my research work?

**Q.** Yes.

**A.** My research work has been -- in fact, I wouldn't even call it cognitive. It's in safety, truck safety. But I wouldn't --

**Q.** Cognitive ergonomics in terms of how it plays with truck safety; is that what you mean, sir?

**A.** Yes, yes.

**Q.** Is it also true that you did not study ergonomics or industrial engineering as an undergraduate student?

**A.** I have courses in ergonomics as an undergraduate student, but my degree was in psychology. I only had a couple of courses in ergonomics. It was not a major.

**Q.** Isn't it true that you did not obtain a Master's degree in industrial engineering or design?

**A.** It was in industrial -- it was in engineering psychology,

 which was an interdisciplinary program; but it was in a psychology program, yes.

**Q.** Not in industrial engineering?

**A.** Not in industrial engineering.

**Q.** Isn't it true that you have never taken course work in structural engineering?

**A.** No, that's not true.

**Q.** You sure that's not true?

**A.** After I had my PhD, I went back and sat in on classes that had statics, dynamics, thermomechanics, materials to get ready for the professional engineering exam.

**MR. WOHL:** I'm going to, your Honor, pull from Dr. Johnson's deposition taken in this case and I'm going to read from Volume 1, Page 35, Lines 18 to 21.

**BY MR. WOHL:**

**Q.** So first off, Dr. Johnson, let me just lay the foundation.

Is it correct you gave a deposition in this case on April 4, 2012?

**A.** Yes.

**Q.** And reading from page 35, line 18-21:

"**QUESTION:** In accordance with obtaining your Ph.D. in industrial engineering, did you take course work in structural engineering?

"**ANSWER:** No."

**A.** That's correct. I did not -- I had my Ph.D. already, when

I took those courses.
**Q.** Isn't it true that the first degree you obtained in industrial engineering was, in fact, your Ph.D. program?
**A.** Yes.
**Q.** And that was the first time you completed any course work in industrial engineering?
**A.** Yes.
**Q.** So --
**A.** When -- you're saying for my Ph.D. was the first.
**Q.** Right.
**A.** Yes.
**Q.** Correct. So, in summary, you did not study physical ergonomics at all until you began your Ph.D. program; isn't that correct?
**A.** That's correct.
**Q.** Now, have you ever been designated, meaning a counsel has designated you as an expert in ergonomics before in connection with litigation? I'll restate that question.
In connection with litigation, have you ever been designated by counsel, that is counsel declaring you to be an expert in ergonomics?
**A.** I believe, if I'm understanding it -- I'm not sure I understand the legal aspects, but I believe in the *Auto Zone* case there was an Auto Zone case where there was a deposition taken.

**Q.** Did the *Auto Zone* case have to do with the issue of seats --

**A.** No.

**Q.** -- as presented in this case?

Perhaps you remember from our deposition we both talk fast, but we both have to be quiet until the other guy talks or else the record is a mess.

*Jones vs. Auto Zone* was not a seats case, correct?

**A.** Correct.

**Q.** Were there any other cases which are seats cases in which you were designated as an expert?

**A.** Recently, yes, the *CVS*, *Target*, *Rite Aid*.

**Q.** May I help you with *Home Depot*?

**A.** Yes, *Home Depot*.

**Q.** Okay. That's five cases plus this case, correct?

**A.** Yes.

**Q.** And in each and every one of those cases, the counsel that designated you as an ergonomics expert are the folks sitting at plaintiff's counsel table here today, correct?

**A.** That's correct.

**Q.** Is it correct that in the *Kilby vs. CVS* case, you gave an expert report?

**A.** Yes.

**Q.** And your report recommended that seats could be provided to cashiers who currently stood; is that correct?

**A.** That providing seats for those cashiers would be beneficial, yes.

**Q.** Isn't it true that your testimony was partially stricken in the *Kilby* case?

**A.** I don't know about that.

**Q.** Isn't it correct that the court in the *Kilby* case struck your testimony because -- regarding modifications necessary to the provision of seats because the Court founds it could not be supported by facts or data?

**A.** I don't know about that.

**Q.** If I showed you a copy of that order, would that refresh your memory?

**A.** No. I mean, I -- I'm not sure what that means, struck my -- I'm not sure what that means.

**Q.** Okay. So even if I showed you the order, you wouldn't know if that was the --

**A.** I would look at it, but I'm not sure I would understand.

**Q.** I would be happy to show it to you.

**A.** Yes, please.

**MR. WOHL:** Your Honor, with your permission, I would like to show the witness a copy of the Court's order in *Kilby vs. CVS Pharmacy* -- that's the Southern District of California -- in part affirming tentative rulings, denying --

**THE COURT:** Okay.

**MR. WOHL:** I didn't know how much formality you

wanted.

**THE COURT:** Show it to the witness and see if his memory is refreshed.

**MR. MATTHEW RIGHETTI:** Your Honor, I don't think it's been established that he has ever seen it.

**THE COURT:** He doesn't have to have seen it in order to refresh his memory. Anything can be used to refresh memory.

Irving Younger used to say your favorite song or the scent of a perfume, or anything might refresh memory.

There is no requirement that the document have been seen by the witness before. However, the witness never actually said that seeing the document would refresh his memory. He only said he would be willing to look at it. But we're going to pass that defect for now.

Can you answer the question from memory whether or not your testimony was stricken?

**THE WITNESS:** From memory, I cannot. From this document, it appears that it has.

**THE COURT:** Well, that doesn't -- all right. That doesn't count. We're dealing with the witness and his memory. If you want to show and impeach him in some other way that some other judge struck his testimony, more power to you. But this is not refreshing memory.

**MR. WOHL:** All right, your Honor. That's fine. I think I've made my point.

**BY MR. WOHL:**

**Q.** Now, it's correct, is it not, that apart from your litigation practice that you've told us something about, you also do consult with companies in a non-litigation context about workplace ergonomics, correct?

**A.** Yes.

**Q.** And one of those companies was Brookshire Grocery, correct?

**A.** Yes.

**Q.** And at Brookshire, you looked at specifically cashier positions; did you not?

**A.** No. At Brookshire there was a little bit of looking at the cashier, but the primary thing was in their cooked area. Cooked foods area.

**MR. WOHL:** Your Honor, another deposition. This time I'm going to read from the deposition that Dr. Johnson gave in a case called *Brown and Williamson* -- apparently not the tobacco company, or whatever they do -- *vs. Wal-Mart Stores*. And this was a case pending in this court. And the deposition of Dr. Johnson was taken on April 13, 2011, in Fayetteville, Arkansas.

**BY MR. WOHL:**

**Q.** Do you recall testifying in that deposition?

**A.** Yes.

**THE COURT:** Give us page and line. Say "question,"

 read the question. Say "answer," read the complete answer.

**MR. WOHL:** Your Honor, I'm reading from page 23. I'm starting at line 15, and continuing to line 25.

**"QUESTION:** And what kind of --

**"ANSWER:** As I remember --

**"QUESTION:** -- work did you do for Brookshire Grocery?

**"ANSWER:** We were looking particularly at musculoskeletal disorder problems within the facility. So the cashier was one of the locations."

Goes on to say:

"We also looked at the bakery and other aspects of the facility, as well. But it was -- it was specifically looking for musculoskeletal things -- aspects of the workstation design that were potentially increasing the risk of musculoskeletal disorders."

**BY MR. WOHL:**

**Q.** Correct?

**A.** I stand by that.

**Q.** And that did include specifically looking at the cashier position at Brookshire?

**A.** No, wait. Specifically was -- no, but I did look at the cashier workstation relative to musculoskeletal disorder of the upper extremity in particular. But the focus was on -- on the bakery or the baked goods.

**Q.** Well, with regard --

**A.** I don't see that that statement is inconsistent with what I said today.

**Q.** With respect to the cashier workstation, is it correct that you made some recommendations about changes to procedures and workstation design that could be used to reduce the risk of many MSDs -- MSD, musculoskeletal disorders, correct?

**A.** With respect to the cashier workstations --

**Q.** Yes.

**A.** -- at Brookshire?

**Q.** Yes.

**A.** I don't --

**Q.** Did you not do that?

**A.** -- recall that I did.

**MR. WOHL:** Reading again from the deposition, your Honor, page 24, starting at line 1, and continuing to line 5:

"And what were your conclusions with respect to the cashier position for Brookshire Grocery?

"**ANSWER:** We recommended some changes in -- in both -- in some of the procedures that they were using, as well as -- as workstation changes."

**BY MR. WOHL:**

**Q.** That is your testimony, correct?

**A.** The procedures they were using were -- were the twisting of the -- I know what the procedures were.

**Q.** But you went on to say workstation designs -- workstation

changes. So you also looked at work -- cashier workstation --

**A.** Is it cashier workstations?

**MR. MATTHEW RIGHETTI:** Your Honor, he misquoted the impeachment.

**THE COURT:** Do this. Show the witness the document so that he can see it in print.

**MR. WOHL:** Of course, your Honor.

**THE COURT:** And then maybe -- then give us your statement you were about to make.

**MR. WOHL:** Okay.

**THE COURT:** The witness will. And then counsel can ask a fresh question.

**THE WITNESS:** Yes. This does say with respect to cashier position. But the recommendations we made, I was going further with the recommendations for the workstation were actually with respect to the cooking area. But the procedures area were relative to the cashier. And that was to stop them from twisting the items as much.

**BY MR. WOHL:**

**Q.** Dr. --

**THE COURT:** Is the testimony correct or incorrect?

**THE WITNESS:** The testimony is incorrect here, with that statement "cashier position." We recommended some changes in both -- in both -- in some of the procedures that they were using, as well as workstation changes. The workstation changes

would have been, here, with respect to the cooking area.

**BY MR. WOHL:**

**Q.** But that's not what the deposition says?

**A.** You're correct.

**Q.** Okay. And, in fact, at Brookshire cashiers don't sit; do they?

**A.** No.

**Q.** And you don't recommend that they be provided with seats; isn't that correct?

**A.** That's correct.

**Q.** Let's talk about Wal-Mart. Isn't it correct that in 2006, long before you were designated an expert in these seats cases, this one, all the other we talked about, you consulted with Wal-Mart for the purpose to see whether their cashiers could sit while performing their job duties?

**A.** It was to look at the advantages and disadvantages, the constraints on doing that, yes.

**Q.** And for Wal-Mart, you considered whether they should be provided with a seat or with a lean stool; isn't that correct?

**A.** They included a lean stool in that effort.

**Q.** Explain to the Court what a lean stool is.

**A.** A lean stool as opposed to a seat that you sit on or stand without, a lean stool is a stool that you lean against, bracing your legs on something below you.

**Q.** So it's not a seat, it's something you lean against; isn't't

that correct?

**A.** It is, yes.

**Q.** And instead of your bottom supporting your weight, it's actually the back part of your legs supporting your weight against the lean stool, correct?

**A.** Yes. You're taking the weight off the legs and, at the same time, allowing mobility of the upper torso to work.

**Q.** Is it correct that in performing your analysis for Wal-Mart as to that issue you didn't consider what products the cashiers handled, correct?

**A.** When you say --

**MR. MATTHEW RIGHETTI:** Your Honor, this Wal-Mart issue does raise that confidentiality agreement again. And if we're going to be back here tomorrow for more cross-examination, then during the afternoon recess I can check Mr. Wohl's representations that none of the -- that Wal-Mart, apparently, is not interested in enforcing the confidentiality agreement.

Of course, if Dr. Johnson is ordered to answer questions then -- I just don't want him getting crossways with Wal-Mart, and getting sued by Wal-Mart by violating the confidentiality agreement.

**MR. WOHL:** We have the deposition right here. Nowhere is there anything about protective order, confidentiality, so forth.

Wal-Mart was represented in the case because it was

brought against Wal-Mart. We are prepared to make a proffer or offer testimony that we obtained this from the court reporter, and specifically asked the court reporter, Is there any confidentiality attached to this? We were told no.

**MR. MATTHEW RIGHETTI:** Mr. Wohl, apparently, obtained a deposition transcript in the Wal-Mart matter without notifying us. I wouldn't really care. But, more importantly, without notifying Wal-Mart or its attorneys. And the court reporter gave it to him.

Now, Wal-Mart, apparently, doesn't know, and I just found out that Mr. Wohl obtained this transcript without notifying Wal-Mart or its counsel. So the fact that he got the transcript doesn't necessarily mean that Wal-Mart is waiving the confidentiality agreement with regard to Dr. Johnson.

**MR. WOHL:** Your Honor, this becomes surreal. They clearly disclosed everything about Dr. Johnson's work to plaintiff's counsel, who was suing them for a seats claim. So the idea that somehow, in Wal-Mart's mind, well, we'll keep it confidential as to everybody else except these plaintiffs, makes no sense.

But, in any event, the deposition the speaks for itself, your Honor. There's no confidentiality or protective order.

**THE COURT:** Can I see the transcript?

**MR. WOHL:** Yes, Your Honor.

**THE COURT:** First, show it to counsel. Counsel, have

you seen it?

**MR. MATTHEW RIGHETTI:** Yes.

**MR. WOHL:** It's their offer when they took the deposition. So, of course, they've seen it.

**MR. MATTHEW RIGHETTI:** We took the deposition by subpoena. He wasn't an expert in this case. He was a fact witness.

**THE COURT:** You should know, as counsel in that case, Mr. Righetti, whether or not there's some other order someplace that keeps this transcript under seal.

**MR. MATTHEW RIGHETTI:** Charlie Jones' office is handling that case. And I intend, when we're finished here today, to go over that with him.

**THE COURT:** Are you counsel in that case?

**MR. MATTHEW RIGHETTI:** I am an attorney in that case, but I did not handle that deposition. I've never personally read that deposition.

**THE COURT:** Yes, but you know about this witness. This is an obvious issue to -- you brought it up yourself. You could have checked all this out before we came here today.

**MR. MATTHEW RIGHETTI:** Yes. Theoretically, I could have. I don't have a bone to pick. I'm not trying to hide anything or prevent anything from coming out. I just don't want Dr. Johnson getting crossways on a confidentiality agreement that Wal-Mart had him sign before he did work at

Wal-Mart. That's my only consideration. We're not trying to hide anything about Wal-Mart.

**MR. WOHL:** I think what Mr. Righetti is saying, if you simply instruct the witness to answer my question then everything is fine because then he's doing it based on the judge's direction, and Wal-Mart would surely have no cause or complaint about that.

**THE COURT:** Just a minute.

(Pause.)

**THE COURT:** Well, in the word index at the back I've looked for the words "confidentiality," "protective" and "order." I don't see those at all.

I've looked through the transcript to see if there's any indication that something is secret. And I don't see that.

So, as far as I can tell, this is a public document that has no confidentiality requirement, whatever. And the defendant was represented at the deposition by Littler Mendelson, it says here --

**THE WITNESS:** Excuse me, sir. I was not represented by her.

**THE COURT:** It says the defendant was represented.

**THE WITNESS:** I wasn't the defendant. I was a fact witness.

**THE COURT:** Yes, you were the witness.

**THE WITNESS:** Oh, I was? The person from Wal-Mart was

representing me?

**THE COURT:** No. I said the defendant. Were you the defendant in that case? No. You were supposed to be a witness. But the defendant was Wal-Mart.

So Wal-Mart was present and had every opportunity to say something in here is secret. So the witness will be ordered to answer anything and everything that is covered by this deposition.

Now, if it's a different subject, I don't know. If the witness says -- do you have -- do you have some confidentiality agreement with Wal-Mart?

**THE WITNESS:** I had a confidentiality -- as part of that effort, there was a confidentiality agreement signed.

**MR. MATTHEW RIGHETTI:** I believe the confidentiality agreement is an exhibit to that deposition, your Honor.

**MR. WOHL:** But, your Honor --

**THE COURT:** What exhibit number is that?

**MR. WOHL:** I'll take a look for you. I would represent I would only be asking him things disclosed in the deposition. So I think I'm tracking exactly what you're suggesting would be the right way to --

**THE COURT:** Here's the answer. Mr. Righetti, it's not under seal. It's in the public domain. Your objection is overruled.

The witness will be ordered to answer these questions. If

he doesn't, I may strike the entirety of his direct.

**MR. MATTHEW RIGHETTI:** That's all I ask, your Honor. Thank you. That's fine.

**THE COURT:** Thank you.

Do you understand what I just said?

**THE WITNESS:** I do, sir.

**THE COURT:** I'm handing back this deposition.

**MR. WOHL:** Thank you, Your Honor.

**THE COURT:** We're going to move on.

**MR. WOHL:** Appreciate your attention to that. Thank you.

**BY MR. WOHL:**

**Q.** Dr. Johnson, let's resume. My question was -- I'll ask the question one more time.

**A.** Is it allowed, can I modify my response relative to Brookshire? While you were talking about that --

**THE COURT:** Go ahead.

**THE WITNESS:** It was footrests. I did recommend that they put some footrests at that workstation. There was nothing at the top or the other side. There were footrests, and at the time there was a footrest that I was addressing.

**THE COURT:** Thank you.

**BY MR. WOHL:**

**Q.** Again, not seats?

**A.** Pardon?

**Q.** Not seats?

**A.** No, no, it was not seats. But I was trying to figure out -- that statement bothered me, okay.

**Q.** Okay.

**THE COURT:** Next question, please. Let's move on.

**MR. WOHL:** I'm trying to. Thank you, Your Honor.

**BY MR. WOHL:**

**Q.** So, again, my question was, in performing your analysis for Wal-Mart about whether cashiers could either use a seat or a lean stool, you did not consider what actual products they handled through the checkout process; isn't that correct?

**A.** I did not analyze that, no.

**Q.** Specifically, you didn't consider the products, the types of products, the weight or the sizes of the products that the cashiers handled, correct?

**A.** Now, when you're saying "consider," I did consider from the standpoint of observations and watching. I did not document it in any form.

**Q.** Not whether you documented it or not. Whether it played any role in your analysis about whether they could use a seat or a lean stool.

**A.** What they were handling was part -- when you say analysis, what they were handling could -- was considered, but I did not have enough knowledge of what that was. I did not take data on that. All I did was observations. I did not have that

information.

**Q.** I'm going to read from your deposition in the *Brown vs. Wal-Mart case.*

**MR. WOHL:** And I guess I'll just read the whole paragraph, your Honor, that's just as well.

**THE COURT:** Read the question. Tell us page and line and date of the deposition.

**MR. WOHL:** Yes. I'm going to do that, your Honor. Again, this was taken on April 13, 2011. I'll read from question starting on page 24, line 21, through page 25, line 9.

**"QUESTION:** Okay. And could you just describe for me, generally, what you -- what you did for Wal-Mart back in 2006-2007.

**"ANSWER:** Okay. I -- the goal -- the goal was to look at the possibility of using a seated or lean stool during the performance of the cashier's task. And so what I did was, I went in and analyzed the job from the standpoint of the geometry of the job, the people, and then -- and looked at rather the feasibility of -- of doing that. Now, an important aspect is that I did not get -- at that point, the next step in this was to look at what frequency and what types of products would be used -- would be. And I did not analyze the products, types -- the types of products, weight, sizes and so on of the --

of the product that was not -- that was not part of the project."

**THE WITNESS:** That's consistent with what I said.

**THE COURT:** Do you stand by what counsel just read?

**THE WITNESS:** I do.

**THE COURT:** Thank you. Next question.

**MR. WOHL:** Thank you, sir.

**BY MR. WOHL:**

**Q.** And isn't it correct that that ordinarily would have been part of your ergonomic analysis?

**A.** If it would have gone further, yes.

**Q.** And, in fact, if you had considered the products the cashiers handled, that could have had an impact on whatever analysis or recommendation you came out with; isn't that correct?

**A.** Yes.

**Q.** Isn't it also correct that you did not know the frequency, duration, and interval of the Wal-Mart cashiers being required to move from a lean or seated position?

**A.** Yes, that was not considered.

**Q.** That information also would have been critical to your analysis; isn't that correct?

**A.** Yes. I wasn't coming up with a conclusion on whether -- I was talking about the advantages and disadvantages, what aspects were advantages and disadvantages for seating at that

point. I did not come to a conclusion about that.

**Q.** I understand.

**A.** So to come to a conclusion relative to what you're saying, yes.

**Q.** That would have been crucial to your analysis, if you had come to a conclusion. That's what you're saying?

**A.** To come to a conclusion would have been required.

**Q.** Okay. Is it correct that in connection with your work for Wal-Mart in this project, you recommended that it consider -- not that it actually use, but that it consider using a lean stool?

**A.** Yes.

**Q.** And you did not recommend that it consider using a seat; isn't that correct?

**A.** The option -- the -- by the time I got done, the option was -- for their particular situation, was a lean stool as opposed to a seat, yes.

**Q.** That was your recommendation to them as to what it should focus on or consider; isn't that correct?

**A.** It wasn't a start and finish. This was a lot of interaction with Wal-Mart people. This went through a number of presentations and discussions in the meantime. So there was input from Wal-Mart with respect to that, as well.

**Q.** But what you told Wal-Mart was, you would not recommend they consider using a seat for the cashiers; isn't that

correct?

**A.** I don't recall saying that, that they would not. I don't recall that that was a -- a statement.

**Q.** You told Wal-Mart that it should consider using a lean stool instead of a seat; isn't that correct?

**A.** Yes. The conclusion that we had come to as -- like I say, this was not a one-sided situation. This was a situation where I was dealing, as I usually do, with a company and with their engineers.

**Q.** And there were two reasons, in your mind, why you did not recommend that they consider using a seat for the cashiers; isn't that correct?

**A.** Uhm, again, I haven't read that -- I don't recall that part right now.

**Q.** Let me take you through the reasons first.

**A.** Okay.

**Q.** Then we'll go to depo if we have to.

**A.** Okay.

**Q.** One reason you identified is that if the employee has upper motion in the torso, a lean station works better than a seated workstation?

**A.** That's correct.

**Q.** And the other reason is that if a person must periodically get up to do other activities, it's easier to get up and off a lean stool or slide off a lean stool and slide back on than it

 is to get off a chair. Correct?

**A.** Yes.

**Q.** With a chair, the employee has to move it out of the way, which is much more awkward?

**A.** No. Depends on -- depends on where the chair would be or how it would be configured.

**Q.** Is that what you told Wal-Mart, that if you had a chair, it would be -- it would not be desirable because the employee would have to move it out of the way, which was much more awkward?

**A.** What was the first part of that statement?

**Q.** All right. So we're tracing through. I'll step back.

**A.** Okay.

**Q.** We're tracing through the two reasons that you had --

**A.** Okay.

**Q.** -- why you did not recommend to Wal-Mart that they consider using a seat rather than using a lean stool.

**A.** Okay.

**Q.** Are you with me so far?

**A.** Yes.

**Q.** And the first reason was because when you have a position with a lot of upper motion in the torso, the lean station works better than the seated position, correct?

**A.** Yes.

**Q.** And the other reason was that if the employee, in

performing his work duties, has to periodically get up to do those other activities, it's easier to get up and off of a lean stool or to slide off of a lean stool than it is to get off of a chair?

**A.** Yes. It is easier to get off of a lean stool.

**Q.** And that with a chair, the employee has to move it out of the way, which is much more awkward for the employee to do, correct?

**A.** It depends on what they're doing in that area, but that could be the case, yes.

**Q.** Isn't it correct that you also told Wal-Mart that, in your experience, a cashier would use a lean stool only 20 to 40 percent of the time?

**A.** Again, that would depend on the individual. Are you talking about due to the -- again, remember, this was not a --

**THE COURT:** Wait, wait.

**THE WITNESS:** I didn't have enough data to make the analysis.

**THE COURT:** Wait a minute. He's asking you a question where you can say, yes, I did say that, or, no, I didn't say that, or, I just don't remember what I said. You don't -- this is not an occasion, on cross-examination, to give a speech.

So, did you say that, is all he's asking.

**THE WITNESS:** Repeat --

**THE COURT:** Did you say that to Wal-Mart?

**THE WITNESS:** If you would repeat the question.

**BY MR. WOHL:**

**Q.** Certainly, sir.

Isn't it true that you told Wal-Mart that, in your experience, a cashier would use a lean stool only 20 to 40 percent of the time?

**A.** What was the -- before that, without knowing what the context is, in terms of the --

**Q.** I'll read your deposition testimony, Dr. Johnson.

**A.** Okay. I mean, I'm not doubting that I made that statement right there. It's what was the context before that statement.

**THE COURT:** All right. Read the page and line first.

**BY MR. WOHL:**

**Q.** All right. So this references an e-mail -- should I show you the e-mail, first? Would that cut to the chase?

**A.** That would help.

**MR. WOHL:** That might be quicker, your Honor.

**BY MR. WOHL:**

**Q.** I'm going to show you -- this was an exhibit in the deposition. This was an e-mail that you had sent to a Ms. Linda Whittaker, of Wal-Mart's legal department, on February 9 of 2007.

**MR. WOHL:** Your Honor, would you like a copy, as well?

**THE COURT:** No, I don't want one. I want you to mark that as an exhibit so the record will be clear.

**MR. WOHL:** All right.

**THE COURT:** What is that going to be?

**MR. WOHL:** What is that going to be?

**THE COURT:** We'll mark it at the end of this sequence of questions.

**MR. ADKINS:** 375.

**MR. WOHL:** 375, your Honor.

**MS. SOMMERFELD:** 377.

**MR. WOHL:** 377, your Honor.

**THE COURT:** Thank you. All right. Has the witness read it?

**THE WITNESS:** Yes.

**THE COURT:** What's the question?

**BY MR. WOHL:**

**Q.** So, first off, since we're laying a foundation, Dr. Johnson, do you recognize this to be a e-mail that you sent to Linda Whittaker on February 9, 2007?

**A.** Yes.

**Q.** And this was in connection with your consulting work with Wal-Mart that we've been talking about, correct?

**A.** Yes.

**Q.** And Ms. Whittaker was an in-house lawyer at Wal-Mart, correct?

**A.** Yes.

**Q.** And if you go to the -- one, two, three, four, five --

fifth paragraph of the e-mail, could you read that into the record, please.

**A.** (As read:)

"My experience with this design has indicated that people try to set them so that they can sit or -- sit on the seat. Notice the -- notice --"

That is the right spot?

**Q.** No, it's not. I said fifth paragraph. So I'll begin it for you.

"My belief is that ..."

**A.** Oh.

"My belief is that most of the people will use the lean stool 20 to 40 percent of the time, particularly between customers. This is sufficient to -- to rest -- provide rest, recovery of the legs, standing and leaning configuration, yes."

**Q.** So it is correct that, in your experience, you thought that even if you provided a lean stool, the cashier would only use it 20 to 40 percent of the time, correct?

**A.** Yes. This is in the context of I do not think that this is stable enough laterally. This is in the context of evaluation of that particular lean stool, yes.

**Q.** Well, is it this particular lean stool, or in general lean stools?

**A.** This was in the context -- the response was relative to

this particular lean stool. But, I'm not sure I would disagree with that otherwise.

**Q.** And you noted that that would be particularly true, that is, using the lean stool would be more likely to happen between servicing customers, correct?

**A.** Yes.

**Q.** Therefore, when they are servicing customers, they would be off of the lean stool to service the customer; isn't that correct?

**A.** Not necessarily.

**Q.** That's not what you meant by saying particularly between customers?

**A.** I'm not saying that they would be off of the stool. I still think they -- again, what you're asking me is what conclusions I was drawing. And I did not draw any conclusions in this particular analysis. There were many other things. This is related to this particular stool. And the point was that even if they used it 20 to 40 percent of the time, or whatever the percentage was, that that would be sufficient for recovery.

**Q.** But, again, you thought they would use it only 20 to 40 percent of the time, correct?

**A.** Yes.

**Q.** And would use it particularly between customers, meaning between serving customers, correct?

 **A.** No. It will be available to them between customers. That -- it does not say in here they will only use it between customers.

**Q.** I didn't say "only." I said "particularly," correct?

**A.** Yes, that's in fact one of the times it will be used, is between customers, yes.

**Q.** You also told Wal-Mart that a swivel seat has more disadvantages than advantages when moving products laterally, correct?

**A.** That's correct.

**Q.** With a swivel seat, the cashier has to lock his legs to exert enough force to move the products across the counter to prevent the swiveling, correct?

**A.** Are you asking did I say that?

**Q.** Yes.

**A.** Yes.

**Q.** And that's, in fact, true, correct?

**A.** Yes. Depends upon the resistance of the swivel.

**Q.** So you --

**A.** You can set it up -- which we did with Aldi -- so that the resistance is higher, to reduce back problems, but, yes.

**Q.** You told Wal-Mart that if the cashier has to move items laterally, it's better not to use a swivel seat, correct?

**A.** Are you asking -- yes.

**Q.** You also told Wal-Mart that, quote, I also do not think a

seat provides the upper torso mobility necessary to handle the larger items. Correct?

**A.** There are items, yes, that's correct.

**Q.** You also told Wal-Mart that your opinion was that a seated posture would not receive as positive a response from both management and customers, correct?

**A.** As a what?

**Q.** Do you want me to repeat that?

**A.** Yes, but --

**Q.** You told Wal-Mart --

**A.** Okay.

**Q.** -- that your opinion was that a seated posture would not receive as positive a response from both management and customers?

**A.** As what?

**Q.** Do you want me to show you the e-mail where you said that, Dr. Johnson?

**A.** Yes.

**THE COURT:** Is that the same e-mail?

**MR. WOHL:** Different e-mail.

**THE COURT:** I've been searching through here and not finding what you are referring to. This is --

**MR. WOHL:** 378, your Honor.

**THE COURT:** Are you offering 377 in evidence?

**MR. WOHL:** Yes, I am, your Honor. Thank you.

**THE COURT:** Is there any objection to 377? Hearing none, 377 is received.

(Trial Exhibit 377 received in evidence.)

**MR. WOHL:** Your Honor, I am presenting Dr. Johnson with Exhibit 378.

**BY MR. WOHL:**

**Q.** Again, to lay our foundation, do you recognize Exhibit 378 as, in fact, two e-mails? One -- well, there's actually even more e-mails. So just to pick up the track here, if you turn to page 124 of the exhibit, the bottom Dr. Johnson.

**A.** Oh, I'm sorry. On page 124?

**Q.** Yeah. Just for the record, this is your typical email chain where oldest e-mail is on the bottom and newest is on the top. Correct? I'm sorry, correct?

**A.** Yes.

**Q.** Great.

So the e-mail at the bottom was an e-mail that was sent from Packard Industries to kray@officesource.com, dealing with a proposal by Packard Industries to proceed with two prototypes for the Wal-Mart project that you were working on. Correct?

**A.** Okay, yes.

**Q.** Is that correct?

**A.** Yes.

**Q.** And then Kirk Ray, to whom this e-mail was addressed, then passed it along to Linda Whittaker at Wal-Mart, correct?

**A.** Yes.

**Q.** And then Linda, in turn, passed it along to you?

**A.** Yes.

**Q.** And her e-mail passing along to you is what appears at the bottom of page 123, that is the first page of the exhibit?

**A.** Yes.

**Q.** And Ms. Whittaker wrote:

"Please let me know what you think. I am thinking we ask for only the one it will do at no cost."

And the one that they will only do at no cost was the seat.

"Unless you think the other sounds more likely to satisfy our needs."

And the other one was a lean stool, correct?

**A.** Yes.

**Q.** Okay. So then in the top email, which is the last one in the chain, you respond to Ms. Whittaker, correct?

**A.** Yes.

**Q.** You state, one, two -- five paragraphs down, quote:

"My opinion is that a seated posture would not receive as positive a response from both management and customers. I also do not think it provides the upper torso mobility necessary to handle the larger items. But if it's free" -- meaning that the manufacturer was offering it as a free prototype -- "it might be

worth a try."

That's what you wrote to her, correct?

**A.** Yes, that's correct.

**Q.** And your statement in that e-mail, that you thought it would not receive as positive response from both management and customers if a cashier at Wal-Mart sat, was based on your conversations with Wal-Mart customers; isn't that correct?

**A.** No. Well, wait just a second. This -- this is they would not be as --

**Q.** Would not receive as positive a response?

**A.** As with a lean stool. So what we're comparing it against is against a lean stool. Okay. I want to make sure I'm understanding.

**Q.** Right. But seated cashier, you wrote to Wal-Mart, in your opinion, would not receive as positive a response from both management and customers. You made that statement to Wal-Mart, correct?

**A.** Yes, in the context of compared to a lean stool.

**Q.** And that was based on your conversations with Wal-Mart customers, correct?

**A.** I'm trying to think of what the -- I did not analyze -- this would have been discussions with them. But I did not document discussions. I did not do a survey of customers.

**Q.** I'll read from your deposition, again, in the same case, starting at page 138, line 12, and continuing through 139, line

3. I did say 12, yes.

**"QUESTION:** Okay. All right. The next paragraph says" --

And this is referencing the same e-mail.

**A.** Okay.

**Q.** (As read:)

"-- quote, my opinion is that a seated posture would not receive as positive a response from both management and customers. End quote. What was the basis --"

You interject:

**"ANSWER:** Very --

**"QUESTION:** -- for that opinion?

**"ANSWER:** That -- that it's just totally -- I should have used the belief -- the word belief probably there because that -- that was -- actually, I did. I talked to some customers as they were coming through. And I talked to a lot of the others, as well, about would the -- would the seated posture give the impression of Wal-Mart not being as good of service. And -- but that was just casual talking to them. And that -- and that's one of the things -- and I would like to read this in terms of where the next -- where the project would go next, if we would complete that. But a survey of nature is something that would have

been needed to be -- had to be done to look at the total feasibility --

**"QUESTION:** My --

**"ANSWER:** -- of the project."

Okay?

**A.** Yes.

**Q.** So we see a pattern.

**A.** I agree.

**Q.** We have lawyers and witness talking over each other even in the deposition there.

**A.** But I don't disagree with that statement.

**THE COURT:** Well, I need to ask. Do you stand by what you testified to in the deposition?

**THE WITNESS:** Yes.

**THE COURT:** Thank you. Go ahead.

**BY MR. WOHL:**

**Q.** Now, the design for a lean stool you came up with wasn't intended to fit everybody?

**THE COURT:** Can I ask a question?

**MR. WOHL:** Yes.

**THE COURT:** I wanted to ask the witness.

What is the difference between a seat and a lean stool?

**THE WITNESS:** May I draw it? May I draw a lean stool?

**THE COURT:** What are you going to draw it on?

**THE WITNESS:** Just the back of one of these.

**THE COURT:** It will have to be part of the record. Give the witness a clean sheet of paper.

**MR. WOHL:** Handing the witness a pristine piece of paper.

**THE COURT:** Draw us those two items so we'll have in mind what you think the difference is.

**MR. WOHL:** May I see it too, your Honor?

**THE COURT:** Is that the lean stool?

**THE WITNESS:** That would be the lean stool.

**THE COURT:** Draw a seat, too.

**THE WITNESS:** Okay.

**THE COURT:** All right. The one on the left is the --

**THE WITNESS:** Lean stool.

**THE COURT:** All right. Counsel, for the record, mark it as an exhibit.

So as you drew that, it does not have a back to it -- a seat does not have a back to it.

**THE WITNESS:** Not necessarily, no.

**THE COURT:** So I would have called that a stool, what you drew as a seat. But you think that's a seat.

**THE WITNESS:** It is -- it would be called -- it's a seat and a stool, yes.

**THE COURT:** All right. Okay. Thank you.

**MR. WOHL:** So, your Honor, if I haven't already, I would like to move into evidence -- I don't know if I moved 378

as well, so 378 and 379.

**THE COURT:** 378, any objection?

**MR. MATTHEW RIGHETTI:** No, Your Honor.

**THE COURT:** Received.

(Trial Exhibit 378 received in evidence.)

**THE COURT:** 379 is the diagram; is that correct?

**MR. WOHL:** Yes.

**THE COURT:** Any objection?

**MR. MATTHEW RIGHETTI:** No, Your Honor.

**THE COURT:** Received. Go ahead.

(Trial Exhibit 379 received in evidence.)

**BY MR. WOHL:**

**Q.** Before the judge's question, my question to you, Dr. Johnson, the design for a lean stool you came up with wasn't intended to fit everybody; isn't that correct?

**A.** Was not intended?

**Q.** Was not intended. You didn't intend that that was going to fit everybody who might have need to use it; isn't that correct?

**A.** Yeah. I did not do dimensions. This was a concept.

**Q.** For example, a 400-pound person would not be able to use that lean stool, correct?

**A.** Probably not.

**Q.** And wouldn't you agree that whether even the lean stool would have been feasible depended on, among other things,

whether the cashier was responsible for loading merchandise into the customer shopping carts?

**A.** Yes.

**Q.** In fact, you told Wal-Mart's counsel, in connection with the deposition, that the need to load merchandise into the customer shopping carts was a deal breaker for even using a lean stool in the first place?

**A.** Yes.

**Q.** Now, following the work you did for Wal-Mart, Wal-Mart did not install a lean stool for its cashiers; isn't that correct?

**A.** That's correct.

**Q.** It also did not install seats for his cashiers; did it?

**A.** I don't believe so.

**THE COURT:** May I ask a different question?

**MR. WOHL:** Yes, sir.

**THE COURT:** The work you did for Wal-Mart, were you retained in Wal-Mart by the lawyers to be a litigation consultant, or were you simply retained by Wal-Mart on a business basis, to give advice?

I'm still unclear as to how you got involved in the Wal-Mart case.

**THE WITNESS:** The Wal-Mart had nothing to do with litigation at all. It was, I had some graduate students who had gone to Wal-Mart and started to work, and the legal staff asked them about whether this would be possible looking at it

 from an ADA standpoint and other concerns. And then that's when this got started. So this was a very small effort.

**THE COURT:** I got it. Thank you.

Continue on please.

**MR. WOHL:** Thank you.

**BY MR. WOHL:**

**Q.** And to this day, Wal-Mart cashiers continue to stand while performing their job duties; isn't that correct?

**A.** Correct.

**Q.** And you're not recommending in this case that Kmart install standing lean stools, correct?

**A.** I'm not recommending -- when you say, I'm not recommending, yeah.

**Q.** Isn't one of the reasons why is that a lean stool would have to be permanently installed in the floor to provide stability, so that when the cashier leaned back he didn't fall over? In other words, have to be bolted to the ground.

**A.** It doesn't have to be bolted down. We came up with some other alternatives. But, yes, it has to be stable because the important part of a lean stool is the ability to put your legs up and take some of the weight off of the legs.

So there has to be a lateral force there. So it has to be stable, yes. That's the disadvantage.

**Q.** And what that would mean then is that, permanently, the lean stool would be in the way of the cashier if the cashier

needed to get up and move around the checkstand station?

**A.** No, I think that one of the alternative designs -- again, these are all very preliminary -- was one that had the lean stool this way, and then it would flip up, and the person could stand in front of it comfortably.

**Q.** But in the Kmart configuration, that would put it too far back. It wouldn't put the cashier close enough to the counter to actually work while leaning against the lean stool, correct?

**A.** I have not analyzed this relative to the Kmart workstation.

**Q.** And the reason why you have recommended a movable stool is you thought, well, at least with a stool, they can move it under the counter and get it out of the way if they need to stand while performing their job duties, correct?

**A.** Okay. What is your question again?

**Q.** The reason why you've recommended a movable stool for Kmart cashiers is that that way they can simply move it under the counter and get it out of the way, so they can move around in the space behind the counter?

**A.** As opposed to what?

**Q.** As opposed to a fixed lean stool, correct?

**A.** I never entertained a fixed lean stool.

**Q.** Okay. Let's change subjects.

**MR. WOHL:** Your Honor, we're still stopping at 1:00 o'clock today?

**THE COURT:** You have 14 more minutes.

**MR. WOHL:** Thank you, Your Honor.

**BY MR. WOHL:**

**Q.** In -- in your report, in your analysis of this case, you cited your work for Aldi to show that it's obviously possible to perform the checkout function in a seated posture with an appropriately designed configuration, correct?

**A.** I would say that's correct.

**Q.** Is it accurate, therefore, to say that your conclusion that it's possible to perform the checkout function in a seated posture is contingent, is dependent on an appropriately designed configuration?

**A.** When you say "appropriately designed," there are configurations that you would not be able to sit.

**Q.** Right. And that's, actually, your phraseology. But "appropriately designed configuration," we understand each other. Correct?

**A.** Make the statement. Ask me the question again, if you would.

**Q.** In order to have a checkout function performed in the seated posture, there has to be an appropriately designed configuration?

**A.** Yes.

**Q.** As an ergonomist, you wouldn't just place a chair in a workplace without any consideration for such things as counter

 height and length or reach distance, or bending and twisting requirements, correct?

**A.** Now, are you talking about providing a chair for recovery, for example, when they're not working?

**Q.** No. Providing a chair for them to actually perform their work duties. You would never recommend, just throw a chair in there and that would be fine?

**A.** Depends on where "there" was. But there would be configurations that that would not work.

**Q.** Right.

And in this case, the reason why, as plaintiff's counsel took you through all the changes that you propose making to the existing checkout stand, is in an effort to make it appropriately configured for a seat, correct?

**A.** Correct.

**Q.** And as I think you heard counsel reaffirm this morning, unless you did it, those modifications or some other modifications, a seat would not work at the checkout stand at Kmart --

**A.** Again --

**Q.** -- for the employ to perform his job duties?

**A.** It would -- looking at this with what you have right now, the person could sit down and do some of the job duties. But that's not what I would certainly recommend.

**Q.** And it's correct, I think, as you testified previously,

you only looked at the work performed at the front-end cash register, correct?

**A.** Yes.

**Q.** And the work that you looked at specifically was taking the product from the customer?

**A.** Well, the customer puts it on the counter so, yes, taking it from a customer.

**Q.** Scanning it?

**A.** Yes.

**Q.** Putting it in the bag?

**A.** That was part of it.

**Q.** And completing the transaction with the customer?

**A.** Those are all part of the transaction process, yes.

**Q.** You did not consider time spent away from the register as being relevant to your analysis, correct?

**A.** No, I was looking at whether those tasks could be performed in a seated posture.

**Q.** You did not consider how frequently the cashiers must leave the checkout stand, correct?

**A.** No.

**Q.** With regard to the Aldi comparison that you've made, isn't it correct that Aldi uses a conveyor belt?

**A.** Yes.

(Reporter interrupts.)

**Q.** Isn't it correct that Aldi uses a conveyor belt?

**A.** Yes.

**Q.** And there are no conveyor belts at Kmart in Tulare, correct?

**A.** Correct.

**Q.** And at Aldi the customer bags his own groceries, correct?

**A.** Yes.

**Q.** And, generally speaking, that's not true at Kmart. The cashier bags the merchandise, correct?

**A.** That's correct.

**Q.** Are you also aware that at Aldi the customer has to pay 25 cents for the right to use a shopping cart?

**A.** Yes.

**Q.** And to recover that 25 cents, he has to physically return the shopping cart to where he got it, to get back that deposit?

**A.** Yes.

**Q.** Even if he doesn't take it with him, but he just leaves it somewhere in the store, he loses his 25 cents, correct?

**A.** It's a very popular program. That's speculation.

**Q.** I'm sorry, what was that?

**A.** I'm sorry.

**Q.** Was that sarcastic?

**A.** No, no, no. Speculation. It's beyond my area of expertise.

**Q.** But, in fact, aren't you aware that Aldi rates among the bottom in customer satisfaction surveys in terms of service

that they receive from cashiers?

**A.** Did not know.

**Q.** Would that surprise you, given what you know about the Aldi operation?

**A.** Yes.

**Q.** And when you were called to perform your work for Aldi, they had also set up their system that their cashiers were sitting, correct?

**A.** Correct.

**Q.** And you weren't called upon to assess whether sitting was a good thing or bad thing. That was a given as part of the job?

**A.** Correct.

**Q.** And your focus was on the stand, correct?

**A.** Yes.

**Q.** And whether improvements could be made to the standing process, correct?

**A.** Yes.

**Q.** How high is the counter at an Aldi?

**A.** I don't have those data with me.

**Q.** Do you agree that, by definition, the counter at Aldi is lower than the counter at a Kmart?

**A.** I don't have any -- I don't know.

**Q.** You don't know that?

**A.** I don't know that.

**Q.** Well, you recognize that the Kmart counter is designed for standing, correct?

**MR. MATTHEW RIGHETTI:** Your Honor, are we talking about Tulare or all Kmart's?

**MR. WOHL:** Thank you. Tulare.

**BY MR. WOHL:**

**Q.** You agree that the checkout stand at Kmart Tulare is designed for standing?

**A.** Yes.

**Q.** And the checkout counter at Aldi's is designed for sitting?

**A.** Yes, on a platform. They have the stools on top of a platform. So there's the floor, then there's a platform, and then there's the stool.

**Q.** But they're not sitting on a stool that's higher than a regular chair, isn't that correct, at Aldi?

**A.** Well, the chair they're sitting on is higher than what you would -- if it were from the floor, so that it's at the comparable level.

What's your question, again?

**Q.** So you're saying that the -- by the way, you're saying a stool, but there's a back rest at the Aldi stores; isn't that right?

**A.** Yes.

**Q.** So it's really more like a chair than a stool, what we

would commonly refer to as a stool, correct?

**A.** That definition is okay.

**Q.** So even if it's sitting on an elevated platform, nevertheless, it is the height of a normal chair that we'd see in the courtroom or --

**A.** Yes.

**Q.** -- office settings. Correct?

**A.** Yes.

**Q.** And the modifications that you're preparing for Kmart would be someone sitting in a stool that would be higher than a regular chair, correct?

**A.** Yes.

**Q.** And that, as you explained, was because you want this to be usable both by people who stand and by people who sit?

**A.** Yes.

**Q.** And in order to achieve the same distance of elbows and shareholders above the counter, you necessarily have to raise the person in a seated position to approximately the same distance, as if they were standing. Correct?

**A.** No. No. What you're doing is you're raising them to the point where their thighs are in contact with the bottom of the counter. That's how you decide how high to raise them.

**Q.** But the point is that they will be -- their arms and shoulders will be above the counter the way they would be above the counter if they were standing?

**A.** Yes. Their arms and shoulders would be in a comfortable posture.

**Q.** Because, otherwise, if you put them in a regular chair, they would have to be up like -- and, for the record, I'm raising my arms above my shoulders -- in order to get above the counter because they are not sitting low to the counter, correct?

**A.** You're talking about --

**Q.** A chair rather than an elevated stool.

**A.** When you say "elevated stool," it's 26 inches.

**Q.** Higher than a chair?

**A.** It is higher than a chair, but it is not --

**Q.** Just so we're clear --

**A.** -- would not use the word "elevated."

**Q.** -- the seat pan, which is the term used for where you actually sit, would be higher off the ground than the type of stool you're talking about than would the seat pan in a chair?

**A.** Yes.

**Q.** And that's necessary so that you bring the employee up so that they can operate above the counter in a manner similar to if they were standing?

**A.** Yes.

**Q.** Okay.

**THE COURT:** How high is a chair?

**THE WITNESS:** These are 18, probably. I don't know.

in that range.

**THE COURT:** How high is a stool?

**THE WITNESS:** Twenty-six. Eight inches higher.

**THE COURT:** Go ahead.

**BY MR. WOHL:**

**Q.** At Aldi, not only could the customers bag their own items, but the cashier doesn't hand the items to the customer. Simply moves them along. The customer both has to pick them up and bag them, and then take them away. Correct?

**A.** Correct.

**Q.** When you looked at videos of Kmart cashiers at work, you saw that 73 percent of the time, nearly three-quarters of the time, they either would hand the bag of merchandise to the customer or would actually put the bag of merchandise in the customer's shopping cart. Correct?

**A.** That was at Prescott, not at Tulare.

**Q.** All right. But you've already told us they were the same setups at the two stores, correct?

**A.** No. In fact, the geometry is different between the two stores. I was saying -- when we're talking about that, when I was looking -- when I did my report back then, at that point, I didn't have all of the data.

And the only difference is, if I'm understanding correctly, that the actual bag table is separated a little more. So people tend to pile things on the demagnetizer, then

walk around and bag at the end of the demagnetizer, and put it into the basket like this (indicating.)

The procedure was quite a bit different on how they did the job at Prescott than it is at Tulare.

**Q.** Well, do you have any basis to say that in fact at Tulare, as well, three-quarters of the time, at least, the customer is -- the cashier is either handing the merchandise directly to the customer or putting it in the customer's shopping cart?

**A.** No. I think I have those data in one of my reports that is different from that.

**Q.** All right. Well, we'll talk about that later then.

At Aldi, did you ever have occasion to evaluate how frequently cashiers had to get out of their seats?

**A.** No.

**Q.** Do you know whether they were responsible for moving from checkstand to checkstand, to help other cashiers as need be?

**A.** No.

**Q.** Do you know whether they're responsible for standing away from the checkstand, to invite customers who might be waiting in line in a different checkout line, to come over to their station?

**A.** No.

**Q.** And at Kmart you understand that cashiers frequently do what I've just described?

**A.** I have not --

**Q.** You're not aware at Kmart cashiers will move from a different line to help another cashier?

**A.** I have not observed that, but I've not looked for that.

**Q.** Or get out of their line to invite customers to move from a crowded line to their open line; you are not aware of that?

**A.** Again, a majority of what I've observed relative to Kmart was the overhead video that is looking straight down and does not indicate where the person is going when they are going out of the box.

**Q.** All right.

**MR. WOHL:** Your Honor, I was going to change to another subject. Would it make sense to stop for today?

**THE COURT:** All right. This will be an okay place to stop.

**MR. WOHL:** Thank you, Your Honor.

**THE COURT:** Dr. Johnson, you are on cross-examination now, so no talking with counsel overnight. We'll see you back here at 7:30 a.m., in the morning, please. So you can step off the stand now and let me deal with counsel for a moment.

Please give those documents to counsel.

**THE WITNESS:** Okay.

**MR. WOHL:** Thank you Dr. Johnson.

**THE COURT:** Do the lawyers need me for anything? Any way I can help you between now and tomorrow morning?

**MR. WOHL:** I think we're good, your Honor.

**THE COURT:** I guess we're good. I'll see you here at 7:30 in the morning.

Who's the next witness after this, after Dr. Johnson?

**MR. MCINERNEY:** Natasha Wright. She's a cashier.

**THE COURT:** From Tulare?

**MR. MCINERNEY:** Yes.

**THE COURT:** Okay. Great. Thank you.

**MR. WOHL:** Thank you, Your Honor.

(At 1:00 p.m. the proceedings were adjourned until Wednesday, November 14, 2012, at 7:30 a.m.)

\- - - -

# I N D E X

| | PAGE | VOL. |
|---|---|---|
| Opening Argument by Mr. McInerney | 28 | 1 |
| Opening Argument by Mr. Adkins | 42 | 1 |

| **PLAINTIFF'S WITNESSES** | PAGE | VOL. |
|---|---|---|
| **JOHNSON, STEVEN** | | |
| (SWORN) | 70 | 1 |
| Direct Examination by Mr. Righetti | 72 | 1 |
| Cross Examination by Mr. Wohl | 156 | 1 |

\- - - - -

E X H I B I T S

| TRIAL EXHIBITS | IDEN | VOL. | EVID | VOL. |
|---|---|---|---|---|
| 28A | | | 81 | 1 |
| 28B | | | 82 | 1 |
| 28C | | | 97 | 1 |
| 28D | | | 99 | 1 |
| 28D | | | 101 | 1 |
| 28F | | | 103 | 1 |
| 28G | | | 108 | 1 |
| 28-H | | | 122 | 1 |
| 28-I | | | 130 | 1 |
| 28-K | | | 140 | 1 |
| 28-J | | | 141 | 1 |
| 28-L | 142 | 1 | 144 | 1 |
| 28-M | | | 146 | 1 |
| 28-N | | | 148 | 1 |
| 28-O | | | 148 | 1 |
| 28-P | | | 149 | 1 |
| 216A | | | 110 | 1 |
| 216B | | | 110 | 1 |
| 377 | | | 203 | 1 |
| 378 | | | 209 | 1 |
| 379 | | | 209 | 1 |
| 216-C | | | 115 | 1 |
| 216-D | | | 115 | 1 |

- - - - -

**CERTIFICATE OF REPORTERS**

We, KATHERINE POWELL SULLIVAN and DEBRA L. PAS, Official Reporters for the United States District Court, Northern District of California, hereby certify that the foregoing proceedings in C 11-2575 WHA, **Lisa Garvey vs. Kmart Corporation**, were reported by us, certified shorthand reporters, and were thereafter transcribed under our direction into typewriting; that the foregoing is a full, complete and true record of said proceedings at the time of filing.

DATE: Tuesday, November 13, 2012

Katherine Sullivan
Katherine Powell Sullivan, CSR #5812, RPR, CRR
U.S. Court Reporter

Debra L. Pas
Debra L. Pas, CSR #11916, RMR CRR