Volume 2

Pages 228 - 475

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ALSUP

LISA GARVEY, individually and on        )
behalf of all others similarly         )
situated,                              )
                                       )
              Plaintiff,               )
                                       )
  VS.                                  )  No. C 11-2575 WHA
                                       )
KMART CORPORATION, and DOES 1          )
through 50 inclusive,                  )
                                       )  San Francisco, California
              Defendants.              )  Wednesday
_____)  November 14, 2012


**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

**For Plaintiff:**          Righetti Glugoski, P.C.
                            456 Montgomery Street, Suite 1400
                            San Francisco, California 94101
                    **By:  Matthew Righetti, Esquire**
                          **Michael Righetti, Esquire**

                            McInerney & Jones
                            18124 Wedge Parkway, #503
                            Reno, Nevada 89511
                    **By:  Kevin J. McInerney, Esquire**


**Reported By:  Katherine Powell Sullivan, RPR, CRR, CSR #5812**
               **Debra L. Pas, RMR, CRR, CSR #11916**
               **Official Reporters - U.S. District Court**

**APPEARANCES (CONTINUED)**:

**For Plaintiff:**          Dostart Clapp & Coveney LLP
                           4370 La Jolla Village Drive, Suite 970
                           San Diego, California 92122
                  By:  **Zachariah Paul Dostart, Esquire**

**For Defendants:**        Paul Hastings LLP
                           55 Second Street, 24th Floor
                           San Francisco, California  94105
                  By:  **Jeffrey D. Wohl, Esquire**

                           Winston & Strawn
                           333 South Grand Ave, 38th Floor
                           Los Angeles, California  90071
                  By:  **Amanda C. Sommerfeld, Esquire**
                       **Emily C. Schuman, Esquire**

                           Winston and Strawn LLP
                           101 California Street, Suite 3900
                           San Francisco, California 94111
                  By:  **Robb Christopher Adkins, Esquire**
                       **Joan B. Tucker Fife, Esquire**

1                  **P R O C E E D I N G S**

2  **NOVEMBER 14, 2012**                              **7:28 a.m.**

3          THE COURT:  Shall we just jump right in or are there

4  any preliminary issues?

5          MR. WOHL:  Not from our side, your Honor.

6          MR. ADKINS:  I believe there is one issue, your Honor.

7  At least from the defendant's side.

8      You had asked for us to provide if your Honor -- yesterday

9  you asked us to provide you with something in writing about the

10 exhibits that had been stipulated to be admissible between the

11 parties.

12         THE COURT:  Correct.

13         MR. ADKINS:  We had sent a document over to

14 plaintiff's last night.  I think they may have an objection in

15 part to a disclosure, side issue.  We have the email confirming

16 which exhibits we have stipulated to prior to trial --

17         THE COURT:  No, please.  Just do a thing with a

18 caption on it and say:  The following documents are stipulated

19 to.  If they are not stipulated to, and the other side wants to

20 object, they have the right to object.

21     You can't -- what is the point -- what are you trying to

22 get at?

23         MR. ADKINS:  We had an agreement as to certain

24 exhibits --

25         THE COURT:  If it's not signed and filed with the

1   Court, it doesn't count in my view.  I'm not going to hold some

2   evidentiary hearing involving emails.  So do it the right way.

3           **MR. ADKINS:**  Very well, your Honor.

4           **THE COURT:**  Let's get it done by the end of today.

5       Now, counsel --

6           **MR. MICHAEL RIGHETTI:**  Yes, your Honor.

7           **THE COURT:**  (Continuing) -- the suggestion is being

8   made that you're jacking around the defendants.  Is that true?

9           **MR. MICHAEL RIGHETTI:**  No, your Honor.

10          **THE COURT:**  Do your best to get this resolved by the

11  end of the day.

12          **MR. MICHAEL RIGHETTI:**  I will do my best.

13      Does the Court want to address the issue of the late

14  identification of exhibits to be used for cross-examination

15  now?

16          **THE COURT:**  I'm sorry.  Is this a different issue?

17          **MR. MICHAEL RIGHETTI:**  I think it's related to this

18  issue, but it's the reason we won't stipulate to a specific

19  exhibit and I wanted to bring it up to the Court.  I don't know

20  if the Court wants to address it now --

21          **THE COURT:**  Is it going to come up with this witness?

22          **MR. MICHAEL RIGHETTI:**  No, it's not.

23          **THE COURT:**  All right.  Let's pass it for now.

24          **MR. MICHAEL RIGHETTI:**  Thank you, your Honor.

25          **MR. ADKINS:**  Thank you, your Honor.

1          **THE COURT:**  A stipulation is a stipulation.  That

2    means both sides agree.  If one side wants to be unreasonable

3    and not agree, they have the right to do that.  Maybe I'll get

4    upset with them for something, for standing by some dumb

5    objection, but maybe it's not dumb.  Maybe it's a good

6    objection.  But I can't force somebody to stipulate to

7    something they don't want to stipulate to.  It's just basic.

8       Now, Mr. Wohl.

9          **MR. WOHL:**  Thank you, your Honor.

10          **THE COURT:**  The floor is yours.

11          **MR. WOHL:**  Thank you.

12       May I just ask to confirm there are no witnesses in the

13    courtroom other than Dr. Johnson?

14          **THE COURT:**  Anybody who thinks they may be a witness

15    you need to step outside right now.

16       (No response.)

17          **THE COURT:**  Okay.  I guess no one is going to be a

18    witness out there.  The floor is yours.  Please continue.

19          **MR. WOHL:**  Thank you, your Honor.

20                         **STEVEN   JOHNSON**,

21    called as a witness for the plaintiff herein, having been

22    previously sworn, resumed the stand and testified further as

23    follows:

24

25

<u>**CROSS EXAMINATION RESUMED**</u>

**BY MR. WOHL:**

**Q.**   Good morning, Dr. Johnson.

**A.**   Good morning.

**Q.**   Since appearing yesterday have you spoken to anybody about your testimony?

**A.**   No.

**Q.**   I would like to pick up with your reference to your observations of cashiers in Europe and their sitting.

    Is it correct that your testimony in that regard is just based on your observations when you were in Europe?

**A.**   Yes.  In combination -- as I mentioned, I had lived there for six months earlier.

**Q.**   But you haven't taken the type of ergonomic analysis with regard to those checkout stands that you have in this case?

**A.**   No.

**Q.**   Is it correct that in your textbook, *Work Design* (indicating) -- I have a copy here that I purchased from Amazon.com, you wrote that:

        "Note that in England the operator sits and the
         customer not only pays for the bag, but also bags
         groceries."

    Is that a correct statement of what you wrote in your textbook?

**A.**   Would you say it slower?

JOHNSON - CROSS EXAMINATION / WOHL

```
 1  Q.   Sure.
 2          "Note that in England the operator sits and the
 3           customer not only pays for the bag, but also bags
 4           groceries."
 5  A.   That's a statement that's in the book, yes.
 6  Q.   Would you agree that if the customer bags his own
 7  groceries, then he's not getting the same level of service than
 8  if the cashier has bagged the groceries for him?
 9  A.   Same level of service.  There is service that's provided
10  that isn't provided if they don't bag, yes.
11  Q.   And isn't that correct that the as an ergonomist, it's not
12  always appropriate to judge whether a practice is sound for one
13  population because it happens to be applied to a different
14  population?
15  A.   Yes.  You want to make sure that the population that
16  you're applying it is representative; that it is
17  representative, yes.
18  Q.   But more specifically, there could be cultural norms that
19  would impact what practices are followed in one place versus
20  another, is that correct?
21  A.   That would not be part of what I would consider as an
22  ergonomist.
23  Q.   Well, didn't you write in your textbook, quote.
24          "Design for an American population may not be
25           appropriate for a non-American population."
```

1  **A.**   I do not believe I wrote that.  I'm a second author on

2  this. I do not believe I was the author of that particular

3  part, but I don't disagree with it.

4  **Q.**   So you do endorse that statement?

5  **A.**   But I don't disagree with the statement, yes.

6         **THE COURT:**  Well, wait a minute.  You mean you -- it's

7  in your book.  Do you agree with it or not?  You can say, "Yes,

8  I agree with it."  "No, I don't agree with it."  That's fine.

9  You can disagree with what's in your own book.

10      But you've got to -- don't be evasive.  You're being

11  evasive.  Every answer you give is evasive.  On cross

12  examination you should say, "Yes," "No," "I don't recall" and

13  then you can give a short explanation.  But every single answer

14  you give is equivocal.  I don't know why you're doing that.  I

15  want you to try your best to answer the question.  That was a

16  fair question.

17      All right.  So try it again.  Read that -- read that

18  sentence again.  And either say you agree with it or you don't

19  agree with it.  Read that sentence again.

20      (Brief pause.)

21         **MR. WOHL:**  I'm sorry.  I thought you wanted the

22  reporter to do that.

23  **BY MR. WOHL:**

24  **Q.**   Do you agree with the statement in your textbook, quote:

25         "Design for an American population may not be

1            appropriate for a non-American population."

2  **A.**    Yes.

3        Thank you?

4        **THE COURT:**  All right.  That was good.  That was the

5  way to do it.  That's a good straightforward answer.

6        **MR. WOHL:**  Maybe we will get on a roll here.

7  **BY MR. WOHL:**

8  **Q.**    Okay.  You talked about in your deposition and in your

9  report literature in the ergonomics field that you had reviewed

10 in connection with delivering your opinions, correct?

11 **A.**    Correct.

12 **Q.**    Is there any literature that you reviewed that discussed

13 directly whether a cashier at a discount department store

14 should sit or stand?

15 **A.**    Yes.  I don't know that there were any that were

16 specifically discount department stores.

17 **Q.**    You do cite to the NIOSH guidelines.  Could you explain to

18 the Court what NIOSH guidelines is?

19 **A.**    NIOSH is the National Institute of Occupational Safety and

20 Health.  It's a federal agency that is -- whose objective is to

21 improve the occupational safety and health of industry in the

22 United States or activities in the United States.

23 **Q.**    Is that under the federal OSHA agency or program or is

24 that separate?

25 **A.**    Yes, yes.

1   Q.   It is part of it?

2   A.   Yes.

3   Q.   And you view NIOSH as one are the authoritative sources

4   for your conclusions in this case, don't you?

5   A.   Yes.

6   Q.   And you cite to the NIOSH guidelines for the proposition

7   that workers should be allowed to, quote, at their discretion

8   alternate between sitting and standing, end quote, correct?

9   A.   Yes.

10  Q.   But it's true that this guideline, again, is not

11  specifically is applicable -- let me restate that question.

12       Isn't it true the guideline isn't referring specifically

13  to cashiers at discount department stores?

14  A.   That is correct.  It is, as I mentioned yesterday, a

15  universal principle within ergonomics.

16  Q.   And isn't it also true that with regard to this stated

17  principle, NIOSH also says that when the employee is sitting,

18  then all materials and tools that the employee will have to use

19  should be located in front of the employee to avoid twisting

20  motions?

21  A.   Are you asking me if I agree with that or if that is what

22  they say?

23  Q.   I'm asking is that what they say?

24  A.   I --

25  Q.   Do you want me to restate that?

```
 1            THE COURT:  Show him the document.  Do you need to see

 2   the document?

 3   A.   I will submit that's a correct reading of the document.

 4   BY MR. WOHL:

 5   Q.   All right, thank you.

 6        Now, here isn't it correct that you don't that recommend

 7   for the Kmart check stand all of the tools and materials that

 8   the cashier would have to use to perform the job be located

 9   directly in front of the cashier?

10   A.   No.

11   Q.   In fact, there would be some to the side?

12   A.   In terms of the --

13            THE COURT:  I want counsel to be aware.  It's really

14   counsel's fault now.  Every lawyer does this in every trial.

15   It's the double negative problem.

16        You say:  Is it correct that blah, blah, blah where there

17   is a negative.  "Is it correct that there is no tool?"  Answer,

18   "No."

19        Does that mean, "No, it's not correct," or "No, there is

20   no tool"?

21        It's your record.  You've done this several times in this

22   trial.  Later on I know what you're going to do.  You're going

23   to try to use the ambiguity to your favor.

24        Please be careful about this.  A lot of these answers are

25   ambiguous.  And it's the combination of a negative with, "is
```

1    that correct."  And if the witness says "No," does that mean

2    it's not correct or does that mean -- so the way to solve this

3    problem -- there are two ways to solve this problem.

4        "You did not give notice, did you?"  Instead of saying,

5    "is that correct," say "did you."  "You did not give notice,

6    did you?"  And the witness says, "No."  Everyone knows that

7    that means, "No, I didn't give notice."

8        By the way, the problem is exactly the same if the witness

9    says, "Yes."  But the "did you" solves that problem.

10       Or you could say, "You did give notice, didn't you?"  And

11   then say, "Yes."  Everyone knows that means "Yes, I did give

12   notice."

13       So if you insist on asking a leading question, that's the

14   best form to ask that question in.

15       Now, you can also solve the problem by asking a narrowly

16   directed question which is not so leading, which is, "Did you

17   give notice?"  "Did you give notice?"  You can either say, "No"

18   or "Yes."  But when you combine it with a negative, with "is it

19   correct" -- "You didn't give notice, is that correct?"  And

20   they say, "Yes" or "No," you don't know what it means.

21       And you will pay the price when it comes to findings of

22   fact.  Both sides have to keep this in mind.  Because you're

23   making the record.  It's the one who insists on asking the

24   leading question who has the problem.

25       So be aware of this.  There are several instances when you

 1  go back through the transcript, you will see this ambiguity.  I

 2  bring it to your attention so if you can address it before the

 3  trial -- while we're early in the trial.

 4          MR. WOHL:  I appreciate that, your Honor.  I was not

 5  aware of that and the last thing I want to do is create any

 6  ambiguity in the record.

 7          THE COURT:  This is not just me.  We talk about this

 8  in the judge's lunch room all the time.  Every single judge on

 9  this court complains about this problem.

10      So I'm bringing it to your attention so you can -- if you

11  insist on -- you're right to ask leading questions, but ask the

12  form that doesn't lead to an ambiguous answer.

13      All right.  Go ahead.

14          MR. WOHL:  I hope the judges aren't just talking about

15  me, your Honor, because I would feel bad.

16          THE COURT:  I'm sure the judges love you, but for your

17  own good you should take this to heart.

18          MR. WOHL:  All right.  Thank you, your Honor.

19  BY MR. WOHL:

20  Q.  All right.  So we talked about the location of tools and

21  equipment in your recommended configuration of the check stand.

22      So is it correct that you recommend -- that in your

23  recommended configuration the cash register would be to the

24  right of the cashier?

25  A.  In the final design, that would not be -- I have not

```
 1  recommended that for a final design.  I am trying to
 2  accommodate the situation that is there now.
 3  Q.   That's what I mean.  With regard to the existing check
 4  stand, with the configurations or modifications that you've
 5  proposed, what you took us through yesterday and I'm going to
 6  go through a bunch of them later this morning --
 7          THE COURT:  Are we out of the textbook now and we're
 8  talking about the Kmart situation or are we back still in the
 9  textbook?
10          MR. WOHL:  We're talking about the Kmart
11  configuration, your Honor.
12          THE COURT:  All right.  Go ahead.
13  BY MR. WOHL:
14  Q.   So as I heard you go through with Mr. Righetti the
15  modifications, the cash register was still going to be
16  perpendicular to the cashier, correct?
17      When the cashier is facing the customer, that is, the
18  register would be perpendicular to the side?
19  A.   Yes.  Now, you're not asking if that's my recommendation.
20  You're saying in what I have tried to accommodate to find out
21  if they can do this in a seated posture, have I left that
22  there?  The answer is yes.
23  Q.   So that would be an example where an important tool or
24  equipment that the cashier must use to perform the job is not
25  located in front of the cashier, but that when the cashier is
```

1  facing the customer instead it's to the side?

2  **A.**   Yes, but I did not say I agreed with that statement in --

3  that you said earlier.  I agreed that that's what they said.

4  **Q.**   That's fine.  I think I made my point.

5      Isn't it true that several of the sections that you cite

6  concerning the NIOSH manual actually refer to meat and deli

7  workers and not cashiers more generally?

8  **A.**   They are in different sections of the report and it is set

9  up by different areas, yes.  I think the same principles apply.

10  **Q.**   Is it correct that the manual recommends a sit/stand or

11  lumbar support bar rather than a chair for cashiers?

12  **A.**   That's one of the things that is stated in the NIOSH.

13  **Q.**   And that's not what you're recommending here, correct?

14  **A.**   Excuse me?

15  **Q.**   You are not recommending a sit/stand or lumbar support bar

16  for Kmart cashiers, correct?

17  **A.**   This goes back to what we were talking about yesterday.

18  Some people -- and I'm not sure how they use that in that

19  particular document.  Some people refer to a sit/stand as a

20  lean stool in the sense that we were talking about it

21  yesterday.  That's a sit/stand stool.  Some people refer to

22  that.  Is that -- if that's the type of thing that you're

23  talking about.

24      The other alternative is sit or stand at the discretion.

25  People will use sit/stand configuration to use for both of

```
 1   those configurations.

 2        So depending on which one --

 3        THE COURT:   It would help the Court to understand

 4   these terms.  You know, maybe you two disagree on what these

 5   terms mean, but we should be clear at least what the witness

 6   thinks these terms mean.  I have no idea what "sit/stand"

 7   means.

 8        A "lumbar support," I have an vague idea what that means.

 9   It would be worth clearing all this up.

10   BY MR. WOHL:

11   Q.   First, Dr. Johnson, I want you to explain to Judge Alsup

12   what a lumbar support would be?

13   A.   Lumbar support is something that your lower back to --

14   when you're sitting back, to give you support.

15        THE COURT:   Is the seat under you?

16        THE WITNESS:   No.  It's on the back of the seat.  Not

17   underneath, but on the back.

18        THE COURT:   You said when you're sitting back.  I have

19   in mind that you're sitting on something.

20        THE WITNESS:   Yes, but as in right now I'm not sitting

21   back.  So the lumbar support, when I'm sitting like this

22   (indicating), would have no effect.  The lumbar --

23        THE COURT:   What does a lumbar support look like?

24        THE WITNESS:   In an automobile on the side -- many of

25   the automobiles today have lumbar support controls where you
```

1  can pump up a little balloon, if you will, on the back to give

2  at your lower back more support while you're driving.

3       **THE COURT:** So there is a seat. When there is a

4  lumbar support, it sounds like you're saying there is also a

5  seat with somehow a lumbar support attached to it.

6       **THE WITNESS:** Yes. I would say the seat has a back

7  because I use the word "seat" as anything that someone sits on.

8       **THE COURT:** All right. So I'm going to take -- it's

9  like a seat with a lumbar support.

10      When I first heard you use the term a minute ago, I had

11  this idea of something you would lean back on, like a bar that

12  you would lean back on and take a little bit of the weight off

13  of you, but still most of your weight was on your feet.

14      Something you kind of like lean back against a wall,

15  leaning back against a bar or maybe a padded bar, but that's

16  not what you have in mind. You actually mean a seat as well as

17  something that supports your back.

18       **THE WITNESS:** What you defined and I drew yesterday on

19  the left-hand side is what I would refer to as a lean stool.

20       **THE COURT:** I'm not talking about a stool.

21       **THE WITNESS:** Well --

22       **THE COURT:** Nothing to sit on. I'm talking about

23  there is nothing -- it's like leaning against the wall, is the

24  image I had in mind when you used that term -- or counsel used

25  that term.

```
 1        Are these things defined someplace?

 2            THE WITNESS:  That is what we're discussing right now,

 3   is that that are two uses of the word "sit/stand"

 4   configuration.

 5        One, people talk about it in the context of what they are

 6   describing is a lean stool.  He asked me if that's what I

 7   recommended here.  If that's what you're defining as a

 8   sit/stand in this situation is what I drew on the left-hand

 9   side, where you put your feet up and you are -- if you brought

10   your feet up, you will slide down.

11        If that's what they are discussing, then I --

12            THE COURT:  Let me see that diagram again.  I don't

13   remember it clearly enough.  Can I see the chart that the

14   witness drew yesterday?

15            MR. WOHL:  Which I think was 379 by the way,

16   Mr. Righetti.

17            THE COURT:  May I see that?

18        All right.  So what is the other meaning?

19            THE WITNESS:  The other meaning is you can sit or

20   stand at your discretion.  So there is a stool, but you've

21   configured it so that you can also stand at the work station to

22   do the job or you can sit at the work station to do the job,

23   but not at the same time.

24        (Photograph was tendered to the Court.)

25            THE COURT:  I'm looking at 379.  Just to refresh
```

1  everyone, it's like a tall pole with a flat thing that is at a

2  45-degree angle that you can kind of sit on and -- but,

3  obviously, it's like a slide.  You would slide right off it if

4  you -- if you picked your feet up.

5          THE WITNESS:  That's what I would refer to as a

6  lean --

7          THE COURT:  Unless it had velcro or something on it so

8  that you wouldn't slide off.

9  BY MR. WOHL:

10 Q.   I said NIOSH before.  The particular document I was

11 looking at, as I'll show you, says OSHA.

12     When it uses the phrase "sit/stand," it doesn't mean that

13 they will sit for part of the time and stand for part of the

14 time.  They describe what you mean as a lean stool, is that

15 correct?

16 A.   I don't know which one they mean.  That's part of the

17 problem in that situation.

18          THE COURT:  Why don't you show him the document and

19 see if you all can agree on this?

20          MR. WOHL:  Which is what I'm going to do, your Honor.

21 BY MR. WOHL:

22 Q.   I'm going to show you OSHA Guidelines for Retail Grocery

23 Stores.  OSHA publication 319-205N, published, it appears, in

24 2004.

25     Let me draw the witness' attention in particular to

1    Page 17 of that document.

2         (Document was tendered to the witness

3          and counsel.)

4    **Q.**   First off, Dr. Johnson --

5         **MR. WOHL:**   If this isn't already marked, we should

6    mark this as an exhibit.

7         **MR. MATTHEW RIGHETTI:**   Your Honor, I'm not sure.  It's

8    not direct impeachment.  It hasn't been previously marked in

9    any of the pretrial disclosures.  I'm not sure how the Court

10   handles that situation.

11        **MR. WOHL:**   It's challenging the assertion that NIOSH

12   or OSHA -- NIOSH is part of OSHA -- has recommended that

13   cashiers sit for part of the time and stand for part of the

14   time.

15        In fact, the page that I'm directing the witness's

16   attention to shows quite clearly that everything that they are

17   talking about keeps the cashier standing and, therefore, it is

18   impeachment of his contention that --

19        **THE COURT:**   Impeachment in my view is a signed

20   statement by the witness, a deposition, something the witness

21   himself has adopted before.  Something that merely contradicts

22   what a witness says is not impeachment.

23        **MR. WOHL:**   Your Honor, there is a difference here.

24        **THE COURT:**   What is the difference?

25        **MR. MATTHEW RIGHETTI:**   I don't want to quibble over

 1    this because I think we're all trying to get at -- the point I

 2    think that counsel is trying to make is we're trying to get an

 3    understanding of the terminology here and if that helps us get

 4    an understanding of the terminology, then I perhaps don't have

 5    an objection.

 6         But going forward, if we keep popping out exhibits, I

 7    would just like to know how the Court handles those.  That's an

 8    advisory ruling, so I kind of understand what you're doing.

 9         **THE COURT:**  I'm saying to both of you that

10    impeachment -- many lawyers think that anything that

11    contradicts the general theme of what a witness has said is

12    impeachment.  No, that's not true.  I don't agree with that at

13    all.  Impeachment is -- that's case-in-chief material.  That's

14    something you should designate for your case-in-chief because

15    that's your side of the story.  The other side has their side

16    of the story.  You should designate that as case-in-chief

17    material.

18         Impeachment of a witness is where they have said something

19    to the contrary before or failed to say something where they

20    should have spoken up or have adopted a statement or signed a

21    statement or said something in a deposition.  That is

22    impeachment.

23         So that is the way I view impeachment.  It is not the

24    broad view that Mr. Wohl just espoused.  I disagree with that

25    completely.  And I have said with that in the guidelines

1    somewhere.  You should have read those guidelines.

2        So in my view this OSHA document is not impeachment.

3        Now, if the witness had said something like -- in his

4    direct testimony:  I've read the OSHA guidelines and they

5    provide for X, Y, Z.  Okay.  You are then entitled to impeach

6    him by saying -- showing that the OSHA guidelines said the

7    exact opposite.  Even though he did not -- that's because he

8    put it in play directly on his direct.  That would be okay.

9        But for you just to bring up a point that happens to

10   support your side and say:  This generally contradicts the

11   theme of the plaintiff's case, that's not impeachment.  That's

12   case-in-chief material.

13           MR. WOHL:  Your Honor, I don't think that's correct.

14   And the reason I don't think it's correct is that he testified

15   just a few minutes ago that the NIOSH guidelines provide that

16   workers should sit for part of the time and stand for part of

17   the time.

18       I'm impeaching that testimony by showing that the

19   guidelines, in fact, for cashiers say just the opposite in that

20   they only suggest standing accommodations, not seated

21   accommodations.

22           THE COURT:  Did he say that on direct examination?

23           MR. WOHL:  I don't recall, but I don't think that's

24   matters.

25           THE COURT:  You're bootstrapping it.  You're asking

 1   him a question and saying:  Do the NIOSH guidelines provide for

 2   X, Y, Z?  And he says:  No.  And then you -- and then you want

 3   to impeach him on that, but that's something that you're

 4   bringing up.

 5        I don't think that's impeachment.  That's the kind of

 6   thing that you should be making on your case-in-chief.

 7            MR. WOHL:  Well, your Honor --

 8            THE COURT:  However, in this case the objection has

 9   been withdrawn, so you can use this particular document.

10            MR. WOHL:  Thank you, your Honor.

11            THE COURT:  But I'm going to -- I'm not backing off my

12   general view of what constitutes impeachment.

13            MR. WOHL:  All right.  Thank you, your Honor.

14   BY MR. WOHL:

15   Q.  So we will --

16            THE COURT:  Plaintiff should know the same thing on

17   the plaintiff's side.  If you two want to relax the rule and

18   agree to relax the rule, that's fine with me.  But until you do

19   that, I'm going to stick with my normal practice.

20        All right, go ahead.  This document is okay to use.

21            MR. WOHL:  So we've marked this as Exhibit 380, I

22   believe, your Honor.

23        (Trial Exhibit 380 marked for identification.)

24   BY MR. WOHL:

25   Q.  So first off, can you identify this as the OSHA Guidelines

1    for Retail Grocery Stores?

2    **A.**    Yes.  And it's not a NIOSH document.  It is an OSHA

3    document.

4    **Q.**    NIOSH is part of OSHA, correct?

5    **A.**    This is an OSHA document.

6    **Q.**    All right.  But you do agree --

7    **A.**    And OSHA has a different function than NIOSH.

8    **Q.**    But do you agree on Page 17, referring specifically to

9    "Front end cashiers, checkout, bagging and carry-out," where

10   they do make the reference to on the bullet point on the

11   left-hand column towards the bottom:

12            "...consider using check stands combined with an

13             adjustable sit/stand or lumbar support on which

14             cashiers can lean."

15       That and everything else on this page refer to cashiers

16   standing not sitting.

17   **A.**    Another interpretation of this, which some people use, is

18   adjustable sit/stand meaning that people can sit or they can

19   stand at the cash register and perform the task, either sit or

20   stand.

21       And then "or lumbar support," meaning they have something

22   to lean against is an alternative.  And that's just a different

23   interpretation of this.

24   **Q.**    But you've previously told Judge Alsup that by "lumbar

25   support" you understood that to mean as part of a seat.

 1         Do you agree that's not what is said here?

 2    A.    Well, are we talking about sit/stand here?   Lumbar -- it's

 3    assuming that the person is sitting.

 4    Q.    It's the same sentence:

 5              "Consider using checkstands designed to use with

 6                adjustable sit/stand or lumbar support against which

 7                cashiers can lean."

 8         So do you disagree -- do you agree --

 9              MR. WOHL:   Thank you, Judge Alsup.

10    BY MR. WOHL:

11    Q.    Do you agree that this is referring to a cashier who is

12    standing and that he could receive some support or relief by

13    leaning against something as opposed to sitting.

14    A.    Yes, that part is for sure.   Rather, they are also

15    suggesting the alternative, that a person could sit or stand

16    alternatively is something that I think is disputable.

17    Q.    But that's not what that says, correct?

18    A.    No, that's what I'm saying is disputable in my opinion.

19    Q.    Okay.   Thank you.

20         Let's turn to the modification being of the checkout stand

21    at Tulare that you had discussed at length in your direct

22    testimony.

23         If I counted it correct --

24              MR. MATTHEW RIGHETTI:   I'm sorry, your Honor.   Is that

25    marked as an exhibit?

1          MR. WOHL:  Yeah, 380.

2          MR. MATTHEW RIGHETTI:  Thank you.

3    BY MR. WOHL:

4    Q.   So if I both heard you correctly and counted correctly, I

5    counted 14 specific changes to the existing check stand

6    configuration.  I'll go through each one to make sure I got it

7    right.

8          MR. MATTHEW RIGHETTI:  Before we get away from that,

9    is that in evidence?

10         THE COURT:  No.

11         MR. WOHL:  I'm sorry.  I did mean to move that into

12   evidence.

13      I would like to move that into evidence, your Honor.

14         THE COURT:  Any objection?

15         MR. MATTHEW RIGHETTI:  No objection.

16         THE COURT:  Received in evidence.

17      (Trial Exhibit 380 received in evidence.)

18         MR. WOHL:  Thank you, Mr. Righetti.  I appreciate

19   that.

20   BY MR. WOHL:

21   Q.   The 14 that I counted are, No. 1:  Remove, replace and

22   relocate the merchandise and hanger and garbage bins below the

23   counter.

24      I will take one at a time so we have a clear record.  Is

25   that one of your proposed changes?

1   A.    Yes.

2   Q.    No. 2 reads:  Remove the vertical support under the

3   counter?

4   A.    Which vertical support?

5   Q.    The vertical support structure that you said needed to be

6   removed so there would be more knee clearance?

7   A.    If I had a diagram, it would be very beneficial.  Is this

8   in my report?  Could I refer to my report?

9         MR. WOHL:  Do we have that document that we went

10  through with all the squiggly stuff?

11        MS. SOMMERFELD:  No.

12        MR. WOHL:  Do we have one of the photographs that has

13  underneath the counter and we could show Dr. Johnson that?

14        MR. MATTHEW RIGHETTI:  They are Exhibits 1 through 14.

15        MR. WOHL:  Can we pull that up, so we do have this

16  clear?

17        MR. MICHAEL RIGHETTI:  It's 216, C and D.

18        MR. WOHL:  Sorry, your Honor.  We will get to this in

19  a moment.

20        (Brief pause.)

21  BY MR. WOHL:

22  Q.    I would like to show you what has on the screen, 216 --

23        MR. MICHAEL RIGHETTI:  C and D.  C goes to 14 and D

24  goes to 12.

25        MR. WOHL:  The one with the numbers is D.

```
 1        MR. DOSTART:  The one that goes 1 through 14 is D.  D
 2  is more complete than C.  Use D.
 3        MR. WOHL:  All right.  I only have one -- how about
 4  this one?
 5        MR. DOSTART:  On the back it says whether it's D and
 6  C.
 7        MR. WOHL:  This is D --
 8  BY MR. WOHL:
 9  Q.   I'll put them both in front of you.
10        MR. WOHL:  And, your Honor, I don't know if there are
11  additional copies for you to look the or we can have Dr.
12  Johnson show it to you.
13  BY MR. WOHL:
14  Q.   Take a look at that and tell me if that refreshes your
15  memory as to what you were referring to when you were talking
16  about vertical support?
17  A.   I don't believe this shows the vertical support that we
18  were talking about in these particular diagrams.  They do show
19  the bins underneath, but not the vertical support.
20  Q.   So you don't have any recollection of a vertical support
21  as a structure that you said needed to be removed for further
22  knee clearance?
23  A.   There are diagrams in my report that illustrate those
24  vertical support.
25  Q.   All right.  So for my purposes it may be sufficient just
```

1  to ask you to agree that you were recommending that some

2  vertical support as part of the counter be removed to provide

3  greater knee clearance, is that correct?

4  **A.**    When you say "vertical support," I am not implying that it

5  is required for support of the counter.  You can remove that in

6  that support.  It is still sufficient.  The counter would not

7  collapse without that support.

8       So I hate to use the word "support" in some respects at

9  that point.

10 **Q.**    All right.  Well, all I asked was were you recommending

11 that be removed.  So I think apropos what Judge Alsup said

12 that's a "yes," "no" question.

13      So, again, my question is:  What you identify as a

14 vertical support, were you recommending that be removed to

15 provide greater knee clearance?

16 **A.**    Yes.  I was removing the verticals underneath.

17 **Q.**    And while we're on that subject just quickly, your

18 contention is that would not in any way impair the integrity of

19 the counter, is that correct?

20 **A.**    It could be accommodated easily.  When you say would it --

21 you may need to change the structure slightly, but as you can

22 see, it's easily accommodated.  That size is not a problem from

23 a physical standpoint.

24 **Q.**    Just so we're clear, you're saying, then, there would have

25 to be some other change to support the structure with that

1   vertical support having been taken out?

2   **A.**   I don't even know if that would be necessary.   If it would

3   be necessary, it would not be a major issue.

4   **Q.**   All right.   But you don't know whether it would be require

5   additional support or not, is that correct?

6   **A.**   I have not done that analysis.

7   **Q.**   No. 3:   Remove a shelf under the counter.   There was a

8   shelf under the counter that you should be removed as well, is

9   that correct?

10  **A.**   If you're referring to the shelf under the counter that is

11  back underneath there, I believe that probably would be removed

12  to -- for relocation of some of the other objects.

13  **Q.**   No. 4:   Remove what Mr. Righetti referred to as a toe

14  kick, which was sort of a panel, sort of recessed panel at the

15  bottom of the counter?

16  **A.**   It's better to refer to that as the lowest shelf on the

17  counter all the way around.   That is the lowest shelf that goes

18  around the bottom of the counter.

19  **Q.**   But it is visible from the outside.   So when the cashier

20  is standing up at the counter currently, his or her toes could

21  touch or would touch that panel that I'm referring to as a toe

22  kick, is that correct?

23  **A.**   If you could put up a graphic, I could point to it.

24  **Q.**   Umm, sorry.

25  **A.**   This is geometric and it would be much easier to do with

1   the diagrams.

2          MR. WOHL:  Do we have a graphic that I could show the

3   witness?

4      Sorry, your Honor.

5      (Document displayed.)

6   BY MR. WOHL:

7   Q.   Does this help you identify what I referred to as the toe

8   kick?

9   A.   Yes.  And, again, what we talked about yesterday, toe kick

10  is not a term that I use.

11     This shelf, the lower shelf along the bottom right there

12  would then be removed so there would be floor underneath the

13  entire area.

14  Q.   Thank you.

15     Fifth was to take that bagging table or module, which I

16  again point to because we have this diagram up here, which is

17  Exhibit -- well, Slide 2-B.  Is there an exhibit number?

18          MR. DOSTART:  On the back top left corner.

19  BY MR. WOHL:

20  Q.   Exhibit 216-A.  You would take that bagging table or

21  module and you would move it so it would be aligned right next

22  to the main counter, is that correct?

23  A.   That's correct.

24  Q.   No. 6:  Reduce the depth of the counter, to reduce the

25  reach necessary to go across the counter; is that right?

1   A.   I don't think that would be necessary.

2   Q.   So you weren't recommending any reduction in the depth of

3   the counter?

4   A.   I -- I don't recall that I did that.

5   Q.   Reducing the depth of the bagging module.  Did you at

6   least recommend that?

7   A.   When you're talking about the counter, you're talking

8   about where the scanner is at this point?  That's the counter

9   you're talking about?

10  Q.   Yes, yes.

11  A.   Not the one on the right-hand side with the POS.

12  Q.   We will do both.  So first off, that main counter, the

13  first counter that you're talking about, you're not

14  recommending that that depth gets reduced, is that correct?

15  A.   Would you point to that for me?

16  Q.   Of course.  This is the counter that the customer would

17  normally stand in front of.  So it has the scanner and the

18  demagnetizer.  And the merchandise is normally placed on this

19  part of the counter (indicating)?

20  A.   And the dimension that you're talking about depth is what?

21  Q.   Depth is going across cashier to the customer.

22  A.   I believe it's approximately 23 inches.

23  Q.   You would not reduce that?

24  A.   That was not a recommendation.

25  Q.   The bagging table module, would you reduce the depth?

```
 1  A.   No, I would not change the size of the bagging table.

 2  This was not part of the report.

 3  Q.   The record will speak for itself on that point.

 4  A.   Okay.

 5  Q.   Seven:  You would remove the baggage rack -- or, excuse

 6  me.  You would move the baggage rack to a different location,

 7  correct?

 8  A.   Yes.  If I put the -- move what's called the bagging table

 9  next to the demagnetizer, then the bagging well would have to

10  change position.

11  Q.   You would lower the coupon printer?

12  A.   I would change the location of the coupon printer, yes.

13  Q.   Lowering it?

14  A.   I would get it closer to the person as well as lowering

15  it.

16  Q.   You would lower the receipt printer?

17  A.   No.  The receipt printer -- are you talking about --

18  Q.   The cash register receipt printer.  I thought I heard you

19  say you were going to lower that as well; is that not correct?

20  A.   When you said I'm going to -- these are recommendations I

21  would make to make it a more compatible work station that a

22  seated person could use.

23  Q.   I'm not asking why you're saying it.  I'm just saying:

24  Was that one of the modifications that you proposed?

25  A.   When you say modification I proposed, a goal that I would
```

JOHNSON - CROSS EXAMINATION / WOHL

1  like to achieve is to have the receipt printer and the coupon

2  at a much more comfortable position.  There is no reason that

3  they have to reach their hands above their shoulder level each

4  time.

5      Now, if you're sticking with that POS with that cash

6  register, that is attached to the cash register.  The coupon

7  dispenser is not attached.  It is more easily moved than the

8  receipt is.

9      Given a choice, I would like both of them as -- to be

10 reoriented, as some of the other Kmart's are.  Actually have

11 better configurations.

12         MR. WOHL:  Your Honor, I would ask that the witness

13 just answer my question.  I think we heard a lot more than what

14 I asked for right there.

15         THE COURT:  Remember what I said about the "yes" or

16 "no"?

17     He's simply asking:  Yesterday did you make a modification

18 for a certain feature?  The reasons for it are not what he's

19 asking.

20     So ask that question again about did you make a

21 modification for, and then fill in the blank.

22 BY MR. WOHL:

23 Q.  Was another one of your recommendations to replace the

24 cash drawer, which currently pops out against the cashier, with

25 a cash box which would have a flip top lid so it would not move

JOHNSON - CROSS EXAMINATION / WOHL

```
 1   out, but instead it would move up?
 2   A.    Yes, in terms of --  yes.
 3   Q.    Thank you.
 4         Did also recommend that the POS device, which is the
 5   device the customer would swipe a credit or debit card, be
 6   rotatable so that it could be rotated so the cashier could use
 7   it without having to stretch further to reach it from the other
 8   side?
 9   A.    Yes.  You're using the term POS different than I have been
10   using the word POS.
11   Q.    Okay.  Well, that's the term I'm familiar with.  But
12   what's identified here as a credit card reader.
13   A.    Okay.
14   Q.    POS standing for point of sale.  It's a term that's used
15   in the industry and --
16   A.    I'm not -- that's why --
17   Q.    If you're not familiar with it, that's fine --
18   A.    I know.  And that's why --
19         THE COURT:  You two are talking over each other.
20   Please try to remember not to.
21         Continue with your answer.
22   BY MR. WOHL:
23   Q.    Just so we're clear.  Credit card reader, you would
24   recommend that that be rotatable?
25   A.    Yes, or taken off or at least -- yes.
```

1  Q.   You would also relocate the check writing platform,  which

2  is what the customer would use to sign a check or other

3  paperwork?

4  A.   That was one of the other.

5  Q.   The you would install a swivel adjustable stool that the

6  cashier could actually sit on?

7  A.   Yes.

8  Q.   And you would install an adjustable foot rest that the

9  cashier would rest his or her feet on, isn't that correct?

10  A.   It probably wouldn't be an adjustable foot rest.  There

11  would be multiple foot rests.  It could be an adjustable foot

12  rest or multiple foot rests.

13  Q.   All right.   Now, it's correct that you don't know of any

14  retailer who actually is using a check stand design that is

15  based on the Kmart set-up, but then has all the modifications

16  that you've proposed?

17         MR. MATTHEW RIGHETTI:  Objection.  Vague and

18  ambiguous.

19         THE COURT:  Overruled.

20  A.   Would you ask the question again?

21  BY MR. WOHL:

22  Q.   Yes.  You're not aware of any retailer who uses a check

23  stand design which is based on the Kmart check stand design,

24  but then incorporates all the modifications that you've just

25  proposed?

1  **A.**   No, that has -- no.

2  **Q.**   And as far as you know, such a design has never actually

3  been used; that is, never actually been tested?

4  **A.**   When you're saying "such a design," you're saying with my

5  modifications, that Kmart -- with my modifications have not

6  been tested, that's correct.

7  **Q.**   You also have not priced how much that would cost for

8  Kmart to incorporate all those modifications to the existing

9  check stand, isn't that correct?

10  **A.**   That is correct.

11  **Q.**   All right.  Now, let me talk about a few of the

12  modifications.

13      Is it correct that with regard to the bins that are

14  currently under the counter, isn't it correct that you --

15  restate that.

16      Is it correct that you don't know how frequently those

17  bins are used?

18  **A.**   Are you -- you're talking about accessed or --

19      **THE COURT:**  See, there is the point.  "Is it correct

20  that you don't know?"  And he says, "No."  What does that mean?

21  Does that mean, "No, I don't know"?  "No, it is correct"?

22      **MR. WOHL:**  All right.

23      **THE COURT:**  You see the problem.  All right.

24      **MR. WOHL:**  I was trying to avoid that, your Honor, so

25  I'll try again.

```
 1              THE COURT:  It doesn't help to put the "is it correct"
 2   at the front.  It's the same problem.  It's the negative plus
 3   "is it correct."
 4              MR. WOHL:  All right.
 5              THE COURT:  All right.
 6   BY MR. WOHL:
 7   Q.   Doctor, you do not know how frequently those bins are used
 8   under the counter?
 9              THE COURT:  Do you?
10              MR. WOHL:  There we go.
11   Q.   Do you?
12              THE COURT:  That's a perfect question.  Answer that
13   question.
14              MR. WOHL:  I'm learning, your Honor.  Thank you.
15   A.   Is it appropriate for me to ask what you mean by usage?
16   There's two there.  You can use one to put things in, the other
17   is to empty it.
18        I do have a feel for the--
19              THE COURT:  Both ways.  Answer it both ways.
20   A.   Okay.  From the operations I have done, I have a feel for
21   how many times they are accessed in terms of putting things
22   into them.  I do not know how often they are taken from the
23   work station.
24   BY MR. WOHL:
25   Q.   I want to read from your deposition, Dr. Johnson, the one
```

 1 | taken in this case on April 4, 2012.  Starting Page 147,

 2 | Line 13.

 3 |        **"QUESTION:**  Sure.  Do you know how frequently

 4 |        merchandise or items are placed in those bins?

 5 |        **"ANSWER:**  I do not.  I do know the ones I have seen

 6 |        have been empty when I've gone in.

 7 |        **"QUESTION:**  So it could be empty because they are

 8 |        frequently emptied, correct?

 9 |        **"ANSWER:**  Yes.

10 |        **"QUESTION:**  So you don't know how frequently items are

11 |        placed in any of those bins, those three bins, you

12 |        don't know what goes into those bins, correct?

13 |        **"ANSWER:**  That's correct.

14 |        **"QUESTION:**  You don't know how frequently they are

15 |        emptied, correct?

16 |        **"ANSWER:**  That's correct.  I've not done that

17 |        analysis."

18 |      And that ends it at 148, Line 2.

19 |      Is that your testimony in the deposition?

20 | **A.**  Yes, yes.

21 |        **THE COURT:**  Do you stand by that testimony?

22 |        **THE WITNESS:**  I stand by that testimony.

23 | **BY MR. WOHL:**

24 | **Q.**  You also, Dr. Johnson, do not know what size the bins are,

25 | correct?

1    A.   I did not measure the bins, no.  No.

2    Q.   And you can't say if they were to be removed and

3    relocated, they would be the same size bins?  That is, in order

4    to make them fit someplace else, the size would have to change;

5    isn't that possible?

6    A.   Yes.

7    Q.   And you can't say whether that would impair their utility?

8    A.   No.

9    Q.   With regard to what you called the  lowest shelf and what

10   I referred to as the toe kick, isn't there an ergonomic reason

11   for having that type of panel or toe kick to the bottom of a

12   counter?

13   A.   If it were recessed and using it as a foot rest, it would

14   be functional, yes.

15   Q.   Isn't there a different reason for it as well?

16   A.   I'm not sure what you're speaking of.

17   Q.   Isn't another purpose for that panel or toe kick to make

18   sure that the cashier, while standing, keeps his or her

19   balance?

20   A.   I don't know where that would --

21   Q.   Doesn't that act as a natural boundary so the cashier

22   doesn't step too far under the counter; that is, putting his

23   feet too far under the counter, which would cause him to push

24   back and possibly lose his balance?

25   A.   If I replace it, that's not a problem -- I mean, if I

1    remove it that's not a problem.

2    **Q.**   On the contrary, Doctor, if you remove that, then there is

3    no natural boundary to keep the cashier from stepping too

4    deeply into the counter.  Is this --

5    **A.**   I've never encountered that as an issue.

6    **Q.**   So just so we're clear, you are unfamiliar with any

7    ergonomic principle that the reason for a bottom panel or toe

8    kick when you have some sort of vertical structure is to make

9    sure the person doesn't step in so far under the counter that

10   they could actually start leaning back and lost their balance?

11   **A.**   I have never encountered that.

12   **Q.**   All right, sir.  With regard to moving the bagging module

13   or bagging table over to where the other counter is, that would

14   eliminate this path for the cashier to walk through, is that

15   correct?

16   **A.**   Correct.

17   **Q.**   As a consequence, if the cashier needed to come to the

18   front of the check stand for any reason, the cashier would have

19   to walk all the way around and all the way back to get to the

20   same place, isn't that correct?

21   **A.**   Yes.  They would go out the back and come around the --

22   what is now called bagging table.

23   **Q.**   Do you agree that would not be productive time for the

24   cashier?

25   **A.**   Yes.  In terms of the -- yes, there is time now where they

1  actually walk through and come through that small area and bend

2  down.  So you would subtract the difference in the times to

3  figure out what the loss would be and you would look at the

4  frequency that occurred, yes.

5  **Q.**   But, Dr. Johnson, you agree it takes less time to walk

6  between the two tables to come to the front than to walk all

7  the way around --

8  **A.**   Yes.

9  **Q.**   (Continuing) -- to get to the same place, correct?

10 **A.**   Yes.

11 **Q.**   And that difference is an example of what you called

12 yesterday no value added time, correct?

13 **A.**   No.  The value added in that particular situation is the

14 gain that you have from not having to move all of the time that

15 you spend moving items from the demagnetizer over to the --

16 over to the table.

17     So what happens in that situation that the gain of not

18 having to make those motions for every bag that you have is

19 much, much, much higher than the loss of having to walk around

20 about five percent of the time that they -- as I understand

21 correctly, that they access the back of the...

22 **Q.**   You say that, but you have done no actual analysis or

23 calculations to see if that's true?

24 **A.**   No.

25 **Q.**   And isn't that correct that another option the cashier

 1  might deploy, instead of walking all the way around, is simply

 2  to reach across the counter, correct?

 3  A.    To perform what task?

 4  Q.    Whatever task that the cashier might otherwise have to

 5  perform in front, the cashier might just reach over to try to

 6  accomplish that task?

 7  A.    Yes.  If you're talking about checking things in the

 8  bottom of the -- I would have to know what the task is.  I

 9  guess that's my problem.

10  Q.    I will give you two examples.

11  A.    Okay.

12  Q.    If the customer is having problems operating the credit

13  card reader, the cashier or clerk currently could walk between

14  the two tables, come to the front and assist the customer with

15  that task, correct?

16  A.    Correct.

17  Q.    But if this path of egress is now blocked, instead of

18  walking all way around, the cashier might be inclined to simply

19  reach over to perform the same task?

20  A.    Yes.  And that's why it's 16 inches and that's why I'm

21  suggesting the combination 16 inches plus the rotatable, I

22  think that would be doable.

23  Q.    If the customer needed help putting bags in their grocery

24  cart, the cashier must be tempted to simply lean over the

25  counter and put it into the cart, as opposed to walking through

1  and putting it into the cart, correct?

2  A.   I would think the management would instruct them not to do

3  that, but I don't...

4  Q.   Regardless of how the manager instructed him, that would

5  mean that that's what the cashier would actually do, correct?

6  A.   Cashiers can do things that they shouldn't do, yes.

7  Q.   More generally you've not done -- I think you've covered

8  this point, but just as to be clear.

9       You've not done any calculations with regard to the Kmart

10  check stand operation regarding net productive or

11  non-productive time?

12  A.   No.

13  Q.   Thank you.

14      With regard to lowering the coupon printer and the receipt

15  printer, you testified yesterday that it's -- even in a

16  standing position, it's not ideally -- they are not ideally

17  located because the cashier would have to reach too far to

18  access them, is that correct?

19  A.   It would be better if it were -- no, it would be better --

20  it's not the reach as much as it is the orientation.  If it

21  were rotatable, it's more the orientation than it is the reach.

22  The reach is acceptable.

23  Q.   Do you agree that if the cashier were sitting and those

24  two printers were not lowered, it would be an even longer reach

25  for the cashier to access those two printers?

1   **A.**    Very small difference.  The shoulder difference of the

2   seated versus the standing person is about three inches

3   difference in terms of the shoulder position.  So the actual

4   position, it would not change.

5   **Q.**    Just so I'm clear, your testimony is that if the cashier

6   were sitting rather than standing, but still had to reach the

7   printer and coupon -- excuse me, the receipt and coupon printer

8   in the current location, you don't believe there would be any

9   meaningful difference in the reach that the cashier would have

10  to deploy to access those printers?

11  **A.**    The coupon would be about, for a -- now, are you talking

12  about a sitting versus a standing person?

13  **Q.**    Yes.

14  **A.**    That's the reference, okay.

15  **Q.**    With the receipt and coupon printers in the same location

16  they are currently now.

17  **A.**    Where they are now.  And it turns out that the shoulder

18  level of a sitting fifth percentile person is about

19  three inches lower than what the standing shoulder position is

20  for a fifth percentile person.  Meaning, for the average person

21  I think it's four.  I may have that turned around.  I think

22  it's four for the -- no, that's correct.

23       It's three for the fifth percentile, meaning only

24  five percent of the people are shorter. Five percent of the --

25            **THE COURT:**  This is so confusing.  I have never heard

1  anything so confusing.

2      Start all over and say it clearly so that I will

3  understand what you're trying to say.

4  **A.**   The issue we're dealing with is the reach to the coupon

5  and to the receipt.

6      So the question is:  What is the height of the person's

7  shoulder when they're -- because that's the orientation, that's

8  the location of the start of the reach, from that standpoint.

9  And what is the height of the shoulder and where would the

10 shoulder be in both of those situations?

11     And the height of the shoulder, if you've got a fifth

12 percentile female -- meaning only five percent of females are

13 shorter than them -- is about three inches different between

14 sitting and standing.  And so there would be a three-inch

15 increase in height when they went to reach for those.

16     The horizontal distance would be the same.  But, again,

17 I'm looking at the coupon, in particular, having a lower

18 horizontal distance and the receipt reach would be acceptable.

19 **BY MR. WOHL:**

20 **Q.**   Well, you say "acceptable," but do you agree that it would

21 not be desirable to require cashiers to actually extend their

22 reaches even if it's just three inches?

23 **A.**   I don't think these are very -- these are not very optimal

24 at this point.

25 **Q.**   How high is the seat that you are proposing or

1  recommending to be used here?

2  **A.**    The highest seat would be, again, about 26 inches.

3  **Q.**    And just so we're clear, this would be from the floor to

4  the seat pan, which is the actual part of the stool or seat

5  that the cashier would sit on, correct?

6  **A.**    Yes.

7  **Q.**    And would that be a fixed 26 inches or would that be

8  adjustable?

9  **A.**    Initially -- for sure initially it would be adjustable.

10 **Q.**    And what range would it be adjustable?

11 **A.**    It really -- the adjustability, actually, you could have

12 it adjustable from 22 to 29 if you wanted.

13          I'm saying the highest that I think it would be set so

14 that the fifth percentile female can put her legs underneath

15 the counter would be at 26 inches.  That's the highest it would

16 be set at, but the actual adjustable range could be whatever it

17 would be chosen to use.

18 **Q.**    That's higher -- what you just described, that's higher

19 than the generally recommended height for a seated work

20 station, true?

21 **A.**    Without foot rests?  Yes.  If you're putting your feet on

22 the floor.

23 **Q.**    The recommended height for a seated work station is only

24 15 to 22 inches, correct?

25 **A.**    What is the height of the counter that they are working

 1  with?  Because that wouldn't be the case if you're working with

 2  a counter that's higher.

 3  Q.   Well, in fact, it's not recommended that someone sit at

 4  a -- on a high stool with a foot rest.  The anticipation is

 5  they will be sitting with the chair on the floor and their feet

 6  on the floor, isn't that correct?

 7  A.   Not at all.

 8  Q.   Okay.  And you've never seen a seat at that height,

 9  26 inches, used in any retail store in the United States?

10  A.   When you say "that height, 26 inches" -- okay.  I have not

11  seen seats used in retail stores other than Aldi.  And those

12  are shorter because they use the platform as opposed to the...

13  Q.   If a Kmart cashier used a seat of that height, that would

14  mean that they could not put their feet flat on the floor,

15  correct?

16  A.   When they are sitting on the seat, correct.

17  Q.   They would have to put their feet up on a foot rest,

18  correct?

19  A.   They could put one foot on the floor and the other foot on

20  the seat rest.

21  Q.   And in order to get -- well, in fact, they would have to

22  have something to put their feet on because it would not be

23  ergonomically safe to have their legs dangling for long periods

24  of time at the register, correct?

25  A.   You would want to have foot rests, yes.

1   Q.   You also say there with should be a swivel -- well, you

2   agree there should be a swivel seat?

3   A.   For this application I think because of -- because of the

4   situation where the  what I'm calling POS is on the right-hand

5   side and you need to access that, then I think swiveling is

6   appropriate.

7        The other thing is to get up and move out of the work

8   station, then swiveling the other way to get up and move out is

9   appropriate.  So I think a swivel would be appropriate.

10  Q.   But if they are in the swivel then to the extent they are

11  moving things laterally, they are going to have to brace

12  themselves or else they are going to start moving on the seat?

13  A.   That is only -- this was stated yesterday.  That is only

14  for heavy objects.  If you're dealing with something heavy and

15  you're moving it like this, then, in fact, what's happening is

16  is if you're moving it rapidly this way and it's heavy, the

17  seat would have to rotate.

18       But light objects, as you can imagine, are not a problem.

19  So only the objects that they would actually stand for in the

20  first place would cause that issue.

21  Q.   Well,l first off, if they stayed in the seat moving a

22  heavy item laterally, they would have to brace themselves to

23  avoid the seat turning, correct?

24  A.   They would -- when you say "brace themselves," they would

25  use the foot rest and they would move it across, yes.

1  Q.   And if they otherwise don't try it while seated, they then

2  would have to get off of the seat?

3  A.   Yes, either all the way off the seat or just one foot off

4  the seat and reach it and come back as...

5         THE COURT:  I want to focus on this now.  Pick a heavy

6  item that you think would be involved here.

7         THE WITNESS:  A case of soda, 24.

8         THE COURT:  All right.  Take that.  So that goes

9  across the scanner.  The cashier is going to have to move it

10 across the scanner, right?

11        THE WITNESS:  Yes, they would.

12        THE COURT:  So if they stay seated, is there a safety

13 problem?

14        THE WITNESS:  I'm anticipating for those applications

15 with that, as I'm saying, they would stand to do that.

16        THE COURT:  All right.  So they would stand to do

17 that?

18        THE WITNESS:  Uh-huh.

19        THE COURT:  And the reason is because they would -- it

20 would be safer really to stand and do it, wouldn't it?  It also

21 may be better for their own health.

22        THE WITNESS:  And they don't have the muscle,

23 sufficient muscle --

24        THE COURT:  All right.  So they are going to have to

25 stand up, sit down, stand up, sit down depending on the heavy

 1  item, light item, heavy item, light item.

 2      So is there any -- I guess the issue, one of the issues is

 3  going to be whether or not that repetitive up and down is a

 4  problem.  What do you think?

 5          THE WITNESS:  Two aspects of that.  The first thing is

 6  what is the frequency of it.  And then we update it to indicate

 7  what the frequency is.

 8          THE COURT:  What is the frequency?

 9          THE WITNESS:  It's about five percent, less than

10  five percent of the time.  I think Dr. Fernandez ended up with

11  once every 10 minutes they would have to do that.

12          MR. WOHL:  Your Honor, I need to interject here.  I

13  believe that Dr. Johnson is referring to things in a

14  supplemental expert report he submitted which is actually

15  subject to a motion to strike because it was late produced.

16          THE COURT:  This is something that I'm asking.

17  Overruled.

18          MR. WOHL:  All right.  Thank you.

19          THE COURT:  Go ahead.  Tell me what your -- look,

20  counsel brought this up and I'm trying to understand it.  I'm

21  asking a question that's intimately involved with what counsel

22  is bringing up.

23      So what is the frequency of the up-and-down situation?

24  Now, five percent seemed very low to me.  Where did you get

25  that number?

1    THE WITNESS:  Well, this is from Dr. Fernandez's data.

2    THE COURT:  Well, you didn't do your own data?

3    THE WITNESS:  Yes, I did my own as well.

4    THE COURT:  What is your --

5    THE WITNESS:  It's approximately the same.

6    THE COURT:  Five percent, one out of twenty times?

7    THE WITNESS:  Uh-huh.

8    THE COURT:  To me that seems pretty low.  Now, I
9  haven't gone in to do a study, but it seems like a larger
10 number of the items would be heavy enough that you would want
11 to stand up.

12   THE WITNESS:  Two things happen.  One is, when people
13 come in with heavy items, they will set it on the counter.
14 They will hand scan it.  Then they will put it back in their
15 basket.  That's the normal operation for heavy objects, is that
16 the cashier --

17   THE COURT:  What do you mean "people"?  The customer
18 does all that hard work?

19   THE WITNESS:  It's -- remember, they are taking it out
20 of the basket and putting it in their cart.  So they are
21 bringing it.  They put it on the counter.  It's scanned and
22 then they put it back in the basket.

23     That's one of the procedures that reduces that amount of
24 time, that frequency is all I would say.

25   THE COURT:  Who moves it across the scanner?

1           THE WITNESS:  It's a hand scan.  They hand scan it.

2   Most heavy objects --

3           THE COURT:  Where is a hand scan in your picture?

4           THE WITNESS:  The hand scan is right there

5   (indicating).  And, again --

6           THE COURT:  The pink thing?

7           THE WITNESS:  Yeah, it's the pink.  And you pick that

8   up and scan it with a -- it's a pistol grip type of scanner.

9       I think it would help, from my standpoint, if you would

10  measure 26 inches to get a real feel for what a 26-inch seat,

11  the height of a 26-inch seat.

12      He keeps referring to it as a high seat and I'm not

13  referring to it as a high seat.  And if we could use a

14  measuring tape and indicate what 26 inches is, I think that

15  would be helpful.

16          THE COURT:  You're suggesting a 26-inch seat that the

17  cashier would be sitting in?

18          THE WITNESS:  That's the maximum height that I'm

19  talking about.

20          THE COURT:  How high is the seat I'm in?  Here, give

21  me the measuring tape again.

22          MR. MATTHEW RIGHETTI:  Mr. McInerney took off with it.

23          THE WITNESS:  I have one in my briefcase.

24          THE COURT:  While they are getting that, here is the

25  concern I've got.

```
 1        Some somebody has to stand up.  Get up and get down.
 2   Stand up and sit down.  A certain amount is good for you, but
 3   after awhile it's going to start hurting your back.
 4        Can I have that measuring tape?  You lawyers should have a
 5   measuring tape.
 6            MR. DOSTART:  We have one.
 7        May I approach the witness?
 8            THE COURT:  Give it to the clerk.  You don't approach.
 9   This is like a moat.  You have to do it the right way.
10        (Tape measure was tendered to the Court.)
11            THE COURT:  All right.  My chair is the 20 inches off
12   the ground.  Twenty-six inches off the ground would be even
13   higher.
14        Do you want to measure what your chair is so you can have
15   that in the record?
16            THE WITNESS:  Again, see, the reference point -- my
17   chair is 18 inches.
18            THE COURT:  All right.  And we're measuring just to
19   where you're rear end sits on and meets the seat itself,
20   correct?
21            THE WITNESS:  Yes.
22            THE COURT:  All right.  So that will be the record.
23        Okay.  I think this is an important point.  A lot of these
24   points seem like miscellaneous to me, but this one bothers me.
25        And I want to hear more about the up and down, the
```

1    repetitive up and down that heavy objects would require.

2    That's just so, you know, something I'm thinking about.

3        Go ahead, counsel.

4    **BY MR. WOHL:**

5    **Q.**   Moving heavy items across the counter is not the only

6    reason why a cashier would need to get off the seat to perform

7    job duties, isn't that correct?

8    **A.**   That's correct.

9    **Q.**   So if the customer needs help getting things in the

10   basket, the cashier has to be standing?

11   **A.**   Yes.

12   **Q.**   If the customer needs help with the -- if the cashier

13   needs to check to make sure there is no items left at the

14   bottom of the cart, the cashier needs to be standing for that,

15   too?

16   **A.**   No.

17   **Q.**   They need to be able to see the bottom of the cart.  If

18   they are sitting, they won't be able to see the bottom of the

19   cart, is that correct?

20   **A.**   There are other ways to see the bottom of the cart.  As

21   the cart is coming toward them, they can also look in the

22   bottom of the cart as it's coming.  They can also look in the

23   bottom of the cart as it's going away.

24       Then what some organizations do is they put a mirror on

25   the other work station, so that they can look in the mirror and

1   look down there.  So there are other ways of handling that.

2   **Q.**   If the cashier is consumed with one transaction, doesn't

3   have a chance to look up to see the cart coming, by the time

4   the cart is in front of the counter he's not going to be able

5   to see it just from a seated position, isn't that correct?

6   **A.**   And you're saying they are going to see it now --

7   **Q.**   If they get up, they can see.

8   **A.**   But what is the current, standing?

9           **THE COURT:**  What counsel is saying is, they want to

10  make sure they charged the customer for everything.  Sometimes

11  they have got a big heavy case of 24 Coca-Colas in the bottom

12  of the basket.  And at least in my own experience the cashiers

13  look down there to see what you've got.  Maybe there is

14  nothing.  Maybe there's a lot.  And they just stand up and they

15  look, or if they are already standing, they just glance down

16  and look.

17      He's saying under your system, how are they going to

18  check?  You're saying they use a system of mirrors like a

19  periscope.  That doesn't sound practical to me.

20          **THE WITNESS:**  It works very well.  You put a mirror on

21  the surface of the next counter --

22          **THE COURT:**  In that picture there, I don't see where

23  you would even put the mirror in the picture that's on the

24  screen.

25          **THE WITNESS:**  Oh, right here --

1    **THE COURT:**  There is not a work station over there.

2 There is candy bars and things.  So you're going to hide the

3 mirror in the candy bars?

4    **THE WITNESS:**  In this particular situation you could

5 put it, but, again, I -- if they look at it as it's coming in

6 and look at it -- as a standard procedure to reduce the

7 shrinkage, that's not an unreasonable thing to do from my

8 standpoint.

9    **THE COURT:**  You would have to then train the cashiers

10 to spot it when it's coming and then while they are working,

11 remember that there was something down there.  Isn't that kind

12 of asking a cashier to do a lot of memory?

13    **THE WITNESS:**  That's a very important part of reducing

14 the shrinkage for these companies, sir.

15    **THE COURT:**  All right.  That doesn't sound practical

16 to me.  I'm just letting you know that part doesn't sound

17 practical.

18    That's not the end-all of this case.  There is a lot of

19 factors here, but counsel, it seems to me, to have raised a

20 practical point.  This is a lot of practical things here.  I

21 would like to have a better solution than having a memory test.

22 **BY MR. WOHL:**

23 **Q.**  If the cashier had to go to a telephone to call for

24 assistance, say, on a price check or refund issue, they would

25 have to get up for that, too, correct?

JOHNSON - CROSS EXAMINATION / WOHL

```
 1   A.    Yes.

 2   Q.    And from what you described each time they got up, they

 3   would have to move the stool under the counter so that they

 4   would have free movement to move back and forth, otherwise the

 5   stool would be in their way; isn't that correct?

 6   A.    No.

 7   Q.    So you're saying they get off the stool, leave the stool

 8   there, and still move around the counter?

 9   A.    When you're saying "move around the counter," for which

10   purpose are you talking about now?

11   Q.    Any of these purposes.

12   A.    Oh, the stool will stay fixed and then they would rotate

13   out.  The stool will not be moved very often at all.  The stool

14   would be here and they rotate and stand up.

15   Q.    That means, then, if they want to go back to use the

16   register to get the receipts, to get the cash or any other

17   function, they have to sit back down again, correct, because

18   otherwise the stool would be in the way?

19   A.    Well --

20   Q.    What you just described, Doctor.  You said they won't get

21   off and move the stool under the counter.  They will just get

22   off.  Do whatever they are doing for why they are standing up.

23   But then in order to do these other functions at the register,

24   they will have to get back in that stool, correct?

25   A.    No.
```

1   Q.   Otherwise the stool would be in the way?

2   A.   No.  It's not in the way.

3   Q.   Well, that's a very curious proposition.

4        We have the picture of the space.  You're saying the stool

5   is going to be right in the middle here?

6   A.   No.  It would not be in the middle.  Remember, the person

7   is all the way up so the front of their stomach is at the edge

8   of the counter.  So that's the normal sitting position, is the

9   person is sitting up with the front of their stomach at the

10  edge of the counter in that situation.

11       So the stool is not quite halfway underneath the counter

12  in the normal situation.

13  Q.   And you're saying that they will be able to swivel out,

14  with that space allowed, and the stool will remain in the exact

15  same position?

16  A.   Yes.

17  Q.   You testified yesterday they were going to half to move

18  the stool under the counter, under the counter, correct?

19  A.   If they want to stand and perform the job normally, yes.

20  If they want to stand for a period of time.  Not as a result of

21  something else they needed to do, but if they chose, as I said

22  in the Walmart, to only use the stool 20 to 40 percent of the

23  time and stand the rest of the time, that other time the stool

24  would be underneath the counter.  And that's the time that they

25  would move the stool underneath the counter.

1          THE COURT:  Okay.  Now, you're suggesting a stool that

2    has wheels on the bottom and can roll underneath -- how would

3    that stool get underneath?

4          THE WITNESS:  They would just slide it in.  It would

5    have the sliders on the front edges of it.

6          THE COURT:  Maybe not have wheels, but it would slide

7    across the floor and go under?

8          THE WITNESS:  Yes, but --

9          MR. WOHL:  Well, actually, your Honor, there is an

10   anti-fatigue mat there.

11         THE COURT:  Say what?

12   BY MR. WOHL:

13   Q.   There is an anti-fatigue there as well, correct?

14   A.   Not under the counter.

15   Q.   There would be an anti-fatigue mat that the stool would

16   have to sit on for the -- two of its legs, if it was a four-leg

17   stool?

18   A.   Yes.  And when you scoot it in, you would tilt it back and

19   slide it in -- I wish we had a -- this is very easy to

20   demonstrate.

21   Q.   But the point is it's not just a slide, it's a lift and

22   slide.

23   A.   Actually, you're only --

24   Q.   You have to lift the back --

25   A.   You're only tilting it and sliding it.

 1  **Q.**   A push and slide, if that makes you feel better, but you

 2  would have to lift up the back of the stool to clear the

 3  anti-fatigue mat because otherwise the anti-fatigue mat would

 4  keep you from gracefully moving the stool under the counter,

 5  isn't that correct?

 6  **A.**   If we could do it on this carpet, it would be easy to

 7  illustrate how it is to slide that.

 8  **Q.**   But surely a cashier, if they want to access the register,

 9  is going to move that stool out of the way.  He is not going to

10  leave the stool half exposed and block his access to at least

11  half the way.

12          **MR. MATTHEW RIGHETTI:**  Objection, argument.

13          **THE COURT:**  No, it's okay to argue with the expert.

14  That's what they are doing in the first place.  It's an

15  argument presented by expert opinions.  It's mere opinion and

16  using a hypothetical to vary the hypothetical is a time-honored

17  way to cross examine an expert.

18      Yes, it is argumentation, but that's permitted with

19  experts.

20      Overruled.  Please answer the question.

21  **A.**   Would you ask the question again?  I'm sorry.

22  **BY MR. WOHL:**

23  **Q.**   The question is:  The cashier in the normal course of

24  things, if he had to get off the stool to do one of those

25  chores that we have described requires standing, then in order

1  to finish the transaction he's not going to leave the stool

2  where it is.  He's going to move it out of the way because

3  otherwise it's blocking at least part of his access to the

4  register?

5  A.   If we're talking about the heavy objects, where they have

6  to stand on one leg and then reach the heavy object and pull it

7  across, okay, to where they are, okay, literally what they are

8  doing if you look at 27, they would be standing -- they would

9  be standing on one leg still with their other foot probably on

10 the foot rest and they would be pulling it across, okay.

11      The times that they are going to have to stand to do the

12 operation is when they are getting up to go look at the items

13 underneath -- or to scan the items underneath and whatever and

14 that type of situation.

15 Q.   All I'm asking, Doctor, is under your scenario they either

16 are then going to go back and sit down to finish the

17 transaction or they are going to move the stool out of the way

18 so they can finish the transaction standing; isn't that

19 correct?

20 A.   They will have room to finish the transaction from behind

21 it.

22 Q.   With the stool sticking out?

23 A.   Partially out.

24 Q.   Which means --

25 A.   Remember, all they are doing --

1  Q.   Which means that now their reach is now decreased because

2  they've got the stool between them and the edge of the counter.

3  A.   What is the scenario?  I guess what we're trying to do is

4  define a scenario and that's a difficult thing to do in this

5  situation.  I don't know what you're referring to.

6  Q.   I think I --

7       (Counsel and the witness speaking simultaneously)

8  Q.   They are sitting in the stool.  They need to get out of

9  the stool to perform some task that requires them to stand.

10 They now are coming back to finish the transaction which

11 require access to the register, access across the aisle --

12 across the counter to the customer.

13      To my surprise, you're saying, well, actually they

14 wouldn't move the stool under the counter to provide clearance

15 to do those things.  They would leave the stool where it is;

16 namely, sticking halfway out under the counter.

17      That's the scenario.  Do you understand that?

18 A.   Yes, yes.

19 Q.   How is that -- how is that going to be an efficient way

20 for the cashier to perform these functions where the stool is

21 either going to be partially in the way reaching the register

22 or partially blocking him from reaching across the counter?

23 A.   They will not be reaching across the counter at that

24 point.  If they are going to be dealing with the counter, if

25 it's in a seated situation, yes, they would sit back down and

1    go back to doing the other items that they are doing.

2        So we're talking about where they are picking up, like, a

3    case of Coke, or something like this, and they are moving it

4    across.  In that case they are going to be hand scanning it.

5    Then they are going to move it across.

6        In my system they will just push it over onto the table.

7    They won't have to lift it up and carry it over as they do now

8    over to the bagging table.

9        So at that particular point what they are doing is they

10   are moving it.  Again, with that type of situation what happens

11   today is when they hand scan it, the customer takes it at that

12   point.  And I think to illustrate -- the videos that we have

13   illustrate that.

14   **Q.**  I don't think you're responsive to my question at all,

15   Doctor.  I'm sorry.  I don't know if I can do much more with

16   you because you're not answering my question.

17       Let me ask this:  The time the cashier would take to get

18   off of the stool, to move the stool under the counter, later to

19   come back on the stool, that's again non-productive time,

20   correct?

21   **A.**  Yes.

22   **Q.**  Non-value added time, correct?

23   **A.**  Yes.

24   **Q.**  And none of that would be necessary if the cashier were

25   simply standing for the entire transaction?

1  **A.**    But if they are standing for the entire transaction, they

2  are still moving it over here.  They are still making all of

3  those motions --

4  **Q.**    But clearly that's more efficient.  There is no -- there's

5  no reasonable dispute that it's more efficient to stay on your

6  feet --

7              **THE COURT:**  Wait a minute.  Now that is too

8  argumentative.

9              **MR. WOHL:**  All right, your Honor.  Let me try again.

10              **THE COURT:**  Maybe he does dispute it.  It's not your

11  position to say it's not reasonable.

12              **MR. WOHL:**  All right.

13              **THE COURT:**  And you shouldn't also say things like "to

14  my surprise."  Just ask normal argumentative questions instead

15  of the exceedingly argumentative questions.

16              **MR. WOHL:**  Thank you.  Talk to my wife, your Honor.

17  She has the same view.

18  **BY MR. WOHL:**

19  **Q.**    It is more efficient to perform these transactions

20  standing for the entire transaction than if you had to take the

21  time to get off of the stool, push the stool behind, then come

22  back, pull the stool back out or get back on the stool.  That

23  just takes up more non-productive time, isn't that correct?

24  **A.**    Yes.  It is my opinion that the configuration that I have

25  suggested will be much more efficient in terms of the amount --

1   number of transactions per unit time than the current situation

2   of dropping them, and taking them, carrying them, picking them

3   back up again and moving them to that other counter.

4           **THE COURT:**  I'm going to interrupt.

5           **MR. WOHL:**  Yes.

6           **THE COURT:**  Okay.  So your answer is basically no,

7   even though you refuse to say "yes" or "no," but it sounds like

8   you're saying "no."  But you say "no" by referring to your

9   configuration.

10      So be precise and tell us what is the configuration that

11  would -- you're referencing in that answer.

12          **THE WITNESS:**  Without moving the bagging station,

13  cutting part of the POS area, I would -- your statement would

14  be correct.

15      With the modifications that are possible, then, in fact,

16  the efficiency of that operation would be significantly better

17  for both the standing and for the sitting.

18          **THE COURT:**  All right.  And your --

19          **THE WITNESS:**  In my opinion.

20          **THE COURT:**  In that configuration what kind of chair

21  are you talking about?

22          **THE WITNESS:**  A stool that is 26 inches and adjustable

23  and swivels.

24          **THE COURT:**  Swivels.  What do you mean "swivels"?

25          **THE WITNESS:**  The top swivels, as your chair swivels.

1             THE COURT:  Does it have a back?

2             THE WITNESS:  No, probably not.

3             THE COURT:  So it just is likes a bar stool, so to

4    speak, that turns, twists.

5        All right.  Does that slide -- is that one of those things

6    that slides under the counter or is it affixed to the floor?

7             THE WITNESS:  No, it would be free standing.

8             THE COURT:  What does that mean?

9             THE WITNESS:  It would not be fixed to the floor.

10            THE COURT:  Slide underneath the counter, is that --

11            THE WITNESS:  When the person chose to stand to

12   perform the job, whatever percentage of time they would choose

13   to do that, they would move it under the counter and then

14   perform the task.

15            THE COURT:  And then when that task is done, do they

16   then go back and pull the chair -- the stool back out so they

17   can sit on it?

18            THE WITNESS:  No.  When you say "that task," I'm

19   talking about the situation where the person has chosen to

20   stand for a period of time to perform the task.

21        If you're talking about a particular item, which my

22   contention is from data is once every 10 minutes is how often

23   those events occur --

24            THE COURT:  That sounds to me far-fetched, once every

25   10 minutes.  However, I haven't heard all the evidence.

1       It could -- but let's say -- whatever you want to say on

2   that point, that's not my -- you won't answer the question.   I

3   want you to answer the question.

4       All right.   So the cashier is sitting and then has a heavy

5   item and stands up and then finishes that -- and stands up and

6   then you're saying will push that chair underneath the counter,

7   perform the task.

8       So it seems to me that the cashier then has got to come

9   back and lean down and pull that chair back out before they can

10  sit on it.

11          THE WITNESS:   No.   I'm contending they will stand up,

12  do that part of the task.   They are not going to do the whole

13  transaction.   And then, yes, sit back down to complete the

14  transaction, if they are choosing to do that.

15          THE COURT:   How can they sit if the thing is under the

16  counter?

17          THE WITNESS:   No.   No, they are not -- I'm sorry.

18          THE COURT:   You said it would be slid under the

19  counter.

20          THE WITNESS:   No.   There are two situations.   One is

21  when there is a heavy object and they have to stand to handle

22  the heavy object.   In that particular case they do not slide it

23  under the counter.   They move it, move it across.

24      If they need to help the person, then they get up,

25  slide -- and they swivel around and get up.   That's if there is

1   a heavy object.  That's the thing that happens with -- we can

2   talk about the regularity.

3        The second item is when they choose to stand to perform

4   the task because that's the way they like to do it, as opposed

5   to sitting to do the task for let's say 10 minutes, 15, the

6   next hour whatever time.  In that particular case if they are

7   going to be standing to perform multiple transactions, then, in

8   fact, they would slide it underneath the counter.

9            THE COURT:  All right.

10            THE WITNESS:  But the normal situation they would not

11   slide it underneath the counter.

12            THE COURT:  All right.  So the first of those two

13   scenarios, let's just call it the short stand up situation.

14   Still, when the cashier comes back, don't they have to look

15   behind them and take care that they are going to sit down in

16   the right spot so that they don't fall on the floor by -- maybe

17   hit the edge and fall off?

18        In other words, they are moving around when they stand up

19   with a heavy object.  Then they've got to come back and if they

20   are going to sit back down, at least I would if I was doing it,

21   I would look around to make sure I was sitting in the right

22   spot so I wouldn't fall on the floor, or do you have a

23   different view of it?

24            THE WITNESS:  No.  They will come back and sit down.

25   I've used this in many, many different industrial operations,

1    packaging and assembly and...

2             THE COURT:  And in that situation, do you think that

3    there would be a safety hazard in a cramped quarter of having

4    that stool out there in the work space as opposed to be slid

5    under?  Is there a safety hazard in that?

6             THE WITNESS:  If the person were going to leave it out

7    there and perform the task, multiple transactions, I would say

8    that would be a safety problem.

9             THE COURT:  Then why should we tolerate that?  Why

10   wouldn't we -- why are you introducing a bad thing instead of a

11   good thing?

12            THE WITNESS:  If they are doing multiple transactions,

13   then I'm referring to that as the longer term situation where

14   they would move it underneath.

15            THE COURT:  That's your second scenario.

16            THE WITNESS:  That's the second scenario.

17            THE COURT:  The way to deal with that, in your view,

18   to eliminate the safety thing is push it under the counter, get

19   it out of the way so the safety hazard goes away.

20            THE WITNESS:  Yes.

21            THE COURT:  And in the first situation you're saying

22   it's such a short duration that the person would not -- would

23   just naturally know where the seat was and it wouldn't be a

24   safety hazard.

25            THE WITNESS:  No.  All the work I've ever done in

1   seating operations, I have never had a problem with anyone

2   missing the seat or having a problem with standing and sitting.

3          THE COURT:  Well, I've had that problem.  So I -- I

4   don't know.  Maybe you didn't pay enough attention to -- that's

5   a common problem.  People -- you could be trained, I'm sure, to

6   make sure you're sitting in the right spot.  We're talking

7   about a little stool now, right, with no back?

8          THE WITNESS:  Yes.

9          THE COURT:  And one that rotates.  So if you kind of

10  hit it the wrong way, it would rotate out from underneath you.

11         THE WITNESS:  No.

12         THE COURT:  No?  Why not?

13         THE WITNESS:  Because when you put your pressure on

14  it, they -- it's just like any or bar stool.  A lot of bar

15  stools rotate.  A lot of stools that people have in their homes

16  in kitchen bars are 30 inches actually.

17         THE COURT:  All right.  I think I do understand your

18  testimony now, and I understand your point.

19         THE WITNESS:  A demonstration would be very

20  beneficial.

21         THE COURT:  You've described it.  Go ahead, counsel.

22  BY MR. WOHL:

23  Q.   In fairness, when you said you've done this numerous times

24  in industrial settings, the space is nowhere as cramped as

25  supposedly in this picture, right?

1  **A.**    Some were actually more cramped in poultry processing

2  operations, yes.

3  **Q.**    There was no line of customers waiting for the employee to

4  do something for them, correct?

5  **A.**    No.

6  **Q.**    And the judge had you point out that there is no backrest

7  to this stool, correct?

8  **A.**    My expectation is there would not be a backrest.

9  **Q.**    And the reason there is not a backrest is because with the

10  backrest you could not push the stool all the way under the

11  counter?

12  **A.**    Correct.  Now, you could have a backrest that came up a

13  slight amount, just a -- something that came up so that the

14  total height of the seat would be no more than the 30 inches

15  that fits underneath the -- 30-and-a-half inches that fit

16  underneath.

17  **Q.**    The backrest would be in the way between the cashier and

18  the counter, correct?  The backrest would add thickness between

19  the cashier and the counter because it would not go completely

20  under the counter, it would still be sticking up?

21  **A.**    No, the only way I would recommend at all using a backrest

22  is that the backrest were less than -- it just came up and it

23  was a 5-inch backrest, like this, to give some support.

24          In terms of a back of the chair, no, there would not be a

25  back of the chair.  But there is some recommendations, and I've

```
 1  used it in the past, where you end up having some support at

 2  the lower back here.

 3  Q.   With even that short backrest, with the dimensions you've

 4  described, it would not fit entirely under the counter; it

 5  would still stick up part of the way, correct?

 6  A.   Yes, it would fit under the counter.

 7  Q.   Even if the stool were deployed to the highest heights to

 8  accommodate the employees' height?

 9  A.   The 26 inches.

10  Q.   And you agree that without a backrest the employee would

11  not enjoy the comfort and relief from fatigue that a backrest

12  provides?

13  A.   When you're dealing -- what I found, and this is when

14  people are dealing with their hands out in front of themselves

15  like this, which is they are in packaging operations or

16  assembly operations, they don't tend to use -- they don't use

17  the backrest in the first place.

18       They do use the backrest when they have time between

19  customers or something like this, or whatever.  But, in

20  general, to actually perform the task, the backrest or the

21  lower lumbar support is not important when you're performing a

22  task where the hands are out in front of the body.

23  Q.   In the photographs you showed us yesterday, of the Aldi

24  and UK setups, they all had backrests, correct?

25  A.   Yes.
```

1  Q.   And they were using the backrests as they were doing their

2  job?

3  A.   No.  If you look at the Aldi picture -- if you watch Aldi

4  workers, when they're actually doing the scanning and the

5  operations they are not using the backrest.

6  Q.   You also do not recommend that casters be used on the

7  stool, correct?

8  A.   Correct.

9  Q.   And that's because if you use casters, that would

10  introduce instability when the cashier sat on the stool,

11  correct?

12  A.   Yes.

13  Q.   So the tradeoff is, without casters there does have to be

14  some movement, some energy to move the stool under the counter?

15  A.   Yes.

16  Q.   That is greater than if there were casters?

17  A.   Yes, but with the -- with the types of feet that they have

18  today, you know, the furniture moving type of material, again,

19  my contention is the force required to push that in is very

20  minimal, and that can be demonstrated.

21  Q.   Now, isn't it correct that if the cashier were to sit,

22  that would not alleviate any risk of injury to the neck, upper

23  back, shoulders, arms, hands, and wrists, correct?

24  A.   That would not eliminate -- compared to standing, you're

25  saying?

1  Q.    Yes.

2  A.    Oh, I think in terms of -- with my configuration, the lack

3  of having to drop things down into the bags and pick them back

4  up and move them over to that table, it would significantly

5  improve those --

6  Q.    I'm just talking about sitting compared to standing.

7  A.    Yes, that's what I'm --

8  Q.    You believe in sitting rather than standing to relieve

9  fatigue and stress to the back, legs, ankles, and feet,

10  correct?

11  A.    Say that again.

12  Q.    You believe that sitting is preferable to standing, to

13  relieve fatigue and stress to the back, legs, ankles, and feet?

14  A.    Yes.

15  Q.    But sitting would not alleviate any risk of injury.  That

16  is, just the issue of sitting would not alleviate any risk of

17  injury to the neck, upper back, shoulders, arms, hands, and

18  wrists, correct?

19  A.    No, other than reconfiguring the workstation the answer --

20  Q.    In fact --

21  A.    -- is correct.  The answer is correct.  Your answer was

22  correct, without reconfiguring the workstation.

23  Q.    In fact, depending on what lifting or reaching the worker

24  performed, sitting actually could aggravate the risk of injury

25  to the neck, upper back, shoulders, arms, hands, and wrists;

1   isn't that true?

2   **A.**   Yes, if they're dealing with heavy objects, that would be

3   the case.

4   **Q.**   Doctor, it's also true that sitting is not the only way to

5   relieve stress, fatigue, and pain for the back, legs, ankles,

6   and feet, true?

7   **A.**   When you say "the only way" --

8   **Q.**   If you want to relieve stress and fatigue to the back,

9   legs, ankles, and feet, sitting is not the only way to

10  accomplish that; is that true?

11  **A.**   To reduce the amount of -- from being on your feet, you're

12  saying sitting -- if you're comparing the stress of being on

13  your feet, and you're saying sitting is not the only way to

14  reduce it from being on your feet, I'm not sure what you're

15  speaking -- I'm not sure what you're talking about.

16  **Q.**   Well, for example, isn't it true that antifatigue mats can

17  provide postural relief?

18  **A.**   Antifatigue mats do reduce the stress to the lower legs,

19  yes.

20  **Q.**   Isn't it true that any stress, fatigue, or pain

21  experienced when individuals stand statically is relieved by

22  movement?  That is, it's different if you stand perfectly still

23  like a Beefeater at Buckingham Palace, versus someone who's

24  constantly in motion, moving back and forth, stepping back and

25  forth?

1  **A.**    But you're still on your feet.

2  **Q.**    Still on your feet?

3  **A.**    My contention is that still prolongs standing.

4  **Q.**    But it's better, in terms of avoiding or reducing fatigue

5  or stress, if you have to stand, to be moving as opposed to

6  standing still like the Beefeater?

7  **A.**    If you're talking about if you're standing at attention,

8  that is more fatiguing than if you can -- not standing at

9  attention.

10 **Q.**    Now, it is your opinion, of course, that allowing workers

11 to sit periodically is beneficial?

12 **A.**    Yes.

13 **Q.**    Are you aware that Kmart cashiers only work four and a

14 half hours on average a day?

15 **A.**    I -- that was not part of my study.

16 **Q.**    Are you aware they get regular breaks?

17 **A.**    Again, that was not part of my study.

18 **Q.**    Including rest breaks?

19 **A.**    Again, that was not part of my study.

20 **Q.**    Including, if they work enough hours, lunch breaks,

21 correct?

22         Are you aware --

23              (Reporter interrupts.)

24              **THE COURT:**  Are you admitting these things?  Counsel

25 is saying, Are you aware?  I don't like that form of question

 1  because that presupposes something that's not in evidence.

 2      Is it going to be in evidence?

 3          MR. WOHL:  Yes, sir.

 4          THE COURT:  All right.  Well, then, I'll let you ask

 5  that question as long as you follow up and you prove those

 6  things.  But none of those things did the witness admit.  You

 7  were asking those questions like he was admitting these things.

 8  So --

 9          MR. WOHL:  Well, I'll re-ask it, your Honor.

10  BY MR. WOHL:

11  Q.  Are you aware -- well, do it all the way back now?  I'm

12  losing track.

13      Are you aware, on average, the cashiers work four and a

14  half hours a day?

15          THE COURT:  Yes or no?

16          THE WITNESS:  No.

17  BY MR. WOHL:

18  Q.  Not aware of that.

19      Are you are you aware that they receive regular rest

20  breaks?

21  A.  No.

22  Q.  Are you aware they receive lunch breaks if they work

23  enough hours?

24  A.  No.

25  Q.  Are you aware that during their rest or meal breaks, if

1   they wish, they can sit in the break room or the store

2   restaurant?

3   **A.**   No.

4   **Q.**   Would you agree that if everything I said just now were

5   true, they worked, on average, four and a half hours a day,

6   they get regular rest breaks, they get regular lunch breaks,

7   they work enough hours, that during those breaks they can go to

8   the break room or the restaurant and sit down, that that in

9   fact would provide relief from any fatigue or stress they might

10  experience from standing?

11  **A.**   That any stress they would -- no.  I mean, when you say

12  "any stress," no, that would not release -- relieve any stress

13  they would experience.

14  **Q.**   I think you're parsing words.

15          **THE COURT:**  No.  You chose a form of question which

16  invited exactly that response.  "Provide any relief" --

17  "provide relief from any fatigue."  So that suggests that it

18  would wipe out any and all fatigue.

19          So that was an ambiguous question, and the witness was

20  proper to respond as he did by listening carefully to the way

21  you worded it.

22          But, it was a good question which you could rephrase.  And

23  I would like to know the answer to it if it's fairly rephrased.

24          **MR. WOHL:**  And I will do that, your Honor.  Thank you.

25

1  BY MR. WOHL:

2  Q.    Would it provide any relief for stress or fatigue caused

3  by standing?

4  A.    Yes, it would provide some relief.

5  Q.    You agree that if an individual were to attempt to lift a

6  heavy item from the seated position, that would result in

7  increased ergonomic risk, true?

8  A.    It depends on the distance in front of the person.

9  Q.    You agree that it -- that ergonomically it would not be

10  wise for a cashier to bend down to retrieve merchandise from or

11  materials below the counter level while seated, true?

12  A.    How far below the -- they could do that to a certain point

13  how far below?

14  Q.    Well, you tell me.  How far would be acceptable to you?

15  How far would be unacceptable?

16  A.    They would absolutely be able to retrieve things that are

17  at arm length, which is about, let's say, 12 inches below.  But

18  below that, if they have to reach down further, that would be

19  problematic.

20  Q.    What you just demonstrated to me indicated that if they

21  don't have to bend, it's acceptable.  If they do have to bend

22  at the waist, it's unacceptable.  Is that true?

23  A.    The amount of bending is the factor that has an effect.

24  If it's not a regular operation having to bend sometimes, just

25  like they have to get down on their knees now to get underneath

 1  things, or whatever, is not a risk situation.

 2  Q.    Ergonomically, you would prefer, then, instead of bending

 3  down to reach something, they get out of the seat, and that way

 4  they could bend their knees to retrieve the item; is that

 5  correct?

 6  A.    It depends on the frequency of it.  Not necessarily.

 7  Q.    Isn't it correct that sitting would reduce the normal

 8  reach distance for a cashier?

 9  A.    Very, very slightly.

10  Q.    From your understanding of ergonomics, when considering a

11  reach distance, what is the normal working area while seated?

12  A.    What do you define as "normal working area"?

13  Q.    That's not a meaningful term for you in ergonomics?

14        The "normal working area" would mean the area that you

15  would expect the employee to be able to work within without any

16  ergonomic threat or concern.

17  A.    There's --

18  Q.    In other words, a comfortable working area.

19  A.    The working area, as you define it, is generally referred

20  to as if they're doing an assembly operation or if they're

21  doing something, and it would be 18 inches, 20 inches, in that

22  range.

23              THE COURT:   From what?

24              THE WITNESS:   From the front of the person.

25              THE COURT:   From the chest?

1     **THE WITNESS:**  But that's not the reach distance, and

2  that's what I'm saying.  If you're operating in terms of where

3  the scanner is, the distance relative to the scanner is very

4  different than the distance relative to reaching for something.

5  The reach distance is about 24 to 26 inches.  The normal, if

6  you're doing an assembly operation or something and you want to

7  work, you don't want to work out at that level.  You want to

8  work at closer to 18 inches, 20 inches, in that range, maximum.

9  BY MR. WOHL:

10 Q.  Doesn't the literature in ergonomics indicate that, when

11 considering reach distance, the normal working area is actually

12 only 13 to 17 inches while seated?

13 A.  Again, that's when they're -- not reach distance.  Not

14 reach distance, no.

15 Q.  And that the reach distance for a normal working area when

16 standing is 18 to 21 inches?

17 A.  Again, when you're talking about reaches versus when

18 they're manipulating things.  That's the difference.  And I'm

19 having trouble with which situation -- scenario you're

20 defining.

21 Q.  Let me show you, Doctor, a document that's called

22 "Cumulative Trauma Disorders, the Manual for Musculoskeletal

23 Diseases of the Upper Limbs" edited by Vern Putz-Anderson.  Two

24 pages.

25     **MR. WOHL:**  And I guess we'll mark that Exhibit 381, if

1  I may.

2          **MR. MATTHEW RIGHETTI:**  Your Honor, we would object for

3  the same reasons that we've already had this discussion with

4  the previous exhibit.

5          **THE COURT:**  All right.

6          **MR. WOHL:**  If I could get a little latitude, your

7  Honor, I think this will fit within your definition of

8  impeachment.

9          **THE COURT:**  Well, you need to -- there are only two

10 ways -- I'm going to use the rules of evidence to rule on this.

11 So you can try to lay your foundation.  I can't say never.

12     You can try to lay the foundation to be able to use this,

13 but I want to again emphasize merely because it's a document

14 that tends to help your side does not make it impeachment.

15     All right.  Go ahead.

16         **MR. WOHL:**  Thank you, Your Honor.

17 **BY MR. WOHL:**

18 **Q.**  Do you recognize this document?

19 **A.**  Yes, I do.

20 **Q.**  Can you tell the Court what it is, please?

21 **A.**  It was a little pamphlet where -- a small book that Vern

22 Putz-Anderson did, I think in the early '90s, if I'm not

23 mistaken, on musculoskeletal diseases and injuries.

24 **Q.**  And who is Vern Putz-Anderson?

25 **A.**  He's an ergonomist.

1   **Q.**   And can you turn to the second page.

2   **A.**   Yes.

3   **Q.**   And can you describe for the Court what the second page

4   is.

5   **A.**   Yes.   That's a diagram showing some reaches.

6   **Q.**   And it's entitled "Figure 28, Graphic Aid for Estimating

7   Reach Distances for Sitting or Standing Average Worker."

8   Correct?

9   **A.**   Correct.

10  **Q.**   And it shows someone sitting and it shows someone

11  standing, correct?

12  **A.**   Yes, a male standing and a female sitting.

13  **Q.**   And it shows a reach for both, correct?

14  **A.**   What it defines here, yes.

15  **Q.**   And what is the reach that it shows that is the maximum

16  average reach, which I presume would be the -- forgetting what

17  the right term is, but sort of the outer point of the circle

18  for the female?

19          **MR. MATTHEW RIGHETTI:**   Your Honor --

20  **BY MR. WOHL:**

21  **Q.**   For the seated employee, I should say.

22          **THE COURT:**   What is the objection?

23          **MR. MATTHEW RIGHETTI:**   He's walking through the

24  exhibit.

25          **THE COURT:**   Sustained.   You're having the witness read

1   from something that is not in evidence and is not impeachment.

2          MR. WOHL:  All right.  Well, I'll get to that in a

3   moment then, your Honor.

4   BY MR. WOHL:

5   Q.   Is it correct that Dr. Putz-Anderson is indicating that

6   the reach for the seated individual is 17 inches and the reach

7   for the standing individual is 21 inches?

8          THE COURT:  Sustained.

9          MR. MATTHEW RIGHETTI:  That objection was just

10  sustained.

11         THE COURT:  Sustained.  Exactly so.  Mr. Wohl.

12         MR. WOHL:  Your Honor, I'm trying to lay the

13  foundation for impeachment, and I can't do that unless I get

14  him to agree what this shows.

15         THE COURT:  First you have to show that this witness

16  has somewhere cited to or adopted this particular article in

17  the past and that he -- something like that.  At least get

18  close to that.

19         MR. WOHL:  That's what I'm prepared to do, your Honor.

20         THE COURT:  No, you're not.  You're reading in all of

21  the contents into the record.

22         MR. WOHL:  Well, your Honor, I'll do whatever you

23  want, but I have to establish this is what it says.

24         THE COURT:  No, that comes last.  You get to hit the

25  home run at the end of the lay the foundation.  You have to lay

1  the foundation first.  You don't get to make the home run first

2  and then forget about foundation.  Do the foundation first.

3          MR. WOHL:  All right, your Honor, thank you.

4  BY MR. WOHL:

5  Q.   Do you recognize the book I'm holding, Dr. Johnson?

6  A.   Yes, I do.

7  Q.   And that's your textbook that you described yesterday,

8  correct?

9  A.   That I'm the second author on.

10 Q.   "Work Design, Occupational Ergonomics, Stephen Konz,

11 Steven Johnson, Second Edition."  Correct?

12 A.   Correct.

13 Q.   I'm going to show you an excerpt from that book and we'll

14 mark that as Exhibit 382.  Two, yes?

15      Do you recognize Exhibit 382 as a reproduction of certain

16 pages from your textbook?

17 A.   Yes.

18 Q.   And if you turn to page 211.

19 A.   Yes.

20 Q.   Do you see in the upper right-hand corner Figure 11.32?

21 A.   Yes.

22 Q.   11.32 is entitled "Approximate Reach Distances For Average

23 U.S. Workers, Male and Female"?

24 A.   Yes.

25 Q.   Do you recognize that diagram?

1  A.   Yes.

2  Q.   In fact, that's the exact same diagram that appears in

3  Exhibit 381 by Mr. Putz-Anderson, correct?

4  A.   Correct.

5  Q.   And that diagram, put in your textbook, says that the

6  average reach for a seated individual is 17 inches, that is the

7  maximum normal reach.  And the maximum normal reach for a

8  standing individual is 21 inches.  Correct?

9  A.   The reason for this was to illustrate, if you read the

10 text --

11          THE COURT:  Wait, wait.  He's asking --

12          THE WITNESS:  Yes.

13          THE COURT:  -- is it exactly the same diagram?

14          THE WITNESS:  Yes.

15          MR. WOHL:  All right.  Thank you, Your Honor.  I move

16 to --

17          THE WITNESS:  But I better have --

18          MR. WOHL:  There's no question pending, your Honor.

19          THE COURT:  Well, you can put in his diagram.  That

20 doesn't -- does he cite to this article as where the source of

21 the diagram?

22          MR. WOHL:  Yes, right here, your Honor.  Source, V.

23 Putz-Anderson, edit, Cumulative Trauma Disorders, copyright

24 1988, right at the bottom.  It's the same diagram.

25          THE COURT:  Is that it?  You cited from this very

1    article?

2           THE WITNESS:  Yes.

3           THE COURT:  All right.  Well, then this exhibit comes

4    into evidence --

5           THE WITNESS:  Oh --

6           THE COURT:   -- as impeachment.

7       What is the exhibit number, 381?

8           MR. WOHL:  So I believe 381 was the original

9    Putz-Anderson excerpt.  And 382 -- do I have that right?

10          MR. ADKINS:  Yes.

11          MR. WOHL:  -- is the work design expert, your Honor.

12          THE COURT:  All right.  I'll put both of those in.

13      Now, if you want to explain that, go ahead.  Take your

14   time and explain whatever it is you want to explain.

15          THE WITNESS:  Okay.  I would like to go back to make

16   sure I know what the question was that I just said yes to.

17          THE COURT:  That these diagrams all are the same.

18          THE WITNESS:  Oh, yes, yes.

19          THE COURT:  Did you want to modify that in some way?

20          THE WITNESS:  The reason -- the first author is the

21   one that put this in.  When I came into the textbook, this was

22   already in there.  And what this was illustrating in the

23   textbook is how you have to drop off the horizontal reach as

24   the person goes above or below the shoulder level.

25          Could we put this on the --

1          THE COURT:  Are you saying that the -- you're blaming

2   your coauthor and saying somehow this is inaccurate information

3   in your own book?

4          THE WITNESS:  No, it's not inaccurate information.

5   The reason we put this material -- he put this material in --

6   and I've checked on that -- is to indicate how the horizontal

7   distance changes as you go from your shoulder down and your

8   shoulder up.

9          THE COURT:  But do you stand by the information in

10  your own book, regardless of who put it in there?

11         THE WITNESS:  There are aspects of this that are

12  illustrative of what we were talking about and there are

13  aspects of this that were not.

14      Could you look --

15         THE COURT:  Can you answer my question?

16         THE WITNESS:  Yes.

17         THE COURT:  I said, Do you stand by the accuracy of

18  the information in your own book, even if the other guy put it

19  in there?

20         THE WITNESS:  The text part, yes.  Other ways of

21  interpreting this diagram, not necessarily.  This text

22  refers --

23         THE COURT:  All right.  So maybe there's an issue of

24  interpretation of your own book that you wouldn't agree with.

25  That's what you're saying.

 1              THE WITNESS:  Yes.  Oh, yes.

 2              THE COURT:  All right.  Go ahead.

 3    BY MR. WOHL:

 4    Q.   Isn't it true, Dr. Johnson, that some literature puts out

 5    even a more conservative recommendation for maximum reach

 6    distances than what Dr. Putz -- what Putz-Anderson shows in the

 7    documents we've just been through?

 8              MR. MATTHEW RIGHETTI:  It miss --

 9              THE COURT:  What?

10              MR. MATTHEW RIGHETTI:  Mischaracterizes the evidence

11    as maximum reach distance.

12              THE COURT:  Well, no --

13              MR. MATTHEW RIGHETTI:  I can bring that up on

14    redirect, your Honor.

15         THE COURT:  That's a different objection that I don't

16    sustain.  Overruled.

17         Please go ahead.

18              THE WITNESS:  Yes, there probably are.

19    BY MR. WOHL:

20    Q.   For example, Cal-OSHA says that the reach distance for

21    sitting is 15 inches, and 18 inches for standing, correct?

22    A.   I am assuming that you are reading that correctly.

23    Q.   You do agree, do you not, that an individual's actual

24    reach is longer when he or she is standing and can rotate his

25    hips than when he is seated on a nonrotating chair or stool?

 1   **A.**   If he's standing up against the surface, how does he

 2   rotate his hips?

 3   **Q.**   Well, you tell me.

 4        **THE COURT:**  Twist.  You know, when I'm standing with

 5   my feet fixed, I can rotate 45 degrees both ways.  Come on, you

 6   know --

 7        **THE WITNESS:**  You can do that when you're sitting as

 8   well, sir.

 9        **THE COURT:**  Well, that's a different point.

10        **THE WITNESS:**  Okay.

11        **THE COURT:**  But he asked when you're standing up, you

12   can rotate a little this way.  You can rotate even though your

13   feet are planted on the ground.  We all do that.

14        **THE WITNESS:**  But he said at the hips.  And my --

15        **THE COURT:**  Where else is it?

16        **THE WITNESS:**  It's above -- my hips are staying

17   virtually in the same position doing this or -- I think that's

18   the distinction that he's getting at, I guess.

19        Go ahead.  I'm sorry.

20   **BY MR. WOHL:**

21   **Q.**   I'll try to restate it.  Maybe I can state it more

22   similarly.  Don't you agree -- restate that.

23        It is true that if you're standing for rotation, you can

24   extend your reach further than what you could accomplish

25   sitting even if you rotate?

1   **A.**   If your hips are not constrained while you're standing,

2   that would be the case.

3   **Q.**   Now, your view is that a cashier would not experience any

4   back or shoulder or neck discomfort from performing in a seated

5   position, depending if they did something to cause that,

6   because if they started feeling that, they would simply get up

7   and not perform the duty in a seated position, correct?

8   **A.**   If they started feeling discomfort because of sitting, I

9   think they would stand.

10  **Q.**   So your view is that, as soon as people experience pain or

11  discomfort, then they will get up to avoid that?

12  **A.**   When you say, "as soon as," there's a temporal aspect of

13  that.

14  **Q.**   As soon as they experience it, as soon as it feels

15  uncomfortable, then they will just get up to perform this task

16  rather than just keep going with what I'm doing.

17  **A.**   I don't think people purposefully cause themselves pain.

18  **Q.**   Is that based on your experience?

19  **A.**   Yes.

20  **Q.**   But you have not done any empirical data to support that,

21  correct?

22  **A.**   I have many years of experience as an ergonomist.

23  **Q.**   And isn't it true that sometimes injuries are not

24  immediately apparent; that is, you actually are injuring

25  yourself, but you don't even know it because you don't

1   experience any immediate pain?

2   **A.**    Injuries -- what type of task?

3   **Q.**    Any sort of task.

4   **A.**    Yes, as a general statement, yes.

5   **Q.**    And, in fact, that's the whole issue with cumulative or

6   repetitive injuries, that people do not realize they're doing

7   something that can be causing that injury until, in effect,

8   it's too late.  They've already done enough harm to themselves

9   that they now experience the pain or discomfort?

10  **A.**    No, usually they have discomfort and continue through the

11  discomfort.  The system -- the system -- if I can?

12            **THE COURT:**  Go ahead.  Give your example.

13            **THE WITNESS:**  The system goes from effort to fatigue

14  to discomfort to pain to injury to disability.  There are many

15  different stages as you go through that, all the way from

16  effort to fatigue to discomfort -- effort to fatigue to

17  discomfort to injury to pain to injury to disability.

18      The point is, we would like to stay much at the low level

19  of that.  We obviously don't want to get to just -- we don't

20  want people to experience disability.  By don't want them to

21  experience injury.

22      Effort and fatigue are things we pay for.  That's what,

23  actually, part of doing work is, is actually expending energy

24  and effort.  And, in fact, some amount of fatigue is not bad as

25  long as there's a recovery time that is sufficient to recover

 1  from that fatigue.  But -- so it depends on where we are on

 2  that continuum.

 3  **BY MR. WOHL:**

 4  **Q.**   But my question was far simpler than what you just said.

 5  I was simply asking:  Isn't it correct that some workplace

 6  injuries are cumulative, which means that they are not

 7  observable until after some period of repetitive actions?

 8  **A.**   And what I am saying is I believe in the cumulative

 9  trauma --

10          **MR. WOHL:**  I think I'm entitled to an answer, your

11  Honor.  He's not giving me an answer.  He's going on to

12  something else.  I think I'm entitled to a yes or no to that

13  question.

14          **THE WITNESS:**  I guess "no" is the answer then, at that

15  point, depending on how you're defining.

16  **BY MR. WOHL:**

17  **Q.**   Well, in deposition in the *Hall versus Rite-Aid* case,

18  didn't you testify just the opposite, Doctor?

19  **A.**   I...

20  **Q.**   Okay.  There we go.

21          **THE COURT:**  How much longer do you have on

22  cross-examination?

23          **MR. WOHL:**  I would estimate, your Honor, maybe 15

24  minutes, tops.  I'm almost done.

25          **THE COURT:**  We are going to continue on until we

 1 finish your cross and then we'll take our break.

 2          MR. WOHL:  Thank you, your Honor.

 3          THE COURT:  But I feel like we ought to be making more

 4 progress here.  And I'm not blaming anybody, but we are -- this

 5 is dragging along.

 6          MR. WOHL:  All right, your Honor.  I appreciate that.

 7 And I am cutting portions out to try to facilitate it quicker.

 8     So I'm going to read now from Dr. Johnson's deposition in

 9 the *Hall versus Rite Aid* case taken on January 27, 2012.  And

10 I'm going to start on page 147, line -- actually, hold on one

11 second.  I want to make sure I have the right cite here.

12     You know what, your Honor, in the interest of time I'm

13 going to skip that.

14          THE COURT:  Good.

15 BY MR. WOHL:

16 Q.   Now, it's correct that you recommend training to inform

17 and direct employees about ergonomic dangers, correct?

18 A.   Yes, that would be a general statement.

19 Q.   But it is true that in your experience, even after

20 training, sometimes people don't do what they've been trained

21 to do?

22 A.   People can do things they're not supposed to do, yes.

23 Q.   And that's why you recommend supervision as well as

24 training?

25 A.   In general, yes.

1  Q.   In your textbook you wrote that, "It's hard to get people

2  to move their feet instead of twisting," correct?

3  A.   Many times -- yes.

4  Q.   Therefore, isn't there a risk that what would happen if

5  cashiers sat is that they would simply twist instead of

6  standing to perform a task?

7  A.   No, they do that standing right now.  They will twist and

8  we experience a lot of twist standing.  When they're on a

9  swivel seat, then they will swivel as opposed to twisting.  It

10  reduces the amount of twist to the body.

11  Q.   But they could twist in the seated stool instead of

12  getting up on their feet because the tendency would be, I'm

13  already seated, I'll just stay seated to perform the task,

14  rather than the getting up on my feet as I should?

15  A.   That's not a twist issue because they're rotating.  So the

16  twisting will be reduced.

17  Q.   But wasn't the whole point of your statement in the book

18  that it's hard to get people to move their feet instead of

19  twisting?

20  A.   No, that's like the standing situation.  I'm representing

21  there the standing -- that's why we look at the swivel and the

22  benefit of a swivel stool over the standing is because you have

23  more stress to the person's lower back because they're twisting

24  to turn to the POS today.

25  Q.   Dr. Johnson, you can't say that there would be no impact

324

1   on customer perceptions if Kmart cashiers sat, correct?

2   **A.**   I don't have any data on that.

3   **Q.**   Don't have any expertise in customer service, correct?

4   **A.**   No.

5   **Q.**   Or retail marketing?

6   **A.**   No.

7   **Q.**   Is it also correct that you've not obtained any

8   anthropometric data about the Tulare cashiers?

9   **A.**   No, that was not necessary.

10  **Q.**   And just so we're clear, can you explain to the court what

11  anthropometric data are?

12  **A.**   Body dimensions.

13  **Q.**   And what would be those dimensions in terms of body

14  dimensions?

15  **A.**   Height, elbow sitting height, eye height.  Those types of

16  dimensions.

17  **Q.**   How about girth?

18  **A.**   Yes.

19  **Q.**   Can you define girth for the Court?

20  **A.**   Well, trying to think.  Generally, girth isn't in the

21  data.

22  **Q.**   Can you define girth first?

23  **A.**   How big a person is around is how I would define girth.

24  **Q.**   How about thigh thickness?

25  **A.**   There's thigh depth.

 1  **Q.**   If that's the term you prefer, "thigh depth," then explain

 2  to the Court what the thigh depth is.

 3  **A.**   Is the distance from the top to the bottom of the thigh

 4  when you're sitting, or if you're standing, from the front to

 5  the back of the thigh.

 6  **Q.**   And do you agree that a person could be more thick or less

 7  thick in the thigh regardless of the person's height?

 8  **A.**   Yes.

 9  **Q.**   Are you familiar with Kmart's ergonomist, Dr. Fernandez?

10  **A.**   Yes.

11  **Q.**   And do you know him to be a qualified expert in

12  ergonomics?

13  **A.**   Yes.

14       **MR. WOHL:**  Your Honor, could I have one moment before

15  we close?

16       (Defense counsel confer off the record.)

17       **MR. WOHL:**  All right, Your Honor, in the interest of

18  time I think I'll close right there.  Thank you.

19       **THE COURT:**  Thank you.  All right.  We'll take a

20  15-minute break.  You are now off of cross-examination.  You're

21  free to talk to lawyers at this point if you wish.

22       We will take a 15-minute break and come back soon.  Thank

23  you.

24       (Recess taken from 9:20 to 9:38 a.m.)

25       **THE COURT:**  Here's your time so far.  The plaintiff

 1  has used 100 minutes.  The defendants used 182 minutes.  Each

 2  side is allocated 720.  When you run out, you run out.  So make

 3  sure you marshal your time effectively.

 4          **MR. WOHL:**  I'm sorry, your Honor, I didn't quite

 5  understand that math.  You said each side has 720 left?

 6          **THE COURT:**  720 minutes, that's 12 hours.

 7          **MR. WOHL:**  Oh, sorry.

 8          **THE COURT:**  Twelve hours of time.  I keep track by the

 9  minute so that each side -- then I like to tell you every now

10  and then what I have.

11      So where's our witness?  We need to resume.

12          **MR. MATTHEW RIGHETTI:**  Our clock can be running.  He

13  forgot he didn't go to the restroom so he's going to the

14  bathroom real quick.

15          **THE COURT:**  All right.  We'll wait for him.

16      Is there anything we can do while he's away?

17          **MR. MATTHEW RIGHETTI:**  I can take the stand.

18          **THE COURT:**  Go right ahead.

19          **MR. ADKINS:**  Your Honor, there's the issue of the

20  video if we wanted to take that up, that Mr. Righetti had

21  raised.

22          **THE COURT:**  What's that issue?

23          **MR. ADKINS:**  As I understand it, they have an

24  objection to disclosure of video that we wanted to play on

25  cross-examination with the cashier witnesses.

PROCEEDINGS

1          **THE COURT:**  Does it show one of the witnesses?

2          **MR. ADKINS:**  Yes, Your Honor.

3          **THE COURT:**  If it shows the witness, it's proper

4    cross-examination.  That's proper.  It shows the witness

5    herself.  It's like the person who claims to have -- be

6    disabled and the insurance company goes out and shows them

7    playing tennis in a video.  That happens all the time.  That's

8    proper cross-examination.

9          **MR. MICHAEL RIGHETTI:**  Thank you, Your Honor.

10       The plaintiff's concern is trying to get everybody to play

11   by the same rules according to the Court's guidelines in the

12   standing order.

13         **THE COURT:**  You can do the same thing.

14         **MR. MICHAEL RIGHETTI:**  And so --

15         **THE COURT:**  Do you have a video of their people?  You

16   can show it too on cross-examination.

17         **MR. MICHAEL RIGHETTI:**  Sure, your Honor.  I'm pointing

18   the Court to the specific guideline that we identify the

19   exhibits that we're going to use on direct by a certain time

20   and then the defendant identifies the exhibits it will use on

21   cross by a certain time.

22         **THE COURT:**  Yes, those are --

23         **MR. MICHAEL RIGHETTI:**  This morning -- I want to focus

24   the Court on what happened this morning at 7:00 a.m. when

25   defendants' technicians and paralegals ran into the courtroom

```
 1   to supplement Exhibit 218 with a bunch of individual disks that

 2   had not been in the file before and had not been turned over to

 3   us.  So this morning at 7:30 is the first time that we've

 4   seen --

 5              THE COURT:  Cross-examination material -- that's not

 6   true.  I was about to make a mistake.

 7       True impeachment material does not have to be disclosed at

 8   all.  That's the -- you can hide -- keep -- hide behind some

 9   video and not let the other side know it's coming if it's true

10   impeachment.

11       And by "true impeachment," I mean something that is

12   something they signed before or a video of that very person.

13   That will be okay.

14       But what you cannot try to masquerade as true impeachment

15   is case-in-chief material that helps your -- are you listening

16   to me?

17              MR. MICHAEL RIGHETTI:  I am, your Honor.

18              THE COURT:  Then why are you talking to Mr. Righetti?

19              MR. MATTHEW RIGHETTI:  Pardon me, your Honor.  That's

20   my fault.  I'm sorry.

21              THE COURT:  Yes, it is.  When the judge is talking to

22   the person right there, you ought not come up and start

23   whispering -- do you want to hear what I have to say?

24              MR. MICHAEL RIGHETTI:  Absolutely.

25              THE COURT:  All right.  What I have to say is, on
```

PROCEEDINGS

1  cross-examination there are two categories of material that

2  sometimes gets used.  One is true impeachment.  That does not

3  have to be disclosed, period.  But I want you to know that I

4  thought Mr. Wohl -- some of that stuff he used was not true

5  impeachment, some of it was.

6      On the other hand, there is case-in-chief material that

7  happens to be usable and brought in through that witness on

8  cross-examination, even though all it does is generally support

9  the themes of your case.  If that is disclosed, that can be

10  used, subject to other objections, of course.  But that can be

11  used.

12      Now, you seem to be complaining that these videos were

13  only disclosed to you this morning.  But if it's true

14  impeachment, it did not have to be disclosed at all.

15          MR. MICHAEL RIGHETTI:  I'm absolutely comfortable with

16  the distinction.  They identified those as exhibits they --

17  that they were going to use to cross-examine, not to impeach.

18  We don't know what they're going to use to impeach.

19          THE COURT:  Maybe they gave you a gift by giving you a

20  head's up on something they didn't have to.  But I'm going to

21  follow my guideline.  I've told you what the guideline is.  I'm

22  positive it's the correct way that trial lawyers have

23  understood impeachment versus -- especially if you did a lot of

24  criminal work, you would understand what real impeachment is.

25      Civil lawyers, who don't do much criminal work, think that

1  anything that generally contradicts the other side's case is

2  impeachment.  That is baloney, baloney, baloney.  It's not

3  impeachment.

4      It has to be something they signed, something they

5  adopted, something very close to that.  A video is good enough

6  if it shows that very person.  If it's a video of somebody

7  else, no.

8          **MR. ADKINS:**  Yes, Your Honor.

9          **THE COURT:**  All right.

10         **MR. ADKINS:**  One point, Your Honor, just to be clear,

11 we did disclose these videos yesterday before 2 o'clock,

12 according to the Court's orders.

13     As I understand it now, Mr. Righetti's issue is that we

14 have pulled clips out so that we can efficiently show them to

15 the witness for a minute or less rather than hours of video.

16 That's, I think, the only distinction we are talking about.

17         **MR. MICHAEL RIGHETTI:**  You are incorrect, counsel.

18 You did not disclose them before 2 o'clock.  You disclosed them

19 yesterday evening and then you finally provided us with the

20 videos today.  I have the e-mail right here in my folder.

21         **MR. ADKINS:**  As do I have.  We disclosed, as they did

22 with us, in writing to them with Exhibit 218.

23         **THE COURT:**  What do my guidelines require?  What time

24 of day does my guideline require?

25         **MR. ADKINS:**  2:00 p.m.

PROCEEDINGS

```
 1            THE COURT:  Did you do it by 2:00?

 2            MR. ADKINS:  At 1:51, your Honor.

 3            THE COURT:  Mr. Righetti is saying that's not true.

 4   What do you want me to do about this?

 5       Show me the e-mail with the time stamp on it, if this even

 6   matters.

 7            MR. ADKINS:  Can I hand this to the clerk, your Honor?

 8            THE COURT:  Yes.

 9       I'm looking at an e-mail that has a 1:53 p.m.

10            MR. ADKINS:  And the one below it, your Honor.

11            THE COURT:  There's another one that says 1:50 p.m.,

12   Tuesday, November 13.

13       Have you seen this, Mr. Righetti?  Is this sufficient or

14   is this not on point?

15            MR. MICHAEL RIGHETTI:  Your Honor, I have the e-mail

16   where counsel identifies the excerpts of the video that they're

17   going to show.  It was yesterday evening.

18            MR. ADKINS:  What happened, your Honor, is we

19   disclosed -- you can see that in the e-mail.  We disclosed

20   Exhibit 218, the video of cashier Hyatt, for example, by 1:50.

21       They then called later at about 5:00 p.m. and said that

22   they wanted more information, as I understand it, so we gave

23   them more information about it with start and stop times and

24   additional information by 6:30.

25            MR. MICHAEL RIGHETTI:  That's the one I'm talking
```

 1  about, 6:30 p.m.  And then I actually got the excerpts this

 2  morning in hard copy.

 3          THE COURT:  But the excerpts are only part of a larger

 4  thing they did disclose on time.

 5          MR. MICHAEL RIGHETTI:  Which is hours and hours and

 6  hours and hours and hours of video.

 7          MR. ADKINS:  This is an exhibit, your Honor.  They've

 8  had this for --

 9          THE COURT:  Well, does the entire Exhibit 218 show the

10  same person?

11          MR. MICHAEL RIGHETTI:  No, Your Honor.  It shows all

12  of the class members, all of the current employee cashiers.  I

13  mean, what are we supposed to do with that?  We can't prepare

14  our witnesses.  We can't -- we don't know which person is

15  which.

16          THE COURT:  Well, how long is 218?  How many hours is

17  it?

18          MR. ADKINS:  Very large number of hours, your Honor.

19          THE COURT:  Like a hundred?

20          MR. ADKINS:  I don't know the exact number, your

21  Honor.

22          THE COURT:  How many hours?  Come on, you're dodging.

23      How many hours is it, Mr. Righetti?

24          MR. MICHAEL RIGHETTI:  I don't even know it's so many

25  hours.

 1          **MR. ADKINS:**  Your Honor, we disclosed which particular

 2   cashier we were referring to.  When they asked for the start

 3   and stop times, we gave it to them.  It's a few minutes or

 4   less.  It's their witness and it's an exhibit that has been

 5   disclosed since September.

 6          **MR. MICHAEL RIGHETTI:**  If they want to use it to

 7   impeach the witness, I know I can't object to that.  But if

 8   they want to use it for normal cross-examination, that's not

 9   playing by the same rules.

10          **THE COURT:**  Okay.  Are you trying to get it into

11   evidence?

12          **MR. ADKINS:**  We'd like to, your Honor, but if your

13   Honor does not -- that seems easier.  I don't -- it's my

14   understanding they don't even object to its admissibility.

15          **THE COURT:**  See, you lawyers are dodging the point.  I

16   want you -- something doesn't necessarily come into evidence

17   just because it's used for impeachment.

18      For example, let's say you ask the cashier the question,

19   Were you at work on a certain day?  And they say, yes, I was.

20   And you were hoping they would say no so you could impeach them

21   with the video.

22      Well, now that they've said yes, I was at work, that

23   doesn't -- you can't even bring it up.  There's nothing to

24   impeach.  That's your point.

25      Or let's say that they say, I never in my life -- I never

PROCEEDINGS                                      334

1   in my life twist 90 degrees to the left and you have video

2   showing them 90 degrees.  Well, then you could use it for

3   impeachment.  But if they said, yes, sometimes I do that, then

4   you can't impeach them.

5        So if you're going to use it for impeachment, it has to

6   contradict something that they've said under oath.

7            MR. ADKINS:  It's my expectation it would not be used

8   for impeachment, your Honor.  My expectation is it will show

9   simply what the cashiers do every day.

10           THE COURT:  Then if you're going to try to get an

11  excerpt in from a long document, you should have done it by

12  2:00 p.m.

13           MR. ADKINS:  We identified which cashier from that

14  video in the e-mail at 1:50.  And when they inquired, we gave

15  them the specific start and stop times.  Some of them are less

16  than 30 seconds.

17           THE COURT:  You gave them that information after the

18  fact.  I'm going to let you get away with it this time.  I'm

19  going to give Mr. Righetti equal latitude next time you have a

20  default.  But going forward, by 2:00 p.m., give them the

21  specific information instead of hiding it in a jungle of very

22  long video.

23       Here, Dawn, I'm giving you this back.  I don't need to see

24  this.

25       It's time to move on.  Let's go.  Let's go.

1           MR. MICHAEL RIGHETTI:  Thank you.

2           MR. ADKINS:  Thank you, Your Honor.

3           THE COURT:  Mr. Righetti, do you have any redirect

4    examination of this witness?

5           MR. MATTHEW RIGHETTI:  I do.

6           THE COURT:  Please, go ahead.  Time is running.

7                        **REDIRECT EXAMINATION**

8    BY MR. MATTHEW RIGHETTI:

9    Q.   Dr. Johnson, can you explain for us what the concerns are

10   from an ergonomic perspective of prolonged standing?

11   A.   Fatigue in the legs, swelling of the ankles.  There's a

12   lot of research and literature on prolonged standing that

13   causes heart problems, edema, knees problems.

14          THE COURT:  How about varicose veins?

15          THE WITNESS:  Varicose veins was just on my lips.

16   Varicose veins is a big one, indeed.

17          But, beyond that, far beyond that, from my standpoint as

18   an ergonomist, is the fatigue and the discomfort going up in

19   that continuum, and that's at the injury and the disability

20   stage.

21          What I'm more concerned about, or as concerned about, are

22   down toward the fatigue, effort, pain, that side before it

23   causes injury.  The literature indicates the injury.  There's a

24   lot more of a problem, also, that is just the discomfort to the

25   people.

1   BY MR. MATTHEW RIGHETTI:

2   Q.   And you were shown a exhibit yesterday from Mr. Wohl that

3   had to do with your Wal-Mart work.  And I think there was

4   two -- I'm trying to figure out the right number of the

5   exhibit.

6        I want to show you the e-mail and ask you whether the

7   e-mail that Mr. Wohl had referenced included a photo which was

8   not included with the exhibit that he had given you.

9             MR. WOHL:  Your Honor, I'm sorry, which exhibit are we

10  referring to?

11            MR. MATTHEW RIGHETTI:  Looking at the February 9,

12  2007, e-mail.

13            THE COURT:  What is the exhibit number?

14            MR. MATTHEW RIGHETTI:  377, your Honor.

15            THE COURT:  All right.

16            MR. MATTHEW RIGHETTI:  377, when it was provided to

17  Mr. -- to Dr. Johnson, included a photograph that Mr. Wohl had

18  left off the exhibit.

19  BY MR. MATTHEW RIGHETTI:

20  Q.   I guess that's my question.

21       Did the e-mail include a photograph?

22  A.   Yes, it did.

23  Q.   Okay.  Was that included in 377, which is the exhibit that

24  Mr. Wohl showed you yesterday?

25  A.   I don't believe so.

1    **Q.**    When you made comments about -- in Exhibit 377, in your

2    e-mail, were they comments in general or were they comments

3    with reference to something that was included in the e-mail

4    inquiry that had been made to you?

5    **A.**    I think, as I've stated in my testimony, that was related

6    to a particular stool that would not have been sufficient.

7    **Q.**    Do you see the picture -- in what I have given you, do you

8    see the picture of the stool that was part of the e-mail?

9    **A.**    I do.

10   **Q.**    Okay.  And what is it about that stool that you believe is

11   insufficient?

12   **A.**    That it is a standby stool.  It's not a lean stool.  One

13   of the things that I diagrammed -- gave you the diagram of is

14   the fact that for a lean stool to work, you have to have a

15   footrest and have an angle between the lower legs and the

16   footrest so that you can take some weight on your body.

17        This would simply tip over if that were the case.  And

18   that's why I was referring to it as not being stable.

19           **THE COURT:**  I'm sorry, I want to make sure I

20   understand this.  Could I see 377, the original e-mail.  Please

21   hand that up to me.  Make sure Mr. Wohl sees it.

22           **MR. MATTHEW RIGHETTI:**  I'm handing you my copy, your

23   Honor.

24           **THE COURT:**  I want to see the official copy.

25           **MR. MATTHEW RIGHETTI:**  I understand that.  Mr. Wohl

 1   has the original.

 2          THE COURT:  How can Mr. Wohl have the original?  The

 3   Court should have the original.

 4          MR. WOHL:  The Court has the original.

 5          MR. MATTHEW RIGHETTI:  377.

 6          THE COURT:  377.

 7          MR. MATTHEW RIGHETTI:  It's not over here.

 8          MR. MICHAEL RIGHETTI:  May I approach the witness?

 9          THE COURT:  Yes, you may.

10          MR. WOHL:  I'm sorry, your Honor.  Is there a

11   photograph that he's referring to or is he just describing the

12   photograph?

13          THE COURT:  There is a diagram, but it's not a

14   photograph really.

15       I would like to see 377 as used earlier by Mr. Wohl.

16   Somebody -- the lawyers should --

17       Dawn, you're in charge.  Where is 377?

18          THE CLERK:  I have no idea, your Honor.

19          MR. WOHL:  We marked it and used it.

20          THE COURT:  I want you lawyers to know -- I said this

21   earlier -- there's an official document.  It's the one that

22   goes to the Court of Appeals.  It has the tag on it.

23   Everything is supposed to be marked.

24       Mr. Righetti, I let him get away with not doing it the

25   right way yesterday.  This is an illustration of what happens

1   when you don't properly mark the documents.

2        I'm going to go off the bench.  When I come back, you need

3   to find Exhibit 377.

4        And, Mr. Righetti, have all of these documents you marked

5   yesterday, do they now have tags?

6            **MR. MICHAEL RIGHETTI:**  Yes, Your Honor.

7            **THE COURT:**  Proper tags?

8            **MR. MICHAEL RIGHETTI:**  Yes, Your Honor.

9            **THE COURT:**  All right.  I'm going to step off the

10  bench.  No one gets to go to the bathroom or anything else

11  until you find this 377.  Let me know when you find it.

12       (Recess taken from 9:54 a.m. to 10:02 a.m.)

13           **THE COURT:**  Let's get back to work.

14       Have we found Exhibit 377?

15           **MR. WOHL:**  Yes, Your Honor, I am proud to present it

16  to the Court properly marked.

17           **THE COURT:**  Where was it?

18           **MR. WOHL:**  I don't think it had been marked.

19           **THE COURT:**  All right.  I'm going to say this:  This

20  is going to be an ironclad rule.  This is not a deposition.

21  This is not a mock trial.  This is not a thing before some kind

22  of a dummy jury.  This is the real thing.

23       No exhibit will be shown to this witness or any other

24  witness until it is properly marked.  No more of this

25  Righetti-style put a little sticker on it.  That's not going to

1   work again.

2       Mr. Wohl, you should not have done it the way you did it.

3       **MR. WOHL:**  I apologize, your Honor.

4       **THE COURT:**  I want by the end of the day every single

5   document to be properly marked.  And from now on nothing gets

6   shown to that witness or any other witness unless it is

7   properly marked.

8       **MR. MATTHEW RIGHETTI:**  Your Honor, I understand.

9       **THE COURT:**  Enough said on that.

10      Now I want to go back to where we were.  377 does not have

11  any photograph attached to it.  Doesn't have any diagram

12  attached to it.  So let me see the add-on that you're trying to

13  add to this.

14      **MR. MATTHEW RIGHETTI:**  There are two e-mails that --

15  Mr. Wohl referenced two e-mails in the direct examination.

16  Both of those e-mails, when they came through the -- to

17  Mr. Johnson had photographs attached to them.  And those

18  photographs are now attached to the same e-mails, 383 and 384.

19  That's all we're showing, to put his e-mail response in

20  perspective.

21      **THE COURT:**  383 doesn't have any photo attached.  Oh,

22  yes, it does.  I'm sorry.  383 does.

23      **MR. WOHL:**  Just for clarification, your Honor, which

24  is which?  So one has a photograph of just a lean stool, the

25  other is a photograph of a gentleman leaning against --

 1          **THE COURT:**  Why weren't these attached to the document

 2  that you provided?

 3          **MR. WOHL:**  In fairness, I wasn't aware of them, your

 4  Honor.  I must have missed it.  The Brown deposition was huge

 5  and I did not realize it was missing.  There was no intention

 6  to omit it, I just missed it.  So I apologize.

 7          **THE COURT:**  Well --

 8          **MR. WOHL:**  I know it doesn't change anything.  It

 9  should have been in the first --

10          **THE COURT:**  It should definitely.  I don't like

11  incomplete documents.

12      All right.  Fine.  Let's continue on with your

13  examination.

14          **MR. WOHL:**  I'm sorry, just can I ask then:  Is this

15  384 or 383, Mr. Righetti?

16          **THE COURT:**  The document --

17          **MR. MATTHEW RIGHETTI:**  That's 384.

18          **MR. WOHL:**  Thank you.  That's all I needed.  Thank

19  you.

20          **THE COURT:**  Let's continue.

21  **BY MR. MATTHEW RIGHETTI:**

22  **Q.**   I'm showing you the originally marked trial exhibits 383

23  and 384.  Those have what attached to them?

24  **A.**   Uhm, I believe this is a capture from a web page on 383.

25  And 384, I think, was taken out -- out of a brochure for that

1  particular manufacturer of that lean stool.  It was a capture,

2  again, or a copy.

3  Q.   And your response to those e-mails, were they in relation

4  to what was attached to the e-mail that had come to you?

5  A.   Yes.

6  Q.   All right.  And your response was -- was what in relation

7  to the photograph that was attached?

8  A.   That I didn't think that particular design -- I thought it

9  would not be stable and I did not think it would work and I

10  didn't think people would use it a very high percentage of time

11  at all.

12  Q.   Who had suggested that as a possible alternative at

13  Wal-Mart?

14  A.   I'm not sure.  One of the engineers that we were working

15  with it had seen it.

16  Q.   Okay.

17  A.   Or it may come from -- may be part of the -- I'm sorry.

18  May be part of the sequence here.  I'm not sure.

19  Q.   All right.  Do you recall yesterday Mr. Wohl making a

20  reference to testimony of yours as to whether it had been

21  struck by Judge Anello in the CVS case?

22  A.   Yes.

23  Q.   I show you the same order that Mr. Wohl --

24       THE COURT:  Wait, has that got an exhibit number?

25       MR. MATTHEW RIGHETTI:  385.

 1            THE COURT:  Is it official?  Is there an official tag

 2    on that document?

 3            MR. MATTHEW RIGHETTI:  No --

 4            THE COURT:  Well, you violated my order right off the

 5    bat.

 6            MR. WOHL:  Your Honor, if you might recall,

 7    Dr. Johnson told me he knew nothing about the order and,

 8    therefore, I could not introduce it into evidence because it

 9    had no foundation.

10            THE COURT:  That's true.

11            MR. WOHL:  I don't know how he's going to get it in

12    this time.

13            THE COURT:  That's true.  How can you show it to him

14    now, after he disclaimed any knowledge?

15            MR. MATTHEW RIGHETTI:  He didn't actually disclaim any

16    knowledge.  He said that he -- it refreshed his recollection

17    about whether his testimony had been struck.

18            MR. WOHL:  I beg your pardon, your Honor.

19            THE COURT:  Let me see the transcript.  Let me see the

20    transcript.

21            MR. MATTHEW RIGHETTI:  I refer the Court to the

22    underlying passages on the --

23            THE COURT:  Let me see the transcript --

24            MR. MATTHEW RIGHETTI:  Oh, I'm sorry.

25            THE COURT:  -- of what he said yesterday.

**MR. MICHAEL RIGHETTI:** I have it. Starting at page 177, I have a general frame of reference for where it is.

**MR. DOSTART:** Here it is. Here's the hard copy, if the Court would like to see it. It begins at the very bottom of the previous page.

**THE COURT:** I got it. What I'm seeing on page 178 is, he says:

"From memory, I cannot. From this document, it appears that it has."

And then I say:

"Well, that doesn't count. We're dealing with the witness and his memory. If you want to show and impeach him in some other way that some other judge struck his testimony, more power to you. But this is not refreshing memory."

Then Mr. Wohl says:

"That's fine. I think I made my point."

Well, actually he did not make his point because it never got into evidence even though that was Mr. Wohl talking. But Mr. Wohl is correct, the witness said yesterday he had no memory of this.

So how do you get around that, Mr. Righetti?

**MR. MATTHEW RIGHETTI:** I suppose I don't.

**THE COURT:** You don't, yeah.

**MR. MATTHEW RIGHETTI:** I guess I've made my point,

 1   like Mr. Wohl made his point.

 2           THE COURT:  Unless overnight he's had a sudden burst

 3   of recollection, and now he remembers it with dazzling clarity

 4   that his testimony got struck.  So he's not going to say that.

 5           MR. MATTHEW RIGHETTI:  Well, it wasn't struck.  I

 6   mean, Judge Anello had some very glowing comments to make about

 7   Dr. Johnson -- that was our only point -- in that order.

 8       But that's fine, we can move on, your Honor.

 9           THE COURT:  Well, he doesn't remember the order.  He

10   would just be reciting from hearsay.

11           MR. MATTHEW RIGHETTI:  Judge Anello --

12           THE COURT:  Has your memory been refreshed overnight?

13           THE WITNESS:  No, sir.

14           MR. MATTHEW RIGHETTI:  I hope not.

15           THE COURT:  So then we will just move to something

16   else where he does remember.

17           MR. MATTHEW RIGHETTI:  All right.

18   BY MR. MATTHEW RIGHETTI:

19   Q.   Mr. Wohl asked you a number of questions about

20   modifications of the current Kmart configuration in Tulare.  Do

21   you recall that?

22   A.   Yes.

23   Q.   Did any of the cross-examination change your testimony

24   about whether the nature of the work that occurs at the Kmart

25   store in Tulare permits the use of a seat?

1   A.   No.

2   Q.   What does impede the use of a seat at the Kmart store in

3   Tulare?

4   A.   The nature of the configuration, I guess, is the -- that

5   is used right now, with a lack of leg space and the distance to

6   the -- a bagging table in particular.

7   Q.   So --

8            MR. MATTHEW RIGHETTI:   Dawn, can we pull up -- how do

9   I turn this on?

10           THE CLERK:   The Elmo, sure.

11      (Document displayed.)

12  BY MR. MATTHEW RIGHETTI:

13  Q.   I'm showing you Exhibit 9 on the -- Exhibit 9.  And you

14  understand this is a picture of the configuration of the

15  current Kmart in Tulare?

16  A.   Yes.

17  Q.   All right.  If you were designing this workstation as an

18  ergonomist from scratch, how would this workstation change?

19      In other words, would the -- would the cash register

20  station be where it's located?

21  A.   No.

22  Q.   So you can show on the screen what would happen to the

23  cash register station if you designed this workstation from

24  scratch given the nature of the work that occurs at the Kmart

25  in Tulare?

1  **A.**    Well, with a modern POS -- and I'm referring to the cash

2  register over here on the right-hand side as the POS -- I

3  would, as Aldi has, I would put the cash box right in between

4  the scanner and the cashier.  It's very handy at that point.

5      I would put the keyboard at this point right above this

6  (indicating) aiming toward the person.  And then I would get

7  rid of these (indicating), put them down at the other side so

8  that I could move things back to the customer from this area

9  right here (indicating) as opposed to taking it over to the

10  other area.

11      So I basically would move these components to right in

12  front of the person, which is the recommendation of the NIOSH.

13  **Q.**    When you say "these components," what are you referring

14  to?

15  **A.**    The components on the POS over here (indicating).

16  **Q.**    So mark an X through the components where they would not

17  be --

18          **THE COURT:**  I would suggest, for the Court of Appeals'

19  benefit -- I think this is important for appeal purposes -- you

20  ought to go back and put a 1, a 2, a 3 or something, because

21  it's incomprehensible.

22      I understand what you're saying, but the Court of Appeals

23  is not going to have a clue, because none of this -- even if we

24  take a picture of it, it's not marked in a way that -- you're

25  just saying "this" and "that."

```
 1        So start over and do 1, 2 and 3.  Let's take off those.
 2   All right.
 3   BY MR. MATTHEW RIGHETTI:
 4   Q.   All right.  So mark an X through where the -- where the
 5   cash register station would not be where it is today.
 6   A.   It would not be in this area, 1.
 7   Q.   Okay.  Where the X is located, correct?  And that's 1?
 8   A.   A 1.
 9   Q.   And where would the point of sale system be for the cash
10   drawer and the keyboard?
11   A.   Well, the cash box would be one that's made for a seated
12   operation, which there are many vendors that make that.  And it
13   would be between -- it would be in position 2, which is between
14   the cashier and the scanner.
15   Q.   And then you've also noted that the credit card machine
16   would be perhaps lower or rotatable?
17   A.   Yes.  This would come down and be rotatable.
18   Q.   Mark a 3 on the credit card.
19   A.   This would be lower and rotatable.
20   Q.   Okay.
21   A.   And I would move these items to position 4 on this side so
22   that they don't obstruct from the person being able to take the
23   material from this position after they're scanned.
24   Q.   And that's a configuration for a new check design?
25   A.   That would be a new check stand, without the constraints
```

1  that I assumed when I was working on that report.

2  **Q.**   Okay.  "Constraints" being have to modify the existing

3  design?

4  **A.**   Yes.

5  **Q.**   All right.  Is there any question in your mind about

6  whether a new check stand design can be created that would

7  accommodate a seat at the Kmart Tulare store?

8  **A.**   No.

9  **Q.**   Is there any question in your mind about whether that

10  would be beneficial to employees?

11  **A.**   No.

12          **MR. MATTHEW RIGHETTI:**  Okay.  Since we've gone to the

13  trouble of putting 1, 2, 3, 4 on this, your Honor, I think we

14  should probably ask Dawn to kindly --

15          **THE COURT:**  Are we done with it now?

16          **MR. MATTHEW RIGHETTI:**  I think we are finished.

17          **THE COURT:**  Please make a copy, Dawn, and let's make

18  that a part of the permanent record.

19          **MR. MATTHEW RIGHETTI:**  And that would be Exhibit 385.

20          **THE COURT:**  385?

21          **MR. MATTHEW RIGHETTI:**  Yes, Your Honor.

22          **THE COURT:**  All right.  Any objection to that coming

23  into evidence?

24          **MR. WOHL:**  No, Your Honor.

25          **THE COURT:**  Received.

```
 1         (Trial Exhibit 385 received in evidence.)

 2              THE COURT:  All right.  We need to put a tag on that

 3    as soon as it's in hard copy.

 4              THE CLERK:  Okay.

 5              MR. MATTHEW RIGHETTI:  Thank you.  Capture it?

 6              THE CLERK:  Yes.

 7              THE COURT:  All right.  Next question.

 8    BY MR. MATTHEW RIGHETTI:

 9    Q.   And, again, now putting up Exhibit 28E, which is in

10    evidence.

11         (Document displayed.)

12    BY MR. MATTHEW RIGHETTI:

13    Q.   Is this -- what is this?

14    A.   That's a cash register configuration where the keyboard is

15    on top of the cash box.

16    Q.   And that is -- is this the type of configuration you were

17    thinking about as part of a new design?

18    A.   No.

19    Q.   All right.  28P, is that the type of configuration you're

20    thinking of as part of a new design?

21    A.   Yes.

22    Q.   Okay.  And where -- under new design, where would that be

23    located in relation to the scanner?

24    A.   It is between the cashier and the scanner.

25    Q.   So how much -- under -- I'm sorry, go ahead.
```

1   **A.**   It can be to the left or the right.  In other words,

2   that's my optimum position.  But if that's not chosen -- and,

3   again, other people have an impact on this, the companies and

4   the vendors.  But it also could be on the left or the right.

5        But it is much handier as opposed -- this type of cash

6   box, and there are those made for U.S. currency that correspond

7   to this.  But this is much more efficient than the current cash

8   box that comes out of the POS.

9   **Q.**   So what is -- installing a cash box and point of sale

10  directly in front of the cashier between the cashier and the

11  customer, what does that do to the movements of the cashier as

12  compared to the movements that a Tulare cashier has today to

13  ring up a sale?

14  **A.**   Well, today, if they're standing there, they need to

15  either sidestep or to twist and then put the information into

16  the POS and then use the cash box to the right.

17       So they either have to sidestep and turn, and that was

18  what was in the textbook earlier; people tend to twist to do

19  that.  And, also, the other thing at Tulare at this point is

20  they have to reach quite high to get the objects, which, again,

21  I don't think would cause injury, but I do think adds to

22  fatigue and, over time, discomfort.

23       If I can, the other advantage of this, according to the

24  Aldi --

25            **MR. WOHL:**  I'm sorry, your Honor.  Mr. Righetti asked

 1  me to find an exhibit, so I think the witness shouldn't be

 2  testifying till we get another exhibit together.

 3      Did you find what you need, Mr. Righetti?

 4          **MR. MATTHEW RIGHETTI:**  No, I'm just looking for

 5  Exhibit -- I hate to say this again, but Exhibit 380, which

 6  Mr. Wohl moved into evidence.  But while they're looking, I'm

 7  going to keep going, your Honor.

 8          **THE WITNESS:**  The other advantage of this, from my

 9  understanding from Aldi, is that it keeps the cashier looking

10  at the customer all the time as opposed to turning sideways to

11  the customer, so it's a friendlier environment.

12  **BY MR. MATTHEW RIGHETTI:**

13  **Q.**  Okay.  There is a discussion that we had about whether the

14  seat would block the -- whether a seat would be a health hazard

15  as a customer got up and down.  And I'd like to explore that

16  just a little bit more.

17      When you do a -- what you've recommended is a sit/stand

18  option, right?

19  **A.**  Sit or stand.

20  **Q.**  Sit or stand.  Is it -- is it your belief that cashiers

21  can be trusted to make a decision about whether they sit or

22  stand to ring up sales at a Tulare Kmart?

23  **A.**  I have no reason to think cashiers would be any different

24  than all of the other sitting and standing operations that I've

25  designed over the years where they make the choice themselves

1   without a problem.

2   **Q.**   Okay.  So if a -- if a cashier chooses to stand for half

3   of their shift -- say you got a four-hour shift and a cashier

4   chooses to stand to do his or her work during, you know, the

5   two hours of the four-hour shift, what happens to the seat?

6   **A.**   The seat would be moved into Area 1 underneath the

7   counter.

8   **Q.**   Okay.  In that area is it completely out of the way?

9   **A.**   Yes.

10   **Q.**   Is it a hazard at all?

11   **A.**   Not at all.

12   **Q.**   If the cashier is sitting -- and I'm talking about, now,

13   working with a constraint that we have to modify, right?

14      We're talking about the constraint of modifying the

15   existing Tulare workstation, right?

16   **A.**   Yes.

17   **Q.**   So if a cashier has to -- wants to sit, but for some

18   reason has to get up to do a task such as grab the hand scanner

19   and scan something, how much does the seat stick out?

20   **A.**   Uhm, it would be about -- about two-thirds of the seat

21   would be in the aisle, I believe.

22   **Q.**   Okay.

23   **A.**   Not in the aisle, but in this area right here

24   (indicating).

25   **Q.**   Would there be room for the cashier to still maneuver in

1   the cashier box with two-thirds of the seat sticking out?

2   **A.**   Yes.  It's not something I would recommend if they were

3   going to do multiple transactions, but during a transaction --

4   a 24-inch seat is easily reached over without a problem.  It's

5   not a big obstruction.  Twenty-six.

6   **Q.**   Getting back to the Wal-Mart testimony yesterday, I think

7   you testified that Wal-Mart does not provide seats, correct?

8   **A.**   Correct.

9   **Q.**   Yesterday at direct examination we talked about ASDA,

10  correct?

11  **A.**   Yes.

12  **Q.**   And what is your understanding of the relationship between

13  ASDA and Wal-Mart?

14  **A.**   They are, I guess, a subsidiary.  I'm not sure of the

15  formal term, but Wal-Mart owns them, as I understand.

16  **Q.**   Showing you again Exhibit 28-F in evidence.  And we can

17  see on the -- on the right, right here, what does that say,

18  where my pen is?

19          **THE COURT:**  You need to blow it up.  Unless you have

20  Superman powers, it's impossible to read what that says.

21      It says ASDA, A-S-D-A.

22  **BY MR. MATTHEW RIGHETTI:**

23  **Q.**   And I think yesterday you testified that this is a picture

24  of what?

25  **A.**   This is a picture of a checkout station in -- outside of

1   London in the United Kingdom of an ASDA store.

2   **Q.**   And what does it show?

3   **A.**   It shows the cashier sitting and checking people out.

4   **Q.**   When you went and visited the ASDA in the UK, did you see

5   any difference in the nature of the work that's performed at

6   the ASDA in the UK as compared to Wal-Mart in the

7   United States?

8   **A.**   No.  The only difference is that at this particular one

9   they asked the people whether they would like to have it bagged

10  and then bag it if they would, whereas it's automatically

11  bagged in the United States.

12  **Q.**   Okay.  Can the cashier bag merchandise from a seated

13  position at the ASDA in the UK?

14  **A.**   Yes.

15  **Q.**   Okay.

16  **A.**   They do.

17  **Q.**   So the fact that they're seated does not impede their

18  ability to bag the merchandise at this workstation that we see

19  on this exhibit?

20  **A.**   No.  I did not observe them doing very much bagging.  In

21  fact, I did not observe them doing any bagging during the time

22  period that I observed, which was only an hour and a half.

23          **MR. WOHL:**  I'm sorry, your Honor, what was the

24  foundation for the statement that they would bag merchandise?

25  I thought he said he observed people bag, and so I'm confused.

1          THE WITNESS:  I'm sorry?

2          MR. WOHL:  Your Honor, I object because he's

3    established a lack of foundation for his statement that they

4    will bag upon customer request if he didn't actually observe

5    anybody bagging.

6    BY MR. MATTHEW RIGHETTI:

7    Q.   What does this cashier appear to be doing?

8          THE COURT:  Just a second.

9          Do you understand the problem?  You said that you did not

10   observe them doing any bagging.  So what do you base your

11   statement on that they would do bagging?

12         THE WITNESS:  The statements by the manager of the

13   store and the cashier that that was the policy; although in

14   this particular one, I think this person actually may have

15   bagged this small item and put it on the counter there.

16         THE COURT:  All right.  It's hearsay, but this is an

17   irrelevant.  The expert can rely upon hearsay, at least within

18   limits, and this is within limits.  Objection is overruled.

19         MR. WOHL:  I'm just saying, your Honor, it should not

20   be accepted as establishing the truth of what he just said.  It

21   may help form his opinion, but he can't represent to the Court

22   it's true because it is pure hearsay.  There's no exception for

23   experts getting hearsay evidence --

24         THE COURT:  He's entitled to have an opinion on the

25   subject of whether or not they bag stuff at that store.

 1  Overruled.  It's an opinion.

 2          MR. WOHL:  Your Honor, what I had asked to be marked

 3  as 380 turns out to have been previously marked as 371.  And I

 4  believe I did move 380 into evidence, but it was not officially

 5  marked for the same reasons we've had problems this morning

 6  with.

 7      So we either -- we should officially mark it as 380 or we

 8  should use 371, but we've got to clarify this so the record is

 9  clear what we're doing.

10          THE COURT:  May I see Exhibit 380.

11      I want you both to hand to me whatever you think was used

12  as 380 yesterday.

13          MR. MATTHEW RIGHETTI:  This is what Mr. Wohl handed

14  me.

15          THE COURT:  You two have to -- no.

16          MR. MATTHEW RIGHETTI:  I think we can reach a

17  stipulation on that.

18          MR. WOHL:  That one that your clerk handed as marked

19  371 was the same document that I referred to as 380, your

20  Honor.

21          THE COURT:  I wrote down 380 on the OSHA document.

22          MR. WOHL:  Right.  I did not realize that had been

23  previously marked as 371.  That is the source of the confusion.

24          MR. MATTHEW RIGHETTI:  We can either withdraw 371,

25  which is probably the easier way to go, and just leave 371 as a

 1  blank exhibit.

 2          THE COURT:  Has 371 been used yet?

 3          MR. MATTHEW RIGHETTI:  No.

 4          MR. WOHL:  Not as 371.

 5          MR. MATTHEW RIGHETTI:  It's not been referenced, has

 6  not been used.

 7          THE COURT:  All right.  Was 380 marked?

 8          MR. WOHL:  Not officially, your Honor, as I've now

 9  learned.  So, no, it was not.

10          THE COURT:  All right.  I'm taking 371 on your

11  representation that it's identical to 380, which was never

12  marked, contrary to the orders of the Court.

13      And I've now inked in "380" instead of "371."  371 will

14  not be used.  380 is already in evidence, and here it is.

15          MR. WOHL:  Thank you, Your Honor.

16          THE COURT:  Handing it back.

17          MR. WOHL:  Appreciate your understanding.

18  BY MR. MATTHEW RIGHETTI:

19  Q.   I would like to hand you 380.  And on page 6, there's a

20  paragraph that starts "Grocery stores," of Mr. Wohl's exhibit.

21  Do you see that?

22  A.   Yes.

23  Q.   Okay.  And what is that -- can you read that paragraph for

24  us?

25  A.   "Grocery stores that have implemented" --

1           **THE COURT:**  Please don't read so fast.  How do you

2    think the court reporter can possibly take down something read

3    that fast?  And, plus, for purposes of the poor judge being

4    able to even understand it, you need to slow down and read

5    slowly so I can hear each word.  So please slow down.

6           **THE WITNESS:**  Okay.  I will start over.

7           **THE COURT:**  Thank you.

8           **THE WITNESS:**  (Reading)

9           "Grocery stores that have implemented injury

10           prevention efforts focusing on musculoskeletal and

11           ergonomic concerns have reported reduced work-related

12           injuries and associated workers' compensation costs.

13           Fewer injuries can also improve morale, reduce

14           employee turnover, encourage employees to stay longer

15           and discourage senior employees from retiring early.

16           Workplace changes on ergonomic principles may also

17           lead to increased productivity by eliminating

18           unneeded motions, reducing fatigue and increasing

19           worker efficiency.  Healthier workers, better morale,

20           higher productivity can also contribute to better

21           customer service."

22   BY MR. MATTHEW RIGHETTI:

23   Q.    Is this consistent with your opinions in this case?

24   A.    It is.

25   Q.    And on page 15 of the same exhibit, Kmart's exhibit, the

1  second bullet point in the lower left, can you read that bullet

2  point?  It's very short.

3  **A.**    "A sit/stand stool will allow for changes in posture."

4  **Q.**    Okay.  And on page 17, the lower left bullet point starts

5  with "Consider."

6  **A.**    "Consider" --

7  **Q.**    First, let me put this in perspective.  Page 17, at the

8  top, says that it has to do with what position?

9  **A.**    The front end positions.

10 **Q.**    It says "Front End," and it says what underneath front

11 end?

12 **A.**    Checkout, bagging, and carryout.

13 **Q.**    It says, "Front end, checkout, bagging and carryout,"

14 right?

15 **A.**    Yes.

16 **Q.**    And is it your understanding that this page has to do with

17 that position?

18 **A.**    Yes.

19 **Q.**    And the box that's -- that we've highlighted down at the

20 bottom, can you read that?

21 **A.**    Consider using checkout -- checkstands designed with an

22 adjustable seat -- or sit/stand or lumbar support against which

23 cashiers can lean.

24 **Q.**    What's your understanding of that in relation to your

25 testimony here today?

1  **A.**   It's consistent with my opinions and testimony today.

2  **Q.**   All right.  Did any of the cross-examination that you went

3  through have any effect on your testimony about what the nature

4  of the work is at Kmart?

5      In other words, did you change your opinion about what

6  cashiers do at the checkout station at Kmart?

7  **A.**   No.

8  **Q.**   Does the fact that a cashier may work two hours or eight

9  hours in a shift or four and a half hours, as Mr. Wohl said is

10  on average, change the nature of the work?

11  **A.**   No.

12  **Q.**   Does the fact that a cashier may take a rest break in

13  compliance with California law change the nature of the work

14  for when they are working?

15  **A.**   No.

16  **Q.**   Does the fact that a cashier may take a lunch break in

17  compliance with California law change the nature of the work

18  for when a cashier is working?

19  **A.**   No.

20  **Q.**   Does the fact that a cashier may sit during their lunch

21  breaks or rest breaks change the nature of the work for when a

22  cashier is actually working?

23  **A.**   No.

24  **Q.**   Now, there was some question that the Court had -- or some

25  interest the Court had about the extent to which, from

1  reviewing and observing Kmart cashiers, the cashiers actually

2  get up or would have to get up.  You understand that?

3  **A.**   Yes.

4  **Q.**   All right.  What -- did you form -- did your analysis

5  include an observation directed at trying to answer that

6  inquiry?

7      Did you try and analyze the extent to which cashiers would

8  have to stand versus sit?

9  **A.**   Yes, I did a -- I looked at the video and documented the

10  number of times that I felt that a person would potentially

11  have to sit.

12      Actually, what I documented was how many times a heavy

13  object would -- was there -- a heavier, awkward object was

14  there, and I documented what those heavy and awkward objects

15  were.  That does not necessarily mean the person would have to

16  stand.

17  **Q.**   Okay.  Well, I'm trying to figure out what it is that you

18  did.  What is it that you reviewed?

19  **A.**   Reviewed videotapes provided by counsel of the Tulare.

20         **THE COURT:**  Which counsel?

21         **THE WITNESS:**  Uhm, Mr. Righetti.

22  **BY MR. MATTHEW RIGHETTI:**

23  **Q.**   Do you have an understanding of who recorded that

24  videotape?

25  **A.**   Dr. Fernandez.

1  **Q.**   And who is Dr. Fernandez?

2  **A.**   He's the consultant for the defendant.

3  **Q.**   Do you have any idea of how much videotape there was?

4      Did you review all -- strike that.

5      Did you review all the videotape?

6  **A.**   No.  If I'm remembering -- and it would help me to have

7  the report to review this, but I think there was something like

8  30 hours.  And I reviewed, I think, 11 hours of that.

9          **MR. WOHL:**  Your Honor, this is the point I raised

10  previously.  He presumably is about to -- Mr. Righetti is going

11  to ask him to testify about his observations of these videos,

12  and that was the supplemental report that was untimely and that

13  we've asked be excluded.

14     So we renew that objection.  He's offering further expert

15  testimony at a time when it was -- when it's untimely.

16          **MR. MATTHEW RIGHETTI:**  Let me explain what went on

17  here.  We had Dr. Johnson's initial report, which was timely

18  provided.  And then when the defense provided Dr. Fernandez's

19  report, included in Dr. Fernandez's report was all this

20  videotape that he had done of the Tulare store, which is 218.

21  It's a videotape that they want to cross-examine people on.

22     What Dr. Johnson did is he reviewed that videotape and

23  then did a supplemental report based upon the videotape that

24  Dr. Fernandez did.

25          **THE COURT:**  Okay.  The way I handle that is I call

 1  that a reply report.  And that should wait until your rebuttal

 2  case, after Dr. Fernandez comes in here and says what -- for

 3  all we know, he's never going to get into any of this.  So this

 4  objection is sustained for the time being.

 5          MR. WOHL:  Thank you, Your Honor.

 6          THE COURT:  But it's without prejudice to bring this

 7  witness back for the rebuttal case, assuming you have enough

 8  time left, and presenting it then.

 9  BY MR. MATTHEW RIGHETTI:

10  Q.  The -- have you ever seen a -- strike that.

11          There was a question about whether cashiers could see the

12  bottom of the basket when they're doing transactions.

13          And my question is:  Have you seen how other retailers

14  handle that?

15  A.  Yes, that's where I was saying.  What I have observed is

16  them putting a mirror on the station next to it so that they

17  could see it.  Those were standing.  These were standing

18  workstations at these places.  They still found it beneficial

19  to have it so people didn't have to bend over to look below.

20          THE COURT:  I want to add one thing.

21          Now, Mr. Wohl, if you have the same problem on your side,

22  assuming we have enough time, you will have to bring your

23  witness back for surrebuttal.  This works the same way for you,

24  assuming you did a proper report and all of that.

25          So if you're going to object here, then they get to object

```
 1   there, and it will work the same way.  I will not allow you to
 2   say, oh, my witness has got to fly back to Florida or wherever
 3   he's from.  No.  He'll have to fly back for his surrebuttal.
 4       So the -- Mr. Righetti is entitled to put in a reply
 5   rebuttal to what your expert says.  And he can do that.  The
 6   normal way is to do it on rebuttal through the reply report.
 7       So just remember it works both ways.
 8           MR. WOHL:  I understand, your Honor.
 9       (Counsel confer off the record.)
10           MR. WOHL:  Thank you, Your Honor.
11           THE COURT:  Are we about done with this witness?
12       How much more do we have, Mr. Righetti?
13           MR. MATTHEW RIGHETTI:  I'm finished, your Honor.
14   Thank you.
15           THE COURT:  Any redirect? -- recross?
16           MR. WOHL:  Your Honor, I think we're fine.
17           THE COURT:  We're fine.
18           MR. WOHL:  Yes.
19           THE COURT:  May this witness now be excused subject to
20   coming back for the rebuttal case?
21           THE WITNESS:  Thank you, Your Honor.
22           MR. MATTHEW RIGHETTI:  Yes, Your Honor.
23           THE COURT:  Thank you, sir.  You're free to go.
24   You're going to have to come back for the rebuttal case.
25       All right.  Would counsel come and take those documents
```

PROCEEDINGS                                                       366

```
 1   off the bench, the witness bench, and make sure that they're

 2   properly taken care of.  You may be excused though.  Thank you

 3   Dr. Johnson.

 4        THE WITNESS:  Thank you, Your Honor.

 5        (Witness steps down.)

 6        THE COURT:  All right.  We're ready to put on our next

 7   witness I think.

 8        Mr. Wohl, do you have something to say?

 9        MR. WOHL:  I think it's time to reverify that

10   everything now has been marked.  So we do not have to face that

11   problem again.  It's all cleared up.

12        THE COURT:  All right.  I see that counsel took those

13   exhibits and put them on the counsel table.  They need to be

14   properly put away.

15        And, Mr. Righetti, are you going to be doing the next

16   examination?

17        MR. MATTHEW RIGHETTI:  No, your Honor.  Mr. McInerney

18   will be handling that.

19        THE COURT:  That's fine.  But there will be no more of

20   this marking documents on the fly unless they are properly

21   marked.  So anything shown to the witness has got to be the

22   real thing that's going to the Court of Appeals.

23        MR. WOHL:  Your Honor, do you still have 380 or has

24   that been given back to us?

25        THE COURT:  380 I gave -- remember you gave me 371.  I
```

1  inked over 371 and put in 380.

2          **MR. WOHL:**  Can we have that back now?

3          **THE COURT:**  I gave it to you.  I don't know what you

4  did with it.

5      Who is this young lady?  Is she the next witness?

6          **MR. MICHAEL RIGHETTI:**  She is.

7          **THE COURT:**  Pour her some water.

8          **MR. MICHAEL RIGHETTI:**  May I fill it up?  We're out.

9          **THE COURT:**  You may do that.

10      Welcome to the Court.  What is your name?

11          **THE WITNESS:**  Natasha Wright.

12          **THE COURT:**  Why don't you raise your right hand and

13  the clerk will swear you in?

14                          <u>**NATASHA WRIGHT**</u>,

15  called as a witness for the Plaintiff herein, having been first

16  duly sworn, was examined and testified as follows:

17          **THE WITNESS:**  I do.

18          **THE COURT:**  Great.  Have a seat.

19          **MR. MATTHEW RIGHETTI:**  Your Honor, while it's fresh in

20  our minds, 383 and 384 were the emails that had the photos

21  attached to them and 3I would move those into evidence.

22          **THE COURT:**  Any objection?  383 and 384, any

23  objection?

24          **MR. WOHL:**  I'm sorry, your Honor.  Excuse me.

25          **THE COURT:**  They were the emails with the photos

PROCEEDINGS                                    368

```
 1   attached.

 2           MR. WOHL:  No.  No objection, your Honor.

 3           THE COURT:  Those are received in evidence.

 4       (Trial Exhibits 383 and 384 marked for identification)

 5           THE COURT:  Mr. Righetti, you should have done that

 6   sooner.  I was on the verge of forgetting what those emails

 7   were.

 8           MR. MATTHEW RIGHETTI:  All right.

 9           THE COURT:  Now, to our witness.  What's your last

10   name?

11           THE WITNESS:  Wright.

12           THE COURT:  Ms. Wright, you see how this moves around?

13           THE WITNESS:  Yes.

14           THE COURT:  Yours does, too.  Move it so it's about

15   this close to your voice.  Closer than that.  Closer.

16           THE WITNESS:  That better?

17           THE COURT:  That's better.  Say your name again and

18   see if everyone back there can hear you.

19           THE WITNESS:  Natasha Wright.

20           THE COURT:  That's perfect.  Thank you.

21       Mr. McInerney, time is running.  You may proceed.

22           MR. McINERNEY:  Would it be okay if I moved the easel

23   over near Ms. Wright?

24           THE COURT:  Do you live in Tulare?

25           THE WITNESS:  Yes.
```

PROCEEDINGS                                    369

```
 1            THE COURT:  How do you say Tulare?

 2            THE WITNESS:  Tulare.

 3            THE COURT:  How ow come the lawyers are saying Tulare?

 4            THE WITNESS:  Because they don't know how to say it

 5   right.

 6       (Laughter.)

 7            THE WITNESS:  We correct them all the time.

 8            THE COURT:  I know it was Tulare, but they have

 9   probably only been there once.

10            THE WITNESS:  We try and correct them all the time,

11   but I don't think they understand.

12            THE COURT:  All right.  Good.  Are you ready to go

13   now?

14            MR. McINERNEY:  I am.

15            THE COURT:  Please, the floor is yours.

16                       DIRECT EXAMINATION.

17   BY MR. MCINERNEY:

18   Q.   Ms. Wright, how old are you?

19   A.   I'm 23.

20   Q.   And where did you spend your younger years?

21   A.   I was born and raised in Arizona and I moved to California

22   in 2005.

23   Q.   Okay.  And where in California did you move to?

24   A.   I moved to Corcoran, California, which is about 20 minutes

25   away from Tulare.  I went to high school there.
```

```
 1   Q.   Okay.  And at what point in time did you actually move to

 2   Tulare itself?

 3   A.   I moved to Tulare in, like, January of 2010.

 4   Q.   Okay.  Can you tell us what kind of jobs you've had

 5   growing up?

 6   A.   My first job, I was a lifeguard for two years.  And then I

 7   was a cashier at a local restaurant in Corcoran.  After that I

 8   was a cashier at, MacDonald's, and then after that I became a

 9   cashier at Kmart.

10   Q.   And approximately when was it that you went to work for

11   Kmart?

12   A.   In April, 2010.

13   Q.   And what was your first job there?  Was it in Tulare?

14   A.   Yes, it was.

15   Q.   Okay.  And are you still working there?

16   A.   Yes.  I still work there.

17   Q.   What was your first job when you got to the Kmart in

18   Tulare?

19   A.   I was a front end cashier.

20   Q.   And when you say the "front end," what particular

21   registers are we talking about?

22   A.   The front registers in the front of the store registers,

23   one through seven.  There are seven up there.

24   Q.   And did you go through some sort of training to be a Kmart

25   cashier?
```

1  **A.**   Yes, I did.

2  **Q.**   Could you briefly tell us what kind of training you went

3  through?

4  **A.**   We had to watch videos and do, like, tests and stuff on

5  the computer and then we actually got to perform transactions

6  at the register.  They have, like, a demo that they do on the

7  register that you can practice.

8  **Q.**   And how long did all that you take roughly?

9  **A.**   Roughly a week.  A couple hours every day for about a

10  week.

11  **Q.**   Now, you started out as a front end cashier, right?

12  **A.**   Yes, I did.

13  **Q.**   And that was in -- you started in April of 2010?

14  **A.**   Uh-huh.

15  **Q.**   Okay.  And did you ever take on any other jobs while you

16  were at Tulare?

17  **A.**   I've done a few other positions.  I currently work in the

18  lay-away department.  I've worked in the cash office and I have

19  worked as an pharmacy tech, also.

20  **Q.**   So you started out as a front end cashier, right?

21  **A.**   Yes.

22  **Q.**   And approximately how long do you stay on the front end?

23          **THE COURT:**  I don't understand your question.  Did you

24  mean:  How long did she stay on?

25          **MR. McINERNEY:**  Yes.

1          **THE COURT:**  You said, "How long do you stay on?"

2          **MR. McINERNEY:**  I'm sorry.

3          **THE COURT:**  She already said she was not doing that

4   job any more.

5          **MR. McINERNEY:**  That's correct, your Honor.

6          **THE COURT:**  Sometimes the verb tense matters.  I hate

7   to be a stickler.  I am a stickler, I admit it.

8       But that question has the wrong verb tense and it's

9   confusing me.  It's not your fault.  It's my fault.  Just the

10  way I am.  But I want to understand the testimony.

11      How long did she stay on as a cashier?  You're no longer a

12  cashier, right?

13         **THE WITNESS:**  I'm a cashier in lay-away, but it's

14  different than the front end cashiers.

15         **THE COURT:**  All right.  So it will help me to -- I'm

16  learning the case as I go.  When I get a curve ball like that,

17  it confuses me.  So remember that.

18      All right.  But the witness is doing a great job.  You

19  continue right on.

20         **THE WITNESS:**  Thank you.

21         **THE COURT:**  Go ahead.

22  **A.**   So as a front end cashier, I was a cashier for probably a

23  year or a little over a year.

24  **BY MR. MCINERNEY:**

25  **Q.**   And then did you work briefly in pharmacy?

1   **A.**    Yes.  I worked in pharmacy for a week while the pharmacy

2   tech was on vacation.

3   **Q.**    And did you develop any kind of interest in pharmaceutical

4   work?

5   **A.**    Yes.  I'm actually in pharmacy school right now.

6   **Q.**    You finished school for that?

7   **A.**    I did finish school.  I was doing my extern.  I was

8   supposed to start this week actually.

9           **THE COURT:**  School doing what?  What kind of school?

10          **THE WITNESS:**  I go to San Joaquin Valley College in

11   Visalia, and I'm going for a pharmacy tech.

12          **THE COURT:**  Good for you.  Go ahead.

13   **BY MR. MCINERNEY:**

14   **Q.**    I forgot to ask you:  Did you have some other training

15   through a school?

16   **A.**    Yes.  I was trained as an EMT, also.

17   **Q.**    So you worked in the pharmacy department of the Tulare

18   Kmart for approximately a week?

19   **A.**    Exactly.

20   **Q.**    You were just sort of filling in?

21   **A.**    Yes.  I was there all day long, Monday through Friday.

22   **Q.**    Okay.  And after that, what department or unit did you

23   work in?

24   **A.**    The lay-away department, and then briefly in the cash

25   office.

1   Q.    Okay.  And can you explain just briefly what the lay-away

2   department is?

3   A.    The lay-away department is, what you can do is if you want

4   to make payments on items, you come to the lay-away department.

5   We ring everything up just like a cashier, but instead of us

6   giving you the items, we keep it and you make a deposit.  Then

7   every two weeks you make a payment.

8   Q.    Okay.  And physically the lay-away department isn't near

9   the front end, is it?

10  A.    No.  It's actually on the complete opposite side of the

11  store.

12  Q.    Now, you said you started in April of 2010 and you worked

13  the front end until approximately when?

14  A.    Approximate a year to a year-and-a-half later.

15  Q.    Would August of 2010 or 2011 be --

16  A.    Yeah, roughly around then.  Yes.

17  Q.    And then you had a week in pharmacy.  You went to lay-away

18  after that?

19  A.    Yes.

20  Q.    You also mentioned you worked in another section involving

21  cash?

22  A.    Yes.  I worked in the cash office for a few days.  Well,

23  it was on and off for awhile.

24  Q.    And what's the cash office?

25  A.    The cash office is every morning we count all of the money

```
 1   from the night before from all of the registers -- that
 2   includes lay-away, electronics, everywhere -- to make sure that
 3   the money is balanced and it's all there.  And then we
 4   distribute the money to the cashiers.  We get all of that ready
 5   for throughout the day.  And we give the bank their money, too.
 6   Q.   Now, how long did you continue working in the lay-away
 7   department?
 8   A.   I worked in the lay-away department until I went on
 9   maternity leave in December.
10   Q.   Okay.  December of 2011?
11   A.   Yes.
12   Q.   And then you had a little girl?
13   A.   Yes.
14   Q.   And did you return to Kmart after your daughter was born?
15   A.   Yes.  I returned to Kmart about six months later.  I think
16   it was, like, in June or July.  And, umm, I returned to the
17   lay-away department.
18   Q.   Okay.  Now, since you returned to the lay-away department,
19   have you ever worked as a front end cashier?
20   A.   I have switched a couple people to work at the front end
21   cashier, yes.
22   Q.   In other words you filled in?
23   A.   I filled in, yes.
24   Q.   Now, I want to show you a photograph.
25        MR. McINERNEY:  It's Exhibit 8, your Honor.  It's
```

1  marked.

2  **BY MR. MCINERNEY:**

3  **Q.**   Ms. Wright, do you recognize that as a photograph of a

4  front end register?

5  **A.**   I do.

6  **Q.**   When you were working the front end regularly between,

7  approximately, April of 2010 and August of 2011, were you

8  working part time or full time?

9  **A.**   Umm, it's on and off.  During the Christmas season, we are

10  full time, but I am considered a part-time employee.

11          **THE COURT:**  I have to interrupt.  I'm sorry.

12      My clerk is handing my a note saying you referred to this

13  as Exhibit 8, but it's marked as Exhibit 9 on the screen and

14  she is pointing out that discrepancy.

15          **MR. McINERNEY:**  I'm sorry.

16          **THE COURT:**  Perhaps there is a good answer for this,

17  but it is confusing.

18      So what is the answer to that?  And Mr. McInerney are --

19  Exhibit 9 that's marked is not one of our official markers.  It

20  looks like something from a deposition.

21          **MR. DOSTART:**  That's correct.

22          **MR. McINERNEY:**  Your Honor, I'm sorry.  It's

23  Exhibit 9 --

24          **MR. DOSTART:**  No, no.  I think the Court is correct.

25  It is Exhibit 8.  It was marked in deposition as Exhibit 9.

1   It's a photo of the deposition exhibit, and so --

2           MR. MICHAEL RIGHETTI:  The back of it should be --

3           MR. DOSTART:  Back of the trial exhibit marked

4   properly.

5           THE COURT:  We will go with whatever you marked it as.

6   Is it No. 8?

7           MR. DOSTART:  Yes, your Honor.

8           THE COURT:  And there's only one exhibit -- only one

9   photograph?

10          MR. DOSTART:  That's correct, your Honor.

11          THE COURT:  All right.  So even though it says 9, we

12  will ignore that and go with 8.

13      And this is why I ask you in my rules to mark them with

14  the same numbers as you do in the deposition.  I see that you

15  violated that rule.  Okay.  I give up.

16      But you now see why it's better to do it my way than your

17  way, but I'm going with your way.  It's going to be No. 8 even

18  though it says No. 9.

19      Thank you.  Go ahead.  I interrupted this witness and I --

20  she's doing a great job.  Continue right on.

21          MR. McINERNEY:  Okay.

22  BY MR. MCINERNEY:

23  Q.  So normally you worked what you call part time?

24  A.  Yes.

25  Q.  And how many hours would that be on a shift?

1  **A.**    Part time is usually 4 hours and 30 minutes, but sometimes

2  it's 4 hours and 45 minutes.

3  **Q.**    And when you say around Christmastime you did work full

4  time shifts, about how many hours would be a full-time shift?

5  **A.**    We would work a full eight-hour shift.

6  **Q.**    And were there any particular shifts that you tended to

7  work as a front end cashier?

8  **A.**    Usually I would work the middle shift, which is 1:00 to

9  5:30, but after that I did start working the morning shift,

10  which is 8:00 to 12:30, 12:45.

11  **Q.**    And which of those shifts would generally, you say, had

12  more customer flow, more transactions?

13  **A.**    Definitely the middle shift, the 1:00 to 5:30.

14  **Q.**    And were there particular registers that you tended to

15  work?

16  **A.**    I would usually work at register one or six.

17  **Q.**    Okay.  And one and six are the registers that are more

18  commonly open?

19  **A.**    Either one or six.  At all times one of them has to be

20  open because it is the handicap register.  So one of them

21  always has to be open.

22  **Q.**    So you tended to work at one of the two registers that was

23  traditionally open?

24  **A.**    Yes.

25  **Q.**    And when you were working as a front end cashier, did you

1  try to make some determination of particularly how long a

2  typical customer transaction took?

3  **A.**   Yes.  I was always looking at the clock.  Usually on

4  average a customer takes about three to four minutes.  It

5  depends on if the transaction goes smoothly or not.

6  **Q.**   What are some of the factors that you saw -- well, first

7  of all, let me back up a little bit.

8       So you worked the front end, let's say, approximately a

9  year and a half, okay.  And you typically work four and a half

10 hours on a shift?

11 **A.**   Yes.

12 **Q.**   And you said a typical transaction might take three, four

13 minutes?

14 **A.**   Yes.

15 **Q.**   Do you believe that while you worked on the front end you

16 handled thousands of transactions, hundreds?

17 **A.**   Definitely.

18 **Q.**   I'm sorry?

19 **A.**   Definitely, yes.

20 **Q.**   Which one?

21 **A.**   Thousands.

22 **Q.**   What were some of the factors that struck you as

23 determining how long a transaction might take?

24 **A.**   Definitely, like, payment.  If they are paying with cash,

25 credit card, debit card, check.  Those take longer, obviously,

1   if you're running a check than if you're just taking cash.  How

2   many items they have.  If we need to call other services to

3   help them with that item.  So it just really depends on those

4   factors.

5   Q.   What sort of circumstances might cause you or did cause

6   you to call other services for help with a transaction?

7   A.   The way we call other services is if the -- if they need

8   help carrying the item out, if it's heavy, if we need a price

9   check or if there is just no bar code for us to ring it up, we

10  need to call to get a number to ring them up, also.

11  Q.   Now, I want to just -- if we could sort of take you

12  through out of the thousands of transactions you did.  If you

13  could just describe a typical transaction, and we'll try to

14  point maybe on of this diagram, which is greater clarity than

15  the photograph.

16          THE COURT:  For the record, that's what exhibit?

17          MR. MATTHEW RIGHETTI:  It is 216-A.

18          THE COURT:  Yes.  Okay.  It's in evidence.  Go right

19  ahead.

20  A.   Okay.  So first I would greet the customer standing on the

21  floor mat, and the customer would come and place their stuff on

22  the counter right there next to the scanner.

23  Q.   So you mentioned the floor mat?

24  A.   I would be standing on the floor mat.

25  Q.   This (indicating)?

1   A.    Yes.

2   Q.    And did Kmart always have floor mats at the front end

3   registers?

4   A.    Yes.

5   Q.    So the customer would come which way again?

6   A.    From this direction, and place their things on that

7   counter right there (indicating).

8   Q.    (Indicating)?

9   A.    Yes.

10  Q.    And it would typically be the customer who did the placing

11  of the --

12          MR. ADKINS:   Objection, your Honor.   Leading.

13          THE COURT:   Sustained.

14          MR. McINERNEY:   Okay.

15  BY MR. MCINERNEY:

16  Q.    In the thousands of transactions you were involved with,

17  who placed the purchased items, the items to be purchased on

18  this counter?

19  A.    The customer would.

20  Q.    And what would -- what would happen as a customer

21  approached and began to place his or her items on this counter

22  area?

23  A.    After greeting the customer, I would ask them some of our

24  questions that we ask.   Like, "Do you have a rewards card?"   If

25  they did not have a rewards card, I would ask them if they

1  would like to get one.  Then I would proceed to check them out

2  by scanning them with the counter scanner.

3  **Q.**   Is that the (indicating)?

4  **A.**   Yes, that's the counter scanner.

5  **Q.**   Have you ever heard the term "flat bed scanner"?

6  **A.**   No, I don't know what it's called.  All I know is counter

7  scanner.

8  **Q.**   Counter scanner works, okay.

9  **A.**   Yes.

10  **Q.**   Now, in addition to the counter scanner, was there any

11  other kind of scanner that you used?

12  **A.**   Yes.  We have a hand-held scanner that is right next to

13  the register.

14  **Q.**   So would it be (indicating)?

15  **A.**   Yes, right there.

16  **Q.**   Okay.  And so you asked these questions?

17  **A.**   Uh-huh.

18  **Q.**   And that takes a little time, I take it?

19  **A.**   Yes.  We have many questions to ask.  We have more in a

20  little bit.

21  **Q.**   You have what?

22  **A.**   We have more a little later in the transaction, too.

23  **Q.**   And so then you've asked these questions of the customer.

24  What's the sort of the next step?

25  **A.**   So then we would set them on the demagnetizers to make

 1  sure they don't have any sort of activator that would go off

 2  when they leave after we scan them.

 3  Q.   So this is the demagnetizer over here (indicating)?

 4  A.   Yes.

 5  Q.   Let me interrupt you there.  Are some of the items in the

 6  Kmart Tulare store, do they have security tags?

 7  A.   Yes.  There are many different types of security tags.

 8  Q.   Could you explain what kind of tags you've seen down in

 9  that store?

10  A.   We have spider wraps.

11  Q.   Okay.  And could you tell the judge what a spider wrap is?

12  A.   A spider wrap is used for electronic items, like DVD

13  players, TVs.  There's many different sizes and it wraps around

14  the object and you have to deactivate it with a magnet, which

15  is not -- you don't use that one.  You use a different magnet.

16  Q.   Is it like a black rubber --

17  A.   Well, it's not rubber, but it's like black, hard stick

18  thing.

19  Q.   Plastic?

20  A.   It has plastic around it, but it's like a magnet.  And

21  then they have gator tags.

22  Q.   A what?

23  A.   A gator tag.

24  Q.   What's a gator tag?

25  A.   Those are the white things that are on the clothes that

 1  you guys buy, like pants and stuff.

 2  **Q.**   Okay.  Describe what it looks like?

 3  **A.**   There's different ones, but ours is -- it's just an

 4  oblong, like -- I don't know.  It's, like, straight and then it

 5  has, like, a little button type thing on the other side.

 6  **Q.**   And what's it made out of?

 7  **A.**   Plastic.

 8  **Q.**   Okay.  And if somebody is coming through your checkout

 9  lane and they've got a gator, what do you do with that?

10  **A.**   We have like this little gun looking thing that takes them

11  off.

12  **Q.**   A removable tool?

13  **A.**   Uh-huh.

14  **Q.**   Okay.  And if it's a spider wrap, what do you do there?

15  **A.**   We use the magnet to deactivate that spider wrap.

16  **Q.**   And the magnet is this --

17  **A.**   No, it's a different one.  That is used for -- there are

18  these little magnet sticker things that are on, like, CDs,

19  movies.  That's what that one is for.

20  **Q.**   Okay.  And what do you use, again to demagnetize the

21  spider wraps?

22  **A.**   It's like a little stick magnet thing.

23  **Q.**   Okay.  And where do you keep that?

24  **A.**   It's actually right next to the demagnetizer.  It's

25  hanging down on the side right there.

```
 1  Q.    Right here (indicating)?

 2  A.    Hangs like right there (indicating).

 3  Q.    As the transaction is going along, you're moving goods

 4  across the scanner to the demagnetizer area?

 5  A.    Exactly.

 6  Q.    Okay.  And did you then have more questions of the person

 7  or does something happen first?

 8  A.    I finish bagging the items.

 9  Q.    Okay.  Now, where do you get the bags?

10  A.    They are right there after the demagnetizer, where those

11  little stick things are sticking out (indicating).

12  Q.    You those things sticking out?

13  A.    Yes.

14  Q.    Let me ask you a question:  Do you ever try to go through

15  from where you're standing past those bagging racks to get to

16  the area where the customer might be?

17  A.    Yes, I do.

18  Q.    And do you ever encounter any kind of problems moving

19  through this area?

20  A.    Yes.  I get bruises actually all the time from those.

21  Q.    And what's the problem?

22  A.    They just stick out too far, so there's not a lot of room

23  they don't squeeze through.  So sometimes, like, if you're in a

24  hurry, you just hurry up and go by and bump your leg on them or

25  something, your hip.
```

1  Q.   And have you bumped your hip on those hooks?

2  A.   Yes.

3  Q.   Many times?

4  A.   Yeah, but after awhile you learn not to go that way.

5  Q.   Okay.  And let me ask you this:  Have you observed other

6  cashiers working the front end registers?

7  A.   Yes.

8  Q.   Okay.  And are some of the Kmart Tulare cashiers larger in

9  physique than you?

10 A.   Yes.

11 Q.   Are they able to pass through this area?

12 A.   No.  Usually they go the other way.

13 Q.   When you say "the other way," could you tell me how they

14 go?

15 A.   They go the back way, around the table to the customer.

16 Q.   So they go from here around the bagging counter

17 (indicating), is that correct?

18 A.   Yes.

19 Q.   Okay.  So you get the bags from the bag racks?

20 A.   Yes.

21 Q.   Okay.  Now, are the bag racks faced towards you so that

22 you can just pull a bag toward you?

23 A.   No.  Like, if this was the cash register, they are right

24 here on the side like this (indicating).

25 Q.   Okay.  So they are sticking out --

1  A.    Yes.

2  Q.    (Continuing) -- toward the bagging counter, away from you?

3  A.    Yes, yes.

4  Q.    So after you've gotten a bag, you're putting the purchases

5  that you have placed on the demagnetizer into a bag, is that

6  correct?

7  A.    Yes.

8  Q.    Okay.  And then what happens to the bag or -- and if it

9  depends on how big the transaction is, go ahead and tell us?

10  A.    Umm, well, if it's just a few items, I usually just hand

11  them to the cashier -- or to the, sorry, customer; but if

12  there's multiple, then I just set them on the bagging table,

13  especially if they are still unloading their cart.

14  Q.    So if there's just like one bag or so, you just hand it,

15  the bag with the items in it, to the customer?

16  A.    Yes, but after I finish ringing them up.  I'll just leave

17  it on the demagnetizer.

18  Q.    Okay.  You leave it there --

19  A.    Yes.

20  Q.    (Continuing) -- until you ring up the transaction?

21  A.    Yes.

22  Q.    If there's a bunch of bags required, then you move them to

23  the bagging table?

24  A.    Yes.

25  Q.    And from where you're standing in this area, do you have

1  to step over to that table?

2  **A.**    Yes.  It's a couple small steps, yeah.

3  **Q.**    Now, some items you don't even place in a bag?

4  **A.**    Yes, there are some items.

5  **Q.**    Like, can you give us an example?

6  **A.**    Umm, like a 12-pack of soda, dog food, sometimes, like,

7  gallons of milk.  Some people don't want them in bags.

8  **Q.**    Would you consider some items that customers bring up as

9  heavy?

10  **A.**    Some items, yes, are heavy.

11  **Q.**    Have you ever had occasion to handle, say, a bag of sugar?

12  **A.**    Yes.

13  **Q.**    Okay.  Have you ever handled a bag -- a 10-pound bag of

14  sugar?

15  **A.**    Yes.

16  **Q.**    You believe you have an idea of what 10 pounds is?

17  **A.**    Yes.

18  **Q.**    Okay.  So if we said that 10 pounds or more, we'll call

19  that heavy?

20  **A.**    Okay.

21  **Q.**    Okay.  When a customer has what we now call a heavy item,

22  do you lift that up and put it in the bag?

23  **A.**    No.  Usually I'll just slide it and then have the bag open

24  and just slide it into the bag, if it needs to be bagged.

25  **Q.**    And some items that might be heavy you don't even bag?

1   **A.**    Yes.

2   **Q.**    Okay.

3   **A.**    But sugar, for example, you would bag that.

4   **Q.**    And what would you do, say, with -- do you ever sell bags

5   of kitty litter?

6   **A.**    Yes.  Very heavy.

7   **Q.**    Very heavy?

8   **A.**    Yes.

9   **Q.**    How much do you believe a bag of kitty litter is?

10  **A.**    Probably like 20 pounds.  Even the little bags, like,

11  really heavy.

12  **Q.**    You don't like kitty litter?

13  **A.**    I don't like cats anyways.

14  **Q.**    Nonresponsive.  Okay.

15          And how about dog food?  I mean, people go into Kmart and

16  buy these big bags of dog food.

17  **A.**    Yes.

18  **Q.**    Any idea how much they weigh, the big ones?

19  **A.**    Umm, probably like 40 to 50 pounds, I believe.

20  **Q.**    Okay.  Now, where does the customer -- or what do you do

21  when one of these bags of dog food is being purchased?

22  **A.**    Usually with the dog food, I just use my hand-held because

23  the bar code is at the top of the bag, so all I have to do is

24  just reach over and scan it.

25  **Q.**    So is the customer taking out of the cart or is he leaving

1  it in the cart the dog food typically?

2  **A.**    Usually they leave it in the cart, but sometimes they

3  will, you know, just hand it to me so it is closer.  But

4  typically it's in the cart.

5  **Q.**    So your hand-held scanner is usually left in this area

6  next to the register?

7  **A.**    Yes.

8  **Q.**    And so you lean forward and scan it?

9  **A.**    Well, it reaches pretty far, so I pretty much just --

10 **Q.**    Reach with your arm?

11 **A.**    I don't have to really like lean forward too much.

12 **Q.**    Okay.  Now you have been moving items from the counter

13 where the customer placed them across the scanner to the

14 demagnetizing area.

15        At some point in time do you start -- well, let me ask

16 this:  As you scan an item, right, it's being rung up

17 automatically on the register, correct?

18 **A.**    Yes.

19 **Q.**    And at some point in time when you're finished with all

20 the purchases, you've scanned everything, what happens then?

21 **A.**    So then you would total them out.  You just hit the total

22 button.  You ask them if they have a Sears card.  If they don't

23 have a Sears card, then you ask them if they would like to

24 apply for one.  If they -- you would ask them if they do have a

25 Sears card, if they would like to put it on their Sears card.

```
 1        Then after all that is done, you ask them if they would
 2   like to make a donation sometimes, if we have a donation going
 3   on.
 4   Q.   Is that like a charitable?
 5   A.   Yes.
 6   Q.   Okay.
 7   A.   And then after that you would ask them what form of
 8   payment they are going to be doing, if they didn't obviously do
 9   the Sears card.
10   Q.   What's the worst form of payment as far as speed of
11   service?
12   A.   Definitely a check.
13   Q.   Okay.  And do certain kinds of people tend to use checks?
14   A.   Yes, the older people.
15   Q.   Like me?
16   A.   Yes.
17   Q.   And so you've asked them what kind of payment.  Suppose
18   they say they want to use a credit card?
19   A.   So then I would push the credit card button, which is the
20   debit card also, the EFT tender.  And then they slide their
21   card at the credit card reader.
22   Q.   This thing here (indicating)?
23   A.   Yes.  And sometimes they will hand it to you and you can
24   slide it on the register yourself.
25   Q.   Okay.
```

1   **A.**   After that, it will go through.  I have to check an I.D.,

2   and then they sign, and I get the receipt.

3   **Q.**   Okay.  Do you give the shoppers coupons?

4   **A.**   Yes.  There's coupons.  They don't always come out, but

5   there's coupons that come out of the coupon printer.

6   **Q.**   I'm sorry.  They always don't come out?

7   **A.**   Some items you don't get coupons for.

8   **Q.**   Okay.  Is this the coupon printer (indicating)?

9   **A.**   Yes.

10   **Q.**   Now, is the coupon printer, like, level with the register?

11   **A.**   No.  It's higher than the register.

12   **Q.**   Now, to reach that coupon printer, for you to reach and

13   secure the coupons, do you have to raise your arm at all?

14   **A.**   Yeah, a little I do.  Yes.

15   **Q.**   So you've taken the payment, whatever it may be.  You've

16   given the shopper the coupons?

17   **A.**   The coupon and the receipt.  I'll either ask them if they

18   would like the receipt in the bag or I would hand them the

19   coupon and the receipt together to the customer.

20   **Q.**   And then what?

21   **A.**   And then I thank them for shopping at Kmart and say bye.

22   **Q.**   Okay.  Now, are you aware that cashiers are supposed to be

23   checking that stuff doesn't get stolen?

24   **A.**   Yes.  On the bottom of the shopping cart, yes.

25   **Q.**   And is there any way that you, when you were working the

1   front end, tried to do that?

2   **A.**    I usually do it as they are walking up.  If they are

3   already waiting for me while, you know, if I'm doing something

4   else, I come back and they are already waiting for me, I kind

5   of glance during the transaction and while they are leaving.

6   **Q.**    Okay.

7   **A.**    So I check multiple times.

8   **Q.**    So if -- you're able to see the customer when they are

9   sort of out here, where I'm pointing with a laser (indicating),

10  can you see the bottom of the cart then?

11  **A.**    Yes.

12  **Q.**    And when they walk away, are you able to see the cart?

13  **A.**    Yes.  I can see the cart as soon as they get past the

14  demagnetizer.

15  **Q.**    As soon as they move past this area (indicating)?

16  **A.**    Yes.

17  **Q.**    You can see.

18         And how about the security tags?  I think you mentioned

19  three different kinds:  The little kind that's on videos and

20  spider web, and the --

21  **A.**    Gator.

22  **Q.**    The gator, yes.  Are gators mostly on clothes?

23  **A.**    Yes.  The gators are mainly on pants, sweaters, jackets;

24  those kind of items.

25  **Q.**    If a customer has something that has a security tag on it

1   and they have got it in the bottom of their cart and for

2   whatever reason you haven't been able to spot that they have

3   got something in the cart, what happens, anything?

4   A.    When they walk out the door, the alarm will sound.

5   Q.    And when the alarm sounds, what happens then?

6   A.    When the alarm sounds register one, which is the closest

7   to the alarm, is supposed to report to the door and check the

8   shopping cart and check their receipt.

9   Q.    To make sure that they have paid for everything?

10  A.    Yes, because you don't only check the customers that you

11  have.  You check the other customers also.

12  Q.    And when you were back working on the front end, did the

13  alarm ever go off at the front door?

14  A.    Yeah, definitely.

15  Q.    What sort of frequency?

16  A.    Usually it's because certain shoes have those alarms on

17  them and movies and CDs.  Sometimes when you deactivate them,

18  they don't deactivate fully.  They keep going off.  You have to

19  deactivate them a few times, so that's usually why.

20  Q.    Thank you.

21        When you were working the front end, you said you used to

22  check the clock frequently?

23  A.    Yes, count down the minutes.

24  Q.    Until you got off shift?

25  A.    Yes.

**Q.** Did you ever experience any physical, oh, discomfort while working the front end?

**A.** Sometimes, like, my back and my feet sometimes from my shoes, you know, just standing a lot. Pretty much just my back and my feet.

**Q.** Did you find that the fatigue mat did not prevent that?

**A.** They are pretty worn. We just got some new ones, but when I was a front end cashier they were pretty worn.

**Q.** And how could you tell that they were worn?

**A.** You could see, like, a big circle from where everybody would stand.

**Q.** So in other words, you got a square fatigue mat and there seemed to be a big circle within that mat?

**A.** Yes, in the middle.

**Q.** And why was there a big circle right in the middle of that mat?

**A.** Because that's where everybody would stand.

**Q.** Did you ever wish when you were a front end cashier, that you had a seat?

**A.** Oh, definitely.

**Q.** And why was that?

**A.** Because it would just be a lot more comfortable.

**Q.** Did you ever ask if you could have a seat?

**A.** No, I didn't know that was an option.

**Q.** If you had thought that you could have gotten a seat,

```
 1  would you have asked for one?

 2  A.    There was definitely times when I would have definitely

 3  wanted a seat.

 4          THE COURT:  That's not quite the same thing.  If --

 5  he's asking if you thought you could have -- would you have

 6  asked for one if you had known that was an option?  That's the

 7  question.

 8          THE WITNESS:  Yes, I would.

 9          THE COURT:  All right.  Thank you.

10  BY MR. MCINERNEY:

11  Q.    And why was it that you didn't ask?

12  A.    I didn't know that we could have a seat.

13  Q.    Do you think that you could have performed many of your

14  front end cashier duties if you were seated?

15  A.    Yes.

16          MR. ADKINS:  Objection, your Honor.  Lack of

17  foundation.  Calls for speculation.

18          THE COURT:  Overruled.  This is lay opinion, but it's

19  within the scope of the witness's experience.  Overruled.

20      Please continue.

21  BY MR. MCINERNEY:

22  Q.    Now, if you would put some kind of a seat -- let's say, a

23  stool -- in there, in that little area where the mat is now,

24  would it have been too tight for you to really use that stool?

25  A.    Yes.
```

1  Q.   What would you have wanted done if somehow you could have

2  had a stool and -- what would you have wanted done to allow you

3  to use that stool?  I mean, what sort of a change, if any?

4           MR. ADKINS:  Same objection, your Honor.

5           THE COURT:  Well, this is a more complicated evidence

6  problem.  Let me ask a preliminary question.

7      Back at the time that you were actually standing there and

8  working, did you ever think about that problem of how to change

9  things in order to have a stool, or is this something that

10 you've only thought of recently in connection with this

11 lawsuit?

12          THE WITNESS:  I've thought about it before.

13          THE COURT:  All right.  So I'm going to let counsel

14 ask you questions about what your thinking was back at the

15 time.  I'm going to allow that because that's something she

16 thought of back at the time.  So you can stick to what happened

17 back then.

18 BY MR. MCINERNEY:

19 Q.   Back when you were working the front end as a cashier, did

20 you think in particular what sort of changes might have to be

21 made for you to use a seat?

22 A.   Umm, definitely more room.

23 Q.   I'm sorry?

24 A.   More room.

25 Q.   More room?

1  **A.**   Yes.  More leg room and, like, the bags to be moved

2  closer.  Probably, like, the coupon thing to be moved down

3  more.  Just a few modifications so it's kind of closer.

4  **Q.**   Okay.  Now, if things had been changed to allow leg

5  room -- when you say "leg room," what did you mean?  Room for

6  what?

7  **A.**   Well, just, like, for your knees.

8  **Q.**   Like you're on the witness stand now?

9  **A.**   Yes.

10  **Q.**   And there is a place for your knees, right?

11  **A.**   Yes.

12  **Q.**   And you wanted the bagging racks closer to you?

13  **A.**   Yes.

14  **Q.**   And maybe lower the coupon device, right?

15  **A.**   Yes.

16  **Q.**   Would you be able to tell us how many -- how frequently

17  would you have had to get up to handle bulky or heavy items?

18  How frequently do you think you would have been getting off

19  that stool so that you could assist the customer in the

20  transaction?

21          **MR. ADKINS:**  Objection.  Foundation, your Honor.

22          **THE COURT:**  All right.  Do you have a reasonable basis

23  for answering that question?

24          **THE WITNESS:**  What does that mean?

25          **THE COURT:**  In other words, are you just making this

```
 1    up, guessing at it, or do you have a reasonable basis for

 2    giving us an opinion on that question?

 3              THE WITNESS:  I have a reasonable basis.

 4              THE COURT:  What is your reasonable basis?

 5              THE WITNESS:  Umm, I do think, like, I do get up about

 6    five percent of the time to get up and help a customer because

 7    I don't have to help every customer.

 8              THE COURT:  Where did that five percent come from?

 9              THE WITNESS:  Just out of the whole time that I'm

10    there.

11              THE COURT:  You just happen to know it's five percent?

12              THE WITNESS:  It's probably zero to five percent.

13              THE COURT:  All right.  So you're saying that

14    95 percent of the time you could do your job sitting down?

15              THE WITNESS:  Yes.

16              THE COURT:  All right.  Okay.  Overruled.

17         Please continue.

18    BY MR. MCINERNEY:

19    Q.   I want to return to the bagging.  You said there were some

20    items that you don't bag.  Obviously, a six pack of Coke you

21    wouldn't bag, right?

22    A.   Well, a six-pack, yes, but not a 12-pack.

23    Q.   Not a 12-pack, okay.

24         Now, did it ever occur that the customer themselves would

25    bag their items?
```

 1  **A.**   Sometimes they would, yes.

 2  **Q.**   And in the thousands of transactions that you handled

 3  there at the front end, can you give us any estimate of how

 4  frequently or infrequently that occurred?

 5          **MR. ADKINS:**   Same objection, your Honor.

 6          **THE COURT:**   This is lay opinion.  Overruled.

 7      Please go ahead.

 8  **A.**   Probably a couple of -- like, three to four customers out

 9  of every 10 would do it themselves.  Some customers are very

10  picky and they like their stuff bagged a certain way, so some

11  customers do do that themselves.

12  **BY MR. MCINERNEY:**

13  **Q.**   Now, once the items were bagged, whether they were on the

14  demagnetizer or they were on the large bagging counter, did you

15  put the bags in the cart, or is that something the customer

16  did, or did it depend?

17  **A.**   Usually the customer does it, but sometimes I would do it.

18  For example, if they were still looking for their form of

19  payment or, like, still loading items and I was trying to clear

20  off the table.  So it really just would depend on the

21  transaction.

22  **Q.**   So if they were lagging, you would do it?

23  **A.**   If it was lagging and I had a line, I would definitely put

24  them in the shopping cart.

25          **MR. McINERNEY:**   I'm out of questions.

1          **THE COURT:**  Thank you.

2      Cross-examination.

3                    <u>**CROSS EXAMINATION**</u>

4  **BY MR. ADKINS:**

5  **Q.**   Good morning, Ms. Wright.

6  **A.**   Good morning.

7  **Q.**   We have not met before, have we?

8  **A.**   No, we have not.

9  **Q.**   I'll introduce myself.  My name is Rob Adkins.  Nice to

10  meet you.

11  **A.**   Nice to meet you, too.

12  **Q.**   I want to go back and walk you through some of the

13  checkout portions that you were describing before, if I could.

14      Does the Tulare Kmart have any automatic checkout

15  counters?

16  **A.**   No.

17  **Q.**   Did I pronounce Tulare correctly?

18  **A.**   Tulare.  Yes, you did.

19  **Q.**   Thank you.

20       If I could put up Exhibit 15, I think it's Page 65.

21      Your Honor, these are the photos of the Tulare Kmart

22  store?

23          **THE COURT:**  That's fine, but nothing has come on the

24  screen yet.

25          **MR. ADKINS:**  Just a moment.  I think it will take a

1    moment.

2

3        (Photograph displayed.)

4            MR. ADKINS:  If we could blow that up, I think I that

5    would be easier than the chart there.

6    BY MR. ADKINS:

7    Q.   Do you recognize that as one of the checkout counters at

8    the Kmart store?

9    A.   Yes.  That is register one.

10           MR. ADKINS:  Your Honor, just for ease of reference in

11   this trial, I would like to move in all of Exhibit 15, which

12   are all of the photos from the Tulare Kmart store.

13           THE COURT:  Are they marked?  Is there a marker?

14           MR. ADKINS:  There is, your Honor.

15           THE COURT:  Is there a hard copy with a number 15 on

16   it?

17           MR. ADKINS:  There is, your Honor.

18           THE COURT:  Show me that, or put it up there on the

19   witness stand so I can -- I want the witness to have that

20   document.

21       (Photographs were tendered to the witness.)

22           THE COURT:  All of those are received in evidence

23   unless I hear an objection.  Any objection?

24           MR. McINERNEY:  No, your Honor.

25           THE COURT:  All received.  Go ahead.

 1          (Trial Exhibit 15 received in evidence)

 2  **BY MR. ADKINS:**

 3  **Q.**   So focusing on the screen, that's the checkout counter,

 4  one of the checkout counters at the Tulare Kmart store, is that

 5  correct?

 6  **A.**   Yes.

 7  **Q.**   And up at the top there there's a -- you mentioned there's

 8  a printer for coupons to come out?

 9  **A.**   Yes.

10  **Q.**   And there's a place up on top of the cash register for the

11  receipts to come out, right?

12  **A.**   Yes.

13          **MR. ADKINS:**   And actually if you can pull back just a

14  little bit on the photo, please?

15  **BY MR. ADKINS:**

16  **Q.**   Underneath there, underneath the cash register there is a

17  bucket.  Do you see that?

18  **A.**   Yes.

19  **Q.**   And there is another one.  You can kind of see on the

20  left-hand side there, there is another bucket.  Do you see

21  that?

22  **A.**   Yes.

23  **Q.**   What are those?

24  **A.**   Those are the trash bins.  The other one is for items that

25  the customer decides that they don't want.

1  Q.   Then if we could go to Page 65 of Exhibit 15 -- I'm sorry.

2  64 of Exhibit 15.

3       (Photograph displayed.)

4          MR. ADKINS:  Let's move in on that.

5  BY MR. ADKINS:

6  Q.   You had mentioned this, the credit card scanner, right?

7  A.   Yes.

8  Q.   And do you see, is that the credit card scanner there in

9  this photo?

10 A.   Yes, it is.

11 Q.   And I think you mentioned when a customer is using that

12 credit card scanner, sometimes you have to reach over to help

13 them?

14 A.   Sometimes I would just either walk around or help them,

15 yes.  Some people don't know how to use it as well as others.

16      For the most part I know what it says, so I can just tell

17 them verbally, but if I do need to help them, yes, I will show

18 them how to do it.

19 Q.   Sometimes people aren't good with the magnetic strip and

20 you have to kind of work with them, right?

21 A.   Yes.

22 Q.   There is some kind of survey that comes up on that

23 scanner?

24 A.   Yes, there is.

25 Q.   Can you describe that, please?

 1  A.    Actually I know exactly when it says.  It says:  How

 2  likely are you to tell another person about Kmart?

 3  Q.    And what is the customer supposed to do with that?

 4  A.    They are supposed to select either "very likely,"

 5  "unlikely," all those things.

 6  Q.    Do you every once in a while have to assist the customer

 7  with that when it pops up so they understand what to do?

 8  A.    Yes, or I tell them to press the red button and it will go

 9  away.

10  Q.    Okay.

11         MR. ADKINS:  Can we put up Page 62 of Exhibit 15,

12  please?

13       (Photograph displayed.)

14  BY MR. ADKINS:

15  Q.    This is just another angle of the checkout stand, right?

16  A.    I didn't.

17  Q.    And that's the counter where customers can place their

18  items to be scanned, right?

19  A.    Yes.

20  Q.    And then further back in the photo, looking back there is

21  another table.  That's the bagging table, right?

22  A.    Yes.

23  Q.    Is that what everyone calls it, the bagging table?

24  A.    I don't think there is really a name for it.  They just

25  call it the table or -- I don't know.  We don't really call it

 1  anything.

 2  **Q.**   Lawyers want names for everything?

 3  **A.**   Well, it's a table.

 4  **Q.**   If I call it the bagging table, is that all right?  Just

 5  so we know which table we're talking about.

 6  **A.**   Yes, yes.

 7  **Q.**   Now, that table it's a separate table back there, right?

 8  **A.**   Yes.

 9  **Q.**   And so -- and you can see in this photo there's a little

10  pole almost in the way, but behind that is the cash register,

11  right?

12  **A.**   Yes.

13  **Q.**   So if I were the cashier and I had my fingers on the cash

14  register doing something, if I wanted to, say, go back to the

15  bagging table, I'd have to -- I couldn't reach it, right?

16  **A.**   No.

17  **Q.**   You have to take probably a couple steps, right?

18  **A.**   Yeah, a couple small steps, yes.

19  **Q.**   Okay.

20       **MR. ADKINS:**  Actually, could we put Page 64 up?

21       (Photograph displayed.)

22  **BY MR. WOHL:**

23  **Q.**   Now, I think Mr. McInerney asked you a couple questions

24  about this, but I just wanted to look at it.

25       Is this -- you see the pass-through.  Is this called a

1    pass-through right there?

2    **A.**    Yes.

3    **Q.**    When I say "right there," I'm talking about the space

4    between the two --

5    **A.**    The bags and the table, yeah.

6    **Q.**    (Continuing) -- tables.

7         I just want to make sure I have all of our names down.

8              **MR. ADKINS:**  You can take that down.   Thanks.

9    **BY MR. ADKINS:**

10   **Q.**    Kmart sells a lot of different kinds of merchandise,

11   right?

12   **A.**    Yes.

13   **Q.**    I mean, a lot.

14   **A.**    Tons.

15   **Q.**    In terms of size and shape and weight and type?

16   **A.**    Yes.

17   **Q.**    Flat screen TVs?

18   **A.**    Yes.

19   **Q.**    Furniture?

20   **A.**    Yes.

21   **Q.**    Down to socks and pens, right?

22   **A.**    Yes.

23   **Q.**    And food items, too?

24   **A.**    Yes.

25   **Q.**    And you ring up heavy items and light items as a cashier,

1  right?

2  A.   Yes.

3  Q.   There were no -- looking at the counter and check stand,

4  there are no belts, conveyor belts to run the items down?

5  A.   No, there is not.

6  Q.   Do you ever have a situation as a cashier where the

7  customer has some items and they place it at the edge of the

8  check stand and you have to reach to go grab it and draw it to

9  the scanner?

10 A.   Definitely, yes.

11 Q.   That happens a lot, right?

12 A.   Yes.  Everybody wants to do that.

13 Q.   So it's just a little easier for them, right?

14 A.   Yes.

15 Q.   I mean, I've got to imagine that -- well, strike that.

16      If there's a line of three people, say, okay?

17 A.   Uh-huh.

18 Q.   And you have the person that you're dealing with right now

19 at the check stand and they've got their items on the counter,

20 right?  Do you follow me?

21 A.   Yes.

22 Q.   This isn't that complicated.

23      But then the next person in line comes up and they want to

24 put their stuff on the counter, but there's only a little bit

25 of space because of the other items, right?

WRIGHT - CROSS EXAMINATION / ADKINS

1    A.    Uh-huh.

2    Q.    So you take the 12-pack of soda and you put some other

3    things up there, right?

4         And then you process the transaction, but other folks

5    haven't -- the customer, the next customer hasn't pushed their

6    stuff forward, so you have to reach it and grab it and scan it,

7    right?

8    A.    If it's on the edge, we can't reach it.

9    Q.    You can't reach it.  You have to ask them to push it a

10   little bit?

11   A.    Yes.

12   Q.    This kind of thing happens all the time when you have a

13   lot of people in line, right?

14   A.    Yes.

15   Q.    And then there's items that won't fit on the counter, like

16   a cooler?

17   A.    Yes.

18   Q.    And sometimes if it's big, but not too big, they will

19   leave it in the -- in the shopping cart, right?

20   A.    Yes.

21   Q.    And for those items you grab that scanner gun, right, and

22   you would either go through that pass-through and scan it with

23   that gun or lean over and scan it, right?

24   A.    Yes.

25   Q.    Okay.  And the shopping carts at the Kmart, they are

1    pretty big, right?

2    **A.**    Yes.

3    **Q.**    In fact, they have a shelf at the bottom.  I don't know

4    what to call it.  What would you call it?

5    **A.**    A shelf.

6    **Q.**    We're doing good with names.

7         So there is a shelf at the bottom of that shopping cart.

8    And a lot of times will people put, like, a big set of, you

9    know, water down there or dog food in the bottom part?

10   **A.**    Usually the water is on the bottom.  Dog food, not too

11   much, but 12-packs of sodas, that kind of stuff.  Just pretty

12   much waters and sodas.

13   **Q.**    And for some of those waters and sodas on the bottom, do

14   you usually go out and use the gun to scan it so they don't

15   have to try and haul that up to onto the counter for you?

16   **A.**    Yes, I do.

17   **Q.**    You mentioned that you need to look in the shopping cart

18   so there is no misplaced items in there that people are trying

19   to walk out with potentially?

20   **A.**    Yeah.  Yes.

21   **Q.**    And have you ever heard of phrase BOB and LISA?

22   **A.**    No.

23   **Q.**    You're not familiar with that?

24   **A.**    No.

25   **Q.**    Have you heard someone saying to someone look in the

1   Bottom of the Basket, Look InSide Always.  Do those phrases

2   mean anything to you?

3   **A.**    Yes.

4   **Q.**    Could you tell us what that means?

5   **A.**    Pretty much to scan the shopping cart from on top to

6   bottom to make sure there aren't any items not being rung up or

7   hidden items.

8   **Q.**    You mentioned those gator clips, the security tags?

9   **A.**    Yes.

10  **Q.**    Not all the merchandise has gator clips on it, right?

11  **A.**    No.  It's a certain price that they put those on.

12  **Q.**    And in addition to looking into the shopping cart, aren't

13  you also supposed to -- let's say someone comes up with a

14  backpack which has a zipper on it, right?  Aren't you supposed

15  to -- what are you supposed to do if you have an item with a

16  zipper on it?

17  **A.**    We're supposed to open all the pockets just to make sure

18  there are no items in there.  And backpacks usually have gator

19  tags on them, too, so you would take the gator tag off of

20  those.

21          **THE COURT:**  You're talking about a backpack that the

22  customer brought in with them, like an old beat-up one, or are

23  you talking about one that's on sale at the store?

24          **THE WITNESS:**  The ones that are on sale at the store.

25  If a customer walks in with a backpack, they have to leave it

 1  at the service desk.

 2  **BY MR. ADKINS:**

 3  **Q.**   This is all in part of an anti-theft measure, right?

 4  **A.**   Yes.

 5  **Q.**   You want to make sure that no one has inadvertently or

 6  intentionally put an item inside of a purse or a backpack or a

 7  piece of luggage that they are buying, right?

 8  **A.**   Sometimes other customers will do that and then won't

 9  purchase the item and other customers will come and purchase

10  them also.  So you just always have to check to make sure there

11  is nothing else in there.

12  **Q.**   And if it was an item that was larger, like a suitcase,

13  would you need to take that and put it on the bagging table to

14  open up it up to take a look inside?

15  **A.**   Sometimes, but usually they fit right there on the counter

16  as long as there is no other items and you just check it out.

17  You know, open each zipper.

18  **Q.**   Okay.  And you mentioned going -- I think you said

19  something when you were answering Mr. McInerney's questions

20  about going -- you need to make a price check?

21  **A.**   Yes.

22  **Q.**   What is that?  What does that mean?

23  **A.**   A price check is something where the customer says "Oh,

24  no, that item was supposed to be this price" or, "That item is

25  on sale."

```
 1        So we have to go to the PA system and call that department
 2   to make sure that the item was on sale.
 3   Q.   Am I right that there's only -- strike that.
 4        How many phones do you have at the front end cash
 5   registers at the Tulare Kmart?
 6   A.   We just have one.
 7   Q.   And it's at cash register number three?
 8   A.   Yes.
 9   Q.   Okay.  So if you're at cash register number six, you would
10   have to go, I think, three over to be able to use that phone to
11   call in the price check that the customer has -- is disputing,
12   right?
13   A.   Yes.
14   Q.   And that does happen quite a bit, doesn't it?
15   A.   It doesn't happen too often because usually what we do is
16   the first step is we check our ad, which we have -- I don't
17   think you can see it in the pictures, but there's a little --
18   kind of like cubbies and it has folders that have our ads in
19   them, and so we will check the ad first.  If the item is not in
20   the ad, then we would go to the PA system.
21   Q.   And is one of the things you're also supposed to do at the
22   cashier stand to go and -- have you ever heard of the phrase
23   "fronting your lane"?
24   A.   No.
25   Q.   Okay.  We're getting away from phrases.
```

 1        Is one of your responsibilities to go up and make sure

 2   that, you know, the merchandise in the lane and right out in

 3   front of the aisle --

 4   **A.**   Oh, I know what you're saying now, yes.

 5   **Q.**   (Continuing) -- get...   Why don't you describe what you

 6   do?

 7   **A.**   Like bringing everything forward?

 8   **Q.**   Yes.  And reorganizing the candy and making sure

 9   everything is arranged correctly?

10   **A.**   We call it straightening.

11   **Q.**   I'm sorry?

12   **A.**   Straightening.

13   **Q.**   Straightening?

14   **A.**   Yes.

15   **Q.**   And that's something that you do?

16   **A.**   Yes.

17   **Q.**   And those bins that we were talking about before that have

18   merchandise that people didn't decide to buy, what to you do

19   with that?

20   **A.**   If we don't have any customers, what we usually do is we

21   have another shopping cart that's in between one of the cash

22   registers that's not in use and we usually just dump it into

23   that shopping cart.

24   **Q.**   And then what about the -- you know, there's a place you

25   put, like, stuff you need to throw away and garbage?

1   A.    Yes.  We also have another shopping cart that we would

2   line with a bag and we would put the trash in there.

3   Q.    And what about hangers?

4   A.    Hangers we usually throw away.  There is times where we

5   have to keep them, so we would just get another shopping cart

6   and put them in there; but mostly we just throw them away.

7   Q.    If you ran out of some supplies or catalog or whatever

8   else at the check stand, you need to go and get more obviously,

9   right?

10  A.    Well, in the cubbies that the folder is in, they are

11  stocked right there.

12  Q.    When it runs low, you would have to replenish it, right?

13  A.    Yes.

14  Q.    I want to ask a couple things about customer service.

15        You would say your job -- I know you're not doing it now.

16  You're in lay-away right now, correct?

17  A.    Yes, yes.

18  Q.    But you were a cashier, right?

19  A.    Yes.

20  Q.    And as a cashier, I mean, that's a customer service job,

21  right?

22  A.    Definitely.

23  Q.    Yeah.  And part of that, part of your job is to make sure

24  that customers come through and can do their transactions, you

25  know, quickly and efficiently, right?

```
 1   A.    Yes.

 2   Q.    You greet them with a smile?

 3   A.    Yes.

 4   Q.    I think you said there's a lot of things you're supposed

 5   to say to them.  That's part of the job?

 6   A.    Yes.

 7   Q.    And part of this is that you want to make sure that these

 8   customers come back and do more business at Kmart?

 9   A.    Yes.

10   Q.    And if they aren't happy with the way it went, if the line

11   takes way too long to move or if you're just not very nice to

12   them or giving them good customer service, they can go to a

13   different store?

14   A.    Yes.

15   Q.    And I believe there's a Walmart right across the street

16   from the Tulare Kmart, right?

17   A.    Yep.

18   Q.    And there is a Target, I don't know, a few blocks down on

19   the street, right?

20   A.    Two blocks away.

21   Q.    They could go there?

22   A.    Yes.

23   Q.    While you were a cashier -- I just want to make sure I've

24   got this straight.

25         While you were a cashier working in the cashier's stand we
```

1  were just looking at a little bit ago, if you needed to reach

2  up to scan that bag of dog food, you couldn't do that from a

3  seat, right?

4  **A.**   Well, it doesn't really take too much movement because,

5  like I said, the gun goes pretty for.  So all you have to do is

6  really just extend your arm.

7  **Q.**   That's bad question.

8       For the bottles of water and the 12-packs that are in the

9  shopping cart on that bottom shelf?

10  **A.**   Yes, you would have to go around for that.

11  **Q.**   You would have to go around to scan that, right?

12  **A.**   Yes.

13  **Q.**   And for those really heavy items that are hard to lift,

14  you wouldn't be able to do that from a seated position, right?

15  You would have to get up and lift them, right?

16  **A.**   Usually we would just go around for the very heavy items.

17  Most of the time the customers are very helpful and they will

18  just set them on the counter, especially if it's a gentleman,

19  and allow us to scan it.

20  **Q.**   But if someone took a 12-pack of soda and set it down like

21  we were talking about before, not right in front of you but at

22  the edge, you could grab that and pull it forwards, right?

23  **A.**   Sometimes.  Sometimes it's pretty far -- there is an area

24  on the counter where they put their items that you cannot reach

25  at all.  Usually I just ask the customer if they can pull them

 1  forward closer.

 2  **Q.**    If they put it in let's call it the in-between area, not

 3  where you can't possibly reach it, but not right set in front

 4  of you, you grab that and move it over so you can scan it,

 5  right?

 6  **A.**    Yes.

 7  **Q.**    And you couldn't do that if you were seated, could you,

 8  for a heavy item?

 9  **A.**    Probably not for a heavy item, no.

10  **Q.**    And, you know, you mentioned when you're standing as a

11  cashier -- I should back up.

12       You were always standing as a cashier when you were

13  working at the Tulare Kmart, right?

14  **A.**    Yes.

15  **Q.**    You've never tried to do it while seated, right?

16  **A.**    No.

17  **Q.**    So when you were standing as a cashier at the Tulare

18  Kmart, I think you mentioned in response to some of

19  Mr. McInerney's questions that when the coupon would print of

20  the that printer at the top of the cash register, you had to

21  reach a little bit to get it?

22  **A.**    It's a little higher than the register, so you just have a

23  little reach for it, yes.

24  **Q.**    You wouldn't be able to reach that if you were in a seat,

25  would you?

1  A.   As it stands right now, no.  I'm -- not unless it was

2  modified.

3  Q.   And that pin pad that we were looking at before where we

4  were talking about where you would have to, you know, sometimes

5  help people that weren't too good with a credit card, you would

6  have to get up and assist them with that sometimes, right?

7  A.   Yes.

8  Q.   And you couldn't do that as currently configured at the

9  Tulare Kmart, you couldn't do that from seat?

10  A.   No.

11  Q.   Now, before you mentioned -- you mentioned that before you

12  were working at Kmart, you worked at MacDonald's, right?

13  A.   Yes.

14  Q.   What was your position there?

15  A.   I was a cashier, so I did the drive through area.

16  Q.   Now, did you ever observe the front end cashiers at

17  MacDonald's?

18  A.   Yes.  I would work there, too, sometimes.

19  Q.   I mean, that's kind of a customer service job, too, isn't

20  it?

21  A.   Yes.

22  Q.   You're dealing with -- you know, you're doing transactions

23  with the customer and handing things to them, right?

24  A.   Yes.

25  Q.   You even have increased sales.  Like you were -- you

1   talked about before that you try and have customers at the

2   Tulare Kmart use certain credit cards.  And at MacDonald's you

3   will say things like, "Hey, do you want to Super Size that,"

4   right?

5   **A.**   Uh-huh.

6   **Q.**   You have to say "yes" or "no" or she can't write it down.

7   I'm sorry.

8   **A.**   Yes.  Sorry.

9   **Q.**   And the front end cashiers at MacDonald's, they don't use

10  a seat, right?

11  **A.**   No.

12  **Q.**   They stand?

13  **A.**   Yes.

14  **Q.**   Just like the customers are standing across from them?

15  **A.**   Yes.

16          **MR. ADKINS:**  I have no further questions, your Honor.

17  Thank you.

18          **THE COURT:**  All right.  Any more questions?

19          **MR. McINERNEY:**  I have a few, your Honor, if I may.

20                    <u>**REDIRECT EXAMINATION**</u>

21  BY MR. MCINERNEY:

22  **Q.**   When customers want to purchase an item of some size, like

23  a flat screen TV,  how does that merchandise come up to the

24  front end of the store?

25  **A.**   A stock person would bring them up on a flatbed.

1  Q.   All right.  And then if the stock person brings up this

2  large item, like a flat screen on a flat bed, how is that item

3  rung up by a cashier?

4  A.   There was a few different ways.  Sometimes the stock

5  person will hand you a slip that you just scan.  That's the bar

6  code for the item.  They will read the number to you, the UPC

7  number, which is the number that the register rings up for the

8  price.  Or we would use our hand-held.

9  Q.   By the way, this hand-held, you said it reaches pretty

10 far.  Is this one of the hand-helds that's on a cable or is

11 this --

12 A.   No, it's not.

13 Q.   So when you say it reaches pretty far, do you have to be

14 touching the purchased item, the bar code, with the hand

15 scanner for it to work?

16 A.   No.  The actual scanner that takes on the bar code, like,

17 the distance from the bar code and the scanner, it reaches a

18 great distance so you don't have to be close.

19 Q.   Okay.  Can you give us some idea by your hands --

20 A.   You can probably reach about, probably about this far

21 (indicating).  It really depends on the size of the UPC because

22 there are different sizes.

23         MR. McINERNEY:  For the record, your Honor, 20 inches?

24         THE COURT:  Agreed.

25         MR. ADKINS:  That's fine with me, your Honor.

1           THE COURT:  Twenty inches, okay.

2   BY MR. MCINERNEY:

3   Q.   Now, you mentioned that items could be difficult to reach

4   if they were at the far end of the counter, is that correct?

5   A.   Yes.

6   Q.   Okay.  Is that true even if you're standing as a cashier?

7   A.   Yes.

8   Q.   So the problem is that sometimes items are placed -- is

9   there a particular part of that counter that is the most

10  difficult for you to reach even when -- you know, when you're

11  standing?

12  A.   Yeah.  It's the corner of the counter.

13  Q.   Just so we're clear, we're talking about this area

14  (indicating)?

15  A.   Yes.  That corner, yes.

16  Q.   So if one of those elderly men came along with a sawzall

17  and cut that off, you wouldn't have a problem reaching anything

18  there, huh?

19  A.   No.

20  Q.   Do you know what a sawzall is?

21  A.   Is that one of those hand-held saw things?

22  Q.   Yeah.

23  A.   I knew it.

24  Q.   Defense counsel asked you if the fact that a cashier is

25  expected to straighten items.  As you come up to these cash

1  register stations, there's, like, a big row of candy, right?

2  **A.**    Yes.

3  **Q.**    Just to drive mothers crazy.

4  **A.**    It's perfect for the kids.

5  **Q.**    And if you said, you know -- can you estimate when you

6  were a front end cashier, how much time of your shift working

7  at the front end would you actually spend straightening that

8  candy?

9          **MR. ADKINS:**  Same objection, your Honor.

10         **THE COURT:**  No.  It's within her lay opinion.

11     Go ahead.  Please answer the question.

12  **A.**    Okay.  Percentage-wise, you probably spend about zero to

13  five percent of the time.  There's not that much candy where

14  you would be straightening for too long.

15  **BY MR. MCINERNEY:**

16  **Q.**    And then another duty you're supposed to perform when

17  you're a cashier is cleaning?

18  **A.**    Yes.

19  **Q.**    And what's involved in cleaning the front end?

20  **A.**    Cleaning is usually, like, wiping down the counters,

21  straightening items; like, if you have papers or your trash is

22  overflowing or that kind of thing.  We don't sweep or anything

23  like that.  So pretty much just wiping things down.

24  **Q.**    And so, again, if you could give us an estimate of the

25  percentage of time when you're working as a front end cashier

1   up there, what percentage of your time did you spend cleaning?

2            MR. ADKINS:  Same objection, your Honor.

3            THE COURT:  Overruled.  Please answer.

4   A.   Cleaning is only done usually in the morning.  So probably

5   about zero to five percent, because it's only done pretty much

6   the first person that comes in.

7   BY MR. MCINERNEY:

8   Q.   Would you sometimes wipe down the counter, though, during

9   the course of your shift?

10  A.   Yeah.  Me personally, I do.  I get sanitation wipes

11  because I don't like germs, so I wipe them all down.

12  Q.   Don't like cats and you don't like germs.

13  A.   Huh-uh.

14           THE COURT:  I don't like germs in this courtroom

15  either, as some of you know.  Good for the witness.  That's

16  good.  Cats are okay, however.

17      All right.  What else?

18           MR. McINERNEY:  I'm done.

19           THE COURT:  Anything further on recross?

20           MR. ADKINS:  No, your Honor.  We can excuse Ms.

21  Wright.

22           THE COURT:  May this witness be excused for good and

23  discharged from the subpoena?

24           MR. ADKINS:  She may, your Honor.

25           MR. McINERNEY:  Yes.

1          THE COURT:  This means you don't have to come back.

2     You're no longer under subpoena.  You may return to Tulare.

3          Thank you.  Have a safe journey home.

4          THE WITNESS:  Thank you.

5          (Witness excused.)

6          THE COURT:  Counsel will you please retrieve those

7     exhibits so that they stay in the right spot?

8          It's now time for our 15-minute break.  We will take the

9     break.  Who is our next witness going to be?  Who is that going

10    to be, Mr. McInerney?

11         MR. McINERNEY:  It's Evelyn Hyatt, your Honor.

12         THE COURT:  All right.  He will see you in 15 minutes.

13         (Recess taken from 11:54 a.m. to 12:11 p.m.)

14         THE COURT:  Please remain seated, and let's go back to

15    work.  Let's call the next witness.

16         My clerk is not here right this second, so if you need

17    exhibits you'll have to fish them out on your own.

18         Are you ready to go?

19         MR. DOSTART:  We are, your Honor.

20         THE COURT:  Next witness then.

21         MR. DOSTART:  Evelyn Hyatt is the next witness.

22         THE COURT:  Evelyn Hide?

23         THE WITNESS:  Hyatt.

24         THE COURT:  Is that you?  Please stand right there.

25

PROCEEDINGS

1                          **EVELYN HYATT**,

2   called as a witness for the Plaintiff herein, having been first

3   duly sworn, was examined and testified as follows:

4            **THE WITNESS:**  Yes.

5            **THE COURT:**  Welcome.  Please, have a seat.

6       Do you see that microphone?  It needs to be about this

7   close to your voice.  It will move closer.  See how it moves?

8   Why don't you say your name.

9            **THE WITNESS:**  Evelyn Hyatt.

10           **THE COURT:**  Move it a little closer.  All right.

11  That's good.  That will work.

12      Counsel, go ahead.

13           **MR. DOSTART:**  Thank you, Your Honor.

14                     **DIRECT EXAMINATION**

15  BY MR. DOSTART:

16  **Q.**   Good morning, Ms. Hyatt.

17  **A.**   Good morning.

18  **Q.**   What is your name?

19  **A.**   Evelyn Hyatt.

20  **Q.**   And where do you live?

21  **A.**   Tulare, California.

22  **Q.**   How long have you lived in Tulare, California?

23  **A.**   For a long time.  About 40 years.

24  **Q.**   About four-zero years?

25  **A.**   Forty years.

HYATT - DIRECT / DOSTART

1  Q.   Would you please describe your educational background.

2  A.   Uhm, high school.

3  Q.   Okay.  Did you finish high school?

4  A.   Finished high school.

5  Q.   And did you finish high school in Tulare?

6  A.   In Tulare, yes.

7  Q.   And what is your current occupation or occupations?

8  A.   I have two jobs, currently.  I work full-time at JoAnn

9  distribution Center, for the JoAnn Craft Stores.  And I also

10 work part-time at Kmart.

11 Q.   Okay.  What do your job duties consist of at JoAnn's?

12 A.   I'm an RTV clerk.  So it consists of sitting, standing,

13 packing, talking to vendors, talking to other DCs.

14 Q.   Okay.  And what is your current job duty at Kmart?

15 A.   Cashier.

16 Q.   Have you had any other job duties at Kmart?

17 A.   Yes.

18 Q.   What other job duties have you had at --

19 A.   I was an assistant manager back in '99-2000.  And came

20 back as a stocker, and then went into cashiering.

21 Q.   Okay.  How many years total have you spent cashiering at

22 Kmart?

23 A.   Approximately seven.

24 Q.   And you mentioned that you work at Kmart on a part-time

25 basis?

HYATT - DIRECT / DOSTART

```
 1  A.    Yes.

 2  Q.    Approximately how many hours a week would you estimate you

 3  work at Kmart?

 4  A.    Twelve to 17.

 5  Q.    And how many days a week do you typically work?

 6  A.    Three to four.

 7  Q.    Now, I'm going to show you an exhibit that has been

 8  properly marked.

 9         THE COURT:  Thank you.

10         MR. DOSTART:  You're welcome, your Honor.

11      Although, I do not believe it has been admitted into

12  evidence yet.  I think it was first discussed in opening

13  statements, but obviously not moved into evidence.

14      So I'm going to hand the original to the witness.  And if

15  I could ask Ms. Hyatt to take a look at that real quickly.

16         MR. MATTHEW RIGHETTI:  I'm not sure that's going to

17  work.

18         MR. DOSTART:  I'm sorry?

19         MR. MATTHEW RIGHETTI:  I'm not sure that's going to

20  work without Dawn.

21      Oh, there she is.

22         THE COURT:  She heard you say her name.  Right

23  through.

24      What is that exhibit number?

25         MR. DOSTART:  It is Exhibit Number 1.
```

 1              THE COURT:  Number 1.  A good number.

 2         All right.  Do you know what that thing is, Exhibit 1 is?

 3              THE WITNESS:  It's the plans to the store, the layout.

 4              THE COURT:  Any objection?

 5              MR. ADKINS:  No, Your Honor.

 6              THE COURT:  All right.  Received in evidence.

 7         (Trial Exhibit 1 received in evidence.)

 8              THE COURT:  Great.  Got it.  Let's go ahead.

 9    BY MR. DOSTART:

10    Q.   Ms. Hyatt, if you could -- on that screen right in front

11    of you, if you could do your best Monday Night Football

12    impression, if you touch the screen it's going to draw on the

13    screen.

14    A.   Okay.

15    Q.   What I would like you to do, if you don't mind, is to

16    indicate to the Court where the front end cash registers are at

17    Tulare.

18    A.   Right here.  I can't draw very well, but they're there

19    (indicating).

20              THE COURT:  Good.  Thank you.

21              MR. DOSTART:  Just for the record, I'll indicate that

22    the witness has circled the bottom right of the exhibit, if

23    "confidential" is on the bottom of the exhibit, where there

24    appears to be six or seven sort of linear objects.

25

1  **BY MR. DOSTART:**

2  **Q.**   And so those are the checkstands, Ms. Hyatt?

3  **A.**   Yes.

4  **Q.**   Do you know how many checkstands there are at the Tulare

5  store?

6  **A.**   There are seven front end checkouts.

7  **Q.**   And do you ever work at those checkstands?

8  **A.**   Yes.

9          **THE COURT:**  You know what I think we ought to do?

10 Mind if I interrupt you?

11     On the actual exhibit itself would you take this

12 highlighter and highlight the area where the checkstands are.

13 That way there will be a record for the Court of Appeals.  And

14 then the lawyers, if you would like to come up and see what the

15 witness has done, then you'll have that area.

16     And why don't you write there, just write -- no, have the

17 witness do it.  With that same color just say "checkstands."

18         **THE WITNESS:**  Checkouts?

19         **THE COURT:**  Checkouts.  Whatever the right ...

20     All right.  So everybody see what the witness has done?

21         **MR. DOSTART:**  Yes, your Honor.

22         **MR. ADKINS:**  Yes, your Honor.

23         **THE COURT:**  Okay.  That's the way the Court of Appeals

24 is going to see it.  The Supreme Court, the International Court

25 of the Hague, and as far as you want to take this case.

```
 1              MR. DOSTART:  Thank you, your Honor.

 2              THE COURT:  Thank you, Ms. Hyatt.

 3        Our next question.

 4   BY MR. DOSTART:

 5   Q.   When you are scheduled to work at the checkstand, how do

 6   you find out that you're scheduled to work there?

 7   A.   We have a schedule that's posted.

 8   Q.   And where is it posted?

 9   A.   In the office and online.

10   Q.   And how often is it posted?

11   A.   Every week.

12   Q.   So let's imagine --

13   A.   Weekly, on Thursdays.

14   Q.   And so let's imagine that you walk into work on an average

15   day.  What do you typically do first?

16   A.   Uhm, we clock in.

17   Q.   And where do you clock in?

18   A.   At the checkouts, 6 or 7.

19   Q.   And what do you do next?

20   A.   Go up front to check out your money.

21   Q.   And when you say go up front, what location of the

22   store --

23   A.   To the service desk at the front of the store, so that you

24   can check out your money and then go back to your designated

25   register and put the money in the till and get started.
```

HYATT - DIRECT / DOSTART

432

1   Q.   And how do you know which register to go to?

2   A.   You just pick one that's empty.

3   Q.   Do you have to do anything to get that register ready for

4   business?

5   A.   Set up your register.  And then you turn on your light to

6   let other people know that the register is open.

7   Q.   Okay.  And when you say "let other people know," are you

8   referring to other employees of Kmart?

9   A.   No.  The guests.

10  Q.   Guests of Kmart?

11  A.   Uh-huh.

12  Q.   Okay.  Is there a number or a password that you have to

13  enter into the register in order for you to open it or unlock

14  it?

15  A.   Yes.

16  Q.   Which one is it?  Is it a --

17  A.   We have a password, and then we have a secret code that

18  you change weekly.

19  Q.   Okay.  And at which point do you enter in each of those?

20  A.   Before the register door can open, you have to identify

21  yourself as you're going to log onto the register.  And then

22  you put in your secret code so that the register acknowledges

23  you.

24  Q.   Okay.  Do you know if Kmart was able to keep track of your

25  logging in or unlocking the register using that code?

HYATT - DIRECT / DOSTART                                    433

1           MR. ADKINS:  Objection.  Lacks foundation.  Calls for

2   speculation.

3           THE COURT:  Well, let's find out.

4       The question is, do you know?  Do you know the answer to

5   that question?

6           THE WITNESS:  I know that they can -- that we have our

7   rings per minute that shows, so they have to know when we can

8   log in.

9           THE COURT:  They have what?

10          THE WITNESS:  A rings per minute.  It's like when the

11  register is opened, they can tell -- or when it's unlocked,

12  they can tell when or how many rings per minute you can --

13          THE COURT:  What is a ring?

14          THE WITNESS:  Uhm, every time you scan an article, it

15  goes through.  An item.

16          THE COURT:  And the store is able to track that by

17  your name?

18          THE WITNESS:  Yes.

19          THE COURT:  How do you know that they can do that?

20          THE WITNESS:  Uhm, just experience.  Just listening

21  and knowing.

22      We have to check in every day, so it tells you your rings

23  per minute and how long you can be there.

24          THE COURT:  Yourself, have you ever seen such a

25  report?

1          THE WITNESS:  No.  Well, just on the register, in the

2    morning when you come in, it has the register rings per minute

3    on there.  I mean, it tells you what you do every day.

4          THE COURT:  So you're saying that you can look at your

5    own register, and it will tell you how many rings you yourself

6    have --

7          THE WITNESS:  No, it doesn't tell us that.  I'm sure

8    that they would keep it.

9          THE COURT:  Well, I'm going to let counsel ask the

10   questions --

11         THE WITNESS:  I'm sorry.

12         THE COURT:  -- but so far you've not established that

13   this witness has firsthand knowledge of the -- to answer the

14   question.  So you need to establish that foundation first,

15   without asking leading questions.

16   BY MR. DOSTART:

17   Q.   Ms. Hyatt -- Ms. Hyatt, what does rings per minute mean to

18   you?

19   A.   How often that you can -- how fast an item goes through

20   the scanner, how many rings -- how much articles can go

21   through.  You know, like you bag and scan.  You scan and bag,

22   scan and bag, scan and bag.  So it's just telling you how much

23   time you spent with each guest.

24   Q.   Okay.  And so do you know if you have a number or if you

25   ever had a number that would be your personal rings per minute?

1    **A.**    It tells us every day we log on to our computer what

2    standings you are in the company or in that store of how many

3    rings per minute you are at.

4            THE COURT:  What computer are you talking about?

5            THE WITNESS:  The checkout register.

6            THE COURT:  The checkout register also is a computer?

7            THE WITNESS:  Well, it's -- I don't know if it's a

8    actual computer.  It has to be, to communicate with the other

9    offices, I'm sure.

10           THE COURT:  You're saying you can look at that, and

11   there's like a window or a screen, and it will tell you what

12   information, again?

13           THE WITNESS:  What -- how we ranked on rings per

14   minute.

15           THE COURT:  You get some kind of prize if you're the

16   number one?

17           THE WITNESS:  No.  No, you don't.

18           THE COURT:  All right.  So it says you're number one

19   or number two or number ten --

20           THE WITNESS:  Yes.

21           THE COURT:  -- in terms of how many items that you

22   have processed?

23           THE WITNESS:  Throughout your shift, yeah.

24           THE COURT:  All right.  So that's right there on the

25   machine.

 1            THE WITNESS:  It is.

 2            THE COURT:  All right.  Well -- okay.  So what's wrong

 3   with that?  It's right there on her machine.  She can see that.

 4            MR. ADKINS:  If the questions are about what she sees

 5   on her machine, that's fine.  I think the prior question went a

 6   little deeper.

 7            THE COURT:  We'll take it one step at a time and see

 8   where we go, but I'm going to let in evidence anything she

 9   reads off of her own machine.

10       So, go ahead.

11            MR. DOSTART:  Thank you, Your Honor.

12   BY MR. DOSTART:

13   Q.   As far as you know, Ms. Hyatt, can a cashier be written up

14   or punished or in any way reprimanded if the rings per minute

15   are slow?

16            THE COURT:  Don't guess at that.  I don't like

17   questions that say "as far as you know."  It begs the question

18   of how far she does know.  You need to lay that foundation.

19            MR. DOSTART:  Okay.

20            THE COURT:  I don't like that question.

21            MR. DOSTART:  I'll move on.

22   BY MR. DOSTART:

23   Q.   Ms. Hyatt, before we get into questions about the front

24   end register itself, I want to talk a little bit about the

25   amount of time that a cashier spends -- or, I should say the

1  amount of time that you spend, on average, at the front end

2  register when you're scheduled to work at the front end

3  register.

4       So, let me ask you this.  When you're scheduled to work as

5  a front end cashier, do you spend 100 percent of your time at

6  the register itself?

7  **A.**   No.

8  **Q.**   Okay.  What percent of your time would you estimate that,

9  on a typical shift, you spend at the register itself?

10  **A.**   Between 70 and 90 percent.

11  **Q.**   Okay.  And what do you spend the balance or the rest of

12  your time doing?

13  **A.**   Uhm, doing returns, emptying your trash underneath,

14  straightening the front end of the store area.  Close enough to

15  the registers where you can still be there and have view of it.

16       **MR. DOSTART:**  Okay.  Great.  Now, I'm going to walk

17  over here, and I'll try to keep my voice loud enough for the

18  court reporter to hear me and for defense counsel.  I'm going

19  to stand next to what has been marked as Exhibit 216-A.  And I

20  believe it's already into evidence.

21  **BY MR. DOSTART:**

22  **Q.**   Ms. Hyatt, can you tell me what this is?

23  **A.**   The register area where we stand.

24  **Q.**   Okay.  Now, in this diagram, where is the actual register?

25  **A.**   The cash register is -- kind of backwards.

HYATT - DIRECT / DOSTART

```
 1              THE COURT:  The witness is fading out.  You've got to

 2   speak into the microphone so we can hear you.  All right.

 3   Answer that question again.

 4              THE WITNESS:  The register --

 5              THE COURT:  Use the pointer.  Let's have -- or your

 6   little -- do you have the little, magic laser pointer?

 7              MR. DOSTART:  Yes.

 8              THE COURT:  Show the witness what button to push.

 9              MR. DOSTART:  That's it, right there.

10              THE WITNESS:  The register would be right here

11   (indicating).

12              THE COURT:  What would be right there?

13              THE WITNESS:  The register, cash register.

14              THE COURT:  Got it.  Okay.  And?

15   BY MR. DOSTART:

16   Q.   And does the register itself print the receipt?

17   A.   Yes.

18   Q.   Okay.  And where is the counter that merchandise would be

19   placed?

20   A.   It would be right here (indicating).

21   Q.   Okay.  And where is the coupon printer?

22   A.   Right here (indicating).

23   Q.   Okay.  And where is the scanner, the counter scanner?

24   A.   The scanner is right here (indicating).

25   Q.   And where would the hand scanner be?
```

1  **A.**    Between the register.  And it would be like right in here

2  where the register is (indicating).

3  **Q.**    And where is the credit card terminal or credit card

4  reader?

5  **A.**    In front of the cash register, right there -- I mean in

6  front of the guest, right here.

7  **Q.**    And since you said that, I'll ask this question next.

8  Where would the guest be standing while you're typically

9  ringing up a customer's purchase?

10 **A.**    On this side of the register.

11 **Q.**    And from which direction would the customer initially

12 approach?

13 **A.**    They would approach from this area right here, which is

14 the store area.

15 **Q.**    Okay.  And where is the demagnetizer?

16 **A.**    It's right here.

17 **Q.**    And what is the purpose of the demagnetizer?

18 **A.**    It deactivates the tags, the electronic scanning.

19 **Q.**    Okay.  And what are those tags in place for?

20 **A.**    To prevent them taking it without paying for it.

21 **Q.**    Okay.  And, obviously, we have the item labeled as a floor

22 mat.  Is that where you would stand?

23 **A.**    Yes.

24 **Q.**    And where are the bagging racks?

25 **A.**    They're right here (indicating).

1  Q.    All right.  And where is the bagging table?

2  A.    Right here (indicating).

3  Q.    All right.  So I want to walk through, if we can, a

4  typical transaction at the Kmart store in Tulare.  So if a

5  customer walks up to the register and maybe after you turned on

6  the light, what is the first thing that you do?

7  A.    We check to make sure that the baskets have the items

8  underneath.  It's easier to look at that time.

9  Q.    Okay.  And what is the purpose of looking to make sure

10  that there are no items in the bottom of the basket?

11  A.    So that we know to scan those items.

12  Q.    Okay.  Is there anything else you do as the customer

13  initially approaches?

14  A.    We greet the customer.

15  Q.    All right.  And while you're greeting the customer or

16  checking the bottom of the cart, is the customer typically

17  doing anything?

18  A.    They are unloading their -- their purchases onto the

19  counter.

20  Q.    Okay.  Speaking of carts, does every customer have a cart?

21  A.    No.

22  Q.    If you had to estimate, what percent of customers at Kmart

23  would you believe have a cart or bring a cart to the register

24  with them?

25  A.    Probably 15 percent, maybe.

1   **Q.**   Okay.

2   **A.**   Depending on the size of the -- what they have.  I mean,

3   it could be even higher than that.

4   **Q.**   Okay.  And so after the customer places their merchandise

5   on the counter, what do you do next?

6   **A.**   Unlock the register, ask them if they have any rewards

7   cards, and process from there.  Just start scanning.

8   **Q.**   All right.  Now, when you say ask them if they have any

9   rewards cards, what specifically do you ask customers?

10  **A.**   Well, you greet them and ask, Do you have your rewards

11  card today?  And if they do, then we scan it.  If they don't,

12  we punch in their number.  And then we go on from there and

13  start scanning their items.

14  **Q.**   Are there any other questions that you're supposed to ask

15  customers while they're being checked out?

16  **A.**   If they would like to apply for a Sears card.  You know,

17  that's probably about it.

18  **Q.**   Okay.  And after the merchandise has been placed on the

19  counter and you've asked any questions that you needed to, or

20  greeted the customer, what do you do next?

21  **A.**   You find out how they're paying, whether it be debit or

22  credit.

23  **Q.**   At what point do you typically scan the merchandise for

24  the customer?

25  **A.**   As soon as they place it on the counter.

HYATT - DIRECT / DOSTART

1  Q.    Okay.  And how do you determine whether to use the counter

2  scanner or the hand scanner?

3  A.    Depending on how heavy the articles are.  If it's dog food

4  or cat litter, or something like that, water, we generally get

5  up and walk around and, you know, -- walk around and scan it

6  with a handheld scanner.

7  Q.    Okay.  And what about items besides the items that you've

8  mentioned?

9  A.    Uhm, we just scan them through the scanner.

10 Q.    All right.  Which would you estimate that you use more

11 often, the counter scanner or the hand scanner?

12 A.    You could use both, depending on if the UPC scans or not.

13 Q.    In your experience, would you say you use one more than

14 the other, or would you estimate that you use them equally, or

15 do you not have a way to estimate that right now?

16 A.    No, I don't.

17 Q.    Okay.  You mentioned that there are some items that you

18 would maybe need to use the hand scanner for.  I want to talk a

19 little bit about those.  What types of items are those,

20 generally speaking?

21 A.    That you would use the hand scanner on?

22 Q.    Yes.

23 A.    Just the heavier items.

24 Q.    All right.  What percent of transactions would you

25 estimate, based on your experience at Kmart, are items that you

 1 would estimate are heavy?

 2          **MR. ADKINS:**  Objection.  Vague.  Calls for

 3 speculation.

 4          **THE COURT:**  It's vague.  The word "heavy" needs some

 5 definition.

 6          **MR. DOSTART:**  Okay.

 7 **BY MR. DOSTART:**

 8 **Q.**  Ms. Hyatt, would you be able to estimate what a 10-pound

 9 item feels like?

10 **A.**  Yes.

11 **Q.**  Okay.  Let's call items that weigh ten pounds or more

12 items that you would estimate are heavy.  And let me ask a

13 different question.

14       What percent of transactions or what percent of customers

15 would you estimate have an item that is heavy?

16 **A.**  Probably zero to five percent.

17 **Q.**  Okay.  And is it fair to say that most customers have

18 light items at Kmart?

19 **A.**  Yes.

20 **Q.**  And what are some of the ways that you check out or ring

21 up a customer if they have heavy or awkward items?

22       We talked about the hand scanner.  Are there any other

23 ways that you go about ringing up the customer if they have

24 heavy or awkward items?

25 **A.**  Sometimes they'll pull a tag off, and you can scan it that

1    way.  The porters will bring up heavy article on a flatbed, and

2    you can scan it that way.

3    **Q.**    So let's talk about those two things.  So if there's a

4    tag, where would that tag be located on the item?

5    **A.**    It could be anywhere on the box, or, you know, next to the

6    UPC label.

7    **Q.**    And how does that tag get scanned, do you take it from the

8    item?  Does the customer take it from the item?

9    **A.**    Some can be taken from the item.  Others you just have to

10   scan it with the handheld.

11   **Q.**    Let's go to the second category of items that you said you

12   would scan, that were large or awkward.

13       Who are porters?  What are porters at Kmart?

14   **A.**    They're the -- well, they do multiple things, but they're

15   the people that take the -- the heavier articles out for

16   customers.

17   **Q.**    Okay.  And so do they place them on the counter or --

18   **A.**    No.  They leave them on the flatbeds and either scan the

19   UPC for us, if we hand them the gun, or they will bring it

20   close enough to where we can scan it.

21   **Q.**    Okay.  Thank you.

22       And so once the items have come through and are scanned,

23   what do you typically do next?

24   **A.**    We finish up the article -- the sale.

25   **Q.**    All right.  And at what point do you bag the items?

HYATT - DIRECT / DOSTART

1  **A.**   Uhm, right after you scan it.

2  **Q.**   All right.  And do you bag all items that you scan?

3  **A.**   Not all items.

4  **Q.**   Which items do you not bag?

5  **A.**   Uhm, a lot of the bigger items, the big detergent,

6  anything that's big that won't fit into a bag.

7  **Q.**   Okay.  And what -- how does that item become placed on the

8  counter, the items that are large, that you're not going to

9  bag?

10  **A.**   Uhm, the guest will place it on the counter, and we just

11  scan it over like we normally would, and then place it on the

12  opposite counter so that they can take it and put it in their

13  basket.

14  **Q.**   When you say they can take it, are you referring to the

15  guest taking it?

16  **A.**   The guest, yes.

17  **Q.**   So the guest would take the heavy or awkward item that

18  you're not going to bag, and place it back into their own cart?

19  **A.**   Yes.  And sometimes they just leave it in the cart,

20  depending on what size it is.

21  **Q.**   All right.  And I know that you have indicated to me where

22  the bags are according to Exhibit 216-A.

23       Would you estimate that you have to move your legs in

24  order to bag items?

25  **A.**   Yes.  You have to be able to reach the bags.

1   Q.   Okay.  And so they are not within arm's distance?

2   A.   No.  They're around the corner.

3   Q.   Okay.  After you've bagged an item, what do you do with

4   it?

5   A.   Place it on the bagging table.

6   Q.   All right.  And what happens after an item is placed on

7   the bagging table?

8   A.   The customer takes it and places it in their cart.

9   Q.   Okay.  Now, so after you've scanned, bagged, placed items

10  on the bagging table, what do you do next?

11  A.   We take their form of payment, whichever, ask them what

12  kind of payment they're going to make with it.

13  Q.   So if a customer is going to pay with a credit card, is

14  there anything that the cashier must do?

15  A.   We have to ask them for I.D., and then we push the button

16  for the credit card.

17  Q.   And where is that button located?

18  A.   It's located on the register?

19  Q.   And what if a customer is going to pay with a debit card,

20  what do you --

21  A.   We do the same thing.  We don't ask for I.D., but we push

22  the button for it.

23  Q.   What if a customer is going to pay with cash, what does

24  the cashier have to do?

25  A.   We just take the money, count it, and push in what they

 1  gave us, and give them change if it's required to do so.

 2  Q.   Okay.  And what if the customer is going to pay with a

 3  check, what does the cashier have to do?

 4  A.   We also ask for I.D. for checks.  We can -- they can fill

 5  the check out, or the register has an operation on there where

 6  it will fill it out and we can give it back to them.

 7  Q.   Okay.

 8  A.   Place it into a check reader, and it does all the work for

 9  us.

10  Q.   Okay.  After a customer has provided you with payment,

11  what is the next step in the transaction?

12  A.   To thank the guest.  And then they're gone, and we do the

13  next thing again, for the next guest.

14  Q.   I just want to be clear.  At what point does the receipt

15  printer or the register print the receipt?

16  A.   Oh, after the transaction.

17  Q.   Okay.

18  A.   Forgot about that.

19  Q.   And what does the cashier do with the receipt?

20  A.   We hand it to the guest or place it in their bag,

21  whichever they want to do.

22  Q.   And then after that you say good-bye to the customer and

23  thank them?

24  A.   Yes.

25  Q.   And then is that the end of a typical transaction at

HYATT - DIRECT / DOSTART

1  Kmart?

2  **A.**    Yes.

3  **Q.**    Now, I'm going to ask you some questions about your work

4  at Kmart, and whether it involves standing or being seated.

5  Have you done all of your work as a front end cashier standing?

6  **A.**    Yes.

7  **Q.**    Have you ever wanted a seat?

8  **A.**    Yes.

9  **Q.**    Why?

10  **A.**    Uhm, just tired.  Your back hurts.  Your legs hurt.  Feet

11  hurt.

12  **Q.**    So based on your experience as a front end cashier, is it

13  easy for you to stand throughout an entire shift and do all of

14  your duties?

15  **A.**    There are days.

16  **Q.**    Okay.  And are there some days when it's not easy?

17  **A.**    Yes.

18  **Q.**    All right.  Have you ever experienced any fatigue or

19  discomfort or pain, in addition to any that you just mentioned

20  right now, as a result of standing as a cashier at Kmart?

21  **A.**    Just -- just the -- the feet or the back hurts, or the

22  knees, yeah.

23  **Q.**    Okay.  How often would you estimate that you experience

24  that discomfort that you've just described?

25  **A.**    It could be during any shift.  I don't know.

1 Percentage-wise or --

2 **Q.**   Yeah.   Let's say out of all the shifts that you can work,

3 if you were to estimate, you know, how often do you feel

4 fatigued or discomfort or pain, that you believe is a result of

5 standing throughout your entire shift?

6 **A.**   Uhm, I don't know.   Ask me again.   I'm sorry.

7 **Q.**   Okay.   I guess I just want to figure out whether the

8 sensations that you said you were feeling are common, or

9 whether they're not common.

10 **A.**   They're common depending on -- yeah, they're common

11 depending on the day.   I mean --

12 **Q.**   Okay.

13 **A.**   -- we work four hours --

14       **THE COURT:**   That doesn't mean anything, "common

15 depending."

16    Okay.   Let's say out of ten typical days, when you're

17 standing there at the cash register, are we talking about you

18 get these pains one time out of ten?   Five times out of ten?

19 Nine times out of ten?   Or any other number.   You tell us.

20 What's your estimate?

21       **THE WITNESS:**   I would say about eight to nine times.

22       **THE COURT:**   Eight or nine times out of ten you have

23 these pains?

24       **THE WITNESS:**   Yes.

25       **THE COURT:**   Okay.

HYATT - DIRECT / DOSTART                     450

1  BY MR. DOSTART:

2  Q.   Speaking of fatigue, are there antifatigue mats at the

3  Kmart store?

4  A.   Yes.

5  Q.   And have there always been antifatigue mats?

6  A.   There always has.

7  Q.   Have they been recently replaced?

8  A.   Yes, they have.

9  Q.   I wanted to talk about the mats that were in existence

10 before they were replaced.  What shape were those mats?

11 A.   They were in real bad shape.  Real bad.

12 Q.   What did the mats look like?

13 A.   They were a -- a square mat.  I'm not sure on

14 distance-wise, whether it be four by four, or whatever.  But

15 the area where we stood a lot, where they were worn down, was

16 really bad because they had holes in them, actually, and asked

17 to be replaced.

18 Q.   Who asked them to be replaced?

19 A.   I asked them to be replaced.

20 Q.   Who did you ask?

21 A.   The office personnel, the upfront service guest -- service

22 person.  And I also spoke to the manager.

23 Q.   And so why did you ask to have these mats replaced?

24 A.   Because they had holes in them, and they were dangerous,

25 and you couldn't stand and get comfortable, be comfortable on

451

HYATT - DIRECT / DOSTART

 1  them.

 2  **Q.**    So I want to talk about both of that.  Why -- both of

 3  those points.

 4        Why could you not be comfortable on the mats?

 5  **A.**    Because they had holes on them.  And if you moved too --

 6  when the register drawer opened and you moved, you could fall.

 7  They were, to me, dangerous.  They were a hazard to be up

 8  there.

 9  **Q.**    Okay.  And after you made the request to have the mats

10  replaced, what happened?

11  **A.**    Uhm, they finally did replace them.  It took about a

12  month.

13  **Q.**    And when did you make that request?

14  **A.**    About a month ago.  No, a month before they replaced them.

15  They replaced them recently.

16  **Q.**    When were they replaced?

17  **A.**    Within the last two weeks.

18  **Q.**    Do the new fatigue mats have holes in them yet?

19  **A.**    No.

20  **Q.**    Okay.  Now, you mentioned that you've been a -- that

21  you've worked the duties of a front end cashier for

22  approximately seven years.  Is it fair to say that you've

23  handled thousands of customer transactions?

24  **A.**    Yes.

25  **Q.**    Okay.  I want to ask you a little bit about -- a little

1   bit about this checkstand.

2        Based on your experience at Kmart and, you know, prior to

3   this lawsuit being filed, did you ever think about what

4   modifications would be required in order for a seat to be

5   provided at the checkstand register?

6   **A.**   Yes.

7   **Q.**   What modifications do you think would need to be made?

8   **A.**   The bags would have to be moved over.  The knee area would

9   have to be able to be free underneath.  There's like a counter

10  that holds their trash area.  That would have to be moved.  And

11  then the seat could roll back and forth.

12  **Q.**   Okay.  Based on your experience at a -- as a Kmart

13  cashier, do you believe that you could perform most of the

14  essential duties of a cashier while seated, if those

15  modifications were made?

16  **A.**   You could.

17  **Q.**   Okay.

18  **A.**   Yeah.

19  **Q.**   So I'm going to go back to the transaction that we walked

20  through.  And I want to -- I want to get a feel for what you

21  believe you could do seated, if those modifications that you

22  just testified to were made.

23       Do you believe that you could greet the customer while you

24  were seated?

25  **A.**   Yes.

1  Q.   Do you believe that you could check the bottom of the

2  basket as the customer approaches the checkstand, while seated?

3  A.   Yes.

4  Q.   Do you believe that you could use the counter scanner

5  while seated?

6  A.   Yes.

7  Q.   Do you believe that you could use the hand scanner while

8  seated?

9  A.   Yes.

10 Q.   If a --

11        MR. ADKINS:   Objection.   Vague as to how she would use

12 the hand scanner.

13        MR. DOSTART:   I'm going to get into that right now, so

14 I'm happy to withdraw that question.

15        THE COURT:   Withdrawn.   Go ahead and ask your

16 follow-up question.

17        MR. DOSTART:   Okay.

18 BY MR. DOSTART:

19 Q.   With items that were placed on the counter in front of

20 you, do you believe that you could use the hand scanner while

21 seated?

22 A.   Yes, you could.

23 Q.   Would you have to get up from your seat if you needed to

24 walk around the register to scan an item with the hand scanner?

25 A.   Yes.

HYATT - DIRECT / DOSTART

1   Q.   Do you believe that you could bag items while seated?

2   A.   Yes, you could.

3       THE COURT:   Does that mean all items or some items?

4   What do you mean by that?

5       THE WITNESS:   Uhm, you could bag most items, because

6   some items are too big to bag.  So you wouldn't bag all those.

7       THE COURT:   Would there ever be any circumstance where

8   there would be something you needed to bag but you had to stand

9   up to do it?

10      THE WITNESS:   Yes.

11      THE COURT:   What would that be?

12      THE WITNESS:   The toys, the big toys that go in a

13  different bag.  Anything that's bigger than you can reach the

14  bag area with.

15      THE COURT:   Go ahead, Counsel.

16      MR. DOSTART:   Okay.

17  BY MR. DOSTART:

18  Q.   Do you believe that you could ask a customer if they have

19  a Kmart credit card while seated?

20  A.   Yes.

21  Q.   Do you believe that you could ask a customer if they have

22  a Kmart or Sears rewards account while seated?

23  A.   Yes.

24  Q.   Do you believe that you could process a customer's credit

25  card payment while seated?

HYATT - DIRECT / DOSTART

 1  **A.**    Yes.

 2  **Q.**    Do you believe that you could process a customer's debit

 3  card payment while seated?

 4  **A.**    Yes.

 5  **Q.**    Do you believe that you could process a customer's cash

 6  payment while seated?

 7  **A.**    Yes.

 8  **Q.**    Do you believe that you could process a customer's check

 9  payment while seated?

10  **A.**    Yes.

11  **Q.**    Do you believe that you could ask a customer for their

12  identification while seated?

13  **A.**    Yes.

14  **Q.**    Do you believe that you could retrieve a customer's

15  receipt while seated?

16  **A.**    With modification, or if the seat was high enough you

17  could.

18  **Q.**    And what modification are you referring to?

19  **A.**    Maybe bringing the register down some or -- yeah, that

20  would work.

21  **Q.**    Okay.  Do you believe that you could hand the customer

22  their receipt while seated?

23  **A.**    Yes.

24  **Q.**    Do you believe that you could place the customer's receipt

25  in a bag while seated?

HYATT - DIRECT / DOSTART

1  A.    Yes.

2  Q.    Do you believe that you could say good-bye to the customer

3  while seated?

4  A.    Yes.

5  Q.    Do you believe that you could provide good service to a

6  customer while seated?

7  A.    Yes.

8  Q.    Okay.  Next, I want to show you an exhibit that is

9  properly marked -- two for two.  It has not yet been moved into

10  evidence.  I'm going to hand the witness the original,

11  originally-marked exhibit.  It is exhibit number 157.

12       And I will ask you, Ms. Hyatt, do you recognize this

13  document?

14  A.    It's the job description for a register operator.

15  Q.    Okay.

16          MR. DOSTART:  And we'd like to move this document into

17  evidence.

18          THE COURT:  Any objection?

19          MR. ADKINS:  No, Your Honor.

20          THE COURT:  Received in evidence.

21     (Trial Exhibit 157 received in evidence.)

22     (Document displayed.)

23  BY MR. DOSTART:

24  Q.    All right.  Ms. Hyatt, what I would like to do now -- and

25  I will zoom in here so we can get in as much text onto the

1  screen as possible -- is I wanted to walk through this job

2  description with you.  And we're going to find out which of the

3  job duties, responsibilities, and supervision, scope of

4  responsibilities, you believe you could do while seated, given

5  those modifications that you testified to.

6       So let's start in the -- on the line that starts with "Job

7  Summary."  It is about nine lines down.

8       Do you see the row that states "Job Summary"?

9  A.    Uh-huh.

10 Q.    Ms. Hyatt, do you believe you could provide world class

11 customer service by surprising and delighting our customers

12 every day while seated?

13 A.    Yes.

14 Q.    Do you believe you would be able to run fast and efficient

15 cash register operations while seated?

16 A.    Yes.

17       MR. ADKINS:  Objection.  Calls for speculation.  No

18 foundation.

19       THE COURT:  Well, it's lay opinion.  And she's

20 qualified to give lay opinion based on her experience.  So

21 that's overruled.  I understand it's an opinion.  But,

22 nonetheless, it's admissible.  Overruled.

23 BY MR. DOSTART:

24 Q.    Ms. Hyatt, in your opinion, based on your seven years of

25 experience as a Kmart cashier, do you believe you could observe

 1  customer traffic and call for additional service as needed

 2  while seated?

 3          MR. ADKINS:  Your Honor, I want to be clear.  Is

 4  counsel going down the list?

 5          MR. DOSTART:  The job summary, I'm going sentence by

 6  sentence.  And I'll go down the list line by line.

 7          MR. ADKINS:  Thank you.

 8          MR. DOSTART:  So I'm at the last sentence of the row

 9  that is entitled, "Job Summary."  And the last sentence is,

10  "Observe customer traffic and call for additional service as

11  needed."

12  BY MR. DOSTART:

13  Q.   My question is, Ms. Hyatt, do you believe you could do

14  that while seated?

15  A.   Yes, you could.

16  Q.   Okay.  Now let's go to "Job Duties/Responsibilities."

17       The first one I'm not going to ask you about because it

18  says "To arrive on time in appropriate dress code."  And if you

19  can come in on a seat, you're very talented.  So I'm not going

20  to ask about that.

21       The next one, "Be able to run a cash register quickly and

22  efficiently."

23       Ms. Hyatt, could you do that while seated?

24  A.   Yes.

25  Q.   Ms. Hyatt, could you have a strong understanding of

1  precise register functions, including how to process all

2  transactions and forms of tender, as well as paying off chair

3  [sic] and layaway payments while seated?

4  **A.**   Yes.

5  **Q.**   Ms. Hyatt, do you believe that you can be prepared to

6  serve the customer with a positive attitude at all times while

7  seated?

8  **A.**   Yes.

9  **Q.**   Do you believe that you can maintain a clean work area

10  while seated?

11            **MR. ADKINS:**  Objection.  Vague.

12            **THE COURT:**  Well, it's your document.

13            **MR. ADKINS:**  The answer -- the question is vague, not

14  the document, your Honor.  What does that mean, to maintain a

15  clean work area?  What is the work area?  What is she cleaning

16  from a seat?

17            **THE COURT:**  Overruled.

18  **BY MR. DOSTART:**

19  **Q.**   Ms. Hyatt, the next sentence I want to ask you about one

20  by one.  So the sentence in full reads, "Maintains register

21  station by replenishing supplies, cleaning and straightening

22  work area."

23       Now, the first part of my question is going to be,

24  Ms. Hyatt, can you replenish the register supplies while

25  seated?

1  **A.**    No.

2  **Q.**    However, Ms. Hyatt, could you clean while seated?

3  **A.**    Yes.

4  **Q.**    Could you straighten the work area while seated?

5  **A.**    Yes.

6  **Q.**    Okay.  To the next line.  Could you have knowledge of

7  store services and locations and merchandise while seated?

8  **A.**    Yes.

9  **Q.**    Could you promote and comply with all register prompts

10 relating to the use of Shop Your Way Rewards, our credit card,

11 smart plans, gift cards, and other add-on sales while seated?

12 **A.**    Yes.

13 **Q.**    Could you demonstrate strong skill set in suggestive

14 selling techniques for add-on sales while seated?

15 **A.**    Yes, you could.

16 **Q.**    Could you practice operation -- I'm going to ask about

17 this question in two parts.

18        Ms. Hyatt, what is operation invitation?

19 **A.**    My experience on that would be greetings them as they

20 walked in the door.

21 **Q.**    Okay.  Could you do that while seated?

22 **A.**    No.

23 **Q.**    Okay.  Could you have positive customer interactions while

24 seated?

25 **A.**    Yes.

1  Q.   All right.  Could you observe customer traffic and call

2  for additional service as needed to provide efficient customer

3  service, while seated?

4  A.   Yes, you could.

5  Q.   Could you monitor shrink and take appropriate action to

6  minimize waste while seated?

7  A.   Yes.

8  Q.   Could you demonstrate good use of EAS -- which we believe

9  stands for electronic alarm system or sensor -- by applying

10  sensors on designated items and ensuring tags are deactivated

11  while goods are sold, while seated?

12  A.   Yes.

13  Q.   Could you monitor sales circulation and be knowledgeable

14  about items that have been sold out, that may be substituted or

15  if rain checks are being issued, while seated?

16  A.   You have to read that question again.

17  Q.   I'm happy to do so.

18       Ms. Hyatt, could you monitor sale circulation and be

19  knowledgeable about items that have been sold out that may be

20  substituted or if a rain check is being issued, while seated?

21  A.   We don't particularly do that.  If something is rain

22  check, they go up to the service desk for a rain check.

23  Q.   Okay.  So we'll go to the next line.

24       Can you make eye contact, smile, greet and offer to help

25  every customer while seated?

HYATT - DIRECT / DOSTART

1  A.   Yes.

2  Q.   Can you assist in handling and resolving customer issues

3  and complaints while seated?

4  A.   Yes.

5  Q.   If you cannot help the customer can you find someone who

6  can, while seated?

7  A.   Yes.

8  Q.   Can you thank the customer for shopping at Kmart and

9  invite them back while seated?

10 A.   Yes.

11 Q.   Can you be the customer advocate and surface opportunities

12 to improve the overall customer experience while seated?

13 A.   I'm sorry.

14 Q.   I don't know what that means either, but we'll try it

15 again.  I think what they're trying to say is, can you help --

16        THE COURT:  Ask the witness what she thinks it means.

17        MR. DOSTART:  I'm sorry, I was just -- interrupting

18 myself there, your Honor.

19        THE COURT:  Do you know what that means?

20        THE WITNESS:  I don't exactly know what a customer

21 advocate would be, no.

22        THE COURT:  She doesn't know that one, so let's move

23 to one she can answer.

24        MR. DOSTART:  Okay.

25

1   **BY MR. DOSTART:**

2   **Q.**   Ms. Hyatt, can you maintain a friendly and courteous

3   demeanor while providing fast and efficient service to

4   customers while seated?

5   **A.**   Yes.

6   **Q.**   Can you teach, model, and lead ways to satisfy customers

7   while seated?

8   **A.**   Yes.

9   **Q.**   Can you be knowledgeable of the financial goals regarding

10  sales margin and shrink, and takes steps to improve the store

11  in these areas while seated?

12  **A.**   Sorry.  You're going to have to repeat that again.  I lost

13  my way.

14  **Q.**   Okay.  Ms. Hyatt, I'm looking at the row that is about six

15  from the bottom of the job duties and responsibilities.  It's a

16  two-line row.  And I'll ask the question again.

17        Ms. Hyatt, can you be knowledgeable of the financial goals

18  regarding sales, margin, and shrink, and take steps to improve

19  the store in these areas while seated?

20  **A.**   I don't know the answer to that one.  I'm sorry.

21  **Q.**   Okay.  I'll go to the next question.

22        Ms. Hyatt, can you assist in training fellow associates in

23  checkout procedures while seated?

24  **A.**   Yes.

25  **Q.**   Can you follow corporate guidelines relating to MCNC and

1  known loss merchandise while seated?

2  **A.**    You could.

3  **Q.**    Can you facilitate dialogue between front-line associates

4  and the store leadership team while seated?

5  **A.**    Yes.

6  **Q.**    Could you use the P.A. system effectively to promote

7  advertised goods while seated?

8  **A.**    At the way it is now, no, because you have to get up and

9  go to a -- the phone to work the register -- or to work the

10  P.A. system.

11  **Q.**    Okay.

12  **A.**    But it can be done.

13  **Q.**    And can you call for carryout if the customer would like

14  help loading heavy merchandise into their vehicle, while

15  seated?

16  **A.**    You could.

17  **Q.**    Okay.

18  **A.**    If it was modified.

19          **MR. DOSTART:**  I have no further questions, your Honor.

20          **THE COURT:**  All right.  We have five minutes.  Let's

21  use it.

22                          **CROSS EXAMINATION**

23  **BY MR. ADKINS:**

24  **Q.**    Good afternoon, Ms. Hyatt.

25  **A.**    Good afternoon.

1  **Q.**   I wanted to walk through some of the -- we've not met

2  before, have we?

3  **A.**   No.

4  **Q.**   My name is Robb Adkins.

5  **A.**   Oh.

6  **Q.**   Nice to meet you.

7      I want to walk through with you the -- some of the

8  checkout procedures that you were discussing just a little bit

9  ago with plaintiff's counsel.  Okay.  And this has been talked

10  about quite a bit already in this case, so I want to perhaps

11  shorten it a little bit.

12        **MR. ADKINS:**  Your Honor, I would like to play a

13  portion of Exhibit 218.  This is the video of the -- within the

14  Tulare store, of the witness.

15        **THE COURT:**  All right.  How long will that take?

16        **MR. ADKINS:**  Less than 30 seconds.

17        **THE COURT:**  All right.  So can you see -- is it going

18  to come up on the screen?

19        **MR. ADKINS:**  It is.  It should come up on her screen

20  as well as the other screens, your Honor.  This is identified

21  as -- this clip, for record purposes, is 218-C.

22        **THE COURT:**  All right.  So the witness will please

23  look at the video screen.  Something is about to be played that

24  probably has a picture of you on there.

25      Go ahead, play the item.

```
 1        (Video recording played during questioning as follows.)
 2  BY MR. ADKINS:
 3  Q.   Ma'am, do you recognize that checkstand that you see in
 4  the video?
 5  A.   Yes.
 6  Q.   And is that you as the cashier at the checkstand?
 7  A.   Yes.
 8  Q.   And is that the checkstand for the Tulare Kmart, with you
 9  working at it?
10  A.   Yes.
11  Q.   Okay.
12        MR. ADKINS:  Pause it.  Thank you.
13  BY MR. ADKINS:
14  Q.   So counsel for the plaintiff has asked you some questions
15  about the checkstand.  And you were describing the chart over
16  there to your left.
17  A.   Uh-huh.
18  Q.   Is this that same checkstand you were describing?
19  A.   It's backwards, but yes.
20  Q.   And -- which is backwards?
21  A.   Well, that diagram with the table is on this side
22  (indicating).
23  Q.   The diagram they were showing you before is backwards, the
24  plaintiff's attorneys?
25  A.   Because -- yeah, it is.
```

1    Q.    Okay.  So on the video you can see the cashier stand as it

2    actually appears in the store, right?

3    A.    Yes.

4    Q.    And we've got, it appears, some individuals lined up, some

5    customers lined up at the checkstand.  And you were holding a

6    red item.  Can you tell what that is that you were holding?

7    A.    It looks to me a blouse.

8    Q.    And you're walking over toward what looks to be a phone.

9    Can you tell me what that is?

10   A.    It's the phone that we would have to call to that

11   department to find out what the UPC is so we can get the proper

12   number to ring that article up.

13   Q.    Now, is that the single phone that you were talking

14   about --

15   A.    Yes.

16   Q.    -- that exists to be able to place those types of calls

17   and price checks, and things of that nature?

18   A.    Yes.

19   Q.    And if you look behind you, there is -- on that checkout

20   stand there is, just to the -- just to the side of the customer

21   standing there, a scanner.  That's the scanner on the counter,

22   right?

23   A.    Yes.

24   Q.    And then there's the deactivator people have talked about

25   and I think you mentioned, in which you deactivate those

1  alligator clip security devices, right?

2  **A.**    Right.

3  **Q.**    What do you do with those alligator clips?

4  **A.**    The ones we take off -- there's two different kinds.  One

5  is an ASE or AESS.  We deactivate the other one and take off

6  and place into a bin that actually falls right underneath

7  there.

8  **Q.**    There's bins underneath that counter, right?

9  **A.**    Yes.

10 **Q.**    And there's another bin -- well, what types of bins are

11 under there?  Why don't you just tell us.

12 **A.**    Well, there's a little, small bin underneath the

13 deactivator that we -- there's a hole at the end of that

14 deactivator.  You place the tags in so that it falls into that

15 hole.

16 **Q.**    Is there also a bin to put hangers into?

17 **A.**    Yes.  It's right underneath the knees area.

18 **Q.**    And you put garbage in the bin?

19 **A.**    Yes.

20 **Q.**    And do sometimes people come up with a red blouse like

21 that one and say, you know what, I don't want this, or, it

22 costs too much, and leave it at the checkstand?

23 **A.**    Yes.

24 **Q.**    And what do you do with that?

25 **A.**    I place it into the other bin that's there.

```
 1        There are two bins, and one is a returns bin.  The other
 2   one is a trash bin.
 3           THE COURT:  We're at 1:00 o'clock, so I'll give you a
 4   couple more questions to come to a resting point.
 5   BY MR. ADKINS:
 6   Q.   Behind -- I should just finish that out.
 7        What do you do with those bins once they get full?
 8   A.   We empty them out.
 9   Q.   And how do you do that?
10   A.   We get a shopping cart with a liner, and place the product
11   back in there.
12   Q.   And when you have to put those into the bins, you have to
13   lean down and put them in there, right?
14   A.   Yes.  Or you can just toss them in.  They are open.
15   Q.   And if you have -- behind you, directly behind you,
16   there's an item there that's a pin pad, right, where you scan
17   the credit cards?
18   A.   Yes.
19   Q.   And you said, as I recall, that you -- part of your job
20   responsibilities as a cashier at the Tulare Kmart is to check
21   I.D.s and in some ways assist, if necessary, with the
22   transactions at the pin pad, right?
23   A.   Yes.
24   Q.   And if you don't mind my asking, what is your height,
25   approximately?
```

1   A.    Five-one.

2   Q.    And in order to do that, you are required to reach out

3   there to assist them with it from a standing position, right?

4   A.    Yes.

5          THE COURT:  We need to stop.  I'll give you one

6   question.  I gave you two a while ago, and we've gone ten.

7          MR. ADKINS:  Your Honor, I'll put that one back in the

8   bank and stop right now, if that's okay.

9          THE COURT:  That's great.  Thank you.

10       Ms. Hyatt, please be here at 7:30 in the morning.  We'll

11  continue with your testimony then.  Overnight or between now

12  and then you cannot talk to any of the counsel.  You can talk

13  about logistics of where you are staying, and that sort of

14  thing, but nothing about your testimony.  All right?

15         THE WITNESS:  Yes.

16         THE COURT:  All right.

17         MR. MICHAEL RIGHETTI:  Your Honor, I have one quick

18  request.

19       Seeing that these videos were just provided to us this

20  morning, would it be possible to give Ms. Hyatt a copy of the

21  video so she could review it?  Normally, this is the type of

22  thing that we would have shown her, had it been disclosed

23  timely, and it was not.  I would ask for perhaps slight

24  leniency from your rule --

25         THE COURT:  No, I'm not going to do that.  I don't see

 1  how that could possibly be done without her sitting there in

 2  your office and winding up talking to you about it.

 3          MR. MICHAEL RIGHETTI:  I understand.

 4          THE COURT:  I'm not going to do that.

 5          MR. MICHAEL RIGHETTI:  Okay.

 6          THE COURT:  All right.  So the witness can step down.

 7  Please be back at 7:30.

 8      (Witness steps down.)

 9          THE COURT:  Counsel will make sure that the exhibits

10  are taken care of.

11          MR. DOSTART:  Yes, Your Honor.

12          THE COURT:  And you can all have a seat.

13      What issues can I help you with before we adjourn for the

14  day?

15          MR. MATTHEW RIGHETTI:  Nothing from plaintiff.

16          MR. ADKINS:  Nothing from us, your Honor.

17          THE COURT:  Now, if -- any more video clips need to be

18  done timely and specified and short, so that the next witnesses

19  will be able to have the benefit of being able to see them

20  before they come, unless it's truly for impeachment.  If it's

21  truly for impeachment, then they don't have to be disclosed at

22  all.

23      But you're taking a gamble if it turns out not to be for

24  impeachment.  Like nothing that you did today was impeachment.

25  So you're -- the video was not in any way used to contradict

 1  her testimony.  So that was not impeachment.

 2      All right.  See you here tomorrow.  And remember, at 7:30

 3  you owe me a document that I do want.  Please do not let me

 4  down.  That's the color-coded document about the wage orders

 5  and the letters on it, and so forth.

 6          **MR. WOHL:**  We're giving you that, your Honor, and

 7  we're giving you the brief on business judgment.

 8          **THE COURT:**  Correct.

 9          **MR. WOHL:**  And I assume both just hand to you

10  physically before we file --

11          **THE COURT:**  Hand them up to me at 7:30.  You can also

12  file them.  But I am looking forward to reading them, so please

13  do not come in with some excuse as to why you can't get it

14  done.

15          **MR. McINERNEY:**  Your Honor.

16          **THE COURT:**  Yes, sir.

17          **MR. McINERNEY:**  Could you just tell us where we stand

18  on time?

19          **THE COURT:**  Yes.  Well, I'd have to do some adding up

20  here.  I might not add right, but let me see if I can do that.

21      Plaintiffs look like to me you've used 239 minutes out of

22  a total of 720.  Defendants have used 208 minutes out of a

23  total of 720.

24          **MR. McINERNEY:**  Thank you, Your Honor.

25          **THE COURT:**  All right.  See you in the morning.  Thank

1    you.

2            **MR. WOHL:**   Thank you.

3        (At 1:07 p.m. the proceedings were adjourned until

4    Thursday, November 15, 2012, at 7:30 a.m.)

5                            -   -   -   -

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                          I N D E X

 2   PLAINTIFF'S WITNESSES                      PAGE    VOL.

 3   JOHNSON, STEVEN
     (PREVIOUSLY SWORN)                          232      2
 4   Cross Examination Resumed by Mr. Wohl       233      2
     Redirect Examination by Mr. Matthew Righetti 335     2
 5

 6   WRIGHT, NATASHA
     (SWORN)                                     367      2
 7   Direct Examination by Mr. McInerney         369      2
     Cross Examination by Mr. Adkins             401      2
 8   Redirect Examination by Mr. McInerney       420      2

 9   HYATT, EVELYN
     (SWORN)                                     426      2
10   Direct Examination by Mr. Dostart          426      2
     Cross Examination by Mr. Adkins            464      2
11

12                        - - - - -

13

14

15

16

17

18

19

20

21

22

23

24

25
```

*Katherine Powell Sullivan, CRR, and Debra L. Pas, CRR*
*Official Reporters - U.S. District Court*
*(415) 794-6659*

1                       **E X H I B I T S**

2  **TRIAL EXHIBITS**                    **IDEN**   **VOL.**    **EVID**   **VOL.**

3  1                                                            429       2
   15                                                           403       2
4  157                                                          456       2
   380                                  250      2            253       2
5  385                                                          350       2
   383, 384                                                     368       2

6

7                          - - - - -

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                    **CERTIFICATE OF REPORTERS**

4          We, KATHERINE POWELL SULLIVAN and DEBRA L. PAS,

5  Official Reporters for the United States District Court,

6  Northern District of California, hereby certify that the

7  foregoing proceedings in C 11-2575 WHA, **Lisa Garvey vs. Kmart**

8  **Corporation,** were reported by us, certified shorthand

9  reporters, and were thereafter transcribed under our direction

10 into typewriting; that the foregoing is a full, complete and

11 true record of said proceedings at the time of filing.

12

13 DATE:   Wednesday, November 14, 2012

14

15

16  _____

    Katherine Powell Sullivan, CSR #5812, RPR, CRR

17              U.S. Court Reporter

18

19  _____

        Debra L. Pas, CSR #11916, RMR CRR

20

21

22

23

24

25

*Katherine Powell Sullivan, CRR, and Debra L. Pas, CRR*
*Official Reporters - U.S. District Court*
*(415) 794-6659*