Volume 3

Pages 476 - 723

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ALSUP

LISA GARVEY, individually and on      )
behalf of all others similarly        )
situated,                             )
                                      )
              Plaintiff,              )
                                      )
   VS.                                )  No. C 11-2575 WHA
                                      )
KMART CORPORATION, and DOES 1         )
through 50 inclusive,                 )
                                      )  San Francisco, California
              Defendants.             )  Thursday
_____)  November 15, 2012

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

**For Plaintiff:**          Righetti Glugoski, P.C.
                           456 Montgomery Street, Suite 1400
                           San Francisco, California 94101
                    **By:  Matthew Righetti, Esquire**
                          **Michael Righetti, Esquire**

                           McInerney & Jones
                           18124 Wedge Parkway, #503
                           Reno, Nevada 89511
                    **By:  Kevin J. McInerney, Esquire**

**Reported By:  Katherine Powell Sullivan, RPR, CRR, CSR #5812**
              **Debra L. Pas, RMR, CRR, CSR #11916**
              **Official Reporters - U.S. District Court**

*Katherine Powell Sullivan, CRR, and Debra L. Pas, CRR*
*Official Reporters - U.S. District Court*
*(415) 794-6659*

**APPEARANCES (CONTINUED):**

**For Plaintiff:**          Dostart Clapp & Coveney LLP
                           4370 La Jolla Village Drive, Suite 970
                           San Diego, California 92122
              **By:  Zachariah Paul Dostart, Esquire**

**For Defendants:**        Paul Hastings LLP
                           55 Second Street, 24th Floor
                           San Francisco, California  94105
              **By:  Jeffrey D. Wohl, Esquire**

                           Winston & Strawn
                           333 South Grand Ave, 38th Floor
                           Los Angeles, California  90071
              **By:  Amanda C. Sommerfeld, Esquire**
                   **Emily C. Schuman, Esquire**

                           Winston and Strawn LLP
                           101 California Street, Suite 3900
                           San Francisco, California 94111
              **By:  Robb Christopher Adkins, Esquire**
                   **Joan B. Tucker Fife, Esquire**

**P R O C E E D I N G S**

**November 15, 2013**                                              **7:37 A.M.**

3          **THE COURT:**  I received a number of items from the

lawyers.  I'm going to hand back the joint submission.  It

should be tabbed.  I want somebody to tab it, even if it's just

the little yellow things.  You have 14 or 15 here.

7          Please, Dawn, hand that pack to counsel.  I would like to

read it, but I need the tabs.

9          **MR. WOHL:**  We will take care of that right away your

Honor.

11          (Document was tendered to counsel.)

12          **THE COURT:**  Thank you.

13          I received from briefs from you.  Thank you.  I want to

hand back to you the designations for Amy Grabau.

15          Dawn, would you hand that back to counsel?

16          (Document was tendered to counsel.)

17          **MR. WOHL:**  Your Honor, may I say something?

18          **THE COURT:**  Sure.

19          **MR. WOHL:**  I'm informed by Mr. Righetti that in

addition to the brief that you asked for, they put in some sort

of declaration, presumably with some evidence.  They don't have

service copies for me.  I presume they will give those to me

shortly.

24          I would object, although I haven't seen it, because you

were very clear you wanted a five-page brief on the legal

PROCEEDINGS

```
 1  issues about business judgment.  We did exactly that on our

 2  side.  We did not get into the evidence.  That is not what you

 3  asked for.

 4      And I would object, although I haven't seen it, but I

 5  would object to them introducing any evidence by way of the

 6  submission.  That's not appropriate.  You didn't ask for that.

 7  I followed the rules.  I they should follow the rules in that

 8  regard, too.

 9          THE COURT:  What to you say, Mr. Righetti?

10          MR. MATTHEW RIGHETTI:  I think what was attached was

11  Amy Grabau's testimony regarding whether they had exercised

12  business judgment or not.

13      I think the Court had mentioned that -- I don't know.  Did

14  the Court just want a legal thing or did the Court want -- the

15  Court had mentioned:  Does the business judgment thing apply --

16          THE COURT:  Didn't I say five pages?

17          MR. MATTHEW RIGHETTI:  Pardon me?

18          THE COURT:  Didn't I say five pages?

19          MR. MATTHEW RIGHETTI:  I think we're under five pages.

20  We're definitely under five pages.

21          THE COURT:  The declaration is many pages.  This is --

22          MR. MATTHEW RIGHETTI:  We can take the declaration

23  out.  That's fine.

24          THE COURT:  I'm going to give you the declaration

25  back.  Here.
```

PROCEEDINGS

1          (Document was tendered to counsel.)

2          **THE COURT:**  I'm not even going to read it.  You should

3    not have done that.

4          I am going to read your brief.  And if there is something

5    in the declaration -- I'm sorry, in the testimony, it's got to

6    be in the trial record.

7          In other words, I'm going to decide this case based on the

8    trial record.  You lawyers can't just lard the record with

9    declarations and think that I'm going to rule in your favor

10   based upon something that's in a declaration.  This is a trial.

11   The witnesses are up here.  They are going to be cross

12   examined.

13         So if you want to put something before the Court that I'm

14   going to rule on, it's got to be based upon the trial record.

15         So if in the due course you want to designate her

16   testimony and it's admissible, then it will sail in and you can

17   rely on it then.

18         And it would be fine for you to say in your memorandum

19   that's what you plan to do and here is what she said in her

20   deposition and so forth, but a declaration is more than I had

21   asked for.  All right?

22         **MR. MATTHEW RIGHETTI:**  That's fine.  Thank you.

23         One more small item.  Last night we uploaded a stipulation

24   concerning the testimony of Mr. Evans, which was our FRE1006

25   person, concerning calculation of potential penalties and we

1  stipulated to what he would say and what the summary of records

2  would show.

3      I wanted to make sure that the Court is aware that has

4  been uploaded and is waiting for the Court's approval as a

5  stipulation.

6          **THE COURT:**  Is this something that you both agree

7  should come into evidence?

8          **MR. ADKINS:**  Yes, your Honor.

9          **MR. MATTHEW RIGHETTI:**  Yes, your Honor.

10          **THE COURT:**  Which one is it?  I've got so many things

11  here that you submitted.

12          **MR. MATTHEW RIGHETTI:**  It came in about 11:00 o'clock

13  probably.

14          **THE COURT:**  "Joint Stipulation Regarding Admissibility

15  of Certain Exhibits."

16          **MR. MATTHEW RIGHETTI:**  That is not it.

17          **THE COURT:**  I guess I don't have it.  They gave me a

18  bunch of things, but they didn't give me that.

19          **MR. MATTHEW RIGHETTI:**  We can take care of it during

20  the break, your Honor.

21          **THE COURT:**  I have one called "Penalty Calculations."

22  Is that it?

23          **MR. ADKINS:**  That is, your Honor.

24          **MR. MATTHEW RIGHETTI:**  Yes.

25          **THE COURT:**  You both want me to sign this and both

1   agree that it should come into evidence, is that it?

2           MR. ADKINS:  Correct, your Honor.

3           THE COURT:  Okay.  I'm going to sign it.

4      All right.  I'm giving this to the clerk to be made part

5   of the record.  And you both agree this is in evidence now even

6   though it's not a trial exhibit.

7           MR. MATTHEW RIGHETTI:  Will that be marked, Dawn, as

8   an exhibit?

9           THE CLERK:  The Court just said it wouldn't it would

10   come into evidence even though it's not a trial exhibit.  So I

11   don't know.  Were you putting it in as an exhibit number or am

12   I just e-filing this?

13          THE COURT:  Just e-file it.  If you want to separately

14   mark that as an exhibit for clarity for the Court of Appeals,

15   perhaps that would be a good thing, but I'm going to treat it

16   as part of the trial record.

17          MR. MATTHEW RIGHETTI:  Thank you, your Honor.

18          THE COURT:  All right.  What more do you want me to do

19   before we get started?

20          MR. MATTHEW RIGHETTI:  Nothing from plaintiff.

21          THE COURT:  Thank you.  We had on the stand Ms. Hyatt,

22   right?  That's your name, Hyatt.

23          THE WITNESS:  Yes.  Evelyn Hyatt.

24          THE COURT:  Welcome back.  How are you today?

25          THE WITNESS:  Good.

PROCEEDINGS

```
 1          THE COURT:  So we had gotten up to -- you had done

 2   five minutes of cross, as I remember, right?

 3          MR. ADKINS:  Yes, your Honor.

 4          THE COURT:  So, Mr. Adkins, you may continue right on.

 5          MR. ADKINS:  I have been handed the trial exhibits

 6   from plaintiff's counsel.  Can I approach or hand these to the

 7   clerk to give them back to the witness?

 8          THE COURT:  You may.

 9          (Documents were tendered to the witness.)

10                         EVELYN HYATT,

11   called as a witness for the Plaintiff herein, having been

12   previously sworn, resumed the stand and testified further as

13   follows:

14                    CROSS-EXAMINATION RESUMED

15   Q.   Good morning, Ms. Hyatt.

16   A.   Good morning.

17   Q.   You've not spoken with any of the attorneys in this case

18   since last we were speaking and you were on the stand?

19   A.   No.

20   Q.   Thank you.

21          When we left off yesterday, we were discussing the layout

22   of the check stand at the Tulare Kmart store.  That's been

23   discussed quite a bit.  I only have a couple of questions for

24   you on that.

25          MR. ADKINS:  I'd like to put -- is there a way we can
```

HYATT - CROSS EXAMINATION / ADKINS                484

1   turn on the overhead please?   Thank you.

2         (Document displayed.)

3   **BY MR. ADKINS:**

4   **Q.**   I'm putting on the Elmo Exhibit 15, Page 60, which is in

5   evidence.   And do you recognize that photograph, ma'am?

6   **A.**   Yes.

7   **Q.**   Is that a check stand at the Tulare Kmart store?

8   **A.**   Yes.

9   **Q.**   I think we covered most of the aspects of this, but you

10  see the aisle running up the side of the check stand in front

11  of the scanner and the counter there?

12  **A.**   Yes.

13  **Q.**   And then on the other side there is another aisle, right?

14  **A.**   Yes.

15  **Q.**   And customers and shopping carts go up and down those

16  aisles during the workday, right?

17  **A.**   Yes.

18  **Q.**   There are seven checkstands at the Tulare Kmart store,

19  correct?

20  **A.**   Yes, there is.

21  **Q.**   Now, yesterday the plaintiff's attorney was asking you

22  some questions and you testified that you thought about what

23  modifications would be required in order for a seat to be

24  provided at the check stand register.   Do you recall that?

25  **A.**   Yes.

HYATT - CROSS EXAMINATION / ADKINS

1  Q.   And you testified that you had thought about ways to

2  modify the check stand prior to the lawsuit being filed, right?

3  A.   Yes.

4  Q.   You then described some modifications and you went through

5  that job description document and said that you could

6  accomplish certain of those duties in that document.  Do you

7  remember that?

8  A.   Uh-huh.  Yes.

9  Q.   Okay.  I just want to ask you a couple questions to -- so

10 that I'm clear on that.

11      When you were talking about being able to do those jobs in

12 that job description, you were answering those questions in the

13 context of if the checkstands had been modified, right?

14 A.   Yes.

15 Q.   Do you believe that you could do the cashier job using a

16 seat today using the current check stand at the Tulare Kmart

17 store?

18 A.   You couldn't get your knees underneath if you were to sit.

19 There's no room.

20 Q.   You couldn't do it, right?

21 A.   No, I don't think so.

22 Q.   Let's talk for a moment about some of the modifications to

23 the check stand that you testified about that you were thinking

24 about before the lawsuit was filed.

25      I believe you testified yesterday that the modifications

```
 1   would be made to the existing check stand to allow you to sit

 2   and those would be, the bags would have to be moved over?

 3   A.    Yes.

 4   Q.    The knee area would have to be able to be free underneath?

 5   A.    Yes.

 6   Q.    The counter that holds the trash area would have to be

 7   removed?

 8            MR. DOSTART:  Objection.  I don't think that properly

 9   characterizes the witness's testimony from yesterday.

10            THE COURT:  She can tell us.

11   BY MR. ADKINS:

12   Q.    Please tell us?

13            THE COURT:  If it's true then say, "yes."  If you

14   don't think that that would have to be done, then say, "no."

15   It's up to you.  You decide.

16   A.    Could you repeat that, please?

17   BY MR. ADKINS:

18   Q.    Would the counter that holds the trash area have to be

19   removed?

20   A.    Just the bottom floor area if you're going to use a chair

21   to be able to slide underneath it, if you weren't going to use

22   the chair at all times.

23   Q.    So you could slide the chair underneath?

24   A.    To be able to have room to stand.

25   Q.    And the seat could roll back and forth?
```

HYATT - CROSS EXAMINATION / ADKINS

1  **A.**    Yes.

2  **Q.**    And I think you said that maybe you would bring the

3  register, the cash register down some?

4  **A.**    You could.

5  **Q.**    Are there any other modifications that you were thinking

6  about before the lawsuit was filed that would need to be made

7  to allow you to sit at the check stand in Tulare?

8  **A.**    The card reader would need to be down.  It's way too high.

9  The counter would either have to have a belt or an area where

10  it's closer to me.  Because you're sitting you can reach

11  farther, which is nice.  But that would be probably it.

12  **Q.**    Anything else?

13  **A.**    Not right now that I can think of.

14  **Q.**    And those are the only modifications that you thought of

15  prior to the lawsuit being filed that would have to be made to

16  allow you to sit?

17  **A.**    Yes.

18  **Q.**    Okay.  Let's talk about the knee area.  What did you

19  believe should have been moved to make room for the knee area?

20  **A.**    Umm, the floor part of it.  Up where it's holding the

21  shelf.  The shelf area, where it's holding the container for

22  the trash, would either need to be -- would need to be removed

23  so that you can sit comfortably.

24  **Q.**    Where would the -- where would the -- there is a bin of

25  trash under there, right?

HYATT - CROSS EXAMINATION / ADKINS

```
 1  A.    Uh-huh.

 2  Q.    Where would that go?

 3  A.    You could just use a smaller trash area.

 4  Q.    So the trash area would stay underneath there, but it

 5  would just be made smaller somehow?

 6  A.    I think that the area down there is probably big enough

 7  for both.  It just needs to -- like there is another shelf on

 8  the other side that doesn't hold anything, a little small shelf

 9  underneath.

10  Q.    So you would move the bin to another shelf?

11  A.    To the side.

12  Q.    And you mentioned that the seat could roll back and forth.

13  Would the seat have wheels?

14  A.    Yes.

15  Q.    And you mentioned, I think you mentioned that yesterday

16  that you experience some back pain sometimes, right?

17  A.    Sometimes, yes.

18  Q.    I do, too.

19        And would you want for the seat to have some kind of back

20  for it so that it would support your back, your lower lumbar,

21  as part of the seat?

22  A.    I think just a stool would work.

23  Q.    You wouldn't want a -- you wouldn't want to use back

24  support?

25  A.    Well, if you only had a little bit of a back support
```

1   because you wouldn't -- I don't think you would be sitting on

2   it all day long.  You couldn't.  You would have to stand up at

3   points.

4   Q.   So would you want back support on the seat?

5   A.   I don't think it's needed.  You wouldn't be sitting there

6   that long.

7   Q.   And the plaintiff's lawyer went through the list of job

8   requirements with you and asked you to answer some of those

9   questions and as to whether you could do it seated with those

10  modifications.  Do you remember that?

11  A.   Uh-huh.

12  Q.   He didn't ask about all of the items on that job

13  description sheet.  I just wanted to briefly touch on it.

14          MR. ADKINS:  Put on the overhead Exhibit 157.

15      (Document displayed.)

16  BY MR. ADKINS:

17  Q.   Do recognize that -- it's in front of you in one of the

18  holders as well.

19      Do you recognize that as the job description you were

20  talking about yesterday?

21  A.   Yes.

22  Q.   And you went through this list with plaintiff's counsel

23  and talked about the various job responsibilities, some of

24  which you could do?

25  A.   Yes.

1    Q.    I just wanted to look down towards the bottom.  Do you see

2    at the bottom of this document where it talks about "Required

3    Skills"?

4    A.    Yes.

5    Q.    And it talks about, among other things, "Able to lift and

6    move merchandise, typically a minimum of 20 pounds"?

7    A.    Yes.

8    Q.    And "repetitive bending, lifting, stretching and

9    reaching"?

10   A.    Yes.

11   Q.    Let's just talk about the "Able to lift and move

12   merchandise, typically a minimum of 20 pounds."

13         Do you believe you could lift a minimum of 20 pounds while

14   seated even with the modifications you suggested?

15   A.    If it wasn't bulky items, you could.

16   Q.    So you believe you could lift 20 pounds while in a seat?

17   A.    You can.  You just move it like this (indicating).  You

18   can move it.

19   Q.    Do you think it would be safe to do that from a seated

20   position?

21   A.    It depends on how you would move it.  I mean, I don't

22   know.  I have never -- I've not tried it seated, so I don't

23   know.

24   Q.    Okay.  Fair enough.

25         And, Ms. Hyatt, when you were first hired by Kmart as a

HYATT - CROSS EXAMINATION / ADKINS

1  cashier, you knew that the cashier job was one that required

2  you to stand, right?

3  **A.**   Yes.

4  **Q.**   You were trained to do it standing?

5  **A.**   Yes.

6  **Q.**   And it was Kmart's expectation that you would do it

7  standing?

8  **A.**   Yes.

9  **Q.**   And Kmart -- well, have you ever done it seated?

10 **A.**   No.  We never had the opportunity.  We didn't know we

11 could.

12 **Q.**   Kmart has to make -- I mean, you would agree with me Kmart

13 has to make certain business decisions, right, as a company?

14 **A.**   Uh-huh.

15 **Q.**   They have to decide what products to put in the store?

16 **A.**   Yeah, I would imagine.

17 **Q.**   And what price to list those products?

18 **A.**   Yes.

19 **Q.**   It needs to be -- Kmart to be competitive with stores like

20 Walmart and Target, right?

21 **A.**   Yes.

22 **Q.**   Kmart needs to set the job requirements for the cashiers,

23 too, right?

24 **A.**   Yes.

25 **Q.**   And those policies are important, right?

1   A.   Yes.

2   Q.   You would agree that customer service is very important as

3   the cashier position, as it relates to the cashier position,

4   correct?

5   A.   Yes.

6   Q.   Now, there's another document that plaintiff's counsel was

7   showing you yesterday.  It's Exhibit 1.

8        (Document displayed.)

9   Q.   I think it's before you.  If I remember, this is the one

10  that the judge, I think, wisely had you mark with a marker as

11  to where the cashier stands were so that everyone would know

12  what it is we're talking about in this trial.  Do you remember

13  that?

14  A.   Yes.

15  Q.   Do you have that before you, the one you marked up?

16  A.   I don't know.

17          THE COURT:  Counsel, please go to the witness bench

18  and help the witness.  She's got a bunch of folders there.  It

19  would be of assistance for her for you to --

20          MR. ADKINS:  Your Honor --

21          THE WITNESS:  Oh, is it this one?

22          MR. DOSTART:  Yes.

23          THE WITNESS:  Okay.

24          THE COURT:  All right.  Now the witness has it.

25  What's that exhibit number?

1              MR. ADKINS:  Exhibit 1, your Honor.

2              THE COURT:  Great.

3    BY MR. ADKINS:

4    Q.   Do you see that before you, ma'am?

5    A.   Yes.

6    Q.   Thank you.

7         In that area that you have circled, that you have

8    indicated on that exhibit is where the checkstands are, right?

9    A.   Yes.

10   Q.   And that's right near where the front entry doors to the

11   Tulare Kmart store are located?

12   A.   Correct.  Yes.

13   Q.   So that's the place where the customers come in and where

14   they leave?

15   A.   Right.

16   Q.   Everyone in this whole store, the big diagram, all the

17   customers in there are essentially funneled through that check

18   stand area and out the door, right?

19   A.   Yes.

20   Q.   And so oftentimes the first person, first Kmart employee

21   the customers see when they walk into the Tulare Kmart store

22   are the cashiers, right?

23   A.   In the Tulare store when they walk in, they see the

24   service counter first.

25   Q.   Okay.  But the cashiers shall right there, too?

1  A.   Yes.

2  Q.   But mostly your interaction with the customers is when

3  they are leaving the store as a cashier, right?

4  A.   Yes.

5  Q.   Oftentimes that's the only interaction that a customer has

6  is with the Kmart cashier, right?

7  A.   Yes.

8  Q.   It's important to have -- it's important for the cashier

9  to make sure that the customer has a positive shopping

10  experience, right?

11  A.   Yes.

12  Q.   That's because, again, if they don't have a positive

13  shopping experience, they could go elsewhere.  They could go to

14  Walmart or to Target, right?

15  A.   Yes.

16  Q.   And there is a Walmart right across the street, right?

17  A.   Yes.

18  Q.   And the cashiers at Walmart and Target are all standing at

19  the checkstands, correct?

20  A.   I believe so, yes.

21       MR. ADKINS:  Your Honor, I have no further questions.

22  Thank you.

23       THE COURT:  Redirect, please.

24       MR. DOSTART:  Very briefly, your Honor.

25

1                        **REDIRECT EXAMINATION**

2   **BY MR. DOSTART:**

3   **Q.**   Good morning, Ms. Hyatt.

4   **A.**   Good morning.

5   **Q.**   Ms. Hyatt, do you believe that you could adhere to Kmart's

6   policy to give world class customer service while seated?

7   **A.**   Yes, you could.

8   **Q.**   Based on your seven years of experience as a cashier,

9   yesterday you testified that essentially the vast majority of

10  tasks that a cashier performs at Kmart could be done while

11  seated, is that correct?

12  **A.**   Yes.

13          MR. ADKINS:  Objection.

14          THE COURT:  What's the objection?

15          MR. ADKINS:  Characterizing her testimony, and it's

16  leading.

17          THE COURT:  It is definitely leading.  Sustained.

18  That answer is stricken.

19       Do not lead your own witness.

20  **BY MR. DOSTART:**

21  **Q.**   Ms. Hyatt, do you believe that you could perform the

22  majority of functions at the cash register at Kmart while

23  seated?

24  **A.**   Yes.

25  **Q.**   Has anything that Mr. Adkins asked you yesterday afternoon

```
 1   during cross-examination or this morning during

 2   cross-examination changed your opinion?

 3   A.   No.

 4          MR. DOSTART:  No further questions, your Honor.  Thank

 5   you, Ms. Hyatt.

 6          THE COURT:  Thank you.

 7      All right.  Now, may the witness be excused and

 8   discharged?

 9          MR. ADKINS:  Yes, your Honor.  Thank you.

10          THE COURT:  How about the plaintiff?

11          MR. DOSTART:  Yes, your Honor.

12          THE COURT:  Ms. Hyatt.  Thank you for coming.  How did

13   you get up here?  Did you drive up here?

14          THE WITNESS:  We had a driver.

15          THE COURT:  You had a driver?

16          THE WITNESS:  We had someone bring us up.

17          THE COURT:  Are you going back today.

18          THE WITNESS:  Yes.

19          THE COURT:  I want you to have a safe journey back.

20   Thank you for coming.

21          THE WITNESS:  Thank you.

22      (Witness excused.)

23          THE COURT:  So we now go to our next witness.

24          MR. McINERNEY:  The next witness, your Honor, is

25   Madison Mendiola, M-e-n-d-i-o-l-a.
```

```
 1            THE COURT:  Good morning.  How are you today?

 2            THE WITNESS:  I'm good.  Cold.  It's cold in here.

 3            THE COURT:  Yes.  You're right about that.

 4       Would you raise your right hand to be sworn.

 5                       MADISON MENDIOLA,

 6  called as a witness for the Plaintiff herein, having been first

 7  duly sworn, was examined and testified as follows:

 8            THE WITNESS:  Yes.

 9            THE CLERK:  Okay.

10            THE COURT:  Great.  Have a seat.

11       See is the microphone?  It moves all around.  You need to

12  move it to about this close (indicating).  So a little closer

13  than that even.

14            THE WITNESS:  Like that?

15            THE COURT:  Say your name.

16            THE WITNESS:  Madison.

17            THE COURT:  Can everyone hear?

18       (Attorneys respond affirmatively.)

19            THE COURT:  Good that's great.

20       Thank you.  Go right ahead.

21                     DIRECT EXAMINATION

22  BY MR. DOSTART:

23  Q.  Good morning.

24  A.  Good morning.

25  Q.  Would you please state your full name for the record?
```

1  **A.**    Madison Nichole Mendiola.

2  **Q.**    And where do you live?

3  **A.**    In Tulare, California.

4  **Q.**    And how long have you lived in Tulare?

5  **A.**    Since I was born, 25 years.

6  **Q.**    What is your current occupation, Ms. Mendiola?

7  **A.**    I'm unemployed right now.

8  **Q.**    Have you ever worked at Kmart?

9  **A.**    Yes.

10 **Q.**    At what positions did you work at Kmart?

11 **A.**    The front end cashier.

12 **Q.**    And how long were you a front end cashier at Kmart?

13 **A.**    For a year.

14 **Q.**    From what date to what date were you employed as a front

15 end cashier at Kmart?

16 **A.**    From April to -- I can't remember when I quit there.

17 **Q.**    Okay.  So from approximately -- was it -- do you believe

18 that it was in 2010 that you began your employment at Kmart?

19 **A.**    Yeah.

20 **Q.**    Okay.  And so sometime in approximately 2011 you ended

21 your employment at Kmart?

22 **A.**    Yes.

23 **Q.**    During that entire time, were you a front end cashier?

24 **A.**    Yes.

25 **Q.**    And was this at the Kmart in Tulare?

1   **A.**    Yes.

2   **Q.**    Was your employment at Kmart on a full-time or part-time

3   basis?

4   **A.**    Part-time.

5   **Q.**    How many hours per week would you estimate that you worked

6   on average?

7   **A.**    Probably about 15.

8   **Q.**    I want to ask you a little bit about where a front end

9   cashier spends most of their time or spends their time.  Would

10  you --

11          **THE COURT:**  You're putting that in the present tense,

12  but she doesn't even work there now.

13          **MR. DOSTART:**  I apologize, your Honor.

14          **THE COURT:**  You should put it in the tense of:  When

15  she was there, how did the cashiers spend most of their time?

16      Now, very likely it's not changed, but we don't know that.

17  I have had cases where it has changed.

18      So I would appreciate using the correct verb tense that

19  this witness can testify to.  She can't testify to the present.

20          **MR. DOSTART:**  Correct.

21          **THE COURT:**  All right.  Thank you.

22  **BY MR. DOSTART:**

23  **Q.**    Ms. Mendiola, when you were employed at Kmart, where did

24  you spend -- did you spend 100 percent of your time at the

25  front end register?

1  A.   I would say about 90 to 95 percent of the time at the

2  front end.

3  Q.   And the balance of your time or the remainder of your time

4  was away from the register?

5  A.   Yeah.  Straightening up the candy or magazines.

6  Q.   Okay.  I want to talk a little bit about what you did

7  while you were at the front end register.

8       When a customer first approaches the register, what would

9  you do?

10 A.   Greet them.

11 Q.   Okay.  Were there any --

12          THE COURT:  A little closer to the microphone, please.

13 You can move the mic.  It's just that your voice trailing off.

14          THE WITNESS:  Okay.  Is that better?

15          THE COURT:  Much better.  Go ahead.

16 BY MR. DOSTART:

17 Q.   And what would be the next thing that you would do after

18 you greet a customer?

19 A.   Oh, it's been so long.  Scan the items.

20 Q.   Okay.  Let me ask another question.  I know that Kmart --

21 or have you ever heard of the phrase BOB or Bottom of Basket?

22 A.   Yes.

23 Q.   At what point would you check the bottom of a customer's

24 basket?

25 A.   As they are coming in and as they are leaving.

```
 1   Q.   Would you try to check the bottom of the basket as the

 2   customer is right in front of you?

 3   A.   No, because you can't see the bottom of it when they are

 4   right in front of you.

 5   Q.   Why is that?

 6   A.   Because the aisles are so thin.

 7            THE COURT:  Aisles are what?

 8            THE WITNESS:  On one?

 9            THE COURT:  Aisles are --

10            THE WITNESS:  Are thin.

11            THE COURT:  Thin?

12            THE WITNESS:  Yes.

13            THE COURT:  What does that mean?

14            THE WITNESS:  Like to where you can barely fit your

15   cart through there.  You get stuck times they are so thin.

16            THE COURT:  Narrow?  You mean narrow?

17            THE WITNESS:  Yeah.

18            THE COURT:  All right.

19   BY MR. DOSTART:

20   Q.   Just for clarity, when the customer was approaching, you

21   would check the bottom of the basket?

22   A.   Yes.

23   Q.   And as the customer was --

24   A.   Was leaving.

25   Q.   (Continuing) -- would you check the bottom of the basket?
```

1  **A.**    Yes.

2  **Q.**    So after -- let me talk a little bit about scanning.

3       When a customer would approach, you said you would scan

4  items?

5  **A.**    Yes.  Greet them and then start scanning their items as

6  they would put it up on the counter.

7  **Q.**    What would you do after you scanned an item?

8  **A.**    Ask them for their payment.  After I had done scanning,

9  bag it, ask them for their payment.

10 **Q.**    Okay.  If you had to -- I kind of want to speak generally

11 here.  What percent -- or what number of customers you would

12 estimate would bring an item to you -- let me take a step back.

13      Ms. Mendiola, do you have a way of estimating what a

14 10-pound object feels like?

15 **A.**    Yes.

16 **Q.**    Okay.  So let's call a 10-pound object heavy.  What

17 percent of customers would you estimate have a heavy object or

18 an awkward object when they come through the register?

19 **A.**    They --

20           **MS. FIFE:**  Objection, your Honor.  Calls for

21 speculation.

22           **THE COURT:**  Well, you need to tell us first if that is

23 a question on which you have a -- based on experience, a

24 reasonable basis to answer.

25           **THE WITNESS:**  I'm sorry?

1          **THE COURT:**  In other words, counsel asked you the

2    question:  What percent of customers would you estimate have a

3    heavy object, and then he changed it to awkward object.

4          So right off the bat I'm not going to allow that question

5    because I don't know what an "awkward" is versus "heavy."

6          But whenever he asks you the question, I'm going to come

7    back and ask you if you have a reasonable basis for you to be

8    able to answer that question.

9          So, counsel, this is possibly an important question.  You

10   asked two different things.  Which one did you mean?  Awkward

11   or heavy?

12         **MR. DOSTART:**  I will take a step back.

13         **THE COURT:**  Thank you.

14   BY MR. DOSTART:

15   Q.   Ms. Mendiola, if you had to estimate the number of

16   transactions that you've completed at Kmart as a front end

17   cashier total over the course of your employment, how many

18   would you estimate that you've done?

19   A.   Heavy items?

20   Q.   No.  Total transactions, all transactions?

21   A.   Throughout the day probably, like, 15 to 20 transactions.

22   Q.   Okay.  But what about over the course of your entire

23   employment?  Would it be fair to say that uniform completed

24   hundreds, if not thousands?

25   A.   Yes.

 1          **MS. FIFE:**  Objection, your Honor.  Leading.

 2          **THE COURT:**  Yes, definitely leading.  That answer is

 3  stricken.

 4  **BY MR. DOSTART:**

 5  **Q.**   Ms. Mendiola, how many transactions would you estimate

 6  that you've completed over the course of your career as a Kmart

 7  cashier?

 8  **A.**   Oh, probably over, like, 100.

 9  **Q.**   Over your entire career?

10  **A.**   Thousands of customers?  I mean, I can't estimate.  I

11  don't count every customer that comes through.  That's what

12  they have the computer for.

13  **Q.**   Let's go back to my initial question about heavy objects.

14  So you stated that you can estimate what a 10-pound object

15  feels like, is that correct?

16  **A.**   Yes.

17  **Q.**   What percent of customers or what number of customers out

18  of, let's say, 10 or 20 would you estimate come through with an

19  object that weighs more than 10 pounds?

20  **A.**   I would say about two out of every twenty customers.

21  **Q.**   Okay.  While you were working as a front end cashier at

22  Tulare, did you do all of your work in a standing posture?

23  **A.**   Yes.

24  **Q.**   Did you ever experience any fatigue or discomfort as a

25  result of standing?

1    **A.**    Yes.

2    **Q.**    Would you please describe that fatigue or discomfort?

3    **A.**    Feet pain, knees, back.

4    **Q.**    Is that it?

5    **A.**    Yeah.

6    **Q.**    Out of 10 days, how many days you would estimate that you

7    experienced that, those symptoms that you just described?

8    **A.**    Every day I would work.

9    **Q.**    Let me ask you a question about seats.  Did you ever wish

10   that you had a seat while you were cashiering at Kmart?

11   **A.**    Yes.

12   **Q.**    Did you ever ask anyone for a seat while you were

13   cashiering at Kmart?

14   **A.**    Yes.

15   **Q.**    Who did you ask?

16   **A.**    Cindy.

17   **Q.**    What did you ask her?

18   **A.**    I asked her if I could have a chair, anything to sit down

19   while I was working, because I was pregnant at the time and my

20   back and feet were killing me, and she told me no.

21           **MS. FIFE:**  Objection, your Honor.  Hearsay.

22           **THE COURT:**  This is proving up a transaction.  It's

23   not offered for the -- she's testifying firsthand.  The

24   statements that she's referring to are proving up a

25   conversation or transaction.  So, so far I don't see any

1   hearsay problem.

2        Objection overruled.  Please continue your answer.

3   **A.**   Umm, because I was pregnant at the time and I would love

4   to sit down while I was pregnant.  Within an hour of working is

5   when all the pain started coming in.

6            **THE COURT:**  What did she say in response?

7            **THE WITNESS:**  She told me no and she said if I wanted

8   to sit down, I could go home.

9            **THE COURT:**  Who was this person?

10           **THE WITNESS:**  Cindy.

11           **THE COURT:**  I never heard of her.  Who is she?

12           **THE WITNESS:**  She's a manager there, one of the

13  managers.

14           **THE COURT:**  What year did this occur?

15           **THE WITNESS:**  In 2010.

16           **THE COURT:**  All right.  Continue on, counsel.

17  **BY MR. DOSTART:**

18  **Q.**   And so what did you do after Cindy refused to give you a

19  seat?

20  **A.**   I just looked at her, like, really?  And just continued

21  working.

22  **Q.**   And did you end up continuing to work until you went on

23  maternity leave?

24  **A.**   Yes.  I had to go on maternity leave two months early

25  because of how painful it was to stand that long.

```
 1   Q.   Do you believe if you were provided a seat, you would have
 2   been able to continue working?
 3   A.   Yes.  I probably would have worked until --
 4            MS. FIFE:  Objection, your Honor.
 5            THE COURT:  What's the objection?
 6            MS. FIFE:  Calls for speculation.
 7            THE COURT:  It's a lay opinion.  Objection overruled.
 8            MR. DOSTART:  I will ask the question again.
 9   BY MR. DOSTART:
10   Q.   Or, do you remember the question?
11   A.   Yes.  I would have continued working probably until my due
12   date if I was able to have had a seat.
13   Q.   Do you think you would have been able to perform the
14   essential functions of a cashier while seated?
15   A.   Yes.
16   Q.   Were there any modifications that you would have liked to
17   have seen occur at the check stand in order for you to more
18   comfortably use a seat?
19   A.   Yes.  More knee room and for the bags to move closer to
20   you.
21            THE COURT:  I don't understand that last part.  More
22   knee room, I understand that part; but for the backs to move
23   closer, what do you mean by that?
24            THE WITNESS:  Like, to set them maybe, like, right
25   here.  So after you're done scanning, you just put them right
```

 1  here in the bag.

 2          THE COURT:  Oh, you said for the bags to be closer.

 3          THE WITNESS:  Yes.  For the bags to be closer.

 4          THE COURT:  I'm sorry.  I thought you said backs to be

 5  closer.  You said bags to be closer.

 6          THE WITNESS:  Yeah, the bags.

 7          THE COURT:  I understand now.  Thank you.

 8          THE WITNESS:  You're welcome.

 9  BY MR. DOSTART:

10  Q.   Do you believe with those two modifications you would have

11  been able to perform most of the essential functions of a

12  cashier while seated?

13  A.   Yes.

14          THE COURT:  This question has got a clever word in it,

15  "essential functions."  What do you mean by -- I'm going to ask

16  the witness:  What do you mean by essential functions?

17          THE WITNESS:  Scanning, bagging.  That's all you

18  really do at a cashier is scan and bag.

19          THE COURT:  Were there any functions at all that you

20  performed as a cashier that would have required you to stand,

21  assuming that you did have a seat?

22          THE WITNESS:  Umm, if there was a heavy item, a super

23  heavy item where I had to scan with a hand scanner.

24          THE COURT:  You would stand for that?

25          THE WITNESS:  Yeah.  To walk around and scan it.

```
 1              THE COURT:  Is that an essential function?

 2              THE WITNESS:  Not really because you hardly ever got

 3    any heavy items.

 4              THE COURT:  So you would just give that item away for

 5    free if you were sitting down?

 6              THE WITNESS:  No, no.

 7              THE COURT:  How would you -- isn't it essential to

 8    scan that item?

 9              THE WITNESS:  Yes.

10              THE COURT:  Why didn't you call that an essential

11    item?

12              THE WITNESS:  I'm not too sure.

13              THE COURT:  What else would you have to stand for?

14              THE WITNESS:  What else would I have to scan?

15              THE COURT:  No.  What else would you have to stand up

16    for?

17              THE WITNESS:  That's it.

18              THE COURT:  Just that one item?

19              THE WITNESS:  Just heavy, real heavy stuff.

20              THE COURT:  All right.  Thank you.

21              MR. DOSTART:  No further questions, your Honor.

22              THE COURT:  Cross-examination.

23                          CROSS EXAMINATION

24    BY MS. FIFE:

25    Q.   Hi, Ms. Mendiola.
```

 1  **A.**    Hello.

 2  **Q.**    Are you a little nervous?

 3  **A.**    A little bit.

 4  **Q.**    So am I.  So am I.  My name is Joan Fife and I'm the

 5  lawyer that's representing Kmart.  So I'm just going to ask you

 6  a few questions today.

 7  **A.**    Okay.

 8  **Q.**    Ms. Mendiola, you didn't work continuously from when you

 9  started working at Kmart until when you quit working at Kmart,

10  right?

11  **A.**    What do you mean by "continuously"?

12  **Q.**    You took a leave of absence in between?

13  **A.**    Yes.  For maternity leave, yes.

14  **Q.**    And you took several months off for your maternity leave,

15  isn't that correct?

16  **A.**    I believe it was six months.  After maternity leave, I

17  went back to working at Kmart.

18  **Q.**    So you started working sometime in 2010 and then you ended

19  working sometime in 2011 and you had a maternity leave in

20  between, correct?

21  **A.**    Yes, yes.

22  **Q.**    Thank you.

23        Ms. Mendiola, we have had a lot of other witnesses already

24  testify as to the configuration of the checkout stand.  So I'm

25  going to try not to take you through the same questions other

 1  people have been asked, so I apologize if I'm jumping around a

 2  little bit.

 3  **A.**   Okay.

 4  **Q.**   Now, when you were a cashier, you had no control over the

 5  next customer who was coming through your line, correct?

 6  **A.**   I didn't.

 7  **Q.**   Or, I'm sorry.  Let me rephrase it.

 8          **THE COURT:**  You see?  You see the problem?

 9          **MS. FIFE:**  Yes, I do.  Yes, I do, your Honor.  I even

10  practiced last night, but we'll see if I can get it right.

11  **BY MS. FIFE:**

12  **Q.**   When you're a cashier at Kmart, you have no control over

13  the next customer in line, do you?

14  **A.**   No.

15          **THE COURT:**  That's good.  I give you an A for that.

16  But you are using the present tense.  So you should say, "you

17  didn't, did you?"  Stick with the right verb tense.

18          **MS. FIFE:**  Thank you, your Honor.

19          **THE COURT:**  But let's go to the next question.

20          **MS. FIFE:**  Okay.  Thank you, your Honor.  I appreciate

21  that.

22  **BY MS. FIFE:**

23  **Q.**   And a lot of times when you were a cashier at Kmart, you

24  wouldn't know what items would be presented to you in the next

25  transaction, correct?

```
 1  A.   Yeah --
 2         THE COURT:  You did it again.  "You wouldn't know."
 3  "Correct."  "Yeah."
 4         THE WITNESS:  You guys' job's hard.
 5      (Laughter.)
 6         THE COURT:  You can do this.  Ask that question the
 7  proper way.
 8  BY MS. FIFE:
 9  Q.   Ms. Mendiola, when you were a cashier -- when you were a
10  cashier at Kmart, you wouldn't have control over the items the
11  next customer would bring to you, would you?
12  A.   No.
13  Q.   Thank you.
14      And when you were a cashier at Kmart, some periods of time
15  were more busy than other periods of time, weren't they?
16  A.   Yes.
17  Q.   In terms of the number of transactions and the types of
18  transactions, correct -- or, isn't that true?
19  A.   Yes.
20  Q.   For instance, right now, which is a week before
21  Thanksgiving, you worked during this period of time in 2011,
22  didn't you?
23  A.   No.  In 2010 I did.
24  Q.   2010, didn't you?
25  A.   Yeah.
```

 1  Q.   And during that period of time, the holiday season between

 2  Thanksgiving and Christmas, the store was very busy, wasn't it?

 3  A.   Yes.

 4  Q.   And there were lots of customers during that period of

 5  time in the store, weren't there?

 6  A.   Yes.

 7  Q.   And one of the nice things about Kmart is if you were

 8  shopping for gifts or items for your entire family, you could

 9  go through the store and go through all the different

10  departments and find things to buy for lots of different

11  members of your family, couldn't you?

12  A.   Yes.

13  Q.   In your experience as a cashier during the holiday season,

14  you would have customers who would come through your line with

15  lots of different types of items that could be appropriate for

16  toddlers, teenagers, parents, housewares; things of that

17  nature, isn't --

18  A.   Yes.

19  Q.   Didn't they?

20  A.   Yeah.

21  Q.   During the holiday season, Kmart even has special bags

22  that they make available to the cashiers and the customers?

23  A.   Yes.

24  Q.   Don't they?

25  A.   Yeah.  The big huge ones?

1  Q.    They have big huge bags.

2  A.    Yeah.  Like, for big items.

3  Q.    Do they even have bags that are blacked out so your kids

4  can't see what's in the bag?

5  A.    Yeah, for black Friday.

6  Q.    When you were working at Kmart as a cashier, did you use

7  those bags?

8  A.    Yes.

9  Q.    Otherwise, there were other sizes of bags that were

10  available to a cashier?

11  A.    Yes.

12  Q.    And as a cashier, you had access to small bags; isn't it

13  true?

14  A.    Yes, yes.

15  Q.    And you had access to the medium size bags that sit in the

16  bagging prong?

17  A.    Yes.

18  Q.    Didn't you?

19  A.    Yes.

20  Q.    And then under the bagging table there were large bags

21  that you had available to you as a cashier, didn't you?

22  A.    Yes.

23  Q.    And depending on the order, depending on the customer that

24  came through your line, you might need to use those various

25  different sizes of bags, wouldn't you?

1  **A.**    Yes.

2  **Q.**    Now, we have had some testimony about what happens when

3  customers put things on the counter next to the cash register.

4  And when you were working as a cashier at Kmart, you might need

5  to reach to the end of the counter to pick up an item that the

6  customer had placed on the end of the counter, correct?

7  **A.**    Yes.

8  **Q.**    Or, isn't it true?

9  **A.**    Yes.

10 **Q.**    Let me make the question clear.

11         **THE COURT:**  There is no difference between "correct"

12 and "isn't that true."  Both of those are equal in terms of

13 having the same problem.

14     The problem is when there is a negative in the text of the

15 question followed by anything like "is that true" or "is that

16 correct."  So that's the -- it's the negative combined with

17 that little ending or start that is the problem.

18     So you're doing a fine job.  I think all of your

19 questions, except that very first one, are good.  But I'm

20 detecting that you are thinking that somehow "is that true" is

21 better than "is that correct" and there is really no difference

22 in they are equally infected with the potential to have this

23 double negative problem.

24         **MS. FIFE:**  I acknowledge that and I recognize it's the

25 same exact problem.  So thank you, your Honor.

1          **THE COURT:**  All right.  Continue on.

2    **BY MS. FIFE:**

3    **Q.**  When you were working as a cashier if you could reach an

4    item on the counter, you would reach the item, wouldn't you?

5    **A.**  Yes.

6    **Q.**  And you wouldn't ask the customer to reach the item, would

7    you?

8    **A.**  Yes, I have before.

9    **Q.**  If you couldn't reach the item, you would ask the customer

10   to reach the item for you?

11   **A.**  To move it closer.

12   **Q.**  But if you personally could reach the item, you would

13   reach the item, wouldn't you?

14   **A.**  Yes.

15   **Q.**  And sometimes customers put items on the edge of the

16   counter and the customer moves away from the counter because

17   they come down in the lane?

18   **A.**  Yes.

19   **Q.**  Don't they?

20   **A.**  Yes.

21   **Q.**  So when a customer unloads items onto the counter, the

22   customer can -- you've seen it.  A customer has unloaded a

23   gallon of milk, haven't you?

24   **A.**  Yes.

25   **Q.**  And you've reached for a gallon of milk, haven't you?

```
 1   A.    Yes.

 2   Q.    And you have seen a customer unload a two-liter bottle of

 3   soda at the edge of the counter, haven't you?

 4   A.    Yes.

 5   Q.    And you've reached for a two-liter bottle of soda at the

 6   edge of the counter, haven't you?

 7   A.    Yes.

 8   Q.    And yesterday there was some discussion, but I think it's

 9   a 12-pack box of sodas?

10   A.    Uh-huh.

11   Q.    Twelve cans?  Do you know what I'm talking about?

12   A.    Yes.

13   Q.    And you have seen customers put those on the edge of the

14   counter, haven't you?

15   A.    Yes.

16   Q.    And you have had to reach and grab those 12-packs of

17   sodas, haven't you, as a cashier at Kmart?

18   A.    Yes.

19   Q.    And a customer could -- strike that.

20         Now, there is the cashier station and then there are

21   two -- there are prongs that come out and hold the medium size

22   bags?

23   A.    Yes.

24   Q.    Isn't there?

25   A.    Yes.
```

1   **Q.**   And sometimes you load items directly into those bags,

2   don't you?

3   **A.**   Yes.

4   **Q.**   Or didn't you?

5   **A.**   Yes.

6   **Q.**   And, for instance, if you're running through a bottle of

7   shampoo, a bottle of conditioner, a can of shaving cream, you

8   might leave the bag on the prong and load the items directly

9   into the bag, didn't you -- or wouldn't you?

10  **A.**   Yes.

11  **Q.**   And then when you loaded the items into the bag that's

12  still on the bagging prongs, you'd pull the bag off the bagging

13  prong and then you would either set it in the customer's cart,

14  you would set it on the back bagging table, or you might set it

15  up by the scanner?

16  **A.**   Yes.

17  **Q.**   Didn't you?

18  **A.**   Yes.

19  **Q.**   And if there was more than one bag of merchandise that you

20  were bagging, you would take that bag that you've just loaded,

21  you take it off and put it somewhere else, and then you would

22  start loading the next bag, wouldn't you?

23  **A.**   Yes.

24  **Q.**   And on some orders a customer might come through and they

25  might have lots of different types of items, some that got

 1  bagged -- some that you would bag and some you wouldn't bag

 2  isn't -- or, didn't they?

 3  **A.**    Yes.

 4  **Q.**    And as a cashier at Kmart, you never asked a customer to

 5  take the loaded bag off the bag -- of the prongs, did you?

 6  **A.**    I never asked them, no, but they have done it themselves.

 7  **Q.**    Sometimes a customer would voluntarily do that themselves?

 8  **A.**    Yes.   And sometimes they would voluntarily bag themselves,

 9  too.

10  **Q.**    And sometimes they would volunteer to help you, wouldn't

11  they?

12  **A.**    Yeah.

13  **Q.**    And did you ever tell a customer who volunteered to help,

14  "No, that's okay.   Let me do it"?

15  **A.**    Yes.

16  **Q.**    You've done that before, haven't you?

17  **A.**    Yes.

18  **Q.**    And that's part of providing customer service, isn't it?

19  **A.**    Yes.

20  **Q.**    Now, to take the bag of the bagging prongs, if you can

21  remember, you would have to stand to do that, wouldn't you?

22  **A.**    Not if the bags were moved closer, I wouldn't have to

23  stand.

24  **Q.**    So in the existing configuration, the way it was set up

25  when you worked at Kmart, to take the bag off the bagging

```
 1  prongs you would have to be standing, wouldn't you?

 2  A.    Yes.

 3  Q.    And when you filled those medium size bags that were on

 4  the bagging prongs, many times you put more than one item in

 5  the bag, didn't you?

 6  A.    Yes.

 7  Q.    Again, I'm going to try to not cover material we have

 8  already covered, but I have to set up the question so you know

 9  what I'm talking about.

10        When you were working as a cashier at Kmart, there was a

11  bin that was under the cash register for trash and then there's

12  another bin that was under the cash register for returns?

13  A.    Yes.

14  Q.    Wasn't there?

15  A.    Yes.

16  Q.    And the trash bin, was that the bin where you would put

17  hangers if the customer bought an item of clothing that was on

18  a hanger and they didn't want the hanger?

19  A.    Yes.

20  Q.    And you would take the hanger off the item of clothing and

21  lean down and put it in the bin that was below the cash

22  register, wouldn't you?

23  A.    Yes.

24  Q.    And did you ever have a customer who wanted a hanger?

25  A.    Yes.
```

1  Q.   And so you would reach down and grab a hanger from the

2  bottom of the bin and hand it to the customer, wouldn't you?

3  A.   I usually ask them before I take the hanger off if they

4  want to keep it or if they don't want it.

5  Q.   Did you ever have a customer that came through the line

6  who wasn't buying anything with a hanger and they said to you,

7  "Do you have any extra hangers you can give me?"

8  A.   No.

9  Q.   I was just curious.

10 A.   No.  We weren't allowed to just give them hangers.

11 Q.   So did Kmart -- once the bin of -- once you had the bin of

12 hangers that you would put in, so you put the hangers in the

13 bin, once the bin was full or either at the end of your shift,

14 would you take that bin and unload it somewhere?

15 A.   Yes.

16 Q.   And did you have to walk out of the cash register station

17 to do that?

18 A.   Yes.

19 Q.   Now, when you were working as a cashier at Kmart, did you

20 ever have to -- did you ever sell things that were fragile?

21 A.   Yes.

22 Q.   And for the fragile things, you wouldn't drag those across

23 the scanning table, would you?

24 A.   What do you mean by "drag"?

25 Q.   Umm, like slide across, dragging -- slide across the

1  counter instead of picking it up?

2  **A.**     Sometimes I would slide them, but I like to be careful

3  because, you know, you have those little, oh, like gaps in

4  between the registers and sometimes they get caught and fall,

5  so sometimes I would grab it.

6  **Q.**     Because the surface on the counter, from the counter to

7  the scanner to the demagnetizer, is not completely smooth, was

8  it?

9  **A.**     No.

10 **Q.**     Sometimes in the middle of a transaction -- this could

11 happen in any transaction, whether it was big or small or the

12 items were light or heavy.  Sometimes in the middle of the

13 transaction you would have to leave the cash register station,

14 wouldn't you?

15 **A.**     Just if I needed to get a call on a price or anything.

16 **Q.**     Sometimes you would have to go and get more money for your

17 till, didn't you?

18 **A.**     Yes.

19 **Q.**     And that might happen in the middle of a transaction, if

20 you couldn't break a 20 or 100?

21 **A.**     Yes.

22 **Q.**     And sometimes you would also have to leave the station in

23 the middle of a transaction to get some type of approval for

24 the purchase, wouldn't you?

25 **A.**     Yes.

1  Q.   And were there other times -- strike that.

2       Sometimes you would to leave the cash register station in

3  the middle of a transaction, whether the customer was buying a

4  lot or a little, sometimes you would have to leave to go use

5  the phone that was located at another cash register station?

6  A.   Yes.

7  Q.   Didn't you?

8  A.   Yes.

9  Q.   And you can't -- when you were working as a cashier, you

10 couldn't predict on which transaction you might have to leave

11 the cash register station, could you?

12 A.   No, you couldn't predict.  No.

13 Q.   Now, if I say the word "pin pad," do you know what I'm

14 talking about?

15 A.   Where you slide the card?

16 Q.   Yes.  Where the customer slides the card.

17 A.   Yes.

18 Q.   I think it's been referred to by other people, maybe the

19 lawyers, we have been calling it a pin pad and I want to make

20 sure you know what I'm talking about.

21 A.   Yeah.

22 Q.   That's where the customer slides their card for the

23 transaction?

24 A.   Yes.

25 Q.   Isn't it?

1  **A.**   Yes.

2  **Q.**   And when you were working as a cashier, were there times

3  that you had to either walk around and help the -- were there

4  times when you had to walk around to the aisle and help the

5  customer with that pin pad?

6  **A.**   Yes.

7  **Q.**   And you may have to help the customer with the pin pad

8  regardless of whether the transaction was big or small, the

9  order the was big or small, and regardless of whether they had

10 heavy items or light items, didn't you?

11 **A.**   Yes.

12 **Q.**   Now, the Kmart carts or the buggies, the ones on wheels,

13 they were fairly large when you worked there, weren't they?

14 **A.**   Yes.

15 **Q.**   And they had a shelf on the bottom, didn't they?

16 **A.**   Yes.

17 **Q.**   You talked a little bit about this.  You talked about you,

18 as a cashier, had the responsibility to make sure there wasn't

19 anything on that bottom shelf, didn't you?

20 **A.**   Yes.

21 **Q.**   To make sure there wasn't anything on the bottom shelf you

22 testified before that if the cart was coming towards you

23 through the lane, you could see if there was anything -- if

24 there was anything on the bottom shelf, couldn't you?

25 **A.**   Yes, yes.

1  Q.   And when the cart would leave the checkout station, you

2  could also see if there was something on the bottom shelf,

3  couldn't you?

4  A.   Yes.

5  Q.   And do you know what I'm talking about when I reference

6  the pass-through, which is where you can walk between the cash

7  register station -- where the cash register is and where the

8  customer is, there is a pass-through with the bagging prongs.

9  Do you know what I'm talking about?

10  A.   No.   Describe it more.

11  Q.   I call them bagging prongs.   Maybe that's not the right

12  word.

13  A.   Oh, where it's open in between where they store your bags

14  and where the bags are at?   That part there?

15  Q.   What I'm talking about is at the end of the counter, there

16  are metal things that stick out and hold bags, the medium size

17  bags, isn't that right?

18  A.   Yes.

19  Q.   What do you call those metal things?

20  A.   I don't call them anything.   I called them bag holders.

21  Q.   Bag holders, that's fine.   We'll call them bag holders.

22       So you know the area I'm talking about --

23  A.   Yes.

24  Q.   (Continuing) -- where you walk through from the cash

25  register station to where the customer is?

```
 1   A.    Yes.
 2   Q.    So are there -- if the cart is coming by there, you can
 3   also look and see the bottom rack of the cart as well?
 4   A.    Yes.
 5   Q.    Isn't -- or can't you?
 6   A.    Kind of, but not really.
 7   Q.    If you're standing there bagging in those medium size
 8   bags, you can look down through that pass-through and see the
 9   bottom of the cart if it's in front of you?
10   A.    Not if it's in front of me, no.
11   Q.    Were there times that you had to walk around to where the
12   cart was through that pass-through and scan items on the bottom
13   shelf of the cart?
14   A.    Yes.
15   Q.    And then were there times that you also had to scan things
16   that weren't on the bottom shelf of the cart, but were on the
17   bottom of the basket of the cart?  Like, if I filled up the
18   bottom of my basket with Cokes or a flat of water?
19   A.    Yes.
20   Q.    And there were times that you had to scan those items,
21   weren't there?
22   A.    Yes.
23   Q.    And sometimes to scan those items, you would have to walk
24   around through the pass-through and get to the customer's side?
25   A.    Yeah, that or they would hand it to me.
```

 1  Q.   So let me ask you a little bit about this bagging table.

 2  I call it the bagging table.  It's the table on the back of --

 3  it's the third table on the cash register configuration, which

 4  is the table that stores the various size bags.  Do you know

 5  what I'm talking about?

 6  A.   Yes.

 7  Q.   And we have a diagram, if you need help understanding what

 8  I'm saying.

 9  A.   I know what you're saying.

10  Q.   All right.  So if I call that a bagging table, do you know

11  what that means?

12  A.   Yes.

13  Q.   That's that table in the back that holds the bags, okay?

14  A.   Okay.

15  Q.   Okay.  So a lot of times you would use that, wouldn't you?

16  A.   Not all the time, no.

17  Q.   Sometimes you would though, right?

18  A.   Sometimes, not very off though.

19  Q.   So if you were checking out a customer with a lot of bags,

20  a lot of items, you would use the bagging area to store the

21  bags, wouldn't you?

22  A.   What do you mean?

23  Q.   So if a customer comes through and they have a lot of

24  items in their cart, you're scanning and bagging.  Once you

25  fill the bags, where did you place the bags?

 1  **A.**   Either where the thing that deactivates stuff is or on the

 2  other table.

 3  **Q.**   The bagging table?

 4  **A.**   Yes.

 5  **Q.**   So sometimes you would use the bagging table to store bags

 6  that you have already bagged?

 7  **A.**   Yes.

 8  **Q.**   Isn't -- or didn't you?

 9  **A.**   Yes.

10  **Q.**   Let me ask you about the things that you had to be able to

11  reach to do your job as a cashier.

12       There are a lot of things that you had to be able to reach

13  to do the job, weren't there -- or -- weren't there?

14  **A.**   No, not a lot of things.

15  **Q.**   Okay.  Did you have to be able to reach the cash register?

16  **A.**   Yeah, but it was right here, so it's not that far of a

17  reach.

18  **Q.**   It was close?

19  **A.**   Yeah, real close.

20  **Q.**   And there was a cash drawer in the cash register.  You had

21  to be able to reach that?

22  **A.**   Yes.

23  **Q.**   Didn't you?

24  **A.**   Yes.

25  **Q.**   And then there was a holder that spit out the receipt.

1  You had to be able to reach that, didn't you?

2  **A.**    Yes.

3  **Q.**    And then there was another holder that -- that spit out

4  the coupons.  You had to be able to reach that, didn't you?

5  **A.**    Yes.

6  **Q.**    And then there was a monitor above the cash register where

7  you could punch in numbers or things.  You had to be able to

8  reach that, didn't you?

9  **A.**    Yes.

10  **Q.**    And sometimes you would turn that to face the customer or

11  you would turn it so that they could see what was on the

12  monitor, didn't you?

13  **A.**    Yes.

14  **Q.**    And so that's the top of where the cash register is.  You

15  had to be able to reach all those things, didn't you?

16  **A.**    Yes.

17  **Q.**    And then below the cash register there was the bin that

18  holds the trash and the hangers, and you had to be able to

19  reach that, didn't you?

20  **A.**    Yes.

21  **Q.**    And then there was the other bin that held -- that you

22  would use to put returns in.  You had to be able to reach that,

23  didn't you?

24  **A.**    Yes.

25  **Q.**    And when I say "returns," what I mean is if a customer --

```
 1   if I came up and I had three pairs of shoes and I changed my
 2   mind and I said, you know, "I've changed my mind, I don't want
 3   to buy these," you would take those shoes and put them in that
 4   return bin, wouldn't you?
 5   A.   Yes.
 6   Q.   You don't make the customer take it back and put it in the
 7   store, do you?
 8   A.   No.  Sometimes they would.
 9   Q.   Sometimes they will put it in the wrong area of the store,
10   won't they?
11   A.   Yeah.
12   Q.   Let's talk about the counter next to the cash register.
13   You would have to be able to reach all long that counter,
14   wouldn't you?
15   A.   Which counter?  The one with the bags?
16   Q.   The one where people unload their merchandise.
17   A.   Oh, yes.
18   Q.   Okay.  And you would also have to be able to reach the
19   scanner on that counter, wouldn't you?
20   A.   Yes.
21   Q.   And there is a hand held scanner.  You have to be able to
22   reach that, too, didn't you?
23   A.   Yes.
24   Q.   And you would have to be able to reach the security
25   deactivator, wouldn't you?
```

1   A.    Yes.

2   Q.    And there was extra cash register paper that was stored

3   underneath that counter, wasn't there?

4   A.    Yes.

5   Q.    And you would have to be able to reach that extra cash

6   register paper in case your register ran out of paper in the

7   middle of the transaction, wouldn't you?

8   A.    Yes.

9   Q.    You'd have to be able to reach the bagging holders,

10  wouldn't you?

11  A.    Yes.

12  Q.    And you would have to be able to reach those medium size

13  bags that sit off the bagging holders, correct -- or would you?

14  A.    Yes, yes.

15  Q.    And then going back to the bagging table, you'd have to be

16  able to reach the small bags that were stored on that bagging

17  table, wouldn't you?

18  A.    What do you mean?  What small bags?

19  Q.    Weren't there bags that were smaller than the medium

20  bags that were --

21  A.    Yeah, but they were right here, right in front of you,

22  right next to you.

23  Q.    So you would have to be able to reach those, but they were

24  closer than the bagging table, weren't they?

25  A.    Yes.

1   Q.   And you would have to be able to reach the bags that were

2   stored in the bagging table, wouldn't you?

3   A.   Yes, if I ran out of bags.

4   Q.   And then there was also some testimony yesterday about

5   there was some type of holder for security deactivators?

6   A.   Yes.

7   Q.   And there was a bin for those as well, wasn't there?

8   A.   Yes.

9   Q.   And those were stored under the counter, weren't they?

10  And you would have to be able to reach those as well?

11  A.   Yes.

12  Q.   And there was also an ad circular at the check register

13  area, counter, isn't it true -- or wasn't there?

14  A.   Yes.

15  Q.   And you would have to be able to reach that as well,

16  wouldn't you?

17  A.   Yes.

18  Q.   And there were other supplies in the cash register area as

19  well, weren't there?

20  A.   Not other than what you talked about.

21  Q.   Scissors, tapes, things like that?

22  A.   Yeah.

23  Q.   And so you would need to be able to reach all these things

24  I've just gone through because you never know when you might

25  need those things during a transaction, wouldn't you?

1  A.   Yes.

2  Q.   Now, the bag holders that hold the medium bags that we've

3  talked about, sometimes -- let me make this question clearer.

4  I'm stumbling around in my words.

5      Sometimes you would load those bags while the bag was

6  sitting on the holder, wouldn't you?

7  A.   Yes.

8  Q.   And, like, if you were putting three bottles of shampoo or

9  three plastic bottles, you would set them in there individually

10 so that they would all stand up while the bag was in the

11 holder, wouldn't you?

12 A.   Yes.

13 Q.   And sometimes when things came through your stand, you had

14 to scan them for the price, wouldn't you?

15 A.   Yes.

16 Q.   And sometimes whatever the item was, you might have to

17 turn it to find the UPC code so it would line up with the

18 scanner, wouldn't you?

19 A.   Yes.

20 Q.   Like, if somebody had a set of sheets and you picked them

21 up and you might have to turn the box of sheets, the package of

22 sheets, to find the UPC code, right?

23 A.   Yes.

24 Q.   Or wouldn't you?

25 A.   Yes.

1    Q.   And sometimes if you had items -- did you ever have a

2    situation where the item would not scan?

3    A.   Yes.  And then I would use the hand scanner because

4    sometimes it wouldn't pick up on the table scanner.

5    Q.   Okay.  So when you've loaded the bag in the bag holder --

6    strike that.  I think I've already asked you that question.

7         As a cashier at Kmart, you were supposed to do the bagging

8    for the customer, weren't you?

9    A.   Yes.

10   Q.   And the customer was not supposed to have to bag their

11   items, were they?

12   A.   No.

13   Q.   You understood that was the company's expectation for

14   cashiers, wasn't it?

15   A.   Yes.

16   Q.   And that was true regardless of the size of the

17   transaction?  Even if it was a small transaction, it was your

18   job as a cashier to bag the items for the customer, wasn't it?

19   A.   Yes.

20   Q.   And it was your job to get that bag to the customer after

21   they paid for the item, wasn't it?

22   A.   Yes.

23   Q.   You were taught not to waste bags, weren't you?

24   A.   Yes.

25   Q.   And you had to put more than one thing in bags so that you

1  didn't waste bags, weren't you?

2  **A.**   Yes.

3  **Q.**   To fill some of the bags you needed to be standing up,

4  didn't you?

5  **A.**   Kind of.

6  **Q.**   Let me ask you about this.  I'm kind of curious about

7  this.  If somebody bought, like, my jacket, would you hold it

8  up and fold it before you put it into the bag?

9  **A.**   Yes.

10 **Q.**   And to hold up a jacket you would have to lift your arms

11 up, wouldn't you?

12 **A.**   Yes.

13 **Q.**   And then you would fold it and slide it into the bag,

14 wouldn't you?

15 **A.**   Yes.

16 **Q.**   You don't just wad up clothes and put them into the bag,

17 do you?

18 **A.**   No.  That's just rude.

19 **Q.**   And sometimes when you're folding up clothes, you need to

20 stand to fold the clothes, don't you?

21 **A.**   I don't ever stand when I fold clothes.  I always sit

22 down.

23 **Q.**   You always sit down?

24 **A.**   Yes.

25 **Q.**   How about bagging things like -- that are tall, like a

MENDIOLA - CROSS EXAMINATION / FIFE

```
 1  lamp?
 2  A.    We never bagged lamps.
 3  Q.    How about did you ever bag a -- kind of a seasonal item,
 4  like a decoration that looked like a reindeer or --
 5  A.    Big?  One of those ones you put in your lawn?
 6  Q.    Two-and-a-half feet high type of --
 7  A.    Customers never wanted them bagged.  They just would put
 8  them back in their cart.
 9  Q.    Did you ever help a customer put something like that back
10  in their cart?
11  A.    Yes.
12  Q.    And there's always work to do when you were a cashier,
13  wasn't there?
14  A.    Yes.
15  Q.    And you understood that the company expected you to stay
16  busy even if there weren't customers in your line, didn't you?
17  A.    Yes, yes.
18  Q.    And if there weren't customers in your line, there's
19  various different things you could do as a cashier, weren't
20  there?
21  A.    Yeah, but not so much because sometimes another cashier
22  before you already had all that done, so there was really
23  nothing to do.
24  Q.    But you knew you weren't supposed to stand around and not
25  do anything?
```

1  A.   Yeah, yeah.

2  Q.   So you found something to do, didn't you?

3  A.   Yes.

4  Q.   Now, you testified that while you were a cashier at Kmart,

5  you were pregnant, weren't you?

6  A.   Yes.

7  Q.   Or, didn't you?

8       And this was your -- you were pregnant with your first

9  child?

10  A.   Yes.

11  Q.   Weren't you?

12  A.   Yes.

13  Q.   And since then you have had another child, haven't you?

14  A.   Yes.

15  Q.   So you have been pregnant twice?

16  A.   Yes.

17  Q.   I figure you probably know the answer to this question.

18  When you were pregnant, do you remember being careful to not

19  fall or trip?

20  A.   Yes.

21  Q.   And do you remember when you were pregnant that if you're

22  walking up and down stairs, you would probably grab the

23  handrail to make sure you didn't fall?

24  A.   Yes.

25  Q.   Because you're more mindful of your body when you're

1  pregnant?

2  **A.**   You're off balance when you're pregnant.

3  **Q.**   Don't wear high-heeled shoes quite as much when you're

4  pregnant, do you?

5       Do you remember when you were pregnant, what it was like

6  to sit down?

7  **A.**   Yes.

8  **Q.**   Do you remember when you were pregnant, you sat down, you

9  would make sure you didn't miss the seat?

10  **A.**   No, not really.  I would just plop.

11  **Q.**   Okay.  So you don't remember when you were pregnant that

12  you would -- you would put your hand out and reach for the arm

13  rest?

14  **A.**   I never did that when I was pregnant.

15  **Q.**   You just plopped down?

16  **A.**   Yes.

17  **Q.**   So you weren't concerned about falling over when you sat

18  down when you were pregnant?

19  **A.**   No.

20  **Q.**   But you were mindful about making sure you didn't fall

21  down steps?

22  **A.**   Yes.

23  **Q.**   Okay.  Ms. Mendiola, I'm just going to show you one

24  document.

25           **MS. FIFE:**  Which the parties have stipulated to the

 1  admissibility of, your Honor.  It's been marked 373-A.

 2       May I approach the witness, your Honor?

 3            **THE COURT:**  You may.  373-A.  Any objection?

 4            **MR. DOSTART:**  No objection, your Honor.

 5            **THE COURT:**  Received in evidence.  Go ahead.

 6       (Trial Exhibit 373-A received in evidence)

 7  **BY MS. FIFE:**

 8  **Q.**  Ms. Mendiola, I promise I'm not going through every

 9  personnel record when you worked at Kmart.  This is the only

10  one.

11       (Document was tendered to the witness.)

12  **A.**  Okay.

13  **Q.**  If you would take a second to look at this document, is

14  this a copy of your Performance Appraisal from Kmart that you

15  signed on May 7, 2011?

16  **A.**  Yes.

17  **Q.**  Is that your signature on the bottom?

18  **A.**  Yes.

19  **Q.**  Okay.  And let me just ask you:  Under -- on the first

20  page you see Part 2, "Behaviors"?

21  **A.**  Yes.

22  **Q.**  And I'll put it up on the Elmo so we can follow along.

23       (Document displayed.)

24  **Q.**  So on my copy I've just highlighted so you can read a

25  little bit easier.  Under the behavior called "Leadership and

1  People Oriented" --

2  **A.**   Uh-huh.

3  **Q.**   (Continuing) -- under the comments it says:  "Need to

4  motivate yourself and others to stay busy."

5  **A.**   Uh-huh.

6  **Q.**   Is that correct?

7  **A.**   Yes.

8  **Q.**   And you understood that was Kmart's expectation for you?

9  **A.**   Yes.

10  **Q.**   Wasn't it?

11  **A.**   Yes.

12  **Q.**   And under "Customer Focus" it said:

13         "Madison does a good job at customer service.  Make

14          more eye contact and smile more."

15       Do you see that?

16  **A.**   Yes.

17  **Q.**   And is it your understanding that that's what Kmart

18  expected of you as a cashier as well?

19  **A.**   Yes.

20  **Q.**   And then, Ms. Mendiola, if you can turn to the second

21  page.  I'm lousy with technology.  So give me a second.

22       (Document displayed.)

23         Okay.  Under the second page under "Development Plan"

24  it says:

25         "Be sure to ask every customer every time about

 1                   rewards, credits, smart plans and whatever charity we

 2                   are promoting at the time.  Increase speed at

 3                   checking out customers.  Remember BOB and LISA."

 4        Do you see that?

 5   A.   Yes.

 6   Q.   That's what the document says?

 7   A.   Yes.

 8   Q.   And is that your understanding of what Kmart expected of

 9   you as a cashier?

10   A.   Yes.

11   Q.   And remember BOB and LISA?  What's BOB?

12   A.   I don't -- I had to ask all the time because I always

13   forget.

14   Q.   Is it Bottom of the Basket?

15   A.   Yes.  I never knew what LISA was.  When they told me at

16   work, they told me, "Do you know BOB or LISA?"  I said, "Who

17   are they?"  I never knew what they meant.

18   Q.   Is LISA the looking inside, like, backpacks or luggage

19   that zipped to make sure that nobody has hidden something in

20   there?

21   A.   Yes.

22            MS. FIFE:  One second, your Honor.

23        (Discussion held off the record amongst

24          defense counsel.)

25            MS. FIFE:  No further questions.

MENDIOLA - CROSS EXAMINATION / FIFE

1   BY MS. FIFE:

2   Q.   Thank you very much.

3   A.   You're welcome.

4        THE COURT:   All right.   Thank you.

5        Redirect.

6                    **REDIRECT EXAMINATION**

7   BY MR. DOSTART:

8   Q.   Very briefly.   Ms. Mendiola, you testified earlier that

9   besides handling items that weigh more than 10 pounds, you

10  believe you would have been able to cashier while seated, is

11  that accurate?

12  A.   Say that again?   I'm sorry.

13  Q.   You testified earlier that besides handling items that

14  weigh more than 10 pounds for which you might need to stand,

15  that you would be able to cashier while seated, is that

16  accurate?

17  A.   Yes.

18  Q.   Is there anything about Ms. Fife's questions that changed

19  your opinion?

20  A.   No.

21       MR. DOSTART:   No further questions, your Honor.

22       THE COURT:   I have a question.   Can we ask that

23  diagram over there...

24       (Diagram moved.)

25       THE COURT:   All right.   Can you see that diagram which

1   others have explained as a layout of the cashier stand?

2           THE WITNESS:  Yes.

3           THE COURT:  Does it make sense to you?  Does it look

4   like it's the way that you remember it?

5           THE WITNESS:  Yes.

6           THE COURT:  Okay.  So I just have one minor question,

7   but where would -- can we hand the witness a -- the pointer,

8   the 1942 technology?

9           THE CLERK:  It's at the bottom of the...

10          THE COURT:  Oh, please hand the witness the stick.  Or

11  if you want to use the laser thing, that's okay, too.

12       (Laser was tendered to the witness.)

13          THE WITNESS:  I think that this might be fun to use.

14          THE COURT:  You know how to use that laser deal?

15       All right.  Whatever you're using, whatever you want to

16  use.  Where would you be --  in the job as now configured or

17  was when you were there, where would you be standing?

18          THE WITNESS:  Right there on the mat (indicating).

19          THE COURT:  Now, you see the bottom left part of the

20  counter as you face the diagram.  Maybe you can point at it?

21          THE WITNESS:  Bottom left?

22          THE COURT:  No, bottom left.

23          THE WITNESS:  Right here (indicating)?

24          THE COURT:  No.  Over to your left as you're look at

25  it.

```
 1              THE WITNESS:  (Indicating)

 2              THE COURT:  Right there.  Right there.

 3        Is that part of the counter?

 4              THE WITNESS:  Yes.

 5              THE COURT:  Is there any time that customers would put

 6  items there?

 7              THE WITNESS:  Yes.

 8              THE COURT:  So would there be any times when you were

 9  there that you would have to reach over to grab items there?

10              THE WITNESS:  No.  I would ask them to move it closer.

11              THE COURT:  That's the way you did it?

12              THE WITNESS:  Yes.

13              THE COURT:  Was that good customer service?

14              THE WITNESS:  No.  I mean, not too sure.

15              THE COURT:  No, really.  We have heard testimony on

16  this.

17        So it was your practice when you were there to make the

18  customer move it rather than you reach over and get it?

19              THE WITNESS:  Yes.

20              THE COURT:  Is that your testimony?

21              THE WITNESS:  Yes.

22              THE COURT:  All right.  Thank you.

23              MR. DOSTART:  Your Honor, may I ask the witness if she

24  could reach those items?

25              THE COURT:  Go ahead.  Ask that question.
```

1   BY MR. DOSTART:

2   Q.   Ms. Mendiola, if a customer placed an item on that far

3   corner that you just pointed to with the red dot, would you

4   have been able to reach it?

5   A.   No.

6           MR. DOSTART:  Thank you.

7           THE COURT:  So even -- that's a good point.  Even

8   standing --

9           THE WITNESS:  You couldn't reach it even if you were

10  standing.

11          THE COURT:  All right.  So here's the other question.

12  If you were seated, would your -- let me back up.

13      While you were standing and while you were doing the job,

14  were there times when you would have to really bend and reach

15  in order to grab things that you could reach, even though you

16  couldn't reach as far as that corner?

17          THE WITNESS:  Yes.

18          THE COURT:  Now, if you were seated, would your reach

19  be somewhat diminished?

20          THE WITNESS:  What do you mean by "diminished"?

21          THE COURT:  Shorter.

22          THE WITNESS:  No, I think I could be able to reach it

23  if I was sitting.

24          THE COURT:  So your view is that you could reach just

25  as far while seated, down the counter, as you could as if you

PROCEEDINGS

```
 1  were standing up?

 2          THE WITNESS:  Yes.

 3          THE COURT:  All right.  Counsel can ask any questions

 4  they wish, because I've asked questions.

 5          MR. DOSTART:  No further questions, your Honor.

 6          THE COURT:  Any questions over there?

 7          MS. FIFE:  No questions, your Honor.

 8          THE COURT:  Have a safe journey home.

 9          THE WITNESS:  Thank you.

10          MR. DOSTART:  If we could, I want to reference Exhibit

11  216-A as what the witness was pointing to.

12          THE COURT:  Very well.  That's what it was.

13          MR. DOSTART:  And the bottom left corner was the

14  bottom left corner of the area between the scanner, the coupon

15  printer and the receipt printer, at the very, very bottom left

16  corner.

17          THE COURT:  Yes, I think that's what the record

18  already shows.  Go ahead.  You're excused.

19      Our next witness, please.

20      (Witness excused)

21          MR. MICHAEL RIGHETTI:  Your Honor, the plaintiff will

22  take the stand.

23          THE COURT:  All right.  Great.

24      Ms. Garvey, welcome to the stand.  Please raise your right

25  hand.
```

PROCEEDINGS

1                          **<u>LISA GARVEY</u>**,

2    called as a witness for the Plaintiff herein, having been first

3    duly sworn, was examined and testified as follows:

4              **THE WITNESS:**  Yes.

5              **THE CLERK:**  Thank you.

6              **THE COURT:**  Please have a seat.

7         Counsel, unless you're going to have the witness use the

8    pointer, let's give the witness a clear deck there.

9              **THE COURT:**  All right.  You're sitting just perfectly.

10   Why don't you say your name.

11             **THE WITNESS:**  Lisa Garvey.

12             **THE COURT:**  Welcome, again.

13        Go ahead, counsel.

14                      **<u>DIRECT EXAMINATION</u>**

15   **BY MR. MICHAEL RIGHETTI:**

16   **Q.**   Good morning, Ms. Garvey.  How are you?

17   **A.**   Fine.

18   **Q.**   Where are you from?

19   **A.**   Tulare, California.

20   **Q.**   How long have you lived in Tulare?

21   **A.**   Five years.

22   **Q.**   Where did you live before that?

23   **A.**   In Lemoore, California.

24   **Q.**   Are you currently employed?

25   **A.**   Yes.

1  Q.   Where do you work?

2  A.   Salvation Army Silvercrest Residence.

3  Q.   Could you explain to the Court what that is.

4  A.   Assistant manager to the residents that live at

5  Silvercrest Residence.

6  Q.   And what type of residents live at that --

7  A.   Senior citizens, 62 years of age and older.

8  Q.   What do you do for -- for that residence?

9  A.   I am assistant manager.  When the manager leaves, I help

10 take the rent for the apartments, write work orders when parts

11 need repair.  Basically, help out with residents, what they

12 need.

13 Q.   Is that a job that you do while seated or a job that you

14 do while standing?

15 A.   Both.

16 Q.   Are you currently married?

17 A.   No.

18 Q.   Do you have any children?

19 A.   Yes.

20 Q.   How many children do you have?

21 A.   One.

22 Q.   How old is -- how old is your child?

23 A.   Nineteen years.

24 Q.   Boy or a girl?

25 A.   Boy.

 1  Q.   Okay.  Could you explain to the Court what your education

 2  background is.

 3  A.   I have an AA degree in business admin.  And I also took

 4  classes at the Tulare Adult School, for assistant medical.

 5  Q.   Okay.  I'm sorry.  Where did you get your AA from?

 6  A.   West Hills College, Coalinga.

 7  Q.   Where is that?

 8  A.   Coalinga, California.

 9  Q.   When did you receive your AA?

10  A.   1983, May.

11  Q.   All right.  Have you ever worked at Kmart?

12  A.   Twice.

13  Q.   When was the first time that you worked at Kmart?

14  A.   I think it was December of 1990.

15  Q.   For how long did you work at Kmart for the first time?

16  A.   About a month.  Seasonal.

17  Q.   When you say "seasonal," what does that mean?

18  A.   During big holidays.

19  Q.   Would that be the time period around Thanksgiving and

20  Christmas?

21  A.   Yes.

22  Q.   To your understanding, is that something Kmart does, is

23  they bring in additional cashiers to work the seasonal time

24  period?

25  A.   Yes.

```
 1  Q.   You worked at Kmart a second time as well, correct?

 2  A.   Yes.

 3  Q.   When did you work for Kmart the second time?

 4  A.   November 16, 2010.

 5  Q.   Until when?

 6  A.   January 4th, 2011.

 7  Q.   And was that also a seasonal job?

 8  A.   Yes.

 9  Q.   You have -- strike that.  Excuse me.

10       When you worked at Kmart -- and I'll focus on the second

11  time period in 2010 and 2011 -- were you paid by the hour?

12  A.   Yes.

13  Q.   And how much did Kmart pay you per hour to do the job of a

14  seasonal cashier?

15  A.   Eight dollars.

16  Q.   Before taxes?

17  A.   Yes.

18  Q.   You've been present in court throughout this trial; is

19  that right?

20  A.   Yes.

21  Q.   You've had -- have you had the opportunity to listen to

22  other cashiers testify?

23  A.   Yes.

24  Q.   Have you been paying attention to their testimony?

25  A.   Yes.
```

1  Q.   So you heard Natasha explain what she does as a cashier?

2  A.   Yes.

3  Q.   Do you agree with Natasha's opinion that the job of a

4  cashier can be performed while seated?

5  A.   Yes.  Very much.

6  Q.   You also heard Evelyn Hyatt testify, right?

7  A.   Yes.

8  Q.   Do you agree with Ms. Hyatt's opinion, albeit a lay

9  opinion, that the job of a cashier at Kmart could be performed

10  while seated?

11  A.   Yes.

12  Q.   And you also heard Madison take the stand just now.  Do

13  you believe that -- do you agree with her opinion that the job

14  of a Kmart cashier could be done while seated?

15  A.   Yes.

16  Q.   While you were working at Kmart as a seasonal cashier,

17  does that tend to be a busier time than, I suppose, the

18  nonseasonal part of the year?

19  A.   Yes.

20  Q.   Are there many lulls in customers during the seasonal time

21  period, where you're finding yourself standing around at the

22  cash register not doing anything?

23  A.   A little.

24  Q.   How often would that happen?

25  A.   Just kind of depends on when the customer comes into the

1  store.  Sometimes you just get a slew of people just out of no

2  where, just fill up.  And then all of a sudden it's gone, it's

3  empty.

4  Q.   When you were working there as a seasonal cashier, did you

5  have an opportunity to observe what other cashiers were doing

6  while you were also cashiering?

7  A.   Yes.

8  Q.   Did you notice any significant difference in the tasks and

9  duties that other cashiers were performing compared to what you

10  were doing?

11  A.   A lot more were senior to me, so they always had the

12  advantage.

13  Q.   I'm sorry, what do you mean by that?

14  A.   They remembered a lot more of what to ask at the beginning

15  of each transaction.  Do you happen to have a rewards card?

16  Would you like to sign up for one?  Would you like to donate to

17  St. Jude's children?  Other things like that.

18  Q.   I see what you mean.  So, it sounds like certain of the

19  specific things that other, more experienced cashiers did were

20  more routine to them, and you had to learn those things?

21  A.   Right.

22  Q.   Generally speaking, is it your opinion that you were all

23  doing the same tasks while you were cashiering?

24  A.   Yes.

25  Q.   Did you notice any significant difference in the tasks

```
 1  that you were doing compared to the other cashiers?

 2  A.    No.

 3  Q.    I'm wondering if it would be helpful --

 4        MR. MATTHEW RIGHETTI:  And, Your Honor, may I approach

 5  the witness?

 6        THE COURT:  Please.

 7  BY MR. MICHAEL RIGHETTI:

 8  Q.    If I were a customer and I came to you -- for instance,

 9  I'm going to grab this bottle of, looks like, green tea, 16.9

10  fluid ounces of tea.  This is your tea?

11  A.    Yes.

12  Q.    Could I borrow this?

13  A.    Yes.

14  Q.    I just want you to pretend, as you're sitting here, that

15  you are sitting down and you are at a cash register station.

16  Okay.  Pretend that you're in a Kmart, okay?

17  A.    Okay.

18  Q.    Generally, if I were a customer I would come at you from

19  this side where His Honor is sitting, right?

20  A.    Yes.

21  Q.    I'm going to come up and stand right next to you here.

22        And I would like to buy this bottle of tea.  So,

23  generally, what would happen?  I would come up and I would hand

24  it to you?

25  A.    Yes.
```

1  Q.   All right.  So I'm going to do that.

2        MR. MICHAEL RIGHETTI:  And, for the record, I'm

3  putting the tea on the witness box.

4  BY MR. MICHAEL RIGHETTI:

5  Q.   What would you do with it?

6  A.   I would greet you and say, "Hello.  Thank you for coming

7  to Kmart.  Do you happen to have your rewards card?  If not,

8  would you like to sign up for one?  Would you like to donate to

9  St. Jude's?"  And if you said no, then I start to swipe this

10 across.

11 Q.   I would like to sign up for a rewards card, so how do I do

12 that?

13 A.   We have a form.  You have to fill it out, and I put my

14 employee number on it.

15 Q.   And the form would be where?

16 A.   Next to the register.

17 Q.   So could you grab that for me right now, if there was one

18 sitting there?

19 A.   Yes.

20        THE COURT:  This is all on the assumption that she is

21 seated or standing?

22        MR. MICHAEL RIGHETTI:  Seated, Your Honor.

23        THE WITNESS:  I start filling it out and put my

24 employee number at the top.  And I let you fill out the rest.

25     And there's a card at the bottom.  I scan it so it starts

```
 1  building points on it for you.
 2       And this has already been scanned, and now I'm going to
 3  bag it.
 4       And I ask what you want to pay, cash or credit.
 5  BY MR. MICHAEL RIGHETTI:
 6  Q.   What does a Kmart rewards card -- does it look like a
 7  credit card?
 8  A.   Yes.  Or it also comes in those little key ones.
 9  Q.   So if I hand you a credit card, you could pretend to scan
10  that?
11  A.   Or you could across your machine.
12  Q.   All right.  So I'm going to hand you my credit card.  And
13  let's pretend that that's a Kmart rewards card.  And what would
14  you do before you handed that back to me?
15  A.   If this is a Kmart rewards card, I've already scanned it
16  because I had the new card with a sticker on it.
17  Q.   Well, I didn't see you scan it.  Could you scan it for me?
18  A.   Sure.
19  Q.   And then you hand it to me?
20  A.   Uh-huh.
21  Q.   All right.  So hand it back to me.
22          THE COURT:  Was that scanned using the card reader, or
23  was that scanned using the thing --
24          THE WITNESS:  The counter one.
25          THE COURT:  -- the bar codes?
```

GARVEY - DIRECT / RIGHETTI

1          THE WITNESS:  The counter scanner.

2          THE COURT:  The one built into the counter?

3          THE WITNESS:  Yes.

4          THE COURT:  On the flat surface?

5          THE WITNESS:  Uh-huh.

6          THE COURT:  Okay.  Thank you.

7   BY MR. MICHAEL RIGHETTI:

8   Q.   Are you referring to the credit card reader?

9   A.   No.

10  Q.   No.  Where on this diagram on 216-A, I think it is, is the

11  card reader that you would slide the rewards card?

12  A.   Scan here (indicating).

13  Q.   So it's right on the flatbed scanner?

14  A.   Uh-huh.

15  Q.   Okay.  So now I'd like to pay for the green tea.

16  A.   Uh-huh.

17  Q.   So what would you say to me?

18  A.   I would ask you, Is this cash or credit?

19  Q.   All right.  I would like to use my credit card.

20  A.   Okay.  So debit or credit?

21  Q.   I would have to hand you my credit card?

22  A.   Yes.

23  Q.   All right.

24  A.   Debt or credit?

25  Q.   I'm handing you my credit card.

1   **A.**   Debt or credit?

2   **Q.**   Credit, please.

3   **A.**   Okay.  So I hit my register for the credit, and then

4   either you can slide it on your machine at the front or I can

5   slide it, which -- like this.  And then I hand it back to you.

6        May I see your I.D., please?

7   **Q.**   Oh, yes.  I'm handing you my I.D.

8   **A.**   Okay.  So then I verify this and give it back.

9   **Q.**   Okay.  Did that go through?

10  **A.**   Yes.

11  **Q.**   Oh, good.

12       Now, Ms. Garvey, if I wanted a bag for that item --

13  typically, I probably wouldn't, but in this case I would like a

14  bag with that item.  What would you do with that item if I

15  asked for a bag?

16  **A.**   Then I would go over here, open the side one, and stick it

17  in.

18  **Q.**   Then you would hand that back to me?

19  **A.**   I could.  Or I could put it on the back table.

20  **Q.**   Okay.  Would you hand it back to me.  Okay.  Thank you.

21       Now, do you believe that in that transaction you would

22  have been able to be friendly?

23  **A.**   Yes.

24  **Q.**   Do you think that you could have been courteous?

25  **A.**   Yes.

1  Q.   When you worked at Kmart, were you friendly and were you

2  courteous?

3  A.   Yes.

4  Q.   Do you think that you could be friendly and courteous

5  doing that transaction just like you were here in court, if you

6  had been seated at the Kmart?

7  A.   I just did it.

8  Q.   And here in court you're sitting down in the witness box,

9  correct?

10 A.   Yes.

11 Q.   Okay.  Ms. Garvey, why did you bring this case?

12 A.   Because I thought it was an opportunity to have seats.

13 And it would have been much easier during business time -- very

14 busy times.

15 Q.   When you were working at the Kmart, did you -- did you

16 notice other employees that you thought it would have been nice

17 to have a seat for that employee?

18 A.   Yes.

19 Q.   Who did you notice working at the Kmart, when you were

20 there in 2010 and 2011, that you thought it would have been

21 nice if he or she had had a seat?

22          MR. ADKINS:  Objection.  Vague.

23          THE COURT:  Sustained.

24          MR. MICHAEL RIGHETTI:  Okay.  I'll rephrase, your

25 Honor.

1   BY MR. MICHAEL RIGHETTI:

2   Q.   Is there any particular employee that you are referring to

3   when you say that you thought it would have been nice for him

4   or her to have a seat?

5           MR. ADKINS:  Objection.  Vague.

6           THE COURT:  "Nice" is too vague.  Sustained.

7           MR. MICHAEL RIGHETTI:  Thank you, Your Honor.  I will

8   not use the term "nice."

9   BY MR. MICHAEL RIGHETTI:

10  Q.   That you thought it would have been beneficial to have a

11  seat?

12          MR. ADKINS:  Same objection, Your Honor.

13          THE COURT:  Overruled.  Please, answer.

14          THE WITNESS:  Yes, Madison.

15  BY MR. MICHAEL RIGHETTI:

16  Q.   And why did you think, in your mind, that it would have

17  been beneficial for Madison to have a seat?

18  A.   She was really pregnant, and holding her stomach and back

19  all the time.

20  Q.   Is there any other employees that you think it would have

21  been --

22  A.   The older ladies.  They just kind of walk slowly after a

23  few hours.

24  Q.   Okay.  When we performed that transaction just now, with

25  the green tea, do you believe that those functions that you

1  performed were the essential functions of a cashier at Kmart?

2  A.   Yes.

3  Q.   And you were able to do those while seated in the witness

4  box?

5  A.   Yes.

6        MR. MICHAEL RIGHETTI:  I have Nothing further, Your

7  Honor, at this time.

8        THE COURT:  All right.  Cross-examination.

9        MR. ADKINS:  Thank you, Your Honor.

10                      CROSS EXAMINATION

11 BY MR. ADKINS:

12 Q.   Good morning, Ms. Garvey.

13 A.   Good morning.

14 Q.   I know you've been in this courtroom throughout this

15 trial, but we have never met or spoken before, correct?

16 A.   No, sir.

17 Q.   I just want to pick up with the questions that plaintiff's

18 counsel was just asking you about what you do with that green

19 tea up there on the witness box.  You remember those questions,

20 right?

21 A.   Yes.

22 Q.   Okay.  Just a few foundation questions.  Obviously, that

23 witness box is not a checkstand at the Tulare Kmart store,

24 right?

25 A.   Correct.

GARVEY - CROSS / ADKINS

```
 1  Q.    Totally different function for that witness box, right?

 2  A.    Correct.

 3  Q.    The purpose of that witness box is for you to be able to

 4  sit in it and testify, correct?

 5  A.    Correct.

 6  Q.    You've got a microphone in front of you?

 7  A.    Yes.

 8  Q.    You're positioned so that everyone in the courtroom can

 9  see you right now, right?

10  A.    Yes.

11  Q.    And it allows you to perform that function, right?

12  A.    Yes.

13  Q.    It's a very different function that's being performed at

14  the Tulare checkstand, correct?

15  A.    Yes.

16  Q.    It's to process transactions quickly and efficiently,

17  among other things, right?

18  A.    You mean sitting or standing?

19  Q.    I'm sorry?

20  A.    You mean sitting or standing?

21  Q.    I mean -- what was your experience when you were a cashier

22  at the Tulare Kmart store, were you sitting or standing?

23  A.    Standing.

24  Q.    And was the function of the checkstand that you are

25  familiar with, from having been a cashier at the Tulare Kmart
```

1  store, to quickly and efficiently process transactions for

2  customers?

3  **A.**    Yes.

4  **Q.**    Now, by my estimation, that transaction that plaintiff's

5  counsel did with you took about five to six minutes.  Does that

6  sound about right to you?

7  **A.**    Give or take.

8  **Q.**    Weren't you supposed to try to do transactions faster than

9  that, at the Tulare Kmart store?

10 **A.**    Sorry, sir, but he was asking questions to describe it in

11 court.

12 **Q.**    All I'm getting at, ma'am, is, you are not suggesting that

13 you sitting in the box in the witness stand is the same as you

14 conducting transactions at the cashier's stand at the Kmart,

15 correct?

16 **A.**    Wouldn't have made any difference if I was standing up or

17 sitting down.  It still would have taken a short time.

18 **Q.**    That wasn't what I was asking.  I was asking a simple

19 question, which is, it's not just the same thing sitting in a

20 witness box versus scanning items at the store, is it?

21 **A.**    It's still sitting.

22 **Q.**    So you do think it's the same thing?

23 **A.**    Yeah.

24 **Q.**    Part of your job at the Tulare Kmart was to ring up sales

25 at the front end cash register, right?

1    **A.**    Yes.

2    **Q.**    And Kmart -- this has been talked about quite a bit in

3    this trial -- sells big, bulky items, and small items, right?

4    **A.**    Yes.

5    **Q.**    Sells camping equipment, bikes, things like that?

6    **A.**    Yes.

7    **Q.**    Okay.  A lot of items that could not be placed on the

8    counter, correct?

9    **A.**    Yes.

10   **Q.**    And for the ones that you couldn't place on the counter,

11   you would have to use a scanner gun, right?

12   **A.**    Yes.

13   **Q.**    And to reach the scan gun, you would have to bend down to

14   get to it, right?

15   **A.**    No.

16          **MR. ADKINS:**  Your Honor, I didn't have an opportunity,

17   because we didn't have a break, to retrieve the deposition

18   transcripts.

19        May I do that now?

20          **THE COURT:**  Yes.  Go ahead.

21          **MR. ADKINS:**  Thank you.

22          **THE COURT:**  It's 11 minutes after.  We will take a

23   15-minute break at this time.  You're on cross-examination,

24   Ms. Garvey, so please don't talk to counsel about your

25   testimony.  Fifteen minutes.

 1          MR. ADKINS:  Thank you, Your Honor.

 2      (Recess taken from 9:13 to 9:34 a.m.)

 3          THE COURT:  Please remain seated, and let's go to

 4  work.

 5      Please be seated.  Are we ready to go?

 6          MR. ADKINS:  Yes, Your Honor.

 7          THE COURT:  Ms. Garvey, are you ready?

 8          THE WITNESS:  Yes, sir.

 9          THE COURT:  All right.  Counsel are present.  Let's

10  continue right on.

11      Go ahead, Counsel.

12          MR. ADKINS:  Thank you, Your Honor.

13  BY MR. ADKINS:

14  Q.   Ms. Garvey, before we took a break I had asked you the

15  question of whether you needed to reach down to retrieve the

16  scan gun.  Do you remember that question?

17  A.   Yes, sir.

18  Q.   And you answered that you did not need to do that?

19  A.   No.  I like to keep the scanner -- when I get to the

20  register, I move the scanner right next to it.  There's a small

21  gap right here (indicating), and I like to put it right here.

22          MR. ADKINS:  Your Honor, I'd like to read from the

23  deposition of Lisa Garvey in this case, taken on November 7th,

24  2011, page 107, line 23, to 108, line 11.

25          THE COURT:  All right.  Please do.  Read slowly.  Say

```
 1   "question," say "answer."
 2            MR. ADKINS:  (Reading)
 3            "QUESTION:  Where was the scanner gun kept?
 4            "ANSWER:  Right underneath the plastic container for
 5             the -- what did you call them, the garment scanner.
 6            "QUESTION:  Yes, the garment security tags?
 7            "ANSWER:  Yeah, that was a plastic empty box.  And
 8             then underneath it there was a couple more shelves.
 9             And that's where the gun would be.
10            "QUESTION:  Is it in a holster?
11            "ANSWER:  Sometimes yes and no.  Those holsters aren't
12             always working.
13            "QUESTION:  Did you have to bend down to get the gun
14             when you were going to use it?
15            "ANSWER:  Yeah."
16   BY MR. ADKINS:
17   Q.   Was that your testimony, Ms. Garvey?
18   A.   Yes, I guess.
19   Q.   Do you stand by that testimony?
20   A.   It's been two years, sir.  I'm sorry, I don't remember.
21   Q.   Is it your testimony -- I guess I should get a yes or no
22   answer --
23            THE COURT:  She's saying she doesn't remember.
24        Are you saying you don't remember well enough to know
25   whether what you said was true or not?
```

1              **THE WITNESS:**  Exactly, sir.

2              **THE COURT:**  So that's a fair answer.  But what you've

3    read into the record will count as evidence, as well.

4              **MR. ADKINS:**  I'll move on, Your Honor.

5    BY MR. ADKINS:

6    Q.   When you had to scan a big item, you would have to reach

7    over the counter to scan it with the scan gun, correct?

8    A.   Yes.

9    Q.   Okay.  And you've heard people in this trial talking about

10   Bob and Lisa, where people would look in the bottom of the

11   basket or look inside always.

12        Did you do that as a cashier at the Tulare Kmart store?

13   A.   Yes, but I don't remember it called Bob or Lisa.

14   Q.   But looking into the baskets and into the sealed items,

15   that was a Kmart policy, right?

16   A.   Yes.

17   Q.   And Kmart's policies are important, right?

18   A.   Yes.

19   Q.   And the cashiers should follow them?

20   A.   Yes.

21   Q.   And you did follow them?

22   A.   Yes.

23   Q.   In fact, you always checked inside any sealed items, to

24   make sure there was nothing inside?

25   A.   Yes.

GARVEY - CROSS / ADKINS

```
 1  Q.    If customers don't pick up their own bags, you would pick
 2  them up and place them in their shopping cart for them, right?
 3  A.    Yes.
 4  Q.    Okay.  And, overall, your job requires you to do
 5  repetitive bending, lifting, stretching, and reaching, right?
 6  A.    Yes.
 7  Q.    And customer service was also an important part of being a
 8  cashier at the Tulare Kmart store, right?
 9  A.    Yes.
10  Q.    You knew from the beginning of your employment that
11  Kmart's policy was to put the customer first, right?
12  A.    Yes.
13  Q.    And it's important because customers have a lot of choices
14  in where they can shop, right?
15  A.    Yes.
16  Q.    And you had duties away from the cash register station, as
17  well, correct?
18  A.    I'm sorry, say that again.
19  Q.    You had job responsibilities as a Kmart cashier, away from
20  the checkstand, correct?
21  A.    Yes.
22  Q.    Such as organizing items in your lane?
23  A.    Yes.
24  Q.    Was that known as fronting your lane?
25  A.    Yes.
```

GARVEY - CROSS / ADKINS

1  Q.   Emptying garbage from the checkstand?

2  A.   Yes.

3  Q.   Collecting returns from the -- each register, and bringing

4  it up to customer service?

5  A.   Yes.

6  Q.   And if you needed to replenish supplies at the cashier

7  stand, you would have to go retrieve that and bring it back,

8  right?

9  A.   Yes.

10  Q.   If you wanted to use the phone to call in a price check,

11  you would have to go over to register number 3, because there

12  was only one phone up at the upfront cash registers, right?

13  A.   Yes.

14  Q.   And when traffic was slow, were you supposed to go --

15  sorry.  Strike that.

16       When there weren't very many customers coming through the

17  checkstands, you were supposed to go and ask how you could help

18  out around the store, right?

19  A.   Yes.

20  Q.   And, as a cashier, if there were no other things for you

21  to do, there's always something for you to do that they can

22  assign to you, right?

23  A.   Yes.

24  Q.   And you specifically made a point not just to -- strike

25  that.

```
 1        You specifically made a point not to just stand around
 2   during your shift, correct?
 3   A.   Yes.
 4             THE COURT:  Do you see the double negative problem?
 5             MR. ADKINS:  Thank you, Your Honor.
 6   BY MR. ADKINS:
 7   Q.   Did you specifically make a point not to just stand around
 8   during your shift?
 9   A.   Yes.
10   Q.   And you never asked for a seat, did you?
11   A.   I'm sorry?
12   Q.   You never asked for a seat while you were a cashier at the
13   Tulare Kmart store, did you?
14   A.   Didn't know I could.
15             THE COURT:  You didn't answer the question.  Did you
16   ask for a seat?
17             THE WITNESS:  No, sir.
18             THE COURT:  Thank you.
19   BY MR. ADKINS:
20   Q.   Now, you didn't consider filing a lawsuit against Kmart
21   during your employment there, did you?
22   A.   No.
23   Q.   In fact, you didn't consider filing a lawsuit against
24   Kmart until you received a letter in the mail from your current
25   counsel, correct?
```

1  **A.**    Yes.

2  **Q.**    And you've heard the testimony from some of the witnesses

3  in this case, who have said that they thought about whether you

4  could use a seat if the cash registers were reconfigured,

5  right?

6  **A.**    Yes.

7  **Q.**    You, however, did not even think about having a seat while

8  working as a cashier at the Tulare store, correct?

9  **A.**    I'm sorry?

10 **Q.**    Did you ever even think about having a seat while you were

11 working as a cashier at the Tulare store?

12 **A.**    Always.

13 **Q.**    Always?

14         **MR. ADKINS:**  Your Honor, I would like to read from,

15 again, her deposition in this case, November 7, 2011, page 134,

16 line 10 to 16.

17         **THE COURT:**  All right.  Go ahead.  Slowly, and say

18 "question," say "answer."

19         **MR. ADKINS:**  (Reading)

20         **"QUESTION:**  Did it occur to you that you wanted a seat

21          while you were working for Kmart and working in the

22          cashier position, or is that something that didn't

23          occur to you until after your employment ended?

24         "After --

25         "After --

```
 1                (Reporter interrupts.)

 2           MR. ADKINS:  Let me start over, your Honor.  I

 3   apologize.

 4           "QUESTION:  Did it occur to you that you wanted a seat

 5             while you were working for Kmart and working in the

 6             cashier position, or is that something that did not

 7             occur to you until after your employment ended?

 8           "ANSWER:  After.

 9           "QUESTION:  After your employment ended?

10           "ANSWER:  Yes."

11   BY MR. ADKINS:

12   Q.   Is that your testimony, ma'am?

13           THE COURT:  Well, that -- that was the testimony back

14   then.  You just read it.

15        So are you asking, is that her testimony today or -- you

16   should ask her, does she stand by that testimony as accurate.

17   That's the proper question.

18        So answer that question.  Did you hear what you said in

19   the deposition?

20           THE WITNESS:  Yes, sir.

21           THE COURT:  Was that accurate testimony when you gave

22   it?

23           THE WITNESS:  Yes.

24           THE COURT:  All right.  Move on to your next point.

25           MR. ADKINS:  I have nothing further, Your Honor.
```

1   Thank you.

2           THE COURT:  Okay.  Any redirect?  Any redirect?

3           MR. MICHAEL RIGHETTI:  No, Your Honor, no further

4   questions.

5           THE COURT:  You are welcome to step down from the

6   stand and resume your place at counsel table.  Thank you,

7   Ms. Garvey.

8           THE WITNESS:  Thank you.

9        (Witness steps down.)

10          THE COURT:  Next witness.

11       All right.  Welcome.  Who is this witness?

12          MR. DOSTART:  Plaintiff's next and final cashier

13   witness, your Honor, is Amber Hamilton.

14          THE COURT:  Welcome.  Ms. Hamilton?

15          THE WITNESS:  Yes.

16          THE COURT:  Please raise your right hand.  And stand

17   up, please.

18                      **AMBER HAMILTON**,

19   called as a witness for the Plaintiff herein, having been first

20   duly sworn, was examined and testified as follows:

21          THE WITNESS:  Yes.

22          THE CLERK:  Okay.  Thank you.

23          THE COURT:  All right.  You need to sit -- see how

24   close I am to my microphone?

25          THE WITNESS:  Yeah.

573

```
 1            THE COURT:  You've got the same one.  It moves all
 2   around.  It will move closer to you.
 3            THE WITNESS:  Am I good?
 4            THE COURT:  Closer.
 5       Now, say your name.
 6            THE WITNESS:  Amber Hamilton.
 7            THE COURT:  A little closer.  Little closer.
 8            THE WITNESS:  Is this good?
 9            THE COURT:  All right.  That will work.
10            THE WITNESS:  Okay.
11            THE COURT:  Go ahead.
12                      DIRECT EXAMINATION
13   BY MR. DOSTART:
14   Q.   Good morning, Ms. Hamilton.
15   A.   Good morning.
16   Q.   Ms. Hamilton, where do you live?
17   A.   Tulare, California.
18   Q.   And how long have you lived in the Tulare area?
19   A.   For about a year and a half now.
20   Q.   Are you currently employed?
21   A.   Yes.
22   Q.   Where are you currently employed?
23   A.   At Kmart.
24   Q.   What is your position at Kmart?
25   A.   I am now at soft lines.
```

1  Q.   And what is soft lines?

2  A.   It's where you work with the clothes, you straighten up on

3  the floor.

4  Q.   Have you had any other positions while you've worked at

5  Kmart?

6  A.   Yes.  I was a cashier.

7  Q.   And how long were you a cashier for?

8  A.   A little over a year.

9  Q.   From what date to what date, approximately, were you a

10  cashier at Kmart?

11  A.   Uhm, from -- let's see.  July 2011 to around -- sorry --

12  May 2012.

13  Q.   Okay.  Great.  So for the questions I'm going to ask you

14  today, and probably the questions that Kmart's attorneys will

15  ask you today, let's focus and only discuss the time period

16  during which you were employed as a cashier, not while you were

17  working at soft lines.

18  A.   Okay.

19  Q.   While you were a cashier, were you working on a full- or

20  part-time basis?

21  A.   Part-time.

22  Q.   And how many hours per week, approximately, did you work?

23  A.   It could range around 20 to 30.

24  Q.   Okay.  I want to talk a little bit about where you spent

25  your time while you were a cashier at Kmart.

1        Would you estimate that you spent 100 percent of your time

2   at the cash register?

3   **A.**   No.  It would be around 85 to 90 percent of the time.

4   **Q.**   And when you say 85 to 90 percent of the time, do you mean

5   85 to 90 percent of your time at the cash register?

6   **A.**   Yes.

7   **Q.**   Now, over your time period while you were working as a

8   cashier at Kmart, how many transactions -- meaning how many

9   customers -- would you say that you processed over the entire

10  period?

11  **A.**   Probably well over a thousand.

12  **Q.**   Okay.  If I asked you to today, could you estimate what a

13  ten-pound item feels like?

14  **A.**   Yes.

15  **Q.**   Okay.  Out of, let's say, ten transactions while you were

16  working as a cashier, what number of transactions would you

17  estimate involved a 10-pound item?

18  **A.**   Maybe one, if that.

19  **Q.**   So one if that, out of ten?

20  **A.**   Yeah.

21  **Q.**   Okay.  While you were working as a cashier, were you

22  trained or told that you should be checking the bottom of a

23  customer's basket?

24  **A.**   Yes.

25  **Q.**   Let me ask you a question about that.  How many -- or let

1   me phrase that a different way.

2       What percent of customers would you estimate had a basket

3   that you needed to check?

4   **A.**   Uhm, I would say like one out of ten, two, maybe three.

5   **Q.**   Okay.  So for those customers that did have a basket that

6   you needed to check, how did you go about checking that basket?

7   **A.**   Whenever they are coming up to your register, as they

8   enter the aisle, you would then check then.  And as they're

9   leaving the store, out the door, you would check under the

10  cart, too.

11  **Q.**   Okay.  Now, when a customer was right directly across the

12  counter from you, would you attempt to check the bottom of the

13  basket at that time?

14  **A.**   When a customer is directly in front of me, even if you

15  were to stand up and lean over-the-counter they are so narrow

16  that you wouldn't even be able to see at the very bottom of the

17  cart.

18  **Q.**   So when you say they're "so narrow," what area

19  specifically are you referring to that is narrow?

20  **A.**   The aisle right in front of where you would ring up the

21  item on the scanner.  Just the aisle directly in front of you

22  is very narrow.

23  **Q.**   Tell me if I'm incorrect.  So is your testimony that the

24  aisle between the checkstand at which you would be working and

25  the opposing checkstand, that someone else may be or may be not

1  working in, is a narrow area that would cause the customer to

2  be so close to your checkstand that you wouldn't be able to

3  view the bottom of the basket?

4  **A.**    Yes.

5  **Q.**    While you were working as a cashier at Kmart, did you ever

6  want to use a seat?

7  **A.**    Yes.

8  **Q.**    Do you think that you would have been able to use a seat

9  while cashiering?

10  **A.**    Uhm, the way it's built now, probably not.  But using a

11  seat would be nice.

12  **Q.**    What changes, if any, do you think would need to be made

13  in order for you to use a seat while you're cashiering?

14  **A.**    One, the bags would probably have to be closer to you and

15  more space for your knees.

16  **Q.**    Okay.  If you were to be provided a seat, do you think you

17  would be able to greet a customer while seated?

18  **A.**    Yes.

19  **Q.**    And scan items, except for those items that are heavy,

20  while seated?

21  **A.**    Yes.

22  **Q.**    And bag items while seated?

23  **A.**    Yes.

24  **Q.**    And be polite to customers while seated?

25  **A.**    Yes.

1   Q.   And check the bottom of the basket while seated?

2   A.   Yes.

3   Q.   And say good-bye to customers while seated?

4   A.   Yes.

5          MR. DOSTART:   All right.  Thank you, Ms. Hamilton.

6      I think we have no further questions on direct for this

7   witness, your Honor.

8          THE COURT:   All right.  Let's go to cross-examination.

9                        CROSS EXAMINATION

10  BY MS. SOMMERFELD:

11  Q.   Good morning, Ms. Hamilton.

12  A.   Good morning.

13  Q.   My name is a Amanda Sommerfeld.  We met once before,

14  correct?

15  A.   Yes.

16  Q.   That was on the day of your deposition, correct?

17  A.   Yes.

18  Q.   Do you recall when the day of your deposition was?

19  A.   No, I do not.

20  Q.   It was September 26, 2012.  Does that refresh your

21  recollection?

22  A.   Yeah, sure, I guess.

23  Q.   All right.  Ms. Hamilton, you said that you started as a

24  cashier in approximately July of 2011, correct?

25  A.   Yes.

1   **Q.**   And you stopped working in the cashier position in

2   approximately May of 2012, correct?

3   **A.**   Yes.

4          **MS. SOMMERFELD:**  Your Honor, I don't know if I gave

5   the Court a copy of Ms. Hamilton's transcript.  This was not

6   the next witness in order.

7       May I hand the Court a copy of the transcript of Amber

8   Hamilton, taken on September 26, 2012?

9          **THE COURT:**  Yes.

10          **MS. SOMMERFELD:**  I'd like to read into the record from

11   Ms. Hamilton's deposition, at page 15, lines 25 -- excuse me,

12   line 7 through 22.  This is the deposition taken September 26,

13   2012, in this case, Lisa Garvey vs. versus Sears Holdings

14   Management Corporation.

15          **THE COURT:**  Go ahead.

16          **MS. SOMMERFELD:**  (Reading)

17          **"QUESTION:**  How long have you been, quote/unquote, on

18           the floor?

19          **"ANSWER:**  Month and a half, maybe less.

20          **"QUESTION:**  What do you understand your job to be,

21           generally, when you say, quote, on the floor?

22          **"ANSWER:**  Soft lines like, you know, keeping the floor

23           clean and organized.

24          **"QUESTION:**  So you're in the soft lines department

25           now?

1          "ANSWER:  Yes.

2          "QUESTION:  Before that you were a cashier?

3          "ANSWER:  Yes.

4          "QUESTION:  When were you hired?

5          "ANSWER:  In July last year.

6          "QUESTION:  So July of 2011 --

7          MS. SOMMERFELD:  I'm sorry, your Honor.  I need to

8   keep reading through page 16, line 1, if I may.  Excuse me,

9   line 2.

10          THE COURT:  All right.

11          MS. SOMMERFELD:  (Reading)

12          "QUESTION:  Is that a yes?

13          "ANSWER:  Yes.  Sorry.

14          "QUESTION:  That's okay.  And up until from July 2011

15              until about a month and a half ago, you were a

16              cashier, correct?

17          "ANSWER:  Yes."

18   BY MS. SOMMERFELD:

19   Q.   Ms. Hamilton, being that this deposition was taken on

20   September 26, of this year, does that refresh your recollection

21   that you were in the cashier position into sometime in August?

22   A.   Yes.

23   Q.   You mentioned the soft lines department.

24          MS. SOMMERFELD:  If we could put what's been marked as

25   Exhibit 15-84 on the screen.  Could we blow that up.

```
 1        (Document displayed.)
 2   BY MS. SOMMERFELD:
 3   Q.   Ms. Hamilton, is this a picture of what's known as the
 4   soft lines department?
 5   A.   Yes.
 6   Q.   Is this the portion of the store that you currently work
 7   in?
 8   A.   Yes.
 9   Q.   And is this the women's apparel section that is right in
10   front of the front end cash register checkout lanes?
11   A.   Yes.
12   Q.   What do you do currently in that soft lines department?
13   A.   I make sure everything's nice and organized.  I fold
14   shirts, hang things, take back returns, make sure the floor is
15   clear, safety reasons.  Just basically keeping the store clean.
16   Q.   Do you like working in that department?
17   A.   Yeah.  I mean, it's my job so --
18   Q.   All right.  And you found that's a pretty busy job?
19   A.   Yes.
20   Q.   Very busy?
21   A.   Yes.
22   Q.   Let's just establish the parameters of the checkout
23   station, if we could.
24        MS. SOMMERFELD:  Could we put Exhibit 15-64 on the
25   screen.
```

 1        (Document displayed.)

 2   **BY MS. SOMMERFELD:**

 3   **Q.**   Here is our infamous Kmart checkout stand.  Do you

 4   recognize this as one of the checkout stands at the Kmart

 5   Tulare store?

 6   **A.**   Yes.

 7   **Q.**   All right.  And to the far left of this picture you see a

 8   red mat, correct?

 9   **A.**   Yes.

10   **Q.**   And that's the merchandise counter where customers place

11   merchandise on the mat, correct?

12   **A.**   Yes.

13   **Q.**   And your job, among other things, was to retrieve items

14   placed by the customer on the mat, correct?

15   **A.**   Yes.

16   **Q.**   By grabbing them and scanning them, correct?

17   **A.**   Yes.

18   **Q.**   Either over the flatbed scanner embedded in the counter,

19   or with a handheld, correct?

20   **A.**   Yes.

21   **Q.**   And then you would bag the merchandise, if it was

22   something that could be bagged, correct?

23   **A.**   Yes.

24   **Q.**   And you typically moved the bags or the merchandise, after

25   they were scanned, to the back table, correct?

1  A.    Yes.

2           MS. SOMMERFELD:  At this point, I would like to play a

3  portion of Exhibit 218.  This is a video within the Tulare

4  store, of this witness.  These clips have been identified as

5  Exhibit 218-B.

6           THE COURT:  Is it in evidence?

7           MS. SOMMERFELD:  Yes, I believe by stipulation it is

8  in evidence, Your Honor.

9           THE COURT:  All right.  Okay.  So you are going to ask

10  follow-up questions to the witness based on what we see?

11          MS. SOMMERFELD:  I am, your Honor.

12          THE COURT:  The witness needs to understand that you

13  need to look at what the video is and pay attention, because

14  she's going to ask a follow-up question as soon as we watch the

15  video.

16      How long will the video last?

17          MS. SOMMERFELD:  This video is very short, your Honor.

18  I believe it is two minutes or less.

19          THE COURT:  All right.  So roll the tape.

20      (Video recording played during questioning as follows.)

21  BY MS. SOMMERFELD:

22  Q.    This is you at the Tulare Kmart store, Ms. Hamilton?

23  A.    Yes.

24          MS. SOMMERFELD:  All right.  Could we back stop it?

25

1  BY MS. SOMMERFELD:

2  Q.   Do you see there is a 24-bottle case of water on the

3  counter, on the red mat?

4  A.   Yes.

5  Q.   All right.  And you're about to scan that, in this

6  picture, correct?

7  A.   Yes.

8  Q.   You've just reached for the scanner gun?

9  A.   I didn't view that, but I'm pretty sure I might have.

10          THE COURT:  Roll it back.

11          MS. SOMMERFELD:  Roll it back from the beginning.

12          THE COURT:  Do it again.

13          MS. SOMMERFELD:  From the very beginning.

14     (Video played.)

15          MS. SOMMERFELD:  Stop it.

16  BY MS. SOMMERFELD:

17  Q.   Ms. Hamilton, you saw the customer place it on the

18  far-hand corner and shove it toward you a few inches, correct?

19  A.   Yes.

20  Q.   Did you ask him to push it towards you?

21  A.   No.

22  Q.   He just did that on his own?

23  A.   Yes.

24  Q.   All right.  And I see that this customer does not have a

25  cart; does he?

1    **A.**    No.

2    **Q.**    No, he does not.  Correct?

3    **A.**    Correct.

4             **MS. SOMMERFELD:**  And let's go ahead and play it.

5         (Video played.)

6    **BY MS. SOMMERFELD:**

7    **Q.**    You've just finished bagging one item, correct?

8    **A.**    Yes.

9    **Q.**    All right.

10            **MS. SOMMERFELD:**  All right.  Let's stop it.

11   **BY MS. SOMMERFELD:**

12   **Q.**    Tell us what you just did.

13   **A.**    I picked up a case of water and sat it on the counter.

14   **Q.**    You picked up the case of water from the merchandise

15   counter.

16        You raised it above your shoulders, correct?

17   **A.**    Not above my shoulders, but to about right here

18   (indicating).

19   **Q.**    You're indicating right at your chest level?

20   **A.**    Yes.

21   **Q.**    All right.  And you put it back on the back bagging table,

22   correct?

23   **A.**    Yes.

24   **Q.**    Did you ask the customer to do that for you?

25   **A.**    No.

1  Q.   Did this gentleman offer to do that for you?

2  A.   No.

3  Q.   He expected you to do it, right?

4  A.   Yeah.

5  Q.   Could you have moved that 24 case of water from the

6  merchandise table to the back bagging table, while you were

7  sitting?

8  A.   Probably not.

9  Q.   Would you have even tried?

10 A.   Probably not.

11 Q.   Why not?

12 A.   It's just common sense to stand up and pick it up and move

13 it over there.

14 Q.   It's safer for you, right?

15 A.   Yeah.

16 Q.   How much do you estimate that case of water weighs?

17 A.   Thirty pounds.

18 Q.   Little bit less.  Would you be surprised to say 26?

19 A.   Sure.

20 Q.   All right.  Not too far off, though.

21      But you would agree that's a pretty heavy item, right?

22 A.   Yes.

23 Q.   And you would agree that those cases of water are a pretty

24 commonly sold item at the Kmart in the Tulare?

25 A.   Yes.

1   Q.   And I notice this gentleman did not have a basket for that

2   case of water, correct?

3   A.   Yes.

4   Q.   All right.  So not all heavy items are placed --

5           THE COURT:  He did not have a basket, correct?

6           THE WITNESS:  Yes.

7           MS. SOMMERFELD:  Thank you, Your Honor.

8           THE COURT:  It's your record.

9           MS. SOMMERFELD:  Yes.

10          THE COURT:  But please don't rely upon that question

11  and answer to prove anything.

12          MS. SOMMERFELD:  I will not.  I will re-ask it.

13          THE COURT:  I haven't said it with several of your

14  other "not" questions.  Same deal though.

15          MS. SOMMERFELD:  All right.

16          THE COURT:  I don't want you to go back and try to fix

17  it all up now, but, please, be mindful of this problem.

18          MS. SOMMERFELD:  I will, indeed, your Honor.

19          THE COURT:  I think you know what you mean, but with

20  the cold record it will just be impossible to say.

21      So sometimes the witness will say "correct" and bail you

22  out of the problem.  But if the witness says "yes," or the

23  witness says "no," we do not know.

24          MS. SOMMERFELD:  Thank you, Your Honor.

25          THE COURT:  So I need for you to pay attention to

1  this.

2  **BY MS. SOMMERFELD:**

3  **Q.**   You will agree that not all customers put heavy items in

4  baskets?

5  **A.**   As shown right here, yes.

6          **THE COURT:**  See, same problem.  "You will agree" does

7  not fix the problem.

8  **BY MS. SOMMERFELD:**

9  **Q.**   This gentleman didn't have a cart, correct?

10  **A.**   Correct.

11          **MS. SOMMERFELD:**  Let's fix it again.  I apologize.

12          **THE COURT:**  She fixed it for you.  She said "correct."

13  **BY MS. SOMMERFELD:**

14  **Q.**   Thank you, Ms. Hamilton.  I do appreciate that.  Let's

15  keep going with the video.

16      (Video played.)

17          **MS. SOMMERFELD:**  Let's stop it.

18  **BY MS. SOMMERFELD:**

19  **Q.**   Ms. Hamilton, what are you doing right now, in that video?

20  **A.**   Uhm, there's probably a survey question, and I'm answering

21  it for him.

22  **Q.**   And it looks like your feet have left the ground.  Do you

23  see where your heels have left the ground?

24  **A.**   Yes.

25  **Q.**   Could you have helped him with that pin pad operation if

1   you were sitting?

2   **A.**   With the way it's built, probably not.

3          **MS. SOMMERFELD:**   Let's keep going with the tape.

4          (Video played.)

5   **BY MS. SOMMERFELD:**

6   **Q.**   As you conclude the transaction with this gentleman in

7   blue, the next customer has loaded quite a lot of merchandise

8   on the front end of the counter, correct?

9   **A.**   Yes.

10  **Q.**   And you are presently scanning and bagging?

11  **A.**   Yes.

12  **Q.**   I notice this customer appears to have her cart behind her

13  instead of in front of her.   Would you agree?

14  **A.**   Yes.

15  **Q.**   So is it necessary, because the cart is not in front of

16  her, that as you scan and bag you must load that merchandise on

17  the bagging table?

18  **A.**   Yes, it is an option.

19  **Q.**   Excuse me?

20  **A.**   It is an option.

21  **Q.**   All right.   Where else would you have put this

22  merchandise, if not on the bagging table, in this transaction?

23  **A.**   If needed, I could ask her to pull her cart up to the

24  front and ask her to load it in there, if she has more items

25  than what she does.

```
 1            MS. SOMMERFELD:  All right.  Let's stop it.
 2   BY MS. SOMMERFELD:
 3   Q.   I notice, however, that you started scanning this
 4   merchandise before she had even finished unloading her cart?
 5   A.   Yes.
 6   Q.   All right.  So would you -- in the example you just gave,
 7   you would have waited for her to completely unload her cart,
 8   and then asked her to move the cart forward before you started
 9   bagging?
10   A.   Uhm, probably, if this back counter got full, I would ask
11   her to empty out the rest of her merchandise, where the red mat
12   is, and then ask her to pull up the cart.  That way I would
13   have more room to put the rest of the stuff on the back shelf
14   or counter.
15            THE COURT:  This is a hypothetical.  Is she seated, or
16   are we talking about given the present configuration in
17   standing?  It's a little unclear why we're in the "would" verb
18   tense.
19            MS. SOMMERFELD:  Okay.
20            THE COURT:  So it sounds like you have a hypothetical
21   going, but I never caught the circumstances of the
22   hypothetical.
23   BY MS. SOMMERFELD:
24   Q.   Let me ask it a different way.
25        Ms. Hamilton, do you agree that by having the bagging
```

1  table back there and your being able to quickly scan and move

2  the items after you scan them to the back bagging table, that

3  that is a very efficient process?

4        **MR. DOSTART:**  Objection as to "efficient."

5        **THE COURT:**  Overruled.  You can answer.  Please give

6  your opinion.

7        **THE WITNESS:**  Could you repeat that again, please.

8  **BY MS. SOMMERFELD:**

9  **Q.**  Sure.  Do you agree that the fact that you can begin

10 scanning and move the merchandise to the back table while the

11 customer is still unloading at the front end is an efficient

12 process?

13 **A.**  Yes.

14       **MS. SOMMERFELD:**  Let's move to the next clip, if we

15 could.

16    (Video played.)

17 **BY MS. SOMMERFELD:**

18 **Q.**  This is, again, you, Ms. Hamilton, working at the Tulare

19 Kmart store, at the checkouts?

20 **A.**  Yes.

21       **THE COURT:**  Now, I want to be clear on this.  Is this

22 the very next customer in that line, or is this several minutes

23 later?  Let's put on the record what the --

24       **MS. SOMMERFELD:**  Yes, Your Honor.

25       **THE COURT:**  -- what the timing of these --

1          MS. SOMMERFELD:  One moment.  I will get that.

2          MR. DOSTART:  Your Honor, if you go back to the next

3   clip, the clip is date stamped and time stamped so we can

4   indicate that for the record.

5          THE COURT:  What was it?  Just tell us.

6          MR. DOSTART:  I didn't write it down because I was

7   taking notes.

8          THE COURT:  One of you can tell us.

9          MS. SOMMERFELD:  I have it, your Honor.

10         THE COURT:  All right.  What is it?

11         MS. SOMMERFELD:  The prior file was taken August 7,

12  2012, at 6:07:59 p.m. to roughly 6:10:00 p.m.

13     And this clip is taken the same day, at 7:03:01 p.m. to

14  7:04:35 p.m., is the end of the clip.

15         THE COURT:  All right.  Thank you for that

16  clarification.

17         MS. SOMMERFELD:  All right.  Let's roll it again.

18     (Video played.)

19         MS. SOMMERFELD:  All right.  Let's stop it there.

20  BY MS. SOMMERFELD:

21  Q.  Do you recognize what that big box of -- that big boxed

22  item is?

23  A.  It looks like a bench or a seat of some kind.

24  Q.  All right.  Is that -- well, strike that.

25     And you've just moved it from the front merchandise

HAMILTON - CROSS / SOMMERFELD                    593

 1  counter to the back bagging table, correct?

 2  **A.**    Yes.

 3  **Q.**    The customer did not leave that box in the cart for you to

 4  scan in the cart, right?

 5  **A.**    No.

 6  **Q.**    No, she did not?

 7  **A.**    She didn't.

 8  **Q.**    Okay.  Did you ask her to?

 9  **A.**    No.

10  **Q.**    Why not?

11  **A.**    Uhm, maybe that would be rude.  I mean, if she's unloading

12  her cart I'm not going to ask her to leave something in her

13  cart.

14  **Q.**    That's right.  That would not be good customer service,

15  would it?

16  **A.**    No.

17  **Q.**    No, it would not?

18  **A.**    It would not.

19  **Q.**    Have you ever asked a customer to bag their own

20  merchandise?

21  **A.**    No.

22  **Q.**    Would you ever do that?

23  **A.**    No.

24  **Q.**    Why not?

25  **A.**    That's not good customer service.

HAMILTON - CROSS / SOMMERFELD

```
 1          MS. SOMMERFELD:  Let's keep going with the tape.

 2      (Video played.)

 3  BY MS. SOMMERFELD:

 4  Q.  It appears that the baby has picked up an item off the

 5  table, correct?

 6  A.  Yes.

 7          MS. SOMMERFELD:  Let's stop it there.

 8  BY MS. SOMMERFELD:

 9  Q.  Did you just walk through the passthrough to scan the

10  item --

11  A.  Yes.

12  Q.  -- that the baby was holding?

13  A.  Yes.

14  Q.  Why didn't you ask the customer to put that product back

15  on the merchandise table?

16  A.  Well, usually, I'm trying to be in a hurry.  So rather

17  than a parent trying to argue with the kid to put it on the

18  counter, like it has been in the past, I would just walk up and

19  scan it for them.

20  Q.  Do you think it would have been good customer service to

21  demand that the customer put it back on the table?

22  A.  No.

23  Q.  It would not have been, would it?

24  A.  No.

25  Q.  You know that Kmart would not have expected you to do
```

1   that, right?

2   **A.**    No.

3   **Q.**    It would have expected you to do exactly what you did,

4   walk through the passthrough and scan it, correct?

5   **A.**    No.  They wouldn't expect me just to walk up to a customer

6   and scan merchandise that's like in the basket.  With the

7   customer being at checkout while the place mat is right there,

8   you're expecting them to put the merchandise on the place mat

9   so you can ring it up.  That's just being nice.

10  **Q.**    You were being nice by walking through the passthrough and

11  scanning it while it was in the cart, in the baby's hands,

12  right?

13  **A.**    Yes.

14  **Q.**    And you know that Kmart expects you to be nice, as well,

15  right?

16  **A.**    Yes.

17  **Q.**    It's very important to Kmart, right?

18  **A.**    Yes.

19          **MS. SOMMERFELD:**  This is all for this clip.  If we

20  could go to the next one.  And last one, your Honor.

21          **MR. DOSTART:**  Your Honor, I just want to state an

22  objection for the record.

23      These clips are, I think Ms. Sommerfeld testified, two or

24  three minutes long.  And we're showing what appears to be a

25  four or five second potentially nonrepresentative portion of

 1  that clip of Ms. Hamilton.  And I don't know -- we'd prefer

 2  that the entire clip be in the record, if there's going to be

 3  video evidence in the record.

 4          THE COURT:  The entire clip is going to be in the

 5  record, correct?

 6          MS. SOMMERFELD:  Correct, Your Honor.

 7          THE COURT:  All right.  So it will be in the -- it is

 8  going to be in the record, but counsel doesn't have to show the

 9  entire thing right now.

10          MR. DOSTART:  Okay.

11          THE COURT:  If you want to show it on your turn, you

12  can do that.

13          MR. DOSTART:  Okay.  Thank you, Your Honor.

14          MS. SOMMERFELD:  For the record, the next one is taken

15  the same day, August 7, 2012, at 8:27:33 p.m.  All right.

16  Let's go ahead.

17      (Video played.)

18  BY MS. SOMMERFELD:

19  Q.  Ms. Hamilton, the last customer you helped in this video

20  is pulling the bags off while you scan the next customer,

21  correct?

22  A.  Yes.

23          MS. SOMMERFELD:  Could we stop it.

24  BY MS. SOMMERFELD:

25  Q.  What are those items that you are scanning in this

1   picture?

2   **A.**   I don't know what they are.

3   **Q.**   All right.  Do they look like diapers, to you?

4   **A.**   They could be, yeah.

5   **Q.**   All right.  Did you see yourself just rotate that box that

6   you've got your left hand on in order to capture the UPC code

7   on the scanner?

8   **A.**   Yes.

9   **Q.**   Is it correct that you do frequently have to rotate items

10  in order to put the UPC code so that it will be scanned by the

11  flatbed?

12  **A.**   Yes.

13          **MS. SOMMERFELD:**  Let's keep going with the tape.

14      (Video played.)

15  **BY MS. SOMMERFELD:**

16  **Q.**   Ms. Hamilton, you pulled the bag out from the bagging

17  table.  Why did you do that from the bagging table?

18  **A.**   Because there are smaller bags right there, for smaller

19  objects.

20  **Q.**   So there are different-sized bags in the bagging table

21  than there are on the two prongs?

22  **A.**   Yes.

23  **Q.**   How many sizes are in the bagging table?

24  **A.**   There are a smaller size and a bigger size.

25  **Q.**   All right.  And the standard size, for lack of a better

 1  word, is what's hanging on the prongs, right?

 2  **A.**   Yes.

 3         **MS. SOMMERFELD:**  Could we go back to the very

 4  beginning of this clip.

 5  **BY MS. SOMMERFELD:**

 6  **Q.**   Ms. Hamilton, I see that those boxes or diapers, or

 7  whatever they happen to be, are actually stacked at the far

 8  edge of the merchandise counter.  Are they not?

 9  **A.**   Yes.

10  **Q.**   Did you ask the customer to push those toward you before

11  you lifted them and scanned them?

12  **A.**   No.

13         **MS. SOMMERFELD:**  All right.  Let's go from there.

14      (Video played.)

15         **MS. SOMMERFELD:**  Stop.

16  **BY MS. SOMMERFELD:**

17  **Q.**   Do you see your foot go off the ground as you reach for

18  those boxes that are at the far corner of the merchandise

19  table?

20  **A.**   Yes.

21         **MS. SOMMERFELD:**  All right.  Let's go forward.

22      (Video played.)

23         **MS. SOMMERFELD:**  Let's stop it.

24  **BY MS. SOMMERFELD:**

25  **Q.**   You seem to be piling the merchandise up on the

1  deactivator; is that right?

2  A.   Yes.

3  Q.   Is that because this customer has not yet cleared the way

4  off of the bagging table?

5  A.   Yes.

6       MS. SOMMERFELD:   That's it for the clips.   Thank you.

7  BY MS. SOMMERFELD:

8  Q.   Ms. Hamilton, you agree, of course, that the most

9  important part of your job as a cashier was to keep the

10  customer satisfied, right?

11  A.   Yes.

12  Q.   And you knew it was important to Kmart that you work as

13  fast and efficiently as you could, correct?

14  A.   Yes.

15  Q.   That was part of your training at Kmart, for the cashier

16  position?

17  A.   No.

18       MS. SOMMERFELD:   I'd like to read from the deposition

19  of Ms. Hamilton, at page 92, lines 7 through 18.

20       THE COURT:   Please.

21       MS. SOMMERFELD:   (Reading)

22       "QUESTION:   All right.   And you knew it was important

23        to Kmart that you worked as fast and efficiently as

24        you could, right?

25       "ANSWER:   Yes.

1          "QUESTION:  How do you know that?

2          "ANSWER:  Because when you're hired and they train you

3           to keep the customer satisfied, and you know they

4           have a time -- they don't want to be waiting at the

5           register the whole time, so."

6      I would also like permission to keep reading, your Honor,

7  through line 18.

8          THE COURT:  Well, did you finish that answer?

9          MS. SOMMERFELD:  Yes.

10          THE COURT:  So it just stopped in the middle?

11          MS. SOMMERFELD:  Yes.

12          THE COURT:  All right.  Please, go ahead and read the

13  next segment.

14          MS. SOMMERFELD:  (Reading)

15          "QUESTION:  All right.  So it's something that they

16           talk about in the training, right?

17          "ANSWER:  Yes."

18  BY MS. SOMMERFELD:

19  Q.   Aside from Kmart, it being important to Kmart, you know

20  that the customers think it's important that they receive fast

21  and efficient service, correct?

22  A.   Yes, yeah.  It's not like when you're getting training

23  that they're telling you to hurry up and do your job very

24  quickly.

25      Me being as a customer before, I just know I don't want to

1  spend the whole time at the checkouts.  And, yes, when I am

2  being trained it's -- you're being trained, so you're slower

3  than usual.  So like if I have another co-worker training me,

4  let's say I'm trying to figure out something on the register.

5  She's just telling me to speed it up a little bit because, you

6  know, there are people that don't want to spend this whole

7  time.

8       So it's not like they're trying to rush you, but they do

9  want you to be efficient, so to say.

10 **Q.**  Ms. Hamilton, you agree that there's not enough room in

11 the current configuration for a seat or stool?

12 **A.**  Yes.

13 **Q.**  And you agree that if a stool were placed in the current

14 configuration, there are some things that you would have to

15 stand or lean over to get or do, right?

16 **A.**  Yes.

17 **Q.**  You also perform various job tasks outside of the cash

18 register, what we'll call the box that's depicted on slide 2-B

19 in front of you.  Is that right?

20 **A.**  Yes.

21          **MR. DOSTART:**  For the record, that's Exhibit 216-A.

22          **MS. SOMMERFELD:**  Thank you.  I appreciate that.

23 **BY MS. SOMMERFELD:**

24 **Q.**  For example, in between customers you restocked and

25 straightened the area around the front end cash registers?

1  A.    Yes.

2  Q.    And you not only did that in your aisle, but you also did

3  that in the aisles at all the front end cash register aisles,

4  right?

5  A.    Yes.

6  Q.    You also straightened in the soft lines department the

7  area that you just showed at the beginning of the

8  cross-examination, right?

9  A.    At times, yes.

10 Q.    You were also expected to clean your cash register aisle

11 when you were in between customers, right?

12 A.    Yes.

13 Q.    And you were expected to empty the bins from under your

14 cash register, in between customers, right?

15 A.    Yes.

16 Q.    You also collected and returned carts to the corral,

17 correct?

18 A.    Yes.

19 Q.    Now, on several occasions when you were a cashier, you

20 were counseled by Cindy Harris, your manager, to stop standing

21 around talking to other cashiers and do something, right?

22 A.    Yes.  She didn't want us just standing at the register.

23 Q.    And she's not the only person who told you not to stand

24 around, right?

25 A.    Yes.

1  Q.   And when she said, don't stand around the register, she

2  was specifically talking about you standing around, talking to

3  other cashiers, right?

4  A.   Yes.

5  Q.   You would agree that when you're at work, you're not

6  getting paid to just stand around, right?

7  A.   Yes.  We're not supposed to be standing around, yes.

8  Q.   And you would call that a given, right?

9  A.   Yes.

10  Q.   In fact, you'd expressed some irritation about other

11  cashiers that you've seen standing around instead of

12  straightening or cleaning; is that right?

13  A.   Yeah.  I don't think it's fair that they now stand around,

14  and beforehand we didn't.  We -- you know, I think they should

15  still enforce that, if they enforced it before.

16  Q.   But you believe that there is plenty to do in the job as a

17  cashier at Kmart, right?

18  A.   Not all the time.

19  Q.   Not all the time?

20  A.   Not all the time.

21  Q.   But, nonetheless, you wanted to make sure that there is

22  uniform enforcement of Kmart's policies with respect to making

23  sure that cashiers stayed busy, right?

24  A.   Yes.  Treat everyone the same.

25  Q.   And you knew that that was the expectation, was to stay

HAMILTON - CROSS / SOMMERFELD                604

1  busy, right?

2  **A.**   Yes.

3         **MS. SOMMERFELD:**  I have nothing further.

4         **THE COURT:**  All right.  Redirect?

5         **MR. DOSTART:**  Very briefly, your Honor.

6                    <u>**REDIRECT EXAMINATION**</u>

7  **BY MR. DOSTART:**

8  **Q.**   Ms. Hamilton, you testified earlier that approximately one

9  out of ten, or fewer, transactions involved an item that you

10 described as heavy or an item weighing more than ten pounds; is

11 that correct?

12 **A.**   Yes.

13 **Q.**   Ms. Sommerfeld just showed you some video footage that

14 included three different clips from three different hours.  And

15 would you agree that those video clips were not representative

16 of your time as a cashier at Kmart?

17        **MS. SOMMERFELD:**  Objection.  Leading.

18        **THE COURT:**  Sustained.

19 **BY MR. DOSTART:**

20 **Q.**   Let me ask you a question, Ms. Hamilton --

21        **THE COURT:**  Please, don't lead like that.

22        **MR. DOSTART:**  Apologize, your Honor.

23        **THE COURT:**  You should not do that.

24 **BY MR. DOSTART:**

25 **Q.**   Do you believe that those video clips are representative

 1   of your time cashiering at Kmart?

 2            MS. SOMMERFELD:  Objection.  Leading.

 3            THE COURT:  Overruled.  Please answer.

 4            THE WITNESS:  If what I think you're asking, customers

 5   with heavy objects right after the other, that didn't happen.

 6        So, I mean, like I said, one out of ten people, if that,

 7   come in with heavy objects because there is -- let's say TVs

 8   are considered heavy objects.  Well, they have the electronics

 9   where those are purchased at and usually rung up there.

10        And we have other coworkers that on a carry-on crate bring

11   those heavy objects to the cashier.  And either we hand them

12   the gun and they scan it for us making it efficient, the speed,

13   so to say.  And, also, a lot of those objects are taken to the

14   back, in layaway, and rung up there, so.

15   BY MR. DOSTART:

16   Q.   So just to be clear, I want to talk about that, very

17   briefly.

18        You are saying that there are some large electronic items

19   that are purchased in the electronics section?

20   A.   Yes.  That's where a majority of the heavy items come

21   from.  Occasionally, we get the bench, like she showed right

22   here.  But, usually, those are displayed in the garden, that

23   are rung up in the garden.

24   Q.   Okay.  So for heavy items that are purchased in the

25   electronics section, is there anything that a front end cashier

1  has to do in regards to scanning or in any way registering

2  those items with a gun?

3  **A.**   Usually not.  Hardly ever do I actually scan the item when

4  it's brought from electronics because, like I said, they bring

5  it up, they ask for the gun.  They know where the UPC is,

6  already, on the merchandise, so they just scan it for us.

7  **Q.**   Okay.  So -- uhm.

8      You testified earlier that with certain modifications you

9  believe you could do the job of a front end cashier while

10  seated; is that correct?

11 **A.**   Yes.

12 **Q.**   Is there anything about Ms. Sommerfeld's questions to you

13 today that changed your opinion?

14 **A.**   No.

15         **MR. DOSTART:**  No further questions, your Honor.

16         **THE COURT:**  More?

17         **MS. SOMMERFELD:**  Just briefly, your Honor.

18         **THE COURT:**  Go ahead.

19         **MS. SOMMERFELD:**  I will be quick.

20                    **RECROSS EXAMINATION**

21 BY MS. SOMMERFELD:

22 **Q.**   Ms. Hamilton, you sell warranty plans to customers for

23 various items, correct?

24 **A.**   Yes.

25 **Q.**   You actually earned a commission off those warranty plans

1  if you sold them, right?

2  **A.**   We're supposed to.

3  **Q.**   All right.  And electronics are a common product that

4  bears a warranty, right?

5  **A.**   Yes.

6  **Q.**   And, certainly, there were electronics products that came

7  through your cash register line, correct?

8  **A.**   Yes.

9          **MS. SOMMERFELD:**  Nothing further.

10          **THE COURT:**  May the witness be excused and discharged?

11          **MR. DOSTART:**  Yes, Your Honor.

12          **THE COURT:**  Ms. Sommerfeld?

13          **MS. SOMMERFELD:**  Yes.  Thank you, Your Honor.

14          **THE COURT:**  All right.  Ms. Hamilton, thank you for

15  coming.

16          **THE WITNESS:**  Thank you.

17          **THE COURT:**  You are free to go.  You are not subject

18  to recall.  If you're driving back to Tulare, please have a

19  safe drive.

20          **THE WITNESS:**  Thank you.

21      (Witness excused)

22          **THE COURT:**  Next witness.

23          **MR. MICHAEL RIGHETTI:**  Your Honor, we don't have any

24  other live witnesses, but at this time we would like to read in

25  deposition testimony from Kmart's 30(b)(6) witness, Aimee

608

```
 1   Grabau.
 2           THE COURT:  Fine.  Go ahead.
 3           MR. WOHL:  So just point of order, your Honor, will
 4   counsel be reading all of the sections that both sides
 5   designated, or just their sections, but then --
 6           THE COURT:  The way to do it is to read both
 7   designations.  And then you lawyers give me a breakout of
 8   percentage of time that should be charged to plaintiff and a
 9   percent that needs to be charged to defendant.
10       So if the overall thing, let's say, is 30 minutes, and
11   it's like two-thirds plaintiff, then 20 minutes gets credited
12   to plaintiff.  All right.
13           MR. WOHL:  Thank you, Your Honor.
14           THE COURT:  So you'll need to give me what that
15   breakdown is.
16       How long is it going to be?
17           MR. MICHAEL RIGHETTI:  I don't think it will take
18   longer than 20 minutes.
19           THE COURT:  All right.  Are you going to have a
20   reader?
21           MR. MICHAEL RIGHETTI:  This is our head paralegal,
22   Sarah Minkus.
23           THE COURT:  Welcome.  Please come up here.  And you
24   don't need to be placed under oath because you're just a
25   reader.  Important job, but you're just reading.  So give us
```

1   the date of the deposition.

2           **MR. MICHAEL RIGHETTI:**  And I do have a couple of --

3   does the date of the deposition, would the court reporter like

4   me to identify question and answer, or are we just going to

5   have a dialogue here?

6           **THE COURT:**  Dialogue, because it will be clear, the

7   way this is coming down, where the question starts and stops.

8           **MR. WOHL:**  Your Honor, does the version that

9   Mr. Righetti has indicate rulings on objections that we made?

10          **THE COURT:**  I ruled everything that I thought was in

11  controversy in as evidence.

12          **MR. WOHL:**  All right, your Honor.

13          **MR. MICHAEL RIGHETTI:**  And I showed that to Amanda.

14          **MR. WOHL:**  So, effectively, you overruled any

15  objections we made?

16          **THE COURT:**  I overruled those objections that you

17  made, if I understood the designated portions correctly.

18          **MR. WOHL:**  Great.

19          **THE COURT:**  Did you read -- you were supposed to look

20  at what I wrote in the margin.

21          **MR. WOHL:**  Well, I wasn't aware of it

22  Ms. Sommerfeld --

23          **MS. SOMMERFELD:**  Your Honor, Mr. Righetti did share it

24  with me.  I was just suggesting to Mr. Wohl that he might need

25  to look over Mr. Righetti's shoulder, to see the copy that the

```
 1   Court had interlineated.
 2          THE COURT:  Did you see where I had overruled
 3   objections?
 4          MS. SOMMERFELD:  I did, Your Honor.
 5          THE COURT:  Did I goof up in some way and not rule on
 6   something?
 7          MS. SOMMERFELD:  You did not goof up and not rule,
 8   your Honor.
 9          THE COURT:  Then there won't be any need for you to
10   interrupt proceedings.  Just read it.  I have now made those
11   rulings.
12      So, counsel, give us the date of the deposition, who was
13   asking the questions at the deposition, and then just jump
14   right in.
15          MR. MICHAEL RIGHETTI:  Thank you, Your Honor.  The
16   deposition of Kmart took place on December 2nd, 2011.  The
17   deposition was taken by my colleague, Matthew Righetti.
18          THE COURT:  Spell the name of the witness.
19          MR. MICHAEL RIGHETTI:  The witness is Aimee Grabau.
20   Spelled A-i-m-e-e, middle initial L., last name Grabau,
21   G-r-a-b-a-u.
22          THE COURT:  All right.  Please, go right ahead.
23          MR. WOHL:  Your Honor, just so I'm clear on protocol,
24   Mr. Righetti will indicate by page and line where he's reading
25   so I can track exactly what he's reading?
```

611

```
 1              THE COURT:  No.  You are going to have to do that.  He
 2   just reads the full thing.  So you ought to stand and look over
 3   his shoulder if you're not able to -- I don't want -- no,
 4   that's too cumbersome.  I want to hear it like the real thing.
 5   Just look over his shoulder.
 6              MR. WOHL:  That's fine, Your Honor.  I've got my
 7   color-coded version, so I should be able to track pretty well.
 8              THE COURT:  Thank you.  Mr. Righetti, first question.
 9              MR. MICHAEL RIGHETTI:  Thank you.
10                      AIMEE GRABAU,
11   called as a witness for the Plaintiff herein, having been first
12   duly sworn, testified through deposition testimony as follows:
13       (Transcript of deposition testimony as read by Michael
14   Righetti and Sarah Minkus.)
15   Q.   (By Mr. Matthew Righetti)  Your name is?
16   A.   Aim Grabau.
17   Q.   How do you spell that?
18   A.   A-i-m-e-e.
19   Q.   I was thinking of the last name.  Aimee?
20   A.   G-r-a-b-a-u.
21   Q.   All right.  Who are you employed by?
22   A.   Kmart.
23   Q.   What's your position there?
24   A.   I'm a regional HR director.
25   Q.   Where is your office?
```

1    A.    Covina, California.

2    Q.    How long have you worked for Kmart?

3    A.    Twenty-nine years.

4    Q.    And as a regional HR director, I would assume that you

5    have HR responsibilities for some geographic region?

6    A.    Yes, I do.

7    Q.    What is that?

8    A.    I have two regions.  I have the west and the west central

9    regions.

10   Q.    How long has that been your region of responsibility, west

11   and west central?

12   A.    I've had both of them.  And then I went down to just the

13   west.  Now I have both back again, so it has varied.

14   Q.    Have your responsibilities always included all of

15   California as a regional HR director?  Do you understand my

16   question?

17   A.    Yes.  And the answer is yes.

18   Q.    Okay.  Thank you.

19         Now, I doubt if you've been regional HR director for the

20   entire 29 years?

21   A.    I have not.

22   Q.    So how many of those years have you been regional HR

23   director?

24   A.    Since March of 2005.

25   Q.    So since March of '05, you've been regional HR director

GRABAU - DEPOSITION

1  for the area that includes all of California, in addition to,

2  perhaps, other areas?

3  **A.**    There have been different job titles but --

4  **Q.**    Same responsibility?

5  **A.**    Yes.

6  **Q.**    My earlier question was, since March of '05, you had the

7  same responsibilities that have included all of California?

8  **A.**    Yes, I have.

9  **Q.**    Tell me what you do as a regional HR director.  What are

10  your responsibilities, generally?

11  **A.**    I oversee all the HR-related aspects within the region.  I

12  support the store's district managers and the regional vice

13  president within the regions.  I oversee talent acquisition,

14  talent management, talent development, compliance.  There's a

15  lot of other HR-related aspects that fall into those broader

16  categories, that I oversee.

17  **Q.**    And I would assume that regional vice president and DM do

18  not report to you?

19  **A.**    No, they do not.

20  **Q.**    Those are on the operational side of the business, right?

21  **A.**    Correct.

22  **Q.**    You would describe your side of the business as what,

23  other than operational?  Just not operational?

24  **A.**    It's human resources supporting the operational side.

25  **Q.**    And what positions are direct reports to you?

```
 1        This might be easier if there was an org chart.  Do you
 2   have an org chart?
 3   A.   I don't recall" --
 4        MS. MINKUS:  That's not me.
 5        MR. WOHL:  I don't think we'd need to have lawyer
 6   colloquy, but if you want me to, I could play Ms. Sommerfeld.
 7   She didn't have one.
 8        THE COURT:  Thank you.  Go ahead.
 9   Q.   (By Mr. Matthew Righetti) All right.  Go ahead.
10   A.   Currently, I have an HR manager in each of the two regions
11   that I oversee, that report to me.
12   Q.   That's it?
13   A.   That's it.
14   Q.   You understand you're here pursuant to a deposition
15   request directed to Kmart Corporation?
16   A.   Yes.
17   Q.   And you have Exhibit 1 in front of you somewhere.  Sorry,
18   it's in front of me.
19        MR. WOHL:  I'm sure that was the court reporter.  I'm
20   sure Mr. Righetti used that word correctly.
21   Q.   (By Mr. Matthew Righetti)  I'm handing you Exhibit 1.
22   Have you seen this before?
23   A.   Yes, I have.
24   Q.   And, as I understand it, you're here to testify about the
25   topics set forth in this deposition notice?
```

615

GRABAU - DEPOSITION

```
 1  A.    Yes.
 2  Q.    And when did you first learn that you were going to be the
 3  spokesperson for Kmart for this deposition notice, or the
 4  witness to speak on behalf of the corporation?
 5  A.    I believe it was several months ago.
 6  Q.    Several?
 7  A.    I believe so.
 8  Q.    Around that time did you review the topics?
 9  A.    I don't recall.
10  Q.    Prior to today, you reviewed the topics?
11  A.    Yes, I did.
12  Q.    And have you satisfied yourself that you're knowledgeable
13  on the topics that are listed in the deposition notice?
14  A.    Yes.
15  Q.    And when you learned about the topics that you were going
16  to testify about, did you feel there was a need to conduct any
17  document review or talk to people within Kmart or Sears about
18  these topics, to enhance your knowledge?
19  A.    No.
20  Q.    You felt pretty confident that you were the right person
21  to speak on these topics, and you were knowledgeable with them,
22  correct?
23  A.    Correct.
24  Q.    And you're prepared to speak on behalf of the corporation
25  on these topics today?
```

1  **A.**    Yes.

2  **Q.**    Anything that we should know about that would inhibit your

3  ability to give accurate and correct testimony today, on these

4  topics?

5  **A.**    No.

6  **Q.**    For both the piggyback and the standard checkout cash

7  register area, is the process the same for checking out

8  customers?

9  **A.**    The process -- certainly, it varies, depending on what the

10  customer may be purchasing.  So the cashier may have to handle

11  a transaction slightly different, depending on what items are

12  being purchased.

13  **Q.**    Let's go from 4,000 square feet, and then we'll drill down

14  into other things.  But tell me, generally, how the checkout

15  process works at the front checkout area.

16  **A.**    From a cashier or a customer standpoint?

17  **Q.**    Let's start with the customer.

18  **A.**    The customer would walk up, may be directed to come into a

19  particular lane by the associate.  The customer would then walk

20  into that checkout line and, generally, would be placing their

21  items up onto the counter.

22      In the stores that have a conveyor belt -- that have

23  conveyor belts, obviously, it's different than the stores that

24  do not have conveyor belts.  Oftentimes, the cashier will

25  either help them or pull the merchandise down along the counter

1   as the cashier is beginning to scan the items.

2       As the items are being scanned by the cashier, the cashier

3   is then either bagging the items into a bag or perhaps may walk

4   around and scan the larger items while still in the shopping

5   cart.

6       Sometimes the larger items are taken out of the shopping

7   cart either by the customer or by the cashier or combination of

8   both.  And then either the customer or the cashier is taking

9   the bags, and the bags are either being filled up either in our

10  bag stand or being placed up onto the counter so the customer

11  is having to either pick up those bags and put them into the

12  shopping cart, or the cashier is placing them in the shopping

13  cart, or a combination of both.

14  **Q.**   Sorry?

15  **A.**   Then the customer is asked several questions, hopefully,

16  in most of our stores, whether or not they want to purchase

17  standard warranties, if applicable, credit card, if they have a

18  Shop Your Way card.  So the customer --

19          **MR. WOHL:**   "Shop Your Way Reward."

20  **A.**   Shop Your Way Reward.  So the customer interaction might

21  be different depending upon the answers to any of those

22  questions.

23      Then the customer is told the total.  And the customer has

24  to pay for the purchase either by cash, check, or swiping their

25  credit card, or a combination thereof.  If it's a credit card,

```
 1  they're going to sign the pin pad now.  In the past, it used to

 2  be a receipt coming from the cash register operator.

 3       And, typically, then the customer would complete the

 4  transaction and take their shopping cart or their bags out of

 5  the lane.  I think that about covers most of it.

 6  Q.   (By Mr. Matthew Righetti)  So there are scanners at the

 7  front checkout registers?

 8  A.   Correct.

 9  Q.   And all the merchandise is set up so that it's run over a

10  scanner?

11  A.   No.

12  Q.   Some merchandise is rung up by passing it over a scanner,

13  right?

14  A.   Correct.

15  Q.   How else is merchandise rung up for sale?

16  A.   It can be scanned using a hand head [sic] scanner, or the

17  UPS [sic] number can be entered into the register.

18  Q.   Anything else?

19  A.   I believe that's it.

20  Q.   Are there seats located in the cash register stations in

21  the front checkout area?

22  A.   There might be a seat, yes, at some store within

23  California, at the front checkout register area.

24  Q.   So the company, Kmart, allows checkout service associates

25  to perform their responsibilities while seated, in some stores?
```

 1  A.    We don't provide seats for our associates up at the front.

 2  And we don't, certainly, encourage that our associates are

 3  using seats up at the front, to perform their job.

 4  Q.    You are aware, though, that some checkout service

 5  associates perform their duties behind the cash register while

 6  seated?

 7  A.    No.

 8  Q.    You are not aware of any checkout service associate who

 9  has performed their responsibilities at the cash register while

10  seated?

11  A.    No, I'm not.

12  Q.    I kind of got the impression from your earlier question

13  that you were saying that some checkout service associates may

14  perform their jobs while seated in some stores?

15  A.    No.   I believe I answered that there might be a stool or a

16  chair present up at the front of the checkout area.

17  Q.    For what purpose?

18  A.    I don't know.

19  Q.    What's the basis for that testimony?

20  A.    That I have personally seen a stool up at the front

21  checkout area and that it is possible within all of our stores

22  within California that there is a stool located up at the front

23  checkout area.

24  Q.    When you say "up at the front checkout area," what part of

25  the front checkout area are you referring to?   Are you talking

1  about where the checkout service associates are ringing up

2  sales?

3  **A.**    Again, I'm saying that there might be a stool up there.

4  It is possible that we have a store that has a stool up at the

5  front.  When I personally saw a stool up at the front, I did

6  see it behind the checkout counter.

7  **Q.**    Where the checkout service associate would be performing

8  their work?

9  **A.**    Potentially, yes.

10 **Q.**    Did that surprise you?

11 **A.**    I don't know if it necessarily surprised me, no.

12 **Q.**    Was somebody using the stool at the time?

13 **A.**    No.

14 **Q.**    How many times did you see that?

15 **A.**    Only once that I can recall.

16 **Q.**    When was that?

17 **A.**    I don't recall the exact time.  It's been one to two years

18 since I have seen it.

19 **Q.**    What store was it?

20 **A.**    I don't recall which store.

21 **Q.**    What was your response to seeing a stool in the front

22 checkout service area where checkout service associates

23 performed their work?

24 **A.**    I don't remember.

25 **Q.**    Did it strike you as being a violation of company policy?

```
 1  A.    No.

 2  Q.    Does Kmart provide stools or chairs for Kmart service

 3  associates to sit on if they want to while they are performing

 4  their work behind the cash register?

 5  A.    There might be a situation where a decision is made to

 6  provide a stool for a checkout operator.

 7  Q.    You are aware of such situations that have occurred,

 8  right?

 9  A.    No.

10  Q.    What's your basis for your testimony that there may be

11  situations where checkout service associates have been provided

12  seats to sit on while they are performing their checkout

13  responsibilities?

14  A.    I'm believing that there might be a situation where we've

15  done a reasonable accommodation of a checkout operator and

16  allowed them to remain in that position and perform that job.

17  Q.    Are you guessing that that may have occurred or do you

18  know that it actually did occur?

19  A.    No.  I'm saying that it is possible.

20  Q.    There's many things that are possible.  Do you know for a

21  fact that stools or chairs have been provided as a reasonable

22  accommodation due to -- under the ADA to CSA's?

23  A.    No, I do not.

24  Q.    Have you researched that question?

25  A.    No, I have not.
```

GRABAU - DEPOSITION

1   Q.   Do you see any reason why a checkout service associate

2   would not be able to perform their checkout service associate

3   responsibilities while seated if they had a twisted knee or

4   sprained ankle or something?

5   A.   Yes.  I believe it would be difficult.

6   Q.   It would be difficult for them to perform their duties?

7   A.   As a checkout service associate, yes.

8   Q.   So, therefore, I would gather that you would believe that

9   you could not reasonably accommodate a checkout service

10  associate by providing a stool or chair for them to perform

11  their work from?

12  A.   Depending upon what the restrictions would be under the

13  reasonable accommodation, it is quite likely that the

14  individual should not be running a cash register.

15       However, it is also something that our store managers make

16  that decision on and there might be store managers within

17  California that have made -- that have made that reasonable

18  accommodation.

19  Q.   There may be store managers this California who have

20  determined that a checkout service associate could perform the

21  essential functions of the job while seated?

22  A.   Perhaps, yes.

23  Q.   In the event a store manager provide a seat to a checkout

24  service associate to perform their cash register functions

25  while seated, would that be a violation of company policy?

```
 1  A.    No.

 2  Q.    Do you believe that a service desk associate can perform

 3  the essential functions of his or her job while seated?

 4  A.    No.

 5  Q.    Why not?

 6  A.    I believe that it would be difficult for a service desk

 7  associate to be able to perform the various tasks that are

 8  asked of them while sitting on a stool, and that it would be

 9  very difficult for them to be able to even properly ring up a

10  customer and complete a transaction, all steps of that

11  transaction while in a seating -- in a sitting position.

12        I also feel it would be an issue from a customer service

13  perspective if, in fact, that associate was sitting.

14  Q.    So aside from what your attorneys have told you, you're

15  not aware of any investigation that has been done prior to the

16  filing of this lawsuit to determine whether to provide seats to

17  checkout service associates?

18  A.    Correct.

19  Q.    How about the checkout service associates?  Is there an

20  expectation about how much time checkout service associates are

21  expected to spend at the cash register servicing customers?

22  A.    No.

23  Q.    Do you have any idea how much time checkout customer

24  service associates on a daily, weekly monthly basis is

25  stationed behind the cash register?
```

GRABAU - DEPOSITION

1  **A.**    It varies drastically store-to-store, day-to-day,

2  hour-to-hour.

3  **Q.**    What I'm gathering from you is the checkout service

4  associates may be assigned to a cash register, or they may be

5  assigned on a particular day, or they may be assigned somewhere

6  completely different?

7  **A.**    That is correct.

8  **Q.**    What other areas of responsibility would a checkout

9  service associate have on a given day?

10  **A.**    In all of your stores we have the ability to schedule an

11  associate in their primary department, such as in this case the

12  checkouts, but we also have the ability to utilize -- to also

13  utilize that associate and schedule them in other department

14  within the store.

15  **Q.**    Let me show you Bates 38.   What is that?

16  **A.**    It's a job description for checkout service associate.

17  **Q.**    Is that the same description for all checkout service

18  associates in California?

19  **A.**    Yes.

20  **Q.**    Can any of the essential functions of that job be

21  performed while seated?

22  **A.**    There's certainly the ability -- that has the ability to

23  run fast and efficient cash register operations.   Some aspect

24  could be while they're actually doing the cash register

25  themselves, they could be seated; but the total sale from start

1   to finish would be difficult while being on a stool.

2   **Q.**   Have you finished your answer?

3   **A.**   On that particular bullet point.

4   **Q.**   Have you ever tried that?  You ever tried to perform a

5   customer service transaction while seated at the cash register

6   at the Kmart?

7   **A.**   No, I have not.

8   **Q.**   Have you ever observed a cashier doing that even though

9   you haven't done it yourself?  Have you ever observed a CSA

10   doing that while seated?

11   **A.**   No, I have not.

12   **Q.**   Are you aware of any ergonomic studies that have been

13   performed to assess whether a CSA can do the CSA transaction

14   while seated at Kmart?

15   **A.**   No.

16   **Q.**   Go ahead while I'm on the first question.  While essential

17   functions of the CSA can be performed while seated?

18   **A.**   Three:  Demonstrates strong skill set and suggestive

19   selling techniques for add-on sales.  Depending, certainly, on

20   what the item is, that's something that could be done while

21   seated.

22       Assist in training fellow associates in checkout

23   procedures.  While probably the majority of the training could

24   not be performed while sitting on a stool, there are certainly

25   some aspects of the training that might be able to be done

GRABAU - DEPOSITION 626

1  while seated on a stool.

2     Number eight:  Monitor shrink.  Takes appropriate action

3  to minimize waste.  Follows corporate guidelines relating to

4  loss manager.  Demonstrates good use of EAS while applying

5  sensors or designated items and ensuring tags are deactivated

6  as goods are sold.  Some aspects of that could be completed

7  while being seated.

8     Number nine:  Monitor sales circular and is knowledgeable

9  about items that have sold out that may be substituted or if

10  rain checks are being issued.  Depending upon how that store

11  handles the folders.  If the folder is being placed at each

12  register, they would be able to do that while seated at the

13  register.

14 Q.  Is it true that the primary responsibility for the

15  checkout service associate is to ring up customers at the cash

16  registers in the front of the store, and they have secondary

17  responsibilities to perform other functions as assigned by

18  their supervisors?

19 A.  Ringing up a customer is only part of their job.  We're

20  expecting them to do a lot of sales transactions, so they

21  should be doing other tasks, certainly, besides just ringing up

22  a customer.

23 Q.  From the cash register area?

24 A.  It would be from behind that.  Not necessarily stand.  Be

25  right in front of the cash register, but more than likely some

1   of the selling would be done from behind that whole cash

2   register stand area.

3   **Q.**    The primary responsibilities of a checkout service

4   associate are performed in the front of the store at the cash

5   registers?

6   **A.**    Our intent is to schedule appropriately so that we only

7   have the appropriate number of checkout service associates in

8   order to take care of the customers.  Unfortunately, we often

9   over-schedule the number of checkout operators we have up

10  there.  So we tend to use our checkout operators quite a bit in

11  the rest of the store and then we have them as backup to the

12  front end.

13        We also, in select stores, schedule them beyond when the

14  store closes to the public.  So they could end up saying an

15  extra hour after the store closes on a regular basis to be

16  straightening out the store.

17  **Q.**   Was that position designed so that the primary

18  responsibility of the position was to be stationed at the front

19  of the store at the cash registers performing the job functions

20  set forth in their job description?

21  **A.**    I don't know if you can necessarily perform every single

22  one of the items on the job description while standing behind

23  the cash register at the front of the door.

24  **Q.**   Was that job position created such that the primary

25  responsibility was to man the cash registers at the front of

1 the store as a primary responsibility?

2     I understand there are secondary responsibilities beyond

3 that assigned by the supervisor.

4 **A.**   The general function of the checkout service associate,

5 first, would be to provide customer service to the customers as

6 they are coming through if they need to be rung up.  Then they

7 are going to be ringing up that sale for the customer.

8 **Q.**   How about item number two:  Directives or policies issued

9 prohibiting or restricting the use of seats by Kmart's

10 California store employees.  Are you aware of any such

11 directives or policies?

12     Well, are you aware of any written policies that prohibit

13 or restrict the use of seats by checkout service associates?

14 **A.**   No.

15 **Q.**   If you saw a checkout service associate using a seat at a

16 Kmart, would you make a mental note to have a conversation with

17 the store management about what was going on or it's up to him

18 or her?

19 **A.**   If it's during this class period, then, no, I would not.

20 **Q.**   Why not?

21 **A.**   Because I told the store manager in the State of

22 California to allow associates running checkout registers that

23 they could use a stool or seat if they asked for one.

24 **Q.**   When did you do that?

25 **A.**   Approximately February, 2010.

GRABAU - DEPOSITION                                    629

 1  **Q.**   And how did you communicate that?

 2  **A.**   I had a meeting at which all my California store

 3  managers -- or it was intended that all my California store

 4  managers attend the meeting, and one of the topics I discussed

 5  was the stools.

 6  **Q.**   Why did you issue that?  What would you call that

 7  directive?

 8  **A.**   A directive.

 9  **Q.**   Why did you issue that directive?

10  **A.**   It was my belief at the time that in order to mitigate our

11  exposure to the vagueness of the law regarding the seats, that

12  it would be best if we had checkout service associates that

13  were asking for a stool, that we allow them to use the stool.

14  **Q.**   Are you aware of any store managers who have responded to

15  your directive by actually providing seats?

16  **A.**   There was an instance where I was actually in the store.

17  So it was not based off of necessarily my directive that I gave

18  the store managers in the meeting, but I did direct that store

19  manager to allow a checkout service associate to utilize a

20  stool after they had requested one.  And I do know that that

21  store manager authorized that associate to go and use a stool.

22  **Q.**   What store was that?

23  **A.**   That was out of 40340, Santa Rosa.

24  **Q.**   Who was the manager?

25  **A.**   I don't recall his name.

1  Q.    Was it just serendipity that you happened to be in the

2  store at the time when a request was made?

3  A.    Yes, it was.

4  Q.    You just overheard it?

5  A.    Yes.

6  Q.    When did you hear it?  Tell me about it?

7  A.    I was in the HR manager's office with a store manager when

8  an associate walked up and asked to speak to the HR manager.

9  The HR manager stepped out of her office and went to talk to

10 the associate.

11      When the HR manager came back into the HR office, she

12 stopped our conversation and asked the store manager  or

13 informed the store manager that this cashier was requesting a

14 stool.

15 Q.    Was that a checkout service associate?

16 A.    Yes.  The store manager had just been transferred in from

17 Oregon and his response was, "She needs to provide us with a

18 doctor's note."

19      I stopped the conversation and I informed the store

20 manager:  In California we had approved letting associates at

21 the checkouts use stools if they had asked for a stool without

22 the need to provide a doctor's note.

23 Q.    Okay.

24 A.    At which time he then turned to the HR manager and said,

25 "Well, let her have the stool then."  And she walked back

1  outside.  I did not hear the rest of the conversation.

2  **Q.**  Who did you have to go through, if anybody, in order to

3  make this directive to California store managers to allow

4  checkout service associates to use stools or chairs while

5  performing their duties if they asked for one?

6  **A.**  As far as me giving that directive out, I didn't ask for

7  approval from anyone.

8  **Q.**  It was a 100 percent your call?

9  **A.**  Yep -- yes.

10  **Q.**  I'm impressed.

11        **MR. WOHL:**  After 29 years do, right?

12        **MR. MICHAEL RIGHETTI:**  Yeah, I guess.

13  **Q.**  So in February 2010 this directive was issued?

14  **A.**  Yes.

15  **Q.**  And in that time -- we're talking about 19 months, is that

16  right?  No, longer than that.

17        February 2010 until December of 2011, do you know how many

18  stools or chairs had been procured for checkout service

19  associates in response to requests?

20  **A.**  No, I do not.

21  **Q.**  Was your directive ever put in writing?

22  **A.**  As in a written policy?

23  **Q.**  As in a written anything?

24  **A.**  Yes.

25  **Q.**  What is that?

1  **A.**    For that particular meeting I put together a PowerPoint in

2  which one line referenced the stools.

3  **Q.**    Has that been provided here today?

4  **A.**    No.  It's no longer available.

5  **Q.**    What happened to it?

6  **A.**    I lost it when my computer crashed.

7  **Q.**    Have you had any feedback from any of the stores regarding

8  your February 2010 directive positive or negative?

9  **A.**    Well, during that particular meeting, there was some

10  question and answers and certainly some reaction to that.

11  **Q.**    Tell me about it.

12  **A.**    My store managers generally did not like to hear I was

13  telling them that they should allow their cashiers to use

14  stools.

15  **Q.**    Did they say why?

16  **A.**    I don't know if they specifically said that.  They were

17  just asking questions as to why they needed to.  And they also

18  got into a conversation about the fact that our associates

19  could get injured and we would see a rise in Worker's Comp

20  cases if our cashiers were using a stool and trying to bag the

21  merchandise.

22  **Q.**    Anything else?

23  **A.**    Somebody wanted to know who put that law into effect so

24  they could vote them out of office, which, of course, created

25  some laughter.

```
 1        So in response to the questions about why --

 2            MR. WOHL:  I think that's Mr. Righetti.

 3            THE WITNESS:  Sorry.

 4  BY MR. MICHAEL RIGHETTI:

 5  Q.    So in response to the questions about why you were issuing

 6  this directive, did you inform them it was because of

 7  California law, complies with the California law?

 8  A.    Initially I didn't tell them that, that that was the

 9  reason.

10        When the additional questions were asked, I did talk to

11  them a little bit about a law being out there that was vague in

12  nature and that to avoid the possibility of lawsuits or

13  litigation against us, that we were just going to allow them to

14  have associates that asked for a stool use a stool, if they

15  could perform their job still.

16  Q.    Have you heard of any associates having been provided

17  a stool in response to your directive whether there was a

18  subsequent determination made that they couldn't perform their

19  job while seated?

20  A.    No, I have not.

21  Q.    Okay.  Have you heard of any associates being provided

22  with a stool and injuries resulting due in any part to the fact

23  that there was a stool in the area?

24  A.    No, I have not.

25  Q.    Or a stool being used?
```

GRABAU - DEPOSITION

```
 1  A.    No.
 2  Q.    Did you believe and do you believe you have the authority
 3  to issue the February 2010 directive?
 4  A.    Yes.
 5  Q.    Do you believe it was the right thing to do at the time?
 6  A.    Yes.
 7  Q.    Do you continue to believe that?
 8  A.    That at the time it was the right thing to do?
 9  Q.    Okay.  I will settle for that to start.
10  A.    Yes.  At the time with the knowledge I had, I believe that
11  I was doing the right thing.
12  Q.    Okay.  Now, looking back -- it's always wonderful to look
13  back and be a Monday morning quarterback.
14        Looking back from November 2011 until when you did that in
15  February 2010, do you still believe it was the right thing to
16  do?
17  A.    Unless there is any other way.
18  Q.    Okay.  In your personal opinion, do you believe it was the
19  right thing to do looking back now at what you did from
20  November 2011, looking back to what you did in February 2010?
21  Do you still think it was the right thing to do?
22  A.    I think I might have perhaps done a little bit more
23  research to make sure I was making the right decision at the
24  time.
25  Q.    Have you done that research in the 19 months that have
```

1    transpired?

2    A.   I don't know necessarily if it would be research that I've

3    done.

4    Q.   I'm using your term.

5    A.   I have more knowledge as to the circumstances and the law

6    now that I did not necessarily have before I gave that

7    directive.

8    Q.   So the research that you're talking about is legal

9    research?  You would have sought legal advice?

10   A.   Yes.

11   Q.   Anything else that looking back from now until

12   February 2010 that you believe you would have done differently?

13   A.   No.

14   Q.   Have you changed your directive at all since

15   February 2010?

16   A.   No.

17   Q.   Have you received any negative or positive feedback from

18   the stores about this directive?

19   A.   When you say "stores," just some -- just the comments I

20   heard from the store managers that day, or there might have

21   been some other comments made after that day.

22   Q.   Have you received any positive feedback from the store

23   employees?

24   A.   No.

25   Q.   Have you received any positive or negative feedback from

1  up above to you?   Do you know what I mean by "up above"?

2  **A.**    Excluding attorney-client privilege, no.

3  **Q.**    Have you been subject to any sort of counseling,

4  discipline, or reprimands for having issued the February 2010

5  directive?

6  **A.**    No.

7  **Q.**    Do your supervisors know about it?

8  **A.**    I believe so, yes.

9  **Q.**    How do they know about it?

10  **A.**    I'm not a hundred percent sure.   I believe I mentioned to

11  Margie Lynch the fact that we've allowed cashiers to have

12  stools if they requested it.

13  **Q.**    Did you do that in a meeting, telephone call, email, what?

14  **A.**    I can't specifically recall.

15  **Q.**    Do you recall what her reaction was?

16  **A.**    No.

17  **Q.**    Do you believe she had a negative reaction?

18  **A.**    No.

19  **Q.**    Where do you believe that the stores are supposed to

20  procure the seats in response to a request from an associate

21  for a seat?

22  **A.**    I believe that if an associate did request a seat, that

23  more than likely the store manager would remove the seat stool

24  that we use to sell in our furniture department from the sales

25  floor and convert it to a store use item or to purchase the

1   stool that was available for pharmacy stores.

2   **Q.**   Can you describe this pharmacy stool?

3   **A.**   It's smaller.

4   **Q.**   Like a bar stool?

5   **A.**   Wood, short bar stool.  It's solid wood.  It was like a

6   little -- like a bar stool would have that ring around where

7   you would put your feet on -- on it and no back.  It's just a

8   flat seat.

9   **Q.**   Is it adjustable?  You see these chairs, that little

10  do-hickey you can move up and down?

11  **A.**   Yes.  The pharmacy stool, it's not adjustable, the one

12  I've seen.

13  **Q.**   I expect the furniture department in these stores has

14  different types of seats, right?

15  **A.**   Yes.

16  **Q.**   So you would expect that the store managers -- strike

17  that.

18      So you would expect the store managers to select a seat

19  that he or she felt was suitable from the furniture department

20  or did you have a particular seat from the furniture department

21  in mind?

22  **A.**   Well, I never gave any expectation of what the -- of what

23  stool they may or may not use.  The preference would certainly

24  be to purchase the one that's available for ordering.

25      But if they were to -- if they were to pull one, I

1  certainly thought they would probably pull the smaller wood bar

2  stools that we sell.

3  Q.   Okay.  Have you spoken to anybody in the cash register --

4  strike that.

5      Have you spoken to anybody in the store layout and design

6  department of Kmart or Sears to ask them whether they could

7  start paying attention to designing cash register stations that

8  included a suitable stool or seat, that included a suitable

9  seat for California stores?

10  A.   No.

11  Q.   Is that something that you have thought about to put on

12  your to-do list?

13  A.   No.

14  Q.   Why not?

15  A.   We're not opening any new stores and certainly those

16  checkout register stands are quite expensive and I don't

17  foresee that we'll be needing to replace them.

18  Q.   Do you have any stores being remodeled or opened in the

19  last 12 months?

20  A.   We have remodeled a few stores.

21  Q.   And remodeling is kind of a constant annual process,

22  right?  Certain stores are selected for remodel?

23  A.   There have been some waves of some remodels, and at times

24  there are small portions of the stores that are remodeled.

25  Q.   So for stores that are slated for remodel, have you

1  considered whether to have the store layout and design team

2  start thinking about incorporating into the regional design a

3  suitable seat?

4  **A.**    No.

5  **Q.**    Can you tell looking at 1 through 37 when Ms. Garvey was

6  employed?

7  **A.**    Yes.  It says her hire date is 11/16/2010.

8  **Q.**    And can you tell when her employment stopped?

9  **A.**    Her last day worked was 1/4/2011, or separation date.

10 **Q.**    And can you tell what position she held?  Employee code

11 40005?

12 **A.**    40005 is checkout service associate.  It shows that she

13 was hired as a seasonal associate.

14 **Q.**    So during the entire time that Lisa Garvey was employed as

15 a checkout service associate, your directive would have been in

16 place.  If she would have asked for a seat, she would have been

17 provided one?

18 **A.**    Yes.

19        **MR. MICHAEL RIGHETTI:**  That's all I have at this time,

20 your Honor.

21        **THE COURT:**  All right.  That took -- let's see.  It

22 took 38 minutes.  So how do you want me to divide that time?

23        **MR. MICHAEL RIGHETTI:**  75/25?  You guys had a lot of

24 blue in there.

25        **MR. WOHL:**  No, I don't think that would be right.

PROCEEDINGS

```
 1            MR. MICHAEL RIGHETTI:  80/20?

 2            MR. WOHL:  That's in the wrong direction, Mr.

 3   Righetti.

 4            THE COURT:  All right.  You should count up the number

 5   of lines designated by each side and give me the percentages.

 6            MR. WOHL:  We should do that, your Honor.

 7            THE COURT:  Do it, like, at the next break.

 8            MR. WOHL:  We'll do it at the next break, your Honor

 9   for sure.

10            THE COURT:  All right.  Speaking of -- are we done

11   now?  Our thanks to our reader for an excellent job.

12       So before we go to the next witness, who is it going to

13   be?

14            MR. MATTHEW RIGHETTI:  We don't have any other

15   witnesses, with one small exception.

16       Part of the stipulation on exhibits was the Checkout

17   Exception Reports, which were marked Bates No. 3573, and we're

18   going to mark as Exhibit 386 for the trial, and they've been

19   stipulated into evidence by the parties.

20       I have had those Checkout Exception -- the Court may

21   recall we received those, I think, the Friday before trial.

22   They were something that we were told had been destroyed and

23   then --

24            THE COURT:  Yes.

25            MR. MATTHEW RIGHETTI:  You remember all that, okay.
```

1           THE COURT:  You're just going on and on.  What is your

2   point?

3           MR. MATTHEW RIGHETTI:  The point is, is that it's very

4   voluminous data.  We have had it summarized.  I sent the

5   summaries over to defense counsel yesterday.

6       I'm hoping that we can stipulate on what the summaries

7   show and attach those as one more exhibit.  If not, then

8   Hemming Morse of David Breshears, the data base guy, would come

9   in and say that he summarized the records and these are what

10  they show.

11      So with that exception of --

12          THE COURT:  Is he here right now?

13          MR. MATTHEW RIGHETTI:  No, he's not.  I gave them

14  notice yesterday afternoon.

15      I'm not sure.  I don't think there's going to be a dispute

16  about the summary of them.  I don't know if the defense --

17          THE COURT:  When I come back, I want you to tell me if

18  they are in or not.  If they are not -- if it's not agreed to,

19  then I will have to deal with it.

20          MR. MATTHEW RIGHETTI:  Thank you.

21          THE COURT:  I don't want it to be hanging loose.

22      So you're going to rest at that point?

23          MR. MATTHEW RIGHETTI:  That's correct.

24          THE COURT:  So we will start on the defense case in a

25  few minutes.  We'll take a 15-minute break at this time.

 1        There is something I wanted to bring up with you, but it

 2   will occur to me over the break.   Thank you.

 3        (Whereupon there was a recess in the proceedings

 4          from 11:04 a.m. until 11:20 a.m.)

 5            THE COURT:   Back to work.   Please be seated.

 6            MR. WOHL:   Your Honor, we have a percentage for you on

 7   these deposition excerpts.

 8            THE COURT:   Great.

 9            MR. WOHL:   So 29 minutes of the deposition of

10   Ms. Grabau attributable to plaintiff and nine minutes

11   attributable to defendant.

12            THE COURT:   Okay.   Thank you.

13            MR. WOHL:   And then we have a scheduling question for

14   your Honor.

15            THE COURT:   All right.

16            MR. WOHL:   Based on the pace of the testimony and with

17   the announcement that plaintiff is ready to rest and what we

18   anticipate we've got the rest of the day today and tomorrow, we

19   are concerned that we will not have enough testimony for

20   tomorrow without the testimony of Dr. Fernandez, our ergonomics

21   expert, and we scheduled him to come out first thing Monday

22   morning for the testimony.   He's in the Washington D.C. area

23   so.

24        I've asked Mr. McInerney, of course, subject to the

25   Court's approval, whether he would be willing to let the trial

PROCEEDINGS                                        643

1   stop as soon as the rest of the evidence is in on Friday, even

2   if that's short of 1:00 o'clock, and then pick up first thing

3   Monday morning.  And we would respectfully ask the Court to

4   consider that request so that Mister -- Dr. Fernandez could be

5   here Monday morning.

6           THE COURT:  How much -- how short are you going to go?

7   If it's 15 minutes, I can live with it.  If it's 30 minutes, I

8   don't know.

9           MR. WOHL:  Mr. Adkins can speak to that better I can,

10  your Honor.

11          MR. ADKINS:  Obviously, it does depend on the length

12  of cross-examination.  It's our expectation that we should

13  probably fill the day tomorrow with the witnesses we currently

14  have, but I cannot promise you that we will your Honor.  I

15  cannot.

16          THE COURT:  Do you have any witnesses other than

17  Fernandez?   Who would come after him?

18          MR. WOHL:  I think he would be our last witness, your

19  Honor.  The rest we have scheduled for tomorrow, so it would be

20  just Dr. Fernandez.

21          THE COURT:  And then you would rest after Fernandez?

22          MR. ADKINS:  We believe so.  Yes, your Honor.

23          MR. WOHL:  Yes, your Honor.

24          THE COURT:  What does the plaintiff say?  You're

25  agreeable to that?

PROCEEDINGS

 1         **MR. McINERNEY:**  I have no objection, of course, at all

 2    if we break a little early tomorrow.  We actually have a depo

 3    to do tomorrow in this case.

 4         **THE COURT:**  You have so many lawyers.

 5         **MR. McINERNEY:**  I'm sorry?

 6         **THE COURT:**  You have so many lawyers it won't --

 7    you'll be fine.

 8       All right.  I'll go along with that.

 9         **MR. WOHL:**  Thank you, your Honor.  I deeply appreciate

10    that.  I know you take seriously the schedule and we do, too.

11         **THE COURT:**  All right.  Where do we stand on your

12    tabulation?

13         **MR. MATTHEW RIGHETTI:**  So the only -- I've spoken it

14    over with Ms. Sommerfeld and the only part that we're quibbling

15    about are the categories, how the categories have been

16    characterized.

17       I think we're in agreement that the categories on the

18    summary should be categorized the same way as they are on the

19    actual Checkout Exception Reports and not be any different.

20    And they are not right now, so we're ongoing to go back and

21    reclassify these categories.  But other than that, I think we

22    have an agreement that they would come into evidence.

23         **THE COURT:**  You have an agreement?

24         **MS. SOMMERFELD:**  We will reach an agreement with less

25    argumentative headings, yes.

```
 1          THE COURT:  All right.  So do you now rest subject
 2   only to that item?
 3          MR. MATTHEW RIGHETTI:  Yes, your Honor.
 4          THE COURT:  All right.  Plaintiff rests.
 5       Okay.  Before we go to the defense case, I have a couple
 6   things I want to bring up with you.  And that is on your joint
 7   stipulation regarding -- you know, I gave you the thing, the
 8   order we did in the Oracle case, but one thing I just cannot go
 9   with on yours is 35 pages.  Why can't you do this in 25 pages
10   or less?
11          MR. MATTHEW RIGHETTI:  I think the only thing we
12   changed from your --
13          THE COURT:  I was giving you this as a form.  I didn't
14   mean to suggest that you needed 35 pages.
15          MR. MATTHEW RIGHETTI:  I think we can do it far less
16   than 25.
17          THE COURT:  Well, I could live with 25.  Is 25
18   acceptable to both sides?
19          MS. SOMMERFELD:  We'll make 25 work, your Honor.
20          THE COURT:  All right, 25.  Okay.  Thank you.
21       Now, the other thing is, my law clerk will hand out to now
22   an order that I will not yet sent out asking for a amicus brief
23   from the California agencies.  I'm going to give you until
24   5:00 p.m. today for you to comment on this, but please don't
25   try to talk me out of it.  I don't want you doing that.  You
```

1  should use your time to fly speck the form of the questions.

2        Also, please don't try to lard in more questions.  I have

3  five good questions here and you can -- you can fly speck those

4  questions, but please don't try to add in more questions and

5  weight it down and please don't try to talk me out of doing

6  this.  But I would like your help on the form of the questions.

7  My plan is then to issue this tomorrow.

8        So I want to give the views of the administrators who came

9  up with this rule in the first place and see what they think it

10  means.  So that's my plan.

11       So by 5:00 p.m. today you submit your critique.  All

12  right?

13           MR. MATTHEW RIGHETTI:  It's a critique limited to if

14  we want to change any of the five questions; not add or delete,

15  just change any of them.

16           THE COURT:  Within reason.  I'm open to modifying the

17  form of the questions or the -- you know, the order within

18  reason.

19       But what I don't -- I don't want you trying to talk me out

20  of doing this or talk me into asking one more question or two

21  more questions.  I don't want that.  I like my questions.  But

22  I'm open to modifying the way they are worded.  All right?

23           MR. MATTHEW RIGHETTI:  Thank you.

24           THE COURT:  Good.  5:00 p.m.

25           MR. WOHL:  Your Honor, may I just enter into the

 1   record the statement that appears in the DLSE website about

 2   asking for opinions in connection with pending litigation?

 3           **THE COURT:**  What is that?

 4           **MR. WOHL:**  Would you like to see a copy, your Honor?

 5   I did print this out for your consideration.

 6           **THE COURT:**  I didn't know there was such a thing.

 7           **MR. WOHL:**  I mentioned this when we first talked about

 8   this, your Honor.  It hadn't come up again, but I wanted to

 9   raise it to your attention.

10       So I can represent to the Court that I published this --

11   printed this, I should say, from the DLSE website.

12           **THE COURT:**  I'm not asking for a legal opinion.  I'm

13   asking for an amicus brief.  If they don't want to give me an

14   amicus brief, they shouldn't complain about whatever I rule.

15   I'm giving them a good opportunity to help us in this case.

16       I'm not asking for a legal opinion.  If they think it's a

17   legal opinion, all right, that's up to them.  They are being

18   invited, not ordered, to submit an amicus brief.  If they don't

19   want to do it, I can't force them to do it.  It would be of

20   great assistance to the Court to know what they think their own

21   rule means.

22       So thank you for this information.  All right.

23           **MR. MATTHEW RIGHETTI:**  Your Honor, I think the IWC is

24   defunded.

25           **MR. WOHL:**  It is defunded, your Honor.

PROCEEDINGS

```
 1          MR. MATTHEW RIGHETTI:  So I'm not even sure if giving
 2    it to the IWC --
 3          THE COURT:  Who?
 4          MR. MATTHEW RIGHETTI:  I don't want this to be
 5    interpreted as trying to talk you out of this, but I don't
 6    think there is an ICW right now.
 7          MR. WOHL:  Your Honor, the Industrial Welfare
 8    Commission is the agency that has originally promulgated the
 9    wage orders, and they have been out of business for a few years
10    now.
11          THE COURT:  All right.  Then you put that in your
12    critique.  The California Labor Commissioner still exist?
13          MR. WOHL:  Yes.  The Divisional Labor Standards
14    Enforcement, which publishes the website page I just gave to
15    the Court --
16          THE COURT:  Maybe they can respond.
17          MR. MATTHEW RIGHETTI:  Or the Attorney General, we
18    might get them in the case.
19          THE COURT:  I'm not putting the Attorney General in.
20    It's not their regulation.  If the Labor Commissioner wants to
21    get the Attorney General to respond for them and speak for
22    them, that's okay.
23          But it's got to be the word of the Labor Commissioner, an
24    authoritative statement by the Labor Commissioner and not just
25    something that's done by the Attorney General.  The Attorney
```

1   General has to be the authoritative view that everybody in the

2   world can rely on that the Labor Commissioner will stand by.

3   That's what I'm interested in.

4          MR. WOHL:  Your Honor, there has been litigation

5   over -- you may be familiar with this already, but litigation

6   over what the DLSE does, whether, in fact, it has any force,

7   effect of law whatsoever.  This is the whole issue of

8   administrative regulations --

9          THE COURT:  You sound like you're afraid to find out

10  what they think.

11         MR. WOHL:  Your Honor, I just think it's --

12         THE COURT:  I'm not going to be talked out of it.

13         MR. WOHL:  All right.  Thank you, your Honor.  I won't

14  belabor it.

15         THE COURT:  All right.  Now the defense can start

16  putting on your case.

17         MS. SOMMERFELD:  Your Honor, defendant makes a motion

18  for judgment under 52(c).

19         THE COURT:  All right.  Here is what we'll do.  By

20  5:00 o'clock today you file a written motion and it will be

21  deemed as if made now and it will be ruled on in due course.

22         MS. SOMMERFELD:  Thank you, your Honor.  The defendant

23  also renews it's motion for decertification.

24         THE COURT:  Same thing.

25         MS. SOMMERFELD:  Thank you, your Honor.

1          THE COURT:  Now you may call your witnesses.

2          MR. ADKINS:  Your Honor, the defense calls Jesse

3  Gonzalez.

4          THE COURT:  Let's bring him in.  Who is he going to

5  be, by the way?  Another cashier?

6          MR. ADKINS:  No, sir.  He's the corporate

7  representative at counsel table.  He's a vice-president at

8  Kmart.

9          THE COURT:  Mr. Gonzalez, welcome to the stand.

10 Please raise your right hand.

11                      <u>JESSE GONZALEZ</u>,

12 called as a witness for the Defendant herein, having been first

13 duly sworn, was examined and testified as follows:

14         THE WITNESS:  Yes.

15         THE COURT:  Great have a seat.  Welcome to the stand.

16         THE WITNESS:  Thank you, sir.

17         THE COURT:  By now you know you've got to sit about

18 this close (indicating) or else we won't hear you.

19     Why don't you say your full name?

20         THE WITNESS:  Jesse Gonzalez.

21         THE COURT:  Thank you.  Perfect.

22     Go ahead, counsel.

23                    <u>DIRECT EXAMINATION</u>

24 BY MR. ADKINS:

25 Q.  Good morning, Mr. Gonzalez.

1  **A.**   Good morning.

2  **Q.**   Could you tell the Court what your current position is?

3  **A.**   Vice-president of Kmart Retail Service.

4  **Q.**   Where are you located?

5  **A.**   Hoffman Estates, Illinois.

6  **Q.**   How long have you been in that position?

7  **A.**   Six years.

8  **Q.**   Could you describe what your current responsibilities are?

9  **A.**   I'm responsible for store communication, store processes,

10  sales, workload.

11  **Q.**   Are all of those items of the retail service function?

12  **A.**   Yes.

13  **Q.**   How long have you worked at Kmart?

14  **A.**   Thirty-four years.

15  **Q.**   Can you just walk us through briefly how you started at

16  Kmart, what positions you held, up through your current

17  position, please?

18  **A.**   Yes.  Two years of an hourly associate where I worked from

19  running a register as a cashier, replenishment of counters,

20  straightening counters.  Then went to assistant store manager.

21  Management training program.  Store manager.  Merchandise

22  manager.  District manager.  Regional manager.  And then my

23  current job.

24  **Q.**   How much time did you spend during those 34 years working

25  for Kmart in the State of California?

1  **A.**    Twenty-plus years.

2  **Q.**    What were the job responsibilities you had while working

3  in California?

4  **A.**    Assistant manager.   Merchandise manager.   Store manager.

5  District manager.

6  **Q.**    And none of that was in the Tulare Kmart store though,

7  right?

8  **A.**    No.

9  **Q.**    How would you -- can you just generally describe what kind

10  of a company Kmart is?

11  **A.**    It's a company that sells a wide variety of products

12  ranging from garden to toys, sporting goods, apparel and food

13  and consumables.

14  **Q.**    How long has Kmart been around in its earliest forms?

15  **A.**    Early 1900s it was known as Kresge.   In 1962 it

16  transitioned from Kresge to K-Mart.

17  **Q.**    During the background that you were describing, the 28

18  years that you were -- how many years were you -- if I didn't

19  ask this already, how many years were you actually working in

20  Kmart stores physically?

21  **A.**    Twenty-eight years.

22  **Q.**    So 28 of your 34 years at Kmart were physically in the

23  Kmart retail stores?

24  **A.**    Yes.

25  **Q.**    And I think you said 20 years of that was in California?

1   A.    Yes.

2   Q.    Okay.  So during any of that time, did you ever serve as a

3   front end cashier?

4   A.    Yes.

5   Q.    Did you ever supervise cashiers?

6   A.    Yes.

7   Q.    Can you estimate how many transactions you personally have

8   completed as a cashier at the front end registers at Kmart?

9   A.    Tens of thousands.

10  Q.    Now, are you familiar with the -- you sat through this

11  trial, but I should ask you:  Are familiar with the checkstands

12  at the Tulare Kmart store?

13  A.    Yes.

14  Q.    In fact, if we could put upon the screen Exhibit 15, Page

15  65.  That's already in evidence.

16        (Photograph displayed.)

17  Q.    Do you recognize --

18  A.    Yes.

19  Q.    Do you recognize that, sir?

20  A.    Yes.

21  Q.    What is that?

22  A.    The checkout stand with the merchandisers, which is the

23  merchandise adjacent to it.

24  Q.    And is that, in particular, one of the checkstands we have

25  been talking about in this trial at the Tulare Kmart store?

1   A.    Yes.

2   Q.    Are you familiar with that type of check stand?

3   A.    Yes.

4   Q.    Have you done transactions on that type of check stand?

5   A.    Yes.

6   Q.    When you were a store manager and assistant manager, did

7   you train cashiers on how to perform their job using this type

8   of check stand?

9   A.    Yes.   Trained many cashiers.

10          THE COURT:  Can I ask a clarifying question here?  The

11   word "check stand" is ambiguous here.

12       Are you saying to us that the entire configuration that is

13   shown on that posterboard over there that has the bagging table

14   at one end and that this entire design is like a standard

15   design that appears at many different Kmart stores?

16          THE WITNESS:  Yes.

17          THE COURT:  Are there other designs, too?

18          THE WITNESS:  There was one other design that was

19   designed for Super-K, which is a grocery store, that has a

20   carousel and belted registers.

21       And a Super-K, obviously, is a full line grocery.  So they

22   sell meats and produce and those type of products so they have

23   a different configuration.

24          THE COURT:  And "belted" means what?

25          THE WITNESS:  It's a conveyor belt where customers

 1  will put their products on the belt and will put a divider.  So

 2  it will be three or four customers that can actually have their

 3  products and then that product comes right to the cashier so

 4  they can quickly scan it, deactivate it and bag it.

 5          THE COURT:  All right.  But the design at Tulare does

 6  not have a conveyor belt?

 7          THE WITNESS:  Correct.

 8          THE COURT:  You're saying that's a standard -- seems

 9  like you're saying that is the only design that Kmart has for

10  normal stores?

11          THE WITNESS:  Yes.  That is the official design.

12  You'll see that in many stores other than Super-K.

13          THE COURT:  All right.  Okay.  Now I understand.

14      Thank you, go ahead.

15          MR. ADKINS:  Thank you, your Honor.

16  BY MR. ADKINS:

17  Q.  Are you aware, Mr. Gonzalez, of any job descriptions or

18  policies at Kmart that relate to the duties and

19  responsibilities of the cashier?

20  A.  Yes.

21  Q.  We'll get to those -- let's do this.  We'll get to the

22  policies and job descriptions in a minute, but perhaps the best

23  thing for the Court would be is if you can walk us through --

24  we have heard a lot about in different pieces the process of

25  the checkout.

1    Using the check stand you were just describing to the

2  judge, can you please describe that process based upon your

3  experience at the checkout?

4  **A.**    Sure.  As a cashier, once I punch in and I retrieve the

5  money and I put the money in the till, I would prep the two

6  bags.  You'll see that there's two bags at the checkout tips.

7  Those are called T-bags.  I would actually open them up.

8    Then I would turn my light on and customers would then

9  flow into my checkout lane.  I would greet the customers and

10  then in one motion I would grab the products with my

11  right-hand.  I then would take it to my left-hand, scan it,

12  deactivate it in one motion and drop it in the bag.  That's

13  called ring and bag.  While at the same time talking to the

14  customer and asking them, you know, "Are you a Shop Your Way

15  member?"

16  **Q.**    What does that mean, "Are you a Shop Your Way member?"

17  **A.**    It's a loyalty program where the customer gets one percent

18  back from their purchase and two points and they can then

19  redeem the points for cash value by buying products.  It's a

20  basic loyalty program, like an airline point system.

21  **Q.**    Are cashiers instructed to do that in the way you just

22  described it?

23  **A.**    Yes.

24  **Q.**    Go ahead.  I'm sorry.

25  **A.**    If a cashier [sic] says, "Yes I'm a member," then they

1  would provide a phone number and I would key their phone number

2  into the keyboard and then they would receive credit for those

3  points.

4  **Q.**   When you say "the keyboard," what are you talking about?

5  **A.**   There is a keyboard attached on top of the money drawer

6  attached to the POS system.

7  **Q.**   When you say -- well, what is POS system?

8  **A.**   It's the Point of Sale.  It's actually the operating

9  system.  It's the brains of -- it's the computer.  It's the

10 brains of the register.  It contains a check reader, a touch

11 screen, a money drawer.

12 **Q.**   And it's what I think a lot of people would call just

13 generally colloquially a cash register?

14 **A.**   Correct.

15 **Q.**   But it has a lot of other things on it that you just

16 described?

17 **A.**   Yes.

18 **Q.**   Okay.  I'm sorry.  You were talking about entering in the

19 phone number.  What would you do after that?

20 **A.**   I would continue to scan.  Unless the customer says, "No,

21 I'm not a member," and then I would ask them, "Would you like

22 to become a member and earn one percent of your purchases?"  If

23 the member says, "Yes," I would then -- on the computer there

24 is a prompt that comes up.  I hit a key that says "New Member"

25 and then it's going to request for me to fill out some customer

1  information.

2       Okay.  So then I fill out first name, last name and

3  email -- email is important -- and a mobile phone.  Ultimately

4  what it is, once we get the customer's email, then we can

5  target that email with targeted offers based on their

6  purchases.  So they will be receiving marketing emails.

7  **Q.**   Okay.  And you said before you got to that part, you said

8  you would be doing a bagging process where you would reach out

9  with your right-hand --

10 **A.**   Yes.

11 **Q.**   (Continuing) -- scan an item.  What does it mean?  What

12 would you scan the item on?

13 **A.**   There is a very efficient scanner that is -- goes straight

14 up and you'll see it in the picture.  You'll see a window

15 that's facing this way and then the base scanner.

16      So if an item has a UPC on this side or at the bottom or

17 on this top with the bottom here, in one motion it will pick it

18 up.  The only time it doesn't scan is if the UPC is facing the

19 cashier.  Then the cashier would have to turn it.

20      So as I pick up the item, I'm scanning it.  It's going to

21 make a noise for me.  If it goes ping, that means it rang.  If

22 I don't get that noise, it tells the cashier to try it again.

23 **Q.**   Then you mentioned that then you in a continuing motion

24 you would put it over the deactivator, right?

25 **A.**   In one motion.  In one sweeping motion.  Ultimately we

1  want to grab the item, scan it, deactivate it and drop it.  I

2  already have the bags prepped, so I can just drop it.

3      At the same time I'm analyzing the customer's products.

4  There's baby formula.  There's cheese, foods.  There's also

5  chemicals.  They could be garden chemicals like diazinon.

6  There can be, you know, bug sprays, 409 or Comet.  I wouldn't

7  want to bag the chemicals with the baby formula or foods.

8      So there's multiple bags that I'm using.  And I'm scanning

9  and I have to put the items in the correct bag.  I don't want

10 to mix bread, you know, that can be crushed with something

11 heavy, or eggs.  So I am scanning, but I'm also aware of what

12 I'm putting in the bags.

13 **Q.**  Is there a -- let me back up a minute.  You mentioned the

14 deactivator.  What is that?

15 **A.**  Deactivator is an EAS system, which is an Electronic

16 Surveillance Articles, and there's three different types of

17 security tags.

18     There is a soft tags that vendors actually put on their

19 products.  It goes on items like makeup, batteries, razors,

20 movies and music.

21 **Q.**  What does that look like?  What is a soft tag?

22 **A.**  It is a soft tag, about that size (indicating),

23 rectangular and many times it's embedded in the packet or

24 embedded in the product.  In the shoes, for instance, the

25 vendor at -- the manufacturer actually puts it inside the

 1  product so you can't take it off as a consumer, but those are

 2  also available for the stores to put on the products.

 3      It's costly to put them on and the items are costly, so

 4  you only basically see it in high theft items.

 5  **Q.**   That's one of them.  You were mentioning two other types?

 6  **A.**   Yes.  There is another item called the gator clip.  It's a

 7  hard tag.  They're very expensive and those are recycled.  So

 8  as a customer comes in, it's very important that we take it

 9  off.

10      There is an actual detacher that detaches the tag from the

11  product.  If you take this product home with you as a consumer,

12  you're not going to be very happy because you're not going to

13  be able to wear it with a big tag around your shirt or denim

14  pants.  You will have to make a return trip to get it off.

15      And a worse experience is if we don't remove it, if you go

16  to the checkouts -- the doors and the bells go off, then you're

17  going, you know, get stopped by an associate.  You have to come

18  back in the store.  And ultimately a cashier would look and if

19  that's their customer, they will probably go apologize and

20  bring that product back and deactivate it.

21  **Q.**   Is there a third tag?

22  **A.**   Yes.  The third one is a spider wrap.  It's the least

23  most -- the least common and it's basically to prevent

24  customers from opening a packet and taking the product that's

25  inside.

1       Like, if you would a Blue Ray video player and you're

2   selling them for $288.  The spider wrap wraps around the packet

3   and prevents the customer from opening it and stealing the item

4   inside.  Those are also expensive and are recycled, so when

5   they go through the checkouts, they would be taken off.  You

6   see those items in items like power tools, electronics,

7   expensive items.

8   **Q.**  Okay.  And you had mentioned that in that motion you were

9   describing, at the end of it you drop it in a bag.  Is there a

10  certain way that you're supposed to build the bag out in the

11  bagging process?

12  **A.**  Yes, yes.  What you want to do is you want to -- when you

13  take your large items first, you want to build a wall around

14  the bag so that your bag doesn't rip.  If I put something sharp

15  in and then put big items in the middle, it will ultimately rip

16  the bag.  So the last item that I put in that bag should go

17  straight in the middle.

18      Ultimately I ought to be able to take that bag, set it

19  straight on the counter and it should stay straight up.

20  **Q.**  And so what else is going on at the -- or what can be

21  going on in a typical checkout process using this check stand?

22  **A.**  There's a variety of different things that can happen.  If

23  a customer buys alcohol, cigarettes, mature videos -- meaning,

24  like, videos that have violence for kids -- BB guns, spray

25  paint, all those items are restricted by different states,

1  different laws.

2      So if you had somebody come in and buy alcohol and -- you

3  know, I'm going to ask for I.D.  It's going to ask me on the

4  screen to type --

5  **Q.**  I'm sorry to interrupt, but which screen?

6  **A.**  The touch screen.  I'm going to have to ask the customer

7  to show me their I.D.  I'm going to have to take the I.D.  I'm

8  going to have to read their birth date and key that information

9  into the touch screen.  It's going to ask for year, month and

10  date.

11  **Q.**  Let me make sure I have the screens all figured out.  I

12  think I do.

13      I'm facing right now, for the record, the lectern and this

14  is the cash register for purposes of this question.

15  **A.**  Uh-huh.

16  **Q.**  If a customer comes up and puts a six pack of beer down

17  and it gets scanned, on the cash register in front of me a

18  screen appears prompting some information?

19  **A.**  Yes.  It's going to stop me.  I'm not going to be able to

20  continue.

21  **Q.**  Okay.  And then what do you to?

22  **A.**  Then I have to ask for I.D.  Then I key the date, month

23  and year into the system.

24  **Q.**  The date, month and year from the I.D. that you've looked

25  at from the customer?

1  **A.**    Correct.  It's a safety procedure that's going to have

2  every cashier stop, ask for I.D. versus scanning and assuming

3  that they are of age.

4      Same thing for tobacco or -- you know, there's items that

5  are automated.  When Kmart -- we make a purchase and we list an

6  item that has those kind of restrictions, the items are set up,

7  cost, what we charge the customer.  And then certain

8  departments that carry these items, the items are tagged to ask

9  for I.D.

10  **Q.**    Okay.  Going back to the deactivator.  I should have

11  asked, not every product has those security measures attached

12  to it that you described, correct?

13  **A.**    No.  We would not use them in items like dog food or water

14  or those type of items.

15  **Q.**    What else goes on at the typical checkout process using

16  this check stand?

17  **A.**    Okay.  So as I continue to bag and put the items in, I

18  continue to scan, activate and bag the items.  Once those bags

19  are full, then I'm going to have to lift them and I'm going to

20  put them on the side table, okay.

21      Some of those bags can be heavy.  Like, if, say, a

22  customer wants to change their oil, they are going to buy five

23  quarts of oil.  Those five quarts would go into one bag.  I

24  would then lift them, switch them over to the bagging table.  I

25  would then prep my next two bags and then I would proceed

1    scanning.

2         An item could have no UPC.  I would have to call for a

3    price check.  An item might be missing or there might be a

4    pricing discrepancy.  Then I would call for a price check.  An

5    item -- a customer might want a raincheck during that

6    transaction.  I would then -- the customer might ask me:

7    You're out of the Hamilton Beach toaster or two slice toaster.

8    And I would say -- the customer might ask me:  Can you find out

9    if there is any more in the stock room?

10        Well, that's customer service and that means the

11   cashier -- customer service is the most important thing.  I

12   would then stop.  Go make a phone call.  Call housewares, dial

13   311.  When they call, I would say:  Are we out of the toaster?

14   And if they say:  Yes we're out, you can either give them a

15   raincheck or they can buy it online.

16        I would then go back to my register stand and I would ask

17   the customer:  We have two options.  We are out of it.  I can

18   given you a raincheck and you can come back and buy it at that

19   price, or I can ship it to your home free delivery.

20        If they decide they want a raincheck, I would then just

21   take the customer's information and type it in.  It would print

22   out a raincheck for the customer.

23        If they decided they wanted it shipped to their home I

24   would just key the information, the mailing address and they

25   would make payment as part of their transaction.

1  Q.  What about certain items like large electronics?  Is there

2  any kind of warranty, automated process similar to the others

3  that you have described?

4  A.  Yes, absolutely.  There are items that are eligible for

5  replacement warranties and extended warranties.  Those are

6  items that are either run on batteries or electric.

7      So if a customer, for instance, buys a radio or a

8  PlayStation or they by an electronic toy, once they go in and

9  that item is scanned, again, the register would stop.

10     We script everything that the cashier says to the

11  customer.  So on the computer would be some verbiage.  The

12  verbiage would say:  This item qualifies for a replacement

13  plan.  For 2.99 we can protect your plan for an entire 12

14  months.  If it breaks or stops working, we offer a complete

15  replacement.

16     If that's the case, you would then -- if the customer

17  accepts that purchase, you would then answer, tell the system,

18  yes, key in the 2.99, charge the customer and then you would

19  give the customer a pamphlet that describes the program and how

20  it works and you would hand that to the customer.

21  Q.  What about, we have heard the phrases BOB and LISA.  Can

22  you describe what that policy is and how it affects the

23  checkout process?

24  A.  Sure.  One thing on that extended warranty, there is a

25  commission.  So when the associate does -- sells it to the

 1  customer, it's an add-on sale, which is part of their job

 2  description.  They would then also get compensated with an

 3  incentive to do it.

 4       BOB and LISA --

 5  **Q.**   I'm sorry.  Actually, you raise a good point.  We

 6  mentioned the warranty program and commission with that.

 7       Are there other loyalty or card programs or really any

 8  other programs at the point of sale that Kmart has that affects

 9  this process?

10  **A.**   Yes.  It's very -- that comes at the end, and that's a

11  Sears credit card.

12       We -- the object is what we call the total sale.  The

13  first thing you would do is greet the customer and then offer

14  the Shop Your Way program, and you would only offer the

15  warranties when those items are scanned.

16       At the very end of the transaction we would ask the

17  customer, "May I put that on your Sears credit card?"  And if

18  the customer says, "Yes," then you would just, you know, put it

19  on their credit card.  If the customer says, "No, I don't have

20  a Sears credit card," or a company credit card, then that's

21  when you would ask, "Would you like to get one because there's

22  90-day free interest," or whatever, whatever the current

23  promotion is.

24       And I think it's pretty common in the industry if you go

25  to Kohl's or J.C. Penny, they try to give you a credit card.

1   Then you would ask the customer:  "Can I get you a credit

2   card?"  There is a lot of legalese and disclosures that go on.

3   So that would all pop upon the screen.  There is a lot of

4   paperless -- a lot of questions that you would have to ask.

5        The customer would have to key some information on the pin

6   pad to make sure because, obviously, credit and credit records

7   are very confidential and have to be protected.  So there's

8   things the cashier would do on her screen, but there's some

9   tasks that the customer would have to do on the pin pad.  The

10  cashier might have to step around and help them during that

11  transaction to complete it.

12       Now, the cashiers get $2 for every credit card that they

13  sell to the customers or that they get the customers to take.

14  Again, it's another incentive.

15       Again, that would be towards the end.  It really wouldn't

16  make any sense if you had a customer come up and before you

17  even rang up a new product, you would say, "Do you want to be a

18  Shop Your Way member?"  "Do you want to donate?"  "Do you want

19  you a credit card?"  They would get annoyed and irritated with

20  you.

21       It's really done in a way where you're working, checking

22  the customer out smoothly.  The customer knows they are making

23  progress in getting rung up.  At the same time you're being

24  prompted what to do and what to say.

25  Q.   Now, to my favorite acronym names BOB and LISA.  Can you

1  explain how that process works at the check stand?

2  **A.**    BOB and LISA are common terms in the retail and grocery

3  industry.  BOB stands for Bottom of Basket.  LISA stands Look

4  InSide Always.

5      If you go to, like, grocery stores, you might see around

6  their registers taped signs that say "Always remember BOB and

7  LISA."  I've seen it in competitors.  I've seen it in grocery

8  stores.

9      One of the things that happens in a Kmart is heavy items

10 and bulk items will go in the bottom basket.  There's dog food.

11 There's water.  There's Pepsi.  There can be potting soil, bird

12 seed.  It doesn't have to be heavy.  It can also be bulky.

13 Pillows, blankets, sleeping bags, et cetera.  They will go on

14 the bottom shelf to allow enough space in the shopping cart.

15     Particularly if a mother has a baby in the carriage and --

16 you know, a four-year old, they will sit inside a shopping cart

17 plus their products.

18     So BOB and LISA is designated.  The cashiers are required

19 to look at the bottom of the basket and to also look in the top

20 of the basket.  It's impossible and it's a poor experience to

21 look at that after the customer is done.

22     I know you heard that potentially you could look at it

23 when they walk away.  I've never seen that done and I would

24 never train anybody to do that.  Because as a customer, you

25 wouldn't want to write a check or make a payment and then have

1  that customer leave the store and have to retrieve him to come

2  back while you have the next customer in line.  It would really

3  annoy the customers and delay your lines.

4  **Q.**   What about LISA, looking inside the different bags?

5  **A.**   Very important.  So you have items like backpacks, purses,

6  totes, et cetera.  You know, we sell Rubbermaid Totes, plastic

7  containers.  If they need they don't get those, they are pretty

8  large.  Coolers.  They need to look inside.

9      Customers don't do it on purpose.  There's no room, so

10  sometimes they could stick -- you know, if you're buying a

11  cooler, you might put blue ice inside the cooler.  If you're

12  basing plastics, you might put hangers or things that you would

13  organize your closet with.

14      So it's -- you know, customers will -- if they put the tub

15  inside the shopping cart, it takes the whole shopping cart.  So

16  it's not unusual for customers to just throw items in there.

17  So it's very important that you look inside.  Shrink can have a

18  very negative impact in stores.

19  **Q.**   What is "shrink"?

20  **A.**   It's the difference between what your bulk inventory is

21  and then when you do a physical count of the store, it's what's

22  missing.  And that can have just horrific impact on the

23  profitability of that store.

24  **Q.**   So basically BOB and LISA is an anti-shrink device?

25  **A.**   Yes.  Your shrink in a Kmart happens at two spots, or any

1   retailer.  It happens in the receiving door, as products are

2   sold to you by vendors, milk vendors, bread vendors, cookie

3   vendors, it's critical that they get checked in.  In other

4   words, if I'm bringing 48 pieces in, I better get 48 pieces

5   because you're charging me for 48 pieces.

6        The other point is the front end cashiers.  Those two

7   pieces are what we have to most focus on, are points for

8   strength.  Because if you're not ringing up the customers and

9   you're missing products, you know, it's -- it can have a

10  horrible impact on your profit.

11           THE COURT:  Just on that point, a typical Kmart store,

12  if you were there all day standing at the front door, how many

13  times would the alarm go off that somebody is walking out with

14  something, whether on purpose or innocently?

15           THE WITNESS:  I would say that in a typical store it

16  would go off 10 to 15 times.

17           THE COURT:  Is it open 24 hours a day?

18           THE WITNESS:  No, no.

19           THE COURT:  How many hours are they open.

20           THE WITNESS:  Operating hours are 8:00 a.m. to

21  10:00 p.m.

22           THE COURT:  So in that time period you're saying 10 to

23  15 times?

24           THE WITNESS:  Uh-huh.  Yes.

25           THE COURT:  All right.

1          **THE WITNESS:**  I mean, if you're store manager or

2    you're a cashier, if you -- products coming through your line

3    and it's setting off the activating pad, that means we have an

4    issue.  That means that pad is not working.  So you just can't

5    continue to operate that register.  That means you need to

6    close it down.  You need to open another register that's

7    working because, obviously, there's something wrong with that

8    pad.  It's not deactivating.  Or else you have an untrained

9    cashier that's not taking the EAS tag off.

10         And that's very annoying to have to come back in the store

11   once you're outside.  Particularly if you're a young mom with

12   kids and you're in a hurry or your on your lunch hour, to come

13   back in the store to have to take those tags off.  People feel

14   like, you know, the bells go off.  People say, "Oh, they think

15   I'm shoplifting.  I'm not.  I'm not.  I paid for this."

16         So it's not a good experience.  You want to avoid that as

17   much as possible.

18   **Q.**  We've already heard about this in this trial, but just

19   briefly.

20         There's also items that need to be processed at the check

21   stand that can't -- they are either too big or bulky that they

22   can't fit on the counter or for whatever reason a customer

23   leaves them not on the counter, but in the cart.  How do you

24   process those?

25   **A.**   There's really three different ways that a transaction can

1   happen.  There is items that can get scanned through the actual

2   scanner, complete orders.  And there's items that are multiple

3   orders, where you have one large item and small items.

4        An example would be, I buy a bicycle, but I also want to

5   buy a bike helmet and I want to buy a lock, but I want to write

6   one check.  I don't want to pay for some of the items in the

7   back, pay for some of the items here.

8        As a store manager, I want one seamless transaction for

9   the customer.  I want to ring it up for them, give them one

10  receipt and thank them for their business.  So those type of

11  things would all go to the front checkouts.  The cashier would

12  have to step out, go to the item and we have a tear-away UPC.

13  **Q.**   Which item are you talking about here?

14  **A.**   Bicycle.

15  **Q.**   Okay.

16  **A.**   We really wouldn't encourage the customer to take it to

17  the cashier.  I could take a $199 bicycle and hand them a $69

18  tag.

19       So the cashier would step out, take the tag off, go back

20  and scan it with the door lock or the bike lock and the helmet.

21  That's a multiple type of transaction.

22       It's common.  Part of our teams and associates in the

23  sales floor, that's what they are trained.  If a customer buys

24  a barbecue, you want to sell them the briquettes.  If a

25  customer buys a bicycle, you want to sell them a helmet.

1  There's multiple add-on sales that go with it.   Items are

2  displayed that way.

3       The other piece, the other -- the third transaction would

4  be a that item that would require a flatbed.   A flatbed is a

5  heavy cart with four wheels that's safe to push products.

6  There's items in the store that cannot be lifted by the

7  customer that require our help.   Those items wouldn't fit into

8  a shopping cart:   Trampolines, dining sets, patio sets, gas

9  grills, treadmills, et cetera.

10      Those items go on a flatbed.   They get rolled up to the

11 front.   The associate that's with them would either help the

12 cashier or the cashier could come out and scan them if they get

13 close enough.   If not, the cashier can go pull off the tag.

14 **Q.**   What about the use of the scan gun.   When is that used?

15 **A.**   It's quite common because there's things -- there's

16 products that are still in the shopping cart and what we want

17 to be able to do is to avoid a customer having to lift them.

18      You've got to remember, the customer is behind the

19 shopping cart.   The items are underneath or inside the cart.

20 For them to have to reach into the shopping cart and pick up a

21 24-pack of water, a 40-pound bag of dog food, it's much easier

22 for me to lean over or work my way around to scan those items.

23 **Q.**   So you would work your way -- you either lean over or work

24 your way through what some people describe as the pass-through?

25 **A.**   You don't have to go completely through the pass-through.

1  You could put one leg, pick up the item.  Most of the times you

2  have to get pretty close to the shopping cart.

3  **Q.**    Does that hand-held scanner work the same way as the

4  tabletop counter scanner you were describing?

5  **A.**    Yeah.  It has a laser where it will actually scan the UPC.

6  It doesn't work as good as the scanner.  I mean, sometimes, you

7  know, when you have a UPC on an item, it's very easy to scan.

8  When you have an item in the shopping cart, it's more

9  complicated.

10       When customers shop, they are more concerned about finding

11  the right brands at the right price.  They are not concerned

12  that they are putting things in the shopping cart with the UPC

13  facing up.  There is no customers that will do that.  You don't

14  walk around the store saying, "I'm buying all these items and

15  I'm putting all the UPC's facing up at the very top so the

16  cashier can reach over and scan them."  They are thinking

17  price.  They are thinking what's on sale.  Do I have a coupon

18  for that item?  And the different brands.

19       The cashiers need to go over to the shopping cart and they

20  need to not just scan the product.  They need to locate the

21  UPC.  The UPC could be facing down.  You know, there's one UPC,

22  sometimes two UPCs on a product.  If you have the product and

23  the UPC is here (indicating), you're not going to be able to

24  scan it.  You'll need to lift it with one hand and scan it

25  without lifting it.  You don't have to lift the entire item,

1  but you need to maneuver it around where you can get that

2  scanner, to get it scanned.

3  **Q.**    Okay.

4  **A.**    Does that make sense?

5  **Q.**    It does.

6      And, for the record, you were holding up a cup just now,

7  as you were describing that process, and turning it over in

8  your hand, with the other hand, showing how you would scan the

9  UPC?

10 **A.**    Yes.

11 **Q.**    I want to talk for a minute -- let me just ask, have you

12 performed all those functions that you've just described?

13 **A.**    Thousands of times.

14 **Q.**    And trained people on those processes?

15 **A.**    Yes.  Twenty-eight years of working in the stores,

16 training associates, assistant managers, and seasonal help.

17 **Q.**    I wanted to focus a little bit on some of the things that

18 take you away from the checkstand during the checkout process.

19 And I think, just to make sure I have got your testimony right,

20 you have already mentioned if a product is missing a UPC?

21 **A.**    Yes.

22 **Q.**    If there is a price dispute or if you need a price check?

23 **A.**    Price discrepancies, yes.

24 **Q.**    What would you do if there was something like that?

25 **A.**    I would have to call the department to verify it.

1      So a customer comes in and says -- you know, we have

2   toaster ovens 69, 29, 19.  Sometimes products get moved around

3   and signs get moved around.  Customer might bring a toaster

4   oven up and say, What's the price, $69?  Uhm, I think it's 19.

5   Let me have somebody check that price.

6   **Q.**   So you then have to leave the checkstand and do what?

7   **A.**   Yes, I would walk over to the phone, and I would call the

8   hardware department.  Or, if I knew there was an associate in

9   that area, I would call that associate, like associate 42, to

10  the checkout for a price check.

11  **Q.**   Is that the same phone you would have to use if there were

12  out-of-stock items that you described?

13  **A.**   Yes.

14  **Q.**   Okay.  Are there any other things, other than missing

15  UPCs, price disputes, or out-of-stock items that would require

16  you to leave the checkstand during the checkout process?

17  **A.**   Yes.  If I needed change, I would go to the service desk

18  and I would ask them for change so that I have enough money.

19      A customer might -- it's common for a customer to say, I

20  was in the store shopping.  I would like to talk to your store

21  manager.  Either give us a compliment on an associate or maybe

22  they had an issue with a product or associate.

23      And the other thing that could happen is, the alarms could

24  go off.  If the alarms go off, register 1 or register 2 would

25  go talk to that customer.

1  Q.   So what about the shopping carts, we've seen some of the

2  video and some photos where there's the shopping carts that

3  come down the aisle, right?

4  A.   Yes.

5  Q.   And what happens to those shopping carts and what, if any,

6  responsibility is there related to the shopping carts for the

7  cashiers?

8  A.   So as customers come through, it's very common that you'll

9  see a customer with multiple bags or three or four items.

10  You'll see were maybe the mom and dad are together.  Dad takes

11  out a couple of bags, mom takes a bag, and they leave the

12  store.  They don't necessarily take the cart and put it away

13  for us.  That's our job.

14      So there's carts that are abandoned.  And you see carts

15  outside, in the parking lots, that customers leave behind.

16      It's very common inside the store.  Customers will leave

17  their carts.  They'll block the aisles.  In between customers,

18  I need to get those carts, retrieve them, and put 'em in the

19  cart corral.

20      But, retail is messy as a whole.  I mean, at any given

21  time we sell Icees, we sell Cokes, we sell popcorn.  There

22  could be a spill.  I need to keep my work area.  There's

23  brooms, there's many different things that are available so

24  that I could keep -- maintain my area organized and clean.

25  Q.   And those are among the responsibilities of the cashier?

1  **A.**    Absolutely.  It's very important that it's clean at the

2  front checkouts.  You could have customers slipping on spills.

3  It's important that -- that impression of a clean store.

4  **Q.**    What about the job duties away from the checkout stand?

5        So let me just back up.  What we've been talking about

6  this entire time is all of the duties of the cashier at the

7  checkout counter, when they're processing transactions and

8  things that can pull them away during those transactions.

9        What about when there are no transactions taking place,

10 are there other duties that the cashier has in that instance?

11 **A.**    Yes.  So if there is time between customers, there's a

12 variety of things that they're required to do, that they

13 actually own.

14       They're responsible for filling their supplies.  And I say

15 supplies, I'm not talking just their checkout.  If there's two

16 people at the checkouts -- and we have checkout stands from,

17 you know, eight to 17 or 18 depending on the store -- they will

18 need to fill the supplies for all checkouts.

19       So we keep our bags and our supplies in the stockroom.

20 They would be responsible for going to the stockroom, bringing

21 the bags, the detail tapes, et cetera, to the front, and then

22 going through from register 1 to 7, or register 1 to 15, to

23 replenishing those supplies.

24 **Q.**    Anything else?

25 **A.**    Yes.  So they're also responsible for replenishing,

 1  maintaining the merchandise tips.  The merchandise tips are

 2  five feet sometimes seven and a half feet of product that's

 3  displayed on both sides.  So there's a variety.  One is gum and

 4  candy.

 5      And the second merchandiser is general merchandise,

 6  meaning --

 7  Q.  What was that?  I'm sorry, didn't catch that.

 8  A.  General merchandise.

 9  Q.  General merchandise?

10  A.  Yes.  An assortment of what we call impulse items.  These

11  are fast-selling items that sell very well.  Batteries would be

12  one.  So, you know, brushes, combs, things where you are in the

13  checkout line, you're saying, boy, I need that nail clipper, I

14  need that pack of batteries.

15  Q.  Your kid needs the candy?

16  A.  Exactly.

17      A Snickers bar is the number one selling item at the

18  checkouts.  We sell millions of Snickers bars.  So, it's

19  important that we keep those things replenished.  It's a good

20  add-on sale for the shopping cart.

21  Q.  Just to be clear, what is the responsibility of the

22  cashier with respect to that space you were describing?

23  A.  Yeah --

24          THE COURT:  Plaintiff's lawyers are now grinning ear

25  to ear.

```
 1          MR. McINERNEY:  It's because I have a Snickers bar.

 2          THE COURT:  Snickers bar.

 3      (Laughter)

 4          THE COURT:  And I will say that that is my favorite

 5  candy bar.

 6      (Laughter)

 7          THE COURT:  And I have bought many.  Not at Kmart, but

 8  I understand that concept.

 9      And I could tell that the plaintiff's counsel were very

10  pleased with themselves that the Snickers bars came up.

11      Is that what you have there?

12          MR. MATTHEW RIGHETTI:  Proves our case, your Honor.

13          MR. McINERNEY:  We rest.

14      (Laughter)

15          THE COURT:  All right.  Keep going.  You're doing a

16  great job.  I'm listening to everything.  All right.

17          THE WITNESS:  Thank you, sir.

18  BY MR. ADKINS:

19  Q.  While we're on the topic, what is the largest -- or in

20  terms of units sold, the highest number of items sold at Kmart,

21  if you know?

22  A.  The number one item, by far, by far, with 5 million units,

23  in a Kmart is a 35-pack Smart Sense drinking water.  It's 35

24  bottles of water, shrink wrapped in a packet.

25          THE COURT:  The pictures were so blurry, I couldn't
```

1  tell for sure, but seems like there were stacks of those right

2  at the end of the checkout counter.

3          **THE WITNESS:**  Yes.

4          **THE COURT:**  Is that normal?

5          **THE WITNESS:**  That's normal in the summertime because

6  we cannot keep it in stock.  So the counter holds, you know,

7  counter holds four or five cases.  So we actually have to put

8  pallets and pallets of that water in the display aisles.

9      When it's hot, particularly in the summertime, people

10  drink a lot of water.  And bottled water is very popular.  That

11  is the number one item.

12  **BY MR. ADKINS:**

13  **Q.**  Okay.  I'm sorry I interrupted you.  You were talking

14  about duties away from the cash register.  Any others that you

15  can think of?

16  **A.**  Yeah.  I just want to make sure, there's replenishment.

17  So every -- depending on the store, two to three or four

18  different times a week there's a delivery of products.  In the

19  delivery are products for gums and candy, and those other

20  kinds, come in what we call repack boxes.  These are large

21  boxes full of that product.

22      When those products come in, they are moved to the

23  checkouts.  So if you have checkout 1 open and checkout 3 open,

24  those products are left at register 7 or 8.  And during the

25  day, for the next couple of days, the cashiers are responsible

 1  for replenishing those items, but rotating the products.

 2      So meaning that if I get Snickers, I want to put the fresh

 3  Snickers with the -- that just came in, behind the other

 4  Snickers.  That's called product rotation, so there's never any

 5  stale candy, et cetera.

 6      So they're all responsible for doing that.  So they

 7  replenish, they organize the front checkouts.

 8      Now, if it's not busy, if it's not busy, and you have the

 9  apparel department next to you, and then obviously those

10  cashiers would go to the apparel area, size the products,

11  colorize the products --

12  **Q.**  I'm sorry, can we just back -- what is size the products

13  and color the products?

14  **A.**  So you have what we call four-way fixtures.  And when you

15  go shop in a store that sells apparel, you're going to have

16  small, medium, extra large.  For the customer's convenient

17  [sic] we need to make sure that they are all sized.  So if

18  you're looking for medium, you don't want to go through each

19  item.  You want to see what the store carries that's medium

20  size.

21      So they call sizing the products and colorizing.  So you

22  want to see all the blues together, all the blacks together,

23  all the whites together.  So that's very common.  It's very

24  tedious, and it takes a long time.

25      And it's very, very easy to train cashiers to do that.

1  They get very, very good.  So, as a cashier, if you're

2  brand-new, I could -- I could take you to the apparel area and

3  in ten or 15 minutes give you a quick course of how to size the

4  product and how to -- size it.

5  **Q.**   And what is Operation Invitation?

6  **A.**   It's a customer service initiative.

7       So as a customer goes through the line the cashiers are

8  responsible for making sure that there's nobody waiting in

9  line.  So if I don't have any customers, I need to step out of

10 my lane, walk completely through the checkouts.  And instead of

11 yelling, you know, to a customer, hey, I can help you on

12 register 2, I would walk over to the customer, I would say, I

13 can help you in my lane; come with me.

14      And then you would bring that customer to your lane and

15 you would ring 'em up.

16 **Q.**   And what do you do -- what is the cashier trained to do

17 and what is the policy on what the cashier is to do in

18 situations where they have additional free time, if any?

19 **A.**   Okay.  So we have a upfront supervisor.  And -- or service

20 desk associates.  The person that's responsible for if a

21 customer is upset, that's the person that they would say, you

22 know, we have a upset customer.  They would call that person.

23      That person is located at the front checkouts.  That

24 person would call the store manager -- that's part of their job

25 responsibility -- and say, I have three cashiers today.  I

1  really only need two.  It's not that busy.  Then where do you

2  want John or where do you want Sally to go?  Depending on the

3  season, I might say it's Back to School.  So I really need her

4  or him to go to the stationery department.

5      And I would meet them there, unless I already trained them

6  on how to straighten and face counters.  And they would start

7  facing and straightening counters.  It's called recovery.

8      Every store is recovered before the store is closed.  You

9  wouldn't want to leave a store that's messy and go home.  So

10 the store's evening focus and through -- the focus during the

11 day and evening is to recover.

12     Most of the replenishment, heavy replenishment is done off

13 hours or early opening.  And that's for customer service.

14 Meaning, if you went into a Kmart you wouldn't want pallets and

15 pallets of freight on the floor, blocking the aisle.  So the

16 heavy replenishment on the sales floor is done at night.

17     The day focus is recovery, which is straightening and

18 facing.  And that's where the cashiers are important as part of

19 the organization.  They play a big part of that.

20 Q.  And that's known as recovery?

21 A.  Yes.  Straightening/facing is part of recovery.

22 Recovering the store so that we're ready for business the next

23 day.

24 Q.  So for all of these things that we've just talked about

25 for the last 20 minutes or so, are those actions and

 1  requirements of the cashiers at Kmart, are those the

 2  expectations that Kmart has for the cashier position?

 3  **A.**    Absolutely.

 4  **Q.**    Have you -- and you have personally done each of those

 5  tasks?

 6  **A.**    Yes.

 7  **Q.**    And trained others in doing them?

 8  **A.**    Yes.

 9  **Q.**    What about -- what about breaks, down time for cashiers --

10  well, first, let me start, what is the -- what are the typical

11  hours that cashiers work?

12  **A.**    Cashier's shift is four and a half hours.  So if a cashier

13  has been at work for two hours, or close to it, will be asked

14  to take a break.  You know, also, it might not be -- you know,

15  it doesn't have to be exact over the two hours.  If it's an

16  hour and 45 minutes, they might say, Is it okay if I take my

17  break now?  Sure.

18       And there's two areas that they could actually go to.

19  **Q.**    What are those?

20  **A.**    There's an employee break lounge, where we have tables,

21  refrigerator, microwave, TV, couches, seats where the employee

22  goes, and they can rest for 15 minutes.  You know, they can

23  watch TV.  There's also a place for their lunch.  And the other

24  place is the restaurant.

25       We have, basically, multiple, different types of

1   restaurants.  We have Little Caesar's in 450 Kmart's or so.

2   Over 400.  And we have Nathan's Hot Dogs.  And we have what we

3   call K Cafe, which is just a snack bar.  So they can also take

4   their break and eat in our restaurants.

5          THE COURT:  Does the four and a half include the

6   15-minute break?

7          THE WITNESS:  Yes, sir.

8          THE COURT:  So the actual work time would be 4 hours

9   and 15 minutes?

10         THE WITNESS:  Yeah, it's actual paid break.  So they

11  get paid for taking the break and during break.

12         THE COURT:  Is it one break per four and a half hours?

13         THE WITNESS:  Yes.

14  BY MR. ADKINS:

15  Q.   But I take it when they're not on break the cashiers need

16  to be doing the duties you just described previously?

17  A.   Yes.  When they are on the clock, they're taking care of

18  customers, they're ringing customer up, or else they're helping

19  us recover the store.

20  Q.   I'd like to now come back to -- thank you for that

21  description.  I want to come back to some of the documents.

22         THE COURT:  May I ask this question?

23         MR. ADKINS:  Sure.

24         THE COURT:  Let's say you're short one day, and

25  somebody works an extra shift.  Does that ever happen?

1          THE WITNESS:  Yes.

2          THE COURT:  Let's say they work two

3    four-and-a-half-hour shifts.  Do they get overtime for the

4    second shift?

5          THE WITNESS:  Not if it's over -- it has to be over

6    eight hours.  They would get a half hour lunch or an hour

7    lunch, their option, and a second break.  So they would get a

8    total of two breaks and a meal break, which is lunch.

9          THE COURT:  And for the part that was over eight

10   hours, which wouldn't be very much, they would get overtime?

11         THE WITNESS:  Yes, but we wouldn't pay for their

12   lunch.  They would be off the clock for their lunch.  But we

13   would pay for both breaks.

14         THE COURT:  Do they have to volunteer for that, or can

15   you tell them, You have to do this?

16         THE WITNESS:  They would have to volunteer.  We

17   wouldn't want to keep a mom with no babysitting, or a student

18   that has classes, to have to stay.

19       So, normally, it can happen, but there's other options in

20   a Kmart, as well.  Every associate that works on our sales

21   floor is trained to do the registers.  And every register

22   operator is trained to do recovery.

23       If it gets busy, instead of having lines, managers will

24   need to require floor personnel to go run registers, to help

25   with the lines.

```
 1        You know, ultimately the customer service experience is

 2   the most important piece of the store.  It's the last

 3   impression that Kmart gets to make with their customers.

 4   That's when they're exiting the store.  And that's the last

 5   associate that they talk to.

 6        Many times, because we're so self-service, if you come

 7   into Kmart, you want some Folgers Coffee, you want some case of

 8   water, some dog food, you don't need a salesman to sell it to

 9   you unless we're out of stock or you need help.

10        So you put it in a shopping cart and you proceed to the

11   checkouts.  And that's the only interaction that you had with

12   any associate.  So it really is the most important interaction.

13            THE COURT:  All right.  Fresh question.  I

14   interrupted.  Please continue.

15            MR. ADKINS:  Thank you, Your Honor.  Very good

16   question.

17        If we could turn to Exhibit 37, please.  This is already

18   in evidence.  If we could put it up on the screen, I believe.

19   If we could blow that out a little bit.

20        (Document displayed.)

21   BY MR. ADKINS:

22   Q.   Do you recognize that document, Mr. Gonzalez?

23   A.   Yes.

24   Q.   What is it?

25   A.   It's a Kmart job description for the checkout service
```

 1  associate.

 2          MR. ADKINS:  All right.  Maybe if I can go to Exhibit

 3  157, which we've also seen in this trial and is admitted.

 4      And these are in front of you, too, in folders.

 5      If we could -- if could we zoom in really close to the

 6  top, so -- I can see the judge is squinting, as am I.  Okay.

 7      (Document displayed.)

 8  BY MR. ADKINS:

 9  Q.   Do you recognize that document, sir?

10  A.   Yes.

11  Q.   What is this?

12  A.   It's a job description that my team and I worked on and

13  reviewed earlier this year, that was issued March 14, 2012.

14  Q.   Now, why are there two?

15  A.   This is an updated.  Earlier in the year we updated the

16  job descriptions for Kmart.  So we went through and we did all

17  the different jobs in Kmart.

18      So if you're a reset associate that works on planograms --

19  those are the actual layouts of the counter -- or a pricing

20  associate, which is responsible for ensuring pricing accuracy,

21  signing, et cetera, we updated all the job descriptions at the

22  Kmart.

23  Q.   So you updated all of the different positions that are

24  employed at a Kmart store?

25  A.   Yes.

1   Q.    And this was part of that effort, this document?

2   A.    Correct, yes.  They're very similar.

3   Q.    Can you describe how -- you said that your team worked on

4   these.  Can you describe the process that goes into putting

5   forth the job description documents such as this one?

6   A.    Yeah.  We have the meeting to review the current job

7   description.  And then -- we had a meeting to review many job

8   descriptions.  But on this team was communications, store

9   process, training department, HR.  We reviewed it and then

10  covered it with additional people, to get their thoughts before

11  posting it.

12  Q.    So just to be sure this is clear, the document that's

13  currently on the screen is the current job description for the

14  cashiers at Kmart?

15  A.    Correct.

16  Q.    And the one we were looking at just a moment ago, Exhibit

17  37, was the job description that existed up until March 14 --

18  A.    Yes.

19  Q.    -- of 2012?

20  A.    Correct.  We wouldn't have two job descriptions at the

21  same time.

22  Q.    These job descriptions span the time period that's

23  relevant here, right?

24  A.    Correct.

25  Q.    Okay.  And I should make this clear on the record.  What

1  position do these two job descriptions relate to?

2  **A.**   The checkout service associate.

3  **Q.**   And is that -- we've heard the name "cashier" used,

4  because I think that that's a colloquial term.  But what is the

5  CSA, the checkout service associate?

6  **A.**   The CSA is the customer service associate, also better

7  known in the stores as a cashier.

8  **Q.**   So it's the same thing?

9  **A.**   Yeah.  So you see that in grocery stores and in other

10  retailers, they're known as the cashier.

11  **Q.**   Are there any other written job descriptions for the CSA?

12  **A.**   No.

13  **Q.**   Why?

14  **A.**   Well, I would be involved in creating 'em and be part of

15  that.

16  **Q.**   Why wouldn't you have like five or six different job

17  descriptions?

18  **A.**   It would be confusing to the -- to the store management

19  teams and the associate.  We really only one want one.  There

20  is no other purpose for more than one job description for the

21  same job.

22          **MR. ADKINS:**  Now, if we can scan up just a little bit.

23  I know we've seen this document already in this trial, but I

24  want to ask you about a few of the jobs that are in here.

25          Actually, if you go back down a little, please.  And move

1    it over to the left a little bit, please.

2        Thank you.

3    **BY MR. ADKINS:**

4    **Q.**    It says, there towards the top:

5            "Provides world class customer service by surprising

6             and delighting our customers every day.

7            "Able to run fast and efficient register cash

8             registering operations.

9            "Observe customer traffic and calls for additional

10            service as needed."

11        Do you see that?

12   **A.**    Yes.

13   **Q.**   Why -- it mentioned customer service, world class customer

14   service.  Why is customer service important for the role of the

15   CSA?

16   **A.**    It's very important.  Like we spoke before, it's the last

17   impression and, many times, the only impression.  You know, we

18   have competitors that sell the same items that we sell, at the

19   same price.

20        Everybody sells cereal, detergent, toothpaste, just like

21   we do.  The differential is customer service.  Customers will

22   come back if you provide them good customer service.

23   **Q.**    Does Kmart have any recognition or motivational programs

24   for customer service?

25   **A.**    Yes.

GONZALEZ - DIRECT EXAMINATION / ADKINS

1   **Q.**   Could you describe those, please.

2   **A.**   We have -- for the front cashiers, we have what we call

3   The Ultimate Cashier Contest.  So we have where cashiers

4   compete with one another in the store within their district,

5   and within their regions and corporate.

6         So it's a big deal every year.  We fly cashiers up to the

7   corporate office.  We have competition.  They have dinner with

8   the senior management.  We go out to the stores and watch them

9   compete.

10        And they're basically competing on all the different

11  aspects of ringing.  So ringing the product, bagging it, you

12  know, how they take care of the customer, et cetera.  So it's a

13  competition.

14        We also have what we call a WAT program.  WAT stands for

15  welcome, assist, and thank.

16        So if I'm a district manager or regional manager or

17  corporate executive, and I'm touring a store and I witness an

18  associate or a customer service cashier provide good service

19  and thank the customer and welcome the customer, I have with me

20  a pack of gift cards.  And these gift cards are loaded with

21  money.  And I hand 'em over to the associate and thank 'em.

22        We also have the Five Star Award program where, you know,

23  customers will go into online websites, et cetera.  They'll,

24  you know, rate an associate or an experience.  They get one

25  star, two stars, five stars.  They get a certificate.

1            So there's various recognition programs for the

2   associates.

3   Q.    I may have failed to ask you when you were talking about

4   the process at the checkstand.  You mentioned the WAT program,

5   welcome, assist, and thank.  Welcome and thank, is that the

6   beginning and the end of that process?

7   A.    Yes.

8   Q.    Could you just describe that, very briefly?

9   A.    So you welcome a customer.  So you greet 'em.  The main

10  piece is to assist the customer properly, which is the middle.

11  You know, so that's where it's -- you know, it's pretty easy to

12  get associates to greet and say thank you.  It's that middle

13  part where they assist the customers effectively and quickly,

14  that's important.  That's the, you know, the middle piece,

15  assist.

16  Q.    And then what's the last piece?

17  A.    Uhm, the T, the thank.

18  Q.    To thank them?

19  A.    Thank them, yes.  Thank them for their business.

20  Q.    Does Kmart measure customer service in some way?

21  A.    Yes, we have various metrics that are very important, that

22  come out daily.  We have CSAT, which is a customer service,

23  index where we compare our customer service scores from one

24  store to the other store, districts, regions.

25            And then we also have complaints.  So we measure

 1  complaints by thousands.  Meaning that if store A has five

 2  complaints for a thousand transactions, and store B has a

 3  hundred complaints for a thousand transactions, then that store

 4  is deemed as having poor service and, obviously, the store

 5  manager and district manager will have to do a better job of

 6  changing the service levels in that store.

 7  **Q.**   Let's back up for one second.  What do you mean by

 8  complaints, what are these complaints?

 9  **A.**   These are customers that complain to our customer care

10  network.

11  **Q.**   How do they do that?

12  **A.**   They can either go online or pick up the phone and call.

13  **Q.**   Okay.  And you mentioned the CSAT.  Is that C-S-A-T?

14  **A.**   Yes.

15  **Q.**   And how does that work?  I mean, how do they know what

16  number to call or what to do there?

17  **A.**   Yeah, there's -- on the bottom of the receipt, there is

18  a -- where a customer can go online and take a survey on the

19  store.  And then if the customer takes the survey, they take

20  that customer's name, and there's like a drawing.  And they can

21  win gift cards, etc.  It's a way to get more people to give us

22  feedback on the store.

23  **Q.**   We've heard something in this trial about a survey that

24  pops up on the pin pad.  What is that?

25  **A.**   Yeah.  That's a survey that's realtime.  So -- and the

```
 1  reason we like it is because we can provide reporting, daily

 2  reporting.  And it's really quick and easy for the customer to

 3  provide feedback.

 4       And, obviously, that survey is impacted by that

 5  transaction.  If they just had a really poor transaction,

 6  they're not going to rate that store well regardless of -- of

 7  having the items in stock, having a clean store.  If you just

 8  were either rude or made that customer wait a long time, you're

 9  not going to get a good rating.

10  Q.   Because speed and efficiency are important?

11  A.   It's key.  Very important.

12  Q.   Further down on this description, right there it says: "

13           "Maintains register station by replenishing supplies,

14            cleaning, and straightening work area."

15       Do you see that?

16  A.   Yes.

17  Q.   I think you've described this, but is that one of the

18  important job duties for a Kmart cashier?

19  A.   Yes.

20  Q.   Is that part of that description you were previously

21  giving, about the way the cashier is supposed to conduct the

22  checkout?

23  A.   Yes.

24  Q.   Down at the bottom there it says:

25           "Demonstrates strong skill set in suggestive selling
```

```
 1               techniques for add-on sales."
 2        What is that?
 3   A.   That's where the associate would sell you replacement
 4   warranties, your credit cards, your Shop Your Way.  All those
 5   metrics are add-on sales.
 6   Q.   And those are the ones where you're saying they could get
 7   a commission under some of them?
 8   A.   Yes.
 9   Q.   A little further down it says -- just look -- right
10   underneath it:
11               "Practices Operation Invitation and positive customer
12                interactions."
13        That's the Operation Invitation you were describing
14   before?
15   A.   Yes.
16        MR. ADKINS:  If we could go to the very bottom.  And
17   move it over to the right just a little bit, please.
18   BY MR. ADKINS:
19   Q.   And it says there, "Required Skills."  Do you see that?
20   A.   Yes.
21   Q.   And it has:
22               "Able to lift and move merchandise, typically a
23                minimum of 20 pounds."
24        Do you see that?
25   A.   Yes.
```

1  Q.   Is that -- it says next to it, "Required Skills."  Do you

2  see that?

3  A.   Yes.

4  Q.   Is lifting a minimum of 20 pounds a required skill of the

5  CSAs at Kmart?

6  A.   Yes.

7  Q.   Why?

8  A.   Well, there's items that have high selling velocity-type

9  items: water, Pepsi.  Pepsi is another item, 12-packs.  Coke

10  12-packs that are very good sellers.  Cashier needs to be able

11  to lift those, scan 'em.

12       There's also the -- our bags, our shopping bags.  You

13  could have a shopping bag, and you could scan a bag of sugar.

14  Could be five pounds.  But you could also put some pancake mix,

15  put some spaghetti sauce in there.

16       There's a cumulative weight total that goes in these bags.

17  These bags have to be lifted.  You know, if a customer has

18  multiple items, a pretty good-sized order, you would have to

19  lift those bags, move 'em to the bagging table, and fill more

20  bags.

21       So those bags can -- those bags, when they're filled, can

22  weigh more than 20 pounds pretty easy.

23  Q.   Even if the individual items in that bag don't weigh very

24  much?

25  A.   Exactly.

GONZALEZ - DIRECT EXAMINATION / ADKINS

1  Q.    Okay.  And it also has, "Repetitive bending, lifting,

2  stretching, and reaching" there.  Do you see that?

3  A.    Absolutely.

4  Q.    And is that a required skill for CSAs at Kmart?

5  A.    Yes.

6  Q.    And I should back up.  We saw that there was a previous

7  job description, Exhibit 37.  Does every one of the things we

8  talked about just now exist in that prior job description?

9  A.    Yes.

10 Q.    All right.  Let's go to Exhibit 160, please.  I wanted to

11 talk to you for a moment about training.

12     (Document displayed.)

13 Q.    Does Kmart provide training or workshops to ensure that

14 the cashiers are providing the customer service and the job

15 functions you've been describing today?

16 A.    Yes.

17 Q.    Are you familiar with that training?

18 A.    Yes.

19 Q.    Can you explain, generally, what that training is?

20 A.    Yes.  When we hire associate, there's two to three days

21 worth of training, depending on how the manager schedules it.

22 They -- they're in the HR office.

23     There's some computerized base training, where they go on

24 the -- on a computer, and it takes them through some courses,

25 and they talk -- it speaks to register operations, and then

1  they take a question quiz.

2      But the best training, obviously, is the practical

3  applications training, where they go out to the sales floor and

4  they're part of the pal learning system.  Pal.  P-a-l.

5      They're assigned to an experienced cashier, and they just

6  stand next to them, and they watch a cashier, how they ring,

7  and also watch the customer experience piece, which is just as

8  critical than just the ringing, as how to treat the customers

9  and ring the product.

10  **Q.**  Let's look at the Exhibit 160.

11          **MR. ADKINS:**  And, your Honor, I believe this has

12  already been stipulated into evidence, but I would move it into

13  evidence.

14          **THE COURT:**  What is that?  What number?

15          **MR. ADKINS:**  160, Your Honor.

16          **THE COURT:**  Any objection?

17          **MR. MATTHEW RIGHETTI:**  No, Your Honor.

18          **THE COURT:**  Received in evidence.

19      (Trial Exhibit 160 received in evidence.)

20          **MR. ADKINS:**  Can we blow up, please, the top paragraph

21  right there.  Actually, maybe the whole top section.  The top

22  half of the document, please.

23      I'm sorry to keep moving you around.  Could you go to the

24  very top and just do the top portion.  There you go.  Thank

25  you.

1        (Document displayed.)

2  BY MR. ADKINS:

3  Q.   All right.  It says, "Register Training Practice

4  Exercises" at the top, right?

5  A.   Correct.

6  Q.   It has like an associate name and date.  There's a space

7  there?

8  A.   Yes.

9  Q.   Is this supposed to be filled out?

10 A.   Yes.

11 Q.   Okay.  And then it says, "Customer service points."

12        MR. ADKINS:  Now, can we blow that one out so we can

13 see it a little better, so we don't have to squint.  Perfect.

14 BY MR. ADKINS:

15 Q.   It says:

16        "Make sure customers are your number one priority.

17         Make eye contact with all customers and keep a smile

18         on your face.  Make sure customers feel you are doing

19         everything to get them through the transaction

20         quickly.  With a smile, thank each customer for

21         shopping at Kmart.  Remember to execute Operation

22         Invitation at all times."

23    Do you see that?

24 A.   Yes.

25 Q.   Are these things that CSAs at Kmart are trained on in the

1  ways that you described?

2  **A.**    Absolutely.  There's a reason -- you know, you have the

3  associate's name, and then right next to it, for a cashier

4  we're saying customer service is the number one priority.

5        So, that should set the stage for a brand-new associate to

6  understand that here's five key things for you to remember.

7  You know, you have to -- your first -- your top priority is

8  customer service.  You should always smile, right?

9        You should do everything you can to help the customer with

10 those transactions, which might mean calling for a price check.

11 It might mean a rain check.  It might mean actually sending the

12 item to the customer's home through the online ordering system.

13 And, obviously, thanking the customer.

14       And, very important, the Operation Invitation that builds

15 that service culture into the organization, where cashiers are

16 inviting customers to their lanes.

17 **Q.**    Let's move to a different document.  I'm going to shift

18 gears and talk about some of the policies that Kmart has.

19          **MR. ADKINS:**  Could we go to Exhibit 171, please.  And

20 could we blow out the top?  Perfect.

21 **BY MR. ADKINS:**

22 **Q.**    Do you see that, sir?

23 **A.**    Yes.

24 **Q.**    It says:

25          "Bulletin FTE #08.  3 in a line checkout commitment."

1          Do you see that?

2   **A.**    Yes.

3   **Q.**    What is this document?

4   **A.**    That's a standard of operation for our checkouts.  That

5   means that if there's more than three people in line, my duties

6   as a cashier is to go to the phone and call for more help.

7   That we should never have more than three people in line.

8   **Q.**    Why?

9   **A.**    Because that would take a long time to check out the

10  customers.  And the last thing we would want is for you to

11  enter the store and see these long lines and say, wow, I don't

12  even want to spend any money here because I'm going to have to

13  wait a long time.

14          It's an impression.  It's a standard of operation that we

15  have no more than three people in line.

16  **Q.**    Let's go to -- is that a policy that applies to the Kmart

17  CSAs?

18  **A.**    Yes.

19              **MR. ADKINS:**  Let's go to another document, Exhibit

20  172, please.  If we could highlight -- pull out the top of this

21  document, please.

22  **BY MR. ADKINS:**

23  **Q.**    This one states:

24              "To:  All store coaching teams.

25              "From:  Store operations administration."

```
 1        And the "re" line is:
 2            "Bulletin FTE #09.  Operation Invitation."
 3        Do you see that?
 4   A.   Yes, uh-huh.
 5   Q.   Do you recognize this document?
 6   A.   Yes.
 7   Q.   What is it?
 8   A.   Operation Invitation.
 9   Q.   We've talked about this before, but is this a policy --
10   well, tell me what this is.
11   A.   It's customer initiative for a customer policy that really
12   impresses the customer.  Because if they're walking to the
13   checkout lanes and there's no lines, there's nothing better
14   than a Kmart cashier saying, Hello, I can help you, and lead
15   them into their lane.
16        It's kind of like if there's somebody coming to your home,
17   you would open the door and say, welcome, come into my home.
18   They're doing the same thing.  They're welcoming the customer
19   to their checkout line.
20        It also means that during busy times, if they quickly
21   check out their customer, they then go to another checkout lane
22   and help those customers.
23   Q.   I just am looking at the first policy point on the page.
24   It says:
25            "Operation Invitation is a simple action that all
```

```
 1              register operators must practice to acknowledge

 2              customers and improve the customer flow at the

 3              registers."

 4       Do you see that?

 5  A.   Yes.

 6  Q.   And is this a policy that applies to CSAs at Kmart?

 7  A.   Yes.

 8              MR. ADKINS:  One more, Exhibit 174, please.

 9              THE WITNESS:  It's also important, when they're at

10  front, our cashiers need to know where all the products are

11  located.  And you're better able to help customers that might

12  have questions, like, Where's your infant's department?

13  Where's your sporting goods department?  They're more bound to

14  ask those questions of the cashiers at the front of the

15  checkouts, versus behind all the products inside that stand.

16              MR. ADKINS:  Thank you.

17       If we could pull out the top of this document, please.

18  BY MR. ADKINS:

19  Q.   And it's again addressed:

20              "To:  All store management teams.

21              "From:  Store operations administration.

22              "Re:  Bulletin FTE #29."

23       And here we have "Bob and Lisa," right?

24              THE WITNESS:  Yes.

25
```

1  **BY MR. ADKINS:**

2  **Q.**    Okay.  And you recognize this document?

3  **A.**    Yes.

4  **Q.**    Is this a policy that applies to all Kmart CSAs?

5  **A.**    Yes.

6  **Q.**    And this is that description of Bob and Lisa you gave

7  before, correct?

8  **A.**    Correct.

9  **Q.**    Mr. Gonzalez, based on your 34 years of experience at

10 Kmart, and the thousands of transactions that you have

11 conducted, as well as supervising other cashiers, do you

12 believe a Kmart cashier's job could be reasonably done from a

13 seated position?

14 **A.**    Absolutely not.

15 **Q.**    Why?

16 **A.**    Because I've done the job, and I've supervised people.

17 You have to be standing to be able to stretch, scan the items,

18 get them through, scan 'em, bag 'em, be able to move those bags

19 to the bagging table for more products to be able to be -- be

20 able to look in the shopping cart, put the bags in the shopping

21 cart, be able to assist customers with price checks, supplies,

22 be able to price the discrepancies.

23     There's a lot of movement through a cashier.  There's

24 no -- there's no way that I could effectively sit down in a

25 chair and do all those functions today and provide good

1  service.

2  **Q.**    You mentioned "good service."  Does customer service play

3  any role in your answer?

4  **A.**    Absolutely.  It's very important.  It's a last impression.

5  I know I've said it a couple of times.  It's what we tell our

6  cashiers, it's what our executives tell our stores -- tell our

7  management teams when they're in the stores, is that

8  checkout -- checkout transaction is the most important

9  transaction in a store.

10 **Q.**    Can you describe, briefly, Kmart's competitors who are

11 your chief competitors.

12 **A.**    Wal-Mart, Target.

13 **Q.**    Wal-Mart and Target -- let me back up.

14     As part of your responsibilities, do you visit Wal-Mart

15 and Target frequently?

16 **A.**    Yes.  We are required to see what's happening in those

17 stores from a pricing standpoint, a marketing standpoint, and

18 what types of products they're bringing in.

19 **Q.**    You mentioned marketing standpoint.  Do you also look to

20 see what your competition is doing in terms of customer

21 service?

22 **A.**    Absolutely.

23 **Q.**    Do any of the front end cashiers at Wal-Mart or Target

24 perform their job sitting down?

25 **A.**    No.

1          MR. ADKINS:  Your Honor, I have no further questions.

2          THE COURT:  I have a question, just on this last

3    series of questions.

4        Assume for the -- for a moment that there was enough space

5    in the checkout stand for there to be a stool of some type, and

6    that the cashier was sitting there, and there were some

7    configuration changes so that more things would be within

8    reach.  I just want to focus on the -- the customer service

9    part.

10       What is the problem, from a customer service point of

11   view, of having the cashier sit down?  Explain that.

12         THE WITNESS:  Well, one thing is, as a store manager

13   or a cashier, I would want to be able to greet the customer,

14   make eye contact standing up versus sitting down.

15       The perception of my sitting down on the job versus

16   standing, scanning and quickly helping that customer, you know,

17   would be a bad perception.

18         THE COURT:  Well, let's say that the person sitting

19   down was just as fast as someone standing up.  Now, maybe you

20   don't agree with that, but let's assume that.

21       What is the problem with somebody sitting down?  Why is

22   that a negative impression?  Seems like you're saying it is.

23   But I -- I want to understand your reasons for that.

24         THE WITNESS:  Well, I mean, in my mind, if I'm a

25   customer and there's two checkout operators, one standing and

1   one sitting, and they both don't have any customers, I'd go to

2   the cashier that's standing because I would think that the

3   person sitting down is on break.

4        I'd want to go to the person standing because I know that

5   person is ready to take my order and is ready to -- or ready to

6   take my order, and probably in a fast and friendly way.

7        **THE COURT:**  Now, is there something documenting that,

8   anywhere in your training, that says the reason we have people

9   stand and, at least in part, is so that it gives that positive

10  impression?  Is that documented somewhere?

11       **THE WITNESS:**  Not that I've seen.  I mean, that's been

12  the standard.  And it's documented in a -- in a job

13  description.  But that's it.  I mean, it's documented.

14  There's -- if you look at the -- the last job description, it's

15  part of the requirement.

16       **THE COURT:**  Well, I have no doubt that you require

17  people to stand, but I'm -- I'm wondering if the rationale for

18  it, the part of the rationale that deals with customer service

19  and a positive impression is something that was documented.

20       Sounds like you're saying, no, that's not documented.  Is

21  that correct?

22       **THE WITNESS:**  Correct.

23       **THE COURT:**  All right.  So now we go to

24  cross-examination.

25       **THE WITNESS:**  Is there a way I can get some more

```
 1  water?  I got it.  Thank you.
 2              THE COURT:  Is there some in there?
 3              THE WITNESS:  Yeah.  Thank you.
 4              MR. ADKINS:  And, Your Honor, in case I neglected to
 5  move them into evidence, I would move in 171, 172, and 174,
 6  which were the last three documents the witness was discussing.
 7              THE COURT:  171, one-seventy- --
 8              MR. ADKINS:  -- -two, and 174.
 9              THE COURT:  Any objections?
10              MR. MATTHEW RIGHETTI:  No, Your Honor.
11              THE COURT:  All received.
12         (Trial Exhibits 171, 172, 174, received in evidence.)
13              THE COURT:  All right.  Mr. Righetti, the floor is
14  yours.
15                        CROSS EXAMINATION
16  BY MR. MATTHEW RIGHETTI:
17  Q.   So, Mr. Gonzalez, the main reason that cashiers seated
18  would not provide the same level of customer service is because
19  of eye level, their eye level is different?
20  A.   No, I didn't say that.  I said that the -- that's one of
21  the reasons that they would be perceived seated, they wouldn't
22  be able to make eye contact standing with the customer.
23       But the impression that -- if a customer would walk to the
24  front and see or walk in the store and see associates sitting
25  would not be a good impression.
```

1   Q.   Well, how much lower would the eyes be of a seated

2   cashier?

3   A.   What, 24 inches?

4   Q.   That's actually a trick question.  Doesn't it depend on

5   the height of the seat?

6   A.   Yeah.

7   Q.   Okay.  Is it conceivable that a person could be sitting

8   and be the same height as when they are standing?  Could they

9   have their eye level as the same height as when they're

10  standing?

11  A.   If the stool is high enough, yes.

12  Q.   And if that was designed into the workstation, do you

13  believe that that would address the eye contact issue?

14  A.   Yes.

15  Q.   All right.  So tell me who the staff ergonomist is at

16  Kmart, that consults on designing/construction of the

17  workstations such as we've seen in 216-A?

18  A.   The designer of the checkout stand?

19  Q.   The ergonomist, yes.

20  A.   Yeah, I don't have that name.  I don't know.

21  Q.   Well, you've been there 34 years.  You must know that

22  there's an ergonomics department at Kmart?

23  A.   There's industrial engineers.  But we haven't designed any

24  checkout stands in a while.

25  Q.   Well, in preparation for your testimony today, did you go

```
 1  to that department and ask them whether they've ever considered

 2  putting in a seated checkout counter in California?

 3  A.   No.

 4  Q.   Now, Kmart keeps track on the point of sale system of the

 5  items that are sold at the Kmart stores, correct?

 6  A.   Yes.

 7  Q.   And that information is kept in data that's called the

 8  TLOG?

 9  A.   It's called "Operation Workbench."

10  Q.   What is Operation Workbench?

11  A.   It's reporting that you run.  And you tell the system,

12  give me the top 50 best sellers year-to-date, month-to-date in

13  sales or units.  And it produces reporting.

14  Q.   And it will also tell you the weight of the items that are

15  at the top 50 good sellers in -- per day, per week, per month,

16  annually, et cetera?

17  A.   I'm not sure if it produces -- if you could ask for the --

18  that particular system.  I am sure there's a system in Kmart

19  where you could get it, but not the virtual workbench.  The

20  virtual workbench is based around inventory and products and

21  the velocity of the items.

22  Q.   So there's a separate system.  I think Mr. Ebert testified

23  to a system where you can figure out the weight of all the

24  items that are sold at the Kmart?

25  A.   Yes.
```

1  Q.   And you can compare those two, right?  You can compare the

2  top 50 list with the weight of those items, right?

3  A.   Yes.

4  Q.   So tell me, what are the top -- the weights of the top ten

5  items sold at Kmart?

6  A.   I don't have that information.  I can tell you what those

7  items are -- or some of those items are, but I don't have the

8  weight.

9  Q.   Okay.  So tell me what those -- you said the top one is

10  the --

11  A.   Yeah, the --

12  Q.   -- the case of water, I think, right?

13  A.   Yes, correct.  It's a 35-pack Smart Sense drinking water.

14  That's the number one item.

15  Q.   Day in and day out?

16  A.   Day in and day out.  Year to date, almost 5 million items.

17  I wouldn't say every day.  Year to date is 5 million items.

18  Q.   All right.  Keep going.  Do you know any other items in

19  the top ten?

20  A.   Absolutely.  I'll give you not so much the top ten.  I'll

21  give you the top sellers, say, top 10, 15 items?

22      Pizza.

23  Q.   Pizza?

24  A.   Yes, pizza.  Little Caesar's $5 pizzas.  That's in the top

25  15, 20.  Those aren't rung up at the checkouts, but they're

 1   rung up at the Little Caesar's.

 2   Q.    They're not rung up at the checkout counter?

 3   A.    No, but they are a top seller.

 4   Q.    Can they be rung up at the checkout counter?

 5   A.    Yes.

 6   Q.    What size pizza are we talking about?

 7   A.    It's 16 inches.  But you're never going to see -- it could

 8   be rung up, but you'll never see them rung up from the front

 9   checkouts.

10   Q.    Could you pick it up from where you're sitting right now?

11   A.    Yes.  They're not rung up at the checkouts.  They are our

12   top seller, though.

13   Q.    Okay.  Keep going.

14   A.    Okay.  20 -- 12-pack Pepsi, 12-pack Coke, 12-pack Mountain

15   Dew.  Jelly Bird eggs.  Candy corn.

16   Q.    Jelly what?

17   A.    Jelly Bird Eggs.  It's a candy.

18   Q.    And so then you start going to some candy items?

19   A.    Yes.

20   Q.    All right.

21   A.    There's also two pillows.

22   Q.    I missed that.  I'm sorry?

23   A.    Pillows, large pillows.  There's two.

24   Q.    Of that list, how many of those weigh more than ten

25   pounds?

GONZALEZ - CROSS / RIGHETTI

1  A.    Uhm, probably about half of them, if not more.  But,

2  again, even the pillows are very large in size, and require a

3  very large bag.

4  Q.    How frequently -- well, strike that.

5        When you were a cashier -- strike that.

6        There's also a way to ring up items based upon typing in

7  the UPC code, right?

8  A.    Yes.  That's not what we want our cashiers to do.

9  Q.    Cashiers are authorized to do that.  I think you heard

10 testimony, that's one of the ways cashiers do it?

11 A.    They are authorized to type in the numbers if the UPC is

12 missing or can't be scanned.  But from a time efficiency, we

13 want them to scan the product versus typing in, you know, 16

14 different numbers.

15 Q.    Is it a 16-number item for a 35-pack of water?

16 A.    I would estimate 16.  Might be 14 or 15.  I think it's 16,

17 though.

18 Q.    Did you -- you've consulted with the experts in this case,

19 right?

20 A.    No.

21 Q.    You never spoke to Dr. Zeithaml?

22 A.    No.  Oh, yes, I have.

23 Q.    She says you did.

24 A.    Yes.

25 Q.    Okay.

 1  **A.**    I did.

 2  **Q.**    So did you provide Dr. Zeithaml with any of the data on

 3  the types of merchandise that are sold at the Kmarts?

 4  **A.**    I don't think so.

 5  **Q.**    Have you conducted any customer surveys of the Tulare

 6  store, to determine how customers would react to cashiers who

 7  had a sit/stand option?

 8  **A.**    No.

 9  **Q.**    Have you had the ability to do that?

10  **A.**    Yes.

11  **Q.**    Okay.  Why didn't you do it?

12  **A.**    Uhm, to be honest with you, I just recently, within the

13  last two weeks, have been informed of this particular case, and

14  for me coming out here.

15       It wasn't -- my focus has been the Kmart stores in the

16  holidays that we're headed into.  We have Thanksgiving next

17  week.  It's the busiest season for Kmart.  And my focus has

18  been around that.

19  **Q.**    Somebody else at Kmart must have done a customer service

20  survey to determine the effect that seated cashiers would have

21  on customer perception, right?

22  **A.**    I don't know of any survey being done.  I'm not aware.

23  **Q.**    Well, has somebody done a survey of the cashiers at the

24  Tulare store, to determine how they would react to the

25  possibility of being able to do their work while seated?

GONZALEZ - CROSS / RIGHETTI

 1  **A.**   I'm not aware of any survey that's been -- that's been

 2  conducted with the Tulare cashiers.

 3  **Q.**   Would you agree that the nature of the work of the cashier

 4  work at the register stations in Tulare is the same for all the

 5  cashiers?

 6  **A.**   Yes.

 7  **Q.**   Now --

 8         **THE COURT:**  You mean all the cashiers in Tulare, or

 9  nationwide, or what?

10         **MR. MATTHEW RIGHETTI:**  Well, this case was about

11  Tulare, but I'm sure it's statewide.

12         **THE WITNESS:**  Yes.

13         **THE COURT:**  Let's find out what you meant.

14         **THE WITNESS:**  What I took from the question is, do we

15  have consistent processes that we want all our associates to be

16  able to follow and execute.

17      Yes, we want the items and the processes like our

18  bulletins to be followed in all stores.

19  **BY MR. MATTHEW RIGHETTI:**

20  **Q.**   So from this data that you spoke about, that's kept in the

21  point of sale system, what did you call it, again, the report

22  that's ran?

23  **A.**   The top seller list?

24  **Q.**   No, you said that there's a -- yeah, that's a report, I

25  think, the top selling list.

718
GONZALEZ - CROSS / RIGHETTI

1   **A.**   Are you speaking of the top items, as far as velocity and

2   units sold?

3   **Q.**   Right.   What was that report?

4   **A.**   We have -- it's called the top seller list.   And it's

5   available through Operation Workbench.

6   **Q.**   So you can determine how frequently certain items are sold

7   at the -- that go through the cash registers, right?

8   **A.**   Yes.   It gives us a report of what's sold every day, week,

9   month, and year.

10  **Q.**   And you can determine the frequency with which items

11  weighing more than ten pounds come through the checkout

12  station, correct?

13  **A.**   Not with that report.   Maybe some other reports.

14  **Q.**   You have data that you can put that together if you wanted

15  to?

16  **A.**   I think Greg Ebert could.   I'm familiar with Operation

17  Workbench because part of my job is keeping the best items in

18  stock and sells.

19  **Q.**   Through your entire direct examination would you agree

20  that you were seated?

21  **A.**   Yes.

22  **Q.**   And you -- did you think that you did a -- an adequate job

23  demonstrating for us and the Court, through Mr. Adkins'

24  questions, the steps of a typical customer transaction from a

25  cashier standpoint?

 1  **A.**    I hope so.  I think it would have been more effective

 2  standing up.

 3  **Q.**    But you did them all sitting down, didn't you?

 4  **A.**    Yeah.  But it would have been more effective actually

 5  standing and, you know, going through the actual process.

 6  **Q.**    I thought they were very effective.

 7        Strike that.

 8        Do you do training on proper work techniques for cashiers

 9  at Kmart?

10  **A.**    Don't understand your question.

11  **Q.**    I'm sorry, I'll rephrase it.

12        One of the things that Kmart is very interested in, I

13  would expect, like most employers, is to reduce the amount of

14  workers' compensation claims?

15  **A.**    Correct.

16  **Q.**    And one of the ways you do that is giving training to

17  cashiers on things such as proper lifting techniques?

18  **A.**    Correct.

19  **Q.**    And if -- if you gave seats to cashiers at the registers,

20  could you develop a training program to instruct cashiers on

21  how to properly handle merchandise from a sit/stand position?

22        **MR. ADKINS:**  Objection.  No foundation.  Calls for

23  speculation.

24        **THE COURT:**  Overruled.  Please answer.

25        **THE WITNESS:**  It's not my job responsibility, so I

```
 1  wouldn't say that I could do it.  But the safety team for Kmart
 2  would be able to provide an answer.
 3  BY MR. MATTHEW RIGHETTI:
 4  Q.   All right.
 5          THE COURT:  Have we reached a resting point yet?
 6          MR. MATTHEW RIGHETTI:  A resting point is fine.  We
 7  can finish this tomorrow.
 8          THE COURT:  We are going to break for today, right
 9  now.
10      And, Mr. Gonzalez, you can go have a seat.  You're on
11  cross-examination, so no talking with the lawyers about your
12  testimony.
13          THE WITNESS:  Yes, sir.
14          THE COURT:  All right.  And would you please come get
15  the exhibits so we'll take good care of those.
16      (Witness steps down.)
17          THE COURT:  Have a seat.  Let's go over a couple of
18  things.
19      Defendants have used -- do some math here -- 382 minutes
20  out of 720.  So you're roughly halfway through your time.  And
21  the plaintiffs have used 324 minutes.
22      All right.  Anything I can help you with before we break
23  today?
24          MR. MATTHEW RIGHETTI:  Not from the plaintiff's
25  standpoint.
```

 1          **THE COURT:**  Remember, 5 o'clock today, please submit

 2    your critique of the amicus brief item.

 3          Also, I would like for you to help Dawn figure out who

 4    this would be served on and faxed on so that they would get it

 5    right away.

 6          I don't want it to just fall behind the radiator when it

 7    arrives at the wrong person at the labor commissioner.  So you

 8    all need to help us figure out who to send it to so it will get

 9    prompt attention.

10          **MR. MATTHEW RIGHETTI:**  All right.

11          **THE COURT:**  All right?  Anything else?

12          **MR. MATTHEW RIGHETTI:**  No.

13          **MR. ADKINS:**  No, Your Honor.

14          **THE COURT:**  I have a criminal case in 30 minutes, so

15    I'll need to have the tables cleared away.  But you can leave

16    your boxes here.  That's okay.  Thank you.

17          **MR. WOHL:**  Thank you, Your Honor.

18          **MR. ADKINS:**  Thank you, Your Honor.

19          **MR. MATTHEW RIGHETTI:**  Thank you.

20          **MS. SOMMERFELD:**  Thank you, Your Honor.

21          (At 1:02 p.m. the proceedings were adjourned until Friday,

22    November 16, 2012, at 7:30 a.m.)

23                              -   -   -   -

24

25

1                              **I N D E X**

2    **PLAINTIFF'S WITNESSES**                        **PAGE**    **VOL.**

3    **HYATT, EVELYN**
     (PREVIOUSLY SWORN)                               483       3
4    Cross Examination Resumed by Mr. Adkins          483       3
     Redirect Examination by Mr. Dostart             495       3
5

6    **MENDIOLA, MADISON**
     (SWORN)                                          497       3
7    Direct Examination by Mr. Dostart                497       3
     Cross Examination by Ms. Fife                    509       3
8    Redirect Examination by Mr. Dostart             542       3

9

10   **GARVEY, LISA**
     (SWORN)                                          547       3
11   Direct Examination by Mr. Michael Righetti       547       3
     Cross Examination by Mr. Adkins                  560       3
12

13   **HAMILTON, AMBER**
     (SWORN)                                          572       3
14   Direct Examination by Mr. Dostart                573       3
     Cross Examination by Ms. Sommerfeld              578       3
15   Redirect Examination by Mr. Dostart             604       3
     Recross Examination by Ms. Sommerfeld           606       3
16

17   **GRABAU, AIMEE L.**
     Deposition Testimony Read                        611       3
18

19   **DEFENDANT'S WITNESSES**

20   **GONZALEZ, JESSE**
     (SWORN)                                          650       3
21   Direct Examination by Mr. Adkins                 650       3
     Cross Examination by Mr. Matthew Righetti        710       3
22

23                          - - - - -

24

25

723

# E X H I B I T S

| TRIAL EXHIBITS | IDEN | VOL. | EVID | VOL. |
|---|---|---|---|---|
| 160 | | | 700 | 3 |
| 171, 172, 174 | | | 710 | 3 |
| 373-A | | | 539 | 3 |

- - - - -

1

2

3                    **CERTIFICATE OF REPORTERS**

4          We, KATHERINE POWELL SULLIVAN and DEBRA L. PAS,

5   Official Reporters for the United States District Court,

6   Northern District of California, hereby certify that the

7   foregoing proceedings in C 11-2575 WHA, **Lisa Garvey vs. Kmart**

8   **Corporation,** were reported by us, certified shorthand

9   reporters, and were thereafter transcribed under our direction

10  into typewriting; that the foregoing is a full, complete and

11  true record of said proceedings at the time of filing.

12

13  DATE:   Thursday, November 15, 2012

14

15

16  _____
    Katherine Powell Sullivan, CSR #5812, RPR, CRR

17            U.S. Court Reporter

18

19  _____
            Debra L. Pas, CSR #11916, RMR CRR

20

21

22

23

24

25

*Katherine Powell Sullivan, CRR, and Debra L. Pas, CRR*
*Official Reporters - U.S. District Court*
*(415) 794-6659*