Volume 4

Pages 724 - 847

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ALSUP

LISA GARVEY, individually and on      )
behalf of all others similarly       )
situated,                            )
                                     )
            Plaintiff,               )
                                     )
  VS.                                )  No. C 11-2575 WHA
                                     )
KMART CORPORATION, and DOES 1        )
through 50 inclusive,                )
                                     )  San Francisco, California
            Defendants.              )  Friday
_____)  November 16, 2012

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

**For Plaintiff:**          Righetti Glugoski, P.C.
                         456 Montgomery Street, Suite 1400
                         San Francisco, California 94101
                    By:  **Matthew Righetti, Esquire**
                         **Michael Righetti, Esquire**

                         McInerney & Jones
                         18124 Wedge Parkway, #503
                         Reno, Nevada 89511
                    By:  **Kevin J. McInerney, Esquire**

**Reported By:  Katherine Powell Sullivan, RPR, CRR, CSR #5812
              Debra L. Pas, RMR, CRR, CSR #11916
              Official Reporters - U.S. District Court**

**APPEARANCES (CONTINUED)**:

**For Plaintiff:**          Dostart Clapp & Coveney LLP
                           4370 La Jolla Village Drive, Suite 970
                           San Diego, California 92122
                      By:  **Zachariah Paul Dostart, Esquire**

**For Defendants:**         Paul Hastings LLP
                           55 Second Street, 24th Floor
                           San Francisco, California  94105
                      By:  **Jeffrey D. Wohl, Esquire**

                           Winston & Strawn
                           333 South Grand Ave, 38th Floor
                           Los Angeles, California  90071
                      By:  **Amanda C. Sommerfeld, Esquire**
                           **Emily C. Schuman, Esquire**

                           Winston and Strawn LLP
                           101 California Street, Suite 3900
                           San Francisco, California 94111
                      By:  **Robb Christopher Adkins, Esquire**
                           **Joan B. Tucker Fife, Esquire**

1              **P R O C E E D I N G S**

2    NOVEMBER 16, 2012                              7:36 a.m.

3         THE COURT:  All right.  We started with the witness.

4    Thank you for your comments on the order asking for an

5    amicus brief.  I am going to send it to both of the people that

6    you've indicated.  I'm going to stick with my original language

7    on the questions, however.  I think I like my wording better

8    than your wording.  So there we are.

9         Time permitting today, at some point we'll deal with the

10   privilege log and the deposition that you have coming up, but I

11   don't have time to do that right now.

12        Anything else I can help you with before we resume with

13   the witness?

14        MR. ADKINS:  Just to make your Honor aware, after

15   court yesterday defense was able go back.  We have been able to

16   streamline our case.  Nothing has changed.  Dr. Fernandez will

17   be our last witness on Monday, but we have been able to

18   eliminate some witnesses and it's my expectation that we will

19   be finishing up sooner than expected today.

20        THE COURT:  What does that mean?  How many more

21   witnesses do you have?

22        MR. ADKINS:  After Mr. Gonzalez, there will be two

23   more witnesses, your Honor.

24        THE COURT:  Are you going to present any cashiers?

25        MR. ADKINS:  No, your Honor.

PROCEEDINGS

1          **THE COURT:**  All right.  Thank you.  Let's continue on

2   with the testimony.

3                          **JESSE GONZALEZ**,

4   called as a witness for the Defendant herein, having been

5   previously sworn, resumed the stand and testified further as

6   follows:

7                    **CROSS-EXAMINATION RESUMED**

8   **BY MR. MATTHEW RIGHETTI:**

9   **Q.**   All right.  Good morning.  How are you doing today?

10  **A.**   Good morning.  Doing great.

11  **Q.**   So how many -- I can't recall whether we covered this.

12  I'm just going to take a minute.

13       How many cashiers at Tulare have you spoken with about the

14  seated versus standing possibilities at the checkout station?

15  **A.**   None.

16  **Q.**   How many customers have you spoken with who shopped at

17  Tulare about the seated versus standing -- strike that.

18       How many customers have you spoken with that have shopped

19  at the Tulare store about what their perceptions would be about

20  seated versus standing cashiers?

21  **A.**   None.

22  **Q.**   Can you tell me what the revenue is of the Tulare store

23  presently?

24  **A.**   I didn't look at it this week, so I really don't know what

25  the revenue is or the volume of the store.

1  Q.   Do you have any basis to say what the effect would be --

2  neutral, positive or negative -- on revenue if cashiers were

3  allowed to sit?

4  A.   My point of view would be it would have a negative impact.

5  Q.   How much?

6  A.   You know, I'd have to calculate the checkout hours, what

7  we spend on that.  I'm not a finance expert, but it would -- I

8  do know that cashiering is a good portion of the total payroll

9  that's allocated to the stores.

10     So, you know, the risk is that it would be an increase in

11  labor and, obviously, also on sales.

12  Q.   Do you know?

13  A.   No.

14  Q.   Same with profit, you don't know?

15  A.   No.

16  Q.   Is that -- I go into this situation again.

17     It's true that you don't know what effect putting seats in

18  for cashiers would impact revenue, is that correct?

19  A.   I don't know.  My point of view is it would have an impact

20  in labor and, also, sales.

21  Q.   And you don't know how much, correct?

22  A.   No, I don't.  I know that cashiering is 20-plus percent of

23  the total labor allocated to a Kmart.  So there's risk that

24  if -- if there is an increase or efficiencies are lost, that

25  there be additional payroll used in the store.  And if -- if

1   the checkouts or modified in a way where we would have to

2   replace or eliminate some checkouts, then, obviously, there

3   would be sales lost from merchandise placement, et cetera.

4   Q.   You can't quantify the revenue or profit impact, correct?

5   A.   I can't.

6   Q.   Okay.  How many registers are there in Tulare?

7   A.   I have not been in the store, but I have been told there

8   are seven or eight.

9   Q.   And how many of those are in operation typically?

10  A.   They should all be in operation.  You mean, available to

11  use?

12  Q.   No, no, no.  Actually in use.

13  A.   It varies.  There's times during Easter, Back to School,

14  July 4th, Christmas, that they would be at full capacity.  And

15  there's times on a Wednesday morning at 8:00 o'clock there

16  would be one.

17      It just depends on the time of the month.  First of the

18  month and 15th, when people get paid.  You know, it's not any

19  different than a grocery store, we're a lot busier.

20  Q.   Are you familiar with the Point of Sale system abilities

21  at the Tulare store?

22  A.   Yes.

23  Q.   And you understand that information from every sale is

24  registered on the Point of Sale system?

25  A.   Yes.

1  Q.   And it's captured by a computer data base, correct?

2  A.   Yes.

3  Q.   And the information that is captured includes all aspects

4  of the transaction:  What cashier handled it, how long the

5  transaction took, what register it occurred at, what material

6  was sold?

7  A.   Yes, and all that information could be available.  I have

8  not seen everything you're talking about.  I know that there is

9  a report that the -- that's produced at store that tells you

10 how that cashier performed from a warranty, from a credit card

11 perspective, et cetera.  There is metrics that are important to

12 the company that cashiers report in.

13 Q.   And that information is maintained in what Kmart refers to

14 as a T-Log, correct?

15 A.   I'm not familiar with a T-Log.

16 Q.   Are you familiar with T-Log extract data?

17 A.   No.

18 Q.   Are you familiar with market batch data?

19 A.   No.

20       THE COURT:  While you're pausing.  Is there a way for

21 the company to track the efficiency of individual cashiers in

22 terms of how many items they ring up per minute or per hour or

23 whatever?

24       THE WITNESS:  There is a metrics.  It's not very

25 accurate.  It's called rings per minute and it measures how

1   many items are rung up per minute.

2        Some of the items, it's hard to measure one cashier versus

3   another cashier because the report doesn't know what items have

4   sensor tags, what items don't; what items have to be folded,

5   what items don't; what items are -- there's a price discrepancy

6   or missing UPC.

7        So if you had Cashier A and they got a bottle of shampoo,

8   toothpaste and a box of cereal, it's a pretty routine

9   transaction.  If Cashier B had a jacket and a power tool and,

10  say, a can of Folger's coffee or paper towels, the transaction

11  would be completely different because the paper towels, for

12  instance, I'd have to scan, move over, put it on bagging table

13  because it's not going to fit on any of the small bags.  The

14  jacket I'd have to take the gator clip off.  I'd have to fold

15  it, put it in a big bag.  And then the Folger's coffee would go

16  in a bag.

17       So it's hard to compare items, you know, cashier's time --

18            THE COURT:  I'm just asking:  Are those reports done,

19  rings per minute?

20            THE WITNESS:  Yes, there is reporting.

21            THE COURT:  All right.

22            THE WITNESS:  It's not considered a key metrics for

23  the company.

24            THE COURT:  All right.  Thank you.

25       Go ahead, counsel.

1   BY MR. MATTHEW RIGHETTI:

2   **Q.**   Showing you 28-D.

3        (Photograph displayed.)

4   **Q.**   Do you see that?

5   **A.**   Yes.

6   **Q.**   Okay.  Have you been to England?

7   **A.**   No, sir.

8   **Q.**   I think your testimony was that -- strike that.

9        Was your testimony that seated cashiers couldn't do

10  bagging?

11        **MR. ADKINS:**  Objection.  Misstates the testimony.

12        **THE COURT:**  Why don't you just ask him?  Just say:  Is

13  it possible for seated cashiers to do bagging?

14        **THE WITNESS:**  Yes, for some items.

15  BY MR. MATTHEW RIGHETTI:

16  **Q.**   Okay.  I'm going to direct your attention to BOB, Bottom

17  Of the Basket, okay?

18  **A.**   Okay.

19  **Q.**   Do you ever shop at grocery stores?  I'm sure you do.

20  **A.**   Yes.

21  **Q.**   Do you ever notice mirrors on the back side of the

22  checkout stations?

23  **A.**   No, sir.

24  **Q.**   Never seen that?

25  **A.**   No.

 1  Q.   Ever go to the Safeway down in the Marina here in

 2  San Francisco?

 3  A.   No.   There is no Safeway in Chicago.

 4  Q.   So you mentioned two job descriptions yesterday for the

 5  cashier or checkout service associate, right?

 6  A.   Yes.

 7  Q.   And between the two job descriptions, that covers the

 8  entire time of this case, right?

 9  A.   Yes.

10  Q.   And one of the job descriptions, I think the second one

11  was Exhibit 179.

12       (Document displayed.)

13  Q.   Do you recognize this one?

14  A.   The top portion is a job description.   The bottom portion

15  is not a job description.   That's something that would have

16  never gone out to the stores.

17  Q.   It was never what?

18  A.   That's a form that would have never gone out to the

19  stores.

20  Q.   So part of this went to the stores and part did not?

21  A.   Part is the actual job description, which is what is on

22  top that was covered yesterday.

23       That bottom piece is like -- I'm not sure who did it, but

24  it's more of somebody doing a -- some kind of an estimate of

25  what that cashier does from a physical demand of the job.   A

1  store manager and associate would not need to know or be --

2  or -- they wouldn't know about sitting, walking, standing,

3  crawling, or climbing.  That's not important to a store

4  manager.  What's important is that we describe to a cashier the

5  customer service, the bagging and their job description.

6  **Q.**   So between the two job descriptions, the earlier one and

7  the later one that you were involved in, did the job of the

8  cashier change or is the job essentially been the same?

9  **A.**   There's things that changed.

10 **Q.**   What?

11 **A.**   Shop Your Way loyalty cards.  There's always marketed

12 initiatives.  There's always things that -- not much of the

13 descriptions, but there's some that -- that change.

14 **Q.**   Well, referring to Exhibit 179, can you tell me what

15 portions of the job changed in the job description?

16 **A.**   I'd have to see the updated one to tell you and I'd have

17 to compare both of them and then I could probably tell you

18 really quick.

19 **Q.**   So the first one is 37, I think.  Do you still have that

20 up there?

21 **A.**   No.  If I could get both copies, I can speak to it a

22 little bit better for you.

23         **MR. MATTHEW RIGHETTI:**  Approach the witness, your

24 Honor?

25         **THE COURT:**  Yes.

```
 1          (Document was tendered to the witness.)

 2   BY MR. MATTHEW RIGHETTI:

 3   Q.   Do you now have Exhibits 37 and 179 in front of you?

 4   A.   Yes.  Correct.

 5   Q.   So you can make the comparison?

 6   A.   Yeah.  Number one is the same.

 7   Q.   Under "Essential Functions"?

 8   A.   Yes.

 9        Number two is the same.

10        Number three is the same.

11        Number four is the same.

12   Q.   If you want to reference the things that are different --

13   A.   I just don't want to miss any.

14   Q.   Okay.  That's fine.

15   A.   Number five is the same.

16        Number six is the same.

17        Seven, the same.

18        Eight, the same.

19        Nine -- yeah, that's -- the top piece are the actual same.

20   The updated one, this is not the updated.  You said updated.

21   These are the same job description that was out in the stores.

22   This other one was edited for -- but not a store description.

23        So basically what I have in front of me is one job

24   description that the stores would have and this one was not a

25   job description that the stores would have.
```

1  **Q.**    Hang on.

2        (Brief pause.)

3  **Q.**    Let me show you 157.

4        (Document was tendered to the witness.)

5  **Q.**    Maybe it's 179 that's throwing you off:

6  **A.**    Yeah.   That's the updated one.

7  **Q.**    Okay.   So what you want to do is compare 37 with 157,

8  correct?

9  **A.**    Correct.

10 **Q.**    Okay.   Go ahead.

11 **A.**    So if you look at, for instance -- and I'll give you one.

12 Where it says.

13        "Promote and comply with all register prompts relating

14            to the use of Shop Your Way rewards or credit card,

15            smart plans, gift cards and add-on sales."

16     The term "Shop Your Way" is a new term.   It's a new

17 initiative for the stores.   The rest is pretty much the same.

18 **Q.**    Okay.   But in terms of what the cashiers do typically day

19 in and day out, customer-to-customer at the registers, that

20 hasn't changed?

21 **A.**    Yeah.   Customer service is customer service.   People bring

22 in merchandise to the cashiers.   Cashiers need to handle the

23 merchandise, ring it and take payment.   And it's been that way

24 for a long time.

25 **Q.**    So if you look at 179, 179 does describe -- accurately

1  describe the job of the cashier, correct?

2  **A.**   Yes.  Now, that is not a job description that the stores

3  would have.  So that's a -- a job description with other data

4  included.

5  **Q.**   All right.

6  **A.**   So I wouldn't call that a job description.  A job

7  description, to me, is what we send to our stores that

8  describes what they do, which is the other two.

9  **Q.**   And do any of these job descriptions indicate for you

10 where the cashier performs their works?

11 **A.**   I'm sorry.  I didn't understand it.  Can you repeat it?

12 **Q.**   Do the job descriptions indicate for the cashier where

13 they are expected to perform their work?

14      (Document displayed.)

15 **A.**   Yes.  It says they are expected to -- at the very bottom

16 it says -- no, a little bit more.

17           "This job description describes the general nature of

18            the duties and requirements of this job.  It is not

19            intended to be an exclusive list or limit to

20            supervisors ability to modify the work assignments

21            when appropriate."

22      That tells the cashier when they are hired that they are

23 going to be working at the checkouts, but many times during the

24 day they are going to be asked to perform duties outside that

25 area.

1  Q.   On 157, Exhibit 157 there is a red area on 157, right?

2  A.   Yes.

3  Q.   Can you read that for us?

4  A.   "Scope of Responsibility."

5  Q.   Keep reading.

6  A.   (As read)

7       "The cash register operation area within store unit

8        location."

9  Q.   Okay.  And does that indicate for the cashiers that that

10 is their area of responsibility?

11 A.   There's is an area of responsibility for maintaining, but

12 there is also a portion that tells the store manager that

13 there's -- it's not intended to be the only piece.

14 Q.   That's the primary area of responsibility, correct?

15 A.   Yes.

16 Q.   All right.  And you heard the testimony read about

17 Ms. Grabau -- or from Ms. Grabau yesterday, correct?

18 A.   Yes.

19 Q.   And there was a person named Lynch that was referenced in

20 there.  Do you know who Lynch is?

21 A.   She was an HR -- member of the HR team in corporate.

22 Q.   Corporate back in Chicago?

23 A.   Yes.

24 Q.   Do you know how high up she is?

25 A.   I believe she's the director.  She's not a vice-president

1   or -- as far as I know, she was a director.

2   Q.   Above Ms. Grabau?

3   A.   Yes.

4   Q.   Do you know who she reports to?

5   A.   She would report to the HR corporate chain of command.   I

6   would believe the gentleman's name would be Phil Minsel.

7   Q.   And at the stores, at the Kmart stores there are measures

8   that Kmart takes to monitor customer service, right?

9   A.   Say it again?

10  Q.   Are there methods that Kmart uses to measure customer

11  service?

12  A.   Yes.   There are CSAT, that measures the customer service

13  from store to stores.   There are -- customer complaints are

14  also measured by store.

15  Q.   And you heard the testimony yesterday about Ms. Grabau --

16  strike that.

17       It's your understanding that in California for the last

18  couple of years cashiers, if they requested a seat, had the

19  ability to obtain a seat, right?

20  A.   I'm confused with your question.   Are you asking me if I

21  knew for the last two years it's been a request or are you

22  asking me did I hear that yesterday during the deposition?

23  Q.   Well, you heard it yesterday during the deposition read

24  back.

25  A.   Yeah.   I can't -- I mean, I heard a lot yesterday, but I

1  didn't memorize the whole conversation.  So I don't feel

2  comfortable speaking to that because I just don't know.

3  Q.   Okay.  Well, the CSAT customer service measure, that's an

4  acronym for what?

5  A.   It's a customer service -- customer satisfaction index.

6  The T stands for index.  The C customer.  The S satisfaction.

7  And I think the A is for analytics index or something like

8  that.

9  Q.   And is it measured on a scale one to seven or A to F or

10  something?

11  A.   It scheduled from zero to 100.  So a store could have a

12  CSAT score of 50 or 60.

13  Q.   Zero being good or bad?

14  A.   Bad.

15  Q.   And 100 being great?

16  A.   Yes, that's pretty good.

17  Q.   Do you know where Tulare stands on that measure?

18  A.   No.

19  Q.   Do you know where it has stood on that measure at any time

20  since 2010?

21  A.   No.

22  Q.   Do you know how California measures in general as compared

23  to other states?

24  A.   No.

25  Q.   So have you sought to compare CSAT scores for customers

1  that went through a checkout line with a seated cashier as

2  compared to customer scores that went through a checkout line

3  with a standing cashier?

4          **MR. ADKINS:**  Objection.  Assumes facts not in

5  evidence.

6          **THE COURT:**  He's asking whether or not he sought to

7  make such a comparison.  Either you have or you haven't.

8          **THE WITNESS:**  No I have not.

9  **BY MR. MATTHEW RIGHETTI:**

10 **Q.**  You heard yesterday that there was at least one instance

11 where a cashier was -- Ms. Grabau directed the store to give

12 the cashier a seat, right?

13 **A.**  Yes, but it wasn't conclusive.  I don't know somebody

14 saying that a HR director approved for -- or allowed a store

15 manager to make it an option and it being used is two different

16 things.  I don't know who used it, if it was used.

17         Because I will tell you that if I was a store manager, I'd

18 have to -- I mean, we sell step stools.  They are unfinished.

19 They are unpadded.  They are not safe.  I would be concerned

20 from a safety piece that we would -- that an associate would be

21 able to use it.

22         So, you know, without seeing and working with it and -- I

23 don't -- I can't tell you it was used or not, so I can't speak

24 to it.

25 **Q.**  So the stools that Ms. Grabau was referencing as the

```
 1  stools that would be used as a suitable seat in compliance with

 2  your policy are stools that you think would be unsafe, not

 3  padded, et cetera?

 4          MR. ADKINS:  Objection.  No foundation.

 5          THE COURT:  He didn't say that they would be unsafe.

 6  He said he has a -- he hadn't seen any of it.  And he just

 7  thinking about it, it might be unsafe.  I don't know.  He

 8  didn't go so far to say it would be unsafe.

 9  BY MR. MATTHEW RIGHETTI:

10  Q.   Have you evaluated that?

11          THE COURT:  He said he did not.

12      Tell us again:  Did you ever evaluate that situation, I

13  believe it was Santa Rosa?

14          THE WITNESS:  No.  I wasn't aware of it til yesterday.

15          THE COURT:  So, Mr. Righetti, how could you possibly

16  expect him to have done an evaluation overnight on that chair?

17          MR. MATTHEW RIGHETTI:  I didn't know he was not aware

18  of this until yesterday until just five seconds ago.

19          THE COURT:  All right.

20          MR. MATTHEW RIGHETTI:  We didn't have an

21  opportunity -- we may have had an opportunity, but he wasn't

22  deposed because of our deposition limit, your Honor.  So...

23          THE COURT:  Did you use up all your 10 depositions or

24  what?

25          MR. MATTHEW RIGHETTI:  Yes, we did.
```

 1          THE COURT:  Okay.  You picked the 10 that you wanted.
 2  Did you ask me for more than 10 depositions?
 3          MR. MATTHEW RIGHETTI:  I'm not complaining.
 4          THE COURT:  Well, okay.
 5          MR. MATTHEW RIGHETTI:  I'm just saying that --
 6          THE COURT:  So you ran out of -- you used up the
 7  number you were given under the rule.  It's the big rule.  It's
 8  a national rule.  So here we are.
 9      So you asked him the question.  He says he did not
10  investigate that situation because he only learned about it
11  yesterday.
12  BY MR. MATTHEW RIGHETTI:
13  Q.   So I take it that you have not attempted to determine the
14  extent to which cashiers in California used seats, so you could
15  determine the customer perceptions for customers who went
16  through those cashiers as compared to customer perceptions of
17  the -- that went through standing cashiers?
18          MR. ADKINS:  Objection, vague.
19          THE COURT:  Overruled.  I think it's clear enough.
20      Go ahead.  Answer the question.
21  A.   No.  Again, I found out about this case just a short while
22  ago and I -- most of my time was spent flying here and being
23  here.
24  BY MR. MATTHEW RIGHETTI:
25  Q.   Operation Invitation, that's to direct customers into the

 1  lanes?

 2  **A.**    It's a customer service initiative.

 3  **Q.**    Right.  To help get customers into the open lanes?

 4  **A.**    It's two things.  It's to step out of your checkout lane

 5  and invite customers that are in line into your checkout lane,

 6  or to stand in front of the checkouts and as customers walk by,

 7  you greet them.

 8      It's a 10-foot rule.  So if a customer comes within

 9  10 feet, you say, "Welcome to Kmart."  And, of course, there's

10  many times there's questions from customers when they see

11  associates on the floor.

12  **Q.**    Another aid to alert customers that a cash register is

13  open is the light, correct?

14  **A.**    Yes.

15  **Q.**    And cashiers are supposed to do what with the light when

16  they come to a cash register?

17  **A.**    They turn it on.  The only disadvantage of the cashier

18  behind the check stand with the light is that it's -- they are

19  not accessible to customers that need help.  They are

20  accessible to customers that want to be checked out.  So being

21  in front of the checkout line helps -- they become more visible

22  to the customer.

23      If you go into Walmart, they will have greeters at the

24  front of the stores, so they will direct customers.  It's the

25  same thing.  You have customers that are visible -- employees

1  that are visible to the customers that can answer questions

2  about the products and services in the stores, which cashiers

3  are trained in part of the job description.

4  **Q.**   So on Exhibit 179, I just want to ask you a couple of

5  questions about that.

6        The physical demands of the job at the bottom, although

7  not given to the stores is accurate, correct?

8  **A.**   Not sure.  I just seen it the last couple of days and I

9  really haven't even looked at it.

10 **Q.**   Well, take a look at it for me here.  On the right-hand

11 side you'll see it says:  "Activity."  ""Activity"  "Stand,"

12 where I put the little mark.

13 **A.**   I can't see.  The "Activity" is cut off on my end.

14          **MR. ADKINS:**  Objection --

15          **MR. MATTHEW RIGHETTI:**  You have the document right in

16 front of you.  Why don't you reference the original?

17          **MR. ADKINS:**  I'm sorry to interrupt.  Your Honor, if I

18 could ask that he lays an appropriate foundation with this

19 document before asking the witness of it.

20          **THE COURT:**  What's the exhibit number?

21          **MR. MATTHEW RIGHETTI:**  179.

22          **THE COURT:**  Is it in evidence already?

23          **MR. MATTHEW RIGHETTI:**  Yes, your Honor.

24          **THE COURT:**  Well, the foundation has been laid to get

25 it into evidence.  So it's in evidence.

```
 1        So do you know anything about this document?
 2             THE WITNESS:  No.
 3             THE COURT:  Why are you asking -- well, maybe there's
 4   a phrase on there that you know something about.  So direct his
 5   attention to whatever it is that you think he can answer, but
 6   he doesn't know the document itself.
 7   BY MR. MATTHEW RIGHETTI:
 8   Q.   Do you know the physical demands of the cashier job?
 9   A.   The demands of scanning, lifting, ringing?  Yes.  That
10   piece of it.
11   Q.   Well, on 179, 179 relates to the checkout service
12   associate, right?  The cashier?
13   A.   Say it again?
14   Q.   Exhibit 179 has to do with the cashier checkout service
15   associate, correct?
16   A.   Yes.  The top part is the -- identical to what a job
17   description was in the other exhibit.
18   Q.   And at the bottom it has physical demands of the job, and
19   you understand that job being referenced is the cashier?
20   A.   Yeah.  It looks like something that a -- some kind of a
21   medical expert or doctor or some kind of a physical demand
22   expert would put together.
23   Q.   Are you telling me you've never seen this document before?
24   A.   Seen it yesterday and today.
25   Q.   Okay.  So under "Stand" under the "Activity" "Stand" it
```

```
 1  has a -- the box "C" is checked, correct?

 2  A.   I'm sorry.  I've seen this document the first day of the

 3  trial, when I think --

 4  Q.   I'm just asking whether "C" is checked --

 5  A.   Okay.  I think --

 6       (Counsel and the witness speaking simultaneously.)

 7  A.   Say it again, sir?

 8  Q.   I'm just asking whether "C" is checked under the

 9  "Activity" "Stand"?

10  A.   Yep.  I see a "C" and it says "10 pounds or less" checked.

11  Is that what you -- are you referring to the "N" "O" "F" "C"?

12  Q.   No, no, no.

13  A.   Did you say you had the letter "C"?

14  Q.   I just underlined it on your screen.

15  A.   Oh, okay.  "Stand" under "Activity."  Okay.

16  Q.   Got it?  Are we on the same page here now?

17  A.   Yep.

18  Q.   All right.  Right-hand column it says "Stand" and then it

19  says "Frequency" and then "C" is checked.

20       And if you look down at the code at the bottom, "C" is

21  "Constant, 67 to 100 percent of the time," right?

22  A.   Yes.

23  Q.   Then it also has "Walking" on here, right?

24  A.   Yes.  Right below the "Stand," yes.

25  Q.   And what does it show for the frequency of "Walking"?
```

GONZALEZ - CROSS EXAMINATION / RIGHETTI

```
 1  A.   It has an "O," which below says "Occasional."

 2  Q.   Okay.

 3            THE COURT:  What document number is this again?

 4            MR. MATTHEW RIGHETTI:  179.

 5  BY MR. MATTHEW RIGHETTI:

 6  Q.   Then under "Walk" what is the word that it has for

 7  "Activity"?

 8  A.   "Sit."

 9  Q.   And what frequency is that?

10  A.   "Zero percent of the time."  Never.

11       (Document displayed.)

12  Q.   So you do -- you frequent the competitors as part of your

13  job?

14  A.   Yes.

15  Q.   Walmart?

16  A.   Walmart, Target.

17  Q.   Costco, no?  Walmart and Target basically?

18  A.   Yeah.  Our competition is Walmart and Target.  I will go

19  into a Lowe's during garden season.

20  Q.   And when you see things that they are doing, changes that

21  they are rolling out in their operations, do you take a hard

22  look at whether those are things that Kmart would like to do?

23  A.   If I notice something that I think is going to improve our

24  customer service, yes.  If I see something that is not going

25  to -- in my perception does not improve customer service or
```

1 drive additional sales, then I wouldn't go back and spend a lot

2 of time on it.

3     So if I see that they are building displays or bringing in

4 products that are not relevant to Kmart, I really wouldn't do

5 anything with that information.

6 **Q.**   Where does Kmart rank on the customer service scale as

7 compared to Target and Walmart?

8 **A.**   I would say that we're probably real close to Walmart,

9 maybe a little bit below.  And we would be below Target.

10 **Q.**   How much below Target?

11       THE COURT:  What do you mean on a customer service

12 scale?

13       THE WITNESS:  From a customer service CSAT number.

14 **BY MR. MATTHEW RIGHETTI:**

15 **Q.**   Ultimately retailers, there's a ranking of retailers by

16 CSAT stores, right?

17 **A.**   Yes didn't.

18       THE COURT:  What is that?  I never heard of CSAT.

19       THE WITNESS:  It's an index.  It's a customer index.

20       MR. MATTHEW RIGHETTI:  Customer satisfaction.

21       THE COURT:  Who puts that together?

22       THE WITNESS:  I'm not sure who puts it together.  I

23 believe it's a retail industry standard.

24       THE COURT:  All right.  So somebody scores you against

25 Walmart and Target?

 1            THE WITNESS:  Yes.  Based on -- I think it's either

 2    customers.  I'm sure it has to do with customers.

 3            THE COURT:  All right.  Okay.

 4            THE WITNESS:  It's a measurement of -- a lot of

 5    factors go into it; like new buildings, landscaping, clean

 6    buildings, new buildings.

 7            THE COURT:  So you're saying Home Depot is ahead of

 8    you, but you are ahead of Target?

 9            THE WITNESS:  Yeah.  No, not Home Depot.  I said

10    Target is ahead of us.

11            THE COURT:  Target is ahead of you?

12            THE WITNESS:  Yeah.  They have a lot of new stores.

13    And then Walmart, I haven't seen it lately, so Walmart

14    traditionally is pretty close to us.

15            THE COURT:  All right.  Thank you.  Go ahead.

16    BY MR. MATTHEW RIGHETTI:

17    Q.   And, in fact, Kmart, as compared to retailers and Walmart,

18    are at the lower end of the list for CSAT scores?

19    A.   As far as I know, yes.

20    Q.   Let me show you 181 and I want to know if you recognize

21    this document.

22         (Document was tendered to the witness.)

23    A.   This is the document that I first seen during this trial.

24    Q.   So it's not something that you're familiar with?

25    A.   No.

1          **MR. MATTHEW RIGHETTI:**  Okay.  No further questions,

2   your Honor.

3          **THE COURT:**  Thank you.  We now go to redirect.

4                    <u>**REDIRECT EXAMINATION**</u>

5   BY MR. ADKINS:

6   Q.  Good morning, Mr. Gonzalez.

7   A.  Good morning, sir.

8   Q.  I just wanted to go back to make sure the record is clear

9   because I know we were talking about three different documents

10  that were being discussed with you in the context of the job

11  description of a cashier at Kmart, okay?

12  A.  Okay.

13  Q.  So see if I can do this quickly.

14      You have in front of you three exhibits.  If you could put

15  these in front of you, please:  37, 157, and 179.  Do you have

16  those?

17  A.  Yes, sir.

18  Q.  Okay.  If you could look at 37.  What is 37?

19  A.  It's a Kmart job description for a checkout service

20  associate.

21  Q.  And that is the one -- well, you recognize that document?

22  A.  Yes.  That's an actual job description that a store

23  manager could go into our system, their computer, and print and

24  review with new hires or current register operators.

25  Q.  All right.  Am then can pull up -- can you pull up 179,

1  please?

2  **A.**   Okay.

3  **Q.**   Is that document the same as 37, but there's something at

4  the bottom of it?

5  **A.**   Yes.

6  **Q.**   Is that a job description that you've seen before?

7  **A.**   No.  It looks like it's part of somebody's rough draft

8  that they are doing some kind of work.  This is not something

9  that the stores -- the store teams out would have.

10  **Q.**   Now, if you could look at 157, please?

11  **A.**   Yes.

12  **Q.**   What is that document?

13  **A.**   That's a current job description today for a front -- for

14  a checkout service associate.

15  **Q.**   So between Exhibit 37 and Exhibit 157, that's the job

16  description for the cashier during the relevant time period

17  here?

18  **A.**   Correct.

19  **Q.**   And why was that changed, by the way?  Why did the job

20  description change?

21  **A.**   Earlier this year we updated all the job descriptions in

22  the Kmart, so the pricing lead, the reset, the up front

23  manager.

24  **Q.**   On direct yesterday you testified that based on your 34

25  years at Kmart and all the transactions that you've conducted

1    and supervised for cashiers, that you do not believe the

2    cashier job can reasonably be performed from a seating

3    position.

4        Has your opinion changed at all based on any questions

5    that have been asked by Mr. Righetti?

6    **A.**   No.  With my 34 years of 28 -- and 28 years in the stores,

7    it's my position or my belief that a cashier needs to be

8    standing to provide the functions that we're asking them and to

9    provide the correct customer service.

10           **MR. ADKINS:**  No further questions, your Honor.

11           **THE COURT:**  Mr. Righetti, anything more?

12           **MR. McINERNEY:**  Just one second, your Honor.

13       (Discussion held off the record amongst

14        plaintiff's counsel.)

15                    **RECROSS EXAMINATION**

16   BY MR. MATTHEW RIGHETTI:

17   **Q.**   So you referenced 179 appears to be a rough draft?

18   **A.**   Yeah.  I don't know if it was something that was produced

19   by somebody that works for Kmart or an outside party.  It

20   appears to be a working copy for somebody.

21   **Q.**   What about it informs you that it's a working copy?

22   **A.**   Because we -- we work with job descriptions all the time,

23   and this is something that I've never seen before.  So it's not

24   something that my team put together and we are the -- my team

25   is the team that produces and posts this information for the

```
 1   stores to use.  I -- the communication team for Kmart and the
 2   process team for Kmart report to me.
 3   Q.   Well, nothing on it says that it's a rough draft, correct?
 4   I guess that's my point.
 5   A.   No.
 6   Q.   It's correct that nothing on that shows that it is a rough
 7   draft?
 8           THE COURT:  The form of your question cannot be
 9   answered "yes" or "no" because it has the double negative in
10   it.  You did not -- the way you corrected it is not a
11   correction.  You can ask it that way, but your record will be
12   no good.
13           MR. MATTHEW RIGHETTI:  Right.
14           THE COURT:  It's up to you.  Both sides are doing this
15   to me.  But think about the form of that question.
16       Why don't you just say:  Does the document have X on it?
17   Then he can -- it's either a "yes" or a "no."  It's a narrow
18   question.
19   BY MR. MATTHEW RIGHETTI:
20   Q.   Does the documents have any reference on it indicating it
21   is a rough draft?
22   A.   No.  I made that comment based on a job description is a
23   description of the task that an associate has to produce that's
24   communicated to the associate and the manager that's doing
25   that -- that's covering that job description.  That's how I
```

```
 1  define a job description.
 2  Q.   You saw the photo that we -- why don't I put the photo up?
 3       Have you ever seen cashiers at a retail store doing their
 4  work from a seated position?
 5  A.   No, never have.
 6       (Photograph displayed.)
 7            MR. ADKINS:  Your Honor, I would object that it's
 8  exceeding the scope of the redirect.
 9            THE COURT:  Well, you did ask whether or not anything
10  that had been done in Mr. Righetti's cross changed his view
11  that they had to stand and he said no.  And now I guess that's
12  such a broad, broad question which proved nothing anyway.  I
13  mean, it's just argument.
14       Now, Mr. Righetti, you opened the door to allow all of
15  this to him to go back into it.  I'm sorry --
16            MR. MATTHEW RIGHETTI:  It's going to be real quick.
17            THE WITNESS:  Can I reanswer that last question?
18            THE COURT:  Wait a minute.  I need to overrule the
19  objection.  The objection is overruled.
20       Now, what did the witness want to interject?
21            THE WITNESS:  Sorry.
22            THE COURT:  Go ahead.  What do you want to interject?
23            THE WITNESS:  The question is:  Have I ever seen
24  anybody sitting down?  I have been to Aldi's before because
25  they are a retailer grocery in Chicago.  So, obviously, they
```

1  are in neighborhoods that I work and shop.

2  **BY MR. MATTHEW RIGHETTI:**

3  **Q.**   And you see that their cashiers do their work from a

4  seated position?

5  **A.**   Yeah.  Two different complete models.  They don't bag any

6  of the merchandise.  They have a belt and their product

7  assortment is very small compared to ours.

8          **THE COURT:**  I'm sorry.  You're saying that in Chicago

9  they do bag the goods?

10         **THE WITNESS:**  Yeah.  They are sitting down and there

11  is a belt that brings the product.  They have an empty shopping

12  cart.  They take their items.   They throw them in the shopping

13  cart and then the customer is responsible for taking them out

14  of the store.

15      They don't provide any bags, so customers have to bring

16  boxes in to -- or take boxes off the floor to box their

17  products.

18      Their items are very different.  They are grocery type

19  items, small type items.  They don't sell the products that we

20  sell.

21  **BY MR. MATTHEW RIGHETTI:**

22  **Q.**   In your work at Kmart -- putting up 28-D, a picture of

23  28-D.

24      (Photograph displayed.)

25  **Q.**   You have not become aware that there are Wilkinson's

1  cashiers who do their work while seated in England?

2  **A.**    Yeah.   I never heard of Wilkinson's and I have not been in

3  England.

4  **Q.**    You have heard of Wilkinson's in England?

5  **A.**    I have not.

6  **Q.**    You don't know that they perform the work while seated, as

7  you can see in 28-D?

8  **A.**    I'm confused --

9  **Q.**    Okay.  So --

10  **A.**    Yes.   No, I'm not aware that they exist because I didn't

11  know who they are and I have never been there.

12          **THE COURT:**  Can I ask a question on this?

13          **MR. MATTHEW RIGHETTI:**  Yes.

14          **THE COURT:**  One of your main points is that you think

15  if the cashier at Kmart is seated, that it somehow projects an

16  unfavorable attitude to the customer.  Whereas, if they are

17  standing, it projects more positive ready-to-assist attitude.

18      Let me stop there before I ask -- have I said that

19  correctly or -- you can correct whatever I misstated.  Is that

20  your basic view?

21          **THE WITNESS:**  Yes, sir.

22          **THE COURT:**  All right.  What I'm trying to understand

23  is why that's your view?  Why is it that standing up projects a

24  better image than sitting down?

25      We're all sitting down here in the courtroom, except for

1   counsel who is standing at the lectern.  Why is it that

2   standing up is such an important thing in your mind?

3           THE WITNESS:  If I'm a cashier -- and I was a

4   cashier -- standing up allows me to grab the items, in some

5   cases be able to even take items from the shopping cart.  If

6   they are in the baby carrier, the area, I can reach over and

7   assist them.

8       If sitting down, I'm telling the customer I need to take

9   everything out of the basket and put it on there because the

10   cashier is sitting down, he's not going to be able to help me.

11      So, you know, I want to be able to be on my feet, see the

12   customer, help, scan and, if needed, be ready to be able to use

13   my portable scanner to scan items in the basket versus sitting

14   down, getting up, sitting down, getting up during the

15   transaction.

16      You know, one thing that if you look at these pictures,

17   there is no shopping carts.  I have not seen any picture with a

18   shopping cart or a large order.  You know, our customers don't

19   buy one item.  It's like --

20           THE COURT:  What pictures are you referring to?

21           THE WITNESS:  Like the picture here and all the

22   pictures from England or London.  And I don't know where the

23   other manufacturers were.  There wasn't any shopping carts or

24   there was never any product on the counter.  I never seen

25   comforters, blankets, paper towels, large items.  All I seen a

GONZALEZ - RECROSS EXAMINATION/ RIGHETTI

```
 1   one size bag.

 2        We do have four size bags, and that's why we have a

 3   bagging table.  So if a customer brings a blanket or a

 4   pillow -- and pillows are very good sellers -- you scan them.

 5   You place them on the bagging table and then you pull a very

 6   large bag.  Even toys, we actually send in a bigger bag for

 7   Christmas for toys.

 8             THE COURT:  Okay.  All right.  Continue on.

 9   BY MR. MATTHEW RIGHETTI:

10   Q.   So you're not familiar with how retail cashiers work in

11   England, correct?

12   A.   No.

13   Q.   Wilkinson's, Asda, no?

14   A.   No, sir.

15   Q.   I understand that Asda is the subsidiary of Walmart in

16   England.  Are you familiar with that?

17   A.   Yes.  I don't know if their assortments are the same and

18   what departments they carry.

19        (Photograph displayed.)

20   A.   You know, Walmart also owns here in the United States,

21   Pharmacy Market Stores, which are very convenient stores.

22        So when you say they are affiliated with Walmart, does

23   that mean that they carry the same products or does that mean

24   they carry the products sold in a Walmart marketplace, which is

25   a smaller piece.
```

 1  Q.   Dr. Johnson, that we've had previous testimony -- you were

 2  here when Dr. Johnson said the Walmart in -- the Asda in

 3  England sells the same merchandise as Walmart here in the

 4  United States?

 5  A.   I didn't hear it.  I'd have to see it because I'm sure

 6  there's products that are relevant to the demographic of

 7  England and I'm sure there's products that are more relevant to

 8  customers that live in the USA.

 9  Q.   So you don't know that the Asdas in England are seated

10  cashiers?

11  A.   I don't know that they are seated.  I don't know much

12  about their store.  I hadn't heard of it til this trial.

13  Q.   So is it your testimony that Kmart would never hire a

14  wheelchair bound applicant for a cashier position because they

15  could not present a ready-to-serve positive image for the

16  customer?  Is that your testimony?

17          MR. ADKINS:  Your Honor, I want to make the same scope

18  objection.

19          THE COURT:  Sustained.

20  BY MR. MATTHEW RIGHETTI:

21  Q.   Do you believe that a person working from a wheelchair

22  could present a ready-to-serve image?

23          MR. ADKINS:  Objection, your Honor.  Same objection.

24          THE COURT:  Sustained.  You could have asked these

25  before, but you didn't get into it.  It's too late for this.

```
 1  It's beyond the scope.

 2          MR. MATTHEW RIGHETTI:  Nothing further, your Honor.

 3          THE COURT:  All right.  Can the witness step town?

 4          MR. ADKINS:  Yes, your Honor.  Thank you.

 5          THE COURT:  All right.  Thank you.  You may step down

 6  and go back to counsel table, Mr. Gonzalez.

 7          THE WITNESS:  Thank you, your Honor.

 8      (Witness excused.)

 9          THE COURT:  Let's go to your next witness.

10          MR. ADKINS:  The defense calls Dr. Valerie Zeithaml.

11          THE COURT:  Who?

12          MR. MATTHEW RIGHETTI:  Dr. Valerie Zeithaml,

13  Z-e-i-t-h-a-m-l.

14          THE COURT:  Great.  Let's bring in her.

15                        VALERIE ZEITHAML,

16  called as a witness for the Defendant herein, having been first

17  duly sworn, was examined and testified as follows:

18          THE WITNESS:  I do.

19          THE CLERK:  Okay.  Thank you.

20          THE COURT:  Greatly.  Welcome.  Please have a seat.

21  You need to sit.  And you can move this all around.  You see

22  how this moves?  It needs to be about this close (indicating).

23  A little closer.  A little closer.  That's probably going to

24  work.

25      Okay.  Say your name.
```

PROCEEDINGS

 1              **THE WITNESS:**  Valerie Zeithaml.

 2              **THE COURT:**  That's good.  Thank you.

 3         Go ahead, counsel.

 4              **MR. ADKINS:**  Thank you, your Honor.

 5                      <u>**DIRECT EXAMINATION**</u>

 6    BY MR. ADKINS:

 7    **Q.**   Good morning, Dr. Zeithaml.

 8    **A.**   Good morning.

 9    **Q.**   Could you please describe for the Court your educational

10    background?

11    **A.**   I graduated from Gettysburg College and then got an

12    M.B.A., Master of Business Administration and PhD at the

13    University of Maryland.

14    **Q.**   And what is your current vocation, your current job?

15    **A.**   I am the David Van Pelt Distinguished Professor of

16    Marketing at the University of North Carolina.

17    **Q.**   You live in North Carolina?

18    **A.**   I do.

19    **Q.**   What other positions have you held over the years?

20    **A.**   I have held other chaired positions at the University of

21    North Carolina.  I have been a professor at Duke University,

22    and Texas A & M University.

23         I also had my own strategy consulting firm called Partners

24    For Service Excellence.

25    **Q.**   What is Partners For Service Excellence?

 1  A.   It was a firm that worked with major companies to improve

 2  their customer satisfaction service quality.

 3  Q.   And you mentioned that you had held various academic

 4  positions.  What type of academic positions were those?  What

 5  subject matter?

 6  A.   I studied and taught service excellence all of my career,

 7  and customer satisfaction.

 8  Q.   And how long is that career?

 9  A.   That career is 35 years.

10  Q.   Have you received any kind of honors or awards in the area

11  of customer service or satisfaction?

12  A.   I have.  I am a pioneer in this field, and in my 35 years

13  I have won all -- every single major lifetime award in

14  marketing for my work with service -- quality and service

15  excellence.

16  Q.   How many awards are there for that?

17  A.   The lifetime awards?  Six.

18  Q.   Can you tell the Court about -- generally about

19  publications that you've had?  How many?

20  A.   I have published more than 100 articles in business and

21  academic publications.

22  Q.   Have you done any research?

23  A.   All of them are about research.

24  Q.   Have you published any books?

25  A.   I have published seven books.

 1  **Q.**    On what subject matter?

 2  **A.**    All on the topic of service quality and customer service.

 3  **Q.**    And about your articles, have you received any recognition

 4  or citations related to the articles that you've published?

 5  **A.**    Yes.  In our industry, in the publishing industry a

 6  measure of success is the number of times that your work is

 7  cited by others, other academics or other -- or business

 8  people.  And the average is probably around 100 times in a

 9  career, and I have had 60,000, more than 60,000 citations.

10  **Q.**    How do you know that?

11  **A.**    Because there's a website called Publish or Perish that is

12  used to document that.  It's based on a web crawler that goes

13  through and finds your citations.

14  **Q.**    In the publishing world is there a measurement of how

15  frequently individual papers are cited?

16  **A.**    Yes.  That's a standard measure called the H Index.

17  **Q.**    What is that?

18  **A.**    The H Index is a measure of how many times individual

19  papers are cited.  For example, if you have two papers that

20  were each cited two times, your H Index is two.  The higher the

21  H Index is, the more -- it's very difficult to get your index

22  high because then you have to have papers.

23       For example, if you have an H Index of 40, that means you

24  have 40 papers each of which is cited at least 40 times.

25  **Q.**    What is your H Index for your articles?

 1  **A.**   My H Index is 57.

 2  **Q.**   Let me ask you:  Have you ever done this before?  Have you

 3  ever testified in a court of law?

 4  **A.**   I have not.

 5  **Q.**   Can you describe -- I think you've talked about your

 6  background, but can you describe your area of expertise,

 7  please?

 8  **A.**   My expertise is particularly in studying customer

 9  perceptions and expectations of service quality.

10      I started to study this at the time when all companies

11  were trying to pin down what quality meant and it was very

12  difficult to measure what service -- service perceptions were.

13  So I've done more than 12 studies measuring customer

14  expectations and perceptions of customers in 50 different

15  industries.

16  **Q.**   And in your experience or in your opinion, what are the

17  factors that affect customer service?

18  **A.**   Based on  --

19  **Q.**   I'm sorry.  Would you like some water?

20  **A.**   Let me just clear my throat, please.

21      (Brief pause.)

22  **A.**   Based on this research, which is -- has been programmatic,

23  there are five dimensions of service quality.  They are:

24  Responsiveness, reliability, assurance, empathy, and tangibles.

25  And these are not just words that I'm using.  These are

1  actually statistical factors that we found over the many years

2  of studying this.

3      So they are managerial and practical and I can tell you

4  what they are and what they mean, but they are based on

5  research.

6  **Q.**   We'll get to what they are and what they mean in a moment,

7  but you mentioned that this is based on research.  Can you

8  describe the research, please?

9  **A.**   Yes.  The research was based on talking to customers in

10  many, many different industries and then using surveys to

11  measure customer expectations and perceptions.  We then created

12  a scale or a questionnaire, which is the industry standard, and

13  that scale is called SERVQUAL?

14  **Q.**   Can you spell that so they can get that down?

15  **A.**   It's all caps, S-E-R-V-Q-U-A-L.

16  **Q.**   What is SERVQUAL?

17  **A.**   SERVQUAL is a multi-dimensional scale measuring consumer

18  perceptions and expectations of the service quality.

19  **Q.**   Can you tell us a little bit more about SERVQUAL, what it

20  is and how it was born from this research you were talking

21  about?

22  **A.**   All right.  It started the first time we studied it.  We

23  talked to many customers in four different service industries

24  and created -- created a scale.  Actually, we had about a

25  hundred items at first.  Obviously, you never want to have a

ZEITHAML - DIRECT EXAMINATION / ADKINS

1  hundred items in a scale because that's too many items for a

2  customer to answer.

3      So you used statistical procedures called factor analysis

4  to reduce the scale to a set of items that is manageable.  And

5  in the process of doing that, you also can identify clusters of

6  factors, and that's where the five dimensions came from.

7  **Q.**   So the I've dimensions you mentioned before --

8  responsiveness, assurance, empathy, reliability, tangibles --

9  that came out of the process that you just described?

10  **A.**   That's right.

11  **Q.**   Okay.

12  **A.**   And then it was validated time and time and time again,

13  both by me and by many other researchers all over the world.

14  **Q.**   Now, in forming your opinions here, did you obtain

15  information from Kmart?

16  **A.**   Yes, I did.

17  **Q.**   Describe that, please?

18  **A.**   I talked to Jesse Gonzalez, who was vice-president of

19  retail services at Kmart, to understand what Kmart -- how Kmart

20  viewed service.

21  **Q.**   And what did he tell you?

22  **A.**   The three things that he told me that were most

23  significant were, first, customer service plays a major role in

24  Kmart strategy.

25      Second, that Kmart has put in place many programs to hire,

1    motivate, manage, recognize, reward employees to deliver

2    customer service.

3        And, third, that the cashier is the most crucial element

4    of customer service because the cashier is the last and most

5    important impression.

6    **Q.**   And you mentioned a moment ago five factors.  We'll get

7    into the details in a moment, but of those five factors, which

8    of those apply to the situation at Kmart based on the

9    information that you received?

10   **A.**   Well, in any service situation four of the five factors

11   relate to employee behavior, and those are:  Responsiveness,

12   reliability, empathy and assurance.

13   **Q.**   Let's just talk about each one of those for a moment.  You

14   mentioned responsiveness.  What is that?

15   **A.**   Responsiveness is the willingness to help customers and

16   the ability to provides prompt service.  So those are things

17   that an employee does.  Acts -- willing to help service, if the

18   service is good, and the ability to provide prompt service.  So

19   it's both speed and willingness.

20   **Q.**   What about reliability?  What is that?  What factor is

21   that?

22   **A.**   Reliability is dependency -- dependability and

23   consistency.

24   **Q.**   Can you expand on that just a little bit?

25   **A.**   Yeah.  It's dependability and consistency of the service

1  process.   So it means that every time a customer goes to a

2  store, for example, or checkout, that the process is

3  consistent.

4  **Q.**   What is -- can you describe the factor of empathy?

5  **A.**   Empathy is caring, individualized service the employee

6  provides to the customer.

7  **Q.**   And the last one I believe you mentioned was assurance.

8  Can you describe that factor, please?

9  **A.**   Assurance is knowledge and courtesy of employees and their

10  ability to convey trust.

11  **Q.**   And, in your opinion, what are the most important factors,

12  among the ones you discussed, as it applies to the situation at

13  Kmart?

14  **A.**   Responsiveness and reliability.

15  **Q.**   Who are the primary providers of customer service at

16  Kmart?   What is your understanding?

17  **A.**   The primary and often the only providers of service at

18  Kmart are the cashiers.

19          **THE COURT:**   Can I ask a question about that?   Aren't

20  there people -- when you go into a Kmart and you're trying to

21  find where -- I don't know, where the motor oil is and you're

22  walking around and you can't find it.   You see somebody that's

23  got a Kmart badge on and you go up to them and say, "Where is

24  the motor oil?"   That's not a cashier, is it?

25      Don't they have, like, sales representatives floating

1   around in the hardware department, in the motor oil department,

2   or is it just there is nobody like that and you have to go ask

3   a cashier?  How does it work at Kmart?

4          THE WITNESS:  Well, at Kmart, and at most stores,

5   there are people that do that and the same would be said of

6   them.

7          THE COURT:  Would be said of what?  What do you mean?

8          THE WITNESS:  Same would be said of someone  -- if you

9   encountered a sales person on the floor -- if you encountered

10  someone on the floor and you asked them for help, their

11  responsiveness criteria would be the same:  Are they willing to

12  help and do they provide prompt service?

13      My point about cashiers being the most important is that

14  unless a customer encounters someone like that on the floor,

15  the only interaction is at checkout.

16         THE COURT:  All right.  Thank you for the

17  clarification.

18      Go ahead, counsel.

19         MR. ADKINS:  Thank you, your Honor.

20  BY MR. ADKINS:

21  Q.  You mentioned before that in speaking with Jesse Gonzalez,

22  he explained that -- to you that Kmart has many programs to

23  reward customer service.

24      Can you describe your understanding of what those

25  initiatives are?

1    **A.**    Among the programs were the following:  One was called

2    WAT, which is Welcome, Assist and Thank customers.  And that's

3    a program whereby corporate and regional visitors come to

4    Kmarts.  And when they identify a cashier or another employee

5    who's delivering good customer service, they will acknowledge

6    them and give them gift certificates.

7        There's also the Five Star Award, where customers can

8    identify good customer service and write that in and then that

9    employee is rewarded.

10       And the Ultimate Cashier is the program that is most

11   motivating to cashiers.  Managers -- local regional managers

12   identify and nominate cashiers who are performing well and then

13   there's a competition that actually bubbles up and the Ultimate

14   Cashier at Kmart is selected every year.

15   **Q.**    And does Kmart measure customer satisfaction?  Do they

16   have programs to do that?

17   **A.**    Yes.  Kmart measures customer satisfaction four ways:

18   They use something called CSAT -- and that's C-S-A-T -- which

19   is an industry standard way to measure customer satisfaction.

20   When a customer gets a receipt, there is an 800 number that can

21   be called or if a customer can dial -- or can use the internet

22   and access a survey where they can answer questions about their

23   experience in the store.

24       They also have a pin pad in Kmart where very quickly a

25   customer can answer a question.

1       Kmart also collects and has a metric for complaints.

2       And finally they use mystery shopping, where people who

3  aren't actually customers will go in to stores and evaluate the

4  store and the cashier performance.

5  **Q.**   Now, to be clear, you're not an expert on all things

6  Kmart, are you?

7  **A.**   I am not.

8  **Q.**   But that's information you have been provided?

9  **A.**   Yes.

10 **Q.**   You have -- is it fair to say that your expertise is

11 focused on Kmart and its competitors across the industry and

12 industry practice?

13 **A.**   That's right.

14 **Q.**   Generally can you describe how customer expectations

15 affect customer service?

16 **A.**   Yes.  The definition of -- our definition of customer

17 service excellence, and this is widely accepted, is that

18 customer service is the comparison between perceptions, which

19 are reference points that customers bring into a service

20 situation and perceptions which is what they get when they come

21 in.

22      So customer perceptions are benchmarks or reference

23 points.  And they are very important because if customers

24 expect a certain level of service and they don't get it, there

25 is a lot of difference.

1    So ideally if customers expect a level of service and they

2    get that level of service, that's perceived as excellent.

3    **Q.**   What drives those customer expectations?

4    **A.**   They are largely driven by customer experiences.  In the

5    stores, the store -- in Kmart, in this situation, in Kmart's

6    competitors.  Also, in grocery stores, other department stores.

7    **Q.**   What are the customer expectations of cashiers at large

8    retailers like Kmart?

9    **A.**   Large -- cashiers in large retailers are expected to get

10   the customer through quickly, to be engaging, to be responsive,

11   to be standing, to be able to answer any questions that come

12   about.

13   **Q.**   That's the industry standard?

14   **A.**   That's absolutely the industry standard, industry

15   practice.

16   **Q.**   Now, is it true that no study has specifically analyzed

17   whether -- what the impact on customer service would be from --

18   between sitting and standing?  Did I state that accurately?

19   **A.**   That's true.

20   **Q.**   The -- based on your experience of studying customer

21   expectations and perceptions and SERVQUAL and the other things

22   that you mentioned, do you have an opinion on whether standing

23   versus being seated as a cashier provides better customer

24   service?

25       **MR. MATTHEW RIGHETTI:**  Your Honor, I'm just not sure

1   what the basis for that testimony could be.  There's -- she

2   hasn't testified that she's done any customer service

3   interviews or done a study of it for Kmart or any retailer and

4   hasn't said that she has reached or found any articles or

5   literature the topic.

6           THE COURT:  First, do you have an opinion -- just say

7   "yes" or "no."  Do you have an opinion on that subject?

8           THE WITNESS:  Yes.

9           THE COURT:  And do you have a basis for your opinion?

10          THE WITNESS:  The basis for my opinion is my 30 years

11  of experience working in service and service quality and

12  studying customer expectations and perceptions.

13          THE COURT:  Why isn't that good enough?

14          MR. MATTHEW RIGHETTI:  It's bootstrapping.  All she's

15  doing is taking her resume and saying that:  My resume is

16  such-and-such, therefore, I should be able to opine how seated

17  cashiers would be perceived by customers, as opposed to

18  standing cashiers without having researched it herself, having

19  referenced any literature or having done any customer service

20  exit interviews herself or even referenced any that have been

21  done by other people.

22          THE COURT:  The Court will overrule the objection.

23  Nonetheless, I will take it into account.  If there is not much

24  to support it other than her resume, then that doesn't count as

25  much as if there was a resume plus a study or plus something

1   else.

2        So I understand that problem, but nonetheless she's

3   qualified to at least have an opinion.  So the Court will hear

4   the opinion.

5        All right.  Continue on.

6   **BY MR. ADKINS:**

7   **Q.**   Do you have an opinion?

8   **A.**   I do.

9   **Q.**   What is that opinion?

10  **A.**   And please repeat the question.

11  **Q.**   Sure.  Your opinion on whether standing versus seated

12  cashier provides better customer service in the industry?

13  **A.**   I believe that a standing cashier provides better customer

14  service, in part, because it's the industry standard.  Every

15  retail store in the United States has standing cashiers.  So

16  customers expect standing cashiers and, as I said, expectations

17  play a big role in customer service.

18       I also believe that standing cashiers provide responsive,

19  friendly, engaging, connecting service, as well as being able

20  to conduct the transaction.

21       Because there are two pieces here.  There is the

22  relationship piece of eye contact, connection, engaging,

23  thanking, et cetera.  And then there's the transaction.  Both

24  have to be conducted simultaneously.

25  **Q.**   Is there -- in your opinion, would just the mere act of

1  changing cashiers from standing to seated, would that have an

2  effect on customer service or expectations?

3  **A.**    A change in the process by seating cashiers would mean

4  that customer expectations would not be met because industry

5  practice is that cashiers are standing.

6  **Q.**    Do customer -- in your opinion, do customer perceptions

7  play a role in assessing whether the --

8          **THE COURT:**  Can I ask a question about that?  Let's

9  say that you had an employer who discriminated against, let's

10  say, men and only hired women to be cashiers.  All right?  Now,

11  you would know that would be illegal.

12          **THE WITNESS:**  Would you repeat that, the beginning?

13          **THE COURT:**  Yeah.  Let's say you had a big box company

14  that had cashiers and said, "We just want to hire women to be

15  our cashiers.  We will not hire men."  And let's say that

16  that's the way it was in a certain part of the country and

17  that's what people expected.

18      So under your argument, you would have to continue hiring

19  just women because that's what the -- that's what the customer

20  wanted.

21          **THE WITNESS:**  That's what the customer was used to.

22          **THE COURT:**  Yeah.

23          **THE WITNESS:**  That's what they expected.

24          **THE COURT:**  So how much weight should we give to that

25  factor just -- you could justify almost anything that isn't

1  right by saying that's what the customers have come to expect.

2  So how do you answer that problem?

3        **THE WITNESS:**  Okay.  That's a good point.

4     There are changes that are positive and there are changes

5  that are negative.  Ideally we would know what the impact is.

6     Often companies study in advance and find out.  If we

7  change the color of blue in our store to the color of red, how

8  will that affect it?  And we find that out, and then we go

9  ahead to make the change.

10    I don't know if it's appropriate, but when Coke changed

11 its flavor, it's the same kind of situation.  People were used

12 to the old Coke flavor.  They didn't like the new Coke flavor

13 because it didn't meet their expectations.

14    So when I am thinking about changes in a service setting,

15 which happen, by the way, a lot of times, I often work with

16 companies to find out for sure before the change is made that

17 this is a positive change.

18        **THE COURT:**  Well, okay.  But what you're telling me --

19 part of what you -- not all, but a factor that you based your

20 opinion on was what customers are used to seeing and that a

21 change would upset that expectation.  It seemed to be what you

22 were saying.

23    All right.  So -- and what I'm saying to you is:  That is

24 a problematic factor.  I don't know, maybe not.  Maybe it's

25 perfectly legal and we -- but I can see situations in which

 1  everyone would agree that what the customer is used to seeing

 2  is not correct.  And we shouldn't be tolerating it, right?

 3          THE WITNESS:  Right.  As a -- should I --

 4          THE COURT:  No, go ahead.  I'm done.

 5          THE WITNESS:  As an example, the service we receive in

 6  the DMV is very bad and virtually any change that we receive

 7  there would be an improvement.

 8          THE COURT:  I don't know.  I'm not going to comment on

 9  California DMV.  Maybe in North Carolina that's the way it is.

10          THE WITNESS:  All right.  North Carolina DMV would be

11  a good improvement, but in this situation it's very widespread

12  that industry practice is standing cashiers.  Standing checkout

13  personnel, which would be cashiers in the situation at Kmart.

14      So it's a change, it's a major change compared to what

15  consumers have experienced for as long as they have shopped.

16          THE COURT:  All right.  Well, I agree it would be a

17  change.  And what I'm trying to figure out is how we evaluate

18  that and to what extent we can permit that to be a factor, but

19  -- all right.  I'm interrupting.

20      I'm sure counsel has thought of all this and he's going to

21  ask you questions and we will get to it on cross-examination.

22      So go ahead, Mr. Adkins.

23          MR. ADKINS:  Thank you, your Honor.

24  BY MR. ADKINS:

25  Q.   If the industry did change in terms -- Dr. Zeithaml, in

1  terms of competitors of Kmart, like Target and Walmart -- let

2  me back up.

3      You said that standing cashiers provide good customer

4  service for a number of reasons.  If those cashiers were seated

5  at Kmart only, would customers go to competitors for better

6  customer service in your opinion?

7  **A.**   In my opinion, they would go to Target, Walmart and other

8  competitors.

9  **Q.**   Okay.  Now, if Target and Walmart and brick and mortar

10  stores that were competitors of Kmart, for whatever reason, did

11  not have standing cashiers and customers did not receive good

12  customer service, what then would the customers likely do in

13  your opinion?

14  **A.**   I believe they would go to other competitors or go online.

15  If -- if cashiers did not provide adequate customer service,

16  there would be very little reason to go into stores and they

17  could go online, or they could go to Costco, or they could go

18  to grocery stores, or they could go to department stores or

19  other alternatives.

20  **Q.**   Let me ask you, do you know what Aldi is?

21  **A.**   I do.

22  **Q.**   How do you know what Aldi is?

23  **A.**   Aldi is a low cost -- Aldi is a German, low-cost retailer

24  with a business model of efficiency and of little to no service

25  and private label brands and --

1  Q.   What are private label brands?

2  A.   Private label brands are brands that are not national

3  brands.  National brands are Coke, Pepsi, well-known brands,

4  well-known corporate brands.

5      Private label brands are all made by or -- are made by the

6  company, by Aldi or by a major company, and put into Aldi's

7  brand -- brands.

8      So Aldi has a very minimal assortment, little to no

9  service, small stores, costs -- low-cost efficiency.

10 Q.   Do you consider Aldi to be a competitor of Kmart from a

11 customer service standpoint?

12 A.   I do not.

13 Q.   Does Aldi provide good customer service, in your opinion?

14 A.   It does not.

15 Q.   Why?

16 A.   One of its strategies is to reduce the number of customers

17 in the store.  So one rarely sees any customers -- I'm sorry,

18 any employees, except checkout.

19 Q.   Reduce the number of employees in the store?

20 A.   I'm sorry, reduce the number of employees.

21      THE COURT:  What kind of business would want to reduce

22 the number of customers?

23      THE WITNESS:  I'm sorry.  That's a terrible thing to

24 say.

25      THE COURT:  You meant to say reduce the number --

1          **THE WITNESS:**  Reduce the number of employees in the

2    store.

3    **BY MR. ADKINS:**

4    **Q.**    And who loads the groceries, bags of groceries at Aldi?

5    **A.**    Customer does almost everything.  Customer puts the

6    groceries on the counter.  The customer takes them off the

7    counter, puts them in the bag, buys the bag from Aldi, if she

8    or he didn't come in with a bag, and takes care of everything.

9    It's as close to self-service as you can get.

10   **Q.**    Let me ask you about financial performance for a moment.

11          Does customer satisfaction have an impact on company

12   financial performance?

13   **A.**    It does.

14   **Q.**    How so?

15   **A.**    Well, at a very basic level, if you think about a customer

16   going into a store and having a bad experience, that customer

17   won't go in again, and, therefore, won't buy again.  And sales

18   would go down, profits would go down.

19          And if you have a situation where a lot of customers go

20   into a store that is not performing service as well, they won't

21   come back again, and sales and revenues -- sales

22   revenues/profits will be reduced.

23          Now, that all makes very basic sense.  But the -- the good

24   news from a -- an academic, a business perspective, is that we

25   now have actual data that converges on the fact that service

 1  quality -- excuse me, customer satisfaction leads to financial

 2  performance.  High customer satisfaction leads to high

 3  financial performance.

 4  **Q.**   Uhm, let's talk about that, that data and that research

 5  you mentioned.  What is ACSI?

 6  **A.**   ACSI is the American Customer Satisfaction Index.

 7  **Q.**   And what is it?

 8  **A.**   Okay.  The American Customer Satisfaction Index is a --

 9  was created by the University of Michigan and the American

10  Society for Quality, as an economic indicator of American

11  consumers' satisfaction with products and services in the

12  United States.

13       And every quarter the organization measures -- measures

14  customer satisfaction from zero to 100 for various services and

15  products.

16  **Q.**   Is that across all major U.S. companies?

17  **A.**   It's across all U.S. industries.  It measures national

18  companies.

19  **Q.**   What is Compustat?

20  **A.**   Compustat is a database of financial performance on all

21  publicly-traded companies.  And it's available to researchers

22  to study financial performance across firms.

23  **Q.**   Now, you mentioned a moment ago there's good news in terms

24  of the ability to research the impact of customer service on

25  financial performance.  How do ACSI and Compustat play into

1   that good news?

2   **A.**   All right.  Here you have ACSI, which data since 1994, on

3   customer satisfaction across all different -- different firms

4   and different industries.  And here you have Compustat, data on

5   all financial performance.  We can now correlate or run much

6   more elaborate financial models to look at the link between

7   these two, and many studies have looked at that link.

8   **Q.**   Can you describe how they have looked at that link.

9   **A.**   Okay.  Typically, what happens is that they -- they

10  predict that -- they hypothesize that customer satisfaction can

11  predict financial performance.  And that can be financial

12  performance in terms of sales, profits, return on investment,

13  return on assets, market value, market share, whatever the

14  financial performance is.  So they predict that customer

15  satisfaction will lead to these things.

16      So they create a model by which you look at customer

17  satisfaction in one period, and then you look at financial

18  performance in the next period, and you see if there's a

19  relationship.  And there is a relationship.

20  **Q.**   What is that relationship?  Can you describe that?

21  **A.**   It's a significant and positive relationship between

22  customer satisfaction and firm performance.

23  **Q.**   Can you give an example of one of the studies that

24  demonstrates what you just said?

25  **A.**   In one study, using 200 of the Fortune 500 firms across 63

1 industries, it was found that a 1 percent increase in customer

2 satisfaction led to a 1.016 percent increase in market value.

3 Or -- excuse me, in shareholder value, or a $275 million

4 increase in a firm's shareholder value.

5 **Q.** What about bad customer service, is there any indication

6 that that affects financial performance?

7 **A.** There is. And there's one study in particular that shows

8 the asymmetric effect of customer satisfaction.

9 **Q.** What does that mean, asymmetric effect?

10 **A.** Asymmetric effect means that if customer satisfaction

11 increases, there's one result. But if it decreases, there's a

12 much more precipitous result.

13 So in this particular study, a 1 percent change in

14 customer satisfaction led to a -- about a 2.75 increase in

15 return on investment. But a 1 percent drop in customer

16 satisfaction led to about a 5.5 percent decrease on return on

17 investment.

18 **THE COURT:** Are these -- these statistics for this

19 very industry we're talking about, big box discount industry,

20 or what industry is this?

21 **THE WITNESS:** These studies are what we call

22 cross-sectional, meaning it grows across all the different

23 industries that are studied.

24 So we have all these different industries that ACSI

25 studies. And in the first study I talked about it was 200

 1  firms in 63 industries.  And retail was one of them.

 2      And then you look at the financial performance.  It's

 3  across all industries, which is actually the way we typically

 4  study -- we want to find out general principles that -- as you

 5  would in, I don't know, physics or some other field.

 6      If you study general principles, you study them,

 7  typically, cross-functionally.  Meaning, what we're finding is

 8  that regardless of what company, regardless of what -- of the

 9  data, we find this result.  So it wasn't studying any

10  particular company.

11          THE COURT:  I understand it's not limited to this

12  industry.

13          THE WITNESS:  Right.

14          THE COURT:  It's more broad than that.  Okay.  Thank

15  you.

16  BY MR. ADKINS:

17  Q.  Let's talk about brand for a moment.  Is brand affected by

18  customer service?

19  A.  Yes.  In a service business -- in a service business -- in

20  a product business, every single product is a brand.  An M&M's

21  bar is a brand, Coke is a brand, whatever.

22      In service, the company is the brand.  So in this

23  industry, Kmart is the brand, Target is the brand, Wal-Mart is

24  the brand.  And, typically, the employee is the embodiment of

25  the brand.

 1  Q.   What do you mean?

 2  A.   Well, the factors that affect a brand in Kmart might be

 3  the advertising Kmart does or the products that it carries.

 4  But it's also influenced -- and perhaps more than by anything

 5  else -- by the experiences that occur in the store.  So that

 6  would be the customer service.

 7  Q.   How can, in your opinion, Kmart differentiate itself, its

 8  brand, within their industry, discount retail?

 9  A.   It can't differentiate itself on the basis of low prices

10  because everybody has low prices.  It can't do it on assortment

11  because everybody carries the same things.  It can't do it by

12  the size of the store or the location of the store because

13  everybody's the same place.

14       So, really, the only way it can differentiate itself is on

15  the basis of service.

16           MR. ADKINS:  No further questions, your Honor.  Thank

17  you.

18           THE COURT:  All right.  Cross-examination.

19                       CROSS EXAMINATION

20  BY MR. MATTHEW RIGHETTI:

21  Q.   Good morning, Ms. Zeithaml.

22       So when did you get to town?

23  A.   Excuse me?

24  Q.   When did you get to town?

25  A.   When did I get to town?  Two days ago.

ZEITHAML - CROSS / RIGHETTI

1  Q.   Had some meetings with defense counsel?

2  A.   Yes.

3  Q.   How many?

4  A.   Two.

5  Q.   How long?

6  A.   Uhm, two hours one day, four hours another.

7  Q.   Were they kind of question and answer prep sessions for

8  your testimony here today?

9  A.   Yes.

10  Q.   So you rehearsed some of the questions you would be asked;

11  and, likewise, rehearsed some of the cross-examination that

12  might be expected, correct?

13          MR. ADKINS:   Objection.   Misstates what she said.

14          THE COURT:   It's compound.   Sustained on the ground

15  it's compound.   But you're entitled to ask these questions.

16  BY MR. MATTHEW RIGHETTI:

17  Q.   Did you go through the direct examination that defense

18  counsel would be going with you -- going over with you today?

19  A.   Yes.

20  Q.   And did you also go over with defense counsel the

21  cross-examination that might be expected?

22  A.   Yes.

23  Q.   Okay.   Is that typical for you, when you come into court

24  and -- strike that.

25          Is that typical, when you want to have a conversation

```
 1  where you want to tell the truth, that you -- you kind of go

 2  through a rehearsal ahead of time, to make sure that you get it

 3  right?

 4          MR. ADKINS:  Objection.  Argumentative.

 5          THE COURT:  Sustained.

 6  BY MR. MATTHEW RIGHETTI:

 7  Q.   You're married, right?

 8  A.   I am.

 9  Q.   So when you go home and talk to your husband, do you

10  rehearse the story that you're going to tell him when you get

11  home, or do you have a conversation with him when you get home?

12          THE COURT:  Mr. Righetti, --

13          MR. ADKINS:  Same objection.  And irrelevant.

14          THE COURT:  -- are you telling me you never met with

15  an expert before they testified, and did the same thing?

16          MR. MATTHEW RIGHETTI:  No, but I have rehearsed what I

17  tell my wife before I get home, your Honor.  I'll withdraw the

18  question.

19          THE COURT:  Thank you.

20  BY MR. MATTHEW RIGHETTI:

21  Q.   What was your first contact in this case, approximately?

22  A.   August 8th.

23  Q.   And that was less than a month before you issued your

24  final report in this case, correct?

25  A.   That's correct.
```

1  Q.   And it's true that you've never testified about the

2  subject of whether allowing employees to sit would impact

3  customer service?

4  A.   That's right.

5  Q.   And as part of your work in the one month that you

6  spent -- less than a month that you spent working on this case,

7  you visited one Kmart, on September 20th?

8  A.   That was after my report.

9  Q.   So in the less than one month that you -- strike that.

10     So in forming your opinions in this case, you didn't visit

11  any Kmarts between the time you were hired and the time you did

12  your report?

13  A.   That's correct.

14  Q.   And after you did your report, the one visit that you went

15  to in Kmart was in Durham, North Carolina?

16  A.   Yes.

17  Q.   So, apparently, you didn't need to visit any Kmarts and

18  observe customer service at Kmart before you reached your final

19  conclusions in this case, correct?

20  A.   I was asked to study -- I was asked to talk about my

21  general experience on customer service/customer satisfaction,

22  in a broad way.  What I know about this type of store, what I

23  know about companies in general, in a broad way.

24  Q.   So you did not need to visit any Kmarts in order to reach

25  your conclusions in this case?

1  **A.**    My opinions?  No.

2  **Q.**    Is that correct?

3  **A.**    That's correct.

4  **Q.**    And the only reason that you actually visited -- strike

5  that.

6       You did visit the Kmart in North Carolina as part of your

7  work in this case.  It wasn't because you were shopping for a

8  birthday present?

9  **A.**    That's correct.

10 **Q.**    And the one that you picked in Durham, North Carolina was

11 simply one that was picked because it happened to be closest to

12 where you live?

13 **A.**    That's right.

14 **Q.**    You've never been to the Tulare, California Kmart store,

15 right?

16 **A.**    No.

17 **Q.**    You are not familiar with the Tulare store?

18 **A.**    No.

19 **Q.**    You do believe, based upon what Mr. Gonzalez has told you,

20 that Kmart has a consistent business model?

21 **A.**    I do.

22 **Q.**    And what you would expect to see and what you did see in

23 the Kmart in Durham, North Carolina you would expect to see in

24 the Kmart stores in California, correct?

25 **A.**    Correct.

ZEITHAML - CROSS / RIGHETTI

```
 1  Q.   This even though you've never been to any Kmart store in
 2  California, correct?
 3  A.   I may have been in a Kmart at some time in California in
 4  my life.
 5  Q.   Okay.  Do you know if the Tulare Kmart has a pharmacy?
 6  A.   I do not.
 7  Q.   Do you know if the Tulare Kmart has a grocery?
 8  A.   I do not.
 9  Q.   Is it true that Kmart -- strike that.
10       You believe that Kmart's business model is to have all
11  cashiers perform the same job, and all employees receive the
12  same training?
13  A.   Well, there are cashiers at different places in the store.
14  Do you mean front end cashiers?
15  Q.   I mean front end cashiers, yes.
16  A.   I'm sorry, would you repeat the question.
17  Q.   Yes.  You believe that Kmart's business model is to have
18  all cashiers perform the same job at the front end checkout?
19  A.   Yes.
20  Q.   And you believe that the business model at Kmart is to
21  have consistent training of the cashiers for front end work at
22  the Kmarts?
23  A.   Yes.
24  Q.   And you would expect to see the same nature of the work
25  performed at the Tulare store in California as you saw at the
```

1   Durham, North Carolina store, correct?

2   **A.**   Yes.

3   **Q.**   And, in fact, the same nature of the work at the front end

4   checkout performed by cashiers at all the Kmart stores in

5   California?

6   **A.**   Yes.

7   **Q.**   And, in fact, that's what Jesse Rodriguez -- strike that.

8        In fact, that's what Jesse Gonzalez told you when you

9   spoke to him?

10  **A.**   Yes.  And I also consulted Planet Retail, to understand

11  the Kmart business model.

12  **Q.**   In the approximately 30 days that you were working on this

13  case before you reached your final conclusions, how many people

14  at Kmart did you speak to?

15  **A.**   Including the ones I saw in the Kmart store when I visited

16  there?

17  **Q.**   Those were after you finished your report, right?

18  **A.**   Okay.  I didn't know --

19  **Q.**   Let me give -- focus on the question.  Before you finished

20  your report, but after you got your assignment in this case,

21  those 30 days, how many people at Kmart did you did speak to?

22  **A.**   One.

23  **Q.**   And that was Jesse Gonzalez?

24  **A.**   That's correct.

25  **Q.**   Now, it's true that you have no opinion on whether the

1    steps of a transaction at the front end checkout counter

2    performed by a cashier can be done while seated, correct?

3    **A.**    I have an opinion of the signal that would send.

4    **Q.**    A signal?

5    **A.**    Uh-huh.

6    **Q.**    Do you believe -- do you have an opinion that the step of

7    the cashier taking the item from the customer for scanning can

8    be done while seated?

9    **A.**    No.  That's a question of fact or actual things.

10        I have -- I have an idea -- I have an opinion about the

11   perceptions customers have, the signal having a seated cashier

12   would have collectively, all through the process.

13   **Q.**    But you don't have an opinion on whether the cashier can

14   or cannot perform the job while seated?

15   **A.**    No.

16   **Q.**    Is that correct?

17   **A.**    That's correct.

18   **Q.**    And in order to reach conclusions in this case, isn't

19   it -- well, strike that.

20        When you do customer perception research, you -- in your

21   field, you many times will do exit surveys of customers,

22   correct --

23   **A.**    Yes.

24   **Q.**    -- to determine their perceptions, right?

25   **A.**    That's correct.

1  Q.   Because, after all, you're trying to figure out what the

2  perception of the customer is to what they've just experienced,

3  right?

4  A.   That has been done.

5  Q.   And you've done that many times?

6  A.   I do SERVQUAL studies.

7  Q.   Which are measuring the perceptions that the customers

8  have to certain things they have experienced in a retail

9  environment?

10 A.   Yes.

11 Q.   So tell me how many Kmart customers you're spoken to about

12 seated versus standing cashiers.

13 A.   None.

14 Q.   So did you have an opportunity to speak to Kmart customers

15 about the seated versus standing perception of cashiers?

16 A.   No.  And I would not have used an exit interview to do

17 that.

18 Q.   You did not have an opportunity to study -- whether it's

19 an exit interview or some other study, you did have the

20 opportunity --

21 A.   I did not.

22 Q.   Oh.  And the reason you didn't have the opportunity was

23 because of the time in which you were retained versus the time

24 your report was due, correct?

25 A.   Right.

1  Q.   So since you didn't do any research yourself on Kmart

2  customer perceptions, I assume that you looked in the research

3  literature to determine whether other people had studied the

4  issue of the sit versus stand option and its impact on customer

5  service?

6  A.   I did.

7  Q.   And how many studies did you find?

8  A.   Zero.

9  Q.   And you know that Kmart has done CSAT studies, customer

10  satisfaction surveys or studies?

11  A.   They do them continuously.

12  Q.   Regularly, right?  It's part of their business model?

13  A.   Continuously.

14  Q.   Which many retailers do, right?

15  A.   Right.

16  Q.   And of the retail competitors that -- in the industry that

17  Kmart is in, there's a ranking of customer satisfaction, right?

18  A.   Yes.

19  Q.   And tell me where in that ranking Kmart lands.

20  A.   All right.  There are a number of different ranking

21  sources.  I can tell you that in the ACSI, Kmart ranks low,

22  possibly at the lowest.

23       Did you want comparisons with others?

24  Q.   That's fine.

25  A.   I can also tell you that in CSAT studies -- which probably

 1  the Kmart people themselves would know better than I, since I

 2  did not have access to their data -- that Kmart and Wal-Mart

 3  are together at the bottom.

 4  **Q.**   And in that industry of competitors, who's closer to the

 5  top?

 6  **A.**   Costco is the top, Target is slightly below that.

 7  **Q.**   So if I understand what you just said, Kmart did not

 8  provide any of its CSAT customer satisfaction surveys to you

 9  for your work in this case?

10  **A.**   It would not have been helpful.

11  **Q.**   Whether it was helpful or not, or would have been, I'm

12  just asking whether they provided any of their CSAT data to you

13  since you were testifying about customer satisfaction.

14  **A.**   No.

15  **Q.**   And, in fact, Jesse Gonzalez told you that Kmart is not as

16  strong in customer service as Target or Costco?

17  **A.**   Yes.

18  **Q.**   And he didn't know why that was the case, correct?

19  **A.**   I didn't ask him.

20  **Q.**   Well, do you know why that's the case?

21  **A.**   I don't know all the factors, no.

22  **Q.**   And when you spoke to Jesse Gonzalez, how long was that

23  conversation?

24  **A.**   I would say an hour.

25  **Q.**   You met face to face?

1  **A.**   No.   We talked by phone.

2  **Q.**   And did Jesse Gonzalez speak to you about whether he

3  thought cashiers could do their job while seated?

4  **A.**   No.

5  **Q.**   Did you ever ask Kmart whether it had ever attempted to

6  gather information from Kmart customers to determine how they

7  would feel about being checked out by seated cashiers?

8  **A.**   No.   I was asked to be -- to give my opinion based on my

9  expertise, not to do that.

10 **Q.**   Did you speak to anyone at Aldi about how seated cashiers

11 are working out for them and their business model?

12 **A.**   No.   I spoke to no one at Aldi.

13 **Q.**   Did you speak -- so I take it that you did not ask anybody

14 at Aldi whether customer service standards decreased with

15 seated cashiers?

16 **A.**   No, but I know the answer to that.

17 **Q.**   Have you reviewed any literature, whatsoever, showing that

18 customer service drops off when a retailers moves from standing

19 to seated cashiers?

20 **A.**   There is no literature on that.

21 **Q.**   And when you do customer satisfaction survey work --

22 SERVQUAL, I think you referenced; is that right?

23 **A.**   Yes.

24 **Q.**   SERVQUAL gives you a ranking back on a scale of 1 to 7,

25 showing -- showing the 1, I assume, being poor customer

1  service, and 7 being great customer service?

2  **A.**    That's a rating.

3  **Q.**    The SERVQUAL rating?

4  **A.**    Yeah.

5  **Q.**    Right.

6  **A.**    SERVQUAL answers are answered on rating scales.

7  **Q.**    And, tell me, on a SERVQUAL scale of 1 to 7, where would

8  customers grade seated versus standing cashiers?

9  **A.**    I do not know.

10  **Q.**    Have your drafted a survey for Kmart customers, to study

11  the issues in this case?

12  **A.**    No.

13  **Q.**    And if you had had enough time to have done so, would you

14  have wanted to have done a Kmart customer service survey, to

15  study the issues that you're testifying about here today?

16  **A.**    I would have no objection.

17  **Q.**    And can you tell me when -- when you do these customer

18  service or customer satisfaction surveys such as SERVQUAL, you

19  go through those and organize the data based upon ethnicity,

20  gender, age, education, demographics of the customer, correct?

21  You try to slice it those different ways so you can get a

22  better picture?

23  **A.**    One can do that.

24  **Q.**    So tell me how the -- how would the perceptions of seated

25  versus standing cashiers at Kmart vary by ethnicity of the

1   customer?

2   **A.**    I do not know.

3   **Q.**    How about gender?

4   **A.**    I don't know.

5   **Q.**    How about age?

6   **A.**    I don't know, but I -- I don't know.

7   **Q.**    Economic demographics?

8   **A.**    I don't know.

9   **Q.**    Education level?

10  **A.**    Don't know.

11  **Q.**    How about where the customer lives in the United States,

12  north, south, east, west?

13  **A.**    I don't know.

14  **Q.**    Can you tell me at least what the demographics are of the

15  customers who shop at the Kmart in Tulare?

16  **A.**    I don't know.

17  **Q.**    Do you know what their education, age, ethnicity, or

18  gender typically is?

19  **A.**    No.

20  **Q.**    Do you have any opinion about whether the welfare or

21  comfort of Kmart employees would be impacted positively or

22  negatively from being seated versus standing?

23  **A.**    No.

24  **Q.**    And you understand that -- strike that.

25        Do you -- strike that.

1      Were you led to believe that Kmart has a policy to require

2   its cashiers to stand in California?

3   **A.**   No.

4   **Q.**   Do you know whether Kmart -- what Kmart's policy is with

5   regard to seated versus standing cashiers?

6   **A.**   I know that all cashiers in all department stores in the

7   United States stand.  Well, I would say that the standard is

8   for that to happen.  The industry standard is to have cashiers

9   standing.

10  **Q.**   And you're fairly well-traveled?  You're been to England,

11  at least.  I guess that qualifies as well-traveled.  When I was

12  a kid it did.

13  **A.**   I've been to England.

14  **Q.**   Okay.  And you've observed seated cashiers at retail

15  stores in England?

16  **A.**   Yes.

17  **Q.**   Have you ever researched whether there has been a drop-off

18  in customer service attitudes England based upon the retailers

19  having seated cashiers over there?

20  **A.**   No.  And I don't know how long that has been the policy

21  there.

22  **Q.**   Did you ever ask Kmart if it had ever made seats available

23  to cashiers at the front end checkout areas in California?

24  **A.**   No.

25  **Q.**   Did you ever ask the frequency with which cashiers used

1   seats at checkout -- front end checkout areas in California?

2   **A.**    No.

3   **Q.**    Did you ever determine the frequency with which cashiers

4   used seats at the checkout area in California?

5   **A.**    No.

6   **Q.**    Can you tell me -- you testified a little bit about how

7   revenues would be positively or negatively affected by customer

8   service, right?

9   **A.**    Yes.

10  **Q.**    All right.  And can you tell me what the revenue was for

11  the Tulare store last year?

12  **A.**    No.

13  **Q.**    Well, how about the net income?

14  **A.**    No.

15  **Q.**    Can you tell me anything about the financial performance

16  of the Tulare store last year?

17  **A.**    No.

18  **Q.**    Can you tell me what you would expect to see in terms of

19  an increase or decrease in revenue if the Tulare store in

20  California introduced seats for its cashiers?

21  **A.**    I would expect customer satisfaction to be affected.  And

22  if the research holds -- which it holds very strongly -- I

23  would expect that that also could have a decrease in financial

24  performance.

25  **Q.**    How much?

ZEITHAML - CROSS / RIGHETTI

1   **A.**   I don't know.

2   **Q.**   And what is the employee turnover for the cashiers at the

3   Tulare store?

4   **A.**   I do not know.

5   **Q.**   And part of your assumptions that customer service would

6   drop off is that seated cashiers could not make good eye

7   contact, correct?

8   **A.**   That's one factor.

9   **Q.**   But you don't know what the level of the eyes would be of

10   a seated cashier based upon -- strike that.

11       If Kmart introduced seats to its cashiers, you're assuming

12   that, what, that the seat would be a desk chair similar to what

13   we're sitting at at counsel table?

14   **A.**   Uhm, I hadn't made any particular assumption, but I -- I

15   would say that if a cashier is seated, that that cashier is

16   probably not at eye level with the customer.

17   **Q.**   And if they were roughly at eye level with the customer,

18   would that impact your opinions?

19   **A.**   A little hypothetical, but it would be one factor.

20   **Q.**   And if the eye level didn't change appreciably, then that

21   would tend to make you think that it may not have as big an

22   impact on customer service?

23   **A.**   I really can't say.

24   **Q.**   And you don't know whether a seated cashier could reliably

25   check out customers, correct?

1  A.   Reliability, in my view, deals more with the transactional

2  aspect of checking customers out.  You know, the basic skills.

3  Q.   Is it your testimony that you do know that -- how a seated

4  cashier -- strike that.

5      Do you have an opinion that a seated cashier could or

6  could not reliably check out customers?

7  A.   No.  But I am saying that reliability is about consistency

8  and dependability of performance.  And that's about the

9  process.  So that's typically about the -- the transactional

10 nature of checkout, rather than the relationship, the

11 engagement, the commitment, the connection.

12 Q.   You understand that there's also a correlation between pay

13 rates that are paid to the employees and the level of customer

14 service that is provided to the customer, right?

15 A.   I don't know in this situation.

16 Q.   Well, is there a correlation between pay rates and

17 customer service?

18 A.   There's -- there are many factors that link to employee

19 performance.

20 Q.   I'm just asking whether if you pay somebody minimum wage

21 would you expect the same level of customer service as paying

22 an employee a higher wage, in your industry?

23 A.   All other things equal, yes.  But there are other factors.

24 Q.   I understand.  But you would expect a lower level of

25 customer service from a minimum wage worker than you would from

 1  a higher-earning worker, correct?

 2  **A.**    All other things equal.

 3  **Q.**    And the experience that employees have, the tenure that

 4  they have in the store has an impact on customer service,

 5  right?

 6  **A.**    It could be positive and it could be negative.

 7  **Q.**    And some of that depends on how happy -- strike that.

 8         Some of that depends on how happy the employees are,

 9  right?

10  **A.**    Possibly.

11  **Q.**    Well, isn't it true that you would expect better customer

12  service from a happy employee as compared to an unhappy

13  employee?

14  **A.**    The happiness of employee is not as important, according

15  to research, as whether the company gives the employee the

16  tools to deliver customer satisfaction well.  So it's not

17  happiness.  It's whether the company gives the customer -- I'm

18  sorry, the employee the tools.

19  **Q.**    Is it your testimony that a wheelchair user could not

20  provide quality customer service?

21  **A.**    No, I didn't say that.

22  **Q.**    I said that.

23  **A.**    So do I think that a wheelchair employee could provide

24  customer service?

25  **Q.**    My question is whether you believe a wheel- -- you

1 understand that a wheelchair user would be seated, correct?

2 **A.**    Correct.

3 **Q.**    Is it your testimony that a wheelchair user could not

4 provide a high level of customer service?

5 **A.**    That's a double negative.  Could you make it --

6         **THE COURT:**  Wait.  I'm going to let you ask this

7 question, but are you talking about at the Kmart store, or just

8 as a general proposition?

9         **MR. MATTHEW RIGHETTI:**  Right now, it's just as a

10 general proposition.

11         **THE COURT:**  All right.  So not necessary -- could be a

12 jewelry store.  Could be any kind of a store, as opposed to the

13 Kmart.  All right.

14     So with that understanding, please answer the question.

15         **THE WITNESS:**  Okay.  Could you say it again.

16 **BY MR. MATTHEW RIGHETTI:**

17 **Q.**    Is it your testimony that you would expect customer

18 perceptions to drop off if a customer was served by a

19 wheelchair user as opposed to a standing cashier in the retail

20 industry in general?

21 **A.**    That's a very extreme comparison.

22     I would say that -- that customers would view someone in a

23 wheelchair in a different way than a regularly-seated cashier.

24 **Q.**    Meaning what?  How would they see a wheelchair user as

25 compared to a standing cashier?

1  **A.**   As handicapped user.  And they might give that user more

2  leeway.

3  **Q.**   So you would expect that if Kmart allowed wheelchair users

4  to be cashiers at the front end, that that would not impact

5  customer service perceptions?

6  **A.**   I really don't know.

7  **Q.**   Do you -- you don't know the CSAT Kmart ratings given by

8  customers to cashiers at the Tulare store, right?

9  **A.**   Right.

10  **Q.**   And you don't know the ranking of Tulare cashiers as

11  compared to other cashiers in California?

12  **A.**   Right.

13  **Q.**   How about nationally?

14  **A.**   No.

15  **Q.**   How does California, in general, compare nationally in

16  customer service CSAT scores?

17  **A.**   I don't know.

18  **Q.**   And can you tell me how many Five Star awards -- you

19  talked about the Five Star awards, and you also talked about

20  the Ultimate Cashier.  And what was the third metric that you

21  said --

22  **A.**   WANT.

23  **Q.**   WANT.  That's right.  So tell me what the -- there's a

24  score for WANT, at Kmart?

25  **A.**   It's not a score.  It's when a corporate or regional

 1  visitor gives -- identifies someone delivering excellent

 2  service.

 3  **Q.**   There you go.

 4  **A.**   And they give 'em a gift.

 5  **Q.**   And how many such recognitions have been given to Tulare

 6  cashiers?

 7  **A.**   Don't know.

 8  **Q.**   How many have been given to cashiers in California?

 9  **A.**   I don't know.

10  **Q.**   How about Five Star award, same question?

11  **A.**   Don't know.

12  **Q.**   How about Ultimate Cashier award, same question?

13  **A.**   I don't know, but there's one a year.

14  **Q.**   And did that come from California?

15  **A.**   I don't know.

16  **Q.**   You don't know what the percentage change of customer

17  satisfaction would be in Tulare if seats were provided to

18  cashiers at the front end checkout, right?

19  **A.**   Right.

20  **Q.**   And you don't know what the percentage change of customer

21  satisfaction would be if seats were provided to all front end

22  cashiers at the stores in California, right?

23  **A.**   Right.

24          MR. MATTHEW RIGHETTI:  Nothing further, your Honor.

25          THE COURT:  How long will the redirect take?

1          **MR. ADKINS:**  Not very long, your Honor.

2          **THE COURT:**  What does that mean?

3          **MR. ADKINS:**  How about two minutes?

4          **THE COURT:**  All right.  We will finish up the witness

5   before we take our break.  Go ahead.

6                      <u>**REDIRECT EXAMINATION**</u>

7   **BY MR. ADKINS:**

8   **Q.**   Dr. Zeithaml, Mr. Righetti was asking you some questions a

9   moment ago about how you didn't interview any cashiers at

10  Kmart.  Do you remember those questions?

11  **A.**   I do.

12  **Q.**   And your opinion focuses on, as you testified earlier,

13  customer perceptions.

14          Would interviewing cashiers have changed your opinion on

15  customer perceptions?

16  **A.**   No, it would not.

17  **Q.**   He asked you questions about whether or not, in your view,

18  the cashiers at Kmart could do their job while seated.  Do you

19  remember those questions?

20  **A.**   I do.

21  **Q.**   Is customer service a part of the cashier's job at Kmart?

22  **A.**   It is.  And I would say it's the most important part.

23  **Q.**   Plaintiff's attorney asked you some questions about Aldi.

24  Do you remember that?

25  **A.**   Yes.

ZEITHAML - REDIRECT / ADKINS

1  Q.   Mr. Righetti asked you about -- and Aldi is the

2  European-based model where the cashier is seated, correct?

3  A.   Yes.

4  Q.   Okay.  And Mr. Righetti asked you about whether service,

5  customer service drops because of that model, or words to that

6  effect.  Do you remember him asking you that?

7  A.   Yes.

8  Q.   And you said you have an answer to that question.  Do you

9  remember saying that?

10  A.   I do.

11  Q.   What is that answer?

12  A.   I know the performance of Aldi in the United States, and

13  it's very low.  It ranks almost at the bottom, in terms of

14  grocery retailing, in every state, particularly in large

15  states, including California.

16      It has very poor financial performance, very low customer

17  satisfaction scores.  And, actually, they don't even appear on

18  any customer satisfaction evaluation.  The only thing I could

19  find were reams and reams of complaints, online, about how bad

20  Aldi performed in terms of customer service.

21          **MR. ADKINS:**  No further questions, your Honor.

22          **THE COURT:**  All right.

23                    **RECROSS EXAMINATION**

24  BY MR. MATTHEW RIGHETTI:

25  Q.   So how many Aldis are there in California?

1  A.   I don't know.

2  Q.   Can you tell me the location of a single Aldi in

3  California?

4  A.   No.  But I have material that shows that.

5  Q.   So if the -- I want to get back to this -- the customer

6  perception.

7       I think you said that customers expect in the retail

8  industry to see cashiers standing, and if all the sudden Kmart

9  went to seated cashiers or the sit/stand option that could

10 throw things off, right?

11 A.   Yes.

12 Q.   All right.  And would the same reasoning apply, that if

13 all of them were seated in all the retailers, and Kmart

14 suddenly went to standing cashiers, that would throw off

15 customers?

16 A.   So you're saying if everybody seated their cashiers, and

17 Kmart suddenly had their cashiers standing again, would Kmart

18 look better?

19          MR. ADKINS:  I'd object to scope, your Honor.

20          THE COURT:  Was this asked on the redirect?  You have

21 to stick within the scope of the redirect.

22          MR. MATTHEW RIGHETTI:  I thought they covered it in

23 their general --

24          THE COURT:  No.

25          MR. MATTHEW RIGHETTI:  It will be my last question,

 1   your Honor.

 2            THE COURT:  Do what?

 3            MR. MATTHEW RIGHETTI:  It would be my last question.

 4   I was following up on the questions you had during the direct.

 5            THE COURT:  Well, that was a long time ago.

 6       All right.  Answer this one question.  It's a

 7   hypothetical.

 8            THE WITNESS:  Okay.

 9            THE COURT:  If in the United States the custom and

10   practice was that every cashier was seated --

11            THE WITNESS:  All of them?

12            THE COURT:  -- all of them, and then suddenly Kmart

13   decided to make them stand up, would that reduce customer

14   satisfaction?

15            THE WITNESS:  Would it reduce or increase?  It would

16   increase the satisfaction in Kmart, I believe.

17            MR. MATTHEW RIGHETTI:  Okay.

18            THE WITNESS:  Because it would provide better customer

19   service.

20   BY MR. MATTHEW RIGHETTI:

21   Q.   You have no data to suggest that one way or the other,

22   either seated, standing, or --

23   A.   It's so hypothetical --

24   Q.   Right?

25   A.   It's so hypothetical, it's hard to wrap my head around.

1   Q.   I missed your answer.

2            THE COURT:  She said it's so hard to understand the

3   hypothetical --

4            MR. MATTHEW RIGHETTI:  Okay.

5            THE COURT:  -- she can't get her head around it.

6            MR. MATTHEW RIGHETTI:  It was your question, your

7   Honor, so I'll rest.

8            THE COURT:  It wasn't exactly my question, but, fine.

9       All right.  Can the witness now leave?

10           MR. ADKINS:  Yes, Your Honor.

11           THE COURT:  Done?

12           MR. MATTHEW RIGHETTI:  Yes, Your Honor.

13           THE COURT:  Okay.  Dr. Zeithaml --

14           THE WITNESS:  Very good.

15           THE COURT:  -- have a good day.  Safe journey back to

16   North Carolina.

17       All right.  We're going to take our 15-minute break here,

18   unless you have something to bring up with the judge.

19           MR. ADKINS:  No, Your Honor.

20           THE COURT:  Who is our next witness going to be?

21           MR. ADKINS:  Greg Ebert.

22           THE COURT:  What's his area?

23           MR. ADKINS:  Store operations at Kmart, Your Honor.

24           THE COURT:  All right.  We'll resume in 15 minutes.

25   Thank you.

813

PROCEEDINGS

```
 1        (Recess taken from 9:34 to 9:54 a.m.)

 2        THE COURT:  Next witness.

 3        MR. ADKINS:  Thank you, Your Honor.  The defense calls

 4   Greg Ebert.

 5        THE COURT:  Okay.  Mr. Ebert, where are you?  Please

 6   come up here.

 7                        GREG EBERT,

 8   called as a witness for the Defendant herein, having been first

 9   duly sworn, was examined and testified as follows:

10        THE WITNESS:  Yes, I do.

11        THE CLERK:  Okay.  Thank you.  Please be seated.

12        THE COURT:  Welcome.  You need to sit about this close

13   to the microphone.  It moves all around.  It will go up and

14   down.

15        THE WITNESS:  About this close?

16        THE COURT:  A little closer.  That's good.

17        THE WITNESS:  Thanks.

18        THE COURT:  Say your name.

19        THE WITNESS:  Greg Ebert.

20        THE COURT:  Everybody hear okay?  Perfect.

21      Go ahead, counsel.

22        MR. ADKINS:  Thank you, Your Honor.

23                    DIRECT EXAMINATION

24   BY MR. ADKINS:

25   Q.   Mr. Ebert, what is your position at Kmart?
```

1  **A.**   I am the divisional vice president of store operations.

2  **Q.**   And how long have you held that position?

3  **A.**   I've held this position for about three years now.

4  **Q.**   Can you describe for the court what that position entails?

5  **A.**   My primary responsibility is managing labor expenses,

6  select supply expenses.  I do a lot of ad hoc reporting

7  analysis on various topics.  And I manage other projects.  As

8  an example, our fleet of shopping carts.

9  **Q.**   How long have you worked for Kmart?

10 **A.**   I've worked for Kmart for about 27 years now.

11 **Q.**   And can you describe, just generally, what your other

12 positions have been at Kmart.

13 **A.**   I've had positions of increasing responsibilities,

14 starting off in the stores as an hourly associate in the

15 sporting goods and automotive department; assistant manager,

16 manager of store operations, director of store operations, and

17 my current position.

18 **Q.**   Have you ever testified in court before, sir?

19 **A.**   I have not.

20 **Q.**   As the vice president of store operations, have you had

21 experience with fixture remodels?

22 **A.**   Yes, I have.

23 **Q.**   What is a fixture remodel?

24 **A.**   A fixture remodel is when we go into a store and we

25 replace broken, obsolete, outdated or worn-out fixtures and,

```
 1  essentially, remodel the store from that perspective.

 2  Q.   Are checkstands considered fixtures?

 3  A.   Yes, they are.

 4          MR. ADKINS:   Could we put up photo -- see if we're

 5  able to put up Exhibit 15, page 65.

 6          THE CLERK:   All right.

 7          MR. ADKINS:   This is already in evidence, your Honor.

 8      (Document displayed.)

 9  BY MR. ADKINS:

10  Q.   Do you recognize that as --

11  A.   Yes, I do.   It's our standard checkout stand.

12  Q.   And as vice president of store operations, have you been

13  involved in the replacement of these type of checkstands?

14  A.   Yes, I have.

15  Q.   And in that process, do you review cost estimates in

16  replacing existing checkstands?

17  A.   I do.

18  Q.   Where do you get that information from?

19  A.   I get that information from a variety of sources inside

20  the company, from our space planning department, the

21  procurement areas, the project managers.   That's where I get

22  the costs from.

23  Q.   When was the last time you replaced a front end

24  checkstand?

25  A.   It was about a year ago.   There was a store that was
```

EBERT - DIRECT / ADKINS

1   impacted by a flood, and the checkstands had to be replaced.

2   **Q.**   Based on your experience, how much does it cost,

3   approximately, to replace a Kmart checkstand?

4   **A.**   My recollection, it varies depending upon a number of

5   factors.  But it's about $10,000 per front end fixture.

6   **Q.**   When you say front end fixture, can you explain what

7   you're talking about?

8   **A.**   I'm talking about the physical checkout stand that the POS

9   equipment sits upon.

10  **Q.**   And what is POS equipment?

11          **THE COURT:**  I'm sorry, are you including in that the

12  electronic equipment, the computer and the -- or are you just

13  talking about the plyboard?

14          **THE WITNESS:**  I'm talking about just the plyboard and

15  all the labor associated, and costs associated with removing

16  the old, deploying the new, running the electrical work, but

17  keeping the existing hardware that you see in this picture.

18          **THE COURT:**  Wait a minute.  I want to make sure I got

19  that, because that seems like a lot to me.

20      You're saying it would cost 10,000 -- not for the

21  computers, not for the hardware, but just to replace that --

22  it's not plyboard, but whatever that's called, pull out the old

23  and put in the new one, and labor to do that, and the

24  materials, is $10,000?

25          **THE WITNESS:**  Yeah.  That's what -- that's what the

1  average cost runs.  And there's a lot of components that you

2  don't really see from the picture.  You know, in terms of

3  essentially going through and pulling out the old, getting a

4  dumpster to pull out -- to deposit it, the cost associated with

5  having the dumpster dropped off and picked up, and all those

6  associated fees.

7      Then there's scissor lifts that we have to use to run the

8  electrical work.  Sometimes there are permits that come into

9  play.  Sometimes there's floor abatement issues that we have to

10 deal with when we move the fixture.

11        THE COURT:  All right.  That's your -- that's your

12 view, it's $10,000.  But I still think that's high.  I don't

13 know.  I'd like to see the itemization on that.

14     Now, if it was including the hardware, I would say fine, I

15 understand that.  But you're saying it doesn't include the

16 hardware.

17        THE WITNESS:  That is correct.

18        THE COURT:  Okay.

19 BY MR. ADKINS:

20 Q.   How much does the electronic -- you call it the POS items,

21 the scanner, the deactivator, the register, the pin pad, how

22 much does it cost to obtain and install those items if new?

23 A.   The cost estimates that we have from the procurement

24 department is that runs about $7,200.

25 Q.   Now, that could be less, correct, if you weren't going to

1  go with new items?

2  **A.**    Yes.  You know, there are probably other ways that you

3  could reduce that cost.  Buy used equipment, potentially would

4  help solve that.

5  **Q.**    In addition to the costs we just talked about, are there

6  other costs that are harder to define, that would go into the

7  replacement of an existing checkstand?

8  **A.**    I mean, like I said before, you have a lot of the

9  electrical work, the re-merchandising, pulling all the products

10 off of the existing fixtures, deploying the new, and then

11 re-merchandising it.  So you have things along that line.

12 **Q.**    Now, what if you were removing the existing checkstand and

13 putting in a new, different model of checkstand, would there be

14 additional costs that might be involved in that process?

15 **A.**    Yes. I think there are other costs that would definitely

16 occur if we were putting in a new stand.

17        Some of those costs could be, are we doing a belted

18 register?  You know, does the new stand require additional

19 training for the associates, or new training?  You know,

20 developing that training and running the associates through

21 that training, so they know how to utilize the new equipment

22 and configuration.

23 **Q.**    What is your best estimate, generally, for the cost of

24 replacing an existing checkstand with a newly-configured

25 checkstand at Kmart?

1   **A.**   Are you talking about the checkstand that plaintiffs are

2   arguing for, or -- I don't know what model you're talking

3   about.

4   **Q.**   I was just asking a general question in terms of the costs

5   that would be associated with a checkstand that does not fit

6   the same footprint, potentially, in the Kmart store, if there

7   are costs associated with that process.

8           **THE COURT:**  Well, the general cost items, that's fine.

9   But I don't know how you could possibly -- okay.

10          Go ahead.  Answer the question.  Let's see where this is

11  going first.

12          **MR. ADKINS:**  Let me rephrase the question because I

13  think, your Honor, you're right.

14  **BY MR. ADKINS:**

15  **Q.**   Is it extremely difficult to estimate those types of costs

16  for a newly-configured checkstand?

17          **THE COURT:**  Isn't that a leading question?

18          **MR. ADKINS:**  It is.

19          **THE COURT:**  After all the objections you made before

20  about leading, I'm going to object myself.

21      (Laughter)

22          **THE COURT:**  Please don't lead your own witness like

23  that.

24  **BY MR. ADKINS:**

25  **Q.**   Are there additional costs associated with putting in a

1 newly-configured checkstand, in your experience?

2 **A.**     There would be additional cost.  Relative to quantifying

3 those, it would depend upon exactly what fixture we were

4 deploying; if the existing POS equipment that we have, the

5 hardware, would work in conjunction with that; is there enough

6 space on the device to accommodate that; do we need to have a

7 belted register; is there floor abatement work that has to

8 occur.  So there are a lot of unknown costs.

9          **THE COURT:**  All right.  I understand that answer.

10     Now, why don't you have a belted conveyor belt to begin

11 with?  You know a lot of stores have belted -- I go to a

12 grocery store.  They always have a belt there.  Why doesn't the

13 Kmart have a belt?

14          **THE WITNESS:**  In the typical grocery store you have a

15 lot more volume worth of items purchased.  A typical Kmart

16 transaction is about 5.6 items per transaction, where in our

17 Super K stores, that are similar to a grocery store, a typical

18 transaction is somewhere in the neighborhood of 20 to 30 items

19 per transaction.

20     So the way the stands were originally designed, they were

21 designed to accommodate that type of a transaction.

22          **THE COURT:**  Okay.  Thank you.

23     Go ahead.  Next question.

24 **BY MR. ADKINS:**

25 **Q.**   Are you able to give an estimate on what it would cost to

1    replace an existing checkstand with a newly-configured

2    checkstand?

3              **MR. MATTHEW RIGHETTI:**  Objection.  Vague.

4              **THE COURT:**  It is vague because we don't know what the

5    new stand would be.  I don't know what that even would mean, so

6    sustained.

7    **BY MR. ADKINS:**

8    **Q.**   Let me move on to something else.

9         There have been some questions asked this morning about

10   the financial condition of the Tulare Kmart store.  Are you

11   aware of the current financial condition of the Tulare Kmart

12   store?

13   **A.**   I am.

14   **Q.**   What is that?

15   **A.**   The store's financial performance has been suffering.

16   Back in 2010, it made roughly half-a-million dollars in profit.

17   In 2011, it made roughly $257,000 in profit.  On a year-to-date

18   basis through September, the store is $120,000 behind where

19   they were last year, in terms of profit.

20        If you assume, you know, a very optimistic scenario, that

21   the fourth quarter is going to be as profitable as it was last

22   year, best-case scenario for this store is they would go from

23   $257,000 in profit to about $120,000 of profit.

24   **Q.**   And that's through the whole Tulare Kmart store?

25   **A.**   Correct.

822

 1           THE COURT:  Is that number an annual number or a

 2   monthly number?  What is that number?

 3           THE WITNESS:  Those are annual numbers, your Honor.

 4   BY MR. ADKINS:

 5   Q.   Now, getting away from cost, specific cost on replacement

 6   of checkstands, in your experience as the vice president of

 7   store operations, are there issues raised with -- in the

 8   context of replacing a checkstand with a newly-configured

 9   checkstand?

10           MR. MATTHEW RIGHETTI:  Objection.  Vague again.

11           THE COURT:  No.  You can answer.  Please answer.

12   Overruled.

13           THE WITNESS:  Yes, based on my experience, I think, if

14   we were to replace our existing checkout stands with a new

15   configuration, there are definitely potential additional costs

16   or risks or unknowns that we would have to understand.

17   BY MR. ADKINS:

18   Q.   What are those?

19   A.   I would say they fall into three buckets.

20       The first bucket is the new configuration, does it fit

21   into the existing footprint of the existing checkout front end

22   area?

23       So what I'm saying, at the Tulare store, as an example, if

24   I deployed seven new checkout stands in that store, does it fit

25   in exactly the same spots where the existing checkout lanes

1   fit?

2        Assuming that it does, not knowing what this future

3   fixture looks like, we would definitely need to do some studies

4   to understand what kind of impact the fixture has on

5   productivity.  It's a very important element.

6        If the -- if I get the same level of productivity on the

7   fixture that I have today, the risk is relatively -- there's no

8   risk.  But not knowing what that's going to be, there is a

9   chance that it could be a less productive stand, and that could

10  increase my cost, make the lines longer for the customer, and

11  have a negative experience for the customer in that regard.

12  **Q.**   You mentioned three buckets.  What are the other buckets?

13  **A.**   The second bucket I would categorize this in is, let's

14  just say that the new, future fixture doesn't have the exact

15  same dimensions as the existing checkout stand, and we chose to

16  or were not able to expand the space on the front end

17  checkouts.

18       That would, essentially, leave us with the option of

19  reducing the number of checkout lanes that we would have

20  available.  So in the Tulare store, potentially, we would have

21  to go from seven lanes down to six lanes.

22       If that was to occur, during our peak volume periods, our

23  customers would experience longer checkout lines because I just

24  wouldn't have as much capacity to service the customer.  So

25  that could certainly have a negative, you know, influence on

 1  where the customer decides to shop.

 2      I could try to remedy that situation by adding additional

 3  labor.  So, as an example, I could supplement the cashier with

 4  a bagger, you know.  Once again, not knowing exactly what the

 5  future configuration is, it's hard to say.  But, in theory, I

 6  could add a bagger to help the lines move faster or get closer

 7  to what I used to be at, you know, with one less checkout lane.

 8      The third bucket is, really, if we decide, okay, the

 9  fixture is larger sized than our current fixture, the future

10  fixture that is, and we need to expand the footprint of the

11  checkout -- the front end checkout area, now I have to take

12  space from some other area of the store.

13      And this one is especially risky.  As soon as we do

14  this -- the way that the store floor plans are designed, it's

15  to optimize selling square footage and generate sales.  So if

16  now I have to remove X amount of selling square footage from

17  selling products to servicing the customer at the checkout,

18  it's very likely to have an impact on my sales.

19      Typical store in the state of California generates about

20  $174 of sales per selling square foot.  So if I lost a hundred

21  square feet in a particular store, I would be losing $17,000 in

22  sales on an annual basis.  If I had to give up a thousand

23  selling square feet to accommodate it, that's $174,000 in lost

24  revenue.

25      Beyond that, one of the other bigger risks is, you know,

 1   what's going to happen to the rest of the store?  So if I have

 2   to, let's say, expand the checkout six feet in one direction,

 3   what do I have to displace?  So let's just say the cosmetic

 4   department is adjacent to the front end checkouts.  If I take

 5   six feet of space away from there, they lose one rung of their

 6   fixtures.

 7        Where am I going to put that other fixture?  I have to

 8   keep the department together, so I may end up having to move

 9   the entire cosmetics department, and find something else to fit

10   into that space.

11        When we've made moves like this in the past, it's a big

12   domino effect.  What you think's going to start off as a

13   relatively minor change ripples through the store, and you end

14   up having costs that go into the hundreds of thousands of

15   dollars by the time you re-shift everything around in the

16   store.

17        Because adjacencies are very important.  I don't want to

18   just drop, you know, automotive next to infants.  There are

19   certain departments that have nice adjacencies and make sense

20   from a merchandising perspective.

21   **Q.**   Are those among the questions that come to mind when you

22   consider putting in a reconfigured checkstand?

23   **A.**   Those are the big concerns I would have relative to

24   changing the front end configuration.

25        **MR. ADKINS:**  No further questions, your Honor.

```
 1            THE COURT:  I could ask a question before the cross so
 2   that Mr. Righetti will have the benefit of what I want to ask.
 3       Is that all right, Mr. Righetti?
 4            MR. MATTHEW RIGHETTI:  Yes.
 5            THE COURT:  All right.  The -- while we have that
 6   picture -- do you see that picture there?
 7            THE WITNESS:  I do, your Honor.
 8            THE COURT:  All right.  It's been explained to us
 9   already, so it's not like I don't know what the various things
10   are.  But you seem to be the person who knows about the
11   configuration, so let me ask you, do you have some -- can you
12   explain to us how you settled on this particular design?
13       In other words, what's so good or so bad about this
14   particular design, and why is it that Kmart uses this design of
15   a checkout stand?  Or is it just, you know, randomly thrown
16   together?
17            THE WITNESS:  It's certainly not randomly thrown
18   together.
19       The checkout stand that we have today, this is very
20   similar to what we've been using for a long period of time.
21   It's very, very similar to what many or most of our major
22   competitors are using.
23       You know, you may have some variations, belted versus
24   unbelted, but the physical workspace that the cashier is in is
25   very, very similar.
```

1        I wish I could tell you exactly how the original design

2   came up, but I think we were using this back when I started

3   with the company in 1986, this particular configuration.

4        **THE COURT:**  All right.  Thank you.

5        Mr. Righetti, your turn.

6                          <u>**CROSS EXAMINATION**</u>

7   **BY MR. MATTHEW RIGHETTI:**

8   **Q.**   Good morning, Mr. Ebert.

9   **A.**   Good morning.

10  **Q.**   So you understand that we're here about whether -- whether

11  seats should be provided as an option for cashiers in the

12  California Kmart stores, right?

13  **A.**   Yes.

14  **Q.**   And are you aware that there's an exemption provision in

15  Section 17 of the Wage Order that would allow Kmart to seek an

16  exemption from the seating requirements of Section 14?

17       **MR. ADKINS:**  Your Honor, I would object to scope.

18       **MR. MATTHEW RIGHETTI:**  It's just foundation.

19       **THE COURT:**  Sustained.  The objection is sustained.

20  This is beyond the scope.

21  **BY MR. MATTHEW RIGHETTI:**

22  **Q.**   You're talking about the cost of remodeling the front --

23  the front end checkout stations, right?

24  **A.**   Yes.

25  **Q.**   You're familiar with the fact that for the last four or

1  five years Kmart has been operating under a consent decree from

2  a federal judge in Denver, right?

3  **A.**    I'm not aware of that.

4  **Q.**    In order to bring all the stores nationwide into

5  compliance with the ADA, you're not familiar with that?

6  **A.**    Oh, the ADA law, yes, I am familiar with that.

7  **Q.**    And you're familiar with the fact that in order to comply

8  with state and federal laws, many times Kmart has to change the

9  configuration of its stores?

10 **A.**    There are requirements that we must comply with, yes.

11 **Q.**    And how frequently have stores in California remodeled?

12 **A.**    You know, our company, we don't do a lot of remodeling

13 work.  You know, our financial position really doesn't allow

14 for that.

15 **Q.**    So the -- the existing configuration in Kmart has been

16 that for 21 years, right?

17        **THE COURT:**  You mean in Tulare?

18        **MR. MATTHEW RIGHETTI:**  Tulare.  What did I say?

19        **THE COURT:**  You said in "Kmart."

20 **BY MR. MATTHEW RIGHETTI:**

21 **Q.**    In Kmart in Tulare, correct?

22 **A.**    I'm not familiar of the last time that store was remodeled

23 or if it was ever remodeled.  I've never been to that

24 particular location.

25 **Q.**    Open any new stores in California, Kmart stores?

1    **A.**    We have not opened any new stores, technically, since

2    2000'ish, like right at the beginning of 2000.  There have been

3    a couple of stores that we -- that were hit by natural

4    disasters, that were destroyed.  Based on our lease

5    obligations, we were forced to, essentially, reconstitute the

6    business.

7    **Q.**    If you take a look at this slide, 2B, which is Exhibit

8    216-A on the easel, do you see that?

9    **A.**    Yes.

10   **Q.**    Is that about the -- a fair representation of the

11   configuration of the footprint for the Tulure Kmart, of a

12   checkout counter?

13   **A.**    From what I can see from here, yes, it looks pretty close

14   to what it is.

15   **Q.**    And have you looked at options for changing the -- how the

16   footprint would change, if at all, if you reconfigured that

17   workstation to a seated option?

18   **A.**    I'm not aware of any work that's occurred to redesign the

19   checkout stand.

20   **Q.**    Not even conceptual work?

21   **A.**    No.

22   **Q.**    Is that correct?

23   **A.**    That is correct.

24   **Q.**    Are you familiar -- you talked about Kmart's competitors,

25   one being Wal-Mart, right?

1   **A.**    Yes.

2   **Q.**    Are you familiar with the fact that Wal-Mart has handicap

3   accessible checkout counters, from the cashier's standpoint,

4   that will accommodate a cashier in a wheelchair?

5   **A.**    I'm not aware of that.

6   **Q.**    You talked about the financial performance of the Tulare

7   Kmart.  Kmart is a subsidiary of Sears, correct?

8   **A.**    That is correct.

9   **Q.**    And you're familiar with the fact that in 2011, Sears made

10  $374 million in profit, on $13.14 billion in revenue?  That's

11  about right?

12  **A.**    I know the Kmart number.  But the total corporate number,

13  sounds like that would be accurate because I believe the Sears

14  division actually had a loss that year, and Kmart had a gain.

15  Well, not a gain, but we had a profit.  It was meager.

16          **MR. MATTHEW RIGHETTI:**  Nothing further, Your Honor.

17  Oh, actually I do have one more thing.

18  **BY MR. MATTHEW RIGHETTI:**

19  **Q.**    Are you familiar with the job description for the cashiers

20  at Kmart?

21  **A.**    Yeah, I see that information from time to time in my

22  course of work.

23  **Q.**    Show you Exhibit 179.

24          And looking at 179, is this an accurate representation of

25  the job responsibilities of the cashier at the Kmarts in

1  California, including the physical demands of the job?

2  **A.**   I'm familiar with the top half of the document.  I'm not

3  familiar with seeing the table that's, you know, imprinted on

4  the bottom of this document.

5  **Q.**   Take a look at 181, which is, I think, the table alone,

6  from the bottom half of 179, right?

7  **A.**   Yeah, it looks like that's the case.

8  **Q.**   And can you read the top -- top part of that document,

9  181?

10        MR. ADKINS:  Has he asked if he recognizes the

11  document?

12  **BY MR. MATTHEW RIGHETTI:**

13  **Q.**   Let me ask you this, do you recognize the document?

14  **A.**   I recognize it as being what appears to be at the bottom

15  of this document (indicating).

16  **Q.**   And what does the top of it say?

17        MR. ADKINS:  Has he ever seen this document before?

18        THE COURT:  Are you just asking him to publish it?

19        MR. MATTHEW RIGHETTI:  Yes.

20        THE COURT:  There's no jury.  But, okay, just read the

21  top.  Tell us -- publish it for us.

22        THE WITNESS:  It says, "Physical requirements have

23  been added to job description in the job bank."

24  **BY MR. MATTHEW RIGHETTI:**

25  **Q.**   Is that your understanding, that those physical

1   requirements were added to the job description in the job bank?

2   **A.**   I don't know what "the job bank" is.

3   **Q.**   Okay.  Do you recognize that document as a Kmart document?

4   **A.**   I've not seen this document in conjunction with any of our

5   job descriptions.

6           **MR. MATTHEW RIGHETTI:**  All right.  Nothing further.

7           **THE COURT:**  Thank you.  Anything more?

8           **MR. ADKINS:**  Just very briefly, your Honor.

9                         <u>**REDIRECT EXAMINATION**</u>

10  BY MR. ADKINS:

11  **Q.**   When you are putting in the existing checkstand and doing

12  the remodels, do you usually have some kind of engineering

13  write-ups or specifications to help you do cost estimates?

14  **A.**   Yes.  When we do projects, you know, the planning

15  department, they, you know, essentially redraw the store.

16  Everything is specifically identified in terms of what needs to

17  happen.  And, you know, it's quantified to a very high degree.

18  **Q.**   Are you aware of any such very high degree documents

19  related to a remodel of this checkstand?

20  **A.**   Not specifically, no.

21  **Q.**   Do you have any experience with your job of folks giving

22  you -- people, employees, giving you proposals for projects and

23  reconfigurations?

24  **A.**   All the time.

25  **Q.**   What's that experience?

1  **A.**   My jaded experience is, people that want certain projects

2  done, you know-- and I'm specifically talking about merchants.

3  You know, if I'm in charge of the ladies' wear area, or men's

4  wear, or home accessories, they have a vision of what they

5  think will help the company drive more sales.  And, you know,

6  most of the time those estimates are overly optimistic,

7  assuming best case scenario, and almost always fall short of

8  true, actual performance.

9  **Q.**   Do you receive cost estimates?

10 **A.**   I certainly do.

11 **Q.**   And what's your experience with cost estimates?

12 **A.**   Typically, you know, the people that I work with, they

13 tend to understate what the costs are, and overstate what the

14 benefits of the activity are, so.

15 **Q.**   The plaintiff's attorney asked you a question about how

16 many new stores were open in California, or words to that

17 effect.  How many Kmart stores are there in California?

18 **A.**   Currently, there are 102 stores in the state of

19 California.

20 **Q.**   And how many nationwide?

21 **A.**   Uhm, you know, unfortunately, we keep closing stores, and

22 it's a moving target.  Right now, I believe, by the end of this

23 year, after we finish closing everything that's actively

24 closing, we're going to be at about 1,218 stores.

25        **MR. ADKINS:**   No further questions, your Honor.

```
 1              THE WITNESS:  Thank you.

 2              MR. MATTHEW RIGHETTI:  Real brief.

 3                     RECROSS EXAMINATION

 4   BY MR. MATTHEW RIGHETTI:

 5   Q.   How many proposals for reconfiguration of the checkout

 6   stands to a seated versus standing option have you evaluated?

 7   A.   I haven't seen any with, you know, essentially putting in

 8   any kind of seating option.

 9   Q.   Not even -- not a cost estimate, not a schematic, not a

10   spitball approach to it, not even discussed in your

11   departments?

12   A.   I haven't received anything.

13              MR. MATTHEW RIGHETTI:  All right.  Nothing further.

14              THE COURT:  May the witness be excused?

15              MR. ADKINS:  Yes, Your Honor.

16              MR. MATTHEW RIGHETTI:  Yes.

17              THE COURT:  Thank you, sir.  Leave those documents for

18   the lawyers to clean up.  Thank you.

19         Whoever put the documents up there ought to take them

20   back.  That was you, Mr. Righetti.  So let's keep our documents

21   straight.

22         All right.  Next witness.

23              MR. ADKINS:  Your Honor, our next witness would be

24   Dr. Fernandez, who is the one that we had discussed would be

25   called on Monday.
```

1           **THE COURT:**  He's your last witness?

2           **MR. ADKINS:**  That's correct, Your Honor.

3           **THE COURT:**  All right.  So, well, we have some time

4    here.  Here's what I would like for both of you to do.

5           Tell me if we have in evidence -- I know we to, but I want

6    to make sure of it, are there -- are there moving pictures or

7    video, I guess, is the right word, of these overhead shots of

8    what goes on at the Kmart in Tulare, at the checkout?  We've

9    seen some of it already.

10          **MR. ADKINS:**  Exhibit -- if I remember correctly

11   offhand, your Honor -- 218.

12          **MS. SOMMERFELD:**  Yes.

13          **THE COURT:**  How many minutes or hours of uninterrupted

14   time is on there?

15          **MS. SOMMERFELD:**  There are, I believe, your Honor, 40

16   hours.

17          Our expert, who is going to be testifying on Monday, is

18   responsible for having set up the cameras, collected the data,

19   analyzed the data.  And he is going to be presenting evidence

20   to the Court about what the data shows.  And he will be showing

21   the Court clips, as well.

22          **THE COURT:**  Well, but it's already in evidence, right?

23          **MS. SOMMERFELD:**  Yes, Your Honor.

24          **THE COURT:**  So let me just throw out an idea.  Since

25   it's in evidence, what do you think, we use this time -- each

PROCEEDINGS                                    836

1    of you pick out 15 uninterrupted minutes of what you think is

2    represented on there.

3        So probably defendants will pick out 15 minutes worth busy

4    as can be, and plaintiffs will pick out 15 minutes where

5    nothing occurs.  Now, I don't know, maybe it wouldn't be worth

6    doing then.

7        I have seen just snippets, and I would like to get a

8    better feel for what really goes on at the checkout counter.

9    And it seems to me the video may be a good way to understand

10   that.

11       So is it feasible now for you each to -- we take a break

12   for a few minutes.  Each of you isolate 15 minutes worth, and

13   we come back here and I see each side's -- I'll look at each

14   side.  We'll just put it on the machine, and we all sit here

15   and look at it together.

16       What do you think of that idea?

17           MS. SOMMERFELD:  We're certainly open to the idea,

18   your Honor.  We would be willing to do it.  I don't know that

19   we have the hard drive here to select 15 minutes consistently.

20   There are so many --

21           THE COURT:  I don't want to have a mix and match

22   because it's too easy to manipulate.  I would like to have an

23   uninterrupted 15-minute segment.

24       What you showed me so far was like a 2-minute segment.

25   Okay, that was informative.  But maybe there's -- maybe you

PROCEEDINGS

 1  should show me 15 minutes where it's not, you know,

 2  wall-to-wall busy.  And I'd like to see a more representative

 3  sampling of what goes on at the cashier stand.

 4      If that can be done.  If it can't be done, all right --

 5          **MR. MATTHEW RIGHETTI:**  Your Honor, from the

 6  plaintiff's standpoint, I think we would just be pretty much

 7  throwing a dart at the video, in terms of a 15-minute segment,

 8  which I suppose would be as random as anything.

 9          **THE COURT:**  What do you mean "throwing a dart"?

10          **MR. MATTHEW RIGHETTI:**  Random, and in that sense

11  representative, because we don't have a 15-minute segment that

12  we think is the gold standard showing what they do, that we can

13  present to the Court in the next five minutes.

14          **THE COURT:**  All right.

15          **MR. MATTHEW RIGHETTI:**  That's our dilemma.

16          **THE COURT:**  What does the defense say?

17          **MS. SOMMERFELD:**  We're prepared to do it.  We can find

18  a clip at the break, your Honor, and do it.  But --

19          **THE COURT:**  I don't want to do it unless both sides

20  show me something.  So --

21          **MS. SOMMERFELD:**  We can both do it on Monday, your

22  Honor.

23          **THE COURT:**  Here's a different idea.  Has anyone gone

24  through there and itemized of all the transactions that

25  occurred, how many involved an item over five pounds?  How many

```
 1   of them involved a bulky item?  You know, because I've heard

 2   testimony on that, but has anyone actually done the -- run the

 3   numbers to see?

 4            MR. MATTHEW RIGHETTI:  Dr. Fernandez -- and you're

 5   going to hear from him on Monday -- did that.  And so did

 6   Dr. Johnson.  And their numbers are very similar.

 7        Dr. Johnson testified a little bit --

 8            THE COURT:  Is that the 5 percent number?

 9            MR. MATTHEW RIGHETTI:  And he -- he checked

10   Dr. Fernandez's numbers and came up with the same --

11            THE COURT:  Is that Dr. Fernandez's number, too, 5

12   percent?

13            MS. SOMMERFELD:  I don't believe that's correct, Your

14   Honor, but I do not want to put words into the expert's mouth.

15            MR. WOHL:  The Dr. Johnson report with the rebuttal --

16   untimely rebuttal report that we talked about earlier.

17            THE COURT:  Well, but if it's going to come out on

18   cross with Fernandez, you might as well tell me now.  That's

19   what Mr. Righetti says.

20            MR. WOHL:  We disagree that's what it's going to show.

21            THE COURT:  Maybe he won't say that.

22            MR. MATTHEW RIGHETTI:  The answer to your question,

23   yes, analysis has been done of the frequency with which items

24   over ten pounds comes through.

25            THE COURT:  Ten pounds.  All right.  I said five
```

```
 1  pounds.

 2          MR. MATTHEW RIGHETTI:  The ergonomic people picked ten

 3  pounds as being the significant cutoff.

 4          MR. WOHL:  Dr. Fernandez looked at a variety of

 5  things; not just weight of objects, but also movement of the

 6  cashiers in doing their job.  That will come out in the

 7  testimony on Monday.

 8          THE COURT:  All right.  Well, let's let it go then.

 9       Can we make use of this time this morning?  I don't want

10  to do make work, but is there anything you can think of that we

11  can do this morning with the time that's left over?

12          MR. McINERNEY:  I've got two housekeeping items, your

13  Honor.

14          THE COURT:  Please, go ahead.

15          MR. McINERNEY:  First, I wanted to say there was an

16  issue raised about a privilege log for a deposition that I was

17  going to be taking yesterday, of Aimee Grabau.  She was in

18  town.  I proceeded to take her deposition.  They have withdrawn

19  her as a witness, so that's no longer an issue.

20          THE COURT:  All right.

21          MR. McINERNEY:  Then the second housekeeping item I

22  had, your Honor, is how the Court wanted to address closing

23  arguments in the case.

24          THE COURT:  I don't know yet.  I do think we should

25  have a closing argument.  But it may be better to have it after
```

PROCEEDINGS                                                  840

1   I see your proposed findings.  But it may be that we will do at

2   least a short one at the end of the evidence.  It may also

3   depend upon Thanksgiving holiday is coming.  So if we finished

4   the evidence, as I expect we will, by Wednesday, we may not

5   have enough time for a closing argument then.

6        I really can't -- I do think we should have one, but I

7   don't -- right now, I'm tentatively of that view.  But I don't

8   know exactly when we can work it in.

9              MR. McINERNEY:  Well, your Honor, let me tell you what

10  my current understanding of our schedule is.  And that's, we're

11  going to have Dr. Fernandez on Monday, Monday morning.  And I

12  believe the expectation is the direct will take a couple of

13  hours.  Our cross would take some time.  Likely redirect.  But,

14  you know, we're going to end with Fernandez.

15             THE COURT:  Are you going to have a rebuttal case?

16             MR. McINERNEY:  Your Honor, I -- I don't have the

17  transcript yet from Ms. Grabau's depo.  I want to look at that

18  and make sure to be true rebuttal.  But if it is, it's going to

19  be real short.

20       So we're not going to be putting on witnesses for

21  rebuttal.  So, I mean, essentially, we could be done on Monday

22  by 10:30.

23             MR. WOHL:  I don't know if I would say 10:30, but I

24  think, actually, we will be done on Monday with the evidence,

25  your Honor.

PROCEEDINGS                                    841

```
 1              THE COURT:  Does that mean both sides are not going to
 2  use up your time?
 3              MR. McINERNEY:  Can we reserve that for a future
 4  trial, your Honor, like a credit, carbon credit like?
 5       (Laughter)
 6              MR. WOHL:  See what happens with (unintelligible)
 7  lawyers, Judge?  You get a pretty good outcome.  On time, at
 8  least.
 9              THE COURT:  Well, that's an idea.  Put-it-in-the-bank
10  type idea.
11              MR. McINERNEY:  If they can give a credit for carbon,
12  they certainly can give it for hot air.
13       (Laughter)
14              THE COURT:  You can sell that extra time to people in
15  the next case.
16       (Laughter)
17              THE COURT:  There would be a nice market for that.
18              MR. McINERNEY:  Yes, indeed.
19              THE COURT:  Do you want to give closing arguments?
20              MR. McINERNEY:  I would like to.
21              MR. WOHL:  We want to do whatever is helpful to the
22  Court.  We would be fully prepared to do one on Monday or
23  Tuesday, whatever you would like.  Or, otherwise --
24              THE COURT:  Let's do this.  Either Monday or Tuesday
25  we'll have -- how about 40 minutes per side?
```

```
 1        I see the issues pretty clearly now.  I don't know what

 2   the answer is, but you don't need to explain -- you need to

 3   really focus in on some of the issues in your closing.  But I

 4   think you could do it in a lot less than 40 minutes.  How about

 5   40 minutes per side?

 6            MR. McINERNEY:  Your Honor, since we didn't use all of

 7   our allotted time, could I at least get an hour?

 8            THE COURT:  No, I don't think you need an hour.

 9   Forty-five minutes.

10            MR. McINERNEY:  Thank you.

11            THE COURT:  Forty-five minutes per side.

12        A lot of these are legal questions.

13        I'm wondering if the commissioner is going to help us

14   answer so you could work into your closing the legal points.  I

15   mean, I laid out those five questions.  I think those are open

16   questions, in my mind, that you could help me with the case

17   law.  That would be useful.

18            MR. McINERNEY:  Well, that's why I was trying to argue

19   for a little more time.

20            THE COURT:  No, no.  Forty-five minutes per side is

21   enough.  All right.  We'll work in 45 minutes per side for

22   closing arguments on Monday or Tuesday.

23            MR. MATTHEW RIGHETTI:  Bates 5573, which has been

24   admitted by stipulation into evidence, which are the Checkout

25   Exception Reports, are marked as Exhibit 386.
```

PROCEEDINGS                                                      843

```
 1              THE COURT:  Is that in evidence?

 2              MR. MATTHEW RIGHETTI:  Well, it was in evidence as the

 3    Bates No. 5573, according to the stipulation yesterday.  I'm

 4    just putting, it's now marked as the Trial Exhibit 386.

 5              THE COURT:  All right.  Agreed it can come in?

 6              MR. MATTHEW RIGHETTI:  Yes.

 7              MR. WOHL:  386?  Let me check with co-counsel your

 8    Honor.  386 is mistakable.

 9              MS. SOMMERFELD:  That's the Checkout Exception Report?

10    Yes.

11              THE COURT:  All right.  Received in evidence.

12         (Trial Exhibit 386 received in evidence)

13              THE COURT:  What else?

14              MR. MATTHEW RIGHETTI:  Then we have 389, which is the

15    PowerPoint presentation of Ms. Grabau, two pages.  I think we

16    have a stipulation to admit this into evidence.

17              THE COURT:  Agreed?

18              MR. WOHL:  That is fine, your Honor.

19         Just to be clear, this is not the PowerPoint that she

20    referred to in the deposition because that one is still not

21    available.

22         This is a second PowerPoint that she discovered at the

23    time that she discovered there was a PowerPoint.  I don't know

24    if there is really that much of a material difference in it,

25    but it's -- although she didn't recall about having anything
```

```
 1   about policy in the first one, but this one just says an

 2   anticipated policy, not that there is a policy.

 3       But in terms of admitting, I think that's fine, your

 4   Honor.

 5           THE COURT:  389 received.

 6       (Trial Exhibit 389 received in evidence)

 7           THE COURT:  All right.  What else?

 8           MR. MATTHEW RIGHETTI:  That's it.

 9           THE COURT:  Anything else over there?

10           MR. WOHL:  I think we have some clean-up that's going

11   to be submitted on Monday.

12           MR. ADKINS:  Yes, your Honor.  We'll spend our time to

13   get any additional clean-up before we close our case and bring

14   that to the Court's attention on Monday.

15           THE COURT:  All right.  So we'll just adjourn now.

16   It's too early in the day for you to go back and have a single

17   mat scotch, but this being Friday, I hope when you get to a

18   safe place and you don't have to drive, you all take your shoes

19   off and relax and do something that will take your mind off of

20   this case for awhile.

21           MR. MATTHEW RIGHETTI:  I'm hoping we have a seat when

22   we do it.

23           THE COURT:  You have a seat.  That is one opportunity

24   to have a seat.

25       (Laughter.)
```

PROCEEDINGS                                    845

1          **THE COURT:**  See you back here on Monday then.   Thank

2    you.

3          (At 10:37 a.m. the proceedings were adjourned until

4    Monday, November 19, 2012, at 7:30 a.m.)

5                              -   -   -   -

846

1                            **I N D E X**

2   **DEFENDANT'S WITNESSES**                          **PAGE**    **VOL.**

3   **GONZALEZ, JESSE**
    (PREVIOUSLY SWORN)                                  727        4
4   Cross Examination Resumed by Mr. Matthew Righetti   727        4
    Redirect Examination by Mr. Adkins                  751        4
5   Recross Examination Resumed by Mr. Righetti         753        4

6

7   **ZEITHAML, VALERIE**
    (SWORN)                                             761        4
8   Direct Examination by Mr. Adkins                    762        4
    Cross Examination by Mr. Matthew Righetti           786        4
9   Redirect Examination by Mr. Adkins                  808        4
    Recross Examination by Mr. Righetti                 809        4
10

11  **EBERT, GREG**
    (SWORN)                                             813        4
12  Direct Examination by Mr. Adkins                    813        4
    Cross Examination by Mr. Righetti                   827        4
13  Redirect Examination by Mr. Adkins                  832        4
    Recross Examination by Mr. Matthew Righetti         834        4

14

15                         - - - - -

16

17

18

19

20

21

22

23

24

25

*Katherine Powell Sullivan, CRR, and Debra L. Pas, CRR*
*Official Reporters - U.S. District Court*
*(415) 794-6659*

847

1                           **E X H I B I T S**

2   **TRIAL EXHIBITS**                    **IDEN**    **VOL.**     **EVID**    **VOL.**

3   386                                                            843         4
    389                                                            844         4

4                              - - - - -

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                    **CERTIFICATE OF REPORTERS**

4            We, KATHERINE POWELL SULLIVAN and DEBRA L. PAS,

5    Official Reporters for the United States District Court,

6    Northern District of California, hereby certify that the

7    foregoing proceedings in C 11-2575 WHA, **Lisa Garvey vs. Kmart**

8    **Corporation,** were reported by us, certified shorthand

9    reporters, and were thereafter transcribed under our direction

10   into typewriting; that the foregoing is a full, complete and

11   true record of said proceedings at the time of filing.

12

13   DATE:   Friday, November 16, 2012

14

15

16   _____
           Katherine Powell Sullivan, CSR #5812, RPR, CRR

17                   U.S. Court Reporter

18

19   _____
             Debra L. Pas, CSR #11916, RMR CRR

20

21

22

23

24

25