Volume 5

Pages 848 - 1057

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ALSUP

LISA GARVEY, individually and on     )
behalf of all others similarly       )
situated,                            )
                                     )
              Plaintiff,             )
                                     )
  VS.                                ) No. C 11-2575 WHA
                                     )
KMART CORPORATION, and DOES 1        )
through 50 inclusive,                )
                                     ) San Francisco, California
              Defendants.            ) Monday
_____) November 19, 2012


**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

**For Plaintiff:**          Righetti Glugoski, P.C.
                            456 Montgomery Street, Suite 1400
                            San Francisco, California 94101
                     **By:  Matthew Righetti, Esquire**
                            **Michael Righetti, Esquire**

                            McInerney & Jones
                            18124 Wedge Parkway, #503
                            Reno, Nevada 89511
                     **By:  Kevin J. McInerney, Esquire**


**Reported By:  Katherine Powell Sullivan, RPR, CRR, CSR #5812**
               **Debra L. Pas, RMR, CRR, CSR #11916**
               **Official Reporters - U.S. District Court**

**APPEARANCES (CONTINUED):**

**For Plaintiff:**        Dostart Clapp & Coveney LLP
                         4370 La Jolla Village Drive, Suite 970
                         San Diego, California 92122
                     By: **Zachariah Paul Dostart, Esquire**

**For Defendants:**       Paul Hastings LLP
                         55 Second Street, 24th Floor
                         San Francisco, California  94105
                     By: **Jeffrey D. Wohl, Esquire**

                         Winston & Strawn
                         333 South Grand Ave, 38th Floor
                         Los Angeles, California  90071
                     By: **Amanda C. Sommerfeld, Esquire**
                         **Emily C. Schuman, Esquire**

                         Winston and Strawn LLP
                         101 California Street, Suite 3900
                         San Francisco, California 94111
                     By: **Robb Christopher Adkins, Esquire**
                         **Joan B. Tucker Fife, Esquire**

**P R O C E E D I N G S**

1

2   **NOVEMBER 19, 2012**                                    **7:40 a.m.**

3          THE COURT:  Welcome back, everyone.  Please be seated.

4      So we're onto our last witness.  Anything to take up

5   before we go to the next witness?

6          MR. ADKINS:  Yes, your Honor.  I had a housekeeping

7   matter with respect to some of the exhibits.

8      I have handed your clerk the stipulation that was filed

9   November 18th relating to -- it's a stipulation for the

10  admissibility of evidence exhibits in this case, and I would

11  just like to read that into the record and formally move those

12  exhibits in if that's okay.

13         THE COURT:  Yes.  Go ahead.

14         MR. ADKINS:  Pursuant to that stipulation, your Honor,

15  we would move into evidence Exhibits 1 through 15, 37, 157

16  through 187, 189 through 191, 193 --

17     (Discussion held off the record amongst defense counsel.)

18         THE COURT:  218, it says here.

19         MR. ADKINS:  Sorry, your Honor.

20         THE COURT:  There's a 218 on here.

21         MR. ADKINS:  And 218.

22     Also, in the exhibit is a reference to another exhibit,

23  which has now been marked by the plaintiffs as 386.  And so we

24  would move all of those exhibits.

25         THE COURT:  All received.  Agreed?

PROCEEDINGS                                     851

1           **MR. MATTHEW RIGHETTI:**  Yes, your Honor.

2           **THE COURT:**  All received.

3       (Trial Exhibits 1 through 15, 37, 157 through 187, 189

4   through 191, 193 and 218 received in evidence)

5           **MR. MATTHEW RIGHETTI:**  Is 387 and 388 in?  I think

6   they are.

7           **THE COURT:**  I don't have them in.

8           **MR. MATTHEW RIGHETTI:**  Those are the summaries.

9           **THE COURT:**  I have 386 in.  I don't have 387 in.

10          **MR. ADKINS:**  No objection if plaintiffs are moving

11  those in, your Honor.

12          **THE COURT:**  387?

13          **MR. MATTHEW RIGHETTI:**  388.

14          **THE COURT:**  I'm sorry.  Give me the exact number

15  again.  I'm confused.

16          **MR. MATTHEW RIGHETTI:**  387 and 388.

17          **THE COURT:**  Both received in evidence.

18          **MR. MATTHEW RIGHETTI:**  Those are summaries of 386.

19          **THE COURT:**  Okay.  Received.

20      (Trial Exhibits 387 and 388 received in evidence)

21          **MR. ADKINS:**  And the last one, your Honor, just

22  subsets of 218 were clips of a video 218-B and 218-C, which

23  were identified by witnesses.  We would move those in, too.

24          **THE COURT:**  Any objection?

25          **MR. DOSTART:**  No objection, your Honor.

PROCEEDINGS

1        **THE COURT:**  Thank you.

2     Received in evidence.

3     (Trial Exhibits 218-B and 218-C received in evidence.)

4        **MR. ADKINS:**  Thank you, your Honor.

5        **MR. DOSTART:**  We have one more housekeeping item in

6  regards to exhibits, your Honor.

7        **THE COURT:**  Sure.

8        **MR. DOSTART:**  Last night at approximately 8:30 p.m. we

9  received four video clip segments that defendant intends to use

10  today on direct examination with their expert.  And pursuant to

11  Paragraph 9 of your Honor's guidelines for bench trials, they

12  should be excluded.

13        **THE COURT:**  Let's hear what do you have say?

14        **MR. WOHL:**  Yes, your Honor.

15     First off, of course, all the videos are in evidence.

16  This is just a question of designation.  We did the --

17        **THE COURT:**  Didn't we go through this before?  This

18  very problem?

19        **MR. DOSTART:**  Yes, we did, your Honor.

20        **THE COURT:**  Okay.  I'm going to give you a choice.

21     Now, let me hear what Mr. Wohl has to say.

22        **MR. WOHL:**  Yes, your Honor.  I'll make it very quick.

23     We did the very best we could.  The complexity is that

24  each file has a very specific number on it and there was some

25  confusion, unfortunately, between myself and the other folks on

PROCEEDINGS

1   the case as to exactly which ones Dr. Fernandez wanted to

2   comment on, and we discovered that with missed four of them so.

3   So as soon as we determined that four were missing, we

4   immediately emailed plaintiff's counsel.

5        They are all very short.  They are not really different in

6   kind with what they have already seen.  There is really no

7   prejudice here, your Honor.  And if I'm not permitted to use it

8   through Dr. Fernandez, I could simply play it as part of my

9   closing because it is in evidence.

10        But I think it would be easier for both sides if we just

11   got it in through him.  So I would ask the Court's indulgence

12   for this oversight.  And I would apologize to both the Court

13   and counsel, as I did last night, and the Court for the

14   oversight.

15        **THE COURT:**  I will sustain the objection if you really

16   care about it, but I will delay proceedings by one day.  We'll

17   take a recess today so that you'll have the time that you need,

18   if that's what you really want to do.

19        **MR. DOSTART:**  We have no objection then, your Honor.

20        **THE COURT:**  All right.  The objection is withdrawn.

21   All right.  You may use them.

22        Mr. Wohl, this is so irritating.  With all the lawyers

23   you've got over there, you could not be fair to the plaintiffs

24   in this case and you spring this on them at night?  You get

25   away with it.  You're getting away with it as a concession to

PROCEEDINGS

1   the shortness of life, but it is irritating that you cannot get

2   your act together.

3        But I've got calendars to run.  Plaintiffs have got

4   calendars to run and other cases to do.  So you're going to get

5   away with it as a result.  This is not right, but fine.

6        Anything more by way of housekeeping?

7            MR. DOSTART:  Nothing further from plaintiffs, your

8   Honor.

9            THE COURT:  All right.  This is our last witness,

10  correct?

11           MR. WOHL:  Yes, your Honor.

12           MR. DOSTART:  Correct.

13           THE COURT:  Call your last witness.

14           MR. WOHL:  Thank you very much, your Honor.  The

15  defense calls Dr. Jeffrey Fernandez.

16           THE COURT:  Welcome.  Please stand over there and

17  raise your right hand.

18                        **JEFFREY FERNANDEZ**,

19  called as a witness for the Defendant herein, having been first

20  duly sworn, was examined and testified as follows:

21           THE WITNESS:  I do.

22           THE CLERK:  Okay.  Thank you.  Please be seated.

23           THE COURT:  All right.  Welcome.

24       You need to sit about this close to the microphone

25  (indicating).  Say your name, please.

PROCEEDINGS

```
 1              THE WITNESS:  Jeffrey Fernandez.

 2              THE COURT:  Perfect.  Thank you.

 3         Go ahead, Mr. Wohl.

 4              MR. WOHL:  Thank you, your Honor.

 5                    DIRECT EXAMINATION

 6   BY MR. WOHL:

 7   Q.    Thank you, your Honor.  Good morning, Dr. Fernandez.

 8   A.    Good morning.

 9   Q.    Could you please tell the Court what is your current

10   position of employment?

11   A.    I'm the managing consultant at J.F. Associates.

12   Q.    What is J.F. Associates?

13   A.    It's an engineering consulting company based in Vienna,

14   Virginia.

15   Q.    And what type of work does J.F. Associates do -- does?

16   Sorry.

17   A.    We do consulting in the area of industrial ergonomics,

18   time and motion study process improvement, ergonomics, supply

19   chain.

20   Q.    And how long has your firm been in existence?

21   A.    For about nine years.

22   Q.    I would like to have you give the Court some information

23   about your educational background.  So let's start, where did

24   you complete your education?

25   A.    I got my Bachelor's in mechanical engineering from NED
```

1  University.

2  **Q.**   Any degrees past your -- when did you receive your

3  Bachelor's?

4  **A.**   In 1982.

5  **Q.**   And any degrees after your Bachelor's degree?

6  **A.**   I got my Master's in 1983 from Texas Tech University and

7  my PhD in 1986 from Texas Tech University.

8  **Q.**   And any of those degrees concerning ergonomics?

9  **A.**   My last two degrees, my Master's and my PhD, were in the

10  area of ergonomics.

11  **Q.**   Okay.  Did you also study ergonomics in your Bachelor's

12  course of study?

13  **A.**   I did a course on ergonomics in the industrial engineering

14  program at Texas Tech University.  You have a specialization

15  and I specialized in ergonomics within the Department of

16  Industrial Engineering.

17  **Q.**   The Court has heard reference to ergonomics and from Dr.

18  Johnson the definition of ergonomics.  I'm going to give you a

19  chance to tell the Court what ergonomics is?

20  **A.**   Ergonomics is matching the task demands with human

21  capabilities so as to increase productivity and reduce the risk

22  of -- reduce the risk of injury or improve the health and

23  safety of workers.

24  **Q.**   Do you believe that ergonomics is relevant in this case as

25  you understand the issues in this case to be?

1  **A.**    I do.

2  **Q.**    And why do you say so?

3  **A.**    Because whatever changes you make will impact both the

4  health and safety of the worker and impact productivity.

5  **Q.**    And what is it about an ergonomist that would make one

6  qualified to opine on such subjects?

7  **A.**    We have -- I'm in the area of physical ergonomics, as

8  opposed to cognitive.

9        So in physical ergonomics we're involved in anthropometry

10  and biomechanics, sometimes in physiology.  And so we look at

11  the workplace and we evaluate the risk and we try to improve

12  the workplace.

13  **Q.**    Can you just define for the Court what anthropometry is?

14  **A.**    Anthropometry is the measurement of humans.

15  **Q.**    Do you mean the physical measurements?

16  **A.**    The physical measurements of humans.

17  **Q.**    And how is that relevant to an ergonomics analysis?

18  **A.**    There are two types of human measurements.  One is for fit

19  static measurements and dynamic measurements.

20        Static measurements are the ones you take so the person

21  can fit in the workplace.  Dynamic measurements are taken so

22  that the person can function in the workplace.

23  **Q.**    You mentioned psychological ergonomics.  What is the

24  difference between that and physical ergonomics?

25  **A.**    Cognitive ergonomics is as it relates to how one thinks

1   and how one would perceive different items.  Design of -- I'll

2   give you an example.

3         Microsoft and a number of other companies that develop

4   software.  They have got cognitive ergonomists that design for

5   them the interface.  So what's the best way to interact with

6   the -- with the software that you have, the front end as they

7   call it?

8   Q.   And do you think cognitive ergonomics is what's at issue

9   in this case or physical ergonomics?

10  A.   Physical ergonomics.

11  Q.   And your background is in which area of ergonomics?

12  A.   In physical ergonomics.

13  Q.   Do you hold any professional certifications in the area of

14  either industrial engineering or ergonomics?

15  A.   I have a professional engineering degree in industrial

16  ergonomics in the State of Texas.  I'm certified as a certified

17  professional ergonomist, CPE.

18  Q.   Say it again, please?

19  A.   CPE.

20  Q.   For certified professional ergonomist?

21  A.   Yes.

22  Q.   Have you served as a member of any local, state or

23  national societies or board, organizations in your field?

24  A.   I have served in a number of capacities.  At the moment I

25  am on the board of the CPE.  In fact, I'm the chairman of the

1  Exam Committee that oversees the exams of anyone that is being

2  certified in the area who has a certification CPE.

3      I am -- I was the president of the ISOES.  That's the

4  International Society of Occupational Safety and Health.

5  **Q.**  You said you serve, if I heard you correctly, as the chair

6  of the board that determines examinations for ergonomists?

7  **A.**  I'm chair of the committee.  I'm a member of the board.

8  **Q.**  Chair of the committee, excuse me.

9      What's the scope of your work on that committee in terms

10  of examinations?  In other words, is that just for a particular

11  state or particular country or is it broader than that?

12  **A.**  It is -- most of the individuals candidates that apply for

13  certification are in this country, a few of them in Europe; but

14  it is international in flavor.

15  **Q.**  Are there any other well-known ergonomists who serve on

16  the BCPE Examination Committee?

17  **A.**  At the moment there is one gentleman who is based in San

18  Diego who I recruited recently who is on the board and on that

19  committee, and the executive director herself is on the board.

20  So there are three of us.

21  **Q.**  Have there been other well-known ergonomists who have

22  served on this committee in the past?

23  **A.**  Yes.

24  **Q.**  And who are they?

25  **A.**  Dr. Marv Dainoff from Liberty Mutual.  He was the outgoing

1    chair who was in the process of changing the written exam to a

2    computerized exam.  It's been thrown in my lap at the moment.

3    **Q.**    Anybody else you can think of?

4    **A.**    He was the chair for 15 years.

5    **Q.**    I'm asking:  Anyone else who served on the committee who

6    is a well-known ergonomist?

7    **A.**    Not -- not on that committee, no.

8    **Q.**    All right.  So for example, Dr. Khans, was he on that

9    committee?

10   **A.**    Dr. Khans, no.

11   **Q.**    What other organizations have you belonged to or served

12   on?

13   **A.**    I belong to the IIE, the Institute of Industrial

14   Engineers.  I belong to -- where I'm a member.  Human Factor

15   Society, where I'm a member.  It's called the Ergonomist

16   Society in England.  Now it's called the Institute of

17   Ergonomists and Human Factors.  I'm a fellow of that

18   organization.

19   **Q.**    Have you served on the editorial board of any journals

20   within your field?

21   **A.**    Served as the editor of the International Journal of

22   Industrial Engineering for 15 years as the news editor of the

23   International Journal of Industrial Ergonomics for 15 years,

24   and now I'm on their board.

25        I'm also on the board of EHS, and I'm also on the board of

 1  IIE Transactions and Ergonomics and Human Factors, editorial

 2  board.

 3  **Q.**   Have you received any professional award in the field of

 4  ergonomics?

 5  **A.**   I got the MMEU award from the IIE division.  IIE -- the

 6  Institute of Industrial Engineering, the Work Sciences and

 7  Ergonomics Division a few years ago.

 8  **Q.**   Have you published any works in the field of ergonomics?

 9  **A.**   Yes, I have.

10  **Q.**   And what have they included?

11  **A.**   Excuse me, sir?

12  **Q.**   What have they included?

13  **A.**   What have they included?

14  **Q.**   I didn't -- the works that you've published, what have

15  they included?

16  **A.**   They have included a variety of areas within physical

17  ergonomics that I've published with my former students.

18  **Q.**   Have you authored a textbook?

19  **A.**   Yes, I have written a textbook.

20  **Q.**   Is this the textbook (indicating)?

21  **A.**   Yes, it is.

22  **Q.**   Can you identify it to the Court, please?

23  **A.**   That is the second edition of the textbook, *Applied*

24  *Occupational Ergonomics*.

25  **Q.**   Have you authored any articles on ergonomics?

1   **A.**   Yes, I have.

2   **Q.**   How many?

3   **A.**   Within the area -- I have published about 180 articles.

4   Out of that, a majority of those are in the area of industrial

5   ergonomics.

6   **Q.**   And can you identify for the Court -- just a few examples,

7   I'm sure, would suffice -- any publications that you think are

8   relevant to your testimony here today?

9   **A.**   I've published quite a few articles in the area of posture

10  and what posture has to do with the development of MSDs.  How

11  posture has an affect on frequency and force.  How sitting and

12  standing, how would it affect the -- the maximum force you can

13  apply in a sitting position and a standing position.

14        And I've done -- I've done -- most -- my PhD was in the

15  area of the back.  And after that, most of my work has been in

16  the upper extremities.

17  **Q.**   Do you know whether your works are generally viewed as

18  authoritative in the field of ergonomics?

19  **A.**   Some of my papers are.  I wouldn't say all of them are.  A

20  few of them are.

21  **Q.**   Have you been invited at all to present your papers to any

22  professional groups?

23  **A.**   I have been.  I have been -- I have had some invited

24  talks, yes.

25  **Q.**   And do you know whether your textbook is used in any

1    American universities or colleges?

2    **A.**    They are used in four or five universities here.   The

3    Spanish book is used a lot more.

4    **Q.**    Better seller in Mexico?

5    **A.**    In Mexico and South America, but I don't speak Spanish.

6    **Q.**    Okay.   By the way, if you don't mind -- I'm sure, because

7    I was on curious.   Your name is Fernandez, but you don't appear

8    to be Hispanic.   Could you just explain to the Court where your

9    name comes from?

10   **A.**    I'm from a Portuguese colony in India called Goa.

11            **THE COURT:**   Called what?

12            **THE WITNESS:**   Called Goa, G-o-a.

13   **BY MR. WOHL:**

14   **Q.**    In Portugal?

15   **A.**    It's a Portuguese colony in India called Goa.

16   **Q.**    And that's where the name comes from?

17   **A.**    That's where the name comes from and the accent, yes.

18   **Q.**    An interesting factoid.

19         After you completed your PhD, did you teach in the area of

20   industrial engineering and more specifically ergonomics?

21   **A.**    I taught at Wichita State University for 13 years.   I was

22   a professor there.   I resigned my position in 1999.

23   **Q.**    Did you receive tenure?

24   **A.**    I received tenure and I was a full professor when I left.

25   **Q.**    And have you been involved with any other teaching

1  institutions?

2  **A.**    On a part-time basis I do teach at Catholic University of

3  America in Washington D.C. and occasionally I do have the short

4  courses that I conduct in Mexico and some other universities

5  here.

6  **Q.**    Are you familiar with something called the Manufacturing

7  and Innovation Design Center?

8  **A.**    That is a center at Wichita State University that I was

9  involved in creating with some colleagues of mine so that we

10  could generate -- we could support faculty members doing

11  research.

12  **Q.**    And what particular area did that center involve itself

13  with?

14  **A.**    It was in manufacturing.

15  **Q.**    Do you still teach in the ergonomics field?  I think you

16  already answered that.

17       Go ahead and answer again.

18  **A.**    I do.

19  **Q.**    And was that at Catholic University?

20  **A.**    Roman Catholic.

21  **Q.**    Thank you.  I didn't mean to repeat myself.

22       What has been your professional experience since leaving

23  Wichita State?

24  **A.**    Excuse me, sir?

25  **Q.**    Your professional experience, that is non-educational

 1   experience since leaving Wichita State?

 2   **A.**    I'm involved in a consulting company.  I manage a group of

 3   industrial engineers.

 4   **Q.**    Before we get to JF, did you work at a company called

 5   Exponent?

 6   **A.**    I did work at a company called Exponent for four years,

 7   from 1999 to 2003.

 8   **Q.**    And what kind of company was Exponent?

 9   **A.**    Exponent did -- they did a variety of jobs.  They were

10   engineering and scientific consultants.  They are based in the

11   Bay Area here, but they have -- they have offices all over the

12   country.

13   **Q.**    What was the field of work that you engaged in while

14   working at Exponent?

15   **A.**    Human factors in ergonomics.

16   **Q.**    Is human factors considered an analogous phrase to

17   ergonomics?

18   **A.**    In this country it is.

19   **Q.**    Have you done any consulting work?

20   **A.**    I have consulted in the area of ergonomics.

21   **Q.**    And I certainly don't want you to disclose anything

22   that -- by contract or otherwise is deemed confidential, but if

23   you can tell us which organizations have you consulted with and

24   the general nature of the work that you have done for them?

25   **A.**    I have consulted -- I have consulted in a number of

1   different industrial sectors; from the food industry, to the

2   aircraft industry, to the pharmaceutical industry, to small

3   manufacturing.

4        I've worked for the government.  When I say "the

5   government," I'm talking about last year I did some work for

6   the architects from the Capitol in Washington D.C.  I worked

7   extensively with the U.S. Army evaluating, as we call it, stuff

8   for them before they send it to theater, looking at things that

9   people develop and seeing if it is acceptable for humans to use

10  efficiently in the field.

11  **Q.**   Have you done any specific work in connection with the

12  government in an advisory role with regard to ergonomics?

13  **A.**   I worked for NIOSH.  I worked --

14  **Q.**   Sorry.  Can you just tell the Court what NIOSH is?

15  **A.**   NIOSH is the National Institute for Occupational Safety

16  and Health.  It's part of CDC, the Department -- U.S.

17  Department of Health and Human Services.

18  **Q.**   Please define what CDC is?

19  **A.**   Center for Disease Control -- centers for Disease Control.

20  **Q.**   Okay.  And what does NIOSH do?

21  **A.**   NIOSH is the guideline -- research and guideline setting

22  body of the U.S. government for -- as it relates to

23  occupational safety and health.

24  **Q.**   And when did you work with NIOSH?

25  **A.**   I worked as a -- on my sabbatical in 1992, '93.  I was

1  involved in what they call the criteria document for ergonomics

2  that was a precursor to what they were hoping OSHA would come

3  out with the ergonomic standard.

4  **Q.**   And do you recall what your title was with NIOSH at the

5  time?

6  **A.**   I was an NRC Senior Research Fellow.

7  **Q.**   Have you done any work with the Occupational Health and

8  Safety Administration, or OSHA?

9  **A.**   Yes, I have.  There was something else I wanted to mention

10  about NIOSH.

11  **Q.**   Please do.  Please do.

12  **A.**   While I was at NIOSH, I also was involved in what they

13  call the lifting guide.  That is, the standard -- not the

14  standard.  That's the guideline that OSHA uses now to cite

15  companies if somebody is -- if they are over the limit for

16  lifting items.  I was involved in that.

17       And, in fact, I'm one of the seven reviewers of that

18  document that is now very well -- widely used.

19  **Q.**   Okay.  And then OSHA, what work have you done with OSHA?

20  **A.**   OSHA, I was involved in OSHA as the consulting --

21  consulting ergonomist when they were involved in litigation

22  against a chicken -- a poultry processing facility, one of the

23  largest in this country, and they had cited this facility for

24  ergonomic vials violations.  I worked for OSHA as a consultant.

25  **Q.**   Did your work for OSHA address at all issues of standing

1   or sitting by employees at the work station?

2   **A.**   Yes, it did.

3   **Q.**   Have you worked with any private companies with regard to

4   ergonomic issues?

5   **A.**   Yes, I have.

6   **Q.**   Are you at liberty to mention any of those?

7   **A.**   Name of companies?

8   **Q.**   Yes.

9   **A.**   Sanofi-Winthrop, Hay and Forage, Pizza Hut, Raytheon,

10  Cessna, Ditch Witch.  I'm sure there are others.  I don't quite

11  remember.

12  **Q.**   And did any of those engagements involve issues of sitting

13  or standing by employees in the workplace?

14  **A.**   Some of them did.

15  **Q.**   Now, you were starting to tell me -- and then I

16  interrupted to have you finish some other issues -- your work

17  at J.F. Associates.

18         So when did you form J.F. Associates?

19  **A.**   In 2003.

20  **Q.**   And what type of work does J.F. Associates perform?

21  **A.**   We do engineering -- industrial engineering consulting for

22  companies, government and law firms.

23  **Q.**   And how large is J.F. Associates?

24  **A.**   We are five.

25  **Q.**   And do you also do any work through J.F. Associates in

1    connection with law firms and litigation?

2    **A.**    Yes, we do.

3    **Q.**    What type of work do you do in that regard?

4    **A.**    I do work in the area of ergonomics and I do work in the

5    area of time and motion study.

6    **Q.**    Have you ever worked on the side of the government or

7    plaintiff in a case, in an ergonomics case?

8    **A.**    For the government?

9    **Q.**    Either for the government or for the plaintiff.  That is a

10   party asserting a claim or violation as opposed to the

11   defendant.

12   **A.**    Yes.

13   **Q.**    Can you give any examples of those?

14   **A.**    The two OSHA cases; one was against Hudson, which was

15   against Tyson's, and the other was -- ergonomics you mentioned,

16   right?  And the other was Northern States in Omaha.  That was

17   for the government.

18        And I've got -- I worked on a number of FLSA -- sorry,

19   F-E-L-A, FELA cases.  That's the railroad cases for the

20   plaintiffs.

21   **Q.**    So not an ergonomics case, but a case where you worked on

22   behalf of the plaintiffs?  Did I hear you correctly?

23   **A.**    These are ergonomic cases for the plaintiffs.

24   **Q.**    Oh, they are ergonomics cases.  Excuse me.  Thank you.

25        Have you also worked on the side of the defendants in

1    ergonomics cases as well?

2    **A.**    Yes, I have.

3    **Q.**    Are there any particular groups of employed populations

4    that your work has concerned overtime?

5    **A.**    Particular groups?

6    **Q.**    Yes, populations of employees.   In particular, populations

7    that you particularly worked with?

8    **A.**    Are you --

9    **Q.**    In your ergonomics work.

10   **A.**    In litigation or in general?

11   **Q.**    General.

12   **A.**    In general I worked with the disabled.   I worked with the

13   aging population, the normal population.   I worked with the

14   defense.   I think the population I worked the longest with is

15   the disabled.

16   **Q.**    Okay.   Have you ever been qualified to give testimony as

17   an expert before?

18   **A.**    Yes, I have.

19   **Q.**    Okay.   And counting both in court and deposition time, how

20   many times have you testified as an expert in cases?

21   **A.**    Both together?

22   **Q.**    Yes.

23   **A.**    Close to 30.

24   **Q.**    To your knowledge, has a Court ever rejected your

25   testimony as an expert in the sense of not accepting your

1  qualifications as an expert to testify?

2  **A.**   No -- excuse me, sir.  I think I might have misspoke.  Did

3  you ask me how many times I have been involved in testimony in

4  general or in ergonomic cases?

5  **Q.**   Well, let's break that apart then.

6     So how many times in ergonomics cases have you testified

7  as an expert either in court or in a deposition?

8  **A.**   In a deposition, five, maybe six times.  In court never.

9  **Q.**   This is your first time in that regard?

10  **A.**   In ergonomics case, yes.

11  **Q.**   And in a non-ergonomics case how many times have you

12  testified in court as an expert?

13  **A.**   Four or five times.

14  **Q.**   How many times in a deposition in such a non-ergonomics

15  case?

16  **A.**   Close to 30; 25, 30.

17  **Q.**   Thank you.

18     Now you previously gave the Court a definition of

19  ergonomics.  I would like to explore that a little bit further.

20     Is the purpose of ergonomics to further employee safety

21  and well-being without regard to any other factor?

22  **A.**   It's dual.  It's ergonomics is to improve productivity and

23  improve health and safety.

24  **Q.**   So what considerations would an ergonomist want to take

25  into account in trying to achieve what you just said; that goal

1   of improving both productivity and well-being.

2   **A.**   You have to look at the task that is being performed and

3   you look -- you look at the task and you evaluate it from an

4   ergonomics perspective.  And then you have to evaluate it also

5   from an industrial engineering perspective.

6        And when I say "an industrial engineering perspective,"

7   you look at the speed.  You look -- you look at the -- you

8   know, the parts produced and you find out the value and

9   non-value added times that -- and then, of course, you do the

10  other industrial engineering aspects, where I was meaning

11  facility layout; find out what's the best layout, what's the

12  best flow and so on.  That is the industrial engineering

13  aspect.

14       When you're doing the ergonomics aspect of things, you're

15  looking at the forces.  You're looking at the postures.  You're

16  looking at the repetitions.  You're looking at the force,

17  posture, repetition, the durations.  You're looking at how the

18  body parts are interacting, what's happening with the task.

19  You're looking at the job itself.  What's the geometry of it

20  and what's happening.

21       And so based on that, then you go ahead -- you try to

22  match the demands of the task with the human capacities because

23  humans come in different shapes and sizes.  We come -- so

24  anthropometry-wise we're different.  Strength-wise we're

25  different.  And so we operate very differently, each of us.

1  **Q.**   So what type of factors would you want to take into

2  account in trying to come up with a recommendation for an

3  ergonomic solution for a particular job?

4  **A.**   The process that I would typically take is I go and

5  understand the task demands.  Just like we did when we were

6  working for the AOC, which is the Architects Of the Capitol.

7  I went and videotaped the employees, found out the amount of

8  forces and the postures they were involved in, the equipment

9  they were using and spoke to management and found out their

10 constraints; whether they had the budget to make the changes,

11 what were they looking for, you know, where the individuals had

12 to work.  Then based on that, based on all this analysis came

13 up with solutions.

14 **Q.**   Would an employer's expectation of a level of productivity

15 from the employee, would that be a relevant factor in your

16 consideration?

17 **A.**   It is a factor.  Very often these days as the economy gets

18 tough, management does not want to lose on the productivity

19 numbers.  But many individuals in the area of ergonomics who

20 have worked in the area long enough, they realize that

21 ergonomics, good ergonomics means you can improve productivity.

22 **Q.**   Would you want to consider the current work station

23 configuration in your analysis?

24 **A.**   The work station has to come in the analysis because it's

25 the fit and the function, as I mentioned.  You want to see if

1   the worker can fit there first and whether the worker can

2   function there.

3        So you would -- the geometry of the workplace, of course,

4   would come into -- take into consideration.

5   **Q.**   Would you want to consider the expense of any

6   modifications to the work station?

7   **A.**   When you're talking about the expense, you're assuming,

8   sir, that the design that you are recommending, whoever is

9   recommending, is the final design.

10       Is that what -- one would have to consider the cost in the

11  end of what the final design is like; but those iterations to

12  get to that final, it takes -- it takes quite a bit of work.

13  **Q.**   Have you ever been given an unlimited budget to design

14  whatever you want regardless of the resulting cost?

15  **A.**   No.

16  **Q.**   Would you look at whether any changes to how the employee

17  does the job would have any impact on other employees; that is,

18  on other coworkers?

19  **A.**   Have I looked at that?

20  **Q.**   Would you?

21  **A.**   Yes.

22  **Q.**   To the extent that their -- it's a service job that they

23  are interfacing with customers, would you want to consider what

24  impact any changes might have on customer perceptions?

25  **A.**   Yes.  One would have to look at that as well.

1  Q.   And do you recall in your deposition in this case that you

2  testified an ideal ergonomic solution would be if an employee

3  could sit for part of the time and stand for part of the time?

4  A.   Yes, I did.

5  Q.   Can you explain what you meant by that?

6  A.   In an ideal situation, as I've put in my textbook, where

7  you have no cost constraints -- well, in an ideal situation

8  most ergonomists like me will recommend a sit and a stand

9  situation because that's best.

10      But the reality is you have to take into consideration the

11 task, what task they are performing, what's the cost, the space

12 availability, you know, the health and safety of the worker.

13 I'm not sure if I said productivity.  I don't have any notes.

14 Yes, sir.

15 Q.   And were you taking any of those other factors into

16 account when you said the ideal situation would be sit/stand?

17 A.   At that point, I was not looking at all of that because I

18 had not perceived it that way.

19 Q.   Okay.  Now, throughout the trial the Court has been

20 hearing testimony both from expert and from lay witnesses about

21 the differences between sitting and standing while working.

22      Can you explain to the Court in your view what are the

23 advantages or disadvantages about sitting versus standing in

24 performing a job?

25 A.   There are advantages of both.  The advantages of standing

1    is you can apply more force.  It's easy on the upper body.

2        When I say "more force," because very often there is more

3    flexibility.  There is an upper body -- if you want to apply

4    force, you can apply force with your upper body when standing.

5        You can move around the place.  That's another one.  You

6    don't need the knee clearance.  It's a problem to operate a

7    foot control, which is not applicable here, but that's one of

8    the things we talk about in a manufacturing situation.  That's

9    not acceptable when you're standing.

10       Sitting is better because it delays fatigue.  You can

11   stand up.

12       If you're only standing, they say, without stepping aside,

13   what we call static standing, for only half an hour.  You can

14   sit down for one hour, just sit down, static sitting.

15       And so one asks -- usually my students want to know is:

16   How the hell do people survive sitting?  The alternate when

17   we're sitting down, we're moving a bit as well.  Because when

18   we're doing that, we are replenishing the disk in our back.

19       I'm sorry, sir.  I think I might have gone off track.

20   **Q.**   I think you're certainly starting to give us a good idea

21   about that.

22       So are there particular muscles that you would see used

23   more predominantly when you're standing working as opposed to

24   when you're sitting?

25   **A.**   There are different muscles being activated, of course,

1    but I was -- I was talking about sitting.

2         When you're sitting -- when is sitting recommended?

3    Sitting is recommended when all items are within reach, when

4    you're lifting less than 10 pounds or handling less than

5    10 pounds.  Some guidelines say lifting 10 pounds, some say

6    handling 10 pounds.

7         Another one is when there is -- when there is knee

8    clearance, you can sit and do it.  So there's knee clearance.

9         Extended reaches.  Ten pounds.

10        When items are more than six inches above the work

11   surface, you don't recommend lifting.  So when there are these

12   high reaches and you're doing things of this nature, you don't

13   do it sitting down.

14        Sitting, of course, as I mentioned earlier, the advantage

15   is fatigue delays.  You can sit down and do things longer.

16   Q.   Is there any threat to health by prolonged sitting?

17   A.   Prolonged sitting, yes.  The same threat that you would

18   have for prolonged standing, which is venous blood pooling,

19   edema and so on.

20   Q.   Can you explain to the Court -- I don't know if the Court

21   has heard that term before.  What is venous blood pooling.  In

22   this regard it's spelled v-e-n-o-u-s?

23   A.   Yes.  You have veins and arteries.  Veins are basically --

24   excuse my terminology as an engineer.

25        It's the tubing that basically gets the -- instead of the

1  arteries pump blood away from the heart, the veins get the

2  blood back into the heart.  And so -- and they don't exert

3  pressure.

4       The only way you -- the only way you get the blood back is

5  something called the muscle pump.  And this -- if you walk,

6  that's one of the reasons you can get -- you can move.

7       That's one of the reasons that individuals that have --

8  sit down for long period of time, about 60 percent of your

9  blood can accumulate in the low extremities.  That's why

10 individuals that are paraplegic very often they have venous

11 blood pooling.

12      And if you notice individuals that are disabled very often

13 in wheelchairs, when you're sitting with them and talking with

14 them, they all of a sudden -- if they are paraplegic, not

15 quadriplegic -- they will pick up their legs and put it on the

16 counter so the blood can flow back.  They have no way of

17 walking.  So they have no way of getting that block back into

18 the circulation mode.

19 **Q.**   Is this a similar issue with airline passengers on long

20 flights?

21 **A.**   Yes, it is.

22 **Q.**   Is there any cardiovascular risk that's been identified

23 with prolonged sitting?

24 **A.**   For prolonged sitting, yes.  And that particular study was

25 for an extended sitting.  It was not just for a few hours.

1  Q.   Can you define for the Court the term musculoskeletal

2  disorder or MSD?

3  A.   MSD is also called cumulative trauma disorders.

4  Disorders, it's an umbrella term that -- it's physical injuries

5  that develop over a period of time.  They are caused by

6  excessive force, high repetition, awkward postures, and

7  duration -- and work duration, duration of activity.

8       They effect different muscle groups or different parts of

9  the body from the neck to the shoulder.  Frozen shoulder is an

10 example.  Tendonitis, carpal tunnel, these are all examples of

11 musculoskeletal disorders.

12 Q.   Does sitting while working present any particular risk of

13 MSD?

14 A.   Sitting while working has been documented to increase the

15 risk of upper extremity MSDs, especially shoulders.  Shoulder

16 and neck it's been documented.

17 Q.   And how would the symptoms manifest themselves if an

18 employee experienced that or developed that?

19 A.   It's -- as I mentioned, it develops over a period of time.

20 So it's nothing that happens overnight.

21      Initially there is going to be discomfort and pain.  And

22 if they work through it, carry on working with that discomfort

23 and pain, that's going to manifest itself with swelling.  And

24 that swelling then, if you don't take care of it, it then

25 becomes an injury because there is not enough time for it to

1  heal.  These microtraumas need time to heal.

2  Q.   Are you saying begin to develop without the employee being

3  aware of it and then only realize it sometime later?

4  A.   Initially it's discomfort.  Very soon after discomfort

5  they are going to start realizing it, but they may not realize

6  it initially.  There is a trigger and everyone has a different

7  trigger point.

8  Q.   You mentioned NIOSH.  Does NIOSH say anything about MSD

9  risk?

10 A.   NIOSH in 1997 did a thorough evaluation.  They looked at

11 hundreds and hundreds of papers, and they researched papers and

12 they documented the -- documented the risk.

13      First of all, they said that there is -- the risk factors,

14 there are some risk factors that affect MSDs.  And some risk

15 factors affect it more than others.

16      And, therefore, different body parts, they went through it

17 whether force and posture and repetition, which of these would

18 affect which body part and how much.

19          MR. WOHL:  If I can approach the witness, your Honor?

20          THE COURT:  Yes.

21 BY MR. WOHL:

22 Q.   I'm going to show the witness what's previously been

23 marked and I believe admitted as Trial Exhibit 244.

24      (Document was tendered to the witness.)

25 Q.   Can you take a look at that, please and explain to the

1    Court what that is?

2    **A.**    This Exhibit 244 is the "Musculoskeletal Disorders and the

3    Workplace Factors."  It's a publication by NIOSH numbered

4    97141.  This is the second printing.

5    **Q.**    Does that bear on what we just talked about?

6    **A.**    Excuse me?

7    **Q.**    Does that bear on what we just talked about?

8    **A.**    Yes, sir.

9            MR. DOSTART:  Your Honor, we're going to object to

10   this.  This is outside of Dr. Fernandez's report.

11           THE COURT:  Is that true?

12           MR. WOHL:  I don't think so.

13           MR. DOSTART:  This is not included in his report, your

14   Honor.

15           THE COURT:  Show me where it's in the report.

16           MR. WOHL:  All right, your Honor.  Let me take a look.

17           MR. DOSTART:  It's not in the report, your Honor.

18   **BY MR. WOHL:**

19   **Q.**    Just to speed things up, Dr. Fernandez.  Do you recall if

20   these were cited in either your first report or second report?

21           MR. DOSTART:  I Think citing it in the report would

22   not be sufficient.  Included within the report.

23           MR. WOHL:  Your Honor, that would not be a fair

24   distinction.  He obviously he relied upon it.

25           THE COURT:  No.  It depends.  Every statement he makes

```
 1  on direct examination is supposed to be in the report.  It can

 2  be -- it doesn't have to be the exact words, but it has to be

 3  close.

 4      If all I did was cite to something, that's not enough to

 5  sustain testimony about a report.

 6          MR. WOHL:  He's taking it way.

 7      Excuse me, your Honor.  I've got my own copy.

 8      (Brief pause.)

 9          THE COURT:  Now, sometimes on cross-examination the

10  cross examiner opens the door to all kinds of things, but we're

11  not to cross examination yet.

12          MR. WOHL:  I don't know, your Honor --

13  BY MR. WOHL:

14  Q.  Excuse me, Dr. Fernandez, if you can help me here.

15      Basically what the judge is concerned about is whether in

16  your body of your report do you talk about the matter that's

17  covered by that NIOSH publication?  If so, could you just

18  direct us to that?

19  A.  Table 1.

20  Q.  Table 1.  Is this the September 6th report, which has been

21  marked Exhibit 213?

22  A.  Table 1.

23          MR. WOHL:  That's it, your Honor.  And NIOSH is cited

24  in the bottom of the table.

25          THE COURT:  What do you say to that counsel?
```

 1        MR. WOHL:  It's right there.

 2        MR. DOSTART:  As long as the witness is going to

 3   testify just to the chart that's in the report, we have no

 4   objection whatsoever.

 5        MR. WOHL:  Your Honor, that's not what it says.  It

 6   says NIOSH has a publication entitled "Elements of Ergonomics

 7   Program General Workstation Design That Includes the Following

 8   General Workstation Design Principles."  And then it ticks them

 9   off.

10     I think that's what the witness is talking about.  So I'm

11   not sure what the problem is.

12        MR. DOSTART:  Just to be clear your Honor.  I'm not

13   trying to be obstreperous.  As long as it's in the report, as

14   Paragraph 13 of your Honor's guidelines for civil bench trials

15   indicates, he can discuss it.

16     I was afraid that as Mr. Wohl did with Dr. Johnson, there

17   might be an attempt to go outside of what would be permitted

18   pursuant to those guidelines and I was just trying to make sure

19   we didn't get there before --

20        MR. WOHL:  Excuse me, your Honor.  Dr. Johnson's exam

21   was cross examination, so I was allowed to do what I wanted to

22   do.

23     This is direct exam, and I've stayed within the report.  I

24   don't understand why we're even having this discussion.

25        THE COURT:  As long as what he's saying is in the

1  report, it has to be almost the exact words.  Not exactly, but

2  close to it.  You cannot -- merely because the report is

3  mentioned doesn't mean you get to refer to anything that's in

4  that report.  It has to be referenced in the report.  If it is,

5  then he can testify to it.

6          **MR. DOSTART:**  Thank you, your Honor.

7          **THE COURT:**  I cannot -- that's the best guideline I

8  can give you.  Keep that in mind as you go through it.

9      All right.  The objection is overruled for the time being.

10 **BY MR. WOHL:**

11 **Q.**  And while we're at it, Dr. Fernandez, if we could, let me

12 just show you Exhibit 213 so you can confirm this as your

13 report for your -- your opening report I should say.

14     (Document was tendered to the witness.)

15 **A.**  Yes, it is my report.

16 **Q.**  So what does NIOSH say about the relationship between MSDs

17 and certain physical factors?

18 **A.**  I'm just going to read off my report here.  It says:

19 "NIOSH concluded that a" --

20          **THE COURT:**  Wait.  Read slowly.  If you're going to

21 read, you've got to read slowly so I can understand and the

22 court reporter will get it.

23          **MR. DOSTART:**  Your Honor, I would prefer that he be

24 asked if he can remember and then if he cannot remember --

25          **THE COURT:**  Well, look.  He's trying -- if he

```
 1   doesn't -- you know, on the fly you object on the ground that
 2   it's not in the report.
 3        If he reads it exactly the way it is in the report, you
 4   object on the ground that his memory doesn't need to be
 5   refreshed.
 6        I'm going to let him do it in this one instance.  Go
 7   ahead.  Read what you have in your report.
 8           MR. WOHL:  Thank you, your Honor.
 9   A.   (As read)
10           "NIOSH concluded that a large body of credible
11            epidemiological research exists that shows a
12            consistent relationship between MSDs and certain
13            physical factors."
14           THE COURT:  Next question.
15   BY MR. WOHL:
16   Q.   You then have a chart that you call Table 1.  Can you
17   summarize for the Court what Table 1 shows?
18   A.   Table 1 basically has the various body parts and it shows
19   by the -- for the neck and shoulder, by the force, repetition,
20   posture, vibration as a strong evidence that there are --
21   there's strong evidence, evidence, insufficient evidence or no
22   evidence.
23        In the case of neck and shoulder, there is strong evidence
24   that posture has a factor to play.
25        And repetition and force has -- there is evidence with the
```

1   three pluses as they put it out here.

2   **Q.**   How is that relevant to the issue of sitting versus

3   standing while performing work?

4   **A.**   In sitting and standing there are two -- most of these, if

5   you notice, they have repetition, posture and by -- repetition,

6   posture, forces and vibration.

7        In sitting and standing the two factors that come into

8   play are force and posture.  And if in a -- the posture and

9   forces will change from sitting to a standing position.

10  **Q.**   And can you explain that a little bit further for the

11  Court, the differences between the two, force and posture, and

12  how does that relate to sitting versus standing?

13  **A.**   In a standing position, your force you can apply is a lot

14  -- is higher.  I shouldn't say a lot higher, is higher than in

15  a sitting position.

16  **Q.**   Why is that?

17  **A.**   That is documented.  Because you can -- you use different

18  muscle groups and so on and so forth.

19       So you -- so there is a -- and when you're designing to

20  reduce risk, you are designing for one-third of your maximum or

21  15 percent of your maximum.  So if your maximum is going to

22  decrease and you're required to do the same work standing or

23  sitting, the risk is going to increase if you're sitting and

24  doing it.

25  **Q.**   And then please explain what you mean by "posture" and how

 1    that relates to this issue of sitting versus standing?

 2    **A.**    Posture will change -- some body postures, not all body

 3    postures.  Some postures will change while you're in a seated

 4    position.  Your shoulders will be abducted, or moving forward,

 5    and those postures would -- would bear.

 6         And so in this particular case, like it says, posture has

 7    a major factor.  This is just one of the studies.

 8         And then another one also talks -- there are some other

 9    studies that have been done that said upper extremities do

10    cause -- posture has an effect to play as it relates to

11    shoulder and neck.

12    **Q.**    Are you familiar with the term "lordosis"?

13    **A.**    Lordosis has to do with the back.  It has nothing to do

14    with the shoulder.

15    **Q.**    I understand.  But what does lordosis, if anything, have

16    to do with posture?

17    **A.**    Lordosis is the curvature of the low back.  When you're

18    standing, you have that low back lordosis.  When you're sitting

19    down and your back is not supported, you do not have that

20    lordosis.

21         And so basically what happens is you go ahead and create

22    compressive and sheer forces in your low back.  This happens

23    when your back is not supported and you do not have a back

24    rest.  You provide a back rest and you do not have -- then you

25    get that lordosis.  The objective is to get the lordosis.

```
 1        Why does it happen?  Because when you're sitting down and
 2   your back is not supported, your pelvis rotates backwards.
 3   When it rotates backwards, you're not -- you don't get that
 4   lordosis.
 5        That's why very often when you sit down for a long period
 6   of time without a back rest, an effective back rest -- a back
 7   rest need not be something that you just have here.  If it
 8   doesn't touch your low back at a particular point and provide
 9   support, it's not really an effective back rest.
10   Q.   Are you familiar with someone named Don Chafen?
11   A.   Yes, I am.
12   Q.   And is he a recognized expert in the area of ergonomics?
13   A.   Yes, he is.
14   Q.   And has he done any work in the area of what the pressure
15   on the lower back is or lumbar between sitting and standing?
16   A.   He has reported some of those studies by Anderson in 1974.
17            MR. WOHL:  May I show the witness what's been marked
18   as Exhibit 228-A?
19        (Document was tendered to the witness.)
20   BY MR. WOHL:
21   Q.   Please tell the Court if you recognize that document.
22        Let's start, though, just so I don't run afoul:  Is this
23   document also referenced in your report, Chafen?
24   A.   I refer to Chafen and I refer to Anderson 1974, A and B.
25   Q.   Could you direct us to that, because Mr. Dostart has a
```

```
 1  doubt about this and it's been --
 2  A.   The reference is -- is he asking for the reference, the
 3  reference list?
 4       MR. DOSTART:  No.  I'm asking for where in your report
 5  it appears.  I read it many times, but it's quite dense.
 6       (Brief pause.)
 7  BY MR. WOHL:
 8  Q.   Is it on Page 3, Doctor?
 9  A.   I'm looking.  I'm not sure where it is.
10  Q.   Can I direct your attention, in the interests of time, to
11  Page 3 of your report?
12  A.   Yes.  Page 3.
13  Q.   Fourth page.
14  A.   Yes, sir.
15  Q.   Do you see the reference?
16       MR. DOSTART:  I do.  Okay.
17  BY MR. WOHL:
18  Q.   All right.  Thank you.
19       Can you explain to the Court what Dr. Chafen found in this
20  regard?
21  A.   Dr. Chafen in this particular --
22  Q.   Go ahead.  Please explain to the Court.
23  A.   Can I be showing him?
24  Q.   Would you prefer it on the Elmo?
25       THE COURT:  You can hold it up, if that's the way you
```

 1  would like, and use it as an illustrative guide.

 2          THE WITNESS:  That's fine with me, sir.

 3          THE COURT:  Sure, go ahead.  What is it that you're

 4  trying to explain?

 5  A.   Well, what Chafen was saying here is as your arm is

 6  outreached -- as the arm is extended, what happens is the time

 7  for fatigue increases.  The time that you can -- the average

 8  time for a young male to reach significance muscle fatigue

 9  decreases.

10     So from 50 is much less than 40 is much less than

11  30 inches; 50 is less than 40 is less than 30.

12     And the amount of weight that you can lift is also

13  decreasing.  So the further away you are, one, the less weight

14  you can lift.  That's biomechanics --

15          MR. DOSTART:  I'm going to object to this as outside

16  the scope of the report.  The report only addresses the fatigue

17  issue, not the weight issue.

18  BY MR. WOHL:

19  Q.   Is this relevant to fatigue or is this just to strength?

20  A.   Fatigue is because of the weight.  This is the --

21          THE COURT:  Well, does the word "weight" appear in

22  your report?

23     What you're holding up is his article, right?

24          THE WITNESS:  That's right, sir.

25          THE COURT:  All right.  Well, that's not your report.

1   What we have to go by is what's in your report.

2        So you can repeat to me what it is you say about his study

3   in your report, but if you only refer to one of those items,

4   you can't go out and then now enlarge upon that and put in two

5   items.

6              **THE WITNESS:**  That's fine, sir.

7              **THE COURT:**  So just stick with the one item, which

8   sounds like it's the fatigue point.

9              **THE WITNESS:**  Yes.

10             **THE COURT:**  Okay.  So let's stick with fatigue.

11  **A.**   As the reach distance increases, the endurance time for

12  shoulder, muscle fatigue decreases.

13  **BY MR. WOHL:**

14  **Q.**   From an ergonomics perspective, what would be the key

15  considerations in your view as to -- in determining whether a

16  seat is appropriate for employees?

17       Do I need to restate that question, Doctor?

18  **A.**   Yes, please.

19  **Q.**   From an ergonomics perspective, what are the

20  considerations that you think would be key in determining

21  whether a seat is appropriate for an employee?

22  **A.**   Whether there is foot -- the number -- the job requires

23  weights to be lifted, whether there is enough of a knee

24  clearance, whether there is movement involved, whether the job

25  is six inches above the work surface.  These are some of them,

1  yes.

2  Q.   How would weight be a relevant consideration in whether a

3  job should be performed seated versus standing?

4  A.   As weight biomechanics states, that as weight increases --

5  as weight and distance increases, the movements increase.  So,

6  and there is also guidelines that state:  Do not handle items

7  more than 10 pounds.

8  Q.   While seated, you mean?

9  A.   While seated.

10  Q.   How does knee clearance relate to the issue of whether the

11  employee can sit or not?

12  A.   There is no knee clearance of sitting away.  And if you're

13  sitting away, you either can't reach or if you do attempt to

14  reach, you would be bending over and then your back is in some

15  awkward or longer positions.  So you do need knee clearance so

16  you can come in close.

17  Q.   How does movement relate to whether an employee can sit or

18  not?

19  A.   Movement is basically if your job requires you to move

20  from one place in the work station or the work area to another,

21  you've got to move.

22       If the job requires you to move, you -- and you're sitting

23  down, you really -- you have to then get off the seat and move

24  the seat and then move and then go to the other work station.

25  Q.   Are you familiar with the concept of no value add or no

1   value added in ergonomics?

2   A.   No value added is a concept in ergonomics and

3   manufacturing, yes.

4   Q.   Is that something that's considered undesirable from an

5   ergonomic point of view?

6   A.   Yes.

7   Q.   And would having to get off of a seat and move yourself or

8   the seat or both in order to perform the next task, would that

9   be considered no value added?

10  A.   It would be consider no value added, yes.

11  Q.   You also mentioned about working, if I heard you

12  correctly, six inches or more above the work counter --

13  A.   Yes.

14  Q.   (Continuing) -- as being a relevant consideration.

15       How does that relate to sitting?

16  A.   That goes hand-in-hand with don't work above -- they are

17  addressing the same issue of overhead reaching and working at

18  elbow -- shoulder height, trying to ensure that you do not --

19  you try to limit your upper extremity problems of the shoulder.

20       So the quote basically said if it's more than six inches,

21  they should not be doing it sitting.

22  Q.   In light of these considerations, in your own view when

23  would you recommend that an employee could be seated while

24  working?  That is, are there particular types of jobs that you

25  would say that would be appropriate for the employee to sit?

1  **A.**   There are jobs, and I have recommended seats.

2  **Q.**   And what would those be?

3  **A.**   Basically there's not -- there is not much extended -- the

4  extended reach -- everything is within normal, what we call the

5  normal area.

6       This is the normal work area (indicating).  This is the

7  maximum work area (indicating).  So if it's within the normal

8  work area, there are no extended reaches.

9  **Q.**   Can you give the Court some examples of jobs that you

10 believe could be performed ergonomically in a sound way in a

11 seated position?

12 **A.**   I have provided seats in a manufacturing environment

13 where -- on the floor.  Some jobs could have had seats and some

14 jobs didn't.  It didn't sit very well with the workers, but I

15 was not going to give -- recommend a seat so that some of them

16 could get hurt.  I was only going to recommend seat if it was

17 appropriate.

18      So some jobs where there was -- where there was no weights

19 being lifted, you know, and the parts were right in front of

20 them, introduced in front of them so there was no extended

21 reaches, there's no movement involved, I provided them with

22 what -- with not really a -- I wouldn't call it a seat, sir.  I

23 provided them with a butt rest or a high stool.  A sit/stand

24 stool, that's what I called it.

25 **Q.**   Now, this is a highly technical term, so let's get it on

1  the table, butt rest; is that correct?

2  **A.**    It's basically --

3  **Q.**    Embrace it.  Don't be ashamed of it.

4  **A.**    That's a term that is used in the textbooks, sir.  Yes, it

5  is.

6  **Q.**    Thank you.

7       Any other examples of jobs, even if you didn't personally

8  consult with an employer about them, but other types of jobs?

9  Just give the Court an idea of other types of jobs that an

10 employee could perform in your view in a seated position

11 ergonomically correct?

12 **A.**    A programmer.  Somebody involved in a -- a developer,

13 computer developer writing software programs.

14 **Q.**    How about a receptionist?

15 **A.**    Receptionist is a tough one.  It all depends what task

16 they are performing.  Some receptionists perform a lot of their

17 tasks at the work station.  Some receptionists are going to be

18 spending a lot of time out of the work station, in and out.

19 But if they are spending -- so it depends.

20 **Q.**    How about a bank teller?

21 **A.**    Bank teller, yes.  If they are not moving too much, yes.

22 **Q.**    Are you aware of any other authorities who would agree

23 with your view as to what jobs in general would be

24 appropriately performed seated as opposed to standing?

25 **A.**    Most ergonomists would.

1  Q.   And what types of jobs would you recommend that the

2  employee stand to perform in contrast?

3  A.   Stand, when there is movement involved.  It's easier to do

4  it standing.  When you have to apply forces, you do it

5  standing.

6  Q.   Can you give an any examples of jobs that you think would

7  be better performed standing?

8  A.   That I have -- that I see?  You're talking in general?

9  Q.   Sure.

10  A.   On the floor very often the tasks involve different work

11  stations.  And as they are moving along, they have to move

12  along with the -- with the part.  And it's very difficult for

13  them to provide them any sort of a seat, a high stool or

14  anything of that nature.  So you basically provide them with an

15  antifatigue mat or something that would decrease their fatigue

16  in their lower extremities.

17  Q.   Right.  We'll talk more about it in a moment.

18       Going back to the butt rest or lean stool, can you just

19  describe, just so we're clear, to the Court what that is?  And

20  specifically how does that contrast from a seat?

21  A.   Standing or standing erect, it's 180 degrees.  Sitting is

22  90 degrees.  And then a butt rest or a lean stool, it's about

23  135 to 142 degrees.  So it's sort of this position here

24  (indicating).  The muscles in the back and front are both in

25  equilibrium.  Plus, you are getting the lordosis.  But you have

1   to have that 135 to 142, 142 degrees.

2       So that's what we were recommending in the manufacturing

3   environment, those butt rests, those high stools and so on.

4   Those were high.

5   **Q.**   Can you give an example -- I'm sorry.  You said

6   manufacturing you recommended that?

7   **A.**   I did that in the -- in a pharmaceutical.

8   **Q.**   Did you recommend that in a chicken processing facility as

9   well?

10  **A.**   Yes, I did.

11  **Q.**   And so more specifically why did you feel that in that

12  instance a lean stool or butt rest was the appropriate

13  solution?

14  **A.**   The person was standing up, standing on a metal -- on

15  metal grate.  That's what they were standing and working.  The

16  chicken was coming right in front of them on an assembly line.

17  All they were doing -- I shouldn't say all.

18      What they were working on was right in front of them and

19  so they were not -- there was no extended reaches.  There was

20  no movement around, they did not have to move.  It was right in

21  front of them.  They could either do it standing or they could

22  do it sitting.

23      In that situation -- in fact, that was the OSHA.  When we

24  cited that particular company in one of the abatements, that

25  was what I suggested.

1   Q.   Thank you, Doctor.

2        Let's turn now to this case and your opinions about

3   whether Kmart cashiers can sit while working.  Were you asked

4   to give an opinion in this case?

5   A.   Yes, sir.

6   Q.   And what was the opinion that you were asked to give?

7   A.   I was asked to -- the exact words I've got in my report,

8   but basically I was asked whether they could do it standing or

9   whether they could do it in a seated position, the CSAs at

10  Kmart in the present -- in the present work situation.

11  Q.   Were you also asked to review and react to the opinions

12  that Dr. Johnson gave in this case?

13  A.   I was asked in a -- in a second rebuttal I was -- in my

14  second report, which was the rebuttal report, that's what I was

15  asked to do.

16          MR. WOHL:  And just so we have it before the witness,

17  your Honor, in case he needs it, I'm going to ask to show the

18  witness Exhibit No. 214, which is his September 21st report.

19        (Document was tendered to the witness.)

20  BY MR. WOHL:

21  Q.   And if you could just identify for the Court, that is your

22  supplemental report of September 21st?

23  A.   This is my second report, yes, sir.

24  Q.   Okay.  Starting, then, with your initial opinion.  What is

25  your opinion about whether from an ergonomics perspective Kmart

1  front end cashiers could safely effectively and efficiently

2  perform their duties at the front end register in a seated

3  position?

4  **A.**    What are my opinions?

5  **Q.**    What is your opinion about that issue?

6  **A.**    In the present setup, it is not possible for them -- it

7  would -- not possible for them to do it in a seated

8  environment.

9  **Q.**    And we're going to talk more about why you feel that way,

10 but first let's talk a little about process.

11      What was the process that you followed in reaching your

12 opinion?

13 **A.**    I collected data at the Tulare store.

14 **Q.**    And what type of data did you collect?

15 **A.**    Video data and data on the measurements of the work

16 station.

17 **Q.**    Anything else?

18 **A.**    And some anthropometric data.

19 **Q.**    Did you see a job description?

20 **A.**    I saw a job description.

21 **Q.**    Did you talk to anybody at Kmart about the job?

22 **A.**    I spoke to somebody in human resources.  I don't quite

23 remember the name of the person.

24 **Q.**    All right.  Now, what would be about providing a cashier a

25 seat that you felt would not be workable or appropriate from an

1  ergonomic point of view?

2  **A.**    One would be increasing the risk of upper extremities,

3  MSDs.   One would increase the risk of upper extremity MSDs.

4  One would increase the risk of back problems because of the

5  twisting and as it relates to -- and there would be extended

6  reaches.

7  **Q.**    Do you believe that if a Kmart cashier performed the job

8  while seated, that the cashier would be at higher risk of

9  developing MSD?

10  **A.**    I strongly believe that, yes.

11  **Q.**    And what conclusions form that opinion?

12  **A.**    The posture that they would have to conform to would

13  increase the -- the upper extremity posture would increase --

14  the angles would increase, the abduction and so on.  They would

15  not be able to reach out.

16      They would -- the same bend, if the bending -- if you're

17  standing up and if you bend down and if you're sitting down and

18  bending, the risk involved is different from standing to

19  sitting.

20          **THE COURT:**  May I ask you to be clear on something?

21      You're describing now the risks if the cashier was seated,

22  correct?

23          **THE WITNESS:**  Yes, sir.

24          **THE COURT:**  And by that do you mean the 90-degree

25  thing or do you mean a sit -- what you call a butt rest?

1        THE WITNESS:  Sir, I'm talking about the 90 degrees.

2        THE COURT:  All right.  And are you assuming that the

3   legs would be -- knees would be under the table or not under

4   the table?

5        THE WITNESS:  That -- if it is under the table, the

6   angles would be about the same.  If they are not under the

7   table, they would be further away, way further away.

8        MR. DOSTART:  Your Honor, I have never --

9        THE COURT:  What?

10       MR. DOSTART:  I just want to be clear.  His report

11  only deals with the current configuration.  And so to the

12  extent that he begins to offer an opinion about any

13  modifications, we would object that his opinions would be

14  outside --

15       THE COURT:  Well, that's what I'm -- yes.

16       MR. WOHL:  Your Honor, that's actually not correct

17  though.  His first opinion opines on the current configuration.

18      In the second opinion, the rebuttal opinion -- he opines

19  on Dr. Johnson's proposed modifications which include, as the

20  Court knows, clearing away the knee areas so that the knees can

21  go in.

22      So, in fact, he can opine about --

23       THE COURT:  Why is the second report timely?

24       MR. WOHL:  It was timely submitted, your Honor.  We

25  already went through that, September 21st.  Rebuttal report.

```
 1            THE COURT:  What?

 2            MR. WOHL:  It's timely, your Honor.  Their rebuttal

 3   report was untimely.  Ours was timely, September 21st.

 4            MR. MATTHEW RIGHETTI:  Dr. Johnson -- you recall Dr.

 5   Johnson was going to testify from his supplemental report and

 6   Mr. Wohl eloquently objected and he could not testify to it.

 7   Except you said if Dr. Johnson wants to come back on rebuttal,

 8   he could testify to it.

 9            MR. WOHL:  No, your Honor.  It's two different

10   issues --

11            MR. MATTHEW RIGHETTI:  Well, excuse me.

12            MR. WOHL:  Excuse me.

13            MR. MATTHEW RIGHETTI:  The same rule should apply

14   here.

15       If Dr. Johnson comes back to testify about his

16   supplemental report, I suppose Dr. Fernandez can come back

17   and --

18            MR. WOHL:  That's not correct.  I'm sorry.  Dr.

19   Fernandez's September 21st supplemental report responded to Dr.

20   Johnson's opening report, not rebuttal report.  This was

21   appropriate rebuttal to Dr. Johnson's appropriate report and it

22   was submitted timely on September 21st.

23            THE COURT:  What was the date that any report was due?

24            MR. WOHL:  The initial due date, I believe, was

25   September 7 and we submitted ours on time on September 6.  I
```

1  think Dr. Johnson did submit the opening report on time,

2  September 7.  Then the deadline for the rebuttal or

3  supplemental reports was, I believe, September 21st.  We

4  submitted ours on time, September 21st.  They did not submit

5  theirs on time.

6      So Dr. Fernandez's testimony about Dr. Johnson's

7  modifications address his first report.  And his supplemental

8  report is timely, so there is no issue here, your Honor.

9          THE COURT:  Just a minute.

10     Who has the burden of proof on this issue?

11         MR. WOHL:  Plaintiff does, of course.

12         THE COURT:  Agreed.

13         MR. MATTHEW RIGHETTI:  What issue are we talking

14  about?

15         THE COURT:  Well --

16         MR. WOHL:  Any issue --

17         THE COURT:  The issue of whatever it is these experts

18  are discussing.

19     I think the plaintiff has the burden of proof in general.

20  So the way this normally works, according to my case management

21  order, is the party with the burden of proof goes first.  And

22  then the other side, which in this case would be the defendant,

23  submits an opposition report.  And then there's supposed to be

24  a -- can be, doesn't have to be, a reply report.  That's the

25  way I lay them out:  The opening, the opposition and then the

1    reply.  And the reply report is the one that has to be done on

2    rebuttal.

3         So what's confusing me here is the -- here the defendant

4    has two reports:  An opening report, which he didn't even have

5    to give anyway.  That could have been your opposition report.

6    That's what I'm thinking.

7         So to my mind both -- the opening report, which was kind

8    of a gift, it didn't have to be made, the defendant, because

9    you didn't have the burden of proof, and everything could have

10   been said in your opposition report.  That's the way I see

11   this.

12        On the other hand, since the plaintiff has the burden of

13   proof, the response to all of that other stuff should come in

14   rebuttal by Dr. Johnson.

15        So I'm going to let the defendant refer to both these

16   reports since, in my view, they both could have been submitted

17   later in September and not on the opening day since the

18   defendant does not have the burden of proof.

19        So this is not an inconsistency.  It's a -- it's all laid

20   out right there in the case management order.

21        All right.  So that having been said, you still have to

22   stick to what's in the report.  Now we got off onto this

23   because I asked a question.

24        My question was whether or not the witness was assuming

25   the legs of the cashier would be under the bench or out in

1  the -- kind of floating around, hovering over the fatigue mat?

2  What's your answer, please?

3      This was on the opinion you were giving a moment ago.  I

4  need to understand what your assumptions are.  What are your

5  assumptions?

6          THE WITNESS:  My assumption in this particular -- when

7  I made the statement was, there would be knee clearance, and

8  the employee would be able to get under the work surface.

9          THE COURT:  All right.  Now, as I understand the

10  desks, there's a problem.  There may not be clearance because

11  the scanner sticks down six inches, four and a half inches.

12          THE WITNESS:  There's not enough knee clearance.

13  What's going to happen is, they are going to be scooting away.

14  And what's going to happen, for them to reach out for a

15  particular item they would have to be -- they would have to

16  bend more.

17      If they could -- if there was knee clearance, the angle

18  would be -- would not be that extensive.  If there is -- if

19  it's blocked off as -- as it might be, what's going to happen

20  is the angles are not going to be very different, but the risk

21  is going to be different.  That's what I'm getting at.

22          THE COURT:  I think I understand the point.  Continue,

23  please.

24  BY MR. WOHL:

25  Q.   I was going to address this later, but I might as well

1  address it now.

2       Do people have different what might be called girth or

3  thigh thicknesses as part of their anatomy?

4  **A.**   I think thigh thickness is a factor, and one has to

5  consider thigh thickness when it comes to getting under the

6  work surface.

7       So if you're sitting on a chair, your thigh thickness plus

8  one or two inches -- that's what you do is, the chair height

9  plus your thigh thickness plus one, hopefully two inches should

10  be -- and then that should be the height of the underside of

11  your work surface.

12  **Q.**   So what happens if you have a thicker thigh in terms of

13  where you sit at the counter?

14  **A.**   Basically, you've either got to drop down the seat -- and

15  if you drop down the seat, then you the upper extremities are

16  working in this awkward posture.  If you drop down the seat.

17  Or you're sitting down in a real awkward position, as this, and

18  you're moving back because you can't get under the work

19  surface.

20  **Q.**   Okay.  Let's go back to, Judge Alsup asked you about the

21  two differences, so let's make sure we distill them, if you

22  will, so we're very clear what we're talking about.

23       So, first off, if there were no reconfiguration of the

24  checkstand, if we just left it as it is, is it correct that

25  your view is that the cashier could not sit and ergonomically,

 1  in a sound way, perform the job duties?

 2  **A.**    Yes.

 3  **Q.**    And so what are the conclusions that led you to that

 4  opinion?

 5  **A.**    There was no knee clearance.  There's -- they're lifting

 6  ten pounds occasionally.  And over a period of time they are

 7  lifting weights.  There's movement involved.  And they're

 8  working above six inches.

 9  **Q.**    And does bending have anything to do with your opinion?

10  Whether they bend or not, is that part of your opinion?

11  **A.**    The bending would go hand in hand with the six inches.

12  So, basically, if it's -- the amount they bend is going to

13  increase, yes.

14  **Q.**    Now, following up on Judge Alsup's question, what if the

15  obstruction under the counter was removed and, therefore, the

16  cashier could sit with his or her knees under the counter,

17  would there still be any of the concerns that you've expressed

18  about working in a seated position?

19  **A.**    You're asking me about only one of Dr. Johnson's -- just

20  remove --

21  **Q.**    Right.

22  **A.**    -- the shelves?

23  **Q.**    Right.

24  **A.**    If you remove the shelves, as your Honor pointed out, the

25  electronics would -- would be an obstruction.  Even if you did

1  not take that into consideration, you found a way around it,

2  and they came in close, the risk is still there for the upper

3  extremities.  There's still foot movements or movement around.

4  You have to get on/off and move the seat.  And so it would pose

5  problems.

6  **Q.**   All right.  We can come to that in little more detail

7  later.

8      So with regard to the data that you collected --

9          **MR. WOHL:**  Are we good on time, by the way, your

10 Honor?  Should we keep going?

11         **THE COURT:**  Let's go until 9:15.

12         **MR. WOHL:**  Thank you, Your Honor.

13 **BY MR. WOHL:**

14 **Q.**   What specific data did you obtain to form your opinions in

15 this case?

16 **A.**   I collected video data on six cameras.  And the six

17 cameras were, basically, two cameras on -- we've collected data

18 on three aisles.  So two cameras on each aisle, aisle 1, aisle

19 4, and aisle 7, of the Tulare store.

20 **Q.**   So how did you end up selecting those particular cash

21 registers or counters?  1, 4, and 7, is that what you said?

22 **A.**   1, 4, and 7.

23 **Q.**   As opposed to any others?

24 **A.**   The manager told us those are the most commonly used

25 aisles, checkout aisles.  So that's the ones we picked up.

1  Q.   How many cameras did you install per register?

2  A.   Two cameras per register.  One directly over the register

3  itself, and one behind so we could get a side view, so we could

4  get some -- the postures, especially of the back and the arm.

5  Because when you get directly over, you're sometimes not able

6  to see that clearly.

7  Q.   And what period of time was video recording done?

8  A.   For a whole week, from August 7 through August 13, from

9  8:00 a.m. in the morning continuously to 10:00 p.m. at night.

10 Q.   As a result of that recording, how many total hours of

11 video did you obtain?

12      And just so we're clear, two cameras looking,

13 nevertheless, at the same events.  So just looking at the

14 events and not the fact you have double cameras running, how

15 much total time was recorded?

16 A.   We had -- if you're talking about the whole hours, we had

17 294 hours.  That's 14 times 3 times 7.  That's 294.

18 Q.   Okay.

19 A.   Of course, multiplied by two cameras.

20      However, we also collected data because we are not quite

21 sure when somebody -- we were not quite sure a minute before,

22 if a customer came in, whether the employee would be work --

23 CSA would be working.  So we collected data 15 minutes before

24 the start of shift, and 15 minutes at the end of shift.

25      So 7:45 to 8:00 o'clock, and 10:15 to 10 -- 10:00 o'clock

1  to 10:15, data were also collected, and is on the hard drive

2  that you'll have.

3  Q.   Just so we're clear, by "7:45" do you mean in the morning?

4  A.   7:45 a.m., yes, sir.

5  Q.   And by 10:15, do you mean in the evening?

6  A.   Yes, sir.

7  Q.   So, basically, 12 hours plus a little bit of time at each

8  end is what you were recording; is that correct?

9  A.   Fourteen hours plus 15 minutes.

10  Q.   Fourteen hours.  My math is remiss.  Thank you.  Fourteen

11  hours.

12       Okay.  So if I heard you correctly, you accumulated

13  approximately 300 hours worth of video, correct?

14  A.   Yes, sir.

15  Q.   Did you review all 300 hours?

16  A.   No.  We randomly selected 30 hours of video.

17  Q.   And how did you go about randomly selecting those 30

18  hours?

19  A.   We basically came up with a random number generator, and

20  started randomly selecting videos.

21       We selected 50, I think, videos, one-hour video clips.

22  One for camera A, what we call camera A, the one on top, and

23  camera B, the side view.

24       And we went down the list.  We analyzed that one-hour clip

25  only if there was any transactions occurring.  If there were no

1  transactions occurring, we went to the next randomly-identified

2  clip and we analyzed it.

3      In the end, we -- we had to look at 37 clips to pick up

4  the -- the 30 we needed.  There is one --

5          MR. DOSTART:  I just want to object, real quickly.

6  His report states that if the one-hour segment selected did not

7  contain any transactions, that they did not choose a new random

8  hour; they, instead, chose the very next hour.

9          THE WITNESS:  Yes.

10          MR. WOHL:  That's not an objection.  He can do that on

11 cross.  He shouldn't be interrupting my argument with that kind

12 of comment.

13          THE COURT:  That's true.  Save it for cross.

14     Did you say 50 or 30?

15          THE WITNESS:  We identified 50 of them, and then we

16 just went down the list.  And we wanted to select 30.  We ended

17 up picking 37, as per appendix A of my report.

18     We just went down the list and so, first one, for example,

19 the first random hour we picked up there was no transaction, so

20 we moved to the second one, moved to the third, and so on and

21 so forth.

22     So all of the 30 that was selected in the end were from

23 that list of 50.

24 BY MR. WOHL:

25 Q.   And then what were you looking for when you looked at the

1   videotape that you selected?

2   **A.**   There was some variables that we were -- we had identified

3   that we were going to be looking at.  And that is on that --

4   that is on page, I think, 6 of my report, the transactions, the

5   number of foot movements, the -- whether your arms are above

6   elbow height, arms are at shoulder height, and so on.  There

7   are about 10 or 12 variables that we looked at.

8   **Q.**   Let's break this down a bit, Doctor.

9        I'm going to show you what's already been marked and used

10  in this trial as Exhibit 216, which is a diagram of the

11  checkstand at Tulare.  It's on a poster board here, so I'm

12  hoping you will be able to see it at this angle.  If not, if

13  it's all right with the Court, step down and show us.

14       Do you recognize that as a diagram of the checkstand

15  configuration at Tulare?

16  **A.**   Yes, sir.

17  **Q.**   Matter of fact, is that a diagram that you prepared as

18  part of your report?

19  **A.**   Not for the report.

20  **Q.**   Separately, for part of the rebuttal report, perhaps?

21  Separately?

22       It's okay.  But you did prepare this diagram, correct?

23  **A.**   Excuse me?

24  **Q.**   You prepared this diagram, correct?

25  **A.**   Yes.

913

1  **Q.**   Okay.  And do you believe it's a proportionately true and

2  accurate representation of the checkstand configuration at

3  Tulare?

4  **A.**   Yes.

5  **Q.**   And can you just -- I think the Court is familiar with it,

6  but you can take us through where everything is located so we

7  are on exactly the same page where we are referring to.  So

8  this will be relevant, will you tell what the video showed?

9           **MR. WOHL:**  May he step down --

10          **THE COURT:**  Yes, go ahead.

11 **BY MR. WOHL:**

12 **Q.**   You can be brief.  Judge Alsup has heard this before, but

13 I think going through it quickly --

14          **THE COURT:**  I think I know where everything is.  Go

15 ahead.

16          **MR. WOHL:**  I do have additional questions, your Honor.

17 I'll be asking about those too.

18 **BY MR. WOHL:**

19 **Q.**   But, go ahead, Dr. Fernandez, tell us what this shows in

20 terms of the configuration.

21 **A.**   This shows the bagging table out here.  We have out here,

22 which is the -- sorry.  The register.  This is the register

23 here.  Out here, this is the printer, the coupon printer.  This

24 is the screen.  (Witness indicating on diagram.)

25          Out here --

1  Q.   May I ask, is there a keyboard here?

2  A.   The keyboard is right in front here (indicating).  That's

3  the anti-fatigue map.  Out here is the demagnetizer.  This is

4  the bi-optical scanner.  This is the credit card machine and

5  also where you do the surveys.  This is a bagging table out

6  here.

7  Q.   Okay.  Let's get some dimensions out, as well, while

8  you're standing up, Doctor.

9       First off, can you tell the Court -- first of, did you

10 take dimensions of the configuration?

11 A.   I did.

12 Q.   Can you tell the Court what the distance is from on what

13 I'll call the sales counter, from the point where the counter

14 holding the register hits, to the end of the counter, to the

15 right?

16 A.   Thirty-five inches.

17 Q.   And did you measure the height of the counter?

18 A.   The height of the counter is 36 inches.

19 Q.   Okay.  And did you measure what I would call depth of the

20 counter, which is the distance from the edge of the counter

21 towards the cashier, to the edge of the counter towards the

22 customer?

23 A.   It's 23, but I need to confirm that.  Give me second,

24 please, sir.

25 Q.   Please, do.

1   A.   It's 23 inches.

2   Q.   All right.  And then what is the distance -- first off, I

3   don't know if your diagram shows it, but what's -- on a bird's

4   eye view above the mat or otherwise behind the mat where the

5   cashier stands?

6   A.   This has divider out here, and the other side is the next

7   aisle (indicating).

8   Q.   Did you measure the distance from that panel to the edge

9   of the counter where the cashier would be standing?

10  A.   This distance out here from the panel right up to the

11  cashier in front of this scanner front edge is 27 inches.

12  Q.   Now, I believe in your report you used a term called "the

13  box"?

14  A.   Yes, sir.

15  Q.   Can you tell the Court what you meant by "the box."

16  A.   What I meant by the box is this area out here, 35 by 27

17  (indicating).

18  Q.   And just so we're clear, 35, you actually mean going out

19  this far, correct (indicating)?

20  A.   Yes, sir.

21  Q.   So that's the box there, correct?

22  A.   Yes.

23  Q.   Then did you measure the distance between the edge of the

24  counter and the bagging table?

25  A.   Twenty-one inches (indicating).

1  Q.   And then the bagging table itself, what are the

2  dimensions, I guess, looking at that way, perhaps, depth,

3  length and height?

4  A.   The -- this out here is 47.75.  The depth is 28.25.

5  Q.   Just so we're clear 28.25, meaning from left to right on

6  the diagram?

7  A.   Yes.

8  Q.   And the height?

9  A.   And the height of that is 31.75.

10 Q.   All right.  I think those are all the relevant dimensions.

11         THE COURT:  I have --

12         MR. WOHL:  Yes, Your Honor.

13         THE COURT:  -- a question.

14     Maybe it's not to scale, but do you see the thing you call

15 the -- what did you call that dark area?

16         THE WITNESS:  Anti-fatigue mat?

17         THE COURT:  Well, mat.  Okay.  But you said it was 27

18 by 35.

19         THE WITNESS:  This area here, sir (indicating).

20         MR. WOHL:  Beyond the mat, your Honor, all the way.

21         THE WITNESS:  This whole area (indicating).

22         THE COURT:  All right.  I can't see anything that

23 looks -- you mean all the way out to the corner is 35?

24         THE WITNESS:  Yes, sir.

25         THE COURT:  All right.

1    MR. WOHL:  That's what the witness is referring to as

2  the box, Your Honor.

3    THE COURT:  Here's what I want you to do during the

4  break.  I want you lawyers to watch what the witness does, but

5  have the witness ink in those numbers so that there will be

6  real dimensions there.

7    And you all make sure that the numbers that get on there

8  are the ones that were testified to.  Do it the way a draftsman

9  would do it, with little arrows and so forth.  All right.

10    MR. WOHL:  Yes.

11    THE COURT:  So we'll have those clearly available to

12  the Court.

13    MR. WOHL:  All right.

14    THE COURT:  There's one I'm interested in.  What is

15  the distance from the -- all the way out to the far left-hand

16  side of the counter?

17    THE WITNESS:  (Indicating.)

18    THE COURT:  Yes.  From there to there.

19    THE WITNESS:  It's about 22, sir.

20    THE COURT:  What?

21    THE WITNESS:  It's about 22.  I don't know the exact

22  measurement.  I've got this measurement up to the coupon

23  printer.  I don't have this --

24    THE COURT:  What is the coupon thing?

25    THE WITNESS:  Twenty-two.  So that's why I say --

1          THE COURT:  Twenty-two.  All right.

2          THE WITNESS:  So it's about 22.

3          THE COURT:  All right.  And then using the Pythagoras'

4    Theorem, can you, in your head, tell us what the reach would be

5    to that bottom left corner?

6          THE WITNESS:  This corner here (indicating)?

7          THE COURT:  Down there.

8          THE WITNESS:  I could if you give me some -- after the

9    break, I could come back, sir.

10         THE COURT:  But you didn't measure that?

11         THE WITNESS:  No, I did not measure this, no.

12         THE COURT:  All right.

13         THE WITNESS:  But, as you said, it could be

14   determined, yes, sir.

15         MR. WOHL:  Geometry should help us, your Honor.

16   You're right.

17         THE COURT:  Mr. Righetti, do you know what Pythagoras

18   was?

19         MR. MATTHEW RIGHETTI:  I know who he was.  He had

20   something to do with geometry, right?

21         MR. WOHL:  Clever fellow, your Honor.

22         THE COURT:  Angles, yes, correct.  You get an A.

23      All right.  We've got some more time to go.  I don't want

24   to take the break yet.  Continue on.

25

1  BY MR. WOHL:

2  Q.   Now that we have that in front of you and you have given

3  us some dimensions, could you tick off for the Court the

4  various activities or motions or movements that you were

5  observing and recording in your analysis of the video.  Just go

6  through each of the things that you were looking at.

7  A.   I measured the duration of each of the transactions that

8  occurred in that one hour.

9          THE COURT:  Which one hour?  I thought you looked at

10 37.

11         THE WITNESS:  I looked at 37.  Out of the 37, only 30

12 of them had transactions in it.  So I evaluated only those 30.

13 Disregarded the seven.

14         THE COURT:  You mean there was only one hour's worth

15 of transactions during that whole time?  Is that what you're

16 saying?

17         THE WITNESS:  Sir, out of the 37 one-hour

18 transactions, seven of the one-hour transactions had no

19 transactions in them at all, so those were disregarded.  And we

20 picked up -- we went ahead and picked up, then, 30 of -- 30

21 one-hour, the rest of them.  Of the 30, we ended up with 537

22 transactions.

23         THE COURT:  I see.  All right.  Total?

24         THE WITNESS:  Total 537 transactions.

25         THE COURT:  All right.  So does that mean 537

 1  individual items that were rung up, or do you mean 537

 2  customers?

 3          **THE WITNESS:**  Customers.

 4          **THE COURT:**  All right.  Thank you.

 5          **THE WITNESS:**  So we had 537 customers/transactions.

 6  We got the duration of each of those transactions, the number

 7  of foot movements.  And I've gone and displayed it both ways.

 8  I've displayed it in terms of the number -- normalized, how

 9  many times it occurred in one hour.  And I normalized it per

10  transaction.

11  **BY MR. WOHL:**

12  **Q.**  And just define for the Court by a "foot movement," what

13  do you mean?

14  **A.**  If the person is standing and moving.  Clear definition

15  for each of these on page 23 of my report, if your foot is

16  moving in any direction we counted it.  And we counted the

17  number of times your feet move during -- during the whole

18  transaction.

19  **Q.**  Thank you.  What else did you look at?

20  **A.**  We looked at the number of extended reaches.

21  **Q.**  Say, again.  What type of reaches?

22  **A.**  Extended reaches.

23  **Q.**  Extended reaches?

24  **A.**  Neck twists.

25  **Q.**  Actually, let's break this down.  I want to be as clear

1  for the judge as possible.  When you say "extended reach," what

2  do you mean?

3  **A.**     An extended reach is when the arms are fully extended, or

4  the arm is partially extended and the back is flexed.  The back

5  is bent or flexed.

6  **Q.**  Thank you.

7      What next?

8  **A.**     The next one was overhead reach.  And overhead reach is

9  when the CSA is reaching with the arms fully extended, or

10 there's partial extension of the arms above the shareholder.

11 **Q.**   Okay.  What else?

12 **A.**     Back twist.  When the CSA moves back around the sagittal

13 plane -- sagittal plane is the middle plane out here -- greater

14 than 30 degrees, that is a back twist.

15 **Q.**   Anything else?

16 **A.**     Back flexion.  Back flexion is when the CSA is standing

17 and the shoulder is bent forward.  That's what I called

18 flexion.  And this forward bending of the upper back.

19 **Q.**   Anything else?

20 **A.**     Low back flexion, where they're bending down and they're

21 going below where -- below the counter.  That's what I call low

22 back flexion, when they go in to the shelves.

23     Next one was number of the times hands at shoulder, hands

24 at shoulder level or above shoulder level.

25     The next one was number of times elbow at shoulder level.

```
 1        Next was the number of times the CSA was out of the box
 2   during the transaction.  The one after that is the number of
 3   times, the number of instances the CSA was out of the box
 4   between transactions.
 5        The next, the number of instances the items scanned.
 6   Number of instances of items bagged.
 7        Next, number of heavy items present.  And heavy was close
 8   to ten pounds.
 9        Number of instances of heavy items pushed or pulled.
10        The next was --
11             THE COURT:  What's the difference between that one and
12   scanned?
13             THE WITNESS:  All items are scanned, sir.
14             THE COURT:  What?
15             THE WITNESS:  All small items are scanned.  Large
16   items are scanned.
17        When I say pushed or pulled, I was referring only to heavy
18   items being pushed or pulled.
19             THE COURT:  I know, but the earlier one was scanned,
20   heavy items scanned.
21             THE WITNESS:  No, sir.
22             MR. WOHL:  I think it was just items scanned.  I may
23   have misspoke.  I'm sorry.
24             THE COURT:  When you say "scanned," does that include
25   the times that the hand scanner is used on an item still in the
```

 1  basket?

 2          THE WITNESS:  Yes, sir.

 3          THE COURT:  Okay.  Go ahead.

 4          THE WITNESS:  Number of instances of heavy items

 5  lifted, and the number of instances of heavy items rotated.

 6  BY MR. WOHL:

 7  Q.  So those are the movements or actions that you observed?

 8  A.  Yes, sir.

 9  Q.  By the way, did you also observe what items were being

10  purchased on the video?

11  A.  When I documented it?

12  Q.  Yes.

13  A.  I have documented all 537, during each transaction what

14  was occurring, when it was occurring, and what we perceived as

15  was being lifted, yes, or moved.

16  Q.  And that's in your report, as well?

17  A.  If it was heavy, yes.

18  Q.  All right.  So in your report --

19          MR. WOHL:  Again, your Honor, this is Exhibit 213.

20  BY MR. WOHL:

21  Q.  -- do you report on the number of such movements or

22  actions as you observed, as you have described it?

23  A.  Yes, sir.

24  Q.  And does that appear specifically on pages 12 and 13 of

25  your report?

 1   **A.**   Twelve and 13, tables 3 and 4 of my report, sir.

 2   **Q.**   From an ergonomic perspective, is there anything

 3   significant about your findings of the number of times there

 4   were such motions or movements, as you've described them?

 5   **A.**   The foot movements were -- there were what we notice were

 6   the number of foot movements, the number of extended reaches,

 7   the back flexions, and the number of times the shoulder was

 8   the -- the elbow was at the hands -- sorry, the hands were at

 9   the shoulder or above the shoulder.

10       These were some numbers we looked at, and based on that we

11   felt that this -- the foot movements meant that they were

12   moving around pretty high.

13   **Q.**   And what, if any, relevance do you think that has to the

14   issue of whether they can sit or stand while working?

15   **A.**   They would -- if they were seated, they would have to get

16   off the seat and move around to get the job done.

17   **Q.**   Is there any significance to the number of foot movements

18   you observed with regard to whether it presents an undue risk

19   for cashiers to stand while performing this job?

20   **A.**   You'd have to repeat that, or rephrase.

21   **Q.**   Yes.  Do you understand that in this case Dr. Johnson

22   expressed the view that it is ergonomically bad for the

23   employees to have to stand while performing their job all the

24   time?

25   **A.**   Yes, that's what he says.

1  Q.    Is there any significance, in considering that

2  proposition, the fact that you observed them moving quite a bit

3  behind the stand?

4  A.    By them moving, basically, what happens is it helps in the

5  venous blood pooling.

6  Q.    And it does that because what?

7  A.    Because the muscle pump kicks in.  The muscle pump helps,

8  and you're moving around, and you delay fatigue.

9  Q.    Okay.  Did you frequently find cashiers statically

10 standing; that is, standing without any movement?

11 A.    It depends on if the cashier is standing and if there's

12 not movement.  If there's no movement, it's different from if

13 there is movement.  In this particular case, there was

14 movement.

15 Q.    Also, you mentioned antifatigue mats.  And that's the

16 black square that's on the chart.  What's the significance of

17 an antifatigue mat with regard to the issue of standing?

18 A.    It -- it delays the onset of fatigue.

19 Q.    Okay.

20        THE COURT:  It's time now for our break.  But -- so

21 we'll do that.  But you know you've referred to these things in

22 the expert report.  Unless you lawyers have stipulated to the

23 contrary, expert reports don't come into evidence.  Have you

24 stipulated to the contrary?

25        MR. WOHL:  I believe so, your Honor, I believe that is

```
 1   in evidence.

 2           THE COURT:  They're saying no.

 3           MR. DOSTART:  We have not stipulated to the admission

 4   of the expert reports into evidence, your Honor.

 5           THE COURT:  So you are referring to these tables and

 6   things, but that's not in evidence.

 7           MR. WOHL:  I will put them in evidence because I

 8   thought they were, your Honor.

 9           THE COURT:  Expert reports never come into evidence,

10   Mr. Wohl, over objection because it's hearsay.

11        Now, sometimes a table -- it depends.  I'm not saying this

12   one would come in or not.  But, occasionally, some tabulation

13   of data could come in as a standalone document.  But I would

14   say it's exceptional.

15        So if there's anything in that table that you want to make

16   sure is in the record, you need to verbalize it and put it on

17   the verbal record, unless you lawyers can agree that it can

18   come in otherwise.

19        So if, on the other hand, there is a stipulation that your

20   expert reports can come in, I'm okay with that, if you

21   stipulate.  But that would be the rare exception.

22           MR. WOHL:  We'll deal with it one way or the other,

23   but I appreciate it, your Honor.  I thought it was already in

24   evidence, so I will take care of this.

25           THE COURT:  Thank you.
```

```
 1        Now, be sure you that you all confer and have the
 2   witness's numbers put on that slide 2B.  All right.  We'll take
 3   15 minutes at this time.
 4             MR. WOHL:  Thank you.
 5        (Recess taken from 9:22 to 9:41 a.m.)
 6
 7             THE COURT:  All right.  Ready to continue?
 8             MR. WOHL:  Yes, we are, your Honor.
 9             THE COURT:  All right.  Please, continue.
10             MR. WOHL:  First off, your Honor, I think we have put
11   in the dimensions that you requested on Exhibit 216.
12             THE COURT:  All right.
13             MR. WOHL:  216-A.  And I'm going to put this back on
14   the easel.
15             THE COURT:  Thank you.
16             MR. WOHL:  And, also, I guess this should be on here,
17   too, Emily.
18   BY MR. WOHL:
19   Q.   Dr. Fernandez, did you do as the Court requested, which
20   is, using geometry, calculate what's the distance from the
21   point where the edge of the register counter -- the sales
22   counter diagonally across to the far corner of the sales
23   counter table?
24   A.   31.82.
25             THE COURT:  All right.  Thank you.
```

1          **MR. DOSTART:**  I just want to be clear for the record,

2    your Honor, there are some distances that are not yet reflected

3    on what is now 216-A, that we have asked to be reflected.

4          I don't think there's an objection, but we just want to

5    make sure that the Court's aware that there are some additional

6    distances.

7          **THE COURT:**  I tell you what.  If they don't get on by

8    the time you do your cross, you can cross-examine the witness,

9    and we'll put them on there on the fly.

10         **MR. DOSTART:**  Okay.  Thank you.

11         **THE COURT:**  Thank you.

12         **MR. WOHL:**  So we will add, you Honor, that diagonal

13   distance that Dr. Fernandez just testified to so it's a

14   complete chart.

15         **THE COURT:**  Thank you.

16         **MR. WOHL:**  Your Honor, I have been unable to reach an

17   agreement with plaintiff's counsel about simply stipulating to

18   have Dr. Fernandez's reports put in.  So I would like to try it

19   this way.  You can tell me if I'm doing it wrong.

20         I would like to draw the witness's attention to page 12 of

21   Exhibit 213.

22         **THE COURT:**  Yes.

23   **BY MR. WOHL:**

24   **Q.**   Ask, can you identify for the Court what that page is?

25   **A.**   That's the summary of the -- the summary of the video

1  analysis of activities based per hour.

2  **Q.**   And where do the data come from that's shown on this

3  table?

4  **A.**   The 30 one-hour video clips that were collected, that were

5  part of the random sample of the close to 300 -- the 300 hours

6  that we had collected.

7          MR. WOHL:  Your Honor, I am being told plaintiff will

8  stipulate to the admission of at least page 12, with Exhibit

9  213, which is table 3.

10         THE COURT:  What is the exhibit number going to be for

11 that one page?

12         MR. WOHL:  Well, it's part -- actually, it's 213-14, I

13 think, is the right way of putting it, your Honor.

14         THE COURT:  Two --

15         MR. WOHL:  213-14.

16         THE COURT:  Where does the 14 come from?

17         MR. WOHL:  Page 14 of the exhibit.

18         THE COURT:  You said it was 12.

19         MR. WOHL:  Page 12 of the report, but the exhibit

20 numbering is, you pick up a couple of extra pages at the

21 beginning, so it's page 14.

22     213-14 would be the proper way, I think, of identifying

23 this exhibit.

24         THE COURT:  And read into the record the title of the

25 chart that's on that page.

```
 1            MR. WOHL:  Will do, your Honor.  Table 3.  Summary of

 2   Activities, paren, per hour, end paren.

 3            THE COURT:  That item is received in evidence.  And

 4   I'm going to have to ask you to repeat it for my -- 213-14.

 5            MR. WOHL:  That's correct, Your Honor.  And that's

 6   table 3.

 7            THE COURT:  Thank you.  That's received.

 8        (Trial Exhibit 213-14 received in evidence.)

 9            MR. MATTHEW RIGHETTI:  That will have its own exhibit

10   jacket.

11            THE COURT:  Should.  Should be a standalone document.

12            MR. WOHL:  We will do that, your Honor.

13            THE COURT:  All right.

14   BY MR. WOHL:

15   Q.   Let me then draw your attention to page -- I'll stick with

16   the exhibit number because I think that's easier.  Exhibit

17   213-15.  Do you have that in front of you, Dr. Fernandez?

18   A.   Yes.

19   Q.   And can you identify for the Court, what is table 4, which

20   appears on the top half of Exhibit 213-15?

21   A.   This is the summary of the activities, again, from the 30

22   hours of video analysis that was conducted.  But this is

23   normalized per transaction as opposed to the previous table

24   which was normalized per hour.

25   Q.   So does this table show the same data just, as you say,
```

1  organized based on transaction rather than hour?

2  **A.**   Yes, sir.

3          MR. WOHL:  Your Honor, I would ask the plaintiffs

4  stipulate to that table going into evidence, as well.

5          THE COURT:  213-15.  Any objection?

6          MR. DOSTART:  To that table alone, your Honor, no

7  objection.  Obviously, to the paragraphs beneath it we would

8  object.  To that table alone, however, no objection.

9          THE COURT:  The table alone is all you're offering,

10 correct?

11         MR. WOHL:  Yes, Your Honor, since I'm not allowed to

12 put in the rest, so that's what I would do.

13         THE COURT:  All right.  So.that table alone will be

14 received in evidence.  And the table number is what?

15         MR. WOHL:  So that is Table 4, Summary of Activities,

16 paren, per transaction.

17         THE COURT:  Okay.  All right.  That's in.  Next.

18     (Trial Exhibit 213-15 received in evidence.)

19 **BY MR. WOHL:**

20 **Q.**   Let me draw your attention, Dr. Fernandez, to page 26 --

21 excuse me.  Stick with this.  Exhibit 213-28.  And that's a

22 table called, "Dimensions of Cashier Register at Kmart Store in

23 Tulare Configurations."

24     Do you see that?

25 **A.**   Yes.

1  Q.   And can you tell the Court what that table is?

2  A.   These are the dimensions of the seven cash registers at

3  the Tulare store.

4  Q.   Okay.  And was this done by you or your team in connection

5  with this analysis?

6  A.   Yes.

7        THE COURT:  Was it done by you or was it done by

8  somebody else?

9        THE WITNESS:  By my team.

10        THE COURT:  Not by you?

11        THE WITNESS:  Not by me, sir.

12        THE COURT:  So that's hearsay information that they

13  passed on to you?

14        THE WITNESS:  I -- I did verify some of the

15  measurements.  And the measurements on page 27, I have taken.

16        THE COURT:  All right.

17        MR. WOHL:  Okay.  Your Honor, I would offer this table

18  into evidence, as well.

19        THE COURT:  Any objection?

20        MR. DOSTART:  No objection, Your Honor.  I would just

21  like to note that it appears all of the registers are the same,

22  save for row T, which appears to have a slightly different

23  column 2 and 4, distance.

24     But I just like to note that it appears each register is

25  the same besides that, so no objection.

933

```
 1              THE COURT:  The table number is what?

 2              MR. WOHL:  It actually doesn't have a table number,

 3   Your Honor.  So it's part of Appendix D.

 4              THE COURT:  All right.

 5              MR. WOHL:  Actually, if you don't mind, your Honor,

 6   let's make it 213-27 and 28.  And that's Appendix D.

 7              THE COURT:  You're confusing me.  213-27 and 28?

 8              MR. WOHL:  Tell you what, your Honor.  Let's do 213-27

 9   through 30.  That's the -- no, 27 through 29.  Excuse me.

10              THE COURT:  What is the Exhibit number?

11              MR. WOHL:  Exhibit 213-27 through 213-29.  So it's

12   three pages.  And that comprises Appendix D to Dr. Fernandez's

13   report.

14              THE COURT:  Any objection to those three pages?

15              MR. DOSTART:  The only objection to those three pages,

16   your Honor, is the photograph, which is the -- either the final

17   or the -- yeah, the final page of the exhibit, which we would

18   object to.

19              MR. WOHL:  And I will lay the foundation for that,

20   too, your Honor.

21              THE COURT:  Is that page 29?

22              MR. WOHL:  Yes.  So it's simply a photograph of the

23   checkstand.  I can ask the witness if he can identify the

24   photo.

25              THE COURT:  Lay the foundation.  Go ahead.
```

 1              MR. WOHL:  Thank you.

 2   BY MR. WOHL:

 3   Q.   Dr. Fernandez, do you see the photograph that appears on

 4   page -- on Exhibit 213-29?

 5   A.   Yes, I do.

 6   Q.   Can you identify that photograph for the Court, please?

 7   A.   That is a register at the Tulare store.

 8   Q.   And under what circumstances was that taken?

 9   A.   Excuse me?

10   Q.   Under what circumstances was that taken, the photograph

11   taken?

12   A.   When we -- when my team was there on the 8th of August.

13   Q.   8th or 6th?  It has the time stamp --

14   A.   6th of August.

15              MR. WOHL:  Your Honor, I move, then, that those three

16   pages be admitted.

17              MR. DOSTART:  No objection, Your Honor.

18              THE COURT:  All right.  It will be received as

19   213-27/29.

20        This is the most unsavory marking system.  I don't like

21   this marking system.  But there's no choice, given the way this

22   is being served up.  So it's 213-27/29 is, apparently, Appendix

23   D.

24        (Trial Exhibit 213-27/29 received in evidence.)

25              MR. WOHL:  I trust you'll find other parts of my case

1    tastier, your Honor, but I'll do my best.

2              THE COURT:  We are done with doing this, right?

3              MR. WOHL:  We have one more, your Honor -- sorry, I

4    thought the whole report was in, which we wouldn't have to

5    bother you with this.

6    BY MR. WOHL:

7    Q.   I now direct your attention, Dr. Fernandez, to what is now

8    entitled Appendix E of the exhibit.  This begins at 213-30.

9    A.   Yes, sir.

10   Q.   And extends to 213-33.

11   A.   Yes, sir.

12   Q.   And can you identify for the Court what those documents

13   are?

14   A.   These are the measurements taken by my associates while

15   they were at the Kmart store during the week of August the 6th

16   through the 13th.

17   Q.   When you say "measurements," do you mean something more

18   specific?

19   A.   These were weight measurements that were taken.  And there

20   are some dimensions.  When I say measurements, on page 31,

21   which is Exhibit 213-33.  These are the dimensions of the box.

22   Q.   And were these articles of merchandise that were observed

23   in the 30 hours or so of video that were observed?

24   A.   These were some of the merchandise.  But these are what --

25   what we saw around at the Kmart store, not necessarily what we

1  saw in the videos.

2  **Q.**   All right.   And are you using this as part of your opinion

3  in this case?

4  **A.**   We use some of these numbers for -- as we saw it on the

5  video.

6           MR. WOHL:   All right.   Your Honor, I would move for

7  the admission of Exhibit 213-30 through 213-33.

8           MR. DOSTART:   We would object to that as hearsay, your

9  Honor.

10          THE COURT:   May I see the exhibit?

11     (Pause)

12          THE COURT:   It is hearsay, but what's the issue?

13          MR. DOSTART:   The issue is that we don't know who took

14  these measurements.   We believe it was not the witness.   There

15  seems to be, maybe, some problem identifying exactly what the

16  items are.   And it's hearsay.

17          MR. WOHL:   If I can maybe lay a further foundation,

18  your Honor, does that help?

19          THE COURT:   How can he-- he didn't -- unless he did

20  the weighing, he's relying on someone else.   It has nothing to

21  do with his expertise.

22          MR. WOHL:   Well, your Honor, he directed his team to

23  do this.   They did it under circumstances that merit

24  considerations being valid measurements.   And he viewed them

25  worthy enough to rely upon them in delivering his report.

 1        And I must say, your Honor, I don't think there's a whole

 2   lot of controversy about how much these items weigh.  Even if

 3   there's a dispute as whether it's exactly 40 pounds or 39

 4   pounds, I think we can all agree it's certainly within the

 5   range of the weight.

 6        So, again, I think this is exalting some technical

 7   construction over the substance of what we're trying to

 8   establish here.

 9        **MR. DOSTART:**  I would respectfully disagree with

10   Mr. Wohl, your Honor.  Like your Honor said, it's not clear

11   that he did these measurements.

12        And as to whether or not a person could differ about the

13   weight of an item, for instance, a 16-person tent, I know for a

14   fact that not all of them weigh 65 pounds.

15        So the idea that we're going to admit into evidence this

16   chart that appears to be just put together with, you know, a

17   bunch of items and some weights that they believe they weigh is

18   hearsay.  We would object.

19        **MR. WOHL:**  And, of course, your Honor, he is entitled

20   to rely on evidence even if it's hearsay.

21        **THE COURT:**  He can rely on it.  Doesn't mean it comes

22   into evidence.  So this one does not come into evidence.  This

23   one is out.

24        **MR. WOHL:**  All right, your Honor.

25        **THE COURT:**  He can testify to his opinions in

1    referring to this, but the document itself does not come in.

2              MR. WOHL:  All right.  Thank you, Your Honor.

3    BY MR. WOHL:

4    Q.   Finally, Dr. Fernandez, look at what's been attached as

5    Exhibit F to your report, which is Exhibit 213-34 through

6    213-46.

7         Can you identify for the Court what those photographs are?

8    A.   These are -- these are stills that were extracted from

9    pages 33 -- well, should I refer to the exhibit or the page

10   numbers?

11   Q.   Refer to the exhibit numbers so we can try to keep this

12   consistent.

13   A.   Exhibits 213-35 right up to exhibits 213-43, stills from

14   the video footage.

15        And exhibits on pages -- photographs on pages -- sorry.

16   Exhibits 213-44, 213-45, and 213-46 are photographs taken.

17   Q.   All right.  And are these photographs of checkstands,

18   other areas of the floor space, the break rooms at the Tulare

19   store?

20   A.   Yes.

21             MR. WOHL:  Your Honor, I move that these be admitted

22   into evidence.

23             MR. DOSTART:  Your Honor, we would object to the

24   explanations in the report, which are beneath every single

25   photograph on these pages, that purport to explain what is

1    going on in the photograph.

2        We would not object to the photographs themselves.  But

3    because each photograph is accompanied with an explanation, we

4    would object that that's hearsay.

5            MR. WOHL:  Your Honor, I could have Dr. Fernandez go

6    photograph by photograph and simply affirm what's in his

7    report, if that's how the Court wishes --

8            THE COURT:  That doesn't mean the argumentative

9    descriptions come in.

10           MR. WOHL:  They are not argumentative, your Honor.

11   They are observational.

12           MR. DOSTART:  We believe they are argumentative.

13           MR. WOHL:  They are observational, your Honor.

14           THE COURT:  As a tender, objection sustained.

15   BY MR. WOHL:

16   Q.  All right.  Dr. Fernandez, take a look at Exhibit 213 --

17           MR. WOHL:  Your Honor, so I am clear, the photographs

18   are admitted --

19           THE COURT:  No.  You offered them as a packet.  You

20   went all or nothing.  You lose.  You went all or nothing.

21           MR. WOHL:  I will do it the other way then, your

22   Honor.  That's fine.

23   BY MR. WOHL:

24   Q.  So Exhibit 213-35, can you describe for the Court what the

25   photograph is in the top half of the page?

 1   **A.**    Photograph is the CSA is leaning forward.  And there's an

 2   extended reach to pick up an item.

 3   **Q.**    Can you describe for the Court what the photograph on the

 4   bottom of Exhibit 213-35 is.

 5   **A.**    That's the CSA is -- there's an extended reach, and she is

 6   scanning an item in the cart.

 7   **Q.**    Can you tell the Court what the photograph on top of

 8   Exhibit 213-36 is.

 9   **A.**    Flexion of the CSA.  Denotes flexion of the back.  And

10   there's an extended reach while the CSA is scanning an item

11   using a handheld scanner.

12   **Q.**    Can you tell the Court what the photograph on the bottom

13   half of Exhibit 213-36 is?

14   **A.**    There is extended reach.  There's a twist of the back

15   while the CSA is retrieving the receipt from the receipt

16   printer.

17   **Q.**    Can you tell the Court what the photograph on Exhibit

18   213-37 is.

19   **A.**    The CSA is assisting a customer with the credit card

20   machine.  And while doing that, her back is slightly twisted.

21   And there's extended -- there's an extended reach.

22   **Q.**    Can you tell the Court what the photograph in Exhibit

23   213-38 is.

24   **A.**    The CSA is lifting an item that -- is lifting an item.

25   **Q.**    Can you say anything else about that?  If you can't, you

 1  can't.  Don't go beyond what you know.  No?  Okay.

 2      Can you identify what -- the photograph on top of page --

 3  Exhibit 213-39 is?

 4  A.  The CSA is bagging multiple items.  And what she's done is

 5  put a number of items in this large bag.  And I've seen this

 6  video before, and this is -- this would weigh more than ten

 7  pounds.

 8  Q.  Can you identify the photograph at the bottom page of

 9  Exhibit 213-39?

10  A.  The CSA is -- is ex- -- there's an extended reach.

11  There's a slight twist of the back.  There's flexion of the

12  back while she's lifting a 12-pound -- sorry, 12-pack of soda.

13  Which, a 12-pack weighs about 10 to 11 pounds.

14  Q.  Can you identify for the Court what Exhibit 213-40 shows.

15  A.  This is -- this is a photograph of -- of a cash register,

16  showing the underside of the register.  The register and the

17  demagnetizer.  Shelving in some areas, and bends in other areas

18  under the counter.

19  Q.  Can you tell the Court what the photograph at the top of

20  Exhibit 213-41 shows?

21  A.  CSA is flexing her back while she's retrieving items.

22  Q.  Can you tell the Court what the photograph on the bottom

23  of Exhibit 213-41 shows?

24  A.  This particular photograph shows the CSA is retrieving

25  bags from under the -- the bagging counter, and this is what we

 1  call a low back flexion.

 2  **Q.**   Can you tell the Court what the photograph on the top of

 3  page 213-42 shows.

 4  **A.**   Twisting of the CSA.  There's some twisting of the --

 5  twisting of the back, and there's abduction that is movement in

 6  the one side.  And there's awkward posture of the shoulder

 7  while placing a case of beverage on the bagging table.

 8  **Q.**   Can you tell the Court what the photograph shows on the

 9  bottom of Exhibit 213-42?

10  **A.**   This is an example of low back twist, also.  This is some

11  abduction of the hips while retrieving bags from under the

12  counter.

13  **Q.**   Can you tell the Court what exhibit 213 -- photograph on

14  Exhibit 213-43 shows?

15  **A.**   The CSA is reading something off the monitor screen, and

16  she is twisting her neck to view it while she's bagging some

17  items.

18  **Q.**   All right.  Can you tell the Court what the photographs in

19  Exhibit 213-44 show.

20  **A.**   Shows the CSA moving from one point to another in -- while

21  she is performing a task, a bagging task.

22  **Q.**   Can you tell the Court what the photographs in Exhibit

23  213-45 show.

24  **A.**   These are two photographs of the break room in Tulare.

25  **Q.**   And, finally, can you tell the Court what the photograph

1  in Exhibit 213-46 shows.

2  **A.**    This is -- this is the break room, another photograph of

3  the break room in Tulare.

4          **MR. WOHL:**  With that, your Honor, I would ask that

5  these pages of exhibits, specifically 213-34 through 213-46,

6  with the written descriptions that have been supported by the

7  witness, with the exception -- to show that I'm consistent

8  here, with the exception of the written description on 213-38

9  be admitted into evidence.

10          **MR. DOSTART:**  We would object, your Honor, to two

11 things.

12      Number one, the lack of foundation for each photograph;

13 and, number two, the fact that they're hearsay.  There is no

14 evidence the witness took these himself, that he knew who took

15 them, or that they are accurate representations --

16          **THE COURT:**  Which ones of these came from the video

17 that he did otherwise take?

18          **MR. WOHL:**  The witness should confirm it, but anything

19 with the date stamp, your Honor.  So anything that has the date

20 stamp up in the upper right-hand corner would come from the

21 videos.

22          **THE COURT:**  None of this have I seen.  I have no copy

23 of this.

24          **MR. WOHL:**  Do we have a copy for the Court?

25      I also have a color copy I could give your Honor, if you

1    would like that.

2              THE COURT:  No.

3         What is the answer to the question that I asked?

4              THE WITNESS:  The ones that have the numbers on top,

5    yeah.

6              THE COURT:  Those are the ones that --

7              THE WITNESS:  From the video.

8              THE COURT:  Is that all of them?

9              THE WITNESS:  No.  There are some that are

10   photographs.

11             MR. WOHL:  Your Honor, of course, photographs, there

12   isn't a hearsay issue of photograph.  Either the witness

13   identifies them as depicting something or not.  And he did.  So

14   there's no hearsay objection here, your Honor.

15             THE COURT:  Have you been in the break room yourself?

16             THE WITNESS:  Yes.

17             THE COURT:  Is that a fair and accurate -- Do these

18   pictures that you've described of the break room, are they fair

19   and accurate representations of what the break room looked

20   like?

21             THE WITNESS:  Yes.

22             THE COURT:  And you know that from personal knowledge?

23             THE WITNESS:  Yes, sir, when I went there.  I went to

24   the break room, and this is what it looked like.

25             THE COURT:  All right.  All of these will be admitted

```
 1   in evidence, with the exception that the written descriptions
 2   will not be admitted in evidence.
 3            MR. DOSTART:  Thank you, Your Honor.
 4            MR. WOHL:  Thank you, Your Honor.
 5        (Trial Exhibit 213-34 through 213-46 received in
 6   evidence.)
 7   BY MR. WOHL:
 8   Q.  We got back to what we're trying to do to wrap up before
 9   we get into the videos.
10        How often did you observe the cashiers handling what you
11   describe as a heavy transaction?
12   A.  So are you asking me in terms of per hour or per activity?
13   Q.  Why don't you define it either way you want, either per
14   hour or per transaction.  How often did you see her handling a
15   heavy transaction?
16            MR. DOSTART:  Objection.  Vague to the definition of
17   heavy.
18            MR. WOHL:  I thought the witness already defined it.
19   BY MR. WOHL:
20   Q.  But, go ahead, define "heavy."
21            THE COURT:  You said more than ten pounds, right?
22            THE WITNESS:  Yes, sir.
23            THE COURT:  So with that definition, how often?
24            THE WITNESS:  Per hour, it occurs -- lifted about six
25   times per hour.
```

FERNANDEZ - DIRECT EXAMINATION / WOHL

946

1  BY MR. WOHL:

2  Q.   And if -- was it handled any other way, besides lifted?

3  A.   It's handled by if it's pushed or pulled, or if it's

4  rotated.  And if that is the case, then the number increases to

5  8.47 times per hour.

6  Q.   8.7 times per hour?

7  A.   8.47.

8       THE COURT:  8.47, that's only pushing and pulling?  Or

9  it's pushing, pulling or lifting?

10      THE WITNESS:  It's pushing, pulling, lifting and

11 rotating.

12      THE COURT:  8.47 --

13      THE WITNESS:  Yes.

14      THE COURT:  -- per hour?

15      THE WITNESS:  Yes, sir.

16      THE COURT:  Okay.

17 BY MR. WOHL:

18 Q.   And lifting was 6 times an hour?

19 A.   Lifting is 6.07 times per hour.

20 Q.   6.07.  Thank you.

21      What's the significance of that frequency that you

22 observed to the issue of whether the cashier can sit or stand?

23 A.   The number of times, the number of items.  So once in an

24 hour, they are doing it six times.

25 Q.   But in terms of being able to do that standing or sitting,

 1  what's the significance of that?

 2  **A.**     Standing or sitting, when they are doing it standing,

 3  basically, their risk is lower than if they are doing it

 4  sitting.

 5  **Q.**     How often did you observe what you've described as back

 6  flexions?

 7              **THE COURT:**  May I?

 8              **MR. WOHL:**  Yes, of course.

 9              **THE COURT:**  You said this was normalized data,

10  correct?

11              **THE WITNESS:**  This per hour is the normalized, yes.

12              **THE COURT:**  Normalized means that you extend from a

13  smaller base to fill up the entire hour, on the assumption that

14  they are working solid for one hour?

15              **THE WITNESS:**  Yes, sir.

16              **THE COURT:**  All right.

17              **THE WITNESS:**  For example, sir, you -- the duration

18  of -- the average duration of a transaction was 35 minutes.

19  But the old --

20              **THE COURT:**  Thirty-five seconds, you mean?

21              **THE WITNESS:**  Thirty-five minutes.

22              **THE COURT:**  Minutes?  That can't be.

23              **THE WITNESS:**  No.

24              **THE COURT:**  Nobody would stay in business if it took

25  35 minutes to get through the cashier line.

948

FERNANDEZ - DIRECT EXAMINATION / WOHL

 1          THE WITNESS:  The duration of all transactions in that
 2   one hour was 35 minutes.
 3          THE COURT:  I see what you're saying.  All right.  And
 4   so then you extrapolated that to, basically, double the
 5   numbers?
 6          THE WITNESS:  Yes.
 7          THE COURT:  All right.  So -- but in that 35 minutes,
 8   you saw roughly half -- half as many as that six and eight
 9   number, right?
10          THE WITNESS:  In that one hour, sir, we saw these
11   many -- these many.
12          THE COURT:  Can you tell me what the raw data was?
13          THE WITNESS:  This is the raw data.
14          THE COURT:  Tell me, again, the raw data.
15          THE WITNESS:  In this one hour, we found 6.07 times
16   they lifted heavy items.
17          THE COURT:  So they were working continuously through
18   that one hour?
19          THE WITNESS:  They were working only -- they were
20   working for -- in that one hour, they worked for 35 minutes at
21   the checkout counter.  And when they were not working at the
22   checkout counter they also, basically, were working -- they
23   were not on the screen.
24          THE COURT:  So in the 35 minutes only, how many times
25   did they lift an object, a heavy object?

1          THE WITNESS:  Excuse me, sir.  Did you say lift or

2   handle?

3          THE COURT:  Let's take lift.

4          THE WITNESS:  They lifted it 6.07 in that one hour.

5          THE COURT:  So if it was normalized, why wouldn't it

6   be 12 times?

7          THE WITNESS:  I should not have used the word

8   normalized.  I think I misspoke.

9          THE COURT:  Sounds like maybe you did.

10         MR. WOHL:  Your Honor, I think he used normalized as

11  to transactions, not as to time, actually.

12         THE COURT:  What?  Say that again.

13         MR. WOHL:  I thought he used normalized with regard to

14  transactions, not normalized as to time.  But maybe I misheard

15  him.

16         THE COURT:  Well, he said earlier that it was 35

17  minutes.  And he extrapolated it as what it would be if it had

18  been working for a solid hour.  Okay.  I can -- I can

19  understand why you wouldn't want to do that.

20      On the other hand, you've backtracked off of that.  So

21  it's important to get your accurate testimony.  So start over

22  again, and tell us what that number represents.

23         THE WITNESS:  So, I misspoke.  It's normalized for the

24  transactions.  And there are -- in that one hour, with the

25  premeasured, the absolute number was 6.07, the average.  6.07

1   heavy items were lifted.

2           THE COURT:  In one hour?

3           THE WITNESS:  In one hour, sir.

4           THE COURT:  What was the 35-minute part then?

5           THE WITNESS:  The 35 minutes, this is what I got

6   confused and I misspoke.

7       The 35 minutes is -- in that one hour, 35 minutes of

8   transactions occurred.  And the other, close to 25 minutes

9   there were no transactions.

10  BY MR. WOHL:

11  Q.   So does that mean, Dr. Fernandez, that over 35 minutes

12  there were 6.07 incidents of heavy merchandise being handled?

13  A.   Yes.  And it was not multiplied to expand it.

14          MR. WOHL:  So, your Honor, do you understand that,

15  then, it's just the 35 minutes?

16          THE COURT:  Yeah.

17          MR. WOHL:  But he observed for a full hour.

18          THE COURT:  So in that full hour, what was the cashier

19  doing when they weren't -- I don't want you to just guess at

20  this.

21      Were they standing at the cash register waiting for the

22  next customer?  Were they counting money in the till?  What

23  were they doing during the 25 minutes that there were no

24  transactions?

25          THE WITNESS:  They would leave the cash register

1  counter, sir.

2          THE COURT:  Would leave or did leave?

3          THE WITNESS:  They did leave.

4          THE COURT:  You saw that with your own eyes?

5          THE WITNESS:  Yes, we saw them on the videos.  Yes,

6  they would leave.  And the average would be -- they would --

7  was between zero and 50 seconds.

8          THE COURT:  So if that were typical, then what you're

9  saying is that during an entire hour, the employee will do this

10 heavy lifting six times per hour, and have about 25 minutes of

11 time elsewhere in the store?

12         THE WITNESS:  It would be elsewhere in the store.  And

13 I'm not sure what they were doing elsewhere in the store that

14 particular time, yes.

15         THE COURT:  Okay.  I understand.  All right.  Okay.

16 Good.  Thank you.

17         MR. WOHL:  Thank you, Your Honor.  I appreciate you

18 clearing that up.

19 BY MR. WOHL:

20 Q.  Can you just give us the definition of a back flexing,

21 just so we have that clear.  What's a back flexing?

22 A.  A back flexion is when your back leans forward in this --

23 when you're doing this way (indicating).  If you're moving it

24 any other way, that's not called a back flexion.  That might be

25 a twist or abduction.  This is a back flexion.

1  Q.   All right.  And just for the record, it looks like you are

2  almost bowing?

3  A.   Yes.

4  Q.   You're moving your head and torso forward?

5  A.   Right.

6  Q.   How often did you observe the cashiers in the video

7  demonstrating or displaying back flexions?

8  A.   67.63 times per hour.

9  Q.   And what's the significance of a -- of frequent back

10 flexions with regard to sitting?

11 A.   The back flexions would -- the back flexions, the number

12 might be the same, but the -- but the posture would be more or

13 about the same.  But for sure the risk is going to increase.

14 Q.   And why is that?

15 A.   The risk would increase because -- because of the angle,

16 the hip angle, which is different.  And that's how you

17 calculate the biomechanical stress in your low back, in the

18 L4-L5.  That's how one calculates it.

19      If one calculates it, it's always going to be higher in

20 the seated position when compared to a standing position.

21 Q.   All right.  Thank you, Dr. Fernandez.

22      MR. WOHL:  Your Honor, at this time, I think it would

23 be good for us to play the videos.  You had requested on Friday

24 that we come up with 15 minutes of a continuous video stream.

25 We've done that.  And then we have several others that are

1  relatively short, that we'd like to show.

2      I would like to ask, would your Honor prefer that

3  Dr. Fernandez stay silent and you watch the videos, or would

4  you want him to offer any observations or commentary during the

5  videos?

6          **THE COURT:**  No, no, he could offer commentary, I

7  guess.  Occasional commentary, I think that would be helpful.

8          **MR. WOHL:**  Thank you, your Honor.

9          **THE COURT:**  Which one are you going to play first?

10         **MR. WOHL:**  So, first off, your Honor, this is all part

11  of Exhibit 218-G, which has already been received into

12  evidence.

13      So I have the technician identifying things by a simple

14  digit number, which I'll tell him to play, but then I'll

15  identify the file number.  That way it will match up with the

16  exhibit designation.  And I'm sure my team will keep me

17  completely honest in this regard.

18      So, first, for the 15-minute video, we're going to show --

19  actually, we are going to show it in split screen so you'll

20  have both the bird's eye view that Dr. Fernandez testified

21  about, and the angle view.

22      So there's two file numbers, accordingly.  File number --

23  bear with me, Madam Reporter -- 128_02, the duration is

24  14:29:50 through 14:44:50.  And the second view is file number

25  22_01.  And, of course, the time durations are the same because

```
 1   it's the same episode.

 2           THE COURT:  And the time of day and the day of this is

 3   what?

 4           MR. WOHL:  So 1444, your Honor, I believe, means it's

 5   2:44 in the afternoon.

 6   BY MR. WOHL:

 7   Q.   Is that correct, 1444?

 8   A.   1444 is 2:40 is the evening, yes.

 9   Q.   Afternoon.  Thank you.

10           THE WITNESS:  Afternoon.

11           THE COURT:  Afternoon.  All right.  And what day of

12   the week was it?

13           MR. WOHL:  I was going to ask.

14       What day of the week is this?  It will be time stamped.

15   It will show up on the video, your Honor.

16           THE COURT:  What day of the week, Saturday or

17   Wednesday?

18           MR. WOHL:  That we could try to find out for you

19   momentarily.  If you tell me what day it is --

20           THE COURT:  I have a calendar here.  What is the day?

21           THE WITNESS:  August the 8th.

22           THE COURT:  Of last year or --

23           THE WITNESS:  This year, sir.

24           THE COURT:  August 8th is a Wednesday of this year,

25   2012.
```

1          MR. WOHL:  That's correct, Your Honor.

2          THE COURT:  All right.  We will all be silent.  The

3  court reporter will take down only the spoken word, but nothing

4  that is on the tape-recording.

5          MR. WOHL:  These tapes are actually silent, your

6  Honor, so there is no fear of that.

7          (The designated video is played in open court.)

8          THE WITNESS:  A customer is waiting, and there is no

9  CSA at the register.

10         (Video continues.)

11         THE WITNESS:  Using the hand scanner to scan some

12  rugs.  She's got -- the customer has put a number of items in a

13  mop pail.

14         (Video continues.)

15         THE WITNESS:  Here she's scanning some items.

16         (Video continues.)

17         THE WITNESS:  She's reaching, scanning.

18         (Video continues.)

19         THE WITNESS:  The pail was used not for -- as a

20  basket, but they did not use a cart.  And they disposed of it

21  under the register.

22         (Video continues.)

23         THE WITNESS:  She's twisting her back slightly, and

24  now she's going to bag.  She's moved from the small box area to

25  the bagging area, the bagging table.

1          (Video continues.)

2          **THE WITNESS:**  She's entering something on the

3    keyboard.  She's bagging.

4          (Video continues.)

5          **MR. WOHL:**  May I ask Dr. Fernandez that if he observes

6    anything that he described in terms of steps or flexing, if he

7    just points that out to the Court, I think that would be

8    helpful, as well.

9          (Video continues.)

10         **THE WITNESS:**  Seeing a large item being bagged.

11         (Video continues.)

12         **THE WITNESS:**  There are a number of steps here as she

13   moves forward to retrieve another item.

14         (Video continues.)

15         **THE WITNESS:**  This is a 12-pack, which she scanned and

16   then placed on the -- on the bagging table.

17         (Video continues.)

18         **THE WITNESS:**  She's moving from -- she's twisted --

19   not twisted.  She moved from looking at the scanner to looking

20   at the register now.  She's using the touch screen and the

21   keyboard.

22         (Video continues.)

23         **THE WITNESS:**  She's opened the till and the till box

24   out.  She steps back a bit.  She's helping the customer with

25   the -- with the credit card machine.  Now she's scanning

1   container.  I suspect that was coolant or something of that

2   nature.

3        (Video continues.)

4        **THE WITNESS:**  She's taking a few steps.  She's bagging

5   it.

6        (Video continues.)

7        **THE WITNESS:**  Some extended reaches while she goes

8   ahead and operates both the keyboard and trying to reach out

9   for an item.

10       Again, she's using the till.

11       Picked up the receipt and gave it to the customer.

12       (Video continues.)

13       **THE WITNESS:**  Another customer comes in.

14       (Video continues.)

15       **THE WITNESS:**  She's using a hand scanner and places

16  this rug on the bagging table.

17       She scans a few more items.

18       The customer places things in different locations.

19       The CSA is moving around the whole work area.

20       She's scanning some clothe [sic] items, smaller clothe

21  items.  She's got rid of a hanger in the bin underneath the

22  cash register.

23       She scans something in the cart on the other side.  While

24  she did that, she was -- it was flexion of her back.  She

25  reached out to put the bag in the cart.

```
 1        (Video continues.)

 2        She is assisting the customer in the survey, customer

 3   survey that is conducted.

 4        She's walking around.  In fact, she's cleaning up -- I

 5   wouldn't call that the aisle, but the work area.  Something was

 6   dropped down.  She's picking it up.  And she is disposing it in

 7   the bin underneath there, under the cash register.

 8        (Video continues.)

 9        THE WITNESS:  There's reaching and there's movement of

10   the feet.

11        (Video continues.)

12        THE WITNESS:  She's opened the till again.  She's

13   standing in front of the register at the moment.  She's -- she

14   got the receipt, and then she got the coupon.

15        Now she's giving the change and the receipt and the coupon

16   to the customer.  She moved to get that.

17        She just gave the receipt to the customer.

18        (Video continues.)

19        THE WITNESS:  She's scanning some items in the cart

20   there.  While she did that, there's flexion.  Now there's

21   extended reaches with the left arm.

22        (Video continues.)

23        THE WITNESS:  She's putting the bag in the cart

24   through the area between the bagging area and the demagnetizer.

25        (Video continues.)
```

1        **THE WITNESS:**  The customer is answering the survey.

2     (Video continues.)

3        **THE WITNESS:**  She's leaning over.  There's twisting of

4  the back.  Arms are over the shoulder.

5     (Video continues.)

6        **THE WITNESS:**  The next customer she's reaching out,

7  extended reaches.

8     (Video continues.)

9        **THE WITNESS:**  Reached out with the coupon and gave the

10 receipt to the customer.

11     (Video continues.)

12        **THE WITNESS:**  Scanned, now bagging the item, placed it

13 on the bagging table.

14     (Video continues.)

15        **THE WITNESS:**  Opened the till again.

16     (Video continues.)

17        **THE WITNESS:**  The receipt is being printed, and she's

18 taking out the change.

19     (Video continues.)

20        **THE WITNESS:**  She steps forward, picks up the receipt,

21 turns around and gives the money and the receipt to the -- to

22 the customer.

23     The next client comes in, and she's scanning items,

24 reaches out, picks up the item, scans the item.

25     (Video continues.)

1          THE WITNESS:  She's folding items as -- as she gets

2     them.  Scanning, using the hand scanner.

3          (Video continues.)

4          THE WITNESS:  She's bagging some items now.

5          (Video concluded.)

6          THE WITNESS:  That's the end of the 15 minutes.

7          MR. WOHL:  That concludes the 15 minutes, your Honor.

8          THE COURT:  Okay.

9     BY MR. WOHL:

10    Q.   Dr. Fernandez, did you see examples in that video of back

11    flexings [sic] that you described?

12    A.   Yes, there were back flexions there.

13    Q.   Did you see examples of steps or movements that you

14    described before?

15    A.   Yes, I did.

16    Q.   Did you see examples of extended reaches?

17    A.   Yes.

18    Q.   Did you see examples of twists, twisting?

19    A.   Twisting, yes.  At the back, yes.

20         MR. WOHL:  Thank you, Your Honor.

21         We're now going to go to a series of relatively short

22    videos that will illustrate some additional points.  So let's

23    go with what we designated as 3.

24         And, your Honor, again, this is all part of Exhibit 218-G.

25    3 is file number 429_5.  This occurred on August -- better

 1  prepared this time, your Honor -- August 7, 2012, on Tuesday.

 2  And the time elapsed is 11:15:25, 11:15 in the morning, to

 3  11:18, just three minutes later.  Could we have that one

 4  played, please.

 5      (Video played in open court.)

 6  **BY MR. WOHL:**

 7  **Q.**  Dr. Fernandez, in terms of time, if you can just observe

 8  what you're seeing relative to what we've been talking about.

 9  **A.**  She's using a hand scanner and scanning items,

10  demagnetizing it.  Give it back to the client.  Set it for the

11  client.  She's using the hand scanner and scanning some items.

12      She's scanning it.  Reaching out. Picking up an item,

13  scanning it.  She leans over and bends over, and there's

14  flexion.  And she scans an item in the cart.

15      She puts quite a few items, and now that's what we also

16  would consider heavy items.  Now it's in a bag.

17  **Q.**  Heavy items because of the number of items in the bag; is

18  that what you mean?

19  **A.**  Yes.

20      (Video continues.)

21          **THE WITNESS:**  She is bending over.

22          **MR. WOHL:**  Please speak up, Dr. Fernandez.

23          **THE WITNESS:**  She is scanning the items, and she's

24  bagging it.  And she's moving as she is doing all of this.

25      But then she places it on the bagging table.  Each of

 1  these CSAs have different techniques.

 2      Now, the box of Tide, she hand scanned it, put it in

 3  the -- put it in the bag.  And there was something else in the

 4  bag, as well.  So that would be considered heavy item.

 5      (Video continues.)

 6      **THE WITNESS:**  There she's using her keypad, standing

 7  sideways.  Now she's standing in front of the demagnetizer.

 8  Open the till.  Before that, use the keypad.  Takes out a

 9  receipt.  Extended reaches.

10      And now extended reach, while she did that one of her

11  feet -- her foot was off the floor when she reached out there.

12  And she gave the receipt and the coupon to the customer.

13      **MR. WOHL:**  Would the Court wish to see, again, where

14  she lifts her foot?  Are you satisfied from his description?

15      **THE COURT:**  I followed it.

16      **MR. WOHL:**  Thank you, Your Honor.

17      Let's move on to the next one we designated, number 4.

18  This is file number 93_1.  This was taken on August 13, 2012.

19  That's a Monday.  And it starts at 9:54:13, and concludes at

20  9:55:25.

21      (Video continues.)

22      **THE WITNESS:**  Reaching out and scanning.  Reaches out,

23  scans another item.  Then she scans twice because it didn't

24  scan the first time.  She scans it.  This one is having a

25  little problem scanning this item.  She had -- she scans it

 1  again.  Yet another item.  Sorry.

 2       (Video continues.)

 3       **THE WITNESS:**  She started bagging.  Moved to the

 4  bagging area, so she stepped a few -- she walked out there.

 5  She places both those bags on the bagging counter.

 6       There are different techniques to bag.  Some of them bag

 7  one at a time, and sometimes they place the bag there and then

 8  walk back and forth.

 9       (Video continues.)

10       **MR. WOHL:**  Next one we've coded as number 5.  This is

11  file 192_02.  This was taken on August 12, 2012, which was a

12  Sunday.  It begins at 17:26, which would be 5:26 in the

13  afternoon, extending to 17:29, or about three minutes later.

14       (Video continues.)

15       **MR. WOHL:**  I'm sorry, I think there's two -- they are

16  split view.  I apologize.  Can you stop for one second, so I

17  can recite the second part.

18       So that's one view.  And the other view is number file

19  number 186_01.  And, again, the same time, same date, same

20  duration.

21       Thank you.

22       (Video continues.)

23       **THE WITNESS:**  She reaches out, extended reaches.  She

24  goes ahead and picks up an item, scans it.  Picks up another

25  item.  Scans it and now bags it, and places it on the bagging

1    area, the bagging area.

2        (Video continues.)

3        THE WITNESS:  She scans this particular item, and then

4    she throws it in the -- in the bin down there, which she'll

5    have to go ahead and put back again because this particular

6    item had the same -- seems had the same, similar, but didn't

7    have a bar code.

8        (Video continues.)

9        THE WITNESS:  She's reaching out for items.  When

10   she's folding it, her arms are way over her shoulder.  She's

11   using the hand scanner, picks up an item, uses the hand

12   scanner.  She leaned over and scanned something in the cart, as

13   well.

14       (Video continues.)

15       THE WITNESS:  She's scanning items and folding some of

16   the clothes now.

17       She scans them when they don't need folding.  These are

18   not clothes, clothing items.

19       (Video continues.)

20       THE WITNESS:  She's entering some numbers on the

21   keypad, on the keyboard.  Reaching out to the customer,

22   returning something to the customer.  Now she's going to bag

23   the items.

24       She is bagging these multiple items.  She moved to the

25   bagging table and that's where she's bagging the items.

1            **MR. WOHL:**  All right.  Next one, 6, file number

2    192-02.  This was taken, also, on August 12, which is a Sunday.

3    And this runs from 2 -- excuse me, 1740, or 5:40 in the

4    afternoon, to 17:42, or two minutes later.

5            (Video continues.)

6            **THE WITNESS:**  She's reaching out to pick up an item.

7    Then it's placed at the counter, pretty much at the end of the

8    counter.  Now she reaches out and picks up these one, two --

9    six --

10   **BY MR. WOHL:**

11   **Q.**   Is that an example of the extended reach, Dr. Fernandez?

12   **A.**   Extended reaches, yes.

13   **Q.**   Does her foot leave the ground there?

14   **A.**   She went and pulled all of those six, and while she did

15   that she lifted a foot to reach that point.

16           (Video continues.)

17   **A.**   Neck twist.  Slight back twist, as well.  Neck is twisting

18   around.

19           Bag three of those containers, and she's placed it on the

20   bagging table.  She's reaching out and bagging three more.  And

21   she's moved, another extended reaches.  There's shoulder

22   flexion as well.

23           She's helping the client, the customer with the credit

24   card -- with the credit card machine.  The receipt is being

25   printed.  She gives the receipt to the customer.

1   **Q.**   No. 7 taken on August 10, 2012, which was a Friday.  File

2   No. 58_01, running from 20 or 8:00 o'clock in the evening until

3   20:01:05.

4        (Videotape played in open court.)

5   **A.**   She reaches out, accepts an item, scans it, puts it in a

6   bag.  Picks the bag and gives it to the client, who then puts

7   it in the cart.  Goes ahead and reaches to quite a distance of

8   extended reaches.  Scanning and bagging it.  Reaches out, scans

9   it, bags it, moves.

10  **Q.**   No. 8.  Taken on August 10, 2012.  That was a Friday.

11  File No. 160-02, starting 16:46:51 or 4:46 in the afternoon,

12  extending to 16:47:06.  It's a pretty short one right here.

13       (Videotape played in open court.)

14  **A.**   Try scanning it here and she can't scan it.  She comes out

15  of the box and she has to scan it there.  It's a bottle of

16  water -- bottles of water.

17  **Q.**   No. 9, taken August 9, 2012.  That was a Thursday.  File

18  No. 567_06.  Duration starting at 13:07:40, or 1:07 in the

19  afternoon, to 13:07:53.

20       (Videotape played in open court.)

21  **A.**   Accepts an item, scans it with a hand scanner.  She's

22  leaning over.  Goes out of the position itself.  There is

23  movement.  Extended reaches.  Reaching out and to put it on the

24  bagging table.

25  **Q.**   That was No. 8, correct?

```
 1        No. 9 is August 9, 2012, a Thursday.  File No. 567_06
 2   commencing 13:07:40 or 1:07:40 in the afternoon.  Actually,
 3   that looks like -- it's different I guess.  Maybe I misread 8
 4   then.  I apologize.
 5        Are we on 9?  We're on 9.  I might have misstated the time
 6   on 8 then.
 7        Anyway, 13:07:40 to 13:07:53.
 8        (Videotape played in open court.)
 9   A.   Isn't this the same one?
10        MR. WOHL:  Did I skip 8 or did we cover 8 then?
11        DEFENSE TECHNICIAN:  We covered 8.
12        MR. WOHL:  So I'm just doing 9 again.  I apologize.
13   We'll go to 10.  How is that?
14   BY MR. WOHL:
15   Q.   No. 10 is August 13, 2012.  File No. 101 -- which was a
16   Monday.  File No. 101-01 starting at 17:05:33, or 5:05 in the
17   afternoon, extending to 17:06:07.
18        (Videotape played in open court.)
19   A.   She's going to lean over, scanning.  There's flexion of
20   the back.  Another scan in the cart, use the hand scanner.
21   Scans.  Places the item on the demagnetizer.  She's scanning
22   items here.
23   Q.   Okay.  Just a few more.  We're now at No. 11, and here
24   we'll show both views.  So the first one is File No. 8311.  And
25   the second one is File No. 189_02.  Both, of course, same time
```

1  duration, starting at 14:57:49, which is 2:57, extending to

2  14:58:00 and these were taken on August 12, which was a Sunday.

3       (Videotape played in open court.)

4  **A.**   She's going ahead and using the cash register -- the

5  credit card machine.  She bends over.  Extended reaches.

6       Now she's bending down, picks up a large bag.  She's

7  activating that credit card machine again.  She's bagging

8  multiple clothing items.  She's at the bagging counter.  Walks

9  over to the cash register.

10 **Q.**   No. 12.  Again, two views.  File 498_05 and 605_06.

11 Starting at 19:04:00, or 7:04 in the evening -- 19:04:40 and

12 extending to 19:05:17.  And these were taken on Saturday,

13 August 11, 2012.

14      (Videotape played in open court.)

15 **A.**   She's reaching out and while she's doing that, her left

16 foot -- she's on her toes there while she's trying to get the

17 coupon.

18      This is the touch screen.  The printer print a receipt.

19 She reaches out there, extended reaches.  It's overhead, over

20 her shoulder.  She's giving the receipt and the coupon to the

21 customer.

22 **Q.**   Okay.  Now we'll go to the last two.  The one we designate

23 as 2, which is File No. 21703, commencing at 12:21:39 to

24 12:24:07, and this was taken on Tuesday, August 7.

25      (Videotape played in open court.)

1  **A.**   She reaches out and picks up the -- picks up the receipt.

2  Now she's leaning over, bracing herself while she's doing this

3  and she's standing sideways, slightly sideways.

4  **Q.**   Do you have any understanding why she's standing sideways,

5  Dr. Fernandez?

6  **A.**   I would suspect the 27 inches is -- might be slightly --

7  might be tight for her if she stands square.

8  **Q.**   For the record, would you describe her as a heavyweight

9  woman?

10  **A.**   She's a heavyset woman, yes.

11       She went and scanned something and now she's leaning over

12  and performing her -- at the moment this is an extended reach.

13  **Q.**   All right.   One more and we're done.   Finally we'll go to

14  13 taken on August 8, a Wednesday.   File No. 135_02, lasting

15  from 21:41:09, or 9:41 in the evening, until 21:42:45.

16       (Videotape played in open court.)

17  **A.**   CSA comes in, picks up a bin and walks away.   She's

18  going -- some work she's doing with what she has in that bin.

19       Here we see her again in view.   These bins are pretty

20  large and some of these items are on the larger side.   She's

21  taking out another bin now.   These seem to be hangers.

22       That concludes this video.

23  **Q.**   Dr. Fernandez, what do these videos tell you about whether

24  Kmart cashiers can perform their job duties while seated?

25  **A.**   These videos basically show that the Kmart cashiers move

1   quite a bit in their work area.  There's flexion of the back.

2   There is extended reaches.  They are picking up items, either

3   that are -- we've seen them reaching out for items that are

4   pretty heavy.  Seen them lifting and bagging items that may not

5   alone be 10 pounds, but when you add them up, they could well

6   be over 10 pounds.

7        We're seeing them fold clothes well over their shoulders.

8   And when they are doing that, sometimes they need the space so

9   they are stepping back so the garment can hang.  And some of

10  these are or all of these activities -- the folding of the

11  clothes would be next to impossible to perform in a seated

12  position, especially when you've got to lift it up and move

13  back.  Some of those extended reaches would be -- would be next

14  to impossible to perform, even if you had knee clearance.

15       Those -- those movements within the work area, the CSA

16  would have to get off the high seat to move to these various

17  points if they were required to do all of this, those

18  particular tasks.

19  Q.  And the video that we saw with the heavyset woman, would

20  she be able to use a seat or would she be able to use the same

21  kind of seat that other cashiers that you saw use?

22  A.  It would be difficult for her to use the same sort of

23  seat.  She would need a seat that has a larger seat pan to

24  support her and possibly also a large -- these seats come in

25  different cylinder sizes.  So the regular cylinder for the

1  weight, and then you have stronger cylinders that can bear the

2  weight of a heavier individual.

3       Otherwise, what you tend to do is if you use -- heavy

4  individuals tend to sit down on one of these adjustable seats.

5  You bust the air cylinder.  So we're talking about a different

6  type of seat.

7  **Q.**   If she tried to use a seat that the other cashiers use,

8  would that present sort of a safety risk for her?

9  **A.**   It would be a safety risk for her, yes, and the seat would

10 break.

11 **Q.**   She might fall?

12 **A.**   The seat -- she would -- if she did sit in that seat

13 before it broke, she would not be comfortable.  There would be

14 what we call soft tissue compression.  Parts of her body would

15 not be supported and the edges would cut into parts of her

16 thigh, under thigh.

17         **MR. WOHL:**  Are we still good, your Honor?  Do you want

18 to take a break or are we good?

19         **THE COURT:**  Is this a good point?  How much longer do

20 you have a direct?

21         **MR. WOHL:**  Probably about another half hour or so,

22 your Honor.

23      I wouldn't mind getting one point in before we break now

24 that I think about it.  This would be a good place for it.

25

1  BY MR. WOHL:

2  **Q.**   Did you also take dimensions of Tulare cashiers when you

3  were there?

4  **A.**   I did take dimensions of 10 Tulare cashiers.

5  **Q.**   And what dimensions specifically did you take?

6  **A.**   The stature, that's the standing height, the shoulder

7  height and the elbow standing height.

8  **Q.**   And what did you find in that regard?

9  **A.**   Found that the stature, the averages were below the

10 averages -- below the average.  Six out of the ten of them were

11 below the 50th percentile female.

12 **Q.**   If they were to use a stool or other elevated seat to

13 work at that checkout stand, would they need some sort foot

14 rest?

15 **A.**   They would certainly need a foot rest.  The height of that

16 foot rest is what is going to have to be adjustable.

17 **Q.**   How high would the foot rest need to be to properly

18 support the cashier of the average height that you measured?

19 **A.**   About 12-some inches.  12 inches off the floor.

20 **Q.**   So about a foot off the ground?

21 **A.**   Yes, sir.

22 **Q.**   And what would that mean in terms of their actual usage of

23 the foot rest?

24 **A.**   To get on the seat, they would have to climb on the seat.

25 The question is:  How did they climb on the seat?  Do you use

1  the foot rest to climb on the seat?  And where is the location

2  of this foot rest?  Because the ring around the chair is not a

3  foot rest.

4  **Q.**   In your view would that be an ergonomically sound setup to

5  have somebody step up on a foot long 00 or foot high foot rest

6  to get onto the seat?

7  **A.**   A foot high foot rest would pose -- would pose a trip

8  hazard, getting on and off the seat using that kind of a foot

9  rest.

10 **Q.**   Thank you.

11       **MR. WOHL:**  Now might be a good time, your Honor.

12       And, also, if I could ask the Court's indulgence, can you

13  tell me where I am -- or where the defense is on time overall

14  just so we know how much time we have?

15       **THE COURT:**  You have used -- this is a quick add-up,

16  which I just did.  Looks likes 610 minutes out of 720.

17       **MR. WOHL:**  Thank you.

18       **THE COURT:**  And the plaintiff has used 410.

19       **MR. WOHL:**  Okay.  That's very helpful.

20       **THE COURT:**  You've used 200 minutes more.  I thought

21  we were going to finish today.

22       **MR. WOHL:**  We certainly will, your Honor.

23       **THE COURT:**  Well, yes, but the other side gets to

24  cross examine.

25       **MR. WOHL:**  Really?  Is that how that works here?

974

```
 1            THE COURT:  That's how it works.  So you should, you

 2  know -- all right.  Think about that.

 3        All right.  15 minutes.

 4            MR. WOHL:  Thank you, your Honor.

 5        (Whereupon there was a recess in the proceedings

 6         from 11:00 a.m. until 11:18 a.m.)

 7            MR. WOHL:  Can I take this opportunity to move in a

 8  few more items into evidence that we did not do yet, so we're

 9  clear?

10            THE COURT:  All right.

11            MR. WOHL:  First one is 244.

12            THE COURT:  Any objection?

13            MR. DOSTART:  Which one is 244?

14            MR. WOHL:  244, I believe, was the NIOSH document that

15  we examined Dr. Fernandez about.

16            MR. DOSTART:  Is it the chart that appears in his

17  report that you're moving into evidence or the entire article?

18            MR. WOHL:  Just the excerpt of it.

19            MR. DOSTART:  I wasn't sure of that.  244 is just the

20  excerpt?

21            MR. WOHL:  Right.

22            THE COURT:  Show it to me with the official tag on it.

23            MR. WOHL:  I think Dr. Fernandez has it.

24            THE COURT:  You look at it.  Put your eyes on it and

25  see if the document that is labeled 244 meets with your
```

1    approval.

2           MR. DOSTART:  It does not, your Honor.  Mr. Wohl's

3    representation is inaccurate.  It appears there are pages here

4    that do not appear in Dr. Fernandez's report that are included

5    within Exhibit 244.

6           MR. WOHL:  Well, your Honor, the requirement isn't

7    that you reproduce the entire article in the report.  The

8    content of this is what he references in his report.

9           THE COURT:  It's hearsay.  It's not received in

10   evidence.

11          MR. DOSTART:  Good try.

12          MR. WOHL:  Your Honor --

13          THE COURT:  It's hearsay.  Mr. Wohl, it's hearsay.

14          MR. WOHL:  Your Honor, he identified --

15          THE COURT:  So what?  What if he identified the

16   San Francisco *Chronicle*, would that mean the entire *Chronicle*

17   could come into evidence?

18          MR. WOHL:  If he relies upon it for his expert

19   opinion, I think so, your Honor.

20          THE COURT:  No, it doesn't.  It's discretionary with

21   the judge whether an item relied upon by the witness comes into

22   evidence.  He's entitled perhaps to rely upon it in forming his

23   opinion.  He can testify about it, but that does not mean the

24   document itself comes in.  The rule expressly says this.

25          MR. WOHL:  Your Honor, may we admit then

1  Exhibit 244-3, which is the Table 1 "Evidence for Causal

2  Relationship Between Physical Work Factors and MSDs."  That

3  table is, in fact, reproduced in his report.

4          THE COURT:  There was some table that was admitted

5  into evidence.  What was the table number?

6          MR. WOHL:  Table No. 1, Evidence for Casual -- it

7  could be casual.

8      ...Causal Relationship Between Physical Work Factors and

9  MSDs.

10         MR. DOSTART:  Your Honor, I'd just like to be clear.

11     We already have admitted into evidence the table that is

12  Dr. Fernandez's report.

13         MR. WOHL:  It's a different table, counsel.  This is

14  the table from NIOSH which the witness identified and

15  authenticated and said that he had presented his report and

16  said this was part of his -- a basis for his opinion.

17         MR. DOSTART:  Then, once again, I would like to see

18  where in the report it is.  And if it's in the report, then I

19  have no problem with moving it into evidence.

20     I believe it's this table (indicating)?

21         MR. WOHL:  Yes, counsel.  That table.

22         MR. DOSTART:  No objection to that page, your Honor.

23         THE COURT:  All right.  What is it?

24         MR. WOHL:  244-3.

25         THE COURT:  244-3.  And describe it in three or four

 1  words.  Table of what?

 2          MR. WOHL:  Evidence for Causal Relationship Between

 3  Physical Work Factors and MSDs.

 4          THE COURT:  All right.  Received in evidence.

 5      (Trial Exhibit 244-3 received in evidence)

 6          MR. WOHL:  Could we include the title, Page 244-1,

 7  just so the Court know what's we're talking about?

 8          THE COURT:  No.  I'm letting in evidence what's in his

 9  report, not what's in the -- not the separate document that is

10  from NIOSH.

11          MR. WOHL:  Well, he cites to the title of the

12  publication.  It just tells you where the table came from, your

13  Honor.  It's just context, that's all.

14          MR. DOSTART:  We would object to that, your Honor.

15  There's a --

16          THE COURT:  It's going to be the page that was in his

17  report.

18          MR. WOHL:  All right, your Honor.  Thank you.

19      And then 228-A, which was an excerpt of the Chafen article

20  which we had an extended discussion about, and your Honor did

21  rule that was part of his report.

22          THE COURT:  That doesn't mean it comes into evidence.

23  That just means it was part of his report and he can testify

24  about it.

25      What is the article?

FERNANDEZ - DIRECT EXAMINATION / WOHL

1           MR. WOHL:  This was the Chafen study.

2           THE COURT:  Exhibit 228?

3           MR. WOHL:  228-A.

4           THE COURT:  Any objection to that one?

5           MR. DOSTART:  I would like to see 228-A.

6           MR. WOHL:  (indicating).

7       (Document was tendered to counsel.)

8           MR. DOSTART:  Sorry about all this, your Honor.

9           THE COURT:  These should have been moved at the time

10  so we had it when it was fresh.

11          MR. DOSTART:  We have the identical problem.  228-A is

12  the entire article.  The entire article does not appear in Dr.

13  Fernandez's report.  We would object to the admission of the

14  entire article.

15          THE COURT:  What do you say to that Mr. Wohl?

16          MR. WOHL:  I don't think it's the entire article, your

17  Honor.  I think it's an excerpt, although I will double check

18  to be sure.

19      (Brief pause.)

20          MR. WOHL:  It's not the entire article, counsel.

21  Please represent correctly to the Court.  That's a three

22  pages excerpt.

23          THE COURT:  Is it more than is in his report?

24          MR. WOHL:  Well, he doesn't reproduce the entire text.

25  I think the basic essence of it is, yes, there are some things

1    that were not in the report.  Yes, it's true.

2              THE COURT:  The objection is sustained.  It's hearsay.

3              MR. WOHL:  All right, your Honor.  Thank you.

4         Finally, by way of clean-up, all of the videos have

5    already been admitted into evidence, but we think it would

6    benefit the Court if we could separately admit and, therefore,

7    you'll have immediate access to all the videos that I went

8    through with Dr. Fernandez just now.

9              THE COURT:  That's fine.  What are those numbers?

10             MR. WOHL:  Those are what I have already read into the

11   record, your Honor.  So I hope I don't need to do that again,

12   but those were all already --

13             THE COURT:  You would need to give it to me because I

14   didn't make a note of it at the time.

15             MR. WOHL:  All right.  We will do that, your Honor.

16             THE COURT:  My intention is to allow them in, but they

17   are not in yet.  And you need to follow-up on this pronto today

18   so that I can put it on my list.

19             MR. WOHL:  We will do that, your Honor.  Thank you.

20        And then also in that regard Mr. Adkins played a video

21   that pertains to class member Nossamento (phonetic spelling).

22   Again, the video is in evidence.  We just want to give you the

23   specific file numbers.

24             THE COURT:  I will allow that one as well.

25             MR. WOHL:  All right.  Thank you, your Honor.  That

 1  takes care of that clean-up.

 2  **BY MR. WOHL:**

 3  **Q.**    Okay.  A couple other clean-up with Dr. Fernandez on the

 4  testimony.

 5       You told Judge Alsup that you looked at -- or you measured

 6  on an hourly basis 35 minutes of transactions and 25 minutes

 7  which you describe as being away from the counter?

 8  **A.**    Twenty-five minutes of no transactions, which they were

 9  away from the counter or for a few seconds at the counter.

10  **Q.**    All right.  So that's a very important clarification.  So

11  does the 25 minutes include any of the time that they are at

12  the check stand, albeit not involved in a transaction?

13  **A.**    The minimum was zero and the maximum was 50.  The

14  average -- 50 seconds.  The average was 15 seconds for 20 of

15  those random acts.

16  **Q.**    So 35 minutes after being engaged in a transaction?

17  **A.**    Yes.

18  **Q.**    Twenty-five minutes either not engaged in a transaction or

19  away from the register, is that correct?

20  **A.**    Yes.

21  **Q.**    Thank you.  Just wanted to clarify that.

22       Secondly, with regard to heavy items.  When you designated

23  something as a heavy item, was that a single heavy item?

24  **A.**    No, not necessarily.

25  **Q.**    So could it be a collection of items as well?

1   A.    Yes.

2   Q.    But the same criterion of 10 pounds or more?

3   A.    Correct.

4   Q.    Okay.  Now, are you familiar with Dr. Steve Johnson?

5   A.    Yes, I am.

6   Q.    And how are you familiar with Dr. Johnson?

7   A.    I met Dr. Johnson more than 25 years ago when I

8   interviewed for a position at University of Arkansas.

9   Q.    Are you familiar with him otherwise professionally in

10  terms of your work in the field of ergonomics?

11  A.    Professionally I've met him at a number of conferences,

12  yes.

13  Q.    Now, do you do work as an ergonomist the same or similar

14  that Dr. Johnson does?

15  A.    Dr. Johnson is an academic and does consulting.  I'm a

16  full-time consultant who is a part-time academic and I'm an

17  engineer.

18  Q.    Are you familiar with Dr. Johnson's proposed modifications

19  to the Kmart check stand that he's presented in this case?

20  A.    Yes.  He's proposed three changes, the three changes I'm

21  familiar with it.

22  Q.    Okay.  What three changes are you familiar with that

23  Dr. Johnson has proposed?

24  A.    The three changes he's proposed is remove the -- remove

25  the shelving so there is knee clearance.  Bring the bagging

1  counter close to the -- reduce that 21 inches so the bagging

2  counter comes flush with the demagnetizer.  And there was a

3  third one.

4      Give me a second, please.  I have it in my...

5  **Q.**  You have your supplemental report in front of you,

6  Exhibit 214.  Would you care to take a look and see if it

7  refreshes your memory?

8  **A.**  Yes, please.

9      (Brief pause.)

10 **A.**  And he provides foot rests.

11 **Q.**  Are you aware of any other modifications that he's

12 proposed?

13 **A.**  Excuse me, sir?

14 **Q.**  Are you aware of any other modifications to the Kmart

15 check stand that he's proposed?

16 **A.**  I based my rebuttal on those -- on those recommendations

17 that he made.

18 **Q.**  Okay.  Then we'll limit our examination to those three for

19 now.

20     Do you understand that his opinion is that with those

21 modifications, the cashiers could perform the job duties while

22 seated for at least part of the time?

23 **A.**  Yes.  That was his...

24 **Q.**  And do you agree with his opinion in that regard?

25 **A.**  No, I do not.

1  Q.    Why do you disagree with his opinion in that regard?

2  A.    I disagree because I believe the risk of MSD injuries of

3  the upper extremities would increase.  The risk of back

4  injuries could also increase, and productivity numbers may

5  decrease; but I do not have any -- I've not done any scientific

6  evaluation of that.

7  Q.    And can you explain the bases for the disagreement with

8  his opinion as you have just described?

9  A.    The upper extremities, because the way he would have to --

10  once he -- there are some limitations in the electronics and so

11  he could not -- he would not be able to get the seat right

12  up -- right to the point where the work surface is at elbow

13  height.  So it would be below elbow height.

14     So below elbow height, the individuals would have to be

15  working with their shoulders out or in this position

16  (indicating).  So the shoulders are much abducted.  There is

17  going to be shoulder fatigue.

18     And there has been research that has been done and

19  reported where it's stated that individuals that sit and work

20  grocery -- in the grocery industry are at higher risk for upper

21  extremity shoulder problems.

22  Q.    Any other basis for your opinion?

23  A.    So that was the -- while moving around, the swiveling, the

24  back, one would not go ahead and -- one would not be able to go

25  ahead and -- you would have to swivel.  When you're swiveling,

1  either the swivel of the chair wouldn't do the trick so you

2  would have to twist the back.

3      When you're standing, you twist your back slightly or move

4  around with your feet.  So you're standing in front here of the

5  cash register, you could place a few steps and then stand in

6  front of the scanner.

7      If you're on a seat, you would either have to swivel and

8  when you're swiveling, your feet on a foot rest, what you have

9  to do is you have to lock your knees up and so -- you would

10 have to lock some aspect of your lower extremities and the weak

11 link is going to -- is the that's going to hurt.

12     So you have to lock it up because this lateral movement is

13 while you're scanning and this movement is going to -- you will

14 have to -- when you move swiveling, you have to have some

15 locking mechanism and your body is going to be that locking

16 mechanism.

17 **Q.**   Any other basis for your disagreement with Dr. Johnson's

18 proposed modifications?

19 **A.**   I have listed some of them.  Also, the foot rest --

20 besides that, the foot rest, it would have to be adjustable

21 because the small individual would need a foot rest -- the

22 smallest individual, which is four feet eleven, this is the

23 hypothetical five percent individual who we design for, would

24 need a foot rest of four feet -- 14 inches and some-odd.

25 **Q.**   Just so we're clear, you said five percent.  Do you mean

1  five percentile?

2  A.    Five percentile female.

3  Q.    Can you explain that concept to the Court?

4  A.    Five percentile female is the smallest female for body

5  measurements.  It's a statistical number.  You do not get an

6  individual that has those anthropometric measurements that has

7  the fifth percentile person, but you design very often taking

8  the fifth percentile right up to the 95th percentile male.

9  Q.    So fifth percentile female means that what percentage of

10  woman are taller than she is?

11  A.    95 percent of the women.

12  Q.    And a 95th percentile of men, what percentage of men are

13  shorter than he is?

14  A.    95 percent of the men are shorter than he is.

15  Q.    So to accommodate a five percent female -- five percentile

16  female in terms of adjusting the foot rest, how high would the

17  foot rest have to be?

18  A.    Fourteen inches and some-odd.

19  Q.    Any other basis for your opinion of disagreeing with Dr.

20  Johnson's modifications?

21  A.    So it's the back twisting, the shoulder.

22        Also, when they would have to move, they would have to

23  lift this chair or the seat.  The seats --

24  Q.    First, they would have to get out of the seat, I assume?

25  A.    There is not enough space out there.  It's very tight.  So

```
1   if they get off the seat, hopefully, they wouldn't trip over

2   these five legs.  And when they get -- and if they have got

3   to -- and if they have got to -- you need a back rest for the

4   foot rest -- for your seat.  You need a back rest because, to

5   prevent the lordosis, to prevent the low back problems.

6        So if you don't have a back rest -- if you have a back

7   rest, how are you going to scoot it under the work surface?

8   It's going to be somewhere there.

9        The seat's available today with back rests.  They weigh

10  from about 20 pounds to the low 40 pounds.  So if you go to

11  move that, it's going to be problematic.  It's -- when I say

12  "problematic," it's going to violate some of the guidelines for

13  lifting.

14  Q.   Would you consider the time it would take for a cashier to

15  get off of the seat, lift or push it off under the counter to

16  the extent he could, and then move away.

17       Would that be considered value added time or no value

18  added time?

19  A.   That's not value added time.

20  Q.   If the cashier were seated, as Dr. Johnson proposes, would

21  there still be incidents of extended reaches?

22  A.   Excuse --

23  Q.   If the cashier were seated at the sales counter the way

24  Dr. Johnson proposes that she be seated?

25  A.   Yes.
```

1  Q.    Would there still be -- would there still be occasion for

2  extended reaches by that cashier?

3  A.    Yes.

4  Q.    And would it be worse than it was before, the same as

5  before or better than before?

6  A.    It could be the same or worse.

7  Q.    And what would make it worse?

8  A.    When it -- what will make it worse?

9  Q.    Right.

10 A.    They would not be able to get as close.  Some of the

11 cashiers might not want to move their seat and try to reach

12 over because they are facing the cash register and now they

13 have got to work on the scanner.  And, you know, one would --

14 one would not be able to reach both at the same time.

15 Q.    In the videos we saw before the break, you identified

16 several instances of extended reaches and there the cashiers

17 were standing.

18      Could you see the cashiers performing the same extended

19 reach that you saw if they were seated?

20 A.    No.

21 Q.    Is there an accepted -- well, let me ask you:  Has there

22 been any literature about what is considered sort of the normal

23 reach for a seated employee?

24 A.    For a seated employee --

25 Q.    Right.

 1  **A.**   (Continuing) -- for design purposes Vaughn Putz Anderson,

 2  says -- who was a researcher at NIOSH, he recommends for design

 3  purposes a reach of 17 inches for seated -- sitting and

 4  21 inches for standing.

 5  **Q.**   Let me show the witness what's been marked as Exhibit 247.

 6       (Document was tendered to the witness.).

 7  **Q.**   Tell me if you recognize that, Doctor.

 8  **A.**   Yes.

 9  **Q.**   And what is it, please?

10  **A.**   This is the reference that I used in my report and this is

11  the -- this is a page or the diagram that Vaughn uses in his

12  book.

13  **Q.**   And what does this diagram illustrate?

14  **A.**   This diagram illustrates the reach, the maximum reaches or

15  for design purposes -- I shouldn't say maximum.  The reach for

16  design purposes for sitting and standing.

17  **Q.**   And the reach for seated again is what?

18  **A.**   Seventeen inches.

19  **Q.**   And the reach for stand -- I said for seated.  I'm sorry.

20  For seated is?

21  **A.**   Seventeen inches.

22  **Q.**   And the reach for standing?

23  **A.**   Is 21 inches for design purposes.

24  **Q.**   And this diagram that's Exhibit 247, does that appear in

25  your report?

1   **A.**   That does appear in my report, sir.

2   **Q.**   And, in fact, do you know if this same diagram appears in

3   a textbook that Dr. Johnson authored?

4   **A.**   Yes, it does appear in Dr. Johnson's textbook.

5           **MR. WOHL:**   Your Honor, I would move for the admission

6   of Exhibit 247.

7           **THE COURT:**   247 --

8           **MR. DOSTART:**   Just because of the issue we had this

9   morning, I just want to view it.

10          **THE COURT:**   Any objection?

11          **MR. DOSTART:**   Once again, your Honor, 247 has a

12  paragraph beneath the chart that I'm not sure is in Dr.

13  Fernandez's report.

14      And it also contains the front page of the exhibit -- the

15  front page of the article, which I know is not in Dr.

16  Fernandez's report.

17      I have no objection to the chart itself being admitted

18  into evidence.

19          **THE COURT:**   May I see it, the exhibit?

20      (Document was tendered to the Court.)

21          **THE COURT:**   Is this the same Anderson that testified

22  here?

23          **MR. WOHL:**   That's Johnson who testified your Honor.

24          **THE COURT:**   Oh, Johnson, yes.

25          **MR. WOHL:**   But that diagram appears -- as you recall

1    from my cross examine, that diagram appears in Dr. Johnson's

2    textbook, the exact same diagram.

3         MR. DOSTART:  And we have no objection as to the

4    diagram, your Honor.

5         THE COURT:  Well, in this case I'm going to let both

6    pages in.  This is No. 247.

7         MR. WOHL:  Thank you, your Honor.

8         THE COURT:  Not marked.  I don't know why.  It was in

9    a folder.  I don't know why it was not marked.  I had put it on

10   there myself.

11        MR. WOHL:  I'm sorry, your Honor.  It was not marked.

12        THE COURT:  Take a look at it.  I have put it on there

13   just now.

14        MR. WOHL:  Thank you.  I appreciate it.

15        THE COURT:  247 received in evidence.

16        (Trial Exhibit 247 received in evidence)

17   BY MR. WOHL:

18   Q.   Are you aware of any other guidelines that's put out for

19   what is considered appropriate reach besides what Dr. Anderson

20   put out?

21   A.   There's other guidelines available.  There is the

22   California guidelines, as well as the Department of -- I've got

23   the references and it says 15 inches.

24   Q.   So 15 inches for if seated?

25   A.   Fifteen inches is the recommendation.

1   Q.   For both?

2   A.   For both.

3   Q.   So more conservative than Dr. Putz Anderson?

4   A.   Yes.

5   Q.   So when we talk about reach, what are we measuring from?

6   So, for example, looking at the sales counter at Kmart, where

7   are you measuring the reach from?

8   A.   Basically from the shoulder right up to the point where

9   you grip onto something.

10  Q.   If you're standing or seated, would the shoulder be

11  relative to the same point with regard to the counter?

12  A.   Depends whether you're standing up straight up like this

13  or you're bending forward (indicating).  If you're bending

14  forward, of course, then your shoulder is up front and then you

15  can reach.

16  Q.   And the dimension that you said the depth of the counter

17  was what?

18  A.   Twenty-three inches.

19  Q.   So, therefore, whether standing or seated, the stretch

20  that Dr. Putz Anderson is saying should be sort of the

21  normative would be less than the depth of the counter, correct?

22  A.   That's right.

23  Q.   Does NIOSH put out any guidelines about what should be

24  done to minimize reach for employees?

25  A.   For different industries NIOSH has got some, what they

 1  called Health Hazard Evaluations over the years, but I don't

 2  think they are used as guidelines.

 3  **Q.**   So they don't put out anything with regard to where

 4  materials and tools should be placed relative to the worker to

 5  avoid extended reaches?

 6  **A.**   You're talking about in general?

 7  **Q.**   Yes.

 8  **A.**   In general, yes, they have got -- they have got guidelines

 9  for workers and so on.  That's primary working area, or what we

10  call the normal working area and the maximum working area, and

11  they say work within your primary or your normal working area.

12  **Q.**   And what's the recommendation about where tools and

13  materials the employee would use should be located with regard

14  to the primary work area?

15  **A.**   It should be located within the primary working area or

16  the normal working area.

17  **Q.**   And what is the purpose of that relative to reaches?

18  **A.**   So as to basically -- basically the normal working area is

19  the reach.  If you drop your arm down and you -- it's an arch

20  both sides, so as to minimize fatigue and minimize the risk of

21  injury.

22  **Q.**   So with regard to what we saw on the videotapes of

23  cashiers working at the sales counter, did you see any

24  incidents in which they had to reach or move to areas to do

25  their work that was outside of what would be considered the

1  normal work area or reach area if they were seated or standing

2  right in front of the counter where the scanner is?

3  **A.**   Yes.

4  **Q.**   Do you see that often?

5  **A.**   It occurred, yes.

6  **Q.**   And, again, what's the danger of extended reaching?  The

7  employee does too much extended reaching?

8  **A.**   It depends how -- well, it depends.  Extended reaches

9  would basically increase the biomechanical stress on your

10  shoulder.  It depends on the weight you're lifting and how

11  heavy your arm is, because your arm is also a weight.  So it

12  depends on how long, how far away it is, one.

13       And, two, how heavy your arm is and what weight you have

14  got at the other end.

15  **Q.**   With regard to installing the stool, do you have any

16  concerns about using a higher seat or stool in the Rite Aid

17  check stand as configured?

18         **MR. MATTHEW RIGHETTI:**  I don't think this case is Rite

19  Aid, your Honor.

20         **MR. WOHL:**  I said Rite Aid?  I apologize.  Kmart.

21  Thank you, counsel.  Kmart.

22  **BY MR. WOHL:**

23  **Q.**   Do you have any concerns about his recommendation of

24  putting a higher stool or seat at the Kmart check stand?

25  **A.**   Do I have reservations?  Is that what you said, sir?

1  Q.    Yes, yes.

2  A.    I have reservations because of the space limitations, as I

3  mentioned earlier; the getting on and off the seat, how they

4  would move the seat, and how they would stow the seat.  And

5  while swiveling on the seat itself, is there enough space?

6  Would they be knocking their knees?  Would they be hurting

7  themselves?  I don't know how this would work.

8  Q.    And do you believe that even while seated, they would

9  engage in any other types -- so not getting off the stool,

10 staying on the stool.

11        From what you saw do you believe they would engage in any

12 other movements, reaches, twists, bends that would be

13 inconsistent with that ergonomic set-up?

14 A.    They would be engaged in those movements.  Plus, they

15 would also be engaged in trying to get off the seat or reaching

16 beyond what they can because now it's like you're getting your

17 feet tied down, but you're sitting down.

18 Q.    Dr. Johnson said that if cashiers felt they needed to

19 stand for whatever reason, they would just get off the stool

20 and stand to perform a task.  Do you agree with that

21 assessment?

22 A.    It could have been possible if there was ample space.

23 There is no -- there is no space.  The real estate is tight.

24 The footprint, it's very small.

25        And for them to get off, first getting off, I hope that --

1    I'm not sure how this is going to be, because I cannot

2    visualize somebody putting their feet between those five legs

3    and then trying to move this around.  This could be a trip

4    hazard.  It could be a bunch of things.

5        So I don't know how Dr. Johnson's visualizing that they

6    could simply move it away.

7    Q.   And do you say that because of the dimensions of the box,

8    as you call it, in the check stand?

9    A.   It's 27-by -- 27-by-35 is the -- is the dimensions of

10   the -- dimension of the box, but the 27 would be the limiting

11   factor.

12   Q.   Do you believe there is any risk that the employee would

13   try to accomplish some physical movement while remaining

14   seated, as opposed to getting off the stool as ergonomically

15   they really should to perform a task?

16   A.   There's a possibility that they would because, one,

17   it's -- employees might not perceive the risk.  That is one.

18       And, two, there are times, like there are situations where

19   we do know the risk, but we try to do it because it's the

20   faster way to do it.

21   Q.   Wouldn't training help avoid that with cashiers?

22   A.   Training would help to a point, but my experience says

23   that there is -- doesn't always help.

24   Q.   In this trial we had several class members who testified

25   that they thought that they could perform their job duties

1    while in a seated position.  Do you have any view about that

2    testimony?

3    **A.**    I'm not quite sure they would be able to --

4             **MR. DOSTART:**  Objection, your Honor.  That's beyond

5    his expert report as well.

6             **THE COURT:**  Is that in the report?

7             **MR. WOHL:**  They hadn't testified, so I guess it

8    wasn't.  But it's absolutely in the heart of the report, which

9    is:  Can they perform the duties of a cashier while seated?

10        And so they had their witnesses testify they could.  And

11   this is very consistent, I think, with whether, in fact, in his

12   view they know what they are talking about.

13            **MR. DOSTART:**  They had the opportunity to present

14   witnesses who could have testified that they could and they did

15   not.

16            **MR. WOHL:**  That's irrelevant, your Honor.  It has

17   nothing to do with it.

18            **THE COURT:**  It's not in the report.  It's not allowed.

19   At least as that -- as you've phrased the question, it's not in

20   the report.

21        So sustained.

22            **MR. WOHL:**  Your Honor, if you're going to hold me to

23   that, then I'm not going to be able to ask these other

24   questions.  Okay.

25            **THE COURT:**  Now, if -- I see it all the time.  This

1  objection is sustained.  The other side gets up and on

2  cross-examination opens the door to many things.  On redirect

3  examination possibly this very question will be allowed.

4      I see this happen in 80 percent of the trials, because the

5  cross-examiner can't help themselves.  They just go at it and

6  then they open all those doors because the cross-examination is

7  not limited to what's in the report.  The cross-examiner can

8  open many, many, many doors, but once they are opened, the

9  redirect examiner can take advantage of that, too.

10     So maybe you just have to wait your -- wait.  Bide your

11 time.  I don't know.  We'll have to see.  But on direct

12 examination you're stuck with what's in the report.

13         MR. WOHL:  Thank you, your Honor.  I understand.

14 BY MR. WOHL:

15 Q.  Finally, Dr. Fernandez, are you familiar with a store

16 called Aldi?

17 A.  I heard Aldi and that's all I heard.  I'm sorry.

18 Q.  Have you ever been to an Aldi store?

19 A.  I did not hear your question.

20 Q.  Are you familiar with a store called Aldi?

21 A.  Yes, I am.

22 Q.  Okay.  Have you ever been to an Aldi store?

23 A.  Yes.

24 Q.  And do you know if the cashiers at Aldi stores stand or

25 sit while performing --

1          MR. DOSTART:  Objection, your Honor.  This is also not

2     in either of the reports.

3          MR. WOHL:  I don't think that's right, your Honor.  I

4     think that --

5          THE COURT:  Show me where it is in the report.

6          MR. WOHL:  All right.  Give me some space, please.

7        Just so we're clear, Dr. Johnson testified about Aldi in

8     the report and Dr. Fernandez responded.

9          THE COURT:  Yes, but if it's in one of these reports,

10    okay, you can do that.

11         MR. WOHL:  Thank you.

12       (Discussion held off the record amongst defense counsel.)

13         MR. WOHL:  Yes, Page 15, your Honor.  This is

14    Exhibit 214-17, Conclusion 8.

15       Dr. Johnson inappropriately compares the activities

16    performed by CSAs in the Kmart store in Tulare, California to

17    cashiers in Aldi and other European stores.

18         THE COURT:  Is that true?  Is that correct?

19         MR. DOSTART:  I'm finding it right now, your Honor.  I

20    just want to confirm --

21         THE COURT:  Why did you make the objection that it was

22    not in the report without confirming it first?

23         MR. DOSTART:  I honestly believed it was not in the

24    report.

25         THE COURT:  You're burning up counsel's time.  That's

 1  what's going on here.

 2          MR. DOSTART:  I apologize, your Honor.  I apologize,

 3  counsel.

 4          THE COURT:  Take a look and see.  Is it in the report?

 5          MR. DOSTART:  It is, your Honor.  I apologize.

 6  Objection withdrawn.

 7          THE COURT:  Objection is overruled.  Go ahead.

 8  **BY MR. WOHL:**

 9  **Q.**   Trying to remember where I left off, now.

10       Do you know whether Aldi cashiers sit or stand while

11  performing their job duties?

12  **A.**   They sit.

13  **Q.**   And have you been to any stores in Europe observing

14  cashiers performing their jobs?

15  **A.**   Yes.

16  **Q.**   What stores have those included?

17  **A.**   In England I have been to Tesco and Tesco Express,

18  Waitrose, which is a grocery store.  ASDA, A-S-D-A, and a

19  Wilkinson.  I have been to other grocery stores as well.

20  **Q.**   Did you observe cashiers in those European stores sitting

21  while performing their job duties?

22  **A.**   Sitting and standing.

23  **Q.**   What stores did you observes cashiers standing in Europe?

24  **A.**   The ones if I noticed standing were in the Tesco Express.

25  That is, like -- it's a smaller version of a -- this huge

 1  grocery chain.  Where the -- it's not a dedicated cashier.

 2  They are at the cashier station and they also go ahead and --

 3  and they also perform other duties in that small store.

 4  **Q.**   With regard to Aldi and the other European small stores

 5  where you saw is the cashier sitting, did it appear to you that

 6  the operations were the same as Kmart's operations?

 7  **A.**   No.

 8  **Q.**   How were they different?

 9  **A.**   They bag -- they require -- they do not require --

10  **Q.**   When you say "they," be clear what you mean?

11  **A.**   Customer bags and the client -- the cashier does not bag

12  the items that are scanned.  The cashier does sit down and

13  there is limited movement.  They are basically enclosed in sort

14  of a -- smaller console sort of a deal and the seat does have a

15  back rest.

16       **MR. WOHL:**  I think that's all I have.  Thank you, Dr.

17  Fernandez.  I appreciate your time.

18       **THE COURT:**  All right.  Thank you.

19    Let's go to cross examination.

20       **MR. MATTHEW RIGHETTI:**  Your Honor, will we have time

21  to do closings today?  I'm not sure what the Court's calendar

22  is later in the afternoon.

23       **THE COURT:**  We're going to stop at 1:00 o'clock.

24       **MR. MATTHEW RIGHETTI:**  Okay.

25       **THE COURT:**  We will not finish the closings, today.

 1         Please proceed.

 2                      **CROSS EXAMINATION**

 3    **BY MR. DOSTART:**

 4    **Q.**    Dr. Fernandez, you testified that this box (indicating) is

 5    27-by-35, is that correct?

 6    **A.**    That's right.

 7    **Q.**    And you said it was tight, is that correct?

 8    **A.**    Yes.

 9    **Q.**    Would you agree that the box is near the register?

10    **A.**    The box is near the register?

11    **Q.**    The area in this diagram, Slide 2B, 216-A, would you agree

12    that the area, the box is near the cash register?

13    **A.**    Yes.

14    **Q.**    Okay.  I want to talk to you about something that I think

15    is very important.

16         You realize that you took an oath today, right?

17    **A.**    Yes.

18    **Q.**    To tell the truth?

19    **A.**    Yes.

20    **Q.**    At one point this morning the Court asked you a question.

21    The Court asked you if during the 35 minutes -- excuse me.

22    During the 25 minutes that a cashier is not doing a

23    transaction, what were they doing?

24         Do you remember what you told the Court this morning?

25              **MR. WOHL:**  Objection, your Honor.  Misstates the

FERNANDEZ - CROSS EXAMINATION / DOSTART                          1002

```
 1   evidence.  Misstates the testimony.

 2          THE COURT:  Well, I thought I did ask that question,

 3   but if I -- if you remember it differently, you may correct

 4   counsel.

 5       But go ahead.  Tell us again what your memory of that is.

 6   A.   I said they were not involved in a transaction.

 7   BY MR. DOSTART:

 8   Q.   Did you tell the Court at any point this morning that the

 9   25 minutes out of the hour that they were not involved in a

10   transaction, that they were walking around the store away from

11   the register?

12   A.   I said they were not involved -- I might have said that,

13   yes.

14   Q.   Okay.  I think you did.

15          THE COURT:  Well, do this.  Just read it.  Do you have

16   the transcript?

17          MR. DOSTART:  Let's read that actually.

18          THE COURT:  Read the exact testimony and plus or minus

19   to get it in context so that there won't be any question if

20   this is important like you say.  All right?

21          MR. DOSTART:  Very important.

22          THE COURT:  So let's -- who has the transcript?

23          MR. DOSTART:  This is from earlier today, your Honor.

24          THE COURT:  Well, then, the court reporter -- do you

25   have the time, the minutes and the time that this testimony was
```

 1  given?  That might help the court reporter find it.

 2          **MR. DOSTART:**  I actually do not have the precise time.

 3  I know that the words "away" -- the word "away" was used or

 4  "walking around."

 5          **THE COURT:**  Well, the word "25" was used.  So why

 6  don't we see if you can find it, Deb, using whatever.  "25

 7  minutes" and "35 minutes" were in there.

 8      You lawyers have to learn how to use this system so you

 9  can zero in on it.

10      (Brief pause.)

11          **THE COURT:**  Let me read what I found and if it's not

12  it, I'm sorry, but you lawyers need to use the system.

13      Mr. Wohl was asking the question:

14          **"QUESTION:**  You said you told Judge Alsup that you

15          looked at or you measured on an hourly basis 35

16          minutes of transactions and 25 minutes which you

17          described as being away from the counter?"

18      Then the answer was:

19          **"ANSWER:**  25 minutes of no transactions, which they

20          were away from the counter or for a few seconds at

21          the counter.

22          **"QUESTION:**  So that's a very important clarification.

23          So does the 25 minutes include any of the time that

24          they are at the check stand, albeit not involved in a

25          transaction?

1      **"ANSWER:**  A minimum was zero and the maximum was 50.

2          The average -- 50 seconds.  The average was 15

3          seconds."

4     All right.  So I don't know if that's the part you were

5  trying to remember, but that -- that was toward the end of that

6  colloquy on that general subject.

7      **MR. DOSTART:**  And just for clarity, that was after the

8  break when Mr. Wohl then asked Dr. Fernandez to clarify some of

9  his testimony before the previous break.

10     Before the break the Court had asked Dr. Fernandez what

11  the associates were doing during that 25 minutes.  If I

12  recollect correctly, the answer was that they were walking

13  around the store.  They were not at the register.

14     But let me ask Dr. Fernandez.

15  **BY MR. DOSTART:**

16  **Q.**   Dr. Fernandez, is it your testimony here today that the 25

17  minutes, besides the 30 seconds or so --

18  **A.**   Yes.

19  **Q.**   (Continuing) -- when the cashiers are not actively

20  involved in a transaction, is it your testimony here today that

21  they are walking around the store?

22  **A.**   They were not at the register.

23  **Q.**   Let me ask that question again, Dr. Fernandez?

24  **A.**   I don't know where they were.

25  **Q.**   Let me ask the question again.

FERNANDEZ - CROSS EXAMINATION / DOSTART                    1005

```
 1        Is it your testimony that the 25 minutes in your study

 2   during which cashiers were not ringing up transactions, that

 3   they were walking around the store or not at the register?

 4        MR. WOHL:  Objection, your Honor.  Vague and ambiguous

 5   the way he stated that.

 6        THE COURT:  Overruled.  Please answer.

 7   A.   The -- they were not at the register.  That's what I'm --

 8   what the -- what the evaluation shows.

 9   BY MR. DOSTART:

10   Q.   Were they within that 27-inch to 35-inch area that you've

11   identified as the box?

12   A.   They were not -- I cannot answer that.  I'll tell you why,

13   because --

14   Q.   Dr. Fernandez --

15   A.   No --

16        MR. WOHL:  Objection, your Honor.  He's interrupting

17   the witness.

18        THE COURT:  Let the witness finish.

19   A.   What I was saying is the transaction time was 35.

20   Twenty-five minutes there were no transactions.

21   BY MR. DOSTART:

22   Q.   For those 25 minutes, Dr. Fernandez, were the cashiers

23   within the box?

24   A.   It's possible they were in the box for some period of

25   time.
```

FERNANDEZ - CROSS EXAMINATION / DOSTART    1006

1   Q.   Is it true, Dr. Fernandez, that out of the 60 minutes that

2   you would analyze for your report, on average the cashiers were

3   only outside the box for nine minutes or less?

4   A.   I don't believe that's possible.

5           MR. DOSTART:  Okay.  I'm going to read now, your

6   Honor, from the deposition of Jeffrey Fernandez taken on

7   Tuesday -- excuse me, Thursday, October 4th, 2012 in this case.

8   Page 30, Line 22.

9           MR. WOHL:  Sorry, your Honor.  Can you hold one

10  second?  We're getting the transcript.

11          THE COURT:  You should already have that at the ready.

12  Please proceed.

13  BY MR. DOSTART:

14  Q.   From Page 30, Line 22, to Page 31, Line 8:

15          "QUESTION:  Are you able to estimate for me what

16           percentage of time that cashiers at the Tulare store

17           spend working in the box as opposed to outside the

18           box?

19          "ANSWER:  The number of times they work inside the box

20           and outside the box I've got out here.

21          "QUESTION:  What I'm asking for is a percentage of

22           time that cashiers spend inside the box as opposed to

23           outside the box?

24          "ANSWER:  That can be calculated, but I don't have

25           that.  Well, outside the box would be eight, eight

```
 1              and a half, 8.8 minutes in an hour."
 2        Do you stand by that testimony, Dr. Fernandez?
 3   A.   I -- 8, 8.5 minutes?
 4   Q.   8.8, Dr. Fernandez.
 5             THE COURT:  Why don't you show him the testimony in
 6   his deposition -- so that he's -- he may not -- maybe he needs
 7   to hear it again or read it again before that registers.
 8             THE WITNESS:  I'm not quite sure what I said.
 9             THE COURT:  Counsel is going to show you what he just
10   read.
11        (Brief pause.)
12   BY MR. DOSTART:
13   Q.   So I'll ask the same question, Dr. Fernandez:  Do you
14   stand by that testimony?
15   A.   I don't know --
16   Q.   I'll show it to you again.
17   A.   Please, I'm not sure what context I responded to that, but
18   I would like to see it, please.
19             THE COURT:  All right.  Let the witness read the
20   testimony.
21        You take the time that you need, but it sounds like in
22   your deposition you said they were in the box all but 8.8
23   minutes.
24        And then the question is whether or not we're
25   understanding that correctly and whether or not you stand by
```

 1    that prior testimony.

 2         So you read it as carefully as you need to answer that

 3    question.

 4         (Brief pause.)

 5         **THE WITNESS:**  I think I know what happened here.

 6    **BY MR. DOSTART:**

 7    **Q.**  My next question, Dr. Fernandez, relates to --

 8         **THE COURT:**  He gets to answer the question.

 9         **MR. DOSTART:**  I'm sorry.

10         **THE COURT:**  Do you stand by that testimony or not?  If

11    not, what's your explanation?

12         **THE WITNESS:**  So the -- the number of instances CSA

13    out of the box during transaction, that's another entry in

14    Table 3.  And these questions were -- at the deposition were

15    being asked on Table 3.  And it was 3.23.  And number of

16    instances out of the box between transactions, 5.58.  I suspect

17    what I did was I --

18    **BY MR. DOSTART:**

19    **Q.**  5.53?

20    **A.**  Sorry.

21    **Q.**  It's 5.53?

22    **A.**  Yeah, 5.53.

23         I added those two up.  That is the number of instances,

24    not the percentage.

25    **Q.**  You said "minutes" in your deposition?

1   A.   I -- I was wrong.  I said the number of instances per

2   hour.

3            THE COURT:  So in your deposition you said

4   8-point-something minutes, correct?

5            THE WITNESS:  Yes, sir.

6            THE COURT:  But now you're selling us that it wasn't

7   minutes, it was instances?

8            THE WITNESS:  Yes.  I'm basing it on what I'm seeing

9   at the moment.  And I -- I just added those two numbers up, and

10  I -- I misspoke.  I incorrectly said that.

11           THE COURT:  All right.  So he does not stand by his

12  prior testimony.

13           MR. DOSTART:  Okay.

14           THE COURT:  All right.  Next question.

15  BY MR. DOSTART:

16  Q.   Okay.  I will change topics.

17       Dr. Fernandez, you're the managing principle of JF

18  Associates?

19  A.   Yes.

20  Q.   And JF Associates is an ergonomics consulting first?

21  A.   It's on industrial engineering consulting firm.

22  Q.   One of the functions of JF Associates is to provide expert

23  witness testimony?

24  A.   Yes, it is.

25  Q.   You personally spend at least 50 percent of your time

 1  doing expert witness work?

 2  **A.**    Yes.  This year, yes.

 3  **Q.**    Of that time, up to 95 percent of the work that you do is

 4  on behalf of defendants as opposed to plaintiffs?

 5  **A.**    Ninety-five percent?

 6          **MR. WOHL:**  Is that a question, your Honor?

 7          **MR. DOSTART:**  It is.

 8          **THE COURT:**  It's not framed as a question.  You need

 9  to say up to 95 percent of your work is on behalf of

10  defendants; isn't that true?  Or isn't it?

11       You do need to put a question in there.  Sometimes the

12  lawyers don't do it.  But I think you -- I prefer that the

13  lawyers make a question out of it.

14       So, please, answer that question.  Is that 95 percent

15  number correct or not?

16          **THE WITNESS:**  It will be close to that.  But I -- yes,

17  it will be close to that.

18  **BY MR. DOSTART:**

19  **Q.**   Is it true that you haven't done any expert witness work

20  on behalf of a plaintiff since 2006?

21  **A.**    That is incorrect.

22          **MR. DOSTART:**  I'm now going to read from the

23  deposition transcript, from the case *Kristin Hall versus*

24  *Rite Aid*, taken on January 6, 2012, from page 19 lines 19

25  through 24.

 1              THE COURT:  Please, go ahead.

 2              MR. DOSTART:  One second.  I apologize.  It is page

 3   50, line 7 through 16.  Excuse me, line 4 through line 16.

 4              "QUESTION:  Dr. Fernandez, what was the last lawsuit

 5               in which you provided expert testimony on behalf of

 6               the employees?

 7              "ANSWER:  If you're asking me what was the last time I

 8               was deposed, or at trial?  Is that the question, sir?

 9              "QUESTION:  What was the last lawsuit in which you

10               provided expert testimony either in the form of a

11               report or at a deposition or at trial on behalf of

12               employees?

13              "ANSWER:  Okay.  2005 or 2006.  Or maybe later, yeah,

14               in that time frame."

15   BY MR. DOSTART:

16   Q.   My next question, Dr. Fernandez, is, has all of your work

17   since 2006 been on behalf of employers?

18   A.   No.

19   Q.   Involving litigation consulting, has all of your work been

20   on behalf of employers?

21   A.   No.

22   Q.   Have you testified as an expert on behalf of an employee

23   since 2006?

24   A.   Yes.

25   Q.   What case was that?

1   **A.**   This year, for Costco, against Costco.

2   **Q.**   Okay.  Any other cases?

3   **A.**   I've been retained as an expert, but -- but I've not --

4   the cases have -- two of them have settled.  And I refer to it

5   in my -- in the direct, the FELA cases, F-E-L-A, the railway

6   cases, and in --

7   **Q.**   So the only case in which you have provided testimony on

8   behalf of an employee since 2006 is in a case involving Costco;

9   is that correct?

10  **A.**   Yes.

11  **Q.**   Do you recall writing an article titled, "The Role of

12  Physical Ergonomics in Litigation"?

13  **A.**   Yes.

14  **Q.**   In that article, do you recall discussing the role an

15  ergonomist could play in giving expert testimony in a lawsuit?

16  **A.**   In getting?

17  **Q.**   In giving.

18  **A.**   I don't remember the exact words, but I did write the

19  article with some colleagues.

20  **Q.**   Let me ask you, do you remember the article discussing the

21  role an ergonomist could play in giving expert testimony in a

22  lawsuit?

23  **A.**   Yes.  I have written about it.  I am not suggesting I have

24  not.

25  **Q.**   Okay.  Do you remember at one point in the article stating

1   that the role an ergonomist could play in a lawsuit is to help

2   the defendant reduce the amount or the risk of a large damage

3   award?

4   **A.**   Did I use the word "defendant" there?

5   **Q.**   I'm asking you.

6   **A.**   I don't think I used the word "defendant" because my -- my

7   coauthors on this, one of the major coauthors on this paper

8   does not work for the defense.

9   **Q.**   But you do?

10  **A.**   I work -- most of my cases are, yes.  His, most of his

11  cases, no.

12  **Q.**   So in this article you do remember that one point the

13  article made is that an ergonomist can help the defendant

14  reduce the risk of a large award or --

15          **THE COURT:**  Just read it to us.  If it's there, read

16  where the word "defendant" occurs in that sentence.  And so

17  let's not be arguing over whether he did it or did not.

18          **MR. DOSTART:**  I'm quoting from, "The Role of Physical

19  Ergonomics in Litigation," by Jeffrey Fernandez.  First page:

20          "The physical ergonomist can help mitigate the risk

21           for large damages or settlements through improved

22           design."

23  **BY MR. DOSTART:**

24  **Q.**   Do you stand by that statement?

25  **A.**   Yes, yes.

FERNANDEZ - CROSS EXAMINATION / DOSTART          1014

1   Q.   Dr. Fernandez, you have been retained as an expert witness

2   in four different seat cases, correct?

3   A.   Yes.

4   Q.   And in each of those cases you have worked on behalf of

5   the defense, never the plaintiff?

6   A.   Right.

7   Q.   In this case, as of the date of your deposition on October

8   4, 2012, you had billed to Kmart a total of $135,000; is that

9   correct?

10  A.   That's right.

11  Q.   That $135,000 represented 15 to 20 percent of your firm's

12  total billings in 2012, correct?

13  A.   That's right.

14  Q.   You have done additional work since your deposition in

15  this case, correct?

16  A.   That's right.

17  Q.   What is the total amount that you have billed Kmart in

18  this case?

19  A.   About 225,000.

20  Q.   And what percentage of your personal total billings does

21  that represent in 2012?

22  A.   My personal or the company's personal?

23  Q.   Your personal billings.

24  A.   I would have to guess because I have been involved in

25  other cases, as well.

1  **Q.**   Please give me your best estimate, Dr. Fernandez.

2  **A.**   It would be in the 10 to 15 percent range.

3  **Q.**   Apart from your expert witness work in the seat lawsuits,

4  you have never been asked to design a workstation for a retail

5  cashier; is that correct?

6  **A.**   Yes.

7  **Q.**   So that's a true statement?

8  **A.**   That's correct.

9  **Q.**   And apart from your expert witness work, you have no

10  experience advising retail employers about whether cashiers

11  should sit or stand?

12  **A.**   That's right.

13  **Q.**   Now, you do understand that plaintiff's expert,

14  Dr. Johnson, has given that type of advice outside of the

15  context of litigation?

16  **A.**   That's what he says, yes.

17  **Q.**   And so in this respect, Dr. Johnson has real world

18  experience that you do not have; is that true?

19  **A.**   Real world experience?  It depends how you define that,

20  sir.

21  **Q.**   I'll define it as experience advising retail employers

22  about whether cashiers should sit or stand.

23  **A.**   You're asking me whether I have got real world experience

24  consulting in the -- in this particular area?  The answer is --

25  and the answer is going to be no.

1  Q.   You have known Dr. Johnson for 25 years, correct?

2  A.   Yes.

3  Q.   And he is a highly respected ergonomist?

4  A.   He's respected, yes.

5  Q.   His book entitled, "Work Design Industrial Ergonomics" is

6  considered to be an authoritative textbook in the field of

7  ergonomics; is that correct?

8  A.   It's more used in the area of work design than ergonomics,

9  but it is used in departments that have a time study and

10  ergonomics.  This one goes to time study in ergonomics.

11  Q.   Would you agree that it's an authoritative textbook in its

12  field?

13  A.   It's one of the better textbooks, yes.

14  Q.   Now I would like to talk to you about some general

15  ergonomic principles.

16  A.   Yes.

17  Q.   First, what is NIOSH?

18  A.   NIOSH is the National Institute for Occupational Safety

19  and Health.

20  Q.   And it's a federal agency?

21  A.   Yes.

22  Q.   And you've worked at NIOSH?

23  A.   I worked my sabbatical at NIOSH, and I've consulted for

24  NIOSH, yes.

25  Q.   In 1992 to 1993?

1    **A.**    I consulted -- I worked on a sabbatical in 1992-93.

2    **Q.**    And when did you consult?

3    **A.**    After that.

4    **Q.**    And NIOSH issues guidelines about workplace design?

5    **A.**    Yes.

6    **Q.**    And NIOSH guidelines are considered authoritative in the

7    field of ergonomics?

8    **A.**    The guidelines and they -- they claim -- it's stated very

9    explicitly, it's guidelines.  It's authoritative, yes.

10   **Q.**    Now, NIOSH recommends that when designing an employee

11   workstation, employees should be given the option of sitting or

12   standing, correct?

13   **A.**    I don't know the exact terminology that they've used and

14   what particular document you're referring to, but, in general,

15   NIOSH would recommend something like that, yes.

16   **Q.**    And, in fact, you agree and have testified that from an

17   ergonomics perspective, it is best to give a cashier the option

18   of sitting or standing, rather than requiring them to stand

19   exclusively?

20   **A.**    I believe in an ideal situation, yes, they should -- they

21   should be given an option of sitting and standing.  I have said

22   that.

23   **Q.**    And, in fact, you wrote a book on ergonomics called,

24   "Applied Occupational Ergonomics," correct?

25   **A.**    Yes.

FERNANDEZ - CROSS EXAMINATION / DOSTART                                    1018

1    **Q.**    And in your book you specifically recommend that employees

2    should be given the option of sitting or standing, correct?

3    **A.**    They should be given an option of sitting or standing,

4    provided it's --

5    **Q.**    And you stand by that recommendation today?

6    **A.**    I stand by that recommendation, yes.

7    **Q.**    Now I want to talk with you a little bit about some

8    adverse health consequences to prolonged standing.

9    **A.**    Okay.

10   **Q.**    You agree that there are negative health consequences

11   associated with prolonged standing, right?

12   **A.**    Yes.

13   **Q.**    And one of those is varicose veins, correct?

14   **A.**    Yes.

15   **Q.**    What are varicose veins?

16   **A.**    Basically, when your veins get distended over a period of

17   time.

18   **Q.**    And what happens?

19   **A.**    What happens?

20   **Q.**    Yes, when the veins get distended over a period of time,

21   what is the result?

22   **A.**    Are you asking for visually what happens?

23   **Q.**    Yes, visually.

24   **A.**    Visually, basically, they distend and you can see them in

25   your lower legs, in your lower extremities.

FERNANDEZ - CROSS EXAMINATION / DOSTART                1019

1  Q.    And there are published studies in ergonomics literature

2  that say that prolonged standing leads to varicose veins,

3  correct?

4  A.    There are studies that are done, yes.

5  Q.    And you agree with those studies, correct?

6  A.    I do agree with those studies.

7  Q.    And isn't it true that varicose veins can lead to

8  hospitalization if they're serious enough?

9  A.    In some cases, yes.

10 Q.    And there's another adverse health effect associated with

11 prolonged standing called edema; is that true?

12 A.    That's right.

13 Q.    What is edema, Dr. Fernandez?

14 A.    Fluid retention.

15 Q.    Where?

16 A.    Edema is fluid retention in any part of the body.

17 Q.    And where would edema affect an individual who is

18 suffering from edema as a result of prolonged standing?

19 A.    In the lower extremities, or could be other parts or other

20 extremities.

21 Q.    And edema has the potential to be become very serious, as

22 well; is that correct?

23 A.    I am not personally aware of it, but I'm sure in the

24 literature it states that that could become in advance cases,

25 yes.

1  Q.   You would agree that prolonged standing also leads to

2  fatigue in the legs and feet, correct?

3  A.   Yes.

4  Q.   And, in fact, in your book you state that fatigue starts

5  to set in after only 30 minutes of standing.  Is that true,

6  Doctor?

7  A.   Yes.

8  Q.   And another symptom of prolonged standing is foot and leg

9  pain.  Is that true, Doctor?

10 A.   Foot and leg pain, yep.  Yeah, that --

11 Q.   Would you agree -- I'm sorry?

12 A.   Yes, that does occur.

13 Q.   And would you agree that prolonged standing can also lead

14 to nocturnal leg cramps?

15 A.   I'm not familiar with that research.

16      MR. DOSTART:  I'm going to read from the deposition of

17 Jeffrey Fernandez, taken on Friday, January 6, 2012, in the

18 case -- *Kristin Hall versus Rite Aid Corporation*.  It is page

19 345, line 17, to page 346, line 11.

20      "QUESTION:  Well, we can cut through it if you can

21       tell me the research.  So what adverse health

22       consequences are you aware of that result from

23       prolonged standing?

24      "ANSWER:  Prolonged standing is one -- is not moving

25       at all, is venous blood pooling.  There's varicose

FERNANDEZ - CROSS EXAMINATION / DOSTART                 1021

```
 1                    veins, static, the static loading of the lower
 2                    extremities.
 3               "QUESTION:  Edema?
 4               "ANSWER:  Not in -- in -- in some individuals, yes.
 5               "QUESTION:  Nocturnal leg cramps?
 6               "ANSWER:  It -- it might be.  It's -- I'm not -- I've
 7                    not read this.  This is not -- it's like reading
 8                    the -- the fine print in a presc- -- in -- in -- in a
 9                    prescription drug.  These are the common things.
10                    And -- and this is what also happens, the minor
11                    effects.  And all this -- this is not as common.
12                    Occasional.  And, yes, it is documented.  Yes."
13     BY MR. DOSTART:
14     Q.   Do you stand by that testimony, Dr. Fernandez?
15     A.   I stand by it.  I said it, yes.
16     Q.   Haven't there been studies in the ergonomics literature,
17     Dr. Fernandez, that show that prolonged standing can lead to
18     atherosclerosis?
19     A.   There have been literature, yes.
20     Q.   And atherosclerosis is the hardening of the arteries; is
21     that correct?
22     A.   Yes.
23     Q.   And that is serious, Doctor; isn't it?
24     A.   Depends on the duration, the duration of standing.  It
25     depends on the duration of how long the person is standing
```

 1  over, how many years.  But there is literature that says that.

 2  **Q.**   That wasn't my question, Dr. Fernandez.  My question was,

 3  is atherosclerosis serious?

 4  **A.**   Yes.

 5  **Q.**   Are you familiar with an article by Dr. Ryan, called

 6  "Musculoskeletal Symptoms in Supermarket Workers"?

 7  **A.**   Yes.

 8  **Q.**   It appeared in *Ergonomics*, which is a leading

 9  peer-reviewed journal in your field, correct?

10  **A.**   Yes.

11  **Q.**   And Dr. Ryan found that grocery store cashiers had

12  increased foot and leg pain because of prolonged standing at

13  the register; isn't that correct?

14  **A.**   That's right.

15  **Q.**   And because of that finding, Dr. Ryan recommended that

16  cashiers be given the option of sitting or standing at their

17  discretion, correct?

18  **A.**   That's based on his results.  That's what he recommends,

19  yes.

20  **Q.**   And you understand that Dr. Johnson is recommending that

21  cashiers be allowed to alternate between sitting and standing,

22  correct?

23  **A.**   That's right.

24  **Q.**   And when employees alternate between sitting and standing,

25  they don't suffer the same negative health effects as if

1  they're required to stand all day or as if they're required to

2  sit all day; isn't that true?

3  **A.**    In an ideal situation, yes.

4  **Q.**    And, in fact, you are recommending that cashiers be

5  required to stand at the register; isn't that correct?

6  **A.**    I'm -- I am suggesting that based on the task demands,

7  based on the tasks that have been performed, that if they are

8  required to sit, their risk is going to increase.

9  **Q.**    But you understand that Dr. Johnson is not suggesting they

10  be required to sit.  You just testified that you understand

11  Dr. Johnson is advising them to be able to sit and stand.  Is

12  that correct?

13  **A.**    I agree.  But while --

14  **Q.**    Dr. Fernandez --

15            **MR. WOHL:**  Let him finish his response, your Honor.

16            **THE COURT:**  Had you finished your answer?

17            **THE WITNESS:**  No, sir.

18            **THE COURT:**  Please, continue.

19            **THE WITNESS:**  But when -- when they want -- when they

20  need to get up, they need to have the space to get up.  They

21  need to be able to move.  The task demands does not allow them

22  to stand up when they -- when there's heavier weights.

23  **BY MR. DOSTART:**

24  **Q.**    Okay.  Let's talk about your work at the Tulare store in

25  this case.

1     Dr. Fernandez, part of your assignment was to observe

2  Tulare cashiers and determine what they actually do, correct?

3  **A.**   Yes.

4  **Q.**   And you did it by observing them live, and then by

5  videotaping them; is that correct?

6  **A.**   Yes.

7  **Q.**   You recorded 300 hours of videotape, correct?

8  **A.**   Yes.

9  **Q.**   Please turn to Table 2 of your September 6, 2012 report.

10  **A.**   Yes.

11  **Q.**   This table contains a list of the tasks that cashiers at

12  the Tulare store perform, correct?

13  **A.**   Yes.

14            **THE COURT:**  Does somebody have a copy I can look at?

15            **THE WITNESS:**  Yes.

16            **THE COURT:**  You need your copy.

17            **MR. DOSTART:**  I may have one, Your Honor.

18            **THE COURT:**  Counsel will give me one.  All right.

19  Give it to the clerk.  The clerk will hand it to me.  All

20  right.  Go ahead.

21  **BY MR. DOSTART:**

22  **Q.**   Dr. Fernandez, do you believe that this is a complete and

23  accurate list of the tasks performed by the Tulare front end

24  cashiers?

25  **A.**   This is the list that I developed with counsel.  And as

1  far as I'm aware, this is an accurate list.

2  **Q.**  Okay.  Let's go through each task.  First, "Making eye

3  contact, smiling, greeting, and offering to help every

4  customer."  Now I want to go through that one by one.

5      Dr. Fernandez, do you agree that making eye contact could

6  be done from a seated position?

7  **A.**  From an ergonomics perspective, yes.

8  **Q.**  Dr. Fernandez, do you agree that smiling could be done

9  from a seated position?

10 **A.**  Yes.

11 **Q.**  Do you agree that greeting could be done from a seated

12 position?

13 **A.**  Yes.

14 **Q.**  Do you agree that offering to help every customer could be

15 done from a seated position?

16 **A.**  Yes.

17 **Q.**  Next, "Scanning items."

18      Now, Dr. Fernandez, if Kmart modified the workstation, do

19 you agree that this is a task that could be done in a seated

20 position?

21 **A.**  If you tell me, sir, what that modification is.

22 **Q.**  I'm asking you, simply, if they modified it in a way that

23 was ergonomic -- that they just made modifications, could

24 scanning be done in a seated position?

25          **MR. WOHL:**  Objection.  Incomplete hypothetical, your

 1   Honor.

 2          THE COURT:  This particular case, I think it's okay.

 3   Overruled.  Please, answer the question.

 4          THE WITNESS:  It could be done --

 5   BY MR. DOSTART:

 6   Q.   Okay.

 7   A.   -- but --

 8          MR. WOHL:  Your Honor, can he finish?

 9          THE COURT:  Go ahead, finish your answer, please.

10          THE WITNESS:  But while scanning, the risk is going to

11   increase for the upper extremities.

12   BY MR. DOSTART:

13   Q.   Okay.  Now, Dr. Fernandez, you haven't considered any

14   modifications to the workstation at Tulare, correct?

15   A.   No, I have not.

16   Q.   And that was beyond the scope of your assignment in this

17   case, correct?

18   A.   Right.

19   Q.   Okay.  Next item, "Bagging items."

20        Dr. Fernandez, you agree that it is possible to bag items

21   that weigh less than 10 pounds, from a seated posture, correct?

22   A.   It depends.  There are some items that one could bag less

23   than 10 pounds, and other items no.

24   Q.   And you agree that accepting payments could be done from a

25   seated position, correct?

1  **A.**    Accepting payments, yes.

2  **Q.**    You agree that issuing receipts could be done from a

3  seated position, correct?

4  **A.**    It depends if it was redesigned.

5        Now, let me ask you this to clarify.  I shouldn't be

6  asking the question.  Are you asking me these questions with

7  the new design?

8  **Q.**    Let's talk about, "Issue receipts with a redesigned

9  workstation."  Could a cashier issue a receipt from a seated

10 position?

11 **A.**    If it's redesigned and it's within their reach?

12 **Q.**    Yes.

13 **A.**    It could be done.

14 **Q.**    Could a -- and, now, "Processing returns" is the next

15 item.  And this consists of two activities.  One is the

16 physical processing of the return at the register.  The other

17 is processing the return in terms of taking the item back to

18 the store floor.

19       In terms of the processing the item for return at the

20 register, could that be done from a seated position?

21            **MR. WOHL:**  Objection, Your Honor.  Lacks foundation.

22 Counsel is testifying right there.

23            **THE COURT:**  Well, that's overruled.  But it needs to

24 be -- you did not make clear that as to whether or not you're

25 talking about with the existing configuration or with a -- you

 1  know, ideally-modified situation.

 2  **BY MR. DOSTART:**

 3  **Q.**   Let me ask --

 4          **THE COURT:**   So you need to make that clear.

 5  **BY MR. DOSTART:**

 6  **Q.**   Okay.  Dr. Fernandez, in the existing configuration --

 7  strike that.

 8       Dr. Fernandez, with a modified workstation, do you agree

 9  that the portion of processing a return that occurs at the cash

10  register could be done from a seated position?

11          **MR. WOHL:**   Objection.  Vague and ambiguous, your

12  Honor.

13          **THE COURT:**   Overruled.  Please answer.

14          **THE WITNESS:**   If -- if the -- if it's redesigned, yes.

15  **BY MR. DOSTART:**

16  **Q.**   Okay.  The next item on the list is, "Monitor shrink."

17  This means keeping your eyes open for theft.

18       Do you believe, Dr. Fernandez, that monitoring shrink

19  could be done from a seated position?

20          **MR. WOHL:**   Objection, Your Honor.  Counsel testifying

21  again.  Lacks foundation.

22          **THE COURT:**   Well, overruled.  Please answer.

23          **THE WITNESS:**   Monitoring shrink is from -- it depends

24  what the -- what is required by the company.

25       If they are asking the -- the CSAs to look -- to look at

1    the hands or in the cart, I suspect it could be done in the

2    seating -- seated position.

3         But, if you're asking the CSA to look under the cart, it's

4    not -- it's going to be very difficult doing it in a seated

5    position because of the field of view.  You have a better field

6    of view standing up.

7    **BY MR. DOSTART:**

8    **Q.**   Are you aware of any companies that have placed a mirror

9    on the checkstand opposing a cashier so that the cashier could

10   look at the mirror to see the bottom of the cart of the

11   customer that they are checking out?

12   **A.**   I've seen mirrors.  I'm not sure of the efficiency.  You

13   asked me a question.  I'm answering you which part I suspect

14   from an ergonomics perspective.

15   **Q.**   But you've seen it?

16   **A.**   I have seen it, yes.

17   **Q.**   Okay.  The next item on the list is, "Assist with customer

18   satisfaction survey."

19        Dr. Fernandez, do you believe that a cashier at Kmart,

20   with a modified workstation, could assist the customer with a

21   satisfaction survey?

22   **A.**   If it's within reach and they could perform it, yes.

23   **Q.**   Okay.  Do you agree -- the next item on the list,

24   "Maintain a clean work area."

25        Do you agree that a portion of maintaining a clean work

1  area could be done from a seated position?

2  **A.**   Sir, could you explain to me what you mean by "portion."

3  **Q.**   I'm asking you if any portion of maintaining a clean work

4  area could be done from a seated position?

5  **A.**   Portion where, basically, it's within their reach could be

6  done.

7  **Q.**   Okay.  The next is, "Maintain register station by

8  replenishing supplies."

9       Dr. Fernandez, do you believe that a cashier would have to

10  stand to replenish supplies?

11  **A.**   Yes.

12  **Q.**   Do you have any estimate for how often that occurs?

13  **A.**   No.

14  **Q.**   And the same is true with respect to the next two tasks,

15  Dr. Fernandez, isn't it, "Carry out items if required," and,

16  "Load heavy items into vehicle"?

17        **MR. WOHL:**  I'm sorry, vague and ambiguous.  What was

18  the question?

19  **BY MR. DOSTART:**

20  **Q.**   Dr. Fernandez, do you have any estimate for how often

21  cashiers at Tulare carry out items, if required, or load heavy

22  items into vehicle?

23  **A.**   No.

24  **Q.**   The next item, "Resolve customer issues and complaints."

25       Do you agree, Dr. Fernandez, that depending on the type of

1    issue, some customer complaints and issues can be handled from

2    a seated position?

3    A.    I -- I did not -- I don't know.

4    Q.    You don't know?  Your answer today is that you don't know

5    whether that could be done from a seated position, a portion of

6    the task?

7    A.    I don't know what -- what -- what it involved.  I suspect

8    some of it could be done.  Some of it could not be.  Will not

9    be.

10             MR. DOSTART:  I'm going to read from the deposition of

11   Jeffrey Fernandez, taken on Thursday, October 4, in this case,

12   from page 37, line 13 to line 25.

13             "QUESTION:  The next item is, 'Resolve customer issues

14             and complaints.'  What does that consist of?

15             "ANSWER:  Individuals come to the counter, and they've

16             got a complaint regarding a particular bill or a

17             particular person.  So, basically, discussions --

18             sometimes discussions regarding an invoice, statement

19             out there, or receipt.

20             "QUESTION:  And that activity could be performed from

21             a seated position, correct?

22             "Objection.  Overbroad.  Incomplete hypothetical.

23             "ANSWER:  It could be performed, provided they're not

24             bringing back some items."

25             MR. WOHL:  Could he finish the response, your Honor,

```
 1  at the top of page 38?

 2            THE COURT:  Is there more to the answer?

 3            MR. DOSTART:  It appears there is.  I apologize.

 4            THE COURT:  Please read the entire answer.

 5            MR. DOSTART:  (Reading)

 6            "They're not bringing back some items, items being

 7             heavy and so on.  But if it's a question of just a

 8             receipt, it could be performed sitting down."

 9  BY MR. DOSTART:

10  Q.   Do you stand by that language, Dr. Fernandez?

11  A.   Yes.  Yes.

12  Q.   Next is, "Monitor sales circular."

13       Do you believe that cashiers can monitor a sales circular

14  from a seated posture?

15  A.   If they have it in their hands --

16  Q.   What does, "Monitor sales circular" mean, Dr. Fernandez?

17  A.   Review the sales -- sales bulletin and, basically, keep

18  track of what's happening.  And if rain checks need to be

19  issued, give them -- give the customer rain checks.

20  Q.   And so you would agree that monitor sales circular could

21  be done from a seated posture?

22  A.   I said yes.

23  Q.   Next is, "Assisting and training fellow associates."

24       Dr. Fernandez, do you have any estimate of how much time

25  is spent on this task?
```

FERNANDEZ - CROSS EXAMINATION / DOSTART                    1033

1   **A.**    No.

2   **Q.**    Do you believe it could be done from a seated position?

3   **A.**    Some of it could be.  And then some of it has to be done

4   in a standing position.

5   **Q.**    Okay.  Next, I want to talk a little bit about items that

6   weigh more than ten pounds at the Tulare store.

7   **A.**    Okay.

8   **Q.**    You do believe that when a cashier handles an item that

9   weighs more than ten pounds, they should stand up, correct?

10  **A.**    Yes.

11  **Q.**    Now, however, you agree that there are some

12  recommendations in the ergonomics literature that say that the

13  cutoff while lifting an item while seated is 20 pounds, not

14  ten, correct?

15  **A.**    I've seen very few that say that, but there -- I -- I -- I

16  came across one some years ago.  But there are some that says

17  20.

18  **Q.**    Okay.  Now I would like to turn back to your September 6,

19  2012, report, to Table 3.  Would you mind opening that up.

20  **A.**    Sure.  Yes, sir.

21  **Q.**    Okay.  If you go down to the row four from the bottom --

22  **A.**    Yes.

23  **Q.**    -- I'm going to read it.  And it says, "Number of heavy

24  items present"?

25  **A.**    Yes.

1  **Q.**    And this is per hour, correct?

2  **A.**    Yes.

3  **Q.**    Okay.  The mean, the average, is 3.47; is that correct?

4  **A.**    Yes.

5  **Q.**    So that means that there are 3.47 heavy items present per

6  hour, on average; is that correct?

7  **A.**    That's right.

8  **Q.**    And a heavy item is an item that weighs more than ten

9  pounds, correct?

10  **A.**    That's right.

11  **Q.**    Okay.  So is it true that that is approximately once every

12  17 minutes, that a heavy item is present?  If you need a

13  calculator, I can get it for you.  Would you like me to hand

14  you a calculator?

15  **A.**    Please.

16  **Q.**    Okay.  Just for the record, I believe the math is 60

17  divided by 3.47.  I believe, the result is -- Dr. Fernandez?

18  **A.**    5.7.

19  **Q.**    Well, let me ask you, what math are you doing,

20  Dr. Fernandez?  I don't have the degree in engineering.

21  **A.**    3.47.

22  **Q.**    No, I believe that would be the denominator.  I think the

23  numerator would be 60.  I think that, according to your

24  chart -- I don't know; you're the expert -- is the number of

25  times or the number of instances per hour.

FERNANDEZ - CROSS EXAMINATION / DOSTART          1035

1   A.   So 3.47 instances in 60 minutes.

2   Q.   Correct.  So if you were to figure out how often per hour

3   it were to occur, how would you do that math, Dr. Fernandez?

4          MR. WOHL:  I'm sorry.  Separate from what he already

5   said, your Honor?  I don't understand what the question is.

6          THE WITNESS:  I was confused, but give me a minute.

7          THE COURT:  I think he is trying to get at, what is

8   the mean time between instances of lifting something heavy --

9          MR. DOSTART:  That's correct.

10          THE COURT:  -- if there are 3.47 per hour?

11          THE WITNESS:  So, okay.  Sixty divide by -- one every

12   17 minutes.

13   BY MR. DOSTART:

14   Q.   So there's an item that weighs more than ten pounds

15   present at the Tulare workstation approximately once every 17

16   minutes, according to your report, Dr. Fernandez?

17   A.   That's right.

18   Q.   Now, if you go down to the penultimate row or the row

19   second from the bottom, "Number of instances of heavy items

20   lifted."  Do you see that row, Dr. Fernandez?

21   A.   Yes.

22   Q.   Okay.  That row states that the number of instances of

23   heavy items lifted is 6.07 mean per hour; is that correct,

24   Dr. Fernandez?

25   A.   Yes.

FERNANDEZ - CROSS EXAMINATION / DOSTART                    1036

1  Q.   Is it true that the average time, then, in between a heavy

2  item lifted at the Tulare store, is approximately ten minutes,

3  60 divided by 6?

4  A.   Average time between?  Ten minutes.  Ten minutes, yes.

5  Q.   That's correct?

6  A.   Yep.

7           THE COURT:  Can I ask a question.  We just got

8  through, it says, "Number of heavy items present, 3.47."

9           THE WITNESS:  Yes, sir.

10           THE COURT:  But then we have number of instances of

11  heavy items lifted.

12           THE WITNESS:  It's higher.

13           THE COURT:  How could it be higher?  If you've only

14  got 3.47, how can you have 6.07 instances?

15           THE WITNESS:  That was -- that is confusing, sir.

16  When you put these small items together in a bag, they do

17  become heavy.  They do -- they do get above ten pounds.

18       And we've seen that happen in the videos.  They put it in

19  a bag, and then it's more than ten pounds, and they're moving

20  that bag.

21           THE COURT:  So you've got two 5-pound items go into

22  one bag.  That counts as an instance of heavy item lifted?

23           THE WITNESS:  Yes, sir.

24           THE COURT:  Okay.  All right.  I got it.  Thank you.

25

1  BY MR. DOSTART:

2  Q.   So just to be clear, then, I had the exact same question

3  that the Court had.  It's actually not an item.  Or, I should

4  say, it's actually not an item of merchandise.  It could be a

5  compendium or the aggregate of a bunch of items of merchandise?

6  A.   Yes.

7  Q.   Okay.  Are you aware that Dr. Johnson's modification in

8  regards to bagging would alleviate the need for the cashier to

9  bend down, pick up and otherwise rotate with a bag?

10       MR. WOHL:  Objection.  Lacks foundation.  He hasn't

11  explained the modification by Dr. Johnson.

12       THE COURT:  Sustained.  I agree with that objection.

13  You need to rephrase that.

14       MR. DOSTART:  That's okay.  I'll move on.

15  BY MR. DOSTART:

16  Q.   Dr. Fernandez, you also believe that a cashier should

17  stand in order to push or pull an item more than ten pounds; is

18  that correct?

19  A.   That's right.

20  Q.   And, according to Table 3, this happens only 1.67 times

21  per hour, or less than once every 30 minutes; is that correct?

22  A.   Yes.

23  Q.   Finally, you believe that a cashier should stand to rotate

24  an item weighing more than ten pounds; is that correct?

25  A.   Yes.

1   Q.   However, this happens 0.37 times per hour, or less than

2   once every 60 minutes; is that correct?

3   A.   That's incorrect.  So the number was .73.

4   Q.   I'm sorry, what did I say?

5         THE COURT:  It says ".73" on my copy.

6   BY MR. DOSTART:

7   Q.   That's right.

8         THE COURT:  Is that a typo?

9         THE WITNESS:  He said ".37," sir.  Counsel said ".37"

10   incorrectly.

11        THE COURT:  All right.  But it's .73?

12        THE WITNESS:  Yes.

13        THE COURT:  It's still going to be less than once an

14   hour.

15        THE WITNESS:  Yes, sir.

16        THE COURT:  Okay.

17   BY MR. DOSTART:

18   Q.   Thank you, Dr. Fernandez.

19        Dr. Fernandez, I'll take you away from Table 3 right now.

20   I'd like to ask you this:

21        Based on what you know about the tasks that Tulare

22   cashiers perform, you agree that it is possible to design a

23   front end workstation at Tulare that would allow cashiers to

24   alternate between sitting and standing?

25   A.   In an ideal situation, I've said this, in an ideal

1 situation, it is possible.  It is possible to design something

2 like that.  But the reality of an ergonomist is, you've got to

3 take into consideration a number of variables.

4 **Q.**   But it could be done?

5 **A.**   Hypothetically, ideally, yes, it could be done.

6 **Q.**   And this is exactly --

7         **THE COURT:**  Can we do this?  I'd like for the witness

8 to explain what that -- what that design would look like at the

9 Tulare store.

10    Okay.  Can you tell us what -- what it would look like.

11 You just said it could be done, so you must have something in

12 mind.

13         **THE WITNESS:**  I don't know what the cost is going to

14 be.  I do know that for something like this, one would have to

15 change the model of not bagging.  So one -- the CSAs would

16 not -- the bagging is going to be a problem.  Just because one

17 says you should stand up and bag, does not necessarily mean the

18 CSAs will stand up and bag.  They might sit down and bag, and

19 that's going to increase the risk.

20    They would need, I would suspect, conveyor belts.  So that

21 would mean an increased space limitation.  They would need, I

22 would suspect, complete new counters and scanners and

23 registers.

24         **THE COURT:**  How would the seat be arranged so that you

25 would eliminate safety problems?

1          THE WITNESS:  It would not be -- it would be -- I

2    doubt it's ever going to be a sit/stand as Dr. Johnson

3    suggests.

4          THE COURT:  The thing you just described earlier,

5    where they kind of leaned on it, you called it a butt rest.

6          THE WITNESS:  Yes, sir.

7          THE COURT:  How would that work if you had a butt rest

8    here?  How could that possibly fit into the design?

9          THE WITNESS:  So butt rest, the stability problems

10   with the butt rest.  Typically, what you do is you bolt it

11   down.  But if you had something like that there, what you'd

12   have to do is then you would have to -- if you had to get up,

13   it would cause problems.

14         THE COURT:  Why?

15         THE WITNESS:  It would get in your way.  You won't be

16   able to move it.

17         THE COURT:  Well, okay.  But your feet would still be

18   on the floor, right?

19         THE WITNESS:  The feet would be on the floor.

20         THE COURT:  So you would take some of the weight off

21   your legs, if you were able to lean back in that manner,

22   correct?

23         THE WITNESS:  Yes, it would be able to take some

24   weight off, yes, sir.

25         THE COURT:  So to solve the space problem, you would

1   need a bigger footprint.

2           THE WITNESS:  You would need a bigger footprint, yes,

3   sir.

4           THE COURT:  All right.  So, okay.  So, bigger

5   footprint.  But it could be done?

6           THE WITNESS:  Yes, sir, it could be done.

7       I don't know what other constraints, how this all -- how,

8   you know, the dimensions, and so on, how it would -- how it

9   would all measure and what --

10          THE COURT:  So, in that scenario, just to -- just to

11  address something you've mentioned a moment ago, let's say that

12  the employer still wanted them to stand up to bag the stuff.

13  Then at the end of the transaction, the cashier could stand up

14  and go to wherever the bags are, and put the stuff in the bags.

15  But, in the meantime, they might have swiped the individual

16  items over the scanner while seated on the butt stand.

17      Is that it, butt rest, butt stand?  Whatever it is.  I

18  hate to use these kind of gross words in a public proceeding

19  like this, but that's the term you said is appropriate.

20      That could be done that way, right?  The scanning part

21  could be done while seated, unless it was a heavy item.

22          THE WITNESS:  That's right, sir.

23      And the concern there is, of course, would there be enough

24  space in that area where they're scanning to get off the seat

25  and stand up?

 1      Because this -- this high sit/stand stool -- I prefer

 2 using that word here.  The sit/stand stool, the high one --

 3           THE COURT:  Uh-huh.

 4           THE WITNESS:  -- you could not move it around.  You

 5 would not be able to move it because --

 6           THE COURT:  It would have to be a big enough footprint

 7 to allow safely -- for the employee to walk around it.

 8           THE WITNESS:  Sir, what would happen is, if you want

 9 the employee to be close to the scanner, you would go ahead and

10 put that -- you would go ahead and bolt it close to the

11 scanner.

12           THE COURT:  Right.

13           THE WITNESS:  Now, if the employee has to stand up, if

14 the employee had to stand up or it was beyond their reach, they

15 would not have the space.

16      It's like my chair here, and I'm going to get -- I can't

17 move the chair back, and it's here (indicating), and I've got

18 to go ahead and reach out, reach out, it does -- it does pose

19 problems.

20      It would have been nice and better if you could move it

21 around.  But that -- that stability is a problem on those high

22 stools.

23           THE COURT:  All right.  Go ahead, Counsel.

24 BY MR. DOSTART:

25 Q.  So taking a step back, Dr. Fernandez, I just want to be

1   clear, you agree that the ideal ergonomic solution would be to

2   offer a cashier a possibility of change between sitting and

3   standing positions, correct?

4   A.   I said that many times, sir, yes, right.

5   Q.   And this is exactly what Dr. Johnson recommends, correct?

6          MR. WOHL:  Objection.  Misstates his testimony.

7          THE COURT:  I'm sorry, did -- you used the word

8   "cashier."  I want to make sure the witness understands the

9   word "cashier" is in that question.

10         MR. DOSTART:  I'll ask it again, just to be clear.

11         THE COURT:  All right.

12  BY MR. DOSTART:

13  Q.   Dr. Fernandez, you agree that the ideal ergonomic solution

14  would be to offer the cashier a possibility of changing between

15  sitting and standing positions, correct?

16  A.   In an ideal situation, as ergonomists, we ergonomists

17  would recommend that, and so would I.

18  Q.   Thank you.

19       And you agree that that is what Dr. Fernandez --

20  A.   I'm Dr. Fernandez.

21  Q.   That -- that Dr. Johnson recommends, correct?

22         MR. WOHL:  Objection.  Vague and ambiguous.  Is he

23  saying Dr. Johnson --

24         THE COURT:  I don't remember Dr. Johnson's specific

25  design, though.  Did Dr. Johnson do a layout for me, a

1    blueprint?

2           MR. DOSTART:  I don't believe he did a true blueprint,

3    your Honor.  I think he just said it could be done like

4    Dr. Fernandez --

5           THE COURT:  But no one has done it for me yet.  That's

6    one of the things I would come to later.  I would like to see

7    this ideal design, to see how much of a footprint it takes up

8    and whether it's reasonable to require the employer to do it.

9           All right.  Okay.  I'm going to sustain the objection.

10   That -- the -- it presupposes that he, Johnson, actually

11   submitted a design.  In theory, that's what he said.  That's

12   true.

13          MR. DOSTART:  Understood, your Honor.

14   BY MR. DOSTART:

15   Q.   Dr. Fernandez, you would agree that Dr. Johnson recommends

16   a sit/stand option, correct?

17   A.   Sitting or standing option.

18   Q.   Correct?

19   A.   Yes.

20   Q.   And you agree that this was what Dr. Ryan recommends in

21   his article in the publication *Ergonomics*, correct?

22   A.   Dr. Ryan recommends it based on his -- on his study based

23   on the criteria and based on the limitations that he has on the

24   design that he has in the grocery stores that he looked at in

25   Australia.

1  Q.   And you're aware of grocery stores in other countries that

2  provide a seated cashier, correct?

3  A.   There are grocery stores in other countries in Europe that

4  do provide a seated cashier, yes.

5  Q.   And you're aware that the NIOSH guidelines recommend that

6  cashiers be given the option to sit or stand, correct?

7  A.   Cashiers or --

8  Q.   Correct?

9  A.   -- or just workers in general?

10  Q.   Do you understand that NIOSH recommends that employees be

11  given the option to sit or stand, in general?

12         THE COURT:   Why don't you read it, if there is such a

13  thing.   And there is a difference between cashier and employee.

14  So whatever is in there, make sure you read it correctly.

15         MR. DOSTART:   I will, Your Honor.

16      Let me read from a document which I will hand to

17  Dr. Fernandez, entitled, "Elements of Ergonomic Programs."

18         THE COURT:   We're going to break in five minutes, so

19  keep the clock in mind, please.

20         MR. DOSTART:   I will, Your Honor.   The top left of the

21  document is the NIOSH stamp, which is the National Institute

22  for Occupational Safety and Health.

23      The bottom is the stamp of the United States Department of

24  Health and Human Services, the Public Health Service.   The

25  bottom right is the Center for Disease Control and Prevention.

1  And the column on the right states:

2          "A Primer Based on Workplace Evaluations of

3           Musculoskeletal Disorders."

4  **BY MR. DOSTART:**

5  **Q.**  If you turn to what is page 125 of this document, which is

6  titled, "Tray 9A, General Workstation Design Principles."  If

7  you go all the way down to number 6, it states that:

8          "One of the general workstation design principles is

9           to allow workers, at their discretion, to alternate

10          between sitting and standing."

11      Do you see that sentence, Dr. Fernandez?

12  **A.**   Yes, I do.  It's basically workers here, not cashiers.

13  **Q.**   I understand, Dr. Fernandez.

14          **MR. WOHL:**  I'm sorry, your Honor.  I think he's trying

15  to finish his answer, and Mr. Dostart keeps cutting him off.

16  That's not fair.

17          **THE COURT:**  Did you finish your answer?

18          **THE WITNESS:**  No, I didn't, sir.

19          **THE COURT:**  Please, continue with your answer.

20          **THE WITNESS:**   In that same statement it says, "Provide

21  foot mats or padded surfaces for prolonged standing."

22  **BY MR. DOSTART:**

23  **Q.**   Okay.  And would you agree, Dr. Fernandez, that the

24  recommendation to provide a sit/stand option is, in fact,

25  consistent with what you recommend on page 144 of your own

1   book?

2   **A.**   I -- sir, may I clarify something?  When you say

3   sit/stand, you say sitting or standing; am I correct?

4        What many of us in ergonomics call sit/stand, we call the

5   sit/stand stool.  So I need a clarification from you, sir,

6   please.  What are you referring to?

7   **Q.**   Your book doesn't define it, but I'll ask you,

8   Dr. Fernandez --

9   **A.**   When you're alternating between sitting and standing,

10  that's --

11            **THE COURT:**  Tell us what it is you recommended so --

12            **THE WITNESS:**  I recommend alternate between sitting

13  and standing, as you said before.

14  **BY MR. DOSTART:**

15  **Q.**   Perfect.  Thank you, Dr. Fernandez.

16       Now let me ask you this.  Is it true that a person is more

17  likely to be fatigued faster when standing than when seated?

18  **A.**   Yes.

19  **Q.**   Is it true that while standing, 100 percent of the body

20  mass is supported by the feet?

21  **A.**   Yes.

22  **Q.**   And that's one of the reasons why fatigue sets in faster?

23  **A.**   With static standing, yes.

24  **Q.**   Do you agree that one of the advantages of seated over

25  standing operations is that seated operations require less

1  muscular activity?

2  A.   Of the lower extremities, yes.  For the upper extremities,

3  no.

4  Q.   But your book doesn't say that; does it, Dr. Fernandez?

5  A.   My book may not say it, but we are talking about the lower

6  extremities.

7  Q.   Your book, in fact, says, "Advantages of seated over

8  standing operations."

9       "One, requires less muscular activity, thus, delaying the

10 onset of fatigue."

11      Do you stand by that statement, Dr. Fernandez?

12 A.   For the lower extremities, I stand by that statement.

13 Q.   Does your book say that?

14 A.   No, it does not.

15 Q.   Two, advantages of seated over standing operations, "More

16 stability acquired for fine manipulation."

17      Do you stand by that statement, Dr. Fernandez?

18 A.   Yes, I do.

19 Q.   "Three, can operate foot controls more readily without

20 postural shifts."

21      Do you stand by that statement Dr. Fernandez?

22 A.   I do.

23          THE COURT:  It's now 12:59 and 17 seconds.  Unless you

24 can finish by 1:00 o'clock, we're going to break right now.

25 How does it look?

 1              MR. DOSTART:  Can't talk that fast.

 2              THE COURT:  We'll break for now.

 3         Dr. Fernandez, you're on cross-examination, so no talking

 4    to the lawyers overnight.  So, please, be here at 7:30 in the

 5    morning.

 6              THE WITNESS:  Okay.

 7              THE COURT:  All right.  You may step down.  The

 8    lawyers will take care of your -- well, do you have anything

 9    that you brought to the witness stand?

10              THE WITNESS:  Yes, sir.

11              THE COURT:  You can take that with you.  Just the

12    items you brought.

13         What is that thing?

14              MR. DOSTART:  That's my phone.

15              THE COURT:  Just take the items that you brought with

16    you to the witness stand, and the lawyers will take care of the

17    rest.

18              MR. DOSTART:  One housekeeping item.

19              THE COURT:  Sure.

20              MR. DOSTART:  On Exhibit 216-A, he wanted to indicate

21    the vertical height of the coupon dispenser and the receipt

22    printer.

23              THE COURT:  Is that the chart over there?

24              MR. DOSTART:  It is, your Honor.

25              THE COURT:  Yes, I do.  If that's what you want on

1  there.

2          MR. DOSTART:  Okay.

3          THE COURT:  I want it to have both sides' information.

4          MR. DOSTART:  Thank you.

5          THE COURT:  So you can get him to put it in there

6  tomorrow morning.

7          MR. DOSTART:  Okay.

8          THE COURT:  All right.  The witness is free to step

9  outside.  See you here at 7:30 in the morning.  All right.

10  Okay.  Everyone else be seated.

11      Anything the lawyers need the Court for before we break

12  for the day?

13      (Witness steps down.)

14          MR. MATTHEW RIGHETTI:  Thank you, Your Honor.  One

15  brief thing.

16      Part of your request to the labor commissioner and the

17  LWDA was whether counsel should brief the matter or submit

18  materials to those agencies.

19          THE COURT:  No.  I just said that if you are going to

20  do that, you've got to do it on my time frame so that it won't

21  wind up being a delay in the process.

22          MR. MATTHEW RIGHETTI:  Well, there's two things.  I'm

23  not really sure what the Court had in mind, whether we're going

24  to --

25          THE COURT:  If you will submit an amicus brief to the

```
 1   labor commissioner to say, here's the way you should answer

 2   that question, fine, you have a right to do that, both sides.

 3   That's all I had in mind.  I assume that both sides would want

 4   to -- not lobby, but to present their own views to the labor

 5   commissioner.

 6             MR. MATTHEW RIGHETTI:  All right.

 7             THE COURT:  You told me the other entity was defunded.

 8             MR. MATTHEW RIGHETTI:  Right.  And the -- the final

 9   thing is, I think you set the deadline for Friday.

10             THE COURT:  Friday deadline for what?

11             MR. MATTHEW RIGHETTI:  Well, to submit.

12             THE COURT:  What?

13             MR. MATTHEW RIGHETTI:  Submit something to the labor

14   commissioner.

15             THE COURT:  Oh, I see.

16             MR. MATTHEW RIGHETTI:  I was going to ask --

17             THE COURT:  Are you sure it falls on Friday?

18             MR. MATTHEW RIGHETTI:  You said one week from the

19   order, which you issued the order Friday.

20             THE COURT:  Well, then --

21             MR. MATTHEW RIGHETTI:  Could we have middle of next

22   week, perhaps?

23             THE COURT:  How about I'll give you until the 28th.

24   That's Wednesday.

25             MR. MATTHEW RIGHETTI:  Thank you, Your Honor.
```

1          MR. DOSTART:  Two more items, your Honor.

2          THE COURT:  By noon.  So you've got to submit it to me

3   and them at the same time.

4          MR. DOSTART:  Yes, Your Honor.

5          THE COURT:  Yes, sir.

6          MR. DOSTART:  Is there an afternoon calendar that

7   would require the removal of everything from the courtroom?

8          THE COURT:  No, you can leave -- please clear off the

9   tables just in case emergencies come up.  But I don't think I

10  have anything.  You can leave your boxes, and so forth, here

11  for tomorrow, if you want.

12         MR. DOSTART:  And then the second item is one that we

13  probably could calculate ourselves, but it's the time that

14  plaintiffs have remaining, or plaintiffs and defendants.

15         THE COURT:  Well, you've used 480 minutes.

16         MR. DOSTART:  Okay.

17         THE COURT:  I hope you don't plan to use your entire

18  time.

19         MR. DOSTART:  So do I.

20         THE COURT:  The defendants have used 644 minutes.  So

21  they have -- they have more than an hour left.

22         MR. DOSTART:  And closing arguments are exempt from

23  the time requirements?

24         THE COURT:  It would be in addition to.  I'm thinking

25  about making this come out of this because of the rate this is

1   going.  Yes.

2        MR. WOHL:  Yes, Your Honor, any chance we could have a

3   time estimate from plaintiff for how long they think their

4   cross is --

5        THE COURT:  How much longer do you have on cross?

6        MR. DOSTART:  Happy to estimate that, your Honor.  I

7   would estimate that if things go smoothly we would have no more

8   than 45 minutes to an hour, if things go smoothly.

9        MR. WOHL:  And does plaintiff intend to put on a

10  rebuttal case?  We haven't heard.

11       THE COURT:  Do you plan to put on a rebuttal case?

12       MR. DOSTART:  We do not.

13       THE COURT:  All right.  So this is literally going to

14  be our last witness.

15       MR. WOHL:  It sounds like closing no problem for

16  tomorrow.  Plenty of time to do closing tomorrow.

17       MR. DOSTART:  I would like to revise my estimate.

18  Make it an hour to 15 minutes to an hour and 30 minutes.

19       THE COURT:  Why did you suddenly double your

20  estimates?

21       MR. DOSTART:  I remembered something that we were

22  going to show the Court, that I'd excluded from my estimate.

23       THE COURT:  Well, please, let's try to do the closings

24  tomorrow.

25       MR. DOSTART:  We will.

```
 1            THE COURT:  No.  The rate that we're going -- because
 2   Mr. Wohl has the opportunity to do redirect, the rate we're
 3   going we're not going to have the time.
 4        Tell you what we're going to do.  Whatever time with we
 5   have left over after the evidence, we're going to split it in
 6   half.  If it's 18 minutes per side, that's all you get for
 7   closing.  So if you want to save some time for closing
 8   tomorrow -- we don't even need to have closing.  I can do this
 9   off the findings and conclusions of law.  But if we have 42
10   minutes left, each gets 21 minutes for closing.
11        If you -- so what did I say each of you get, 45 minutes?
12            MR. WOHL:  I was going to ask, Your Honor, does it
13   work the other way, as well?
14            THE COURT:  No, it doesn't work.
15            MR. WOHL:  More than 90 minutes --
16            THE COURT:  It's capped at 45 per side.  But we're not
17   going to have that problem.  So if you want to eat into that
18   time, okay.  You can.  But we're going to -- we're going to
19   finish this tomorrow by 1:00 o'clock.
20        So if you want to spend that time on cross-examination --
21   and you're both just beating points to death and asking -- it's
22   okay to argue with an expert, but excessive arguing is too
23   much.
24        So I think you ought to shorten that hour and a half up
25   and try to get it down more like the 45 minutes.  But, in any
```

1   event, whatever -- if we wind up having, say, an hour total for

2   closings, that's grand.  But each side will, again, get 30

3   minutes then.

4        All right.

5           **MR. DOSTART:**  Understood.

6           **THE COURT:**  We're going to finish tomorrow.

7        All right.  See you then.

8           **MR. WOHL:**  Thank you, Your Honor.

9           **MR. DOSTART:**  Thank you, Your Honor.

10          **MR. ADKINS:**  Thank you, Your Honor.

11       (At 1:07 p.m. the proceedings were adjourned until

12   Tuesday, November 20, 2012, at 7:30 a.m.)

13                         -   -   -   -

14

15

16

17

18

19

20

21

22

23

24

25

1056

**I N D E X**

| DEFENDANT'S WITNESSES | PAGE | VOL. |
|---|---|---|
| FERNANDEZ, JEFFREY | | |
| (SWORN) | 854 | 5 |
| Direct Examination by Mr. Wohl | 855 | 5 |
| Cross Examination by Mr. Dostart | 1001 | 5 |

- - - - -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        E X H I B I T S

 2   TRIAL EXHIBITS                    IDEN   VOL.   EVID   VOL.

 3
     1 through 15                                    851    5
 4   37                                              851    5
     157 through 187                                 851    5
 5   189 through 191                                 851    5
     193                                             851    5
 6   213-14                                          930    5
     213-15                                          931    5
 7   213-27/29                                       934    5
     213-34 through 213-46                           945    5
 8   218                                             851    5
     218-B and 218-C                                 852    5
 9   244-3                                           977    5
     247                                             990    5
10   387 and 388                                     851    5

11                        - - - - -

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1

2

3                          **CERTIFICATE OF REPORTERS**

4            We, KATHERINE POWELL SULLIVAN and DEBRA L. PAS,

5   Official Reporters for the United States District Court,

6   Northern District of California, hereby certify that the

7   foregoing proceedings in C 11-2575 WHA, **Lisa Garvey vs. Kmart**

8   **Corporation,** were reported by us, certified shorthand

9   reporters, and were thereafter transcribed under our direction

10  into typewriting; that the foregoing is a full, complete and

11  true record of said proceedings at the time of filing.

12

13  DATE:   Monday, November 19, 2012

14

15

16  _____
       Katherine Powell Sullivan, CSR #5812, RPR, CRR
17                  U.S. Court Reporter

18

19  _____
         Debra L. Pas, CSR #11916, RMR CRR
20

21

22

23

24

25