Volume 6

Pages 1058 - 1219

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ALSUP

LISA GARVEY, individually and on      )
behalf of all others similarly        )
situated,                             )
                                      )
              Plaintiff,              )
                                      )
  VS.                                 )  No. C 11-2575 WHA
                                      )
KMART CORPORATION, and DOES 1         )
through 50 inclusive,                 )
                                      )  San Francisco, California
              Defendants.             )  Tuesday
_____       )  November 20, 2012


**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

**For Plaintiff:**          Righetti Glugoski, P.C.
                            456 Montgomery Street, Suite 1400
                            San Francisco, California 94101
                      By:  **Matthew Righetti, Esquire**
                           **Michael Righetti, Esquire**

                            McInerney & Jones
                            18124 Wedge Parkway, #503
                            Reno, Nevada 89511
                      By:  **Kevin J. McInerney, Esquire**


**Reported By:  Katherine Powell Sullivan, RPR, CRR, CSR #5812**
               **Debra L. Pas, RMR, CRR, CSR #11916**
               **Official Reporters - U.S. District Court**

*Katherine Powell Sullivan, CRR, and Debra L. Pas, CRR*
*Official Reporters - U.S. District Court*
*(415) 794-6659*

**APPEARANCES (CONTINUED)**:

**For Plaintiff:**               Dostart Clapp & Coveney LLP
                                 4370 La Jolla Village Drive, Suite 970
                                 San Diego, California 92122
                          By:    **Zachariah Paul Dostart, Esquire**

**For Defendants:**              Paul Hastings LLP
                                 55 Second Street, 24th Floor
                                 San Francisco, California  94105
                          By:    **Jeffrey D. Wohl, Esquire**

                                 Winston & Strawn
                                 333 South Grand Ave, 38th Floor
                                 Los Angeles, California  90071
                          By:    **Amanda C. Sommerfeld, Esquire**
                                 **Emily C. Schuman, Esquire**

                                 Winston and Strawn LLP
                                 101 California Street, Suite 3900
                                 San Francisco, California 94111
                          By:    **Robb Christopher Adkins, Esquire**
                                 **Joan B. Tucker Fife, Esquire**

PROCEEDINGS

```
1                    P R O C E E D I N G S
2   NOVEMBER 20, 2012                              7:33 a.m.
3             THE COURT:  Back on the record.  Anything I can help
4   you with before we get started?
5             MR. MATTHEW RIGHETTI:  We have a stipulation to move
6   what is Docket No. 199, a joint stipulation and order
7   concerning certain testimony into evidence as Exhibit 389.
8             THE COURT:  389 received in evidence, unless I hear an
9   objection.
10            MR. WOHL:  No objection, your Honor.
11            THE COURT:  Thank you.  All right.
12        (Trial Exhibit 389 received in evidence.  Later remarked
13   as Exhibit 390.)
14            MR. WOHL:  And then, your Honor, you asked yesterday
15   for a writing which specified those video clips by file numbers
16   so you could record them.  I have those.  They are under
17   Exhibits 218-E and G.  And with that, I would ask that those
18   exhibits be formerly moved into evidence.
19        (Document was tendered to the Court.)
20            THE COURT:  All right.  The Court will receive in
21   evidence those items that are identified in the two files that
22   you have just handed me, unless I hear an objection.
23            MR. DOSTART:  No objection, your Honor.
24            THE COURT:  No objection.  All right.
25        For the record, are called Defendant Kmart Corporation's
```

PROCEEDINGS                                    1061

1   List of Video Clips Utilized at Trial, Exhibit 218-E.  And the

2   other one is the same, but 218-G.  And they bear today's date.

3   I guess it's today's date, is that correct?  Yes.

4        All right.  So those are received in evidence.

5        (Trial Exhibits 218-E and 218-G received in evidence)

6             **MR. WOHL:**  Thank you, your Honor.

7             **THE COURT:**  Okay.  What else?

8             **MR. DOSTART:**  Nothing more from plaintiffs, your

9   Honor.

10            **THE COURT:**  All right.  Where is our witness?  There

11  he is.

12       Dr. Fernandez, you may resume the hot seat.  Welcome back.

13  Please have a seat.  Adjust the microphone so that you are

14  heard all over the courtroom.

15       Counsel, are you ready?

16            **MR. DOSTART:**  May I begin?

17            **THE COURT:**  Are you ready over there?

18            **MR. WOHL:**  Yes, your Honor.  Thank you.

19            **THE COURT:**  Please proceed.

20                      **JEFFREY FERNANDEZ**,

21  called as a witness for the Defendant herein, having been

22  previously sworn, resumed the stand and testified further as

23  follows:

24

25

1              **CROSS EXAMINATION RESUMED**

2    **BY MR. DOSTART:**

3    **Q.**   Dr. Fernandez, did you have any communications to or from

4    your attorneys since we left the courtroom or since you left

5    the witness stand yesterday?

6            **MR. WOHL:**   Objection, your Honor.   We're not his

7    attorneys, so this misstates the evidence.

8            **MR. DOSTART:**   Excuse me.

9    **BY MR. DOSTART:**

10   **Q.**   Did you have any communications to or from the attorneys

11   that are working for Kmart on this case since you left the

12   witness stand yesterday?

13   **A.**   No.

14   **Q.**   Did you have any communications with anyone who had

15   communications with the attorneys that are representing Kmart

16   in this case since you left the witness stand yesterday?

17   **A.**   No.

18   **Q.**   Dr. Fernandez, I would like to speak with you for a moment

19   about static posture.

20        On Page 140 of your book you begin Chapter 10, which is

21   entitled "General Workplace Design Principles."   And

22   Section 10.2 of that same page is entitled "General Guidelines

23   For Ergonomic Design of the Workplace."

24        Beneath that is a header entitled, "One," and it states

25   that -- it states:   "Aim at dynamic work.   Avoid static work."

```
 1        Do you remember that phrase?
 2   A.   Yes.
 3   Q.   That section states that:
 4            "Work should be dynamic in nature.  In other words,
 5             work should involve movement and the body should not
 6             be stationary or static for a significant period of
 7             time."
 8        Do you stand by that statement?
 9   A.   Yes.
10   Q.   It says:
11            "Static work is inefficient and accelerates the onset
12             of fatigue.  Static postures cause problems in the
13             muscles, joints and blood circulation."
14        Do you stand by that statement?
15   A.   Yes.
16   Q.   It then states that:  "Examples of static loading
17   include..."  And it has a list.
18        A, is when the work surface is too high.
19        B, is when the work surface is too low.
20        D, is when you're holding or carrying a load.
21        E, is holding or maintaining a part of the body in a
22   non-neutral awkward posture.
23        There is nothing further after E.
24        Now, C is:  Standing for extend the periods of time.
25        Do you agree, Dr. Fernandez, that standing for an extended
```

1  period of time is an example of static loading?

2  A.    Static without movement, yes.  Without movement.

3  Q.    And, Dr. Fernandez, do you -- so you to stand by the

4  statement that standing for an extended period of time is an

5  example of static loading?

6  A.    Sir, I said static work.  An example of static work is

7  standing for a -- an extended period of time, as I put on

8  there, without movement.

9  Q.    Does it say that in your book?

10  A.    It may not say that in the book, but that's what I train

11  my students that's what static means.  That's what I tell them.

12  Q.    Does that say that in your book?

13  A.    It does not.

14          MR. WOHL:  Objection.  Asked and answered.

15  BY MR. DOSTART:

16  Q.    Dr. Fernandez, do you agree that static work should be

17  avoided?

18  A.    Yes, yes.

19  Q.    Dr. Fernandez, are all the statements that we read from

20  your book today and yesterday truthful and accurate statements?

21  A.    Those are statements in the book and they are truthful, of

22  course.  That's --

23  Q.    Okay.

24  A.    (Continuing) -- what I --

25  Q.    I'm sorry.  Finish your answer.

```
 1        I want to make this easy on Ms. Sullivan [sic].  So were

 2   you finished with your answer?

 3   A.   No.

 4   Q.   Please finish your answer.

 5   A.   That's what I use to train students and if I'm not

 6   accurate, I'm going to get myself into trouble.

 7   Q.   Now, Dr. Fernandez, is it true that you would have been

 8   more careful about how you phrased things in your book if you

 9   knew that you were going to be testifying on behalf of Kmart in

10   this case?

11   A.   I will answer in the sense that if I knew this was going

12   to be read by attorneys, I would have been very careful how I

13   phrased it.

14        For engineers I have an opportunity to explain to them in

15   a class.  This is not an online course or something that you

16   read.  I teach them in a classroom.

17   Q.   Okay.  Dr. Fernandez, I'm going to read from your

18   deposition taken on Thursday, October 4th, 2012 in this case

19   from Page 45, Lines 16 through 25:

20           "QUESTION:  Do you believe that your book represents

21             an accurate statement of the ergonomic principles as

22             it relates to lifting items from a seated position?

23           "ANSWER:  My book is written for engineers.  My book

24             was not written for attorneys.  So it's a big

25             difference.  If I had to -- if I knew this was
```

 1                  coming, I would be more careful how I phrased things

 2                  in that book."

 3            "Ms. Sommerfeld:  You probably wouldn't right any

 4                  books, would you?"

 5       Dr. Fernandez, isn't it true that you probably wouldn't

 6  write any books if you knew you were going to be testifying on

 7  behalf of Kmart in this case?

 8  A.    I have published papers for the last 25 years.  I have

 9  written this book, the first edition of this book more than 15

10  years ago.

11  Q.    Okay.

12  A.    And this book, as a professor, is public -- publish or

13  perish.  There is no way that I would have not written the

14  book.

15  Q.    And you agree that your books are accurate and truthful?

16  A.    My books are accurate and truthful, yes.

17  Q.    And you teach from them?

18  A.    I teach from them, yes.

19  Q.    Now, you just mentioned it was the static movement that

20  you were referring to in Chapter 10 in Paragraph 10.2,

21  Subsection 1, Sub-header C, correct?

22            MR. WOHL:  Objection, your Honor.  Vague and

23  ambiguous.  Counsel referred to "static movement."  That is a

24  non-sequitur.

25

1  BY MR. DOSTART:

2  Q.    Standing for extended periods of time in a static posture,

3  is that what you were referring to in Chapter 10, Subsection

4  10.2, Subsection 1(C)?

5  A.    Yes.

6  Q.    And yesterday, Dr. Fernandez, you testified that cashiers'

7  blood would flow from their legs as a result of the muscle pump

8  from their movement, is that correct?

9  A.    Flow from their legs?

10 Q.    Flow from and to their legs?

11 A.    I -- I did not use those words, but I -- what I did say

12 was the muscle pump will assist the blood from the legs to the

13 upper -- to the heart.  That's what I did say.

14 Q.    And I want to be clear.  What would cause the muscle pump

15 to begin working?

16 A.    When you move -- every time you step, every step you take,

17 the muscle's pump helps the muscles contract and expand in the

18 calf and so on, and it moves upwards, the muscle.  The blood

19 moves upwards.

20       So every step you take is not static.  It's dynamic.  So

21 when I was talking about standing -- the example you gave of

22 "C," it's a static movement.  There is no movement involved.

23 Q.    Dr. Fernandez, what is required, in your opinion, to

24 alleviate the effects of prolonged standing?

25 A.    I think I've said some of that in my book.  There is

 1  movement.

 2  Q.    Okay.  I'm going to read from your book.  Chapter 9,

 3  Sub-header 9.7 is entitled "Standing Work."  And I'll read from

 4  it.

 5          MR. WOHL:  Excuse me, counsel.  Can you give me a page

 6  number?

 7          MR. DOSTART:  Page 137.  I apologize.

 8  BY MR. DOSTART:

 9  Q.    Page 137.

10          "Standing work is observed in industry.  However,

11           ergonomists need to be aware that the two limitations

12           for standing for prolonged periods are venous blood

13           pooling and fatigue in the legs and back."

14  And you stand by that statement, Dr. Fernandez?

15  A.    Yes.

16  Q.    (As read)

17          "Venous blood pooling of the lower extremities leads

18           to swelling of the legs, edema and varicose veins.

19           To reduce venous blood pooling, active standing or

20           moving is suggested."

21  Do you stand by that statement, Dr. Fernandez?

22  A.    Yes.

23  Q.    The very next sentence in your book reads:

24          "Active standing is walking for two to four minutes

25           every 15 minutes."

```
 1        Do you stand by that statement, Dr. Fernandez?

 2   A.   I've got a reference for that and that is Konz and

 3   Johnson -- or Konz, I'm sorry.  I shouldn't say Johnson.

 4   Dr. Konz, it was a reference of a particular book, article that

 5   he wrote.

 6   Q.   Dr. Fernandez, do you stand by the statement that active

 7   standing is walking for two to four minutes every 15 minutes?

 8   A.   I gave an example of active standing.

 9   Q.   But your book doesn't give any other examples, does it?

10   A.   It gives one example.

11   Q.   Okay.  Thank you.

12        In your opinion, Dr. Fernandez, do cashiers at Kmart walk

13   for two to four minutes every 15 minutes?

14   A.   What they are doing is moving.  They are not walking.

15   They are -- there is movement involved.

16   Q.   Thank you, Dr. Fernandez.

17        Now, Dr. Fernandez, you did visit the Tulare Kmart store,

18   correct?

19   A.   Yes, I did.

20   Q.   And you spent some time in the store and watched some

21   videos?

22   A.   I didn't watch the videos.  I spent time at the stores and

23   later on I watched videos, yes.

24   Q.   Okay.  Did you notice the fatigue mats in the store?

25   A.   Yes.
```

1  **Q.**   Did you notice the condition of the fatigue mats in the

2  store?

3  **A.**   When you say "condition," what do you mean, sir?

4  **Q.**   What I mean by "condition" is, did you notice that the

5  fatigue mats had holes that were worn in the middle of the

6  fatigue mats?

7  **A.**   I did not notice it.

8  **Q.**   Did anyone else that you were there with, one of your

9  associates or an employee, notice it?

10 **A.**   No.

11 **Q.**   Did anyone mention it to you?

12 **A.**   No.

13 **Q.**   When you said, "I did not notice it," was there anyone

14 else that noticed it?

15 **A.**   No.

16        **MR. WOHL:**  Objection.  Lacks foundation.

17        **THE COURT:**  Well, the -- he's testified to other

18 things that his team did and he relied on.  So if his team

19 reported that to him, he could testify to that.

20        **MR. WOHL:**  That's fine, your Honor.  It's just not the

21 way the question was phrased.

22        **THE COURT:**  So did anyone from your team report to you

23 that there were holes in the mats?

24        **THE WITNESS:**  No, sir.

25        **THE COURT:**  All right.  Go ahead.

1   **BY MR. DOSTART:**

2   **Q.**   Dr. Fernandez, do you believe that holes worn in the

3   middle of a fatigue mat could be evidence that a cashier is

4   standing in one spot?

5   **A.**   No.  What --

6   **Q.**   Dr. Fernandez --  I'm sorry.

7          **MR. WOHL:**  Excuse me, your Honor.  He's trying to

8   finish his response.

9          **THE COURT:**  Please finish.

10  **A.**   What it does, does state is the mat is worn out in that

11  particular place, it could be because a person is moving and

12  every time they step into it, they rub into it.  That's what

13  could happen.

14  **BY MR. DOSTART:**

15  **Q.**   Thank you.  Dr. Fernandez, did you notice in some of the

16  videos that Kmart showed the Court yesterday that there were

17  not fatigue mats underneath the cashier?

18  **A.**   It's possible.  The videos are the videos.  I did not set

19  up anything.  It was -- I set up the cameras.  My guy set up

20  the cameras and --

21          **THE COURT:**  The question is:  Did you notice one way

22  or the other whether any of the cashier stalls did not have a

23  mat?  Is that something you noticed or did not notice?  What

24  was your observation on that point?

25          **THE WITNESS:**  I noticed mats in some of the locations.

1    I'm not -- I cannot specifically say I saw it in all -- in all

2    the videos because I was not looking for the mat in all the

3    videos.

4         So if I'm shown a video with no mats, I would not be

5    surprised.

6    **BY MR. DOSTART:**

7    **Q.**   Okay.  I'm sorry.  I just want to be clear.

8         So were there instances yesterday, 24 hours ago in this

9    courtroom while you were watching videos shown to you by

10   counsel for Kmart, that you noticed that there were no fatigue

11   mats in the stall where the cashier was working?

12   **A.**   I did not notice.

13   **Q.**   Okay.  Thank you.

14        Now, Dr. Fernandez, I want to speak with you a moment

15   about heavy items.  You've indicated that a heavy item is an

16   item that weighs more than 10 pounds, correct?

17   **A.**   Yes.

18   **Q.**   Yesterday you testified that a heavy item was present on

19   average approximately once every 17 minutes during your study,

20   correct?

21        **MR. WOHL:**  Objection, your Honor.  Misstates the

22   testimony.

23   **A.**   You're asking me to --

24        **THE COURT:**  Well, I don't know.  Okay.  Repeat begin,

25   if you remember, what it is that you said yesterday on this

FERNANDEZ - CROSS EXAMINATION / DOSTART                      1073

 1  point?

 2       And remember, now, yesterday that you said you made a

 3  mistake about an item versus a percentage of time and so forth.

 4  So be precise and accurate on whatever this is.

 5            THE WITNESS:  Yes, sir.

 6       Did you say heavy items present?  Heavy items -- the

 7  number of heavy items that -- there are two numbers out here.

 8  Number of --

 9  BY MR. DOSTART:

10  Q.   I said present.

11  A.   Number of heavy items present is .19 -- sorry.  3.47.

12            THE COURT:  What is that?

13            THE WITNESS:  Number of heavy items present.

14            THE COURT:  Per what?

15            THE WITNESS:  Per hour, sorry.

16            THE COURT:  Per hour?

17            THE WITNESS:  Yes, sir.

18            THE COURT:  Three point what?

19            THE WITNESS:  Four seven.

20            THE COURT:  Does that translate to 17 minutes?  Is

21  that what we decided yesterday?

22            MR. DOSTART:  It is, your Honor.

23            THE COURT:  All right.  So do you agree that counsel

24  stated it correctly?

25            THE WITNESS:  Yes.

```
 1              THE COURT:  All right.  Let's move on.

 2              MR. DOSTART:  Thank you, your Honor.

 3   BY MR. DOSTART:

 4   Q.   And yesterday, Dr. Fernandez, do you remember the Court

 5   noting that heavy items were present only once every 17

 6   minutes, but were lifted once every 10 minutes on average?

 7   A.   Yes.

 8   Q.   Okay.  And you explained that the reason for that seeming

 9   disconnect is that you calculated the weight, the aggregate

10   weight of items that weigh less than 10 pounds placed into a

11   customer's bag and then characterized that bag as a heavy item,

12   correct?

13   A.   Yes.

14   Q.   Now, Dr. Fernandez, isn't it possible that cashiers could

15   be trained to not place too many items into one particular bag?

16   A.   Yes.

17   Q.   And you do believe that training for cashiers would be

18   beneficial, correct?

19   A.   Yes.  If --

20   Q.   Yes?

21   A.   If you notice the videos yesterday, some of them did not

22   do it.  The way they bagged -- there were different ways of

23   bagging.  Some of them would open the bag and then put one item

24   at a time.  Some of them would go ahead and put a whole lot of

25   items at a time.  It all -- they differed.
```

FERNANDEZ - CROSS EXAMINATION / DOSTART                    1075

1  **Q.**   And you agree that one of the reasons for training

2  employees is to make them aware of risks and to reduce the risk

3  of injury, correct?

4  **A.**   Training helps, yes.

5  **Q.**   And you agree -- and you, in fact -- strike that.

6       You have trained employees yourself, correct?

7  **A.**   Yes.

8  **Q.**   And the reason why you train employees, once again, is to

9  reduce risk, to reduce awkward postures, and to have the

10 employees perform from a better ergonomic perspective, correct?

11      (Brief pause.)

12 **Q.**   Is that correct, Dr. Fernandez?

13 **A.**   I'm trying to figure out if that's -- that's the global

14 objective of the ergonomic training that we perform and, yes,

15 that would be one of the major ones, yes.

16 **Q.**   Okay.  Furthermore, you do recommend that Kmart train its

17 cashiers to reduce the risk of injuries, correct?

18 **A.**   That would not be the first mode of attack, but, yes, that

19 would be a mode of attack.  You would engineer the problem out

20 first.  That's what engineers -- that's what ergonomists do.

21      First you design it so that you don't -- you try to get

22 the hazard out.  If you leave the hazard out there and leave it

23 for the employee to take care of it, then you're leaving the

24 employee at risk.

25 **Q.**   Doctor, do you have an opinion one way or the over about

```
 1  how often cashiers will perform tasks in a seated position

 2  which they should be performing while standing?

 3  A.   I -- I do not know, but based on experience, there are

 4  times when they should not be doing something and they do it.

 5  Q.   I want to talk for a moment now, Dr. Fernandez, about your

 6  criticisms of Dr. Johnson's opinions.

 7  A.   Okay.

 8  Q.   First, you say that a seat would not fit in the current

 9  work station, correct?

10  A.   Yes.

11  Q.   Okay.  But you have no opinion on whether or not the work

12  station could be modified so that a seat would fit, is that

13  correct?

14  A.   This...

15       (Brief pause.)

16  Q.   I'll ask the question again, if you would like me to.

17  A.   The seat cannot fit under the work station.  It does not

18  matter what the work station looks like.  You cannot go

19  completely under the seat.

20  Q.   You cannot go completely under the seat.  I'm slightly

21  confused by that answer.  Would you please clarify your answer?

22  A.   An ergonomically designed seat has a back rest.

23  Q.   Okay.  Let me ask that question again, Dr. Fernandez.  I

24  think we're not tracking each other.

25       My question was:  Dr. Fernandez, you have no opinion on
```

 1  whether the work station could be modified so that a seat would

 2  fit.  Is that true, that you have no opinion whether the work

 3  station could be modified so that a seat would fit?

 4  A.   I'm not trying to avoid your answer.  I'm just a bit

 5  confused of the question.

 6       So could you rephrase it, please?  Because the seat part

 7  of it is just throwing me off.

 8  Q.   Okay.  I'm going to read from your deposition transcript

 9  in this case taken on Thursday, October 4th, 2012 from

10  Page 138, Lines 5 to 11.

11            "QUESTION:  No.  We're talking about the existing work

12                station.  Do you have an opinion whether there could

13                be modifications that you could make to the existing

14                work station that would allow a seat to fit?

15       Objection, lacks foundation, incomplete hypothetical.

16            "ANSWER:  That's not what I looked at.  Modifications,

17                I did not look at the modifications.  I have not

18                thought this through."

19       Do you stand by that statement?

20  A.   About modifications?  Yes.  I've not -- I've not thought

21  it through and that's what I mentioned to, your Honor

22  yesterday.

23  Q.   Okay.  And so is it true that you have not considered any

24  possible modifications to the Tulare work station?

25  A.   I have not.

1  Q.   Next you criticized Dr. Johnson because you say a seated

2  cashier wouldn't have enough leg room, is that true?

3  A.   Yes.

4  Q.   But you agree that if the shelves and other items

5  underneath the counter were removed, that there would be enough

6  leg room, is that correct?

7  A.   There could be leg room and there could not at all,

8  depends on the design.

9  Q.   Okay.  I'm going to read from your deposition taken on the

10  same day, October 4th, 2012, from Page 138, Line 20 to 139,

11  Line 3.

12          "QUESTION:  And you would agree that you could provide

13           for enough leg room if you removed the shelves

14           underneath the counter?

15          "Objection.  Overbroad.  Lacks foundation, incomplete

16           hypothetical."

17          "ANSWER:  If you remove the shelves and all the

18           machinery and whatever paraphernalia that you would

19           have under the shelves, under the counter, you would

20           possibly get enough of high clearance."

21  A.   I stand by that.

22  Q.   Thank you, Dr. Fernandez.

23      Next, Dr. Fernandez, you say that if cashiers performed

24  their job from a seated position, that they might move their

25  neck and shoulders more, is that correct?

FERNANDEZ - CROSS EXAMINATION / DOSTART          1079

1  **A.**   The shoulders for sure.

2  **Q.**   But you have no idea whether this additional movement

3  would be harmful, do you?

4  **A.**    It would increase the number of shoulder movements,

5  increase -- it would be below the trigger, which ergonomists

6  don't have -- when I say "trigger," what is the limit.

7       But if the numbers increase, if the numbers increase, it

8  will increase the risk.

9  **Q.**   Okay.  But you have no idea whether this additional

10  movement would be harmful, do you?

11  **A.**   As I mentioned, I said that it will increase the risk.

12  **Q.**   Okay.  But it may not be harmful?

13  **A.**   It might.  It might not be.

14  **Q.**   And you've done no studies in this case to find out

15  whether the neck and shoulder movement of a seated cashier

16  would rise to a harmful level, have you?

17  **A.**   I've done no study in this particular situation, no.

18  **Q.**   And it's true that ergonomists do do studies in order to

19  find out whether neck and shoulder movements are or are not

20  harmful, isn't it true?

21  **A.**   Yes, we do studies.  We need mock-ups and that's what we

22  do, yes.

23  **Q.**   But you did not do one in this case, did you?

24  **A.**   I did not, no.

25  **Q.**   But you could have, couldn't you?

1  **A.**    If I knew what the modifications were, I could.

2  **Q.**    Next you say that:

3           "A seated cashier would perform more extended reaches

4            than a standing cashier."

5      Correct?

6  **A.**    Yes.

7  **Q.**    But you can't quantify how many more extended reaches a

8  seated cashier would make versus a standing cashier, correct?

9  **A.**    I cannot quantify, but it would increase the extended

10 reaches.  It would increase the biomechanical forces and

11 movements and it would increase the risk.

12 **Q.**    But you can't quantify that, correct?

13 **A.**    An increased risk.  I cannot quantify it.  I can tell you

14 it's increased.

15 **Q.**    And you have no idea whether the number of reaches a

16 seated cashier would make would be harmful to that seated

17 cashier, correct?

18 **A.**    It would be harmful to some of them and it will not be

19 harmful to others because they have not reached that limit,

20 that trigger point for them.

21 **Q.**    But you don't know whether it would be harmful?

22        **MR. WOHL:**  Objection, your Honor.  Asked and answered.

23 **A.**    Sir, there is no ergonomist who is going to give you a

24 number and says:  This person will break with this -- with this

25 risk factor.

1   **BY MR. DOSTART:**

2   **Q.**   Okay.  But you do agree that if Kmart installed a conveyor

3   belt at each cash register -- at each cash register station in

4   Tulare, that that would reduce the number of extended reaches,

5   correct?

6   **A.**   It would reduce the number of extended reaches.

7   **Q.**   Next, Dr. Fernandez, you say that:

8           "A seated cashier can't reach as far as a standing

9            cashier."

10   Correct?

11  **A.**   Yes.

12  **Q.**   But isn't it true, Dr. Fernandez, that in your book you

13  say that the maximum reach distance for a seated female

14  employee is 23.5 inches?

15  **A.**   Yes.  That's the maximum work area, yes.

16  **Q.**   And the maximum reach distance for seated male employees

17  is 26.5 inches, is that correct?

18  **A.**   That's right.

19  **Q.**   And then, according to your September 6th, 2012 report, on

20  Page 10, Label c -- which we also have now on Exhibit 216-A --

21  the reach from across the counter, from where the cashier is to

22  where the customer is, is 23 inches, correct?

23  **A.**   Is 23 inches.

24  **Q.**   Which is less than the maximum reach for a seated female

25  or a seated male employee, correct?

1  **A.**   That's right, but that's --

2  **Q.**   Finally -- I'm sorry.

3  **A.**   But that's not the way ergonomists design.

4  **Q.**   Okay.

5  **A.**   That's the difference.  The difference here is that you're

6  using -- if you read further on in my book, it says very

7  clearly:  Design within the normal working area.

8  **Q.**   Dr. Fernandez -- I'm sorry.  Go ahead.

9  **A.**   And normal working area is not the 23 for the females and

10 not 26 for the males.  And so if they are going to reach out,

11 it's going to cause problems.

12      And -- and that's one of the reasons why I teach in a

13 classroom and not just give this book out to cause problems.

14 **Q.**   Finally, Dr. Fernandez, you say that there would be a risk

15 that the cashier would trip getting on and off a seat, is that

16 true?

17 **A.**   Yes.

18 **Q.**   You understand that Dr. Johnson is recommending a seat

19 that is approximately 24 to 28 inches high, is that true?

20 **A.**   Yes.

21 **Q.**   And a regular seat is approximately 21 to 22 inches high,

22 is that true?

23 **A.**   No, that's not true.  It goes all the way down to 19

24 sometimes.

25 **Q.**   Okay.  I'm going to read from Page 129 of the same

1    deposition, October 4, 2012, Lines 19 through 24.

2              "QUESTION:  All right.  In the next section of your

3              report you talk about the consequences of introducing

4              a high seat.  What do you mean by a "high seat"?

5              "ANSWER:  A high seat, anything that's more than

6              21 inches, 22 inches.  A regular seat is about 21 or

7              22 inches max.  Beyond that is a high seat."

8         Do you stand by that statement?

9    A.   21, 22 max, I said.  I didn't give you a lower number.

10   Q.   "A regular seat is about 21 or 22 inches."

11        Do you stand by that statement?

12   A.   Yes, I do.

13   Q.   Okay.  So the seat that Dr. Johnson is proposing is only

14   three to seven inches taller than a regular seat, is that

15   correct?

16   A.   Depending on who's using it.  Depending on who's using it.

17   Q.   Well, my question, Dr. Fernandez, is:  Is the seat that

18   Dr. Johnson is proposing approximately three to seven inches

19   taller than a regular seat?

20   A.   If you're talking about the seat in isolation, the answer

21   is yes.

22   Q.   Thank you.

23        And you are not aware of any ergonomic studies that say

24   that higher seats are more unstable than lower seats, are you?

25   A.   There are studies that say that high stools are unstable

1  that have back rests.  And that's what Kroemer said.

2      But if you're asking me about high seats, there is no

3  studies that have been done.  But one does note that as the

4  weight increases higher on, the stability, the center of mass

5  is going to increase.  When center of mass gets higher, the

6  chances of it toppling over is small.

7  **Q.**   So your testimony here today is that there are studies

8  that indicate that high stools are unstable?

9  **A.**   Mentioned Kroemer, and that's what you asked me in the

10  depo as well.

11  **Q.**   I'm going to read from Page 148 of your deposition

12  transcript taken on October 4th, 2012 from Lines 14 through 16:

13          **"QUESTION:**  Are you aware of any studies that have

14           been done about high stools being unstable?

15          **"ANSWER:**  No."

16      Dr. Johnson, isn't it true that you have --

17          **THE COURT:**  Wait, wait.

18          **MR. DOSTART:**  Excuse me.  Dr. Fernandez.

19          **THE COURT:**  Correct.

20          **MR. DOSTART:**  So I have his name right next to it.

21  **BY MR. DOSTART:**

22  **Q.**   Dr. Fernandez, is it true that you do not have a basis for

23  quantifying what the supposed risk is of tripping over this

24  seat?

25  **A.**   I do not have the -- I do not know how much the risk would

1  increase, yes.

2  Q.   Okay.  Now, you've mentioned this Lehman article.  Is it

3  true in the Lehman study her experiments only contain 10

4  participants?

5  A.   Yes.

6  Q.   And is it true that she compared the percent of maximum

7  voluntary contraction for seated versus standing cashiers?

8  A.   Yes.

9  Q.   Is it true take maximum voluntary contraction is a measure

10  of exertion of the muscle?

11  A.   Yes.

12  Q.   Is it true that Lehman found that for both seated and

13  standing cashiers, the maximum voluntary contraction was less

14  than 15 percent?

15  A.   Yes.

16  Q.   And isn't it true that your own book states that:

17         "When maximum voluntary contraction is less than

18          15 percent, that it's not harmful."

19  A.   Yes.  It's based on her study, yes.

20  Q.   And isn't it true that Lehman did not find that the

21  maximum voluntary contraction from seated cashiers was at a

22  harmful level?

23  A.   Based on her study, yes.

24  Q.   And isn't it true that Lehman also found that the

25  cashiers, the majority of the cashiers in that study preferred

1  being seated to standing?

2  **A.**    She did say that and then later on in the article itself

3  she went ahead and said she was not quite sure what would

4  happen if they knew the risk --

5  **Q.**    Okay.  And --

6  **A.**    (Continuing) -- was higher for the upper extremities and

7  if they knew that, what would have happened.  That's what

8  Lehman said in that article.

9  **Q.**    Wasn't the focus of the article a maximum voluntary

10  contraction?

11  **A.**    No, it was not.  It was a comparison.  That's just one of

12  the comparisons.  You're picking up just one, sir.

13  **Q.**    Okay.  I'm going to go to the Yates article.  You cited

14  the Yates article for the proposition that lifting while

15  sitting is more harmful than lifting while standing, correct?

16  **A.**    That's right.

17  **Q.**    Now, in the Yates study do you remember what weight the

18  participants were lifting?

19  **A.**    Thirty-five pounds.

20  **Q.**    Do you have any idea what percentage of products at Kmart

21  weigh more than 35 pounds?

22  **A.**    Very few.

23  **Q.**    In any event, don't you agree that a cashier faced with a

24  35-pound item could use the hand scanner to scan it?

25  **A.**    They could.  We saw -- we saw in some videos yesterday

FERNANDEZ - CROSS EXAMINATION / DOSTART                    1087

 1  that some of them preferred doing it in a particular way.

 2  Others did it in another way.

 3  Q.   As an expert ergonomist, Dr. Fernandez, do you agree that

 4  it's important for you to review all relevant articles before

 5  you reach your opinions?

 6  A.   I try to read as many articles as I can that are relevant.

 7  Q.   Is it true that you were the editor of the "International

 8  Journal of Industrial Ergonomics"?

 9  A.   Yes.

10  Q.   Isn't it true that while you were an editor of that

11  journal, an article was published by Dr. Shinnar?

12  A.   Yes.

13  Q.   Isn't it true that the article was entitled "Survey of

14  Ergonomic Features of Supermarket Cash Registers"?

15  A.   Yes.

16  Q.   Are you aware that Dr. Shinnar's finding was that, and I

17  quote:

18          "Work stations should ideally accommodate both the

19           sitting and standing positions as sitting and

20           standing imposes stresses on different muscles.  An

21           adjustable sit/stand seat would allow the cashier to

22           alternate positions and relax the alternate muscle

23           group."

24      Are you aware that's his finding?

25  A.   Yes.  His sit/stand is not an alternative between sitting

1    or standing.  His is a high stool.  That's what he's

2    recommending.

3    Q.    Similar to what Dr. Johnson is recommending?

4    A.    No.

5    Q.    Dr. Fernandez, why did you not consider that article when

6    rendering your opinions in this case?

7    A.    He has said, use a sit/stand.  He's talking about the

8    ideal situation again.

9    Q.    I would like to ask that question again.

10         Dr. Fernandez, why did you not consider that article which

11   was published in a journal of which you were the editor when

12   you were issuing your opinions in this case?

13   A.    I did not consider it because it was, one, a grocery

14   store.  The tasks were different.  It was based on whether it

15   met OSHA requirement or not.  That's what it was.

16   Q.    Okay.

17   A.    And in the end he did say alternate between sitting and

18   standing.  That's not very different from all the others.

19         He's basing his opinions, rightfully so, on the

20   constraints of what he's looking at.  I'm basing my opinions --

21   I did a literature review.  I'm basing my opinions on the

22   constraints, what the tasks are being performed here.

23   Q.    Dr. Fernandez, I'm going to ask you about another article

24   that was published in the "International Journal of Health

25   Services," volume 35, No. 4, pages 745 through 763.  And it is

```
 1  by a Dr. Karen Messing.  And the title of the article is:
 2  "Standing still:  Why North American Workers Are Not Insisting
 3  On Seats Despite Known Health Benefits."
 4       Dr. Fernandez, did you consider this article when issuing
 5  your opinions in this case?
 6  A.   I did not.
 7  Q.   Why not?
 8  A.   I have not come across that article.
 9  Q.   Dr. Fernandez, I'm going to ask you about another article.
10  This is an article that was published in "Applied Ergonomics."
11       Do you agree that "Applied Ergonomics" is a treatise or a
12  publication that's authoritative in your field?
13  A.   Yes.
14  Q.   This is an article -- this is an article published by
15  Dr. Spielholz, S-p-i-e-l-h-o-l-z, and it's in "Applied
16  Ergonomics," Volume 39 in 2008.  It's entitled:  "Field
17  Evaluation of a New Grocery Check Stand Design."
18       Did you consider this article when you were issuing your
19  opinions in this case?
20  A.   Sir, I was not looking at grocery stores because their
21  constraints are different.  The tasks are different.
22       I was looking in general about sitting and standing and
23  when you're looking in general about sitting and standing,
24  you're looking at the task being performed.  That's what I
25  looked at.
```

1        And there are many articles out there.  There are articles

2   on grocery stores that are not -- that are not comparable.  I

3   was looking at general articles.

4   **Q.**   I'm going to ask you about another article published in

5   "Ergonomics."  Is "Ergonomics" an authoritative publication in

6   your field?

7   **A.**   Yes.

8   **Q.**   This article was published in 1989, Volume 32, No. 4,

9   Pages 359 through 371.  It's published by Dr. Anthony Ryan.

10  It's entitled, "The Prevalence of Musculoskeletal Symptoms in

11  Supermarket Workers."

12       Are you familiar with this article?

13  **A.**   You asked me about it yesterday.

14  **Q.**   And did you consider this article when rendering your

15  opinions in this case?

16  **A.**   I reviewed the article now, but when I was -- when I wrote

17  my report, no.

18  **Q.**   Okay.  I'm going to ask you about another article

19  published in the "Journal of Work Environmental and Health" in

20  1992 --

21       **THE COURT:**  Let's just be clear.  None of these

22  articles are in evidence.  You haven't moved them into

23  evidence.  I'm not certain they could even be received in

24  evidence.

25       But just in case you have a different view of it, I want

1  to make sure, what -- why are we even going through these

2  articles?

3       **MR. DOSTART:**  Your Honor, I agree with your Honor.

4  I'm not going to try to move these into evidence.

5    I want to confirm -- a lot of these articles were shown to

6  Dr. Fernandez three times and I want to make sure that at his

7  first deposition when -- in the Rite Aid case, he didn't

8  consider them.  And then he was asked again if he considered

9  many of these articles in his first deposition in this case.

10 And then he was asked again if he considered them in his second

11 deposition in this case and he never considered them.  And in

12 fact --

13      **THE COURT:**  You haven't gone through that drill, Rite

14 Aid, the other -- that sequence.  How are you going to prove

15 any of that up?

16      **MR. DOSTART:**  I have his deposition transcripts, your

17 Honor.

18      **THE COURT:**  You're going to read that in or something?

19 I mean, you just can't wait -- if you're going to do that, I

20 guess you could try that.

21    But here is the thing.  You can't wait until the record is

22 closed and say:  Oh, judge, I forgot to put the Rite Aid part

23 in where he was asked about it.

24    You see the point?

25      **MR. DOSTART:**  I do, your Honor.

1          **THE COURT:**  You haven't proved up -- you've explained

2    the way you want to try to use it, but none of that's been

3    proven for any of these articles.

4          You haven't gone back to the Rite Aid deposition and

5    said -- read that question and so forth.

6          So I just bring this to your attention to deal with it in

7    the way that you wish, but I don't want there to be some

8    misapprehension as to what comes in or does not come into

9    evidence.

10         So enough said by me.  You proceed as you wish.

11         **MR. DOSTART:**  Thank you, your Honor.

12   **BY MR. DOSTART:**

13   **Q.**   Dr. Fernandez, were you presented the article by Dr. Ryan

14   during your Rite Aid deposition?

15   **A.**   Yes.

16   **Q.**   And is it true that you did not consider it when issuing

17   your opinions in that case?

18   **A.**   Yes.

19   **Q.**   Is it true that you were presented this article again in

20   your Kmart deposition, in your first deposition in this case?

21   **A.**   Yes.

22   **Q.**   Is it true that you were presented with this article again

23   in your second deposition in this case?

24   **A.**   It was not presented.  We discussed it.

25   **Q.**   And have you considered this article?

1    A.    In my reports?  No.

2    Q.    Why not?

3    A.    Because the tasks are different, and I said that yesterday

4    as well.

5    Q.    In the "Journal of Work and Environmental Health," there

6    is an article by Dr. Tushsen, T-u-s-h-s-e-n, entitled "Standing

7    at Work and Varicose Veins."

8         Did you consider this article when issuing your opinions

9    in this case?

10   A.    No.

11   Q.    Dr. Fernandez, you have been to the Tulare Kmart store?

12   A.    Yes.

13   Q.    You've walked around the store?

14   A.    Yes.

15   Q.    You've walked around the aisles full of merchandise?

16   A.    Yes.

17   Q.    Would you agree that there are thousands of different

18   products sold at Kmart in Tulare?

19   A.    Yes.

20   Q.    Have you heard of T-Logs?

21   A.    T-Logs?

22   Q.    Yes.

23   A.    No.

24   Q.    Have you heard of T-Log extract data?

25   A.    No.

1  Q.   Have you heard of market-based reports?

2  A.   Yes.

3  Q.   What are those?

4  A.   Reports you obtained -- I've heard of them.  Have I ever

5  seen them?  Have I analyzed them?  The answer is no.

6  Q.   So Kmart did not provide any of that information to you?

7  A.   No.

8  Q.   Did Kmart provide any transaction level information to for

9  you to issue your reports in this case?

10  A.   No.

11  Q.   Okay.  I would like to turn to your September 6th report.

12  And we'll go to Table 3, which is on Page 12 of the report.

13       I forget the pagination as far as the Exhibit No. goes.

14            MR. WOHL:  I think it's Exhibit 213-14.

15  BY MR. DOSTART:

16  Q.   Exhibit 213-14.

17       And, Dr. Fernandez, my question is:  If you go to the row

18  entitled "Heavy Items Present" as we discussed this morning, it

19  states that:

20            "There are present 3.47 times per hour on  average."

21       Correct?

22  A.   Yes.

23  Q.   And then beneath that is "Heavy Items Lifted."  And that

24  is 6.07 times per hour on average, is that correct?

25  A.   Yes.

1    Q.   And as we discussed this morning, the reason for the

2    seeming disconnect is because you added up the weights of items

3    placed in a customer's bag and then determined which items

4    weigh more than 10 pounds, is that correct -- excuse me, which

5    bags weigh more than 10 pounds?

6    A.   Yes.

7    Q.   Okay.  And the item weights that you took -- strike that.

8         And the item weights that you used in order to calculate

9    the total weight of a customer's bag, you took from the table

10   in your report that has the list of items and the list of item

11   weights, is that correct?

12   A.   That's right.

13   Q.   Let me find that table.  Do you remember which table it

14   is, Dr. Fernandez?  I had it marked.  Here it is.  It is

15   Appendix E-1.

16   A.   Yes, sir.

17   Q.   Which --

18   A.   I'm sorry.  Sorry.

19   Q.   It should be E-1, which is Page 29 of your report.

20   A.   Yes.

21   Q.   Okay.

22   A.   Appendix E.

23   Q.   Now, do you have any idea how many items are on that

24   chart?

25   A.   I don't.  How each of the transactions that were

1  performed, 537 transactions, whenever there was a heavy item,

2  it was identified and if there was a group of items we went and

3  identified it and it was all produced.

4  Q.    We're going to get into this in a lot of detail, so I want

5  to be very, very clear here.

6  A.    Okay.

7  Q.    This chart contains 72 items?

8  A.    Okay.

9  Q.    Were there any other charts that your associates or you

10  relied on for the weights of items that the cashiers scanned

11  during your video analysis of the Tulare store?

12  A.    I'm not aware.

13  Q.    Okay.  So you testified that there are thousands of

14  products at Kmart, correct?

15  A.    Right.

16  Q.    And Appendix E-1 contains 72 products, correct?

17  A.    If you're asking me, sir, that if -- are these the global

18  list that was used and whether -- you know, if you had -- if

19  you had jeans and you had seven pair of jeans and you put it in

20  a bag and whether it would weigh more than 10 pounds and

21  whether it was in this list, the answer most probably is going

22  to be no.

23  Q.    I don't understand that, but I want to.  So let's go piece

24  by piece.

25         What I want to understand is very specifically how you

1   trained your associates and how you personally, when watching

2   the video, were able to identify which product was being

3   purchased, how much it weighed, and in which bag it went?

4        And I want to know how you knew when those bags weigh more

5   than 10 pounds.

6        Please explain that to the Court.

7            MR. WOHL:  Objection, compound.  Misstated.

8            THE COURT:  Overruled.  Please answer.

9   A.   When were the bags -- each of the bags if they had

10  multiple items, we went ahead and identified what we estimated

11  were the items and the weights.

12  BY MR. DOSTART:

13  Q.   You estimated?

14  A.   Yes.

15  Q.   And how did you do that estimation?

16  A.   By look.  Whatever we could see.

17  Q.   Okay.

18  A.   And that is why it was documented.  If there was doubt,

19  somebody could go ahead and review it and disagree with items.

20  Q.   Where is that doubt expressed in your report?

21  A.   The doubt?

22            MR. WOHL:  Objection, your Honor.  Misstates the

23  evidence.  He didn't say he had doubt.

24            THE COURT:  What do you mean by "doubt"?

25            THE WITNESS:  If the opposing side or someone else

```
 1   disagreed with what we meant, there was doubt with our numbers,

 2   you could disagree with it.  That's what I meant by "doubt."

 3   Not doubt on our part.

 4          THE COURT:  All right.  Please continue.

 5   BY MR. DOSTART:

 6   Q.  Dr. Fernandez, let's be very careful here.

 7       Now, were you provided the same quality of video that's

 8   been shown to this Court, that's been provided to plaintiff's

 9   counsel?

10   A.  Yes.

11   Q.  Okay.  So what we're going to do now is we can start the

12   clip.  We're going to start a 15-minute clip.  And I would like

13   you to identify for me what item is being purchased and how

14   much it weighs, okay?

15   A.  I don't think I can do that because we did that in slow

16   motion.

17   Q.  I'm sorry?

18   A.  When yeah did that --

19   Q.  We'll run it in slow motion.

20   A.  We did that in slow motion, one.

21   Q.  We'll run it in slow motion.

22          MR. WOHL:  Your Honor, could Mr. Dostart please show a

23   little courtesy to the witness and allow him to answer before

24   he keeps --

25          THE COURT:  All right.  Finish the answer about slow
```

1    motion.

2    **A.**    I would like to see my data sheets as well.  I had data

3    sheets for each of these and you were provided those data

4    sheets.

5    **BY MR. DOSTART:**

6    **Q.**    We were not provided with data sheets?

7    **A.**    Yes, you were, sir.

8    **Q.**    That had weights of products?

9    **A.**    Basically, sir, in my deposition we walked you through and

10   you asked me -- you got them on CDs in my first deposition --

11   sorry, in the...

12        In my second deposition you got all these in CDs with all

13   the -- all you asked, the backup.  When you asked for

14   production, you asked for -- it was spreadsheets.

15   **Q.**    We're going to watch the data in slow motion, as you

16   indicated, so you can identify the weights of each product.

17        **MR. WOHL:**  Your Honor, I guess he can do whatever he

18   wants to do, but Dr. Fernandez has already explained the

19   methodology they used.  And I think to put him on the stand,

20   however slowly they are going to do it, is kind of a futile

21   exercise because, obviously, there was a lot of care taken in

22   looking and stopping and trying to figure out and so forth.

23        So this is not going to be illustrative of what the actual

24   video shows.

25        **MR. DOSTART:**  We would disagree very strongly with

1 that, your Honor.

2          **MR. WOHL:**  They are free, if they want, to make their

3 own proffer what the video shows.  That's fine, but to put him

4 through this exercise seems to me misleading.  It's --

5          **MR. DOSTART:**  It's not our video.

6          **MR. WOHL:**  Can I finish before you interrupt?

7      Unfair and misleading, your Honor.  It's not the

8 methodology was used.

9      Dr. Fernandez didn't just do this on the witness stand in

10 15 or 30 minutes.  They had a whole team looking at these

11 videos very carefully in slow motion.  This is an unfair

12 exercise and I object.

13          **THE COURT:**  Do you have here the crib sheets that he

14 had that were used, or whatever those documents were that were

15 used to help estimate the weights so he could do it on the fly

16 here?

17          **MR. DOSTART:**  Let me ask this to Dr. Fernandez.

18 **BY MR. DOSTART:**

19 **Q.**  Dr. Fernandez, the crib sheets that you provided us, isn't

20 it true that they did not contain the weights of products?

21 **A.**   It told you what the products were.

22 **Q.**  How did you get that information?

23 **A.**   Those were what we estimated those products were.

24 **Q.**  So it didn't tell you what the products were.  It told us

25 what you estimated the products were, is that correct?

 1   A.   That's right.

 2   Q.   And they were one of the 72 items listed on Appendix E-1,

 3   is that correct?

 4   A.   No.  I'm saying that you had a sheet for each transaction,

 5   for each 537 transactions.  You would -- you had each of those

 6   and it told you the number of foot movements.  It told you if

 7   they were weight lifted and what weights were lifted in each of

 8   those transactions.  And that was -- that was produced to you.

 9   Q.   Did you bring your file with you here today?

10   A.   No.

11   Q.   How did you estimate the weights of the products that were

12   being purchased?

13   A.   How did we estimate?  Partially from this list.

14   Partially -- pair of jeans.  If jeans was not on the list, we

15   estimated.  If there were four jeans or ten jeans.

16   Q.   That's my question to you:  How did you estimate it?  Did

17   you Google it?

18   A.   My guys Googled it.  They went ahead and weighed some of

19   it, yes.

20   Q.   Is that a scientific process, Dr. Fernandez?

21   A.   A scientific process is you collect information.

22   Q.   Couldn't you have asked Kmart for that information?

23   A.   They did not provide me with that information.

24   Q.   That wasn't my question, Dr. Fernandez.

25        Could you have asked Kmart to provide you with the weights

1   of the product that you were measuring?

2   **A.**    I could have.

3   **Q.**    Why didn't you?

4   **A.**    Because I was not aware that they had that kind of

5   information in that kind of detail.

6           **MR. DOSTART:**  With the Court's permission, your Honor,

7   we think it's very important to the credibility of this witness

8   if we show a tape and we have Dr. Fernandez, in his opinion,

9   estimate the weights of products and the weights of bags that

10  are being handed to the customers.  It's a fundamental

11  important issue in this case.

12          **MR. WOHL:**  Your Honor, again, what we're talking about

13  is we would have to put the video slow motion, even freeze

14  frame.  He would then have to make careful notes of everything

15  he saw.  He would then have to cross reference whatever chart

16  or document he has with weights, and that's simply not

17  necessary to put that witness through this for whatever point

18  they are trying to make.

19          **THE COURT:**  Mr. Wohl, this is cross-examination.  You

20  don't get to control what counsel does on cross.

21      But I say to Mister --

22          **MR. DOSTART:**  Dostart.

23          **THE COURT:**  (Continuing) -- Dostart, provide the

24  witness with the crib sheet that went with the segment you want

25  to show.  He says he gave that to you at the deposition.

```
 1        So you give him that, and I will let you do -- we'll at
 2   least try it and see how much time it takes.
 3             MR. DOSTART:  Which deposition was it, Dr. Fernandez?
 4             THE COURT:  How do I know?
 5             MR. DOSTART:  I'm sorry.  Dr. Fernandez.  I'm sorry,
 6   your Honor.  Sorry.
 7             THE COURT:  Go ahead.  Do you know what deposition you
 8   gave --
 9             THE WITNESS:  The second deposition I just produced to
10   you.  It was on CDs, on CDs.
11             THE COURT:  The document, the sheet that had the list
12   of what goods were involved was done on a CD or was it done in
13   hard copy?
14             THE WITNESS:  It was done, sir, on a spreadsheet and
15   copies of those spreadsheets were provided to you.
16             MR. DOSTART:  Okay.  Your Honor, here is the
17   fundamental issue.  We don't have copies of these spreadsheets
18   here in court today.
19             THE COURT:  Well, why -- he's saying he needs those in
20   order to do -- to be able to answer your question.
21             MR. MATTHEW RIGHETTI:  Your Honor, may I have a
22   second?
23             THE COURT:  Yes.
24             MR. MATTHEW RIGHETTI:  Thank you.
25        (Discussion held off the record amongst
```

```
 1        plaintiff's counsel.)

 2        MR. DOSTART:  We'll take this -- we'll make this a

 3   little bit easier.  Instead of having Dr. Fernandez testify to

 4   his estimate of the weights of the product, what we'll do is

 5   we're going to show the Court a 15-minute video clip, as

 6   requested last Friday, as Kmart did yesterday and we'll simply

 7   have Dr. Fernandez identify the product being purchased.

 8        That's the -- that has to be done.  That doesn't take a

 9   crib sheet.  That just takes eyes and the ability to see the

10   video.

11        So, and the testimony is that it's the same quality of

12   video that's been shown in court --

13        THE COURT:  Well, I will allow you to do this within

14   reason.  But what you're proposing to do is stop and start it

15   and that's going to take more than 15 minutes.

16        We'll go down this path for awhile until I feel we've

17   exhausted its utility.

18        MR. DOSTART:  Completely understood, your Honor.

19        THE COURT:  All right.  So you go ahead.

20        And it will be useful to this as an illustration so the

21   witness can more carefully explain the process that was used to

22   estimate these weights.  At a minimum it will be useful to do

23   that.

24        So the witness can talk while it's going, all right?

25        MR. DOSTART:  I prefer that the witness only respond
```

 1  to the questions that I ask.

 2          THE COURT:  Well, then -- or maybe that I ask.  All

 3  right.  So --

 4          MR. DOSTART:  Of course, your Honor.

 5          THE COURT:  So read into the record what we're about

 6  to see.

 7          MR. DOSTART:  We're going to be watching a video that

 8  was taken from the same day that Kmart showed video from last

 9  week, which is August 8th -- excuse me, August 7th, 2012 at

10  12:01 p.m., and we'll hit Play.

11          MR. WOHL:  They should recite the file number, as we

12  did, your Honor.

13          MR. DOSTART:  And the file number is 111_02_R.

14          MR. WOHL:  I think that's just the dates.

15          MR. DOSTART:  Okay.  And we're ready to hit Play.

16          THE WITNESS:  Just one second.

17          MR. WOHL:  I'm sorry.

18      (Brief pause.)

19          MR. DOSTART:  Okay.  Ready to hit Play, Dr. Fernandez.

20          MR. WOHL:  Give him a chance.

21          THE COURT:  Wait, wait, wait.  Do you have something

22  in your report that may tie into this segment that we're about

23  to see.

24          THE WITNESS:  I have -- I have something on here that

25  says, this is -- this is one of the AVI files you got.  This is

1   one of the 30 files?

2           MR. DOSTART:  Correct.

3           THE COURT:  Do you have something in your report that

4   bears on this segment?

5           THE WITNESS:  No, sir.  That's what I analyzed.  I

6   wasn't quite sure if this is one that I analyzed or not.

7           THE COURT:  Was it or not?

8           THE WITNESS:  It is.  It is.

9           THE COURT:  Is there anything in your report on this

10  segment?

11          THE WITNESS:  No, sir.

12          THE COURT:  All right.  So we -- for the record, we

13  have the angle view of a cashier assisting a customer, and

14  we're going to start rolling the tape, and we'll just roll the

15  tape til somebody asks a question.

16      So please start.

17          MR. WOHL:  Your Honor, why don't they show both views?

18          THE COURT:  Well, then we -- if we show both views,

19  then the scene is going to be so much smaller.  I don't see

20  how -- then it's harder to see what the object is.

21          MR. WOHL:  But the problem is with this angle view,

22  sometimes the cashier is blocking the view because the angle --

23  the camera is behind the cashier.  While if it's a bird's eye,

24  then it's straight down.

25      This is going to be an unfair exercise because this is not

```
 1   how his staff reviewed the --

 2           THE COURT:  Let's ask the question.  You're the one

 3   being put on the spot.  Would it be better for you to see the

 4   overhead view or the side view?

 5           THE WITNESS:  Both the views, sir.  That's how my team

 6   analyzed it and that's how I viewed it.

 7           THE COURT:  On the same screen?

 8           THE WITNESS:  On the same screen.

 9           THE COURT:  Can you do that, Mr. Dostart?

10           MR. DOSTART:  Unfortunately, we're not Winston Strawn

11   and Paul Hastings.  We don't have two IT people in the

12   courtroom that can do this for us.

13        We're happy, though, to only ask questions about products

14   that are in the main view of Dr. Fernandez on the big screen.

15        So I do agree with the Court's thought that if you put two

16   photos on the same screen, the products will be even smaller.

17   I think it might actually be more difficult to identify the

18   products, particularly if I agree not to ask about products

19   that are not in the plain view of Dr. Fernandez.

20           MR. WOHL:  But, your Honor, this just demonstrates

21   further the futility of this exercise.  What they are trying to

22   do, obviously, is get Dr. Fernandez to say something that

23   appears to be inaccurate or inconsistent with his report.

24        But the problem is they are not giving him a full and fair

25   opportunity to replicate exactly the inspection of these items
```

```
 1  as his team did.

 2       So this is a ridiculous exercise.  This is not in any way

 3  probative of anything.  This is a "gotcha" kind of exercise,

 4  your Honor, and it's not fair and I continue to object.

 5            MR. DOSTART:  Mr. Wohl is right.  Let's show the tape

 6  they showed yesterday, two screens and the whole nine yards.

 7  Whatever Mr. Wohl showed yesterday.

 8            THE COURT:  We'll do that then.

 9            MR. WOHL:  Fine.  So you pick which one you want.  The

10  15-minute one?

11            MR. DOSTART:  Yes, please.

12            MR. WOHL:  Your Honor, just so we're clear.  Before

13  they go in and showing their own 15-minute tape, this is the

14  15-minute tape --

15            MR. DOSTART:  That is not true.  We're not going to go

16  through the whole 15 minutes of this tape.  We're just going to

17  go through enough to make the point.  Then we're going to show

18  our own 15-minute tape.  There will be no stoping when we show

19  our 15-minute tape; no pausing, no stopping.

20            THE COURT:  So who has the one that was shown

21  yesterday?

22            MR. WOHL:  So we can reproduce the one that was showed

23  yesterday.

24       (Discussion held off the record amongst

25        counsel.)
```

1          THE COURT:  Why don't you just -- you have one that

2    was split screen that you can show.

3          MR. DOSTART:  There is one that's up, your Honor.

4          THE COURT:  All right.  Identify for the record what

5    it is.

6          MR. DOSTART:  This is a videotape taken on August 8th,

7    2012 shown by Kmart yesterday in the direct examination of Dr.

8    Fernandez, and it is at 2:29 p.m., and we can hit Play.

9          THE COURT:  Go ahead.  Start rolling it.

10         (Videotape played in open court.)

11   BY MR. DOSTART:

12   Q.  All right.  Dr. Fernandez, please identify the products

13   that are right now placed on the counter?

14   A.  I can't identify them the way it is at the moment.

15   Q.  Okay.  We'll wait until they are moved.

16   A.  We only identified them -- we all tried to identify them

17   when there were multiple.  And then we backed up, stopped and

18   worked our way backwards, if they were multiple.

19   Q.  Okay.  We'll only identify them when they are multiple.

20         THE COURT:  What is that thing that just --

21         THE WITNESS:  Those are rugs.  There are quite a few

22   rugs.

23   BY MR. DOSTART:

24   Q.  Okay.

25         (Video continues.)

```
 1   A.   Those are slippers.

 2   Q.   How much do those weigh?

 3   A.   Those weigh a few ounces.

 4   Q.   Okay.

 5   A.   There is some jars.  I'm not quite sure what that is.  My

 6   sight is not all that great.

 7        (Video continues.)

 8   A.   That's a bucket, which she's putting under, mop.

 9   Q.   What is that, Dr. Fernandez?

10   A.   I haven't -- I cannot figure out what that is.

11   Q.   Neither can I.

12        Let's see if she put more than one item into the bag.  If

13   so, I would like for you to estimate for me the weight of the

14   bag.

15        (Video continues.)

16   Q.   No.

17        Okay, Dr. Fernandez, now she's putting three items, four?

18   A.   Four.

19   Q.   And so what is the weight of that multiple item bag?

20   A.   Less than 10 pounds.

21   Q.   How do you know that?

22   A.   How do I know that?  It seems less than 10 pounds and

23   basically if you look in the --

24   Q.   Dr. Fernandez, you said you didn't know what the products

25   were that were being placed in it?
```

1  **A.**   They were small products.  Unless they are very heavy or

2  bulky --

3  **Q.**   So if it was a large --

4         **MR. WOHL:**  Please, please, please.  This is, like, the

5  fifth time he's interrupted the witness.  This is

6  unprofessional and unfair.

7     Could he please restrain himself and let Dr. Fernandez

8  testify?  This is not a brow-beating exercise as much as he

9  would like it to be.

10        **THE COURT:**  In between, please tell me what you were

11  trying to say.

12        **THE WITNESS:**  Sir, what I was trying to say is if it

13  were less than 10 pounds, if we estimated it less than

14  10 pounds, we didn't try to measure it, what the weight was.

15     If it was more than 10 pounds, we were trying to figure

16  out what it was.  And so far I've not seen 10 pounds.  I've

17  not.

18     Now I missed this one.

19        **THE COURT:**  Those were the rugs.

20        **THE WITNESS:**  Those were the rugs.

21  **A.**   The milk cans, you know, a gallon of something, of liquid,

22  that would surely be.

23     Now this is more than 10 pounds what she's lifting.

24        **THE COURT:**  What is it?

25        **THE WITNESS:**  This is soda.

1   **A.**    And for each of those entries, sir, we marked out:  It's

2   soda.  It's this.  It's this.  It's this.  We've told them what

3   it is.  We told whoever wants to see what it is.

4        (Video continues.)

5   **A.**    That is antifreeze, or that's more than a gallon.  It's a

6   gallon of some -- of some liquid.  And that's going to be,

7   again, more than 10 pounds.

8        (Video continues.)

9   **A.**   Those are multiple items, but those are certainly not

10  10 pounds.

11  **Q.**   Dr. Fernandez, a gallon of antifreeze weighs 9.33 pounds,

12  according to Google?

13  **A.**   According to Google, with the container?

14  **Q.**   Yes, totally.

15  **A.**   I said close to 10 pounds.  So if you're using 10 pounds

16  as the exact cut-off, no.

17       I mean, you looked at Dr. Johnson's cut-off as well in my

18  deposition.  You asked me, and I said close to nine or

19  ten pounds.  I said that in my deposition as well.  Different

20  makes are going to have slightly different weights.

21       (Video continues.)

22            **THE COURT:**  What is that?

23            **THE WITNESS:**  I'm not quite sure what that is.  That

24  seems like a large rug to me.

25            **THE COURT:**  A what?

1          THE WITNESS:  A rug.  That will be more than

2    10 pounds.

3          (Video continues.)

4          THE COURT:  All right.  I think we've reached the end

5    of the utility of this particular setting.

6          MR. DOSTART:  All right, your Honor.  We're happy to

7    move on.

8          THE COURT:  When are you going to show your 15-minute

9    segment?

10          MR. DOSTART:  We're happy to take a break right now,

11    your Honor.

12          THE COURT:  Let's do it now.

13          MR. DOSTART:  Okay.  We'll do it right now.

14          THE COURT:  This, for the record, for the reader, I'd

15    ask both sides to pick out a 15-minute segment uninterrupted

16    from all of these videos to help the judge get a feel for what

17    goes on at the cashier's stand and they have the freedom to

18    choose any 15-minute segment they wanted.

19       So I have already seen the Kmart version.  What is your

20    version?  Identify it for the record.

21          MR. DOSTART:  Yes, your Honor.  This is a clip taken

22    on August 8th -- excuse me.  I keep saying that.  August 7th,

23    2012, at 12:01 p.m..  And it is video No. 111_02_R.

24          THE COURT:  Great.  All right.  So, and I'll say to

25    the witness, if you see something there that is of enormous

1    importance you want to point out, then you just blurt it out.

2    If counsel wants to ask a question, ask the question.

3        Go ahead and do whatever you would like to do on it.  And

4    if the cross examining side wants to -- I'm sorry, not the

5    cross examining.  The Kmart side wants to come back to it, make

6    a note of what second it is so that you can tee it back up

7    later on when you come back to the lectern.

8        All right.  So otherwise the court reporter won't be

9    taking anything down.  So roll the tape, please.

10       (Videotape played in open court.)

11   **A.**   She reached out and adjusted the touch screen.  She's

12   reached out and touched the credit card machine.

13   **BY MR. DOSTART:**

14   **Q.**   Dr. Fernandez, how much does that bag weigh?

15   **A.**   Less than 10 pounds.

16   **Q.**   How do you know that?

17   **A.**   There's some clothes items in it.  Clothing items in it.

18   **Q.**   So if it -- if it's clothing items, it weighs less than

19   10 pounds?

20   **A.**   I did not say that, sir.  I said in this particular case

21   it's clothing items, a few clothing items.  If there were a

22   number of clothing items and they were heavy, I would have told

23   you.  And there were larger pieces in there.  Might be larger

24   pieces here.

25   **Q.**   How much does a pair of jeans weigh?

```
 1  A.   I don't know the exact -- if you like, I can find out what
 2  it weighs, but in my report it would say that in that -- in
 3  the --
 4  Q.   I'm sorry.  Your report says how much --
 5  A.   It's what's marked in the -- in the sheets.
 6       Extended reaches.  She's returning the money and the
 7  receipt to the customer.
 8       (Video continues.)
 9  A.   She's reaching out to the credit card machine again.
10            THE COURT:  What is she doing there?
11            THE WITNESS:  Basically the customer sometimes are
12  requested to perform a survey; sometimes they do, sometimes
13  they don't.  So if they don't, she goes ahead and just cancels
14  it.  She so reaches out and she cancels it.  That's what she
15  does.
16            THE COURT:  She reaches out and does what?
17            THE WITNESS:  She cancels out the survey.  Says no, I
18  don't --
19            THE COURT:  Oh, the survey.
20            THE WITNESS:  The survey, yeah.
21       (Video continues.)
22  A.   She's explaining to the customer what these items are and
23  the cost.  Something of that nature.
24            THE COURT:  Does the survey on the credit card reader
25  occur before or after the transaction is finalized?
```

FERNANDEZ - CROSS EXAMINATION / DOSTART

1        **THE WITNESS:**  Sometimes, it seems it occurs closer to

2   the end.

3        **THE COURT:**  You're guessing now.  I don't want you to

4   guess.

5        **THE WITNESS:**  No, sir.

6      The top view sometimes gives you, shows you the change in

7   the screen of the survey -- of that credit card machine.

8   **BY MR. DOSTART:**

9   **Q.**   In your estimate, Dr. Fernandez, does that bag weigh more

10  or less than 10 pounds?

11  **A.**   These are six or seven items.  I'm not quite sure how many

12  items there were.

13  **Q.**   Do you have an estimate of --

14  **A.**   At this point I don't.  I don't have my cheat sheet.

15  **Q.**   Do you know which items were placed in that bag?

16  **A.**   I would have to go back and forth, back and forth to

17  figure it out.  That's what they would have to do as well.

18      She's reaching out to both the coupon and the register.

19      (Video continues.)

20  **Q.**   What is being placed in that bag, Dr. Fernandez?

21  **A.**   One seemed like jeans, one seemed like some sweats, but I

22  can't see it too clearly with one view.  Sometimes the top view

23  gives us a better view.  Sometimes the side view gives you the

24  better view.

25  **Q.**   Can you estimate for us the weight of that bag?

1   **A.**   It's less than 10.

2          (Video continues.)

3   **A.**   While she's doing all of this, she's moving around.

4          (Video continues.)

5   **A.**   She's reaching out again.  Back flexion.  Reaching out

6   forward.  Lateral movements.

7          (Video continues.)

8   **A.**   She's reaching out again and helping the customer with the

9   credit card machine.  Steps up, picks up the coupon.

10          (Video continues.)

11  **A.**   Bending down to bag the item.  Back twist.  She's reaching

12  out and continuing her reach.  Twist her neck.  Leans forward.

13          (Video continues.)

14          **THE COURT:**  When the cashier is reaching out just like

15  she did a moment ago, what is she reaching for?

16          **THE WITNESS:**  She's reaching out for the touch screen.

17          **THE COURT:**  Right there?

18          **THE WITNESS:**  Yeah, touch screen.

19          **THE COURT:**  What's on the touch screen?

20          **THE WITNESS:**  Instead of the keyboard, she can operate

21  some of the things on the touch screen.

22          **THE COURT:**  Like -- like if it was a grocery store,

23  punch the banana square so bananas would be registered; is that

24  the kind of thing in there?

25          **THE WITNESS:**  I don't think it's that kind of detail.

FERNANDEZ - CROSS EXAMINATION / DOSTART                    1118

1    I think most of it is scanning on here.

2        If she was to register, she enters it on the key pad.  She

3    doesn't use the touch screen as much though.

4        (Video continues.)

5    **Q.**   What does the cashier appear to be doing now, Dr.

6    Fernandez?

7    **A.**   Counting the money and putting -- possibly putting away

8    the coupons and a bunch of other things.

9        I don't have a top view that would -- these are the

10   statements, the receipts.  She's reconciling some stuff here.

11   She's bending down.

12       You started at 12 -- what sometime did you start?  12:00?

13   **Q.**   Slightly after 12:00.

14   **A.**   The counter says you have been running for 17 minutes,

15   sir.

16            **MR. DOSTART:**  Okay.

17            **THE COURT:**  All right.  Thank you.

18            **MR. DOSTART:**  I have a few more questions, your Honor.

19   Should we take our break now?

20            **THE COURT:**  Let's finish.  I want to go all the way to

21   at least 9:15.

22       Remember, whatever -- I think we should be bringing this

23   to a close so we'll leave time for closing arguments, but

24   whatever time -- we're going to limit the time for closing if

25   need be.

```
 1              MR. DOSTART:  Yes, your Honor.  Of course, your Honor.
 2   BY MR. DOSTART:
 3   Q.   Dr. Fernandez, how you would define the word "repetitive"?
 4   A.   Repetitive?
 5   Q.   Yes.
 6   A.   Done on a regular basis, but when you go ahead and use the
 7   word repetitive in -- Barbara Silverstein who has done quite a
 8   bit of work.  I think she has one every two minutes -- one
 9   every -- one second.
10        (Brief pause.)
11   A.   She's the only researcher that has a definition.
12   Q.   And what is that definition, if you can remember?
13   A.   Offhand, I don't.  Offhand, I don't.
14   Q.   You said one every two minutes.  Is that --
15   A.   No, no, that's incorrect.  No.  That -- when I said it, it
16   did not sound right, no.  That's not...
17   Q.   Dr. Fernandez, in your ergonomics practice do you agree
18   that it is important to familiarize yourself with the
19   applicable laws relating to workplace conditions?
20   A.   Yes.
21   Q.   In your practice do you advise clients that they should
22   follow the applicable law when they design their employee work
23   stations?
24   A.   The laws, yes.
25   Q.   And, Doctor, do you have any evidence at all that Kmart
```

1  gave consideration to California seating law when it designed

2  its Tulare work stations?

3  A.   I am not aware of the law.  I'm aware of some regulations,

4  statute guidelines.  I'm not sure what it is really because I

5  don't know the term and I don't know what Kmart did.

6  Q.   Doctor, you would agree, though, that Kmart should give

7  consideration to California seating law when designing any work

8  stations to be constructed in the future, correct?

9           MR. WOHL:  Objection, your Honor.  Calls for a legal

10  conclusion.  Beyond this witness's expertise.

11           THE COURT:  Sustained.  That does call for a legal

12  conclusion.

13           MR. DOSTART:  No further questions, your Honor.

14           THE COURT:  All right.  We're going to get started on

15  the redirect and then we'll take our break.

16           MR. WOHL:  Thank you, your Honor.

17                    **REDIRECT EXAMINATION**

18  BY MR. WOHL:

19  Q.   Dr. Fernandez, do you recall in your cross-examination Mr.

20  Dostart questioned you about your testimony about how much of

21  the time the cashier was engaged in transactions at the

22  register versus not being engaged in transactions?

23  A.   Yes.

24  Q.   And he read to you from some portion of your deposition

25  transcript?

1    A.    Yes.

2    Q.    I'd like to show you a portion he didn't have you read, or

3    he didn't read himself --

4    A.    Which is later.

5    Q.    Which is the deposition taken on Thursday October 4, 2012

6    starting on Page 33, Line 15 and reading through Page 34,

7    Line 5.

8          Would you read that for me, please?

9    A.    I'm aware of what is written there.

10   Q.    Why don't you read it to the Court so we have that in the

11   record.

12          (Document was tendered to the witness.)

13   A.    Line 15.  "Were you" --

14   Q.    Say "Question" and "Answer."

15   A.    (As read)

16          "QUESTION:  Were you asked, Doctor, to estimate how

17              much time cashiers at Tulare spent on any of the

18              activities listed in Table 2?

19          "ANSWER:  The amount of time spent on transactions

20              that I have.  The duration of a transaction" --

21   Q.    I'm sorry.  Go a little bit slower so the reporter can

22   take down and the judge can hear you well.

23          "ANSWER:  If you're asking me the duration of each of

24              the items, then the answer is no.

25          "QUESTION:  When you say the amount of time spent on

```
 1              the transaction, what amount of time do cashiers at

 2              the Tulare store spend at the transaction at the

 3              front end register?"

 4         "Ms. Sommerfeld:  Overbroad and, therefore, incomplete

 5              hypothetical."

 6         "ANSWER:  According to the random sample we collected

 7              for that one week, 35 out of an hour for the

 8              registers we looked at."

 9         "But Mr. Clapp:

10         "QUESTION:  So you're saying -- well, let me back up."

11    Q.    Keep going, if you want to.  Actually, Line 5 was fine but

12    if there's anything more relevant to this, by all means,

13    include it.  I think that's where it was relevant.

14         So is your deposition testimony you just read consistent

15    with your court testimony about how much time cashiers spend,

16    according to your observations, engaged in transactions at the

17    register per hour?

18    A.    Yes.

19    Q.    Mr. Dostart also drew your attention to Table 3 of your

20    report, which is Exhibit 213-14, if you have that in front of

21    you, and drew your attention to the statistic that the number

22    of heavy items present was 3.47 per hour, correct?

23    A.    Yes.

24    Q.    And he then had you derive a ratio or percentage of 3.47

25    over 60 minutes, correct?
```

1   **A.**   Yes.

2   **Q.**   Now, that, however, is not the same as the percentage of

3   transaction time in which a heavy was present, isn't that

4   correct?

5   **A.**   This is per hour.  The transaction time is going to be --

6   per transaction is going to be different, yes.

7   **Q.**   So Mr. Dostart had you do the ratio of 3.47 over 60

8   minutes, is that correct?

9   **A.**   That's right.

10   **Q.**   If we were looking at how many heavy items per transaction

11   time, what should be in the denominator of that fraction

12   instead of 60 minutes?

13   **A.**   Thirty-five.

14   **Q.**   And if you use 35 rather than 60, what would your

15   resulting percentage be?

16   **A.**   I need a calculator again.

17   **Q.**   All right.

18            **MR. WOHL:**  Do we have a calculator we can provide him

19   with?

20            **THE COURT:**  3.47 by 35 is going to be 1 every 10

21   minutes.

22            **THE WITNESS:**  One every ten minutes, yes.  About

23   one --

24            **THE COURT:**  Is that correct?

25            **THE WITNESS:**  Yeah, 10 percent.

```
 1              THE COURT:  No.  Because -- it's not 10 percent.
 2    Think about it --
 3              THE WITNESS:  One over --
 4              THE COURT:  The 35 is what?  Is that minutes?
 5              MR. WOHL:  Yes, your Honor.  That's what the witness
 6    testified to be the amount of transaction time behind the
 7    register.
 8              THE COURT:  So you can't -- if you've got time in the
 9    denominator, you can only use a percentage of time as in the
10    numerator.  But you don't have time in the numerator, do you,
11    or do you?
12              THE WITNESS:  No.  I don't have time in the numerator.
13              THE COURT:  All right.  So then it would be every 10
14    minutes you would have a transaction involving 10 pounds or
15    more, is the way I see your logic.
16              THE WITNESS:  Yes.
17              THE COURT:  All right.  But it's not -- that's not the
18    same as 10 percent.
19              THE WITNESS:  That's not the same as 10 percent, yeah.
20              MR. WOHL:  Thank you.
21    BY MR. WOHL:
22    Q.  And it's not the same as once every 17 minute figure Mr.
23    Dostart had you calculate, is that correct?
24    A.  One over 17 is per hour and one over 10 is per
25    transaction.
```

1  Q.   Per the transaction time you mean?

2  A.   Per the transaction time.

3  Q.   All right, thank you.

4       Mr. Dostart played for you 15 minutes of a video and you

5  observed it.  During that video, did you see any steps or

6  movements by the cashier?

7  A.   I didn't.

8  Q.   Did you see any twists?

9  A.   Yes.

10 Q.   Did you see any bends?

11 A.   Bends, yes.

12 Q.   Did you see any extended reaches?

13 A.   Yes.

14 Q.   Did you see any lifting over the head?

15 A.   Reaching over the head?

16 Q.   Not reaching over the head.  Raising over, say, the

17 shoulder or raising the arms up?

18 A.   She did that.

19 Q.   In particular, did you see what types of transactions did

20 she raise her arms up?

21 A.   Transactions basically when she was reaching out to the --

22 to the coupon and the -- the coupon printer and the cash

23 register -- the receipt printer.  And I did not -- could not

24 pay much -- did not pay much attention when she was putting the

25 clothes together.  I'm not sure she lifted it above her

1  shoulder.  I'm not quite sure.

2  Q.   Would you like to see that snip of the video again when

3  she was handling a lot of clothing to see to what extent she

4  was raising her arms?  Would that be helpful?  It would be a

5  short segment, two or three minutes.

6  A.   I wouldn't mind, sir.

7            THE COURT:  If that's what you want to do, go ahead.

8  Show the segment again.  I don't want to see all 15 minutes

9  again.

10           MR. WOHL:  I don't want to belabor it if the point is

11  clear to your Honor.

12           THE COURT:  I do remember scenes where the cashier was

13  shaking out clothing items, if that's what you have in mind.

14  BY MR. WOHL:

15  Q.   Do you have that in mind?

16  A.   She was doing this (indicating), but I wasn't quite sure

17  if it's above shoulder height.  That's all I'm saying.

18  Q.   I understand and it's probably my fault for using the

19  phrase "above shoulder."

20      My point, though, is:  Were there instances where she was

21  raising her arms?

22  A.   Yes.

23  Q.   In connection with the folding of clothing?

24  A.   Yes, she was.

25  Q.   How often did you see that happen in the 15-minute

FERNANDEZ - REDIRECT EXAMINATION / WOHL          1127

1  segment?

2  **A.**    It happened more than once, but I'm not quite sure.

3  **Q.**    Were any of those movements that you observed on the video

4  in your view movements that ergonomically could be

5  appropriately done in a seated position as opposed to a

6  standing position?

7  **A.**    In the seated position, it would increase the risk.   It

8  would increase the risk.

9       The folding of the clothes is going to be very difficult

10 doing in a seated position.   One would have to get off the

11 stool, the seat or whatever, and do some of it because you need

12 the space.

13          **THE COURT:**  People -- wait a minute.   People fold

14 clothes all the time while they are seated.   This is a

15 household thing.

16     I don't understand your point that it's somehow dangerous

17 to take a seat and fold clothes.

18          **THE WITNESS:**  I didn't say it was dangerous.   What I

19 meant was some of the clothing, when you're putting it in a

20 bag, you're stepping out.   You're trying to open the bag out.

21 And if you don't open the bag, you end up on the counter.   You

22 end up doing this (indicating).   If you pull it, come back, you

23 could put the clothes at the lower level.   That's what I mean.

24 That's what --

25          **THE COURT:**  You're talking about the step of putting

1    the clothes into a bag?

2              THE WITNESS:  Bag, yes.

3              THE COURT:  All right.

4              THE WITNESS:  And occasionally when you -- so, like, a

5    dress.  And I didn't see that, of course, in this 15, but

6    that's another situation.

7              THE COURT:  Go ahead.

8    BY MR. WOHL:

9    Q.   In terms of the NIOSH guidelines, what your understanding

10   as to what their applicability is?

11   A.   NIOSH guidelines are used by OSHA where it comes to

12   lifting.  We're talking about the lifting guidelines.  It's

13   used by OSHA and OSHA uses it for citation purposes using the

14   general duty clause, which is the 5-A.

15   Q.   Are the guidelines specific to any particular job

16   function?

17   A.   No.  It's in general.

18   Q.   Would an ergonomist automatically apply the NIOSH

19   guidelines to any particular job without consideration for what

20   the job was about?

21   A.   Yes.

22   Q.   Would the ergonomist -- what other factors would the

23   ergonomist need to know to decide whether a function could be

24   performed in a seated or standing position?

25   A.   That -- the lifting guidelines have nothing to do

1  withstanding or seated.

2  **Q.**    Okay.

3  **A.**    The lifting guidelines is specifically for lifting

4  purposes.

5  **Q.**    Okay.  Understood.

6        You were asked about the difference between -- or at least

7  you were asked about the maximum reach and then you mentioned

8  the normal reach.

9        Can you just explain again for the Court what the

10  difference is between maximum reach and normal reach?

11  **A.**    Maximum reach is if you draw an arch, this is your maximum

12  reach (indicating).  I'm going ahead and going ahead at the

13  shoulder height and doing -- and drawing an arch around.  This

14  is my maximum reach (indicating).

15        My normal working area or -- or primary is basically if I

16  drop my arms down and I draw an arch now.  Draw an arch with my

17  arms spread (indicating).  This is the primary or normal.

18        You do most of your work -- and that is what is

19  recommended.  You do most of your work in that primary area.

20  That's what I have in my book as well and that's what all

21  ergonomists, even in Dr. Konz's book, where Dr. Johnson is the

22  co-author, he also promotes the same thing.

23  **Q.**    So ergonomically do you want to design a work station that

24  promotes usual use of a normal reach space or a maximum reach

25  space?

1  A.    Normal.  You try to get -- get as much as possible in the

2  normal, the primary task.  But there are -- there's always a

3  shortage of real estate space on the counter, space on the work

4  station.  And so you've got to make a decision based on

5  priority what's used most often and that goes in the primary

6  area.

7  Q.    Mr. Dostart referenced the Lehman study.  Can you explain

8  to the Court what the Lehman study was?

9  A.    Lehman basically looked at seated cashiers and standing

10 cashiers and basically -- looked at different variables.  She

11 looked at -- she did subjective responses.  She did -- and she

12 did physiological, some physiological measurements as well.

13 The weight she lifted, though, doing in that particular grocery

14 store weighed from a few grams to you, I think, six kilograms

15 and then she had two or three other higher weights.

16 Q.    Where was the study conducted?

17 A.    In Scandinavia somewhere.

18 Q.    And what type of business were the cashiers working at?

19 A.    It was a grocery store.

20 Q.    And in connection with the study, did the cashiers sit or

21 stand in terms of normal business activity before the study?

22 That is just how they would operate the job normal?

23 A.    Is it -- what my understanding is they were sitting.

24 Q.    And how many subjects does she study?

25 A.    Ten.

FERNANDEZ - REDIRECT EXAMINATION / WOHL                    1131

1  **Q.**   And did she express any -- did she report that by and

2  large the cashiers expressed a preference for sitting versus

3  standing?

4  **A.**   Yes.

5  **Q.**   And did she express any opinion about why they expressed

6  that preference?

7  **A.**   She felt that basically they were not aware of the risk

8  and if they were aware of the risk, they might not have done

9  that.

10 **Q.**   And in connection with the various other articles that Mr.

11 Dostart brought to your attention and asked whether you had

12 considered them or not, to the extent you told him you didn't

13 consider those articles, can you explain to the Court why you

14 didn't consider those articles in forming your conclusions in

15 this case?

16 **A.**   Some of them were in an area that -- where the task is so

17 different that it is very difficult to apply.  I use articles

18 that were generic, when you're talking about sitting, standing

19 and so on.

20 **Q.**   That's fine, your Honor.  Thank you -- fine, Dr.

21 Fernandez.  Thank you.

22       With regard to the tape analysis, just so we're clear, can

23 you take Judge Alsup through what actual methodology and your

24 team used to analyze 30 hours of videotape that you have

25 reported on?

1  **A.**   Basically the videos were, the 30 hours -- first of all,

2  all the data were provided in DAV format.  DAV format is the

3  format that the DVR player procedures.  We converted that using

4  the metadata that's putting a time stamp on it and converted it

5  to AIV, and the DVD player allows us to do that.

6      From there we then use a player called Kinovea.  Kinovea

7  basically what it does is -- K-i-n-o-v-e-a, I think.  It's in

8  my report.  It allows you to put both the screens together.  It

9  gives you an opportunity to run one or both controls.  So you

10 can run the controls together, so both -- the times are the

11 same, so it moves at the same time.  So if you want to stop,

12 you want it to slow motion, you just have to hit one key and it

13 controls both the screens.

14     So my associates, two of them plus two others, worked on

15 these -- these analyses and what they did was evaluate in slow

16 motion.  Every time they found something, they went and

17 documented it and then went ahead and had to do research to

18 figure out what it was.

19 **Q.**   And how much time, if you know, on average did they spend

20 per hour of videotape, say, before they reached their

21 conclusions as to what it showed?

22 **A.**   Basically for a one-hour tape, it takes between four to

23 six hours.

24 **Q.**   And then let me take you back -- I'm sorry.  I should have

25 asked you this before.

1        If you go to Table 3 of your report again, Exhibit 213-14.

2   **A.**    Yes, sir.

3   **Q.**    And I previously had you do the calculation for the number

4   of heavy items present.  That was the 3.47 over what you

5   testified was 35 minutes average transaction time.

6        (Calculator was given to the witness.)

7   **Q.**    Could you now do the calculation for the number of

8   instances in which heavy items were lifted, which you report in

9   the table as being 6.07.  So 6.07 divided by 35 minutes.

10  **A.**    Every nine-point -- for some reason I have a problem.

11       (Discussion held off the record amongst

12        defense counsel.)

13  **A.**    Every 5.8 minutes?  Is that about correct?

14  **Q.**    Is that your math?

15  **A.**    That's 60 divided by --

16  **Q.**    6.07 divided by 35?

17  **A.**    Yes.

18  **Q.**    Okay.  No other questions, Dr. Fernandez.  I appreciate

19  your time yesterday and today.

20       **MR. DOSTART:**  Extremely briefly.  We will be done,

21  hopefully, before 9:15.

22       **THE COURT:**  All right.

23                    <u>RECROSS EXAMINATION</u>

24  BY MR. DOSTART:

25  **Q.**    Dr. Fernandez, Mr. Wohl addressed this 35-minute issue,

 1  and I want to come back to it very briefly.

 2        Isn't it true that the 35 minutes only included the time

 3  from when a cashier initiates a limb movement to start a

 4  transaction activity or transitions to the next activity until

 5  the cashier completes the limb movement to end the transaction

 6  activity?

 7  A.    Yes, sir.

 8  Q.    Well, Dr. Fernandez, isn't it true that there is some time

 9  in between those limb movements where the cashier would be at

10  the cash register station?

11  A.    Between the transactions?

12  Q.    Well, I want to be very clear, sir.  The answer to your

13  question is, yes, between the transactions.  Not just between

14  the transactions, but between the limb movements from where you

15  began counting time and you finished counting time.

16        And when I say time, I mean the time period that

17  encompasses that 35-minute interval.

18            MR. WOHL:  I'm sorry, your Honor.  I'm going to

19  object.  I don't understand the question.  I'm not trying to be

20  hard here.  I just don't understand what the actual question to

21  Dr. Fernandez is.

22            THE COURT:  All right.  Start again, please, and try

23  the question again.

24  BY MR. DOSTART:

25  Q.    Dr. Fernandez, I'm going to talk to you about the

1    35-minute interval that is reflected on Table 3 that Mr. Wohl

2    has talked to you about and that I have talked to you about.

3        Do you understand the time period I'm discussing?

4    A.    Yes, I do.

5    Q.    Is it true that when calculating the time that would

6    result to be that 35-minute interval, you began counting the

7    time for an individual transaction at the moment the cashier

8    initiates a limb movement to start the transaction activity or

9    transitions to the next activity; is that true?

10   A.    Yes.

11   Q.    Is it true that from that start point you would end the

12   time period for an individual transaction when the cashier

13   completes the limb movement to end the transaction activity?

14   A.    Right.  But if a transaction occurred

15   back-to-back-to-back, it would have been from the first limb

16   movement to that last limb movement.  If there were, like, five

17   transactions, it would have encompassed all that time.  If

18   that's your question, sir.

19   Q.    Well, my question is this, Dr. Fernandez:  Is it true that

20   there is some time in between customers that is not included

21   within the 35-minute interval?

22   A.    When you say -- again, this is the clarification I need,

23   sir.

24        If there were customers back-to-back-to-back --

25   Q.    That's not my question, Dr. Fernandez.

 1  **A.**    If there were not, then -- that's the confusion I'm

 2  having, sir.  I'm not trying to be difficult.

 3           **MR. WOHL:**  Your Honor, I think the confusion is

 4  counsel is referring to the 35-minute interval, which suggests

 5  a continuous 35 minutes.  I don't think that's the witness's

 6  testimony.

 7           **MR. DOSTART:**  I'm going to go ahead and read from the

 8  deposition.

 9           **MR. WOHL:**  I think that's the confusion.

10           **THE COURT:**  Go ahead and read from the deposition.

11           **MR. DOSTART:**  Thank you.

12           **MR. WOHL:**  Sorry, where is it.

13           **MR. DOSTART:**  I apologize.  This is from the Thursday,

14  October 4, 2012 deposition of Jeffrey  Fernandez on Page 35,

15  Lines 6 through 9.

16           **MR. WOHL:**  Thank you.

17  **BY MR. DOSTART:**

18  **Q.**    "Question" --

19           **MR. DOSTART:**  You know what?  I'm going to go back

20  because I want to make sure the record is clear.

21           **MR. WOHL:**  Okay.

22           **MR. DOSTART:**  So it's going to be Page 34, Line 25 to

23  Page 35, Line 9.

24  **BY MR. DOSTART:**

25  **Q.**    (As read)

 1          "QUESTION:  And where on Table 3 do you derive your

 2           estimate that cashiers spend 35 minutes out of every

 3           hour on that activity?

 4          "ANSWER:  It says 'Duration of Transactions, 35

 5           point.'  It's the third row.  Duration of

 6           transactions in minutes.

 7          "QUESTION:  Does the 'Duration of Transactions' number

 8           include the time that cashiers spend waiting for

 9           customers while they are at the front end check

10           stand?

11          "ANSWER:  No."

12      Do you stand by that statement, Dr. Fernandez?

13  A.   I stand by that statement.  And then I went ahead and I

14  said when there were no -- at that time I did not have that

15  calculation.

16      And then I went ahead and calculated it and I said, it was

17  from zero to 50 seconds and the average was 15 seconds.  That's

18  what I said.  I said yesterday.

19  Q.   Okay.  I would like to read from Page 35, Line 17 to

20  Page 36, Line 4.

21          "QUESTION:  Well, isn't there some amount of time

22           between customers that's not captured within the

23           'Duration of Transaction' number?"

24          "Objection.  Vague and ambiguous.  Overbroad."

25          "ANSWER:  If you're asking me for the few seconds or a

1          minute, possibly a minute, that they are standing

2          there before they go out, it's possible.  But I have

3          the duration of a transaction.  That's what I

4          measured.

5      "You're asking me a slightly different question, which

6          is fine.  Like you said before, this is your

7          deposition.  You ask the questions.  So, yes, but I

8          measured something different."

9      So, Dr. Fernandez, do you stand by that statement?

10 **A.**   I stand by that statement and, again, I want to say that

11 at that time I did not have the time and I went ahead and

12 calculated it and that was between zero and 50 seconds and the

13 average was 15 seconds, and that was not -- that was if a

14 customer came back-to-back-to-back, it was all included in that

15 one chunk.

16     If now there was a break, that break is between zero and

17 50 seconds.  Before they leave the work station, they go out

18 and get customers or they go ahead and do something else.

19 That's what I'm trying to say, sir.

20 **Q.**   Dr. Fernandez, is it true that you have absolutely no

21 estimate for the amount of time cashiers at the Tulare Kmart

22 spend at the cash register versus other places in the store?

23 **A.**   They spend 35 minute at the cash register per day for --

24 during the time that I looked at those 30 hours of video.

25 **Q.**   I'm going to read from the deposition transcript Page 36,

 1  Lines 6 through Lines 13.

 2          "QUESTION:  Can you estimate for me, Doctor, based on

 3           your work in this case what percentage of time the

 4           CSAs spend working at the front end check stand as

 5           opposed to other places in the Tulare store?

 6          "ANSWER:  I can."

 7           "Objection.  Over broad.  Asked and answered."

 8          "ANSWER:  I cannot estimate that, sir."

 9          MR. DOSTART:  No further questions.

10          MR. WOHL:  Very briefly, your Honor.

11                    FURTHER REDIRECT EXAMINATION

12  BY MR. WOHL:

13  Q.   Again, Mr. Dostart, for a reason, doesn't have you read

14  other portions of the depo that seem to be directly relevant to

15  this.

16      Let me have you read, please, from Page 34, same

17  deposition, starting at Line 7 and continuing to Line 23.

18      (Document was tendered to the witness.)

19  A.   Line 7?

20  Q.   Yes.

21  A.   (As read)

22          "QUESTION:  So your saying -- well, let me back up.

23           What does that 35 minutes out of the hour represent

24           in terms of activities the cashiers were doing?  What

25           were they doing during that 35 minutes?"

1          "Ms. Sommerfeld:  Broad.  Overbroad."

2          **"ANSWER:**  Over the -- during the 35 minutes, they were

3           interacting with the client, with the customer,

4           either scanning or it would be the transaction would

5           start when they reach out.

6          "I brought the definition of the transactions on

7           Page 7 on that same table -- same page of Table 2.

8           The start point of a transaction is when a CSA

9           initiates a limb movement to start the transaction

10          activity or transitions to the next activity.

11         "Then the end point of the transaction was when the

12          CSA completes the limb movement to end the

13          transaction activity."

14         "By Mr. Clapp:

15         **"QUESTION:**  And where on Table 3 did you derive your

16          estimates that CSAs spend 35 minutes out of the hour

17          on that activity?

18         **"ANSWER:**  It says during -- duration of transaction,

19          35 minutes.  It's the third row, duration of the

20          transactions in minutes."

21          **MR. WOHL:**  Thank you.  And just for clarity 35 minutes

22    per hour, were you finding that was a continuous 35 minutes or

23    just a combination of separate measured transactions which

24    totaled up to be 35 minutes?

25    **A.**    A --

```
 1              MR. DOSTART:  Objection.  Vague.

 2              THE COURT:  Overruled.

 3   A.   Combination.

 4   BY MR. WOHL:

 5   Q.   So there could be breaks in between?

 6   A.   Yes.

 7   Q.   And to the extent that the cashier either was standing at

 8   the register not engaged in a transaction or away from the

 9   register doing something else, would that time have been

10   captured in the 25 minutes?

11   A.   You would have to repeat that one.

12   Q.   Yes.

13        So you explained in your deposition how you -- and your

14   testimony how you measured the start and end of a transaction?

15   A.   Yes.

16   Q.   So if they did not go back-to-back with transactions, if

17   they finished one and then they had some gap in time before

18   they started the next transaction, are you with me?

19   A.   Yes.

20   Q.   And that gap in time was spent either standing at the

21   register, doing something else, not doing anything, or away

22   from the register, is that time captured in the 25 minutes?

23   A.   It is captured in the 25 minutes and that's -- that's what

24   you asked me to clarify yesterday.  And that's what I -- I did

25   not have an estimate of how long were they at the register or
```

1  not doing transactions.  And that's what I've come up with.

2  It's between zero and 50 seconds.

3  **Q.**   Not how much time at the register, but that time is

4  encompassed in the 25 minutes?

5  **A.**   It's encompassed in the 25 minutes, but they were not

6  involved in the transaction.

7  **Q.**   I understand.  That's it.  Thank you very much.

8         **THE COURT:**  All right.  Mr. Dostart, let's bring it to

9  an end.  Do you have to ask something?

10        **MR. DOSTART:**  I do not, your Honor.

11        **THE COURT:**  Thank you.

12     (Videotape played in open court.)

13        **THE COURT:**  All right.  Does the defendant have any

14  more witnesses?

15        **MR. WOHL:**  No, your Honor.

16        **THE COURT:**  Does the defendant rest?

17        **MR. WOHL:**  Yes, we do, your Honor.

18        **THE COURT:**  Is there a rebuttal case?

19        **MR. DOSTART:**  No, your Honor.

20        **THE COURT:**  The evidence is now closed.

21     Now before I make absolutely sure, each side may have an

22  opportunity to make -- to tell me if there is some exhibit you

23  failed to bring in or whatever.  This is the time to bring it

24  to my attention.  I'm not saying I will allow it in at this

25  late hour, but I'll at least consider it.

PROCEEDINGS                                                          1143

```
 1          MR. WOHL:  I appreciate that, your Honor.  Very good
 2  of you to make sure we have everything in.  We'll check.
 3          THE COURT:  I'll tell you what.  We're going to take a
 4  15-minute break at this time and then you let me know when we
 5  come back.
 6      Then we're going to go to the closing statements.  Each
 7  side has 45 minutes.  The plaintiff can reserve some time for
 8  rebuttal out of the 45.  So you decide how much you want to --
 9  whatever you don't use, you can safe for rebuttal.  All right?
10          MR. DOSTART:  Thank you, your Honor.
11          MR. WOHL:  Thank you, your Honor.
12      (Recess taken from 9:29 to 9:51 a.m.)
13          THE COURT:  Be seated, please.
14      All right.  For the record, are there any -- anything to
15  say about the stipulations, evidence, whatever?
16          MR. McINERNEY:  One thing, briefly, your Honor.
17      This morning we marked a stipulation as 389.  That should
18  have been marked, your Honor, as 390.
19          THE COURT:  399?
20          MR. McINERNEY:  No, three-nine-zero.
21          THE COURT:  Agreed?
22          MR. WOHL:  Sure, your Honor.
23          THE COURT:  389, marked earlier, will now be
24  redesignated as 390, the stipulation.
25      All right.  What else?
```

PROCEEDINGS

1      **MR. ADKINS:**  Other than that, your Honor, the exhibits

2   are complete.

3          **THE COURT:**  All right.  Now, is that correct?

4      **MR. McINERNEY:**  I believe so, your Honor.

5          **THE COURT:**  All right.  So I want to be clear on some

6   things, then, before -- have a seat, please.

7      These expert reports are not in evidence.  You should not

8   be referring to them unless it's a part of it that is in

9   evidence.  What was in a deposition does not count unless it

10   was read into the record.

11      So, we have a trial record, and items were received in

12   evidence.  Some stipulations, I guess.  There were things that

13   were referred to vaguely.  There were some articles that were

14   referred to vaguely, just titles.  But they did not get into

15   evidence.

16      It is important to me to decide this case fair and square

17   on the actual record.  I'm not going to like it if you start

18   referring to things that are outside the record.

19      Now, this being argument, I guess it's okay.  You can

20   refer to the Magna Carta, if you want.  You can refer to the

21   Bible.  You can refer to whatever.  Mark Twain.  This is

22   closing argument.  That's okay.

23      But when it comes time to do your findings and conclusions

24   of law, you must not veer outside the record.  You must stick

25   with what's in the record.  All right.

1        So, there we go.

2        Now, Mr. McInerney, are you going to give the closing

3   argument?

4             MR. McINERNEY:  I am, sir.

5             THE COURT:  On behalf of Ms. Garvey, you may now make

6   the closing argument.  And if you have any time left over at

7   the end, we'll reserve that for rebuttal.

8             MR. McINERNEY:  Thank you.

9             THE COURT:  Please, go ahead.

10                       **CLOSING ARGUMENT**

11            MR. McINERNEY:  I have never had occasion to say this

12   before in my career, but I believe I'm appearing here as a

13   private attorney general.  And if I wasn't quite sure who my

14   clients were, as -- as a private attorney general, quite

15   ironically, our very case number would remind me.

16       When we filed this case, we received the case number 2575.

17   And under PAGA, that's how any award is divided.  Twenty-five

18   percent goes to the aggrieved employees.  Seventy-five percent

19   goes to the California Labor Workforce Development Agency for

20   enforcement and for education.

21       They're different clients, but with respect to penalties,

22   they perhaps have similar goals.  Neither sets of clients want

23   to see a penalty that would put Kmart under.  You heard from

24   several of the cashiers, they work there.  This is a bad

25   economy, we need jobs.

CLOSING ARGUMENT / MCINERNEY

```
 1        Similarly, the California Labor Workforce Development
 2   Agency, which encompasses many labor-related agencies,
 3   including the DLSE, one of their goals is to promote the
 4   creation and maintenance of employment in the state of
 5   California.
 6        However, in this case, a penalty, a penalty is sought.
 7   And the reason a penalty is important, your Honor, is that the
 8   purpose of a civil penalty is largely deterrence.  And without
 9   a penalty, without a penalty, Kmart would be free to continue
10   to ignore the wage order, and other employers would be free to
11   continue to ignore the wage order.
12        Now, up until 2004, when PAGA was created the only way the
13   California labor commissioner could do anything was to go in
14   and persuade a district attorney or a city attorney to issue a
15   misdemeanor criminal charge.
16        But everything changed in 2004, when PAGA was created,
17   because it created this system of civil penalties, recognizing
18   that the labor commissioner never had an adequate budget to
19   enforce all the wage orders, and couldn't enforce all the wage
20   orders.
21        Other cases, your Honor, have been referred to in this
22   case and the pleadings leading up to it.  But I just -- in
23   order to try to answer the five questions that you've put into
24   your letter to the DLSE, I want to explain that there was a
25   case called *Hilton*, *Hilton Hotels*.  And in that case, the job
```

1  description probably indicated this should have been a 14(B),

2  should have been a 14(B) charge.

3      The difference, of course, between 14(A) and 14(B) is when

4  you're actively engaged in your work but the nature of the work

5  would allow a seated posture, seats have to be provided.

6      14(B) is a different scenario.  That's a scenario where

7  the nature of the work involves standing.

8      And I would throw out the example of a salesman in a

9  department store, where you're moving around the department to

10  wait on customers, assist customers.  That, I would submit, is

11  a standing job.

12     But 14(B) provides the situation where there's a lull in

13  the activities.  You're still on duty.  You're still on the

14  floor.  This is not a rest break.  That's something else again.

15  But there's a lull in your activities.  And 14(B) says that

16  near your work area the employer has to provide a seat so you

17  can sit down during the lull.

18     *Hilton* probably should have been a 14(B), but, in any

19  case, it went off on -- on an interpretation of the whole wage

20  order, and used a section, Section 20 of the wage order, where

21  there's a penalty for underpayment of wages, and said, well,

22  since there's a penalty, there can't be a penalty under PAGA.

23     We took up two cases all the way through the second DCA,

24  both of them, and to the steps of the California Supreme Court.

25  Both of those cases, *99 Cents* and *Home Depot*, the Courts of

1    Appeal said when you have a wage order -- and it was 14(A) of

2    course -- when you have a wage order and there's plain

3    language, you apply the plain meaning.

4         The other important thing those cases said was, these are

5    remedial acts, the wage orders, and so they have to be given a

6    liberal construction.

7         And if there's any doubt about the liberal construction

8    that wage orders should be given, you don't have to look way

9    back in the history of the California Supreme Court.  You look

10   back about five or six months, and you see *Brinker Restaurant*,

11   and there's pages in *Brinker Restaurant* that talks about the

12   complete deference that California courts, California courts,

13   have historically afforded Section 14(A) and other provisions.

14        Could I see -- put up number 1.

15        So, as I recall, the first question you posed, generally,

16   was, does "seat" include different items of furniture?

17        And I would suggest, your Honor, that seat is plain

18   language in our society, and that seat is used in 14(A).  And I

19   would suggest that it includes benches in parks where people

20   sit, it includes seats on a bus, and it even includes plain,

21   wooden stools.

22        And the reason I say that is, you remember in Ms. Grabau's

23   deposition she was asked about an instance where she was in the

24   Santa Rosa store, and they -- the manager there was confronted

25   by a request by a cashier for a stool.  And Ms. Grabau said,

 1   you know, yeah, you got to give 'em a stool if they ask for it.

 2         So, certainly, Kmart understood that stool to be in

 3   compliance with 14(A).

 4         You know, and what's reasonable and things like that,

 5   well, you know, you come into this courthouse every day and

 6   there's two entrances.  And it may vary between the two

 7   entrances.  You know, if you come in through Golden Gate,

 8   they're a lot busier than on Turk Street.

 9         Now, they both have to be vigilant, those guards down

10   there.  They're there to protect us.  But, you know, in --

11   in -- you may have a 14(B) situation on Turk Street, where

12   there's lulls in the work and they may sit on a stool.

13         The question number two is a bit tough.  "Repetitive."

14   And I'm not going to be able to answer that.  I thought maybe

15   Dr. Fernandez could tell us what repetitive means.  But it's

16   one of those circular definitions.  You go look up repetitive,

17   and you get repeated.  So I sort of have to pass on that.

18         But the -- I think the basic rule here is common sense,

19   and you want the cashiers -- the purpose of sitting is

20   recovery.  And it may not be that a clerk could sit for ten

21   consecutive minutes, but if you think about it from a common

22   sense point of view, the more you're on your feet, the more

23   valuable even a short period of sitting becomes.

24         Question number three was, well, suppose the job, you

25   know, does allow a seated posture, but the employer wants them

1   to stand to manifest respect.

2        Well, can we see slide number 2.

3        This, perhaps, could have been an issue that Kmart could

4   have taken to the DLSE and said, look, we want 'em to stand.

5   But the problem with the wage order is that it requires a seat

6   for even, you know, a pretty -- pretty low level.

7        In other words, you remember the progression of steps that

8   we talked about.  There's effort, which we're all doing.  I

9   mean, I'm exerting effort.  Everybody is exerting some effort

10  almost all the time.  But then we get to fatigue and then,

11  finally, we get to discomfort.

12       And if you look at Section 17, they talk about the

13  employer having to demonstrate that the comfort or welfare of

14  the employee wouldn't be adversely impacted.

15       So they would have had to have shown under Section 17, to

16  get an exemption, that there's somewhere below that orange that

17  says discomfort.

18       Sometimes in argument from employers, we hear the term

19  "health and safety."  Those aren't the right words.  Health and

20  safety, you're talking about issues that are in the blue, the

21  red and the black.  In other words, when you're talking about

22  health and safety, you're talking about pain, injury, and

23  disability.

24       There you get all kinds of other agencies and other

25  concerns.  You get OSHA.  You get -- you get the fire

1   department involved.

2        You know, I mean, if stools are dangerous, you'd have an

3   OSHA regulation.  But I defy anyone to go check the OSHA

4   regulations and see anything about, you know, stools being

5   dangerous.

6        I don't think that the focus should be on whether these

7   cashiers can necessarily respect the customers.

8        I would say what we're seeing here is an issue of

9   corporate arrogance.  This wage order has been around for about

10  a hundred years.  And it's been roundly ignored.

11       Letters have been written.  The court is going to see

12  letters.  It was on people's radar back in the '80s and the

13  '90s.  We've already submitted the letters that we could find.

14       But it was on the radar, but it just gets ignored.  And

15  that's sort of disturbing because it's basically common sense.

16  The human body wants to come to a seated posture after a while.

17  And if there's no really great reason why, you know, you don't

18  have a seated posture, then you've got 14(A) to be respected.

19       The fourth question had to do with business judgment.  And

20  I understand, I think, what a business judgment is like.  In

21  other words, Kmart, they have these Big Kmart's like Tulare.

22  Then they have Super Kmarts.  And Mr. Gonzalez testified those

23  are different because they have full-line grocery stores in

24  them.

25       And so Kmart decides, they study the situation, they

1  evaluate it, and they put a conveyor belt in their Super Kmart,

2  but they decide not to put a conveyor belt or modify the

3  existing Big Kmarts because they're not a full-line grocery

4  store.

5       Could I see slide number 3.

6       Business judgment was not considered.  There was no

7  business judgment.  There was no real consideration about 14(A)

8  by Kmart.  I mean, I think it wasn't on their radar.  I mean,

9  the first instance, the first recorded instance we have is in

10 2010, and Ms. Grabau comes up with this directive.

11      So whether there was even a considered business judgment

12 is -- is a big question.  But, certainly, there's no evidence

13 that they really considered the comfort and welfare of their

14 cashiers.

15      What we've got in 14(A) is a regulation, a law.  And laws

16 embody public policy.  And public policy trumps business

17 judgment.  And the only exception to that is where a particular

18 statute allows reference to business judgment.  We see it in

19 the ADA, 42 U.S.C. --

20           **THE COURT:**  Let me --

21           **MR. McINERNEY:**  Yeah.

22           **THE COURT:**  All right.  In general, I agree with what

23 you're -- your point you just made.  But here the 14(A) refers

24 to "reasonably permits."

25           **MR. McINERNEY:**  Yes.

1          **THE COURT:**  All right.  So what if an employer in good

2    faith has a policy that in a competitive industry they want

3    their employees to stand, given that the customers are all

4    standing, they want their -- they want their employees to stand

5    and to -- when enacting with customers?

6          Now, is that a reasonable consideration, or do you just

7    say -- in other words, we've got to use the word "reasonably"

8    here.  If the employer -- let's say they make this decision in

9    good faith.  Let's say it's not some kind of a sham, but in

10   good faith the employer believes that for competitive reasons

11   they want to have the employees, dealing with customers, to

12   stand up in the same way that the customers are standing up.

13         So do we take into account that factor as a consideration

14   that gets factored into what's reasonable or not, or do we just

15   say, no, we disagree with that, that's not a -- that's not a

16   marketing point?

17         **MR. McINERNEY:**  14(A) is an objective standard, your

18   Honor.  You refer to the nature of the work, not the nature of

19   the work as the employer contours it.  It's the nature of the

20   work.

21         If somebody had come to this court a year before and had

22   been able to ask the question, what's the nature of the

23   cashier's work, the Court probably could have answered that out

24   of common experience and knowledge.  The nature of a cashier's

25   work is the nature of a cashier's work.

```
 1        If you allow every single employer to put in what they
 2   want, you no longer have any objective standard in the law.
 3   And any time we see business judgment allowed to creep into a
 4   statute like the California Corporations Code 309, that has to
 5   deal with director's liability or the ADA in section -- Title
 6   42, both of those specifically allowed business judgment to be
 7   entered.
 8        Otherwise, otherwise, no law would be enforceable.  It
 9   would be in the eyes of the beholder as to what's reasonable.
10        It's the nature of the work.
11        THE COURT:  All right.  We would need to get rid of
12   sham excuses, I agree with that.  But what if -- you're not
13   answering my question.
14        What if the nature of the work, as defined by the
15   employer, does reasonably require, for competitive reasons,
16   that the cashier stand because the customers are standing, and
17   there's a long line of people behind them, all standing?  And
18   the -- let's say that the business genuinely wants to project
19   an attitude of ready to assist those customers.
20        MR. McINERNEY:  I would say --
21        THE COURT:  Let's say -- bear with me for a moment.  I
22   know you disagree and you say that's a sham and they just made
23   that up for purposes of this case.  But let's assume that I
24   disagree with you.  Let's assume, for the sake of argument,
25   that I agree that that is a legitimate business consideration.
```

1    Okay.

2        Is it your argument, then, that nature of the work has to

3    ignore that, or can consider that, or is it your argument that

4    you just focus on the physical part of the job?

5        Sounds like you're saying you have to focus only on the

6    physical part of the job.  But I want to be clear where you --

7    where you part company with the other side on this.

8            MR. McINERNEY:  Well, I do focus on the physical

9    because, otherwise, you're off in a land of uncertainty.  And,

10   certainly, if -- if -- if Kmart had wanted to, they could have

11   done a survey, they could have done a survey -- a study,

12   rather, and gone into the DLSE, on a Section 17 Application,

13   and said, look, we have surveyed 3,000, 5,000 of our customers

14   when we installed one seated cashier lane, and those customers

15   just despised it, they just despised it.  Then -- then, you

16   know, they could have urged that on the DLSE.

17       They never did that.  They never made a business

18   judgment -- I mean, a business judgment fundamentally means

19   that the company sat down and they considered it, and they made

20   a decision.

21       What they did here was what they -- they just said, well,

22   this is the way it's always been done.  And this is the way

23   Wal-Mart does it.  And if Wal-Mart does it, it has to be right.

24   And this is the way Kresge's did it before it was Kmart.  And

25   it's the way, even before Kresge's, Woolworth did it.

1    But what somebody else did a long time ago doesn't render

2  it right.

3         **THE COURT:**  But is it possible that there's some

4  marketing wisdom in the practice of the ages that in every

5  single department store, in every single grocery store the

6  cashiers are standing?

7         Is it possible that there's some merit to that from a --

8  that that's motivating this, as well?  Or are you just saying

9  that it's crass exploitation of the labor market, the labor

10  force?

11        **MR. McINERNEY:**  I'm not saying it's crass

12  exploitation.  I'm just saying that they've ignored, ignored

13  the comfort.

14        And here's a point, Your Honor.  It's not even

15  fundamentally sound, because we show respect all the time when

16  we're seated.

17        I mean, a receptionist in a law firm, you walk in and

18  you're some big client, who do you first run into?  You don't

19  run into the senior partner who glad hands you.  You run into a

20  receptionist who's seated.

21        These cashiers testified that they believe that they could

22  show respect while seated.  I mean, factually and legally -- I

23  mean, the law says, the law says seated.  And it refers to the

24  nature of the work.

25        If Kmart wants to change the law, they're in the wrong

1  place.  The right place is about 90 miles to the east, in

2  Sacramento.

3          **THE COURT:**  Well, if -- where has the labor

4  commissioner been for the last hundred years?

5      If it's been so rampant for the last hundred years that

6  Kresge's and everyone else is violating the law, doesn't the

7  labor commissioner ever go to any of these stores?

8          **MR. McINERNEY:**  Sure.

9          **THE COURT:**  Why hasn't the labor commissioner ever

10  intervened and said, hey, wait a minute, this is violating the

11  law?

12          **MR. McINERNEY:**  When you read the preamble to PAGA,

13  you see it.  They say the labor commissioner has historically

14  been underfunded.  And because they've been underfunded, they

15  haven't been able to enforce the Labor Code fully; and,

16  therefore, we're creating PAGA.

17      Before 2004, the only way the labor commissioner could do

18  this is take their case down to a city attorney or a district

19  attorney, convince that D.A. that he should stop doing dime

20  bags of coke and take on a highly-complex case against a major

21  corporation.  We know what the odds of that one were.

22          **THE COURT:**  Let's change the subject and focus on the

23  physical.

24      I guess you still have some time, but -- but the -- I

25  don't want to intrude on your time, but does the trial

1    record -- I notice that we've had this mockup in the courtroom

2    the entire time, like a stranded whale, and not a single lawyer

3    has referred to it, not a single witness has referred to it.

4         **MR. McINERNEY:**  I was going to, Your Honor.

5         **THE COURT:**  I'm going to let you have the chance.  But

6    it's not in the record now.  It's not part of the trial record.

7    It was here; nonetheless, no one ever used it.

8         Does the trial record of admitted evidence contain a

9    blueprint or a graphic design showing what you propose Kmart

10   could do to provide suitable seating?

11        **MR. McINERNEY:**  Your Honor, it doesn't.  And there's a

12   reason for that.

13        What Dr. Johnson -- his role was to talk about whether it

14   could have been done.  Not whether it could be done in the

15   future, but whether it could have been done.  And he did

16   describe the things as suggestions.

17        Now, if you want, I can step over there and put into very

18   concrete drawing the totality of what he said.  And I won't

19   depart from the record.

20        **THE COURT:**  No, I'd like you to read to me or

21   summarize for me what he said, so that I can have that in mind.

22   Your drawings now would be illustrative.  It would be argument.

23   But my question pertained to the trial evidence.

24        **MR. McINERNEY:**  Okay.  Can I use Exhibit 216, then?

25        **THE COURT:**  You can.  But I -- I want to -- yes, you

1  can use anything that's in evidence or from the court

2  reporters' transcript.

3      But I'm not so certain that you have something in evidence

4  that is a plan A, that would actually be shown to work.  So I

5  want to see what you say to that point.

6      **MR. McINERNEY:**  Well, I'm going to try to pull

7  together, your Honor, the basic points that Dr. Johnson made.

8      **THE COURT:**  All right.  Please do.

9      **MR. McINERNEY:**  Okay.  And I just didn't want to mark

10 up 216.  That's why I was going to use the white sheet.  But

11 let me try to do it.

12     I can stand over here, Mr. Wohl.

13     **MR. WOHL:**  Thank you.

14     **MR. McINERNEY:**  I said in my opening -- and it even

15 becomes apparent in the 15-minute clip we played -- that the

16 existing workstation is sort of a train wreck for a standing

17 cashier.  And Johnson said that a couple of times.  He doesn't

18 use words, you know, like train wreck --

19     **THE COURT:**  You're not helping me.  You're assailing

20 the -- my question is, what would the modified configuration be

21 for which suitable seating could then be used?

22     **MR. McINERNEY:**  Okay.  First of all, the existing

23 workstation is very tight.  It's so tight you can't use it with

24 a stool.

25     But, that very tightness with modification becomes great.

 1   It could become a U workstation, basically, where everything is

 2   within swivel reach.  That's the irony of it.

 3        Okay.  So, first of all, underneath here you've got a low

 4   shelf that holds two large plastic bins (indicating).  You've

 5   got to take that out, either completely or move it back into

 6   this further left corner area.

 7             THE COURT:  I'm sorry, you take out which bins, now?

 8   Let's be precise.  Which --

 9             MR. McINERNEY:  Well, your Honor --

10             THE COURT:  Is this you talking, or did the expert say

11   this?

12             MR. McINERNEY:  He said it.  He talked about the

13   two --

14             THE COURT:  Show me the bins.  I see one under the

15   cash register.

16             MR. McINERNEY:  Remember, there's two.  One is for

17   trash and one is for return items (indicating).

18             THE COURT:  Yes.  So where would those wind up going?

19             MR. McINERNEY:  Where they wind up going, your Honor,

20   is back into here, somewhere in the bagging table, okay

21   (indicating).

22             THE COURT:  In other words, under the counter of the

23   bagging table?

24             MR. McINERNEY:  Yeah, because --

25             THE COURT:  Is that what he said, or is that you

 1  talking?

 2          MR. McINERNEY:  He said you could modify the size, you

 3  could move 'em back into the corner, or you could put them into

 4  what's now the bagging table.

 5          THE COURT:  He said that?

 6          MR. McINERNEY:  He said that.

 7          THE COURT:  All right.

 8          MR. McINERNEY:  Okay.  Now, when we talk about the

 9  bagging table, you see in the video, the only time that lady in

10  the clip we played was doing any movement was she had to step

11  over to the bagging table.  It makes no sense.  And you notice

12  the other time she has to move is these bagging prongs because

13  they're facing the wrong way.

14      The idea here, the idea was, get these prongs out of here,

15  move this bagging table over.  And Johnson put in a photo.

16  It's one of the 20 -- 28J, or something.  It's in blue.  And he

17  moves it over, okay, and then cuts it off because it doesn't

18  have to be this way.

19          THE COURT:  Cuts off what?

20          MR. McINERNEY:  He cuts off the sides of the bagging

21  table like we did in what's marked as 150 over there

22  (indicating).

23          MR. WOHL:  Your Honor, it's not in evidence.  So, I

24  thought the argument is supposed to be about what is in

25  evidence.

1          THE COURT:  What is 150?

2          MR. WOHL:  He is referring to this thing of beauty

3  over there (indicating).  It's not in evidence.

4          THE COURT:  It's not in evidence.  Please don't refer

5  to it.

6          MR. McINERNEY:  Okay.  So once you've eliminated some

7  of that lower shelf under here, you can move a stool under and

8  you've created knee room.

9      He said move this coupon printer, which you have to reach

10  up to even in a standing position.  I don't know who put it

11  there, but it makes no sense.  You know --

12          THE COURT:  Well, where would it go, under what he

13  testified to?

14          MR. McINERNEY:  It could go right here (indicating),

15  but it has to be lower.  There's no -- there's no reason why it

16  has to be so high.

17      Same thing -- you know, this credit card reader, you look

18  at the pictures and there's no reason why it has to be so high.

19      He said, you know, put it on a swivel, you know, and so if

20  the clerk does have to, you know, do anything with it the head

21  swivels.

22      This is not rocket science, okay.

23      This corner, which everybody has said you can't reach,

24  okay, this far lower-left corner, you know, could be cut off.

25      You know, the idea is you want the customers to put their

1  stuff.  And if you look at the video, okay, you look at the

2  video, they're already placing their stuff so the cashier can

3  reach it.  They may put it here, but if you look at the video,

4  they -- they push it toward the cashier.

5       You know, they do use the bagging table.  But if you moved

6  it over like Johnson said, okay, what you do is you'd get rid

7  of the -- you'd create more room to put the bags on, because

8  right now there isn't enough room on the demagnetizer.  You

9  would be putting them over here, but you wouldn't have that

10 step (Indicating).  It's just stupid.

11      And the other thing is, what Dr. Fernandez is worried

12 about is this lifting and raising of stuff in the bags.  Well,

13 that's because they've got a bag well that you put the stuff

14 down into, and then you have to lift it up.

15      If you put the bags over here, okay, then you do the --

16 what you want to do.  You got the items coming across on the

17 counter, the scanner, and then you grab the bag that's right

18 here, not faced away from you, you slide the bags in and you

19 push it out to the customer.

20           **THE COURT:**  Pause on that for a second.

21           **MR. McINERNEY:**  Yeah.

22           **THE COURT:**  Because I did watch the videos, and the --

23 some of the time, not all of the time, but some of the time the

24 cashier, in one sweep of the arm, would take the item from the

25 right, slide it across the scanner, slide it across the

 1  demagnetizer, and, without stopping, drop it into the bag which

 2  was hanging from those prongs at the end.  And then it would --

 3  the left hand would open the bag, with the right hand push it

 4  in.  It seemed quite quick, maybe an operation less than one

 5  second.

 6      So I see some advantage in having the bags located at the

 7  end of that counter so that the right-to-left sweep can be

 8  terminated by dropping the item into the bag.

 9      With what you're proposing, the sweep would be a longer

10  sweep, and have to go around to a different part of the bagging

11  table.  So maybe I'm missing something, but I think you're

12  skipping over the advantage of having those bags at the end of

13  the -- right at the end of the first counter.

14          MR. McINERNEY:  You could weigh -- the disadvantage of

15  the bagging well where you drop everything in is -- and that's

16  what they do at Aldi, everything just gets dropped, okay -- is

17  that you have to lift it back up.

18      Now, to the extent that's a problem, you may get into a

19  business judgment.  But if you had the bags accessible to the

20  cashier so that they could be reached from here, the cashier

21  can be grabbing the bag and sliding the items in.

22      If you can imagine, your Honor, moving this over, okay, so

23  you've got a bigger counter area right in here, okay, then

24  you've got more room to slide things into bags and to leave the

25  bags for the customers to pick up.

1      I'd like to save a little time for rebuttal.

2          THE COURT:  Well, I have more questions for you.  I'll

3  let you save some time, but tell me -- let's assume that the

4  configuration that you just described was in place.  What would

5  the seat look like?  What would the suitable seating be?

6          MR. McINERNEY:  It would be a swivel, adjustable

7  stool.

8          THE COURT:  Would it have arms?

9          MR. McINERNEY:  No.

10         THE COURT:  Would it have a back?

11         MR. McINERNEY:  No.

12         THE COURT:  Would it have wheels?

13         MR. McINERNEY:  No.

14         THE COURT:  Would it fit under the counter?

15         MR. McINERNEY:  Yes.

16         THE COURT:  And when the cashier had to do something

17 which required standing, which would be from time to time -- I

18 think even you would admit that -- what would be the maneuver

19 that would be made by the cashier, and what would be the

20 maneuver made by the chair?

21         MR. McINERNEY:  It would be the same maneuver, your

22 honor, I've employed in decades in getting off a bar stool.

23 You slide off to the side, and you push the stool forward with

24 your leg.  It's a linoleum floor.  And, you know, you have

25 glides.  They slide.  It's not a heavy stool.

1          THE COURT:  All right.  So the employee would --

2    first, they would have to push themselves out because their

3    legs would be under the counter, right?

4          MR. McINERNEY:  No, your Honor.  The legs are under

5    the counter, but you've got clear room to rotate under the

6    counter.  You've got clearance.  It's a complete swivel.

7          THE COURT:  All right.  So with clearance, then,

8    the -- you're saying the employee would swivel, let's say, to

9    the left?

10         MR. McINERNEY:  Yes.

11         THE COURT:  And then their feet would then stand up,

12   right?

13         MR. McINERNEY:  Yes.

14         THE COURT:  And then they would -- the chair, the

15   stool would be out in the open; it would not be under.  You

16   have to push that under; is that it?

17         MR. McINERNEY:  It would be halfway out.  Because when

18   you use the stool, you know, you want your body fairly close to

19   the counter.  So it's -- it's not like the stool is out here

20   (indicating).  It's here (indicating).

21         THE COURT:  All right.  But it would be at least

22   partially protruding into the work area?

23         MR. McINERNEY:  Yes, right.

24         THE COURT:  So what would then happen, the employee

25   would then bend over and push it under the counter?

1        **MR. McINERNEY:**  (Counsel gesturing.)

2        **THE COURT:**  What does that mean?

3        **MR. McINERNEY:**  That's a knee movement, your Honor.

4        **THE COURT:**  So the employee would then use their knee

5   to nudge it underneath the counter?

6        **MR. McINERNEY:**  What did they say?  The stool was 28

7   inches high.  You can either push it with your hand, push it

8   with your leg.  And depending on why you're standing, you may

9   not have to move it at all.

10       **THE COURT:**  All right.  But when it is pushed under,

11  that's going to require movement, agreed?

12       **MR. McINERNEY:**  Yes.

13       **THE COURT:**  All right.  So now when the employee comes

14  back to resume his or her seat, they're going to have to lean

15  over and pull it back out?

16       **MR. McINERNEY:**  Right.

17       **THE COURT:**  Right?

18       **MR. McINERNEY:**  Yes.

19       **THE COURT:**  Okay.

20       **MR. McINERNEY:**  It's sort of like when attorneys have

21  to stand up, you know, from where they're at their tables in

22  the courtroom, or at their office.  You do move the chair.

23       **THE COURT:**  Now, when the employee is seated on the

24  stool, are their feet on the floor?

25       **MR. McINERNEY:**  Well, the optimum is actually a

```
 1   footrest.  And, you know, when we're going through this
 2   exercise --
 3           THE COURT:  But if there's no footrest, are their feet
 4   on the floor?
 5           MR. McINERNEY:  They can be.  I mean, there's three
 6   possibilities.
 7       Let me answer it this way.  Your feet could be on the
 8   floor, but better still, for the rest, stools have a built-in
 9   ring.  You could rest your feet on there.
10       What Johnson prefers is an actual footrest that's built
11   into the back of the counter.  But, you know, let me --
12           THE COURT:  So here's the thing.  If their feet are on
13   the floor, by definition their eye level would be reduced below
14   whatever it would be when they're standing.
15           MR. McINERNEY:  Not necessarily, Your Honor.
16           THE COURT:  No, there's no other way to do it.  If
17   your legs are bent, you're not going to be standing as high or
18   up as high as whenever your legs are straight.
19           MR. McINERNEY:  Well, that -- okay.
20           THE COURT:  All right.  See the point?  So if they
21   are -- if the legs are bent, then their eye level is going to
22   be reduced, right?
23           MR. McINERNEY:  Somewhat.
24           THE COURT:  I have one last question.  Does -- does
25   the record show where this mirror would go?
```

1    **MR. McINERNEY:**  Yeah.  What he said was, if you wanted
2  to use mirrors you would put them on the opposing checkout
3  lane.
4      You know, what you don't see very clearly here, but maybe
5  you see in the photo, is this type of a, you know, little
6  barrier.  Well, every checkout lane has those.  And you could
7  mount the mirrors along that so if you were over here you would
8  be looking at mirrors that were mounted along the next one
9  (indicating).
10     **THE COURT:**  What kind of mirror does the record show?
11  Would it be these circular things or a flat mirror?  What type
12  of mirror would actually be -- I did hear him say mirrors might
13  work, but I never saw a prototype.  I never saw any
14  demonstration that it would work.
15     What does the record show?  What's the best the record
16  would show on the mirror situation?
17     **MR. McINERNEY:**  It simply says mirrors.  It doesn't
18  say convection, concave, anything.
19     But let me make a point, if I may, your Honor.  We're
20  talking about what -- what could be done with the existing --
21  what could have been done with the existing prototype, okay.
22     But if you were going to do this, you know, from the
23  get-go, we have an example that's been around for many years.
24  It's called Europe.  And we have the photos of checkout stands
25  there.

```
 1        And, more importantly, more importantly, I think
 2   Dr. Johnson testified that although there are seated cashiers
 3   in at least three or four different types of stores -- and they
 4   do bagging.  They do it a little differently.  They say to the
 5   customer, Would you like your items bagged?  Okay.  And they do
 6   bagging.  -- there's no literature that indicates there have
 7   been any problems.
 8        And he said that you get literature when you encounter
 9   problems.  In other words, if you -- if something, a technique
10   is being used in the ergonomics field, and it's causing strain,
11   discomfort, who knows, disability, then you get literature.
12   And there's no literature out there that the seated cashiers in
13   Europe have had problems.
14        I'm told I have to stop.
15        THE COURT:  Is there any literature in our record that
16   shows that any of the cashiers in our case have suffered any
17   harm, permanent harm, as a result of standing?
18        MR. McINERNEY:  No.  You know, we have the cashiers
19   talking about being tired, their feet hurt.  It's tough
20   especially, when you're pregnant.  But, no, no disability.  And
21   we don't have records of our cashiers being permanently hurt.
22        THE COURT:  On the pregnant person, I remember the
23   testimony was that if she felt she was unable to do her job she
24   could just go home.  But if she was there to work, she was
25   expected to be standing at the cashier stand.
```

CLOSING ARGUMENT / MCINERNEY                                   1171

1          So I don't think we ought to be making a company-wide,

2    employee-wide, labor-force-wide rule just to accommodate the

3    occasional person who's pregnant.  That's a special case.

4          **MR. McINERNEY:**  Well, respectfully, your Honor, there

5    was not only Ms. Mendiola who was pregnant, but Natasha Wright

6    was, too.

7          **THE COURT:**  All right.  You have used up more than 45

8    minutes.  I'll give you five minutes for rebuttal anyway.

9          So we'll now go to the other side.  All right.  Please

10   proceed.

11                          **CLOSING ARGUMENT**

12         **MR. WOHL:**  Thank you very much, Your Honor.  Thank you

13   very much for your time in this trial.  And we know you've paid

14   close attention to it, and I'll do my best in this closing to

15   summarize what I think are the most important points for

16   consideration.

17         The starting point, of course, is Section 14(A).  That is

18   the basis for the lawsuit.  14(A)'s language, as Mr. McInerney

19   said at the outset of the trial, is very simple.  Twenty-one

20   words:

21              "All working employees shall be provided with suitable

22               seats when the nature of the work reasonably permits

23               the use of seats."

24         What it doesn't say is, for example, all employees should

25   be provided with seats period.  What it doesn't say is, all

1    employees should be provided with seats when the nature of the

2    physical work, or perhaps better put, the physical nature of

3    the work requires seats.  It says, when the nature of the work

4    reasonably permits seats.

5        It is their burden of proof, as the plaintiff in this

6    case, to have demonstrated in this trial that the nature of the

7    work of the Tulare Kmart cashiers reasonably permitted the use

8    of seats.  And plaintiff fell far short of that burden.  And

9    she fell short for three reasons.

10       Number one, as you just heard Mr. McInerney say, the

11   checkstand at Kmart is a very tight checkstand.  And there is

12   simply no room for a seat where the cashier is expected to both

13   sit for part of the time and to be up on her feet for part of

14   the time.  There's just no room for that.

15       She would have to engage in the type of movements that

16   both Dr. Johnson and Dr. Fernandez called no-value-added time.

17       What you just took Mr. McInerney through, getting off of

18   the seat, pushing it in, going about the next step and then

19   getting back on the seat, moving it back out, getting back on,

20   that's nonproductive time.  That's not consistent with the

21   Kmart model of fast, efficient processing of checkouts.

22       Number two, as the evidence showed, I think, as

23   convincingly as could be, the actual physical movements of the

24   cashier to perform that checkout process quickly and

25   efficiently are all inconsistent with sitting.  We saw those in

1    the videos.

2         Number three -- and your Honor picked up on this very well

3    in your questioning -- Kmart's business judgment, to which it

4    is entitled to make a business judgment, that cashiers need to

5    provide excellent customer service and project a ready-to-serve

6    image would not be consistent with sitting because it would not

7    project to the customer the empathy that the customer is

8    standing, the cashier is standing, too, or that the cashier is

9    on his or her feet, ready to serve, ready to do whatever is

10   required to complete that transaction.

11        We took a look at the diagram, your Honor, of the

12   checkstand.  And what you heard from the testimony is that the

13   box, as Dr. Fernandez described it, which was the space defined

14   by the front edge to the cashier, at least, of the register

15   counter, and then the edge of the sales counter to the cashier,

16   was all of 27 inches by 35 inches.  Twenty-seven inches by 35

17   inches, your Honor, that's not even a square yard.

18        And that design, whether Mr. McInerney likes it or not,

19   whether he thinks it's a good idea or a stupid idea, as he

20   said, nevertheless, that's Kmart's design, and it's there on

21   purpose.  That's not serendipity.

22        The purpose of the design is to facilitate the flow of

23   customers as quickly as possible and as helpfully as possible.

24        So what does that mean?  It means, first off, the

25   footprint is relatively small.  Why would the footprint be

1  relatively small?  Because they want to provide just enough

2  space to get the transaction processed and done, and not to

3  take over too much space in the store.

4        The testimony was there are seven checkout lines.  If you

5  had a larger footprint to accommodate more room, something has

6  to give.  You either will have to lose a checkout line because

7  now you need more space, therefore, fewer checkout, lines

8  therefore, slower processing of transactions -- that's

9  Mr. Ebert's testimony -- or you could expand the checkout lines

10  and take away some sales merchandise.

11        Well, for a store, that's not a very smart idea.  Now

12  you're selling less merchandise, less revenues, less profits.

13        Or you could hire another employee.  So now let's have two

14  employees at each checkstand.  You have a cashier who will ring

15  up the sale, and a separate bagger to bag the merchandise.

16        Guess what?  Your labor costs have now doubled.  That's

17  not a smart way to run your business either.

18        So the Kmart design is standing customers, standing

19  cashiers.  The cashiers take care of the entire transaction.

20  Let's move this flow as quickly as possible.  Therefore, they

21  have this design (indicating).

22             THE COURT:  All right.  But Mr. McInerney's proposed

23  redo would actually take less of a footprint because he would

24  move the bagging table over so that it would now be flush

25  against the demagnetizer; and, therefore, the employee would be

 1   able to reach over there and do just about everything sitting

 2   down.

 3       Now, admittedly, the bins have got to be moved to make

 4   that happen, and some adjustments have to be made in some of

 5   those -- some of those features.  But that's his -- that's his

 6   proposal.

 7           **MR. WOHL:**  Yes.

 8           **THE COURT:**  So what does the trial record show as to

 9   whether or not that would be practical, feasible, so forth?

10           **MR. WOHL:**  Okay.  Several consequences of that.  If

11   you move the bagging table over, you have now more limited the

12   space that the cashier has to move in this area because now

13   she's got a table that's running right against there.

14       So if you think about it now, the true box, not just sort

15   of the metaphysical box, but the concrete box has now become

16   much smaller than what it would have been that way

17   (indicating).

18       Number two, the video showed you there are instances in

19   which the cashier needs to come around to help the customer.

20   And that could be for a variety of reasons.

21       Now, instead of simply walking through the space between

22   the sales counter and the bagging table, the cashier, after

23   getting off the stool, pushing the stool out of the way,

24   walking around, now has to walk all the way around -- in other

25   words, wouldn't be as far as this, but still around, come back,

1   take care of the customer, walk all the way back again

2   (indicating).  Non-value-added time, your Honor.  Exactly what

3   Dr. Johnson admitted.  That's not a smart design.

4        Number three, you've already commented about the utility

5   of the bags being there, the fact that a lot of merchandise can

6   fall right in.

7        Dr. Johnson, I don't think, was very clear with us as to

8   exactly how the bag setup would be on this.  But if you recall

9   the testimony, you have basically regular-sized bags hanging at

10  the end.  You have large bags and small bags stored under the

11  bagging counter (indicating).

12       If this now is over here (indicating), and Mr. McInerney

13  is saying put the bends underneath there -- and I'll comment

14  about that for a second -- where are the bags going to go?

15       Are the bags going to be on top?  If they're on top, then

16  you have to lift the merchandise with the bags in.  It doesn't

17  work in terms of efficiency, your Honor.  That's why they don't

18  do it.

19       The bins we saw in the videos are used for two very

20  important reasons: trash and return merchandise or hangers.

21  And they were good-sized bins.  You saw that on our last video,

22  your Honor.

23       Where are they going to go, and how are they going to be

24  the same size?

25            THE COURT:  Well, they would fit, it seemed to me -- I

1    was paying attention to this point.  It does seem to me that if

2    the bagging table were moved over, or whether it was moved over

3    or not, the bins could fit under the footprint of the bagging

4    table.  But then that would displace whatever is in those

5    bagging tables now.

6         What did the record show was underneath the flat part of

7    the bagging table?

8         MR. WOHL:  The record shows those were the large bags

9    and small bags.  And we saw several instances in which the

10   cashier reached under to pull out a large or small bag.

11        So if that is gone -- that's my point.  If those are gone

12   and the bins go there, then where do the bags go?

13        Dr. Johnson could not explain where the bags -- he just

14   said, put them someplace else.  Didn't explain where.

15        In addition, Dr. Johnson said, I don't know whether the

16   bags would need to be shrunk.  I don't know how often they get

17   filled or empty.  He had no meaningful information on that,

18   whatsoever.

19        I think common sense would tell you that the underneath

20   space here and here (indicating), that is under the sales

21   counter and under the cash register counter, is larger space

22   than what would be exposed in this bagging table.  So,

23   therefore, something has to give.

24        And if you could come up with smaller bins, and still come

25   up with a solution for the bags, then I suppose you could

```
 1   squeeze them underneath.

 2        But then guess what?  Smaller bins will fill up more

 3   quickly, and the cashier will have to spend more time away from

 4   helping customers, to empty those bins to wherever they need to

 5   go.  That's not a smart design, your Honor.

 6        Dr. Johnson came up with all of these modifications

 7   (indicating).  And even with all those modifications, of he

 8   could not say that it would even work in this instance.  I

 9   asked him.

10           THE COURT:  Where did this list come from?

11           MR. WOHL:  From his testimony, your Honor.  These are

12   all modifications --

13           THE COURT:  Read off a few of those so that -- I can

14   barely read it from here.

15           MR. WOHL:  Yes.  Sorry.  Cut off --

16             (Reporter interrupts.)

17           THE COURT:  Slow down.

18           MR. WOHL:  I'm sorry, yes.

19      "Cut off end of counter where customers place merchandise

20   for purchase cut off counter."

21           THE COURT:  That doesn't make sense to me.  What does

22   that mean?

23           MR. WOHL:  "Cut off end of counter where customers

24   place merchandise."  Stop it there.

25           THE COURT:  Cutting off the corner.
```

```
 1              MR. WOHL:  Right.  That's what Mr. McInerney was
 2   saying.

 3              THE COURT:  All right.  Go ahead.

 4              MR. WOHL:  And one consequence of that, your Honor,
 5   is, there's now less space for customers to put merchandise on
 6   the counter because now you've cut off part of it.  So, now,
 7   they have to put more forward, which then can decrease the
 8   efficiency of the process.

 9        Because, now, one customer is in the process of being
10   checked out, the next customer can start loading up.  Now
11   you've lost space, so, guess what, that customer may have to
12   wait until this customer has checked out before they can start
13   loading (indicating).

14        Nothing will frustrate a customer more than having to wait
15   longer than they think they should.

16        "Shorten the counter the cash register sits on."  He just
17   wanted to shorten that.  I don't know if that has particular
18   significance other than, possibly, where the leg clearance
19   might be.

20        "Move the bagging table closer."  We talked about that at
21   length.

22        "Put the bags on the other side of the counter so you can
23   slide things across instead of dropping them down."  I don't
24   think he was specific as to where that would be.

25        And then lowering the coupon printer and bringing the
```

1    coupon printer closer, and so forth.

2        But, your Honor, here is the key point.  He admitted that

3    he knows of no retailer in the United States, or anywhere,

4    that's ever used this retrofitted configuration.  Because let's

5    appreciate what he's doing.  He's not starting from scratch.

6        He's saying, I'll accept the checkstand as currently

7    configured, in terms of standing, because I recognize they have

8    to be able to stand for part of the time.  And he contends they

9    can sit for part of the time.  So he's tried to come up with a

10   configuration that accommodates both, that would allow the

11   cashier to both sit and stand.

12       So it's retrofitting this existing configuration, to try

13   to make that work.  No retailer has ever used that.  He cannot

14   say if it would work.  And he admitted several times, Your

15   Honor -- I think you heard Mr. McInerney say the same thing --

16   these are all conceptual.  You really would just have to try it

17   and possibly revise it as you went along.

18       We heard his testimony in the *Brown vs. Wal-Mart case*,

19   Your Honor.  I think this was extremely significant.  He

20   consulted with Wal-Mart back in 2006-2007, before these cases

21   were brought, before he was the paid expert for these

22   particular plaintiffs' lawyers, because they are the ones who

23   started these cases and used him in several other cases.  And

24   he told us that was the first time he was a litigation

25   consultant.

```
 1        So here he's in his regular practice mode (indicating).
 2   Wal-Mart is paying good money for good, honest advice.  And
 3   they asked him, Can we have a seat for our cashiers?  And what
 4   does he say?  He says, well, you wouldn't want to use a seat
 5   when you have a position with a lot of upper motion in the
 6   torso.
 7        THE COURT:  What is a lean station?
 8        MR. WOHL:  The lean station, as he explained -- and
 9   this is shown -- make sure I have it right there.  Next one.
10   That was his hand drawing (indicating).
11        So, as you can see, that's where you're not really sitting
12   on the pan, where your back and waist are perpendicular.
13   You're leaning against a platform that's sort of at an angle,
14   and so it gives you a little bit of relief from standing, but
15   your feet are still on the ground and your back reclined.
16        We asked him, Are you proposing this for Kmart?
17        No.
18        We asked Dr. Fernandez and Dr. Johnson, Would this work
19   for Kmart?
20        No.
21        And why is that?
22        Because, unlike a stool, which you can move out of the
23   way, this has to be bolted to the ground because since you're
24   not sitting on top, if you lean back, it will push out right
25   from under you.  So they have to bolt it to the ground.  It
```

1   wouldn't work for Kmart because then it's in the way.  Now you

2   can't move it out of the way when you have to stand during the

3   transaction.

4        You asked us, in one of the questions, asked the LWDA and

5   the DLSE, but asked us, is this a seat within the meaning of

6   Section 14?

7        I don't know if I have an answer for you, Your Honor.

8   It's a 21-word reg that just says "a seat."  I don't personally

9   consider that a seat because you're not really sitting; you're

10  leaning.  But I can't give you a definitive answer on that.

11  Certainly, there has been no retailer that has used this

12  configuration.  As you recall Wal-Mart in fact did not use it.

13  Wal-Mart cashiers still stand.

14       This was his statement, ungarnished.  Without any

15  anticipation he would some day be an expert witness taking the

16  opposite position, he says:

17            "A seated posture would not receive as positive a

18             response from both management and customers."

19       That's why he was trying to go with the lean station,

20  because it looks more like they were standing.

21       Well, here, you're hearing these plaintiffs' counsel

22  saying, oh, customers don't mind if they sit; that would be

23  just fine.

24       Well, that's not what Dr. Johnson said, and that's not

25  what he learned when he talked to Wal-Mart customers at the

 1  time.  You heard that in his testimony.

 2      And then how about this one, your Honor?

 3          "My belief is that most of the people will use the

 4          lean stool" -- not the seat, just the lean stool --

 5          "20 to 40 percent of the time, particularly between

 6          customers."

 7      In other words, this is just going to be a resting place

 8  when they're not waiting on customers.  When they're waiting on

 9  customers, they're going to have to be up on it their feet.

10      Very, very significant, your Honor.

11      These are some of the unanswered questions that

12  Dr. Johnson was unable to address (indicating).

13      How would you effectively monitor shrink without the pass

14  through?  You asked the right question.  What kind of mirror

15  are we talking about?  How would that really work?

16      It's their burden of proof, your Honor.  It's up to them

17  to show you how this would work.  They did not do that.

18      Where would the bags be stored, especially the over-sized

19  and extra bags?  Where would you put the trash bins?  And so

20  forth.

21      How about this pin pad issue?  We saw that in the diagram.

22  You have the credit card reader or pin pad that's up higher, to

23  allow the customer easy use of that pin pad.  They want to

24  lower that.

25      Well, that might make it easier for the cashier who is

1    reaching across, but not easier for the customer because now

2    the customer has to look down as opposed to having it at eye

3    level.

4         This is supposed to be about customer service, not cashier

5    service.  I think they have the wrong idea what this job is

6    about.

7              **THE COURT:**  What about the swivel point?

8              **MR. WOHL:**  The swivel point, Dr. Fernandez was very

9    clear, and Dr. Johnson, he admitted this as well, in order to

10   move lateral items in a swivel seat you have to brace yourself

11   because, otherwise, you'll go moving because there's no

12   resistance to keep yourself from moving as you move the lateral

13   merchandise.

14             **THE COURT:**  You answered my question, but I was

15   referring to the pin pad.

16        Mr. McInerney just told me a moment ago you could have it

17   swivel around even at the same height, so that the cashier

18   wouldn't have to go out into the aisle to look at it.

19             **MR. WOHL:**  And that's true.  It could swivel.  But

20   look at where it's still located on the counter (indicating).

21        Recall, Dr. Fernandez testified that this counter is

22   only -- is 23 inches deep, but that the normal work range -- I

23   asked him again this morning -- the normal work range is more

24   like 17 inches if you're standing, 15 inches if you're seated.

25        So even with a swivel credit card reader, they would still

1   have to reach, they would still have to extend to do that.

2       You might say, what's the big deal about a reach.  We all

3   reach sometimes or the other.

4       But Dr. Fernandez said the issue, in terms of a risk of

5   MSD -- musculoskeletal disorders -- is repetitive reach.  If

6   you keep doing it beyond the normal range, that's where you get

7   into trouble.

8       So the ergonomist would never want to design something

9   that basically requires or invites the employees to engage in

10  reaches or stretches or raising the arms.  That's not good for

11  the employee ergonomically.  Their solution wouldn't resolve

12  that issue at all.  They would still be stretching across the

13  counter.

14      Dr. Johnson simply disregards the fact, when he complains

15  about standing not being good for you, that, as Dr. Fernandez

16  testified, standing still, like a Beefeater at Buckingham

17  Palace, is a tough thing to do, yes, but if you're constantly

18  in motion, if you're constantly moving your feet, then that

19  alleviates that problem.

20      Antifatigue maps help very much.

21      And then your Honor put this in the correct factual

22  context.  The evidence shows you that these cashiers, on

23  average, work only four and a half hours a day; they get a rest

24  break after about two hours, consistent with California law;

25  and in the break room or in the restaurant they can sit down.

```
 1              THE COURT:  How long is the break?

 2              MR. WOHL:  Fifteen minutes.  In fact, they go beyond

 3   what is required by law.  The law is 10 minutes.  They get 15

 4   minutes at Kmart.

 5              THE COURT:  Do they get paid for a full eight hours?

 6              MR. WOHL:  Eight hours would be two breaks.

 7              THE COURT:  So they get -- they get paid whatever the

 8   hourly rate is, but the workday is four and a half?

 9              MR. WOHL:  Average workday, the evidence showed, was

10   four and a half hours.  That's right.  Mr. Gonzalez testified

11   to that.

12              THE COURT:  What is -- what is your view of the

13   evidence on the configuration and the electronics sticking down

14   four and a half inches?  Run through that part with me.  I am

15   trying to keep that -- how that affects the analysis.

16              MR. WOHL:  Are you referring to the scanner, Your

17   Honor?

18              THE COURT:  Correct.

19              MR. WOHL:  Yeah, so the evidence was the current

20   scanner has a four and a half inch or five inch piece of

21   equipment that's underneath, that further restricts your knee

22   clearance.

23              THE COURT:  Does it?  That's the point I'm trying to

24   find out.  Notwithstanding that, would someone be able, if you

25   got the bins out of there -- would there be room for your
```

```
 1   knees?

 2        MR. WOHL:  So the issue, as Dr. Fernandez described,

 3   was, if they're going to be in a seated position, you want

 4   their elbows above the work area.  You don't want them reaching

 5   up.  You don't want them reaching down.  You want them to be

 6   level.  So where you put the seat depends on how tall they are

 7   and where their elbow height is.

 8        And, also, remember the issue of thigh thickness.  If you

 9   have someone who's got very thin thighs, they can sit higher

10   because there's still clearance.  If you have someone who has

11   very thick thighs, you can't.  And thigh thickness isn't

12   necessarily related to height.  Usually is, but not

13   necessarily.

14        So if you have an extra four or five inches sticking down

15   under the counter, which you have to clear, then that's going

16   to decrease how high you can elevate.

17        And then if you compound that with a thigh thickness

18   problem, you won't be able to sit very high.  And so what

19   happens now?  You're sitting, but your elbows are up like this

20   (indicating) because you're not sitting high enough to go over

21   them, or you have to unnaturally reach to be over.

22        That's not a good ergonomic solution.  And I don't think

23   Dr. Johnson disputed that either.

24        THE COURT:  What is the distance between the floor and

25   the bottom of the electronics?
```

1        MR. McINERNEY:  Does your Honor -- I don't want to

2   interrupt.  It's 31 and a half.  Dr. Johnson testified that

3   it's 36 to the top of the counter.

4        MR. WOHL:  That sounds right to me, too, your Honor.

5        THE COURT:  Thirty-one and a half.  All right.  So why

6   wouldn't that leave enough clearance?

7        MR. WOHL:  Well, it depends, again, on where the

8   person sits.  But Dr. Johnson was recommending a stool that

9   would be somewhere between 24 and 26 or 27 inches.

10       And then you've got the thickness of the thighs.  And then

11  you're trying to position on top --

12       THE COURT:  So if somebody was at 25, and they had

13  thick -- I don't know how thick six inches is but -- so you're

14  adding the seat height --

15       MR. WOHL:  Because you want to leave two inches

16  clearance, your Honor.  You don't want to have the thigh

17  immediately against the counter.  That would be uncomfortable.

18  You'd have friction and irritation.

19       You still have to have a two inch clearance -- Dr. Johnson

20  said that -- two inch clearance between the top of the thighs

21  and the bottom of the cabinet.

22       THE COURT:  So what is your view of where that would

23  put the average person in terms of where the -- where their eye

24  level would be?

25       MR. WOHL:  Well, the point -- one of the points of

 1   Dr. Johnson's configuration was to try to put the eye level as

 2   the same level as the customer is standing.

 3       I think it just depends on the individual.  I can't give

 4   you a complete answer to that.  It depends on the individual.

 5   Some could be looking up, some level, some down.  Just depends

 6   on --

 7            **THE COURT:**  I don't see how it's physically possible

 8   to have your eye level at the same level and still have your

 9   feet on the floor.

10            **MR. WOHL:**  No, can't have feet on the floor.  That's

11   right.

12            **THE COURT:**  That's just plain, ole logic.  If your

13   legs are bent so that they're getting a rest and they're on the

14   floor then, by definition, the upper part of your body is

15   lowered.

16       But, what if -- what I'm trying to understand is, how much

17   lower would it be?

18            **MR. WOHL:**  So, your Honor, let me address that very

19   clearly.  Both Dr. Johnson and Dr. Fernandez, particularly

20   Dr. Johnson, agreed you need to have a footrest.  You cannot

21   have them sitting on the stool or leaning against the stool

22   with their foot on the ground.  That's not a sound position to

23   be in.

24       So your question is exactly right.  If their feet are on

25   the ground, that's not going to work.  They would not be eye

```
 1   level.
 2           THE COURT:  What does a footrest look like?  Is it
 3   horizontal, or is it at an angle?
 4           MR. WOHL:  I don't think that they were terribly
 5   specific about that.  I think they talked about a couple of
 6   bars where you have a choice between one or two bars to put
 7   your feet on.
 8       And a bar is not a true footrest.  You have to still exert
 9   pressure to keep your foot comfortably on that bar.  As opposed
10   to a flat piece of wood, that is a true footrest, that you
11   could rest your whole foot on.
12       I don't think the evidence gives you a satisfactory answer
13   on that.
14       Dr. Fernandez said that depending on where you rank on the
15   percentile of height, that footrest might have to be as high as
16   12 inches or even 14 inches.
17       Because if you're short and are getting yourself high
18   enough up so that you are at eye level and your elbows are
19   above the counter, your feet are so far above the ground that
20   you need a footrest 12 to 14 inches.
21       He says that would create a significant risk of trying to
22   get up and off of that footrest because you're so high up.
23       Your Honor, this is why no retailer uses this
24   configuration.  It's an absurd configuration.
25       And, certainly, Aldi and the Europeans don't use this for
```

1    that very reason.  No one could ever imagine you would put a

2    cashier up on a foot -- stool, particularly where in the Kmart

3    model they have to get up and down constantly.

4        The other important issue here --

5            THE COURT:  Why would they have to get up in the Aldi

6    model?

7            MR. WOHL:  Because in the Aldi model they don't do the

8    things that Kmart cashiers do.  They don't bag.  They don't

9    provide customer service.  They don't go finding things for the

10   customer.  Their job is simply to scan and --

11           THE COURT:  How do they take care of BOB, over in

12   Aldi?

13           MR. WOHL:  No evidence they do.  We have no evidence

14   they do anything.

15           THE COURT:  Do they use shopping carts at Aldi?

16           MR. WOHL:  I'm told that the customer brings the

17   shopping cart up.

18           THE COURT:  Is that in the record?

19           MR. WOHL:  I don't even know that this is, your Honor.

20   It was their proof, not ours.

21           THE COURT:  I don't want you to rely on things that

22   are not in the record.

23       Didn't we have some photographs of Aldi's?  Did it show

24   shopping carts?

25           MR. WOHL:  I think there were some photographs of

1   Aldi.  I don't recall if there were shopping carts or not, your

2   Honor.

3        What was undisputed is that the customer does most of the

4   work.  It's a different model.  And if it works for Aldi, which

5   is a German company, if it works in the UK, that's fine.  Good

6   for them.

7        It's not the American model that Kmart and all the other

8   leading retailers use.  And nothing in 14(A) says we have to

9   adopt the European model.  That's not what the statute says.

10  Or the wage order says.  Excuse me.

11       Take a look, your Honor, at the original version of the

12  suitable seating requirement.  This is -- the original version

13  the wage order was called Section 23, when it was adopted in

14  1920.  And this wage order had language different than what the

15  current version says.  I know you can't read that.  I'm going

16  to read it.

17            **THE COURT:**  I can almost read it, but read it to me.

18            **MR. WOHL:**  (Reading)

19            "Seats shall be provided at work tables or machines

20             for each and every woman or minor employed, and such

21             seats shall be capable of such adjustment and shall

22             be kept so adjusted to the work tables or machines

23             that the position of the worker relative to the work

24             shall be substantially the same, whether seated or

25             standing.

1            "Work tables, including sorting belts, shall be of

2               such dimensions and design that there are no physical

3               impediments to efficient work in either a sitting or

4               standing position, and individually adjustable

5               footrests shall be provided.  New installations to be

6               provided [sic] by the Commission.

7        So in the 1920s, for the benefit of women and children --

8   this didn't apply to men in those days -- the original version

9   had all types of very substantive requirements for how the

10  workspace would have to be configured, to make sure that the

11  seat would allow the person to work at the same level and would

12  have a footrest, and even to the point that new installations

13  would have to be approved by the Commission.

14       Well your Honor, by 1947, when it was then called Section

15  17, that was dropped.  All of that language was dropped.  And,

16  instead, it simply reads:

17           "Suitable seats shall be provided for all female

18            employees."

19       The second part is really the predecessor of 14(B), as Mr.

20  McInerney already talked about.  But this is all it says:

21           "Suitable seats shall be provided for all female

22            employees."

23       And then it got changed so that by about 1968, it was:

24           "All working female employees shall be provided with

25            suitable seats."

 1        And then 1976, when it was expanded to include men, it was

 2   the same language which currently exists, which is:

 3             "All working employees shall be provided with suitable

 4              seats when the nature of the work reasonably permits

 5              the use of seats."

 6        **THE COURT:**  What is your point?

 7        **MR. WOHL:**  Very significant, Your Honor.  The point

 8   is, number one, if the IWC, when it went through these

 9   iterations, had intended for employers to be governed by these

10   much more specific configuration requirements, it would have

11   retained that language.

12        And Mr. McInerney mentioned the *Brinker* case.  If you

13   recall the *Brinker* case, California Supreme Court, in parsing

14   through the meal period requirements of the various wage

15   orders, said that when the IWC or the legislature dropped

16   language that originally was there, that more -- that

17   differently regulated how meal periods should be taken, that

18   was a significant omission and meant that requirement no longer

19   existed.

20        And that's exactly what happened here.

21        **THE COURT:**  What was dropped in our case?

22        **MR. WOHL:**  Nothing about that you would have to --

23   just what I read, your Honor, that you would have to, number

24   one, have them be capable of such adjustment so that they would

25   be relative -- same level above the tables.

```
 1        And that the work tables, including sorting belts --

 2   because recognize, your Honor, this was really originally

 3   enacted with an eye towards manufacturing, and probably some

 4   textile -- shall be of such dimensions and design that there

 5   are no physical impediments to efficient work in either a

 6   sitting or standing position.

 7        In other words, the original version of this, basically,

 8   said it needs to be a sit/stand situation.  You need to be able

 9   to work either sitting or standing.  Well, that's gone.  That's

10   been gone since 1947.

11        And for any court to ingraft on what the current language

12   is the reconfiguration requirements that their case depends

13   upon without reconfiguration of the checkstand -- their case

14   goes away because they admit the cashiers can't do the job

15   sitting in the current configuration -- then there is no

16   obligation under Section 14(A).  Case goes away.

17        And the case law is very clear, your Honor.  When the

18   governing body, the legislation, the regulatory takes away the

19   requirements, the requirements are gone.  They are not to be

20   reinstituted through some sort of interpretation by a court.

21        Okay.  Let's talk about nature of the work.  We went

22   through in the evidence -- and this was both in the job

23   descriptions and Mr. Gonzalez's testimony, as well as testimony

24   of the cashiers -- as to what the job requirements were.

25        And Mr. Gonzalez, who as you recall sitting in the
```

1  courtroom, was an individual who spent 34 years at Kmart, and

2  has himself worked as a cashier, as well as trained cashiers

3  and supervised cashiers, and worked his way up to where,

4  currently, he is vice president of the company.  He took you

5  through the entire process of the checkout.  And his emphasis

6  was very clear about, you need to show that excellent customer

7  service and taking care of all the customers' needs in

8  proceeding with the checkout.

9        So he talked about during the transaction all these

10  requirements, which including assisting the customer with the

11  pin pad, including putting the customer items in the cart, as

12  well as, of course, what we saw, handling the merchandise,

13  bagging it, and so forth.

14        He talked about away from the checkstand how you can't

15  stand around, how you have to sort and straighten merchandise.

16  You have to straighten the front end merchandise area.

17        In fact, we saw, your Honor, in the 15-minute video clip

18  that they presented, the cashier, who seemed very friendly,

19  very engaged with her customer, when she was done with the

20  transaction she then attended to her cash drawer.  When that

21  was done, what did she do?  She walked away to the front of the

22  checkstand and started organizing, straightening the

23  merchandise.

24        That's not a standing job.  Excuse me.  A sitting job.

25  That's not a job where you sit waiting for the next customer to

1   come.  You take care of customers.  And when they're gone, you

2   then straighten out your checkout and go outside of the

3   checkout stand.

4       I thought it was very probative of what these folks do.

5       Then of course, your Honor, we had the videos.  And we

6   played a lot of videos.  And they played videos.  And they

7   showed you, I thought, very clearly the actual physical

8   movement of these cashiers.

9       (Photographs displayed.)

10      The big reach for merchandise.  Her foot is now off the

11  ground and certainly very extended.

12      Another big reach, where their whole body reached over the

13  counter.  And reaching for big items.

14      We saw using the passthrough, what I described before,

15  walking from here, around here, to help her customer.

16      And here, walking through to attend to something in the

17  front.

18      That space is used, Your Honor.  They want to get rid of

19  that space, make the cashier walk all the way around.  Makes no

20  sense.

21      And, here, again helping the customer with the customers'

22  needs.

23      Using the bagging table.  Extensive use of the bagging

24  table when, in the interest of efficiency, it helps move the

25  customer to here, to make room now for the next customer

 1  (indicating), instead of having the customer start to

 2  congregate there, and that backs up everything else.

 3      The purpose of the work is to process the transactions as

 4  quickly as possible.

 5      The cashier is there to serve the customer.  The customer

 6  is not there to serve the cashier.  That's what they seem to

 7  have it wrong.

 8      And we saw use of bagging table, including a lot of bags

 9  and merchandise.  Which, as Dr. Fernandez testified, as you can

10  observe, sometimes include heavy items by themselves or a

11  combination of heavy items, makes the bag very heavy.

12      It's a big discount department store.  People tend to buy

13  a lot of items.

14      And we saw the heavy items.  This one -- this cashier is

15  handling a 35-pack of water.  You recall those are stacked in

16  front of the bagging table.

17      See them right here, your Honor (indicating)?

18  Mr. Gonzalez said their biggest single item they sell, five

19  million units a year, 35-packs of water.

20      Lifting the heavy items.  We were guessing it was coolant.

21  I don't know.  But it was a large, heavy bottle.

22      And that was, I think, a 6 or 12 -- bigger than 6, 12 or

23  24-pack of soda.

24      This is real, Your Honor.  This is not just sort of

25  spinning things or conjecturing.  The picture doesn't lie.

1  This is what they're doing.

2      And the test isn't whether they are doing it a hundred

3  percent of the time or some smaller fraction of time.

4      This is what they're doing.  They don't know from customer

5  to customer what the needs are going to be.

6      Their opinion is, well, let's make it tougher for the

7  cashier to do this part of the job.  That they say this is on

8  behalf of the cashiers, I'm sorry, give me a break.

9      This is going to make it tougher for the cashiers because

10 now when someone comes with that 36-pack of soda, or whatever

11 it is, they've got to make the effort to get off of the chair,

12 move the chair out of the way, and then handle it, as opposed

13 to being standing ready to serve, to accept that large item and

14 get it processed quickly.

15     Look at that item, Your Honor.  Maybe not every

16 transaction is a big box like that, but there are certainly

17 some.  And they've got to deal with it.

18     They can't tell the customer, sorry, I'm seated, I can't

19 handle that.  That's you're job.  You need to figure it out and

20 bring it to me.  Which, frankly, is the Aldi model.

21     I'm not going to dwell on this, for the sake of time, but

22 they had cashiers testify, and those cashiers presented, I

23 would say, a different view of what they were doing.

24     But we have photographs from the videos of their own

25 witnesses handling large items.  I believe that's Ms. Hamilton

1    handling a big item.  And there she is stretching.

2           **THE COURT:**  Do you have a photograph of the bagging

3    table, so that I could see what is inside there?

4        I don't want you guessing what's inside there.  You said

5    there are bigger bags.  Is there a photograph that demonstrates

6    that?

7           **MR. WOHL:**  We will find that for, your Honor.  I don't

8    have it in my PowerPoints, but I'm sure we do.  We'll get that

9    for you, your Honor.

10       If I may move on.

11          **THE COURT:**  Go ahead.

12          **MR. WOHL:**  Customer service -- get this moved -- I got

13   it.  There we go.

14       Ms. Hamilton was very candid with the Court about customer

15   service:

16          **"QUESTION:**  Have you ever asked a customer to bag

17            their own merchandise?"

18       Was the question.

19          "No.

20          **"QUESTION:**  Would you ever do that?

21          **"ANSWER:**  No.

22          "Why not?

23          "That's not good customer service.

24          "How about working fast and efficiently?

25           "Ms. Hamilton, you agree, of course, that the most

```
 1              important part of your job as a cashier was to keep

 2              the customer satisfied, right?

 3         "ANSWER:  Yes.

 4         "QUESTION:  And you knew it was important to Kmart

 5              that you work as fast and efficiently as you could,

 6              correct?

 7         "ANSWER:  Yes."

 8      And look at this, Your Honor:

 9         "Me, being as a customer before, I just know I don't

10              want to spend the whole time at the checkouts."

11      We all understand that, your Honor.  Nobody wants to be in

12 line for a long time.

13      And, in fact, recall the testimony was, Kmart,

14 Mr. Gonzalez talked about this, has a three-customer-in-line

15 limit.  Maybe they don't always achieve it.  They strive for

16 it.  But they see three customers in line, then the cashier is

17 supposed to ask somebody else to man a new checkout line.

18      Your Honor, I have that photograph with the side of the

19 bagging table.  It's Exhibit 15-64.

20         THE CLERK:  Put it on the Elmo.  I'll switch it over.

21         MR. WOHL:  Okay.

22         THE COURT:  That picture, on the left side there of

23 the demagnetizer --

24         MR. WOHL:  I see two racks of bags here (indicating).

25         THE COURT:  There two racks?  Okay.
```

1        **MR. WOHL:**  And that, I believe, are the normal-sized

2    bags.  I think that bag hanging on the side of the bagging

3    table is probably the small bag.

4        And then the shelves.  And there's three shelves there.

5    Mostly big bags.  There could be some additional supplies.

6    Smaller bags, I suppose.  I believe the top one or two are the

7    big bags.

8        You saw frequently in the videos, they need those big bags

9    if there's a big item or a bunch of items like the clothing

10   that we saw in their video, the cashier holding and stacking

11   beneath the big bag.

12       **THE COURT:**  So tell me only if the evidence is in the

13   record, on the pin thing, do customers put in their pin number

14   on there?

15       **MR. WOHL:**  Yes, Your Honor.

16       **THE COURT:**  Is that in the record, or is that just you

17   talking?

18       **MR. WOHL:**  No, I believe that's in the record.  That's

19   used for both credit cards and debit card transactions, as well

20   as, your Honor, it's in the record, that's used for surveys.

21       **THE COURT:**  I remember that part.

22       **MR. WOHL:**  And do you remember several times we saw in

23   the videos the customer struggled with how to use it, and the

24   cashier had to walk around to show the customer how to use it.

25       Think about it, your Honor, again, the cashier is trying

 1   to deliver excellent customer service.  If the customer is

 2   struggling, the cashier wants to project:  I'm here to help.

 3   I'll make this process go as quickly and pleasantly for you as

 4   possible.

 5        If the cashier has to be in an awkward position doing

 6   that, it will convey this is a hassle, this is a problem, I

 7   wish you weren't bothering me with this.  They won't say those

 8   words, of course, but that could be the message.

 9        That's not the message that Kmart wants to deliver.  And

10   Kmart is entitled to deliver a customer friendly image.  That's

11   part of its business judgment.  That's part of the nature of

12   the work.

13        And look, your Honor, look at the bags that are all here.

14   Those go away because Mr. Johnson wants to push this over, and

15   so now it's right against this counter.  You can't use that

16   space for bags anymore.  It's all blocked.

17        So where are they going to go?  Dr. Johnson didn't give

18   you an explanation for that.  He didn't tell you where that's

19   going to go.  That's because he hasn't thought it through.

20   This is entirely conceptual.

21        Your Honor, you asked, in one of your questions to the

22   agencies, well, what if you have a job that mixes the two?

23   What if sometimes they're standing, sometimes they're sitting,

24   what does that mean in terms of the nature of the work?

25        The courts in the *Hamilton* case and the *Kilby* case -- so

 1    *Hamilton*/SF *Hilton*, were the desk attendants, *Kilby* were the

 2    pharmacy cashiers -- they addressed that issue.

 3         And they said, you can't just parse out an individual

 4    duty, and even though some duties could be performed while

 5    seated, that means you give a seat.  They said, let's take a

 6    common sense approach, let's look at the job as a whole.

 7         And if the predominant function of the job is one that

 8    requires standing, well, then, there's no requirement to

 9    provide a seat.

10         Desk attendants, there could be times that they don't need

11    to be standing --

12              **THE COURT:**  What if, in this case, 80 percent of the

13    physical work could be done while seated, does that mean seats

14    should be provided?

15              **MR. WOHL:**  If it were truly the case that 80 percent

16    of the job could be done seated, that might well be a different

17    case, your Honor.  We concede that.

18         That is sure not this case.  That is sure not this case.

19    Everything you've seen shows you that is sure not this case.

20         The Grabau directive -- I'm going to spend just a little

21    time on that.  You heard the deposition testimony.  It was

22    nothing that they were trying to portray.

23         For better or for worse, Ms. Grabau had a knee jerk

24    reaction which was, gee, if there's a threat of lawsuits on

25    horizon, maybe we can avoid those lawsuits by telling our store

1   managers go ahead and give them seats.

2       Did she really consult with anybody in operations?  Did

3   she really think it through?  Did she personally think it was a

4   good idea?  No.  She said she didn't.  She just thought this

5   was a good way of avoiding litigation.

6       And, in fact, as you recall, when she told her store

7   managers about the directive, their negative response was:  You

8   kidding me?  That's crazy.  These guys could be hurt if they're

9   trying to do their job seated.  Whoever dreamed up this law?

10  That doesn't make any sense for our business.

11      So, obviously, in hindsight, I'd say, gee, I wish she

12  hadn't done that because that creates an issue or an impression

13  that maybe this could be done.  But that's not what she meant.

14  And she explained that in her deposition.  I think that's a

15  non-issue, particularly given the testimony you've seen.

16      We now then come to the third big issue which your

17  questions talked about, which were the business judgments and

18  what is the role of business judgment?

19      There's no dispute that Kmart's business judgment here is

20  that cashiers need to stand and project that ready-to-serve

21  image.  And, in fact, they do need to stand to perform these

22  job duties, in Kmart's judgment.

23      And Dr. Zeithaml, who was the industry or the retail

24  expert on customer perceptions, made clear that this is an

25  industry standard, and there's good reason for it to be because

```
 1   that's what convinces customers that it's a customer-friendly

 2   establishment, and that they are there -- sorry, judge, that

 3   went too far -- that it did go, for purpose of great customer

 4   service.

 5        Kmart is not Aldi.  So they point to Aldi and ASDA and

 6   Wilkinson, and say, well, look, they sit there so why can't

 7   they sit here?

 8        But it's not the same.  In the United States we have a

 9   different expectation of customer service.  Customer service is

10   all important.  Over there, customer service isn't very

11   important.

12        In fact, we heard testimony that at ASDA, they -- take it

13   back.  At is Aldi, Dr. Johnson said, the customer has to pay

14   for bags.  The customer has to pay for a shopping cart.  You

15   have to actually pay money to get a shopping cart.  And, of

16   course, you bag your own items.

17        That is not the Kmart model.  They want to do it

18   differently in Europe, God bless 'em.  That's not our model.

19        We cite your Honor to the Hamilton vs. Hilton and Kilby

20   vs. CVS Pharmacy case.  In both of those cases, the Court said

21   the employers' business judgment that, respectively, hotel desk

22   attendant and drugstore cashiers need to stand to project a

23   ready-to-serve image, that those were legitimate judgments by

24   the employer.

25        And here's a very important point, your Honor.  They
```

1  wanted to portray this as the law requires seats and the

2  employer's business judgment can't trump that.

3      I would agree that if the law requires seats, business

4  judgment does not trump that.  You asked the example what if

5  the employer wanted to have just female cashiers.  We don't

6  want to have male cashiers serving our customers.  But the law,

7  Title VII, says you can't do that.  You can't discriminate.

8  The correct answer is, too bad, you have to have male cashiers.

9      What's different about this case?  The predicate is the

10  nature of the work.  Again, 14(A) does not say provide all

11  employees with seats, or employ all employees with seats with

12  the physical demands required.

13      It says provide seats when the nature of the work

14  reasonably permits it.  And the employer's judgment about what

15  that work is about, what is the job supposed to do, is part of

16  the determination in the first instance.

17          **THE COURT:**  Your time is up.  Take one minute to wind

18  up.

19          **MR. WOHL:**  Thank you, Your Honor.

20      I'm going to use my time to talk, just quickly, about

21  penalties.  I don't think you'll get to this point, but I do

22  need to mention it.

23      PAGA, of course, invests in you discretion as to whether

24  to award penalties and, how much penalties to award, and says

25  that you can decline or at least reduce them if in the

1    circumstances of the particular case to do otherwise -- that is

2    not to reduce -- would to result in an award that is unjust,

3    arbitrary, and oppressive or confiscatory.

4         Your Honor, I cannot think -- and I've been doing this for

5    over 30 years now.  I can't think of a case that is more

6    compelling why penalties should not be assessed, even if you

7    were to find a liability.

8         What's been the industry standard?  Are we outliers here?

9    Are we the only ones who aren't providing seats?

10        The industry standard is, none of them provide seats.  We

11   are totally in line with what everyone else has been doing all

12   the time.

13        The wage order, in one form or the other -- in fact, as we

14   saw, an even more onerous wage order -- has been in effect

15   since 1920.  How many DLSE enforcement actions have there been

16   over nearly a century against employers to provide seats to

17   cashiers?  None.  Zero.

18        My friend, Mr. McInerney, misstated.  He said the DLSE

19   would have to go to the district attorney and take out a

20   criminal complaint.  That's not true.

21        The DLSE could issue a citation and assess a penalty, and

22   then it would go to civil court to decide whether that was well

23   founded or not.

24        The DLSE, of course, could simply contact the employer and

25   say, gee, I think you're doing this wrong.  I think you need to

1  provide seats.  How many times have they done that?  Zero.

2  Zero.

3          **THE COURT:**  You are well over your time now.

4          **MR. WOHL:**  The only two opinions are out there are in

5  favor of not providing seats, and then all the cases have said

6  no seats.

7      All right, your Honor.  I'm sorry.

8          **THE COURT:**  Your time is up.

9          **MR. WOHL:**  All right.  *Christopher vs.* --

10          **THE COURT:**  You'll get your chance to put in findings

11  of fact and conclusions of law, which I still have to read.

12      Five minutes, Mr. McInerney.

13                      **REBUTTAL ARGUMENT**

14          **MR. McINERNEY:**  Thank you for your indulgence, Your

15  Honor.  I appreciate it.

16      First of all, a lot of points to cover, and they may come

17  in a little disjointed.  I apologize.

18      With respect to what the DLSE could have done in the past,

19  they could have issued citations, but they could only collect a

20  penalty if it was specifically provided in the Labor Code

21  before.  Before 2004, there was none.

22      The testimony of Johnson was that he thought it was best

23  bagging on top.  That's why he would put the bags on top, so

24  you could slide the items in.

25      We talk about --

```
 1          THE COURT:  If you to that, where are you going to put
 2   the goods once they're bagged?
 3          MR. McINERNEY:  Well, that's it.  You create more room
 4   by moving it over, your Honor.
 5          THE COURT:  No, you said you were going to truncate
 6   that and reduce -- you were going to cut off the top part of
 7   that bag.
 8          MR. McINERNEY:  Cut that off, your Honor, slide it
 9   over.  I put the bags here, on top.  The cashier takes a bag
10   and brings it to slide the items into.  (Indicating.)
11          THE COURT:  All right.
12          MR. McINERNEY:  There's no lifting.
13          THE COURT:  But once that's done, where would the
14   bagged item go?
15          MR. McINERNEY:  Okay.  You've got to pretend it's over
16   here, right (indicating).
17          THE COURT:  Yes.
18          MR. McINERNEY:  Okay.  You reach for the bag, you
19   slide the items in, and then you've got all this area to push
20   bags on to (indicating).
21          THE COURT:  But that's where you had the bags to begin
22   with.
23          MR. McINERNEY:  No, I got the bags here your, Honor
24   (indicating).
25          THE COURT:  That part you said you were going to cut
```

1    off.

2            **MR. McINERNEY:**  No, no.  I cut this part off, this top

3    inch.  I put the bags here, okay. (Indicating.)

4            **THE COURT:**  Uh-huh.

5            **MR. McINERNEY:**  I've got all this new area

6    (indicating).

7            **THE COURT:**  All right.  So you have that area, but it

8    would be -- roughly speaking, it's going to be 30 to 40 percent

9    of the unused area to fill the bags in, as opposed to a hundred

10   percent they have now.

11           **MR. McINERNEY:**  Yeah, but look at the film.  They're

12   not using the whole area.  Remember --

13           **THE COURT:**  That's not true.  I saw instances where

14   the whole area was being used.

15           **MR. McINERNEY:**  There certainly are.  And in those

16   cases, presumably the customer would have a cart, and the

17   customer would start putting things in the cart.

18       But, remember, we've got to talk about the norm here

19   because the norm is 5.6 items per transaction.  And when we

20   talk about how often a cashier would have to rise, assuming

21   they were seated, assuming they were seated, it's once every

22   ten minutes, if I recall the testimony.  That's when you've got

23   a heavy item, once every ten minutes.

24       You know, this statute doesn't say, you know, seats will

25   be provided, shall be provided when the nature of the work

 1  requires continuous seating.  It says when it permits it.

 2      The cashiers, depend on how they feel, if they're tired or

 3  not, they may elect to do this standing.  I mean, it's not the

 4  idea that they -- they're required to sit, and then they have

 5  to pop up every ten minutes, or whatever it may be in reality,

 6  okay.  It provides an opportunity for rest and recovery if the

 7  worker wants to use it.

 8      And there have been a lot of phony issues here --

 9      THE COURT:  Well, but in between customers they're

10  supposed to be -- they're supposed to abandon the workstation

11  and go straighten out shelves.

12      MR. McINERNEY:  And that's fine.  You know, if they've

13  got to go straighten the candy, or even go further and

14  straighten the blouses, sure they can walk away.  They don't

15  have to sit.  It's no requirement.  It's the idea of giving

16  them a seat if they want to use the seat if they're getting

17  tired.  It's as simple as that.

18      And we got to keep focusing on the nature of the work.

19  And the nature of the work is scan and bag heavy items every

20  ten minutes.

21      This stuff about reach, the counter, that counter is 23

22  inches.  We're not talking about extended reaches.

23      This is really -- you know, we talk about these water,

24  okay.  But Mr. Gonzalez was talking about Super Ks and Big Ks.

25  This is a Big K.  It's not a full grocery store, okay.  So

1   maybe water gets sold by the truckload at a Super K, the

2   grocery-type Kmart, okay.  But these films were taken in

3   August, in Tulare.  It's warm in August, in Tulare, California.

4   How many cases of water did you see?

5        We've got to focus on Tulare.  We've got to focus on a Big

6   K.  And we've got to focus on what's the nature of the work.

7   If we spin off on to designing workstations for the future,

8   we're in la la land.

9        You know, one of the questions we had during certification

10  is, where is this work performed?  Well, we now know because

11  there was a circle created in that small mat.  And that circle

12  tells us where the cashier's work is performed.

13       He says, well, these cashiers talked about it.  Well, let

14  me ask, where are the other 65?  Where are the 65 they got

15  subpoenaed?  Where are the three that were on their rolling

16  witness list?

17       These cashiers that we put on, they represent the work of

18  the cashiers.  They are the only ones who testified.

19       And if we want to talk about Ms. Grabau, where's

20  Ms. Grabau?  Where is she, to explain what she meant and

21  thought?

22       Ironically, when you read her testimony carefully, she's

23  asked, well, tell us -- Mr. Righetti asked her in her depo,

24  tell me, which -- which instance do you actually know where a

25  manager followed your policy and gave a seat?

```
 1          She said, well, I know one up in Santa Rita because I was
 2     there.  And the manager was confronted with a situation where a
 3     cashier was requesting a stool.  And the manager said, well,
 4     she doesn't have a doctor's note.  And, see, that's the old
 5     policy.  It tumbled out in Grabau's testimony.
 6          And Ms. Grabau says, well, I told that manager she doesn't
 7     need a doctor's note because now, here in California, we just
 8     give it on request.
 9          And when you give a seat on request, okay, what does that
10     imply?  It implies that they believe that the essential
11     functions of the cashier could be done while seated.
12          It's not if the cashier comes up and requests a seat, oh,
13     send them home without pay.  Just send 'em home.  No.  It's, go
14     get a wooden stool.  This is what she said, go get a wooden
15     stool and give it to them.
16          And they can't -- they can't move away, they can't move
17     away from what their practice is.
18          Now, practice to me is a stronger word than policy.
19     Practice to me implies what was actually done, okay.
20          And they used -- can I get that one exhibit?  I'm sorry.
21     Here, let me see if I can find it.  Come on up here.
22          Your Honor, I want to say, while I'm fumbling through this
23     as an old lawyer, that we -- we do appreciate the patience of
24     the Court not only with old lawyers but in allowing younger
25     lawyers to testify -- or not to testify.
```

```
 1            THE COURT:  Well, I certainly have heard a --

 2       (Laughter)

 3            MR. DOSTART:  I apologize.

 4            MR. McINERNEY:  It's us old lawyers who want to

 5   testify, you know.

 6       But the Court -- I never really thought of it so much, but

 7   it is a wonderful training thing.

 8            THE COURT:  What are you looking for, Mr. McInerney?

 9            MR. McINERNEY:  Well --

10            THE COURT:  What was it?

11            MR. McINERNEY:  I'm looking for the page out of the

12   summary judgment.

13            THE COURT:  You mean something I said?

14            MR. McINERNEY:  Yeah.  Here it is.  No, no, Your

15   Honor.  It's something that Kmart said.

16            THE COURT:  Oh, all right.

17            MR. McINERNEY:  Put that up.

18       (Document displayed.)

19            MR. McINERNEY:  Now, you know, we talk about those

20   prongs that used to stab the cashiers when they tried to walk

21   in that aisle?

22       Well, you know, there are prongs in Rule 11.  And I think

23   the prongs are out here that they tried to back away, because

24   right there, at line 14, under "undisputed facts," undisputed

25   facts:
```

1           "However, it has been Kmart's practice during the

2               relevant time period to give cashiers seats upon

3               request."

4      Pretty hard to avoid the implication of that.

5      So if I have even 30 seconds left, I'd like to save that

6  in case I ever have the pleasure of trying another case in

7  front of your Honor.

8           **THE COURT:**  Thank you, Mr. McInerney.

9      All right.  We will look forward to reading your findings

10 of fact proposed and conclusions of law proposed.

11     Remind me when those are due.  I have forgotten what the

12 order said.

13          **MR. MICHAEL RIGHETTI:**  Appears nobody knows.

14          **MR. MATTHEW RIGHETTI:**  We think it's the Wednesday

15 after Thanksgiving.  So I think it's the same day as the

16 submissions to the labor commissioner.

17          **THE COURT:**  All right.  Great.

18          **MR. ADKINS:**  28th, correct?  28th, your Honor.

19          **THE COURT:**  Okay.  I've run out of questions.

20     I want to say that neither side came close to using all of

21 the time that was allocated to you.  So -- I'm talking about

22 evidence time.  So please do not complain to the Court of

23 Appeals that there were time limits.

24     You told me upfront you were going to call 75 witnesses

25 and it would be Armageddon, you needed all this time it turned

1   out you didn't need.  I gave you all the time.

2        And no one even referred to the mockup that was sitting

3   here in court, and all that.  So you can take the mockup away.

4        Is that the slide 2B that has the -- does that have the

5   handwritten -- that one, I want you to leave behind.  I need to

6   consult that.

7        And be sure when you leave here today that every single

8   exhibit that is in evidence is with Dawn, so that when this

9   case goes to the Court of Appeals those exhibits can go up

10  there, too.

11       All right.  Done?

12       **MR. McINERNEY:**  Yes, Your Honor.

13  (Counsel simultaneously reply.)

14       **THE COURT:**  Thank you counsel.

15  (Counsel simultaneously thank the Court.)

16  (At 11:40 a.m. the proceedings were concluded.)

17                             -  -  -  -

18

19

20

21

22

23

24

25

1218

```
1                        I N D E X

2   DEFENDANT'S WITNESSES                    PAGE    VOL.

3   FERNANDEZ, JEFFREY
    (PREVIOUSLY SWORN)                       1061     6
4   Cross Examination Resumed by Mr. Dostart 1061     6
    Redirect Examination by Mr. Wohl         1120     6
5   Recross Examination by Mr. Dostart       1133     6
    Further Redirect Examination by Mr. Wohl 1139     6
6

7   Closing Argument by Mr. McInerney        1145     6
    Closing Argument by Mr. Wohl             1171     6
8   Rebuttal Argument by Mr. McInerney       1209     6
                        - - - - -
9
```

*Katherine Powell Sullivan, CRR, and Debra L. Pas, CRR*
*Official Reporters - U.S. District Court*
*(415) 794-6659*

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | VOL. | EVID | VOL. |
|---|---|---|---|---|
| 218-E and 218-G | | | 1061 | 6 |
| 389 | | | 1060 | 6 |
| 390 (PREVIOUSLY MARKED AS 389) | | | 1143 | 6 |

- - - - -

1

2

3                      **CERTIFICATE OF REPORTERS**

4            We, KATHERINE POWELL SULLIVAN and DEBRA L. PAS,

5    Official Reporters for the United States District Court,

6    Northern District of California, hereby certify that the

7    foregoing proceedings in C 11-2575 WHA, **Lisa Garvey vs. Kmart**

8    **Corporation,** were reported by us, certified shorthand

9    reporters, and were thereafter transcribed under our direction

10   into typewriting; that the foregoing is a full, complete and

11   true record of said proceedings at the time of filing.

12

13   DATE:   Tuesday, November 20, 2012

14

15

16   _____
             Katherine Powell Sullivan, CSR #5812, RPR, CRR
17                      U.S. Court Reporter

18

19   _____
                  Debra L. Pas, CSR #11916, RMR CRR
20

21

22

23

24

25