1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

LISA GARVEY, individually and on
behalf of others similarly situated,

        Plaintiff,

  v.

KMART CORPORATION,

        Defendant.

_____/

No. C 11-02575 WHA

**CLASS ACTION**

**FINDINGS OF FACT AND
CONCLUSIONS OF LAW
AFTER BENCH TRIAL**

**INTRODUCTION**

      This is the first of the so-called "seating" cases to go to trial, a certified class action for
recovery of penalties under California's Private Attorney General Act of 2004.  Plaintiff alleges
that that defendant has failed to provide suitable seats for checkout cashiers in violation of a
California wage order.  This order is the decision of the Court following a one-week bench trial.

**SUMMARY**

      "All working employees shall be provided with suitable seats when the nature of the
work reasonably permits the use of seats," according to the law in California.  In this civil action,
class counsel have failed to prove that the nature of the work reasonably permits the seating
modification urged by counsel at trial.  Possibly a different modification involving a lean-stool
would be provable but this record does not support it.

**United States District Court**
For the Northern District of California

**PROCEDURAL HISTORY**

Plaintiff commenced this action in California state court in April 2011, alleging that defendant Kmart Corporation failed to provide suitable seating for checkout cashiers in violation of California Labor Code Section 1198 and Section 14(A) of Industrial Welfare Commission Wage Order 7-2001, the latter of which provides:  "All working employees shall be provided with suitable seats when the nature of the work reasonably permits the use of seats."

Plaintiff sought civil penalties under California Labor Code Private Attorney General Act Section 2698, as well as attorney's fees and costs.  Defendant timely removed the action to our federal district court in May 2011.

Defendant moved for summary judgment in January 2012.  Following stipulations by the parties, the briefing schedule was repeatedly extended to accommodate the parties' discovery needs.  An April 2012 order denied the summary judgment motion, concluding that (1) the wage order did not require employees to affirmatively request a seat; (2) the wage order did apply to Kmart cashiers; but, (3) there was a genuine issue as to whether the work of Kmart cashiers reasonably permitted seats.

Plaintiff sought to represent a class of Kmart cashiers throughout California, approximately 5600 individuals from 100 stores (Dkt. No. 75).  In July 2012, an order certified a narrower class of 71 cashiers limited to a single Kmart store in Tulare, where the named plaintiff worked (Dkt. No. 92).  The class was specifically defined as:  "All persons who, during the applicable statute of limitations, were employed as a Cashier for defendant at its Tulare Kmart store and were not provided with a seat while working the front-end cash registers."  The class was limited to a single store because of potential problems of manageability with statewide certification.  Certification of the narrower class, proper in and of itself, would illuminate, in the Court's judgment, the extent to which genuine individual issues might preclude statewide class certification.  The possibility of certifying a broader class as to the rest of the Kmart stores in California remains open.  At trial, no class manageability issues arose and, indeed, it became apparent that class treatment for at least the Tulare store was entirely appropriate.

United States District Court

For the Northern District of California

In October 2012, plaintiff moved for sanctions on the basis of spoliation of evidence (Dkt. No. 126).  Following oral argument, an order ruled that defendant had failed to preserve and failed to produce relevant evidence pertaining to cashiers' use of Kmart checkout registers (Dkt. No. 180).  The order did not specify a sanction but concluded that defendant's destruction of evidence might warrant a burden shift depending on the parties' positions at trial on liability and damages.  In the actual event, however, this faded away.

Two weeks before trial, defendant moved to decertify the class as a sanction for alleged discovery violations and on the grounds that plaintiff planned to call a statistically insufficient sample of class members (Dkt. No. 175).  Following argument at the pretrial conference, this motion was denied (Dkt. No. 179).

Both sides initially listed an inordinate number of witnesses for trial.  Plaintiff identified 79 witnesses; defendant identified 78 (Dkt. Nos. 127–128).  The parties subsequently retreated from these lists.  The parties' joint proposed pretrial order winnowed plaintiff's and defendant's potential witnesses down to 20 and 14 individuals, respectively (Dkt. No. 166).

The trial commenced on Tuesday, November 13.  During the trial, plaintiff called six live witnesses.  Plaintiff also read in testimony from a deposition, and one witness' written testimony was admitted by stipulation.  Defendant called only four live witnesses to the stand.  Plaintiff elected not to put on a rebuttal case.  The parties were each accorded 12 hours of time for witnesses at trial, with additional time for opening and closing statements (Dkt. No. 179).  Due to the parties' concerns about the effects of the holidays on the parties' and witnesses' schedules, the Court also agreed to a flexible end date for the trial.  The bench trial concluded on Tuesday, November 20, following closing arguments on the sixth day of testimony.  Both sides finished the trial with substantial amounts of unused time.

During the trial, the undersigned judge requested that the California Labor Commissioner and the Secretary of the California Labor and Workforce Development Agency submit amicus briefs on the meaning of IWC Wage Order 7-2001 Section 14 as to five specified questions.  Plaintiff and defendant both submitted comments to the amicus entities on the questions posed (Dkt. Nos. 200, 203).  On December 7, the California Labor Commissioner filed a short brief,

3

but it did not specifically break out its discussion so as to answer all five questions (Dkt. No. 238).

During the trial, defendant timely moved for judgment under Federal Rule 52(c) (Dkt. No. 201). That motion is addressed by the instant order. Defendant also renewed its motion to decertify the class (Dkt. Nos. 202). During the trial, however, no genuine commonality issues arose and therefore defendant's motion to decertify is **DENIED**.

Following the close of evidence, both sides submitted lengthy proposed findings of fact and conclusions of law, followed by responses (Dkt. Nos. 229, 234, 236–37). It is unnecessary for this order to sort through all of the proposals, for this order will find its own way through the evidence. Nor is it necessary to cite the record. Citations will only be provided that may assist the court of appeals. Any proposal in the parties' proposed findings of fact that has been expressly agreed to by the opposing side shall be deemed adopted. In the findings, the phrase "this order finds . . . " is occasionally used to emphasize a point. The absence of this phrase, however, does not mean (and should not be construed to mean) that a statement is not a finding. All declarative statements set forth herein are factual findings.

## STATEMENT OF FINDINGS OF FACT

Here are the findings of fact most important to the outcome of the case.

### ANATOMY OF A FRONT-END CHECKOUT STAND AT THE TULARE KMART

1.     At issue in this class action are the seven "front-end" cashier stands located at the front of the Tulare store, adjacent to the customer entrance. The term "checkout stand" herein refers to all of the features described in the remaining paragraphs in this subsection. The following top view used at trial will assist the reader (with apologies to the reader for the illegibility of the handwritten material, most of which is too small to read in this reproduction but which is unnecessary for understanding this order). The "box" and the "pass-through" have been added by the Court in this image — those labels were not on the original of TX 216A.

United States District Court

For the Northern District of California

Top View Scheme (TX 216A)

2.      The checkout stands in question resemble checkout stands all of us have seen in modern times.  Nonetheless, a detailed description now follows.

3.      When a customer enters a Tulare Kmart checkout lane, he or she first encounters the receiving end of a 57-inch long checkout counter.  The 57-inch surface serves as an assembly line for processing items from the receiving end where the items are placed by customers to the terminal end where the items are bagged by the cashier.  The 57-inch counter is actually a cabinet with open interior space underneath, open to the cashier side.  The cabinet measures 57 inches in length, 23 inches wide, and 36 inches in height.  The receiving segment is about 22 inches long.  The farthest point thereon, diagonally on the surface of the checkout counter from where the cashier usually stands is approximately 32 inches, meaning that the cashier must at times reach 32 inches to move along some items.  There is no conveyor belt.

United States District Court

For the Northern District of California

4.      The rest of the 57-inch long cabinet is primarily covered with built-in equipment used in completing the transaction.  Next after the receiving end is a flat scanner surface for scanning the bar codes on merchandise.  Rising above the counter at a vertical right angle to the flat scanner is another scanner at the customer edge of the counter that catches codes on the sides of packages.  One or the other scanner will usually read the bar codes.

5.      Next is a built-in flat demagnetizer pad that rises only slightly above the surface of the counter.  When objects are placed on the demagnetizer, various types of security tags used to prevent theft are deactivated.

6.      Situated between the demagnetizer and the scanner — but higher up at a customer-friendly height and on the customer side of the counter — are the credit-card reader and check-writing pad.  The check writing pad is in a fixed position along the side edge of the checkout lane.  The credit card reader includes a pin pad for inputting information (and is sometimes called a pin pad).

7.      The items usually pass quickly from the receiving end to the terminal end of the counter, passing by the scanner, then the demagnetizer, and are then dropped into bags conveniently hanging from prongs at the finish line of the counter, all often in a single sweep of motion by the cashier, at least for the lighter weight objects.  Then, the bags are placed by the cashier on the separate bagging table or in the customer's basket or handed to the customer.

8.      On the exit side, the bagging table is set away from the main processing counter by a "pass-through" wide enough to allow passage by the cashier to and from the customer lane.  The surface of the bagging table measures 47.75 inches long by 28.25 inches wide.  Its long direction runs at a right angle to the long direction of the main processing counter.  The surface of the bagging table is 31.75 inches above the floor, a few inches lower than the main processing counter.  Underneath the surface of the bagging table are open cabinets that hold several sizes of plastic bags.

United States District Court

For the Northern District of California

9.      The following photograph (TX 15-64) also illustrates the layout:



Photograph from Customer Side of Counter (TX 15-64)

10.     As illustrated in the photograph above, the "pass-through" is between the bagging table and the checkout counter.  It is a 21-inch wide gap space that provides the cashier with access to and from the checkout lane.  Part of this space is occupied by four metal prongs which support the plastic bags most frequently used by cashiers for bagging items, that is, the bags that usually terminate the sweep of the item from start to finish, as the item is dropped into a bag (hanging on the prongs) and then moved to the bagging table.

11.     Underneath the surface of the 57-inch long checkout counter cabinet, accessible to the cashier, is a cabinet space.  The bottom of the scanner protrudes downward 5.5 inches into this open space from the top of the checkout counter.  This space also contains a bin with an open bag that is used for trash.

7

12.     Yet a third surface holds the cash register and affiliated items.  This third feature is another cabinet protruding horizontally from the main counter at a right angle in an L-shaped configuration with the long side of the L being the main processing counter, and the cash register cabinet being the short side.  The cash register sits on top of an open cabinet, 36 inches above the floor, that is, the bottom of the cash register is 36 inches above the floor.  From the cashier's perspective, the cash register cabinet is to the right of the checkout counter cabinet, and is flush with the receiving side of the checkout counter cabinet (the side first encountered by a customer entering the checkout lane).  The following photograph (TX 216B) illustrates:



Photograph Looking Over Bagging Table Toward Main Counter and Cash Register (TX 216B)

**United States District Court**
For the Northern District of California

13.     At the bottom of the cash register is a till for cash.  At the top of the register is a keyboard, an elevated touch-screen display monitor, and a receipt printer.  The bottom of the receipt printer is 16.25 inches above the top of the cabinet surface that supports the cash register.

14.     On the left side of the cash register is a coupon printer.  The coupon printer is elevated and separate from the cash register.  The bottom of the coupon printer is 23.5 inches above the surface of the cabinet that supports the cash register, and 22 inches back from the front of the cabinet where the cashier stands.

15.     Underneath the cabinet that supports the cash register is an open space.  Within this space there is a bin containing an open plastic bag.  Cashiers use this bin for discarded clothes hangers and items that customers choose not to purchase.  So there are two bins:  this one for returns (under the register) and one for trash (under the scanners).

16.     Other notable features of the checkout stand are the hand scanner and the anti-fatigue mat.  The hand scanner is usually stored on the top of the cabinet supporting the checkout register, next to the base of the register and on its left side.  The cashier can pick up the hand scanner and, depending on the circumstances, either lean and reach over the surface of the checkout counter, or else walk through the pass-through aisle and manually scan items in the customer's cart.  These items may be on the surface of the checkout counter, or in a customer's shopping cart.  The anti-fatigue mat is a flat pad on the floor in the corner formed by the cabinet under the cash register and the checkout counter cabinet.  This is where the cashier does most of the work.  This area is called the "box."

### THE TYPICAL CHECKOUT PROCESS AT A FRONT-END CHECKOUT STAND

17.     The assembly-line processing of merchandise will now be explained in more detail.  Upon arrival at the checkout stand, the cashier logs in to the cash register computer.  The cashier puts cash in the till as necessary, and opens the first two plastic bags, leaving them hanging on the metal prongs.  Then, the cashier turns on the light in the checkout lane to signal to customers that the checkout lane is open.  The cashier is required to stand for all of these duties.

**United States District Court**
For the Northern District of California

18.     The cashier greets customers as they arrive at the front of the checkout lane. Customers then typically place merchandise for purchase on the checkout counter at the receiving end of the counter.  The cashier manually takes an item and drags it over the surface of the scanner, one at a time.  If the scan is successful, the register will make a beeping sound.  The flat scanner tries to read bar codes on the bottom.  The vertical scanner tries to read bar codes on the sides.  If the cashier doesn't hear a beep, the cashier repeats the scanning motion until the register recognizes the item.  This is usually done in a sweeping motion with one or both arms.

19.     Once the item is scanned, the cashier touches the item momentarily to the surface of the demagnetizer to deactivate any security devices.  Certain items, such as dog food and containers of water, do not use such devices and do not need to be demagnetized.

20.     Once the item is scanned and any security tags are deactivated, the cashier places the item in a plastic bag supported by the metal prongs at the end of the checkout counter. When filled, bags are transferred over to the bagging table or handed to the customer.

21.     For large, heavy, or awkwardly-shaped items, the cashier has three options. One is to manually move the item from the receiving end over the checkout counter, over the scanner and demagnetizer, and then bag it.  Alternatively, the cashier can reach over to scan the item with the hand scanner while it is still in the cart.  This is a long reach.  When the bar code is not reachable in this way, the cashier can walk through the pass-through (between the bagging table and the checkout counter) to scan the item in the customer's cart using the hand scanner.

22.     In rare cases, very large items are brought to the checkout lane on flatbed carts by other Kmart employees.  The item can be scanned with the hand scanner, or the bar code can be torn off the item and scanned in the checkout stand.  Large, heavy, or awkward items are not always bagged.  When they are, the cashier may place them on the bagging table and use larger-sized bags underneath the table to bag the item.

23.     Some items of clothing require additional procedures.  More expensive articles of clothing use a special, reusable "gator clip" security tag.  The cashier will remove the gator clip security tag using a handheld detaching device at the checkout stand, and then fold the article before putting it in a bag.  If the merchandise is an article of clothing with a hanger, the cashier

10

**United States District Court**
For the Northern District of California

1    will ask the customer if they want to keep the hanger.  If the customer does not want the hanger,

2    the cashier will drop it into the bag under the cash register.

3          24.    During the checkout process, the cashier asks if the customer is a member of the

4    Kmart loyalty program.  If so, the cashier asks for the customer's phone number and keys it into

5    the keyboard on the cash register.  If the customer is not a member, the cashier asks if they

6    would like to become one.  If so, the cashier uses the cash register to input the customer's

7    information and sign them up.

8          25.    During the checkout process, the cashier follows standard processing procedures

9    known as "BOB" and "LISA."  "BOB" stands for "bottom of the basket," and refers to the

10    requirement that a cashier look in both the bottom and the top of all customers' shopping carts

11    prior to completing the checkout transaction.  "LISA" stands for "look inside always," and refers

12    to the requirement that a cashier look inside of a closed item for purchase, such as a backpack or

13    a cooler, that could contain other items.  Both procedures are intended to insure that all of the

14    items that a customer brings to the checkout lane are scanned and purchased.  BOB and LISA

15    are "anti-shrink" precautions.

16          26.    If a customer purchases certain restricted items, such as alcohol, the cash register

17    will automatically pause the transaction.  The cashier will ask the customer for identification.

18    In order to complete the scanning process for that item, the cashier will enter customer

19    information into the cash register using the touch screen panel.

20          27.    If the cashier is unable to scan an item or there is a price discrepancy, the cashier

21    will step away from the checkout stand to place an phone call to the appropriate department in

22    the store.  There is one such phone for all seven cashiers.  Upon returning to the checkout stand,

23    the cashier can enter updated information into the register, or use the register to process and print

24    out a rain check for the customer.

25          28.    When the transaction is complete, the cashier asks the customer if they would like

26    to use a Sears credit card to pay for the purchases.  If the customer does not have a Sears credit

27    card, the cashier asks if the customer would like to sign up for one.  If the customer signs up for

28

a Sears credit card, the customer enters information using the credit card reader, and the cashier enters information using the cash register touch screen.

29.     Otherwise, the customer can pay for the transaction using a credit card or debit card in the credit card reader, by check, or with cash.  The cashier often has to assist the customer in pushing the right buttons on the reader.

30.     If the cashier does not have sufficient change for a cash transaction, the cashier will leave the checkout stand briefly to get additional change from a service desk in another section of the store.

31.     At the end of the transaction, the cashier may also leave the check stand to make a phone call requesting another employee to help the customer move a heavy cart or carry a heavy item out to the parking lot.

32.     A typical cashier's shift is four and a half hours.  At approximately the two-hour mark, the cashier gets a paid fifteen-minute break.  During this break, cashiers usually go to the employee break room, which contains space for sitting and eating, or to the public restaurant in the Tulare store.  Cashiers are otherwise required to stand while working.

33.     In sum, most of the tasks done by a Kmart cashier could be done while seated but some tasks can only be done while standing.  Standing tasks include processing heavy, large, and/or awkward items; scanning items in a customer's cart with the hand scanner; looking inside closed items in a customer's cart; straightening the checkout lane when customers are not present; and retrieving additional change for the cash register.  While these are a minority of the time, they nonetheless occur so frequently when the checkout lane is busy that cashiers must be standing many times over the course of an hour.  Put differently, even if seating were allowed, cashiers would be up (and down) frequently to perform the tasks that require standing.

**ANALYSIS AND CONCLUSIONS OF LAW**

34.     The public policy of the State of California is that "[a]ll working employees shall be provided with suitable seats when the nature of the work reasonably permits the use of seats," as set forth in Section 14 of Wage Order 7-2001 issued by the Industrial Welfare Commission, which provision has the full force of law.  Neither the Commission nor the California Labor

United States District Court

For the Northern District of California

Commissioner (DLSE), charged with enforcement of the wage order, has previously interpreted Section 14 as it might apply to the case in hand.

35.     It does not matter that sedentary work has its own health problems.  The welfare balance between standing and sitting has been decided by the Commission.  The Court will not and should not be drawn into a debate over whether it is a wise or unwise policy.

36.     Although the Court requested an amicus brief from the DLSE on five questions, its brief addressed more general considerations and did not answer the five questions. Nonetheless, this order will attempt to follow the general guidance of DLSE and consider the nature of the work and all of the facts and circumstances as set forth in the trial record. The Court is much obliged to the DLSE for its amicus brief.

37.     This civil action does not present any issue under any of the disability laws or parental leave laws.  Section 14 covers able-bodied class members and the extent to which they are entitled to seating.

### DESIGN AND SAFETY

38.     Class counsel concede that some physical cashier tasks require standing and further concede that the suitable seating is not possible in the standard Kmart cashier stall. So, even class counsel acknowledge that simply adding seats to the Tulare store would not work. In a moment, this order will evaluate the proposed re-configuration urged by class counsel, but first it is instructive to see why seating would be impractical and unsafe, with or without the reconfiguration urged by class counsel.

39.     If a stool were introduced in the "box" area occupied by the cashier — which area measures only 27 inches by 35 inches — the stool would be an obstacle course in moving back and forth from the cash register to the bagging area with respect to those tasks that concededly would have to be done while standing.  The Court concludes and finds that this would inevitably lead to stumbles as the cashier hustled from one end of the box to the other.  It would be unsafe.

40.     In acknowledgment of this problem, class counsel propose to redesign the cashier stand so that a stool could slide out from and back under the main processing counter. The standard Kmart stall design now uses that space for trash disposal, using a bin resting on

an elevated bottom shelf a few inches off the main floor.  In other words, the shelf now in use is raised from the floor and would block the stool from sliding under the counter.  So the raised bottom shelf would have to be torn out so that the stool could slide along the floor and under the counter.  Also, this would facilitate making room to bring the legs of the cashier under the counter.  The trash bin there now would have to go elsewhere.  According to class counsel, it would go inside the bagging table, displacing the less-frequently-used-size bags, more about which later.

41.     While this redesign would leave room to store the stool under the main counter — and would leave enough room for the knees and thighs of the cashier to go under the countertop — there would be a stool-movement problem due to the fatigue mat.  The legs of the stool would catch on the fatigue mat and would, in the Court's judgment, not slide smoothly in and out of the under-counter area.  In this regard, neither side presented evidence on this practical question, but this order is confident from ordinary experience that the fatigue mat and the legs of the stool would be an unhappy match.

42.     The fatigue mat is needed at all events because of the standing required by the job.  If wheels were added to the bottom of the legs, this movement problem would be mitigated, but then the risk of an unstable landing on the stool would be aggravated, especially since class counsel also propose a swivel seat.  By landing, this order means the repositioning in going from a standing position to a seated position while managing to land one's rear end squarely on the stool seat.  Such repositioning would have to be frequent.

43.     There would be two movable features of the proposed stool — leg wheels and a seat swivel — and the cashier would need to look carefully for the dead center of the stool each time to make a safe landing.  There would be frequent ups and frequent downs even if most of the work could be done while seated.  Since the stool would almost always be behind the cashier and out of view, the temptation would be to sit without looking carefully and this temptation would lead to accidents.  Again, no evidence was presented by either side at trial on how a swivel stool with wheels would actually work in practice, with or without a fatigue mat.

44.     No stool was brought in, much less one with wheels and a swivel seat.

14

45.     While class counsel built a plyboard mock-up of the stall itself before trial, class counsel withdrew it as an exhibit before trial started.  Defense counsel then subpoenaed the mockup but never used it at trial.  It simply remained in the well of the courtroom like a stranded whale on a beach.  It was never used by either side to illustrate anything.

46.     The Court would be exceedingly reluctant to order Kmart to use a seating system that poses a safety hazard.  Put differently, as to the proposed design modification, plaintiff has the burden to prove that "suitable seating" exists.  Suitable seating must mean safe seating. Class counsel have failed to prove this aspect of their case.

47.     Staying with the proposed design modification by class counsel, there is a further, separate problem.  Class counsel propose to (i) move the bagging table to be flush with the end of the main processing counter and (ii) to shorten the length of the bagging table.  The idea is to bring the bagging table within the long arms reach of a cashier, if seated as proposed by class counsel.  As explained at closing argument, it would look like this:



*Figure 1:  Modification by Moving the Bagging Table*

15

**United States District Court**
For the Northern District of California

48.     This diagram is not a trial exhibit but is the Court's modification of TX 216A to reflect the proposed modification as described by class counsel during closing argument.  Note well that it would eliminate the pass-through, would shrink the overall footprint, and would lop off part of the bagging table.

49.     As stated, the advantage of this modification is that it would reduce the reach required of a seated cashier so that the cashier could remain seated and, with a long reach, still touch the bagging table to deposit the lighter weight items in bags.

50.     The main problem with this modification, however, is that it would eliminate the pass-through.  The pass-through is an important feature allowing swift passage of the cashier to and from the customer lane to scan items and to assist with larger items in the cart (and also to verify that there are no items left in the bottom of the basket).  Without the pass-through, the cashier would need to walk all the way around the bagging table.  This would be less convenient for the cashier and lengthen the checkout time and thus be less convenient for customers.  Although each one-way passage would be only five or so extra seconds, the extra time per customer would accumulate to a material overall inconvenience imposed on the checkout process for all customers and a material overall inconvenience imposed on the cashiers themselves.  The whole point of the pass-through is to avoid this very delay.

51.     To mitigate this problem, class counsel would reduce the size of the bagging table, as stated.  In this way, there would be less of a "around-Robin Hood's barn" route.  This would reduce some of the delay, but most of the delay would remain.  And, this would reduce the surface space available for bagging.  Moreover, it would frustrate class counsel's idea to move the trash bin under the bagging table (recall that class counsel proposed to move the bin to under the bagging table in order to make room for the stool under the main processing counter).  This frustration would occur because the open space under the bagging table accessible to the cashier would be shrunk due to (i) the shorter length of the bagging table and (ii) the fact that most of the cashier-facing side of the bagging table would become blocked by the main processing counter (*see* figure above).

United States District Court

For the Northern District of California

52. Finally, eliminating the pass-through would also destroy the convenient location where the most frequently-used bags now hang. Where these bags (and the larger bags displaced by the relocated trash bin) would go is a mystery.

53. To this, class counsel also say that the pass-through is unnecessary because a system of mirrors would be erected to spy on the bottom of baskets to carry out BOB. That is, the cashiers could remain seated and glance at well-positioned mirrors to check the bottoms of baskets for merchandise. How this would actually work was never demonstrated. Class counsel asked one or two witnesses about the use of mirrors in Europe but even this was sketchy evidence. It remains totally unclear the extent to which a reliable mirror system could be deployed in the Tulare store. Class counsel's mirror theory fails as mere theory and not proven as usable and effective in the Kmart setting. It bears stating that a mirror could not possibly relieve cashiers from having to use the pass-through for other tasks such as scanning a large box in a shopping cart with the hand scanner.

54. In sum, this order rejects the proposed modification by class counsel as too unsafe, too inefficient, and too inconvenient to customers and cashiers. Adoption of the proposed modifications would unreasonably interfere with Kmart's legitimate interest in providing quick and efficient customer service so as to compete with other big box stores.

**THE GRABAU POLICY DIRECTIVE**

55. As "seating" lawsuits were being filed against its competitors, a Kmart HR official, Aimee Grabau, adopted a "policy" that any cashier in California Kmarts would be allowed to use a seat at the cashier stall if he or she asked for one. This was a tactical defensive measure against the eventual day that Kmart would also be sued. It was a secret policy in the sense that cashiers were never notified of this new policy. The policy was never reduced to a memo or email, or if it was, those were destroyed. The only extant documentation of the policy was a slide in a PowerPoint presentation (TX 389). In pretrial proceedings, Kmart asserted the policy as a defense, but the Court ruled that Section 14 was not conditioned on an affirmative request by the employee, rejecting Kmart's line of defense based on this policy.

United States District Court

For the Northern District of California

56.    In a complete turnabout at trial, Kmart counsel then argued that the policy was inadmissible altogether, claiming that it was a "subsequent remedial measure" under Rule 407. This too was rejected.  Kmart wanted the benefit of the secret policy when it thought it might be a defense, but when that lost, it wanted to deep-six the policy altogether to prevent its use against Kmart.  No one, by the way, was ever given a chair at the Tulare store under this secret policy or anywhere else in California, with the sole exception of a store in Sonoma where one cashier possibly was allowed to sit.

57.    After all of Kmart's machinations, it would be poetic justice to hold Kmart to the full implications of its so-called policy, namely to hold that providing a seat in the existing configuration would be safe and practical.  This would, however, not be actual justice, nor actual safety.  Even class counsel have conceded that a chair (or stool) cannot be safely used with the existing configuration.  And, after hearing all the evidence, the Court agrees on this point. Despite severe misgivings about the way Kmart has tried to manipulate the proceedings, the just answer remains that the proposal by class counsel is just not safe and workable.

**LEAN-STOOLS**

58.    In view of evidence concerning how some chains in the United Kingdom and Europe operate with seated cashiers, and in view of the broader industrial welfare themes argued at trial by both sides, this order will now go further and consider more elaborate, revised configurations for cashier stands.  No such specific configuration was actually placed in evidence or subjected to any test runs, so this analysis is necessarily limited to more general considerations.  In the Court's view, the best case for a plaintiff class would involve a form of lean-stool.  As a part of this analysis, this order finds that the term "seats" in Section 14 includes "lean-stools."  Rigid lean-stools allow an individual to place most of their weight on a supported seat, while remaining in a more upright, leaning position.  This was the alternative recommendation by plaintiff's ergonomics expert to WalMart (when he was acting as a business consultant rather than a litigation expert), though WalMart rejected the concept.

59.    The most likely practical alternative would involve a lean-stool permanently affixed to the floor (with its height adjustable to the individual cashier).  Its slim profile would

18

**United States District Court**
For the Northern District of California

1  provide more space to walk back and forth between the register and the bagging table (than

2  would the movable stool proposed by class counsel).  To accommodate the lean-stool and

3  extra walking space, a larger overall footprint would probably be necessary.  At Tulare, this

4  would require tearing out the existing stalls and replacing them with the larger configurations.

5  This would cost several hundred thousand dollars at Tulare and reduce the number of lanes from

6  seven to six (unless extra space was deducted from an adjacent merchandise area).

7      60.    The advantage of this expansion would be that the cashier could lean-sit against

8  the lean-stool and take some weight off their legs while still doing most of the work as

9  efficiently as now.  The pass-through could stay where it is.  The bagging table could stay where

10  it is.  The cashiers would not *sit*.  They would *lean*, almost in a standing position.  Their feet

11  would be on the floor.  The stool would be positioned so as to allow the cashier to lean for

12  routine processing and to stand quickly for the tasks that require standing.

13      61.    It would still be necessary, however, for cashiers to stand during the following

14  operations:  (1) processing heavy and bulky items; (2) stepping through the pass-through and

15  then into the customer lane to check the bottom of the basket and/or to scan a large item left

16  in the shopping cart; (3) to deposit filled bags on the bagging table or in the cart; (4) to assist

17  customers with the pin pad; (5) to stretch for items near the receiving end of the counter for

18  incoming merchandise.  Although these tasks take up a minority of the time at the work station,

19  they happen so regularly during each hour that cashiers would be up and down frequently even

20  in such a configuration.  Put differently, even if standing is required only for ten percent of the

21  tasks, that ten percent occurs so often during each hour that it will result in repetitive rising and

22  sitting (leaning) by the employee.  A lean-stool, when used by a cashier, would keep the cashier

23  poised to stand so as to maintain efficiency and the appearance of efficiency.  The lean-stool

24  would have to be close enough to where the cashiers now stand to allow convenient reach, yet

25  there would need to be adequate clearance to avoid an obstacle-course problem as the cashier

26  moved from, to take one example, the pass-through to the cash register.

27      62.    The fact that Kmart would have to invest some money in reconfiguring the stands

28  would not be a showstopper, for the reconstruction expenses for the Tulare store would be

reasonable — in the same ballpark as the fees paid to its ergonomics expert in our trial. Section 14 requires seating so long as the work reasonably permits. The reconfiguration expense and extra space would likely be nominal in relation to the interests involved.

63.    It bears repeating that class counsel placed little evidence supporting such a lean-stool configuration into evidence and the foregoing is only a generalized notion by the trial judge after hearing all of the evidence. Although the Court views some variant of a lean-stool as the best case for the plaintiff class, this concept was so weakly developed at trial that this order will not find that the work reasonably permits the use of lean-stools, at least on this record.

64.    To be very clear, this order does *not* approve or order lean-stools but only notes that, after hearing all the evidence, lean-stools seem to be the only possible candidate for seating that plausibly would be consistent with the job requirements — a proposition not yet proven by counsel. Before even requiring such seating, the Court would insist on hearing the views of cashiers, the ergonomics experts, safety experts, and Kmart management. This would have to be in a trial involving a different class. The trial on this class at the Tulare store is over and finished.

### CUSTOMER SERVICE

65.    We now come to one of Kmart's main arguments at trial, namely that its cashiers should be required to stand in order to project a ready-to-assist attitude to the customers waiting in line, all of whom are already standing.

66.    If an employer has a reasonable basis for requiring employees to stand rather than sit, then this order holds that such a reasonable basis must be considered in deciding whether the employees' duties reasonably permit them to be seated. This is what the DLSE states in its amicus brief (Dkt. No. 238 at 4). Where an employer denies seating simply out of cheapness to avoid the cost of chairs, such a rationale would be unreasonable, but where an employer requires its employee to stand for good customer service and relations (with appropriate rest breaks), then this should be permitted so long as the rationale is genuine and grounded in reason.

67.    In this case, Kmart has proven — and this order so finds — that it has a genuine customer-service rationale for requiring its cashiers to stand. When customers are in a long line,

United States District Court

For the Northern District of California

they too are standing.  They are waiting.  Their attention is focused on the progress of the line and particularly on the cashier, for it is the cashier whose efficiency signals how long the wait will be.  As frustrations mount, the customers may regret that they chose one lane over another. The longer the wait, the more likely customers will become irritated and, next time, will try a competitor's store.  Kmart has every right to be concerned with the efficiency — and the appearance of efficiency — of its checkout service.

68.    To supply efficiency — and the appearance of efficiency — Kmart requires its cashiers to stand (as do all the other big box competitors).  Even plaintiff's seating expert admitted in the Walmart context that, from a customer-relations viewpoint, it is better for cashiers to stand than to be seated (TX 378 at 1).  There *is* a reasonable connection between this requirement and Kmart's legitimate policy to supply efficient service and the appearance of efficient service.  When checkout lanes are busy, the cashiers work like whirling dervishes. This can be seen on the video images in evidence (TX 218).  Kmart cashiers reach right, they reach left, they twist, heels lift off the mat as they reach, they scoot through the pass-through, they return to the register, they dispense coupons, they assist the customer with the pin pad, and they load the carts.  This choreography can be more efficiently done while standing than while seated.  And, of perhaps more importance, it appears more efficient and customer-friendly to the patrons waiting their turn.

69.    If, by contrast, the cashier were fully seated with their thighs under the counter as proposed by class counsel, it would project less of a ready-to-assist attitude.  Each time the cashier were to rise or sit, the adjustment exercise itself would telegraph a message to those in line, namely a message that the convenience of the store and its employees comes first. For example, the extra time of rising to check a shopping cart in the customer lane and then returning, perhaps adjusting the seat or stool in the process and then re-aligning their thighs under the counter, would grate on those waiting in line or so Kmart could reasonably conclude. Without the pass-through this would be exacerbated.  In order to avoid inconveniencing a seated cashier, moreover, customers might themselves feel obliged to move larger and bulkier merchandise along the counter, a task Kmart wants its cashiers to do in the interest of good

1    customer service.  The cashier is the last representative encountered by customers as they leave

2    the store.  Kmart wants to leave the best possible pro-customer impression, the market being

3    competitive, in order to reap the benefit of repeat business.

4           70.     This order finds and concludes that it is reasonable for Kmart to require its

5    cashiers to stand while processing customers out the door so as to maximize the efficiency of the

6    process and to project to its customers an attitude of efficiency and readiness to assist customers.

7           71.     This rationale, however, would not justify requiring a cashier to stand at a stall

8    when the customer lane is empty.  For example, on a slow day, when the lane is empty and the

9    bins are empty, the candy racks are already straightened, and the cashier has run out of

10   immediate tasks, there would be little point in requiring cashiers to stand (as opposed to resting

11   on a lean-stool) while waiting for a customer to arrive.  Both sides agree, however, that this

12   rarely occurs (*see* Dkt. No. 245).

13          72.     This rationale might (or might not) be compatible with the judicious use of

14   lean-stools.  Possibly, cashiers could use lean-stools while processing a routine customer with

15   only light-weight merchandise in circumstances where there was no one else in line and there

16   was less need to project speed and efficiency, at least so long as the cashier stood for tasks like

17   using the pass-through to check the bottom of the basket.  The trial record did not develop this

18   aspect, namely the extent to which lean stools would be compatible with a "ready-to-assist"

19   perception.  If and when we litigate the next store, counsel are invited to present more thorough

20   evidence on this issue.

                                     **CONCLUSION**

22          As for the Tulare store, this litigation is over and ready for appeal.  As for the Tulare

23   class certified, there is no just reason to delay until the other stores are possibly litigated.  A Rule

24   54(b) judgment will be entered and we may all benefit from the views of the court of appeals.

25          As for all other Kmart stores in California, counsel could not agree as to whether the

26   result in this trial should not control (Kmart counsel particularly refused to agree), so we must

27   proceed to consider certification of classes covering one or more other stores in California and

28   then to try those cases.  One obstacle to further certification will possibly be that the only named

plaintiff has now had her case resolved.  Arguably, she should not be a representative on behalf of cashiers at other stores.  Assuming this could somehow be overcome, at follow-on trial(s), both sides are invited to present more complete evidence on a lean-stool alternative as described above (or variations thereon), in addition to any other evidence counsel wishes to present. New expert reports may also be presented.  A case management conference will be held on **JANUARY 10, 2013, AT 3:00 P.M.** to set a schedule and to address the extent to which discovery will be re-opened.  Please do not ask to stay this case pending appeal.  Useful work can be done before the next trial even if the trial itself turns out to be after the decision by the court of appeals on the Tulare store.

**IT IS SO ORDERED.**

Dated:  December 18, 2012.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE